UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                          Case No. 11-cr-20468

                    Plaintiff,           Hon. Arthur Tarnow

        vs.

BABUBHAI PATEL, R.Ph, et. al.,

                    Defendants.
_____/


TRANSCRIPT OF MOTIONS HEARING

BEFORE THE HONORABLE ARTHUR J. TARNOW
UNITED STATES DISTRICT COURT SENIOR JUDGE
Detroit, Michigan
Monday, March 12, 2012


APPEARANCES:

FOR GOVERNMENT:        JOHN K. NEAL, ESQ.
                       WAYNE F. PRATT, ESQ.

FOR DEFENDANT          JOSEPH A. NISKAR, ESQ.
B. PATEL:              HAROLD FRIED, ESQ.
                       Fried, Saperstein, Abbatt PC

FOR DEFENDANT          EDWARD C.WISHNOW, ESQ.
SHARMA:

FOR DEFENDANT          N.C. DEDAY LaRENE, ESQ.
RAWAL:                 LaRene & Kriger

FOR DEFENDANT          FRANK J. SIMMONS, II, ESQ.
THAKER:

FOR DEFENDANT          JOAN ELLERBUSCH MORGAN, ESQ.
M. PATEL:

                       *      *      *

OFFICIAL COURT REPORTER:
Denise A. Mosby, CSR, RMR, CRR
313) 961-6230      www.transcriptorders.com

US v Patel, et. al. #11-cr-20468

```
APPEARANCES CONTINUED:


FOR DEFENDANT          HAROLD Z. GUREWITZ, ESQ.
TAYAL:                 Gurewitz & Raben

FOR DEFENDANT          DORAID B. ELDER, ESQ.
RAVAL:

FOR DEFENDANT          MARK J. KRIGER, ESQ.
SACHDEVA:              LaRene & Kriger

FOR DEFENDANT          JAMES L. FEINBERG, ESQ.
R. PATEL:

FOR DEFENDANT          EDWARD BAJOKA, ESQ.
TRAN:

FOR DEFENDANT          RICHARD D. KORN, ESQ.
VAID:

FOR DEFENDANT          JAMES W. BURDICK, ESQ.
ACHARYA:               Burdick Law, PC
```

```
 1                                    Detroit, Michigan

 2                                    Monday, March 12, 2012

 3                                    2:20 p.m.

 4                             —      —      —

 5                 THE COURT:  You may be seated.

 6                 CASE MANAGER LANG:  Now calling United States

 7    versus Patel.

 8                 MR. NEAL:  Good afternoon, Your Honor.  John

 9    Neal and Wayne Pratt, appearing on behalf of the United

10    States.

11                 MR. NISKAR:  Good afternoon, Your Honor.  Joseph

12    Niskar and Harold Fried, on behalf of Defendant No. 1,

13    Babubhai Patel.

14                 MR. GUREWITZ:  Good afternoon.  Harold Gurewitz,

15    on behalf of Defendant No. 12, Lokesh Tayal.

16                 THE COURT:  How about let's doing Defendant No.

17    2 next?  A little compulsive that I am.

18                 Does anyone have Defendant No. 2?

19                 Have you introduced yourself, Mr. Feinberg, to

20    your client?

21                 MR. FEINBERG:  James L. Feinberg, attorney for

22    Ramesh Patel, who is Defendant No. 18.

23                 THE COURT:  How about -- anyone want to look at

24    the charging document and see who Defendant No. 2 is.

25                 MR. NEAL:  Your Honor, Defendant No. 2 is Paul
```

1    Petre, and he has pled guilty in this case.

2              THE COURT:  All right.  And what about No. 3?

3              MR. NEAL:  Defendant No. 3 is Dineshkumar Patel.

4    He is scheduled to plead guilty tomorrow in this case.

5              THE COURT:  Okay.  You can just say they are not

6    here.

7              MR. NEAL:  Very well.

8              Defendant No. 4 is Anish Bhavsar.  His attorney

9    is not here.

10             Defendant No. 5 is Ashwini Sharma.

11             MR. WISHNOW:  Edward Wishnow for Defendant 5,

12   Ashwini Sharma.

13             MR. LaRENE:  DeDay LaRene for Defendant 6,

14   Brijesh Rawal.

15             THE COURT:  Spell the last name, please.

16             MR. LaRENE:  R-A-W-A-L, Rawal.

17             THE COURT:  Thank you very much.

18             MR. NEAL:  Defendant No. 7 is Pinakeen Patel,

19   and his counsel is not present.

20             Defendant No. 8 is Kartik Shah, and his counsel

21   is not present.

22             Defendant No. 9 is Viral Thaker.

23             MR. SIMMONS:  Frank Simmons, on behalf of Viral

24   Thaker.

25             THE COURT:  Okay.

```
 1                  MR. NEAL:  Defendant No. 10 is Hiren Patel.  His
 2    counsel is not present.
 3                  Defendant No. 11 is Miteshkumar Patel.
 4                  MS. MORGAN:  I'm Joan Ellerbusch Morgan for
 5    Mr. Patel.  Thank you.
 6                  THE COURT:  Thank you.
 7                  MR. NEAL:  Defendant No. 12 is Lokesh Tayal.
 8    Mr. Gurewitz has entered an appearance for Mr. Tayal.
 9                  Defendant No. 13 --
10                  THE COURT:  Wait a minute.  Mr. Gurewitz wants
11    to...
12                  MR. GUREWITZ:  Your Honor, I'm --
13                  THE COURT:  You're sitting there patiently.
14                  MR. GUREWITZ:  -- up again.
15                  THE COURT:  Pardon?
16                  MR. GUREWITZ:  I already announced my presence,
17    but I will do it again.
18                  Harold Gurewitz, on behalf of Defendant No. 12,
19    Lokesh Tayal.
20                  THE COURT:  Thank you.
21                  MR. NEAL:  Defendant No. 13 is Narendera
22    Cheraku.  His attorney is not present.
23                  Defendant No. 14 is Chetan Gujarathi.  His
24    attorney is not present.
25                  Defendant No. 15 is Arpitkumar Patel.  His
```

1    attorney is not present.

2                Defendant No. 16 is Sumanray Raval.

3                MR. ELDER:  Doraid Elder, appearing on behalf of

4    Sumanray Raval.

5                MR. KRIGER:  Mark Kriger, Your Honor, on behalf

6    of Harpreet Sachdeva, Defendant No. 17.

7                MR. FEINBERG:  James L. Feinberg --

8                THE COURT:  Wait, wait, wait.  Does this look

9    like a shorthand pen?

10               MR. FEINBERG:  I can't see that far, Judge.

11               THE COURT:  All right.  Let's go back to No. 15.

12               MR. NEAL:  Defendant No. 15 is Arpitkumar Patel,

13   and his attorney is not present.

14               THE COURT:  Okay.  And then 16?

15               MR. NEAL:  Defendant No. 16 is Sumanray Raval.

16               MR. ELDER:  Doraid Elder, appearing on behalf of

17   Mr. Raval, Your Honor.

18               THE COURT:  All right.  Welcome.

19               17?

20               MR. NEAL:  17 is Harpreet Sachdeva.

21               MR. KRIGER:  Again, Your Honor, Mark Kriger, on

22   behalf of Mr. Sachdeva.

23                    *(Mr. LaRene is standing.)*

24               THE COURT:  Do you have another Defendant in

25   this race, Mr. LaRene?

1          MR. LaRENE:  Not other than mine.

2          THE COURT:  Oh.

3          MR. NEAL:  Defendant No. 18 is --

4          THE COURT:  Excuse me.

5          Mr. LaRene, we do have chairs with seat belts

6  if...

7          MR. LaRENE:  I see that you have put my easel up

8  for me.  Yes, thank you, sir.  I appreciate it.

9          THE COURT:  Yes.  Just so I can block my view of

10  you.

11          Go on.  Who is No. 18?

12          MR. FEINBERG:  James L. Feinberg, attorney for

13  Ramesh Patel.

14          THE COURT:  Taking control.  I saw that class

15  too, Mr. Feinberg.

16          Go on, Mr. Neal.

17          MR. NEAL:  Defendant No. 19 is Rana Naeem.  His

18  attorney is not present.

19          Defendant No. 20 is Anmy Tran.

20          MR. BAJOKA:  Good afternoon, Your Honor.  Edward

21  Bajoka, on behalf of Defendant Tran.  I am standing in for

22  David Steingold.

23          THE COURT:  Excuse me?  Does Mr. Steingold

24  intend to stay in the case?

25          MR. BAJOKA:  I believe so, Your Honor.

| | |
|---|---|
| 1 | THE COURT:  Does he have any motions pending? |
| 2 | MR. BAJOKA:  Not that I know of, Your Honor. |
| 3 | THE COURT:  He didn't join in in all of the |
| 4 | other motions? |
| 5 | MR. BAJOKA:  He didn't join in in any of the |
| 6 | motions being argued today, Your Honor. |
| 7 | THE COURT:  He didn't feel it was important |
| 8 | enough in a felony case to be here, as they say to me, with |
| 9 | all due respect? |
| 10 | MR. BAJOKA:  Your Honor, I can't speak for |
| 11 | Mr. Steingold, but I know that he had another important -- |
| 12 | THE COURT:  I don't need to know where he is, |
| 13 | but tell me your name again. |
| 14 | MR. BAJOKA:  Edward Bajoka, B-A-J-O-K-A, Your |
| 15 | Honor. |
| 16 | THE COURT:  And you're the famous criminal |
| 17 | defense lawyer that I have never heard of? |
| 18 | MR. BAJOKA:  Very well known, Your Honor. |
| 19 | THE COURT:  Okay.  Around the office I bet. |
| 20 | Go on, Mr. Neal. |
| 21 | MR. NEAL:  Defendant No. 21 is Mark Greenbain, |
| 22 | and his attorney is not present. |
| 23 | THE COURT:  Should he be? |
| 24 | I mean you looked around.  Has his case been |
| 25 | resolved or not? |

US v Patel, et. al. #11-cr-20468

1          MR. NEAL:  His case has not been resolved.  I

2  don't believe he has any motions pending.

3          THE COURT:  Okay.

4          MR. NEAL:  Defendant No. 22 is Mustak Vaid.

5          MR. KORN:  Good afternoon, Your Honor.  Richard

6  Korn, appearing on behalf of Dr. Vaid.

7          THE COURT:  Thank you.

8          MR. NEAL:  Defendant No. 23 is Sanyani Edwards,

9  and his attorney is not present.

10          THE COURT:  Should he be?

11          MR. NEAL:  Yes, Your Honor.  He has motions

12  pending.

13          THE COURT:  Who is his attorney?

14          MR. NEAL:  Shawn Smith.

15          THE COURT:  Anyone know Shawn Smith?

16          MR. NISKAR:  Would you like me to try calling

17  him?

18          THE COURT:  No.

19          MR. NISKAR:  I know him.

20          THE COURT:  That would place you outside of the

21  room while you should be inside of the room.

22          We'll have our case manager make that phone

23  call.

24          Go on.

25          MR. NEAL:  Defendant No. 24 is Komal Acharya.

1          MR. BURDICK:  James Burdick, on behalf of Komal

2    Acharya, who is seated behind me.

3          THE COURT:  Okay.  Go on.

4          MR. NEAL:  Defendant No. 25 is Leodis Elliott,

5    and his attorney is not present.

6          THE COURT:  Should he be?

7          MR. NEAL:  He does not have any motions pending,

8    but his case has not been resolved.

9          THE COURT:  Okay.

10         MR. NEAL:  Defendant No. 26 is LaVar Carter, and

11   his attorney is not present.

12         THE COURT:  Should he be?

13         MR. NEAL:  No.

14         THE COURT:  Is there anyone else -- I didn't ask

15   this with all of the ones who were not here.

16         Is there anyone else, Mr. Neal, that you believe

17   should be here, attorneys?

18         MR. NEAL:  Not that the Government believes

19   should be here, Your Honor.

20         THE COURT:  Okay.  Any of the Defense attorneys

21   know of any anyone else who should be here?

22         Okay.  How do you folks want to proceed?

23         MR. NEAL:  Your Honor...

24         THE COURT:  Then having not carried your burden,

25   I think the motions are all denied.

US v Patel, et. al. #11-cr-20468

1          Is that what you were going to say, Mr. Neal?

2          MR. NEAL:  Indeed, Your Honor.  And I think that

3     was very astute of you to point that out.

4          Assuming there is going to be --

5          THE COURT:  That might be the last opportunity

6     you have to agree with me, but ...

7          MR. NEAL:  Indeed, Your Honor.

8          Your Honor, the --

9          THE COURT:  You even agreed with that.

10         MR. NEAL:  Your Honor, the motion that's pending

11    that has the most -- in which I think the most Defendants have

12    joined is the motion concerning suppression of the fruits of

13    the wiretap.

14         THE COURT:  Okay.  Let's do that last or towards

15    the end, because that is, as they say, highly technical.

16    Let's do the easy ones first.

17         Motion to file -- motion for leave to file

18    motion for bill of particulars.

19         Mr. Cheraku, whose attorney is?

20         MR. NEAL:  Mr. Grady from Ohio, Terrence Grady.

21         THE COURT:  And he is not here?

22         MR. NEAL:  He is not present.

23         THE COURT:  Well, he should be here.

24         MR. NEAL:  Your Honor, my understanding is that

25    he had communication with the Court today and was excused from

US v Patel, et. al. #11-cr-20468

```
 1   attendance.

 2                   THE COURT:  Do you know anything about that?

 3                   (Off the record.)

 4                   THE COURT:  Oh, he is relying on the briefs.

 5                   Anyone else join in this motion?  I see a hand.

 6                   MR. BURDICK:  I am joining in one of the

 7   motions, the motion to sever.  I don't know what you would

 8   call it.

 9                   THE COURT:  I am calling the motion for bill of

10   particulars -- for permission to file a bill of particulars.

11                   Did you join in that?

12                   MR. ELDER:  Judge, I also filed one myself, yes.

13                   THE COURT:  Why don't you come to the podium and

14   identify yourself.

15                   I should tell you early that I do have a

16   photographic memory, but it just never developed.

17                   MR. ELDER:  Doraid Elder, appearing on behalf of

18   Ms. Raval.

19                   THE COURT:  Okay.  Now, you filed a motion for

20   bill of particulars or leave to file?

21                   MR. ELDER:  Leave to file, Your Honor.

22                   THE COURT:  Okay.  What information do you need

23   that the Government hasn't provided yet?

24                   MR. ELDER:  Your Honor, the Government has not

25   provided any dates or any exact offenses that we can rely on
```

1    in terms of forming a defense for Mr. Raval.  Your Honor, they

2    were extremely vague in terms of Mr. Raval's involvement.  He

3    has been charged in two different counts.

4              Your Honor, the information that they have is

5    that Mr. Raval assisted or concealed certain information or

6    that he assisted the main parties in this, Your Honor.  And

7    there's nothing that the Government can point us to that would

8    allow us to find out exactly how to form a defense based on

9    the indictment.

10             Your Honor, there are no dates, and that all of

11   the terms that they use are vague, and they are broadly used

12   against multiple Defendants, not just my Defendant alone.

13             THE COURT:  Response?

14             MR. NEAL:  Yes, Your Honor.

15             Bill of particulars are seldom employed in

16   federal practice, and one of the reasons for that is that full

17   discovery obviates the need for a bill of particulars.

18             In this case, the Government has made full

19   discovery available to Mr. Raval, along with the other

20   Defendants.

21             Full discovery includes the transcripts, as well

22   as the audio, of all of the intercepted calls between

23   Mr. Raval and Mr. Babubhai Patel, the lead Defendant in this

24   case.  The Government has made available the fruits of the

25   search warrant that was executed at the pharmacy where

US v Patel, et. al. #11-cr-20468

1    Mr. Raval worked in this case.  He, therefore, has access to

2    all of the prescriptions, all of the documents.  Mr. Raval has

3    been provided with witness statements that are pertinent to

4    his culpability in this case.

5                 So, in sum, Your Honor, the Government has

6    provided Mr. Raval with more than sufficient information to

7    understand the schemes that are charged and his particularized

8    role in those schemes; and, therefore, his motion for a bill

9    of particulars should be denied.

10                THE COURT:  Your response?

11                MR. ELDER:  Your Honor, we have asked the

12   Government if they could be kind enough to point us to what

13   parts of the discovery we can focus on, Your Honor, because as

14   of today -- I've gone through most of the discovery -- there's

15   not much that we can point to anything concrete that would

16   assist us in putting our thumb on exactly what the Government

17   is going to rely on in terms of proving Mr. Raval's assistance

18   in the conspiracy.

19                THE COURT:  Your response?

20                MR. NEAL:  Your Honor, I'm glad to sit down with

21   Mr. Elder and walk through the specific communications the

22   Government contends are incriminating and that suggest his

23   culpability.  I'm glad to sit down with Mr. Elder, or any of

24   the other defense attorneys in this case, and point them to

25   the specific documents, witness statements, et cetera that --

1          THE COURT:  The motion will be denied without

2     prejudice to you being able to bring it back after you have

3     sat down with the Government.

4          MR. ELDER:  Thank you, Your Honor.

5          THE COURT:  He has offered to do that.

6          And the same for Motion 309, which is the one

7     that is being decided on the pleadings.

8          I assume your answer is the same, is you filed

9     and you just said?

10         MR. NEAL:  That's correct, Your Honor.

11         THE COURT:  Okay.

12         MR. ELDER:  Your Honor, I also have a motion to

13    sever, Your Honor.

14         THE COURT:  Okay.  We'll get to that.

15         MR. ELDER:  Thank you.

16         THE COURT:  There's all these other guys who

17    want to talk too.

18         Okay.  Motion for disclosure of progress

19    reports, No. 317, Defendant Nos. 1, Mr. Babubhai Patel, Komal

20    Acharya, Ramesh Patel, Brijesh Rawal, Ashwini Sharma and

21    Lokesh Tayal.

22         Who is going to speak first?

23         MR. LaRENE:  I'm happy to do that, Judge.  DeDay

24    LaRene for Mr. Rawal.

25         Basically we had asked that the Court require

1     the Government to furnish the periodic reports that are --

2     that were submitted to the supervising judges as the seven

3     wiretap applications were -- excuse me -- the wiretap orders

4     were executed.

5               The Government responded -- and correctly --

6     that there is no specific requirement that these documents --

7     documents of this sort be furnished.

8               We believe it is very clearly within the scope

9     of this Court's discretion to determine whether it would be

10    relevant and helpful to the defense to order these documents

11    furnished.

12              In the course of litigating the motion to

13    suppress the wiretap, one fact emerged that I think sort of

14    militates towards -- even further towards the grant of this

15    motion and the exercise of this Court's discretion to require

16    disclosure.  And, that is, we had pointed out in the original

17    submission, the Title III motion, that the -- at least the

18    first period of interception was conducted by civilian -- that

19    is, non-agent -- monitors and that the judge who authorized

20    the first period of electronic surveillance had not been

21    apprised of the fact that it was the intention of the -- of

22    the investigators to use these unsworn civilian monitors.

23              The Government responded that the supervising

24    judge had been advised in the course of the first 10-day

25    report that civilian monitors were being employed.

US v Patel, et. al. #11-cr-20468

1          And obviously I have no reason to doubt the

2     truthfulness or accuracy of that representation, but it would

3     be helpful and it seems to me material to the resolution of

4     the issues involved in the Title III motion about the

5     participation of the unsworn civilian monitors to know

6     precisely what the supervising judge was told about their

7     participation and, perhaps more significantly, about their

8     supervision.

9          Section 2518(5) specifically requires that if

10    non-sworn monitors are to be employed, they are to be under

11    the supervision of the agents.

12         In this case, each of the affidavits -- excuse

13    me -- each of the orders specifically authorized DEA agents to

14    execute them, to conduct the monitoring.

15         It would be I think significant to the question

16    of the Government's compliance with the directives of those

17    orders to determine what they told the supervising judge, what

18    the judge knew about the mechanics of the execution of the

19    orders.

20         And it appears, from the Government's response

21    to our Title III motion, that information of that sort upon

22    which the Government relies in defending against the motion,

23    which we say -- in which we say that suppression ought to be

24    ordered because of the failure of the Government to advise the

25    Court in the first instance that these civilian monitors would

US v Patel, et. al. #11-cr-20468

1    be participating, the Government relies, in defending against

2    that argument, on these 10-day reports, but won't disclose the

3    reports.

4              So I would think, if nothing else, that

5    circumstance should move the Court to exercise what I think is

6    unquestioned discretion to require the disclosure of these

7    documents.

8              THE COURT:  Mr. Neal?

9              MR. NEAL:  Your Honor, Mr. LaRene points out a

10   relevant fact upfront.  There is no requirement that the

11   reports be disclosed pursuant to Rule 16.  So, the question

12   becomes whether or not the Court should order them disclosed

13   in its discretion because of the fact that they may be

14   relevant to a motion to suppress.

15             I think in this case a motion to suppress has

16   been filed by Mr. LaRene, and a number of the Defendants have

17   joined in that motion to suppress the fruits of the wiretap.

18             The operative documents for the purpose of

19   resolving a motion to suppress are really the affidavit, the

20   application and order and the documents that are submitted in

21   order to apprise the courts of the probable cause necessary to

22   justify a monitoring period.

23             In this case, Mr. LaRene notes that in at least

24   one instance the Government was able to respond through

25   reference to a periodic report in making the arguments that

1    the Court was apprised of the existence of civilian monitors.

2    That's one report that we are talking about.  We are not

3    talking about --

4                    THE COURT:  Has that been provided?

5                    MR. NEAL:  We have not provided that, although

6    we did reference it in our response to the motion to suppress

7    the fruits of the wiretap.

8                    THE COURT:  Well, you certainly opened the door

9    for that one.

10                   MR. NEAL:  Perhaps, Your Honor.  But that's one

11   report out of a total of 24 reports.  I don't think ...

12                   THE COURT:  I heard him ask for seven.  Am I

13   mishearing?

14                   MR. LaRENE:  No, sir.  The number -- I think

15   Mr. Neal is correct in the number.

16                   These are reports that would have been provided

17   or were supposed to be provided every 10 days during the seven

18   periods of interception.  There were seven --

19                   THE COURT:  Okay.  I know I heard seven.

20                   MR. LaRENE:  It would be in the twenties, yes,

21   sir.

22                   THE COURT:  Okay.  So, why do you need the other

23   reports?  Have you referred to any of the other reports?

24                   MR. LaRENE:  Judge --

25                   THE COURT:  It sounds like you need the first

US v Patel, et. al. #11-cr-20468

1    report to see if the judge ...

2                    MR. LaRENE:  I believe that the other reports --

3    one of the two -- well, one of -- one of the two and a half

4    issues that we raise in the Title III motion is minimization.

5                    One of the -- one of the aspects -- one of the

6    factual --

7                    THE COURT:  Is minimization a grounds for

8    suppression?

9                    MR. LaRENE:  Yes, sir.

10                   THE COURT:  Okay.

11                   MR. LaRENE:  And one of the things that the

12   courts are directed to look at in examining minimization

13   claims is the extent of judicial supervision.

14                   A judge supervises a wiretap -- the execution of

15   a wiretap order in significant part through the review of

16   these 10-day reports.

17                   So, I think that -- I can't point to a specific

18   fact or allegation or claim or statement that is made in a

19   report that I haven't seen, but my experience suggests to me

20   that there very well may be matters of fact or factual

21   assertion in the periodic reports that would be relevant to

22   the question of the degree and nature of the judicial

23   supervision or the supervision which was allowed -- I'm

24   sorry -- which was facilitated by these reports.

25                   So, I think that there is at least potential

1    arguable significance even in the reports, the contents of

2    which the Government has not spoken to.

3              THE COURT:  Mr. Neal.

4              MR. NEAL:  Your Honor, setting aside the

5    question of whether minimization is an appropriate basis for

6    suppression of the fruits of an electronic surveillance -- we

7    can address that at the time we address the broader motion --

8    the fact is the relevant documents for a minimization inquiry

9    are the line sheets, the transcripts and the audio of the

10   relevant calls.

11             Mr. LaRene has filed a motion based on those

12   documents.  There's no need to go into communications between

13   the Government attorneys and the courts with respect to

14   updating the court on the status of the wire in order to make

15   a fulsome motion to suppress based on alleged minimization

16   problems.

17             MR. LaRENE:  If, for example, either

18   intentionally or through some circumstance peculiar to the

19   monitoring equipment and/or software, the level of

20   minimization was misreported to the supervising judge over the

21   course of the execution of the court's orders, that would be a

22   circumstance -- perhaps not a conclusive circumstance, but a

23   significant and relevant circumstance to the question of

24   judicial supervision, which is a part of the minimization

25   inquiry.

```
 1                    THE COURT:  Have you ever seen any of these
 2     reports in any case, not just in this case?
 3                    MR. LaRENE:  Traditionally, we always got the
 4     10-day reports.  The Government's resistance to disclosing
 5     them is relatively new to me.
 6                    THE COURT:  Mr. Pratt?
 7                    MR. PRATT:  In my experience, Your Honor, I
 8     think that is one of those things that varies by Assistant
 9     U.S. Attorney.
10                    I would say that I have never given them out in
11     any of my cases, and I've done a fair number of wire tap cases
12     over the years.  But other people, I'm aware, have a different
13     practice.
14                    MR. LaRENE:  Most of my wire tap experience in
15     the early days was with the Strike Force, and it was the
16     practice of the Strike Force --
17                    THE COURT:  Yeah, where are they now?
18                    MR. LaRENE:  The Strike Force?  I have all of
19     the reports now, Judge, if you would like to see them.
20                    THE COURT:  Where is the Strike Force.
21                    MR. LaRENE:  Yes.  The Strike Force, a loving
22     memory, yes.
23                    In any event, I think Mr. Pratt is right; it's a
24     matter of individual practice.
25                    And I should say, although it's certainly not of
```

US v Patel, et. al. #11-cr-20468

1  precedential significance, there have been cases, although not
2  in recent years, when the assistant who was handling the case
3  resisted furnishing 10-day reports and --
4           THE COURT:  How many pages are these reports,
5  Mr. Neal?
6           MR. NEAL:  Your Honor, the reports average 10
7  pages or so, and there are three of them per monitoring
8  period.  So, we are talking about approximately 210 --
9  somewhere between 200 and 230 pages.
10         THE COURT:  Okay.
11         MR. LaRENE:  You know, Judge --
12         THE COURT:  How many Defense attorneys want
13  this?
14         (Hands raised.)
15         THE COURT:  Did you join in the motion?
16         Raise your hands if you joined in the motion.
17         (Hands raised.)
18         THE COURT:  That's your head, Mr. Burdick.
19         MR. BURDICK:  Now, I'm going to move over here.
20         THE COURT:  Okay.  And you can move the easel if
21  you want to.
22         <em>(Brief pause.)</em>
23         THE COURT:  There's some hands still up.  You
24  guys have to leave the room or anything?
25         Okay.  I have no problem with you providing them

1    as long as it's not going to be a basis for asking for an

2    extension of time.

3                    MR. LaRENE:  No, absolutely not, sir.

4                    THE COURT:  You are speaking for everybody?

5                    MR. LaRENE:  I can speak for myself, and I

6    assume everybody agrees with me because I'm obviously right

7    about everything.

8                    MR. NEAL:  Very well, Your Honor.

9                    THE COURT:  Okay.  What's your next motion?

10                    MR. LaRENE:  I'm sorry.  You have a list, Judge?

11                    THE COURT:  I know, but I thought -- you just

12    want to do that motion to suppress, don't you?

13                    MR. LaRENE:  Not really.

14                    THE COURT:  Oh, okay.

15                    The motion to continue motion deadline, who

16    filed that?

17                    No one.  So, that motion is moot.

18                    MR. FEINBERG:  I would like to join, Your Honor.

19    I just got into the case, and I have not had an opportunity --

20                    THE COURT:  Yes, you have.  You have had an

21    opportunity to look at the file.

22                    MR. FEINBERG:  Yes, Your Honor.

23                    THE COURT:  You had an opportunity to file that

24    one paragraph saying I join in this motion or not in that

25    motion.  You may not have taken the opportunity.

1          MR. FEINBERG:  Those were joined by my

2  predecessor.

3          I would like to have the opportunity to file --

4          THE COURT:  Well, who filed the motion in the

5  first place?  Whose motion did your predecessor join?

6          Because there seems to be an absence of any

7  reaction from any of your co-counsel.  I mean, there's nobody

8  here that's taking credit for it.  And I can go back and look

9  at the ...

10          *(Off the record.)*

11          THE COURT:  Who is your client, Mr. Feinberg?

12          MR. FEINBERG:  Ramesh Patel.

13          THE COURT:  Who is representing Mr. Raval?

14          MR. LaRENE:  Your Honor, for what it's worth,

15  Mr. Patel was previously represented by Chris Andreoff.

16          MR. FEINBERG:  Correct.

17          MR. LaRENE:  We had just a group of lawyers, old

18  guys, who had been cooperating together with motion practice

19  and such from the beginning, and Mr. Andreoff was part of that

20  group.  So, the Title III motion was filed in his name as

21  well, but I --

22          THE COURT:  This is a motion to continue motion

23  deadline, and our records show Mr. Elder filed it.

24          MR. ELDER:  Judge, that's ...

25          THE COURT:  That's not an accurate record?

US v Patel, et. al. #11-cr-20468

1              MR. ELDER:  No, Judge.

2              THE COURT:  Then we will go to the next one.

3              MR. KRIGER:  On that theme, the last time we

4    were here Mr. Pratt and Mr. Neal said, because I got into the

5    case late, that they would give me some extra time as long as

6    it was a substantive motion.  And I am still working on one

7    motion, but I don't have an answer yet.  So, as soon as I

8    do --

9              THE COURT:  What do you mean, you don't have an

10   answer yet?  Are you going to answer your own motion?

11             MR. KRIGER:  No.  The question was whether one

12   of the Co-Defendants might be willing to testify on my

13   client's behalf in a separate trial.  And I don't have an

14   answer to that question yet.  So --

15             THE COURT:  Well, go out of the room and ask 'em

16   now.

17             MR. KRIGER:  Well, that --

18             THE COURT:  You don't have to look at who it is.

19             MR. KRIGER:  That client is not here yet.  He's

20   not here, Your Honor, that Defendant.

21             His lawyer is here, but the lawyer doesn't have

22   an answer for me yet.  I spoke to the lawyer today about it.

23             So, that is the only motion I thought I might

24   file to --

25             THE COURT:  Your telephone works, right?

1          MR. BURDICK:  Not in that direction, Your Honor.

2          MR. KRIGER:  Not in that direction, exactly.

3          THE COURT:  Okay.  I mean, you could have called

4    the attorney yesterday or the day before and -- it's amazing

5    how everything gets done in court.

6          MR. KRIGER:  I did.  I did call the lawyer.

7          THE COURT:  That's wonderful.

8          All right.  And what was that relevant to,

9    Mr. Kriger?  Are you asking for more time to ...

10         MR. KRIGER:  Just for that one motion.  But

11   they've agreed to give me I think it was 30 days from the date

12   we were here last time, which is February sometime, Your

13   Honor.  I mean, I can file a stip. and order.

14         THE COURT:  So, you don't need me to do

15   anything.

16         Now, Mr. Feinberg, you have ...

17         MR. FEINBERG:  I would just like an additional

18   30 days, Your Honor.

19         THE COURT:  From when?  From when you got in?

20         MR. FEINBERG:  From today.

21         THE COURT:  Wait.  Are you in the first group or

22   the second group?

23         MR. FEINBERG:  Second.

24         THE COURT:  Any objection, Mr. Neal?

25         MR. NEAL:  Your Honor, there's a slight

1   complexity with respect to Ramesh Patel.  Depending on what

2   motions he files.

3                Right now we've got Mr. Patel slated to go in

4   the second group because of a Bruton-Crawford issue.

5                THE COURT:  Yes.

6                MR. NEAL:  If he files a motion to suppress his

7   post-arrest statement, it would make more sense to try him in

8   the first group if that statement is in, fact, suppressed.

9   So, I --

10               THE COURT:  That's not a veil threat, is it?

11  It's a pretty bold threat.

12               MR. NEAL:  It's not at all a threat.  It's just

13  a reality in terms of the presentment of the proofs and --

14               THE COURT:  But he can still be tried in the

15  second -- when is the first trial?

16               MR. NEAL:  The first trial is June the 4th, Your

17  Honor.

18               THE COURT:  Well, if he gets 30 days, that will

19  be decided before then.

20               MR. NEAL:  Very well, Your Honor.

21               MR. FEINBERG:  Thank you, Judge.

22               THE COURT:  How much time do you want to

23  respond?  Two or three minutes?

24               MR. NEAL:  Ten days is fine.

25               THE COURT:  Okay.  So, 30 days would be April

US v Patel, et. al. #11-cr-20468

1    12th, and -- let me get my calender.

2              Okay.  April 12th.  And then ten days would be

3    April 23rd, which is a Monday.  All right.

4              MR. KRIGER:  Your Honor, I'm sorry.  My 30 days

5    is up on Thursday, I realize.  And I spoke with the lawyer --

6              THE COURT:  How much time did you take to

7    prepare for today, Mr. Kriger?

8              MR. KRIGER:  Not that long.

9              THE COURT:  I can tell.

10             MR. KRIGER:  30 days is up Thursday.  He will

11   not have an opportunity to speak to his client before that.

12             So, if I can get another ten days, I would

13   appreciate it.

14             MR. NEAL:  No objection, Your Honor.

15             THE COURT:  All right.  You've got another 10

16   days.

17             All right.  Mr. Patel, Defendant No. 1, motion

18   for discovery and disclosure of Jencks and Brady.

19             Didn't we decide this already?

20             MR. NISKAR:  Your Honor, Joseph Niskar, on

21   behalf of Mr. Patel.

22             We discussed that at the last pretrial on

23   February 29th.  The Court had indicated, although no order has

24   been entered, that the Government would have to turn over that

25   information three weeks prior to trial.

US v Patel, et. al. #11-cr-20468

```
 1                    THE COURT:  Now that the trial has been
 2   extended, do you want to turn it over a little bit sooner
 3   perhaps?
 4                    MR. NISKAR:  We were asking for -- we were
 5   asking for 60 days prior to trial in our motion.
 6                    THE COURT:  Okay.  Well, I'm asking Mr. Neal a
 7   question.
 8                    MR. NEAL:  Your Honor, I think that three weeks
 9   would be more than sufficient for the Defense to review the
10   statements of the witnesses that will be presented against
11   them and bear appropriate cross-examination.
12                    THE COURT:  Make it four weeks and then we're--
13   I have to believe at this point there is no Brady material
14   that has not been disclosed.
15                    Is that accurate, Mr. Neal?
16                    MR. NEAL:  No Brady material, to our knowledge,
17   has not been disclosed.
18                    THE COURT:  Okay.  So, he's talking about Jencks
19   material.
20                    MR. NISKAR:  That's correct.
21                    But as it relates to Brady material, that goes
22   to our motion, Mr. Patel's motion for a return of certain
23   property that's in the exclusive possession of the government
24   at this time.
25                    THE COURT:  What property and what should be
```

1    returned?

2            MR. NISKAR:  Well, there are numerous, I would

3    say, thousands of pages of business records, financial records

4    that have been seized by the Government during the execution

5    of the search warrants in this case.

6            Although the Government has invited us to come

7    over and look through those boxes, we are asking the Court to

8    order that the Government copy those materials at their

9    expense and provide those to us so that we can review those

10   with our client.

11           It would be impossible for us to go to the U.S.

12   Attorney's office, look through these banker boxes of

13   documents without our client in order to determine which

14   records are relevant to a defense, which records are

15   exculpatory.

16           The Government is not going to be looking

17   through these boxes for exculpatory information.  So, anything

18   that they had seized --

19           THE COURT:  Well, wait a minute.  I would hope

20   that they were looking through all of the boxes for

21   inculpatory and exculpatory.

22           MR. NISKAR:  Well, I think our ...

23           THE COURT:  Mr. Neal?

24           First of all, are there any boxes that you

25   haven't looked through?

US v Patel, et. al. #11-cr-20468

1      MR. NEAL:  Your Honor, there are a very large

2  number of boxes that were obtained in the course of executing

3  search warrants in this case.  We are in the process of going

4  through those boxes and have already identified substantial

5  inculpatory information from those boxes.

6      To date, we have not discovered any exculpatory

7  information in those boxes --

8      THE COURT:  But you are looking for it?

9      MR. NEAL:  Certainly.

10      I mean, to the extent we encounter inculpatory

11  documents, we will absolutely turn that over to the Defense

12  affirmatively and work with them, but we have not discovered

13  any such information to date.

14      THE COURT:  What is your response to them having

15  access to the documents to prepare?

16      MR. NEAL:  Your Honor, we have made all of that

17  material available to the Defense.  They can come over and

18  take a look at it to determine what documents they think are

19  relevant --

20      THE COURT:  Including his client?

21      MR. NEAL:  Your Honor, that would pose certain

22  complications given that his client is incarcerated.

23      THE COURT:  Oh, I knew that.

24      MR. NEAL:  I think perhaps a more efficient

25  model would be for the attorneys to come by, take a look at

US v Patel, et. al. #11-cr-20468

1    the material, and then we can certainly arrange for that

2    material to be shared with Mr. Patel at Milan prison.

3                    THE COURT:  Mr. Niskar?

4                    MR. NISKAR:  We object to that process.

5    There's...

6                    THE COURT:  Have you tried it?

7                    MR. NISKAR:  Yeah.  We have filed several

8    motions --

9                    THE COURT:  No, no, no.

10                   Have you tried the process?  Have you gone over

11   and looked at the documents?  That's a yes or a no.

12                   MR. NISKAR:  No, we haven't.

13                   THE COURT:  But they've been available to you.

14                   MR. NISKAR:  The offer has been made for us to

15   come and look at them, but without our client we are unable

16   to --

17                   THE COURT:  But you don't know that unless you

18   look at them and say I can't read this because of the

19   handwriting or language or whatever.

20                   But that would be a first step, would it not?

21                   MR. NISKAR:  But I don't think that helps,

22   because based upon the volume of discovery, it is

23   impracticable for us to sit at the U.S. Attorney's office for

24   eight hours a day preparing for trial, looking for exculpatory

25   information, looking for witnesses that need to be

1   investigated, need to be --

2              THE COURT:  Well, do you have a witness list?

3              MR. NISKAR:  We have not compiled a final

4   witness list at this time.

5              THE COURT:  Mr. Neal, have you a tentative

6   witness list?

7              MR. NEAL:  We have not compiled a final witness

8   list.  However, as we debrief witnesses and peruse reports of

9   those interviews, we are disclosing them to the Defense.

10             THE COURT:  How many witnesses do you anticipate

11  in this case?

12             MR. NEAL:  In Trial Group 1?  Perhaps 30.

13             THE COURT:  Okay.  I'm puzzled why you don't

14  give it a try and then come back and report I can't do it

15  because, rather than say --

16             And I would suggest -- I have no idea how you

17  are preparing your case, but you might have an associate, an

18  investigator or somebody other than yourself -- under your

19  supervision though -- go through this material.

20             I mean, this is not rocket science.  It may be

21  the opposite of rocket science in terms of interest.  It's

22  tedious and difficult, but --

23             MR. NISKAR:  I just don't see how --

24             THE COURT:  That's one of the advantages of

25  being a lawyer.  You can delegate it to somebody else.

1          MR. NISKAR:  It just causes a lot of other

2    logistical problems in us having to come down to do that.

3          And if those records belong to the Defendant,

4    which they do, then the expense should be borne by the

5    Government --

6          THE COURT:  We haven't even got to the expense

7    question.

8          MR. NISKAR:  Well, I think then the procedure

9    should be that if those records belong to the Defendant, that

10   those records should be copied and should be returned to the

11   Defendant, either copies or originals.

12         THE COURT:  Mr. Neal, how's your budget?

13         MR. PRATT:  Your Honor, as to the point --

14         MR. NISKAR:  We'll take black and white copies.

15         MR. PRATT:  You know, their motion of course

16   indicated that many of those documents don't belong to the

17   Defendant.  There's 30 different pharmacies -- there's 30

18   different premises, and many of those were pharmacy

19   corporations and --

20         THE COURT:  You're not going to come back and

21   try and pierce the veil, are you?

22         MR. PRATT:  I have no idea, but, Your Honor,

23   just to say that everything they've got over at DEA or FBI is

24   his documents, that's not the case.  And so, you know, the

25   universe of documents that are demonstratively his -- if, for

1    example, were taken from -- you know, from his house, for

2    example, that's not going to be documents in boxes and boxes

3    and boxes and boxes.  You know, it's --

4              THE COURT:  How many have you got from his house

5    or his office?

6              MR. PRATT:  I don't know.  But that's nowhere

7    near the volume.

8              But when you talk about going through an entire

9    pharmacy and taking out their records, which can include boxes

10   of prescriptions, boxes of financial records, I think there's

11   a good reason no one has gone through them at least in great

12   detail, because people generally understand what -- certainly

13   the Defense and the Defendants understand what kind of records

14   you get at a pharmacy.  And they haven't seen fit to think

15   that there's all that much there to go through

16   document-by-document.

17             And in many instances the Government, while

18   certainly they know what's there, they haven't gone through

19   them document-by-document either, because there's just certain

20   categories of documents that aren't really going to be all

21   that important to this case.

22             MR. NISKAR:  Well, in the sense that they

23   contain exculpatory or inculpatory information, they are very

24   important.

25             And then there's also a separate aspect to this

1    case, and that is that there's a criminal forfeiture alleged.

2    And those records, as they relate to each and every one of the

3    pharmacies, are highly relevant to the criminal forfeiture.

4                    THE COURT:  Prescriptions of customers?

5                    MR. NISKAR:  Yes.

6                    THE COURT:  Bills of lading from nonnarcotics?

7                    MR. NISKAR:  Yes, absolutely.  They show the

8    legitimacy of the pharmacies and the legitimacy of the

9    businesses.

10                    THE COURT:  Is there any question that the

11    businesses had at least a portion of legitimate activity?

12                    MR. NISKAR:  I can't --

13                    THE COURT:  Is that an issue in the case?

14                    MR. NISKAR:  I think it will be an issue in the

15    case, yes.

16                    THE COURT:  Is the Government claiming that none

17    of the activity of the pharmacy was legitimate or is the

18    Government claiming that there were legitimate portions and

19    criminal portions?

20                    MR. PRATT:  Your Honor, the Government is

21    alleging that there were legitimate and criminal portions, but

22    varying based on premises.  Some, the amount of legitimate

23    would be minuscule and others it might be more substantial.

24                    But you are probably not going to get at that by

25    simply looking at the documents.  You know, the legitimacy of

1    a lot of it is the source of those prescriptions, not simply

2    looking at the prescriptions themselves, and the conversations

3    and the wiretap that discussed how those prescriptions got

4    there.

5                    The fact is, just to say that we have to return

6    to them things that didn't even belong to Babubhai Patel, I

7    don't think there's a basis in Rule 41 for ordering that,

8    particularly when it's all available for their inspection.

9                    THE COURT:  Mr. Niskar?

10                    MR. NISKAR:  I mean, if you would like us to go

11    and give this a shot, we will, and then --

12                    THE COURT:  Well, when you do that, you respond

13    to the Government who is saying that a very small percentage

14    of those many, many documents are relevant to the illegality

15    that was alleged in the indictment.

16                    MR. NISKAR:  I don't think we -- I don't think

17    the Defendant should have to rely on the Government's --

18                    THE COURT:  No, I'm not asking you to rely.  I'm

19    asking you to rely on what you observe when you go over there.

20                    MR. NISKAR:  All right, all right.

21                    THE COURT:  But keeping in mind what you are

22    looking for.

23                    MR. NISKAR:  I will, Your Honor.

24                    THE COURT:  Okay?

25                    MR. NISKAR:  Okay.

1          THE COURT:  Now, other people have joined in

2   your motion?

3          MR. NISKAR:  For the return of property, no.

4   But yes as to the advanced disclosure of Jencks, which you

5   have set four weeks, and the motion of memorandum for witness

6   and exhibit lists that we had already filed asking for those

7   to be disclosed 30 days prior to trial.

8          THE COURT:  Didn't I rule on that at the end of

9   February or at least indicate?

10          MR. NEAL:  Your Honor, you said three weeks,

11   along with the Jencks material.

12          Given that the Jencks material is now due four

13   weeks in advance of trial, the Government has no objection to

14   providing the witness list at that time as well.

15          THE COURT:  Great.  You guys are making my job

16   easy.

17          Anything else, Mr. Niskar?

18          MR. NISKAR:  Yes.

19          Mr. Patel also has a motion today to dismiss the

20   indictment for improper grand and petit jury selection or

21   anticipated problems with the petit jury selection process.

22          THE COURT:  Have you received a copy of the

23   administrative order about jury selection?

24          MR. NISKAR:  I do --

25          THE COURT:  Huh?

1          MR. NISKAR:  Yes, I have a copy.

2          THE COURT:  Okay.  We will come back to that.

3          MR. NISKAR:  Okay.  Other than that one motion,

4    we had joined in some others, but ...

5          THE COURT:  We have talked about discovery of

6    exhibits and witness lists that you've filed, which is 373,

7    and we have decided 372, and return of property is 374.

8          There's a motion to request notice of

9    Government's intent to call expert witness.

10          MR. KRIGER:  Good afternoon, Your Honor.  Mark

11    Kriger, on behalf of Mr. Sachdeva.

12          My predecessor counsel filed a motion to limit

13    the Government's use of expert witness to interpret lingo on

14    the tapes.  I have -- this is a little broader at least as to

15    my client, broader than what actually applies to my client,

16    but --

17          THE COURT:  Excuse me.

18          MR. KRIGER:  My client is not charged in the

19    drug conspiracy.  However, there is some -- upon information

20    and belief, they are going to try to interpret some of the

21    words that my client uses to say they might be bribes or

22    something like that.

23          THE COURT:  Okay.  Hang on a second.

24          The motion that I'm looking at has to do with

25    wanting to know -- you wanting to know if the Government

US v Patel, et. al. #11-cr-20468

1  intends to call expert witnesses related to dispensing and

2  filing of prescriptions.

3              MR. KRIGER:  Oh, no, that's not mine.  That's a

4  different motion then.

5              MR. GUREWITZ:  I believe that's mine, Your

6  Honor.

7              THE COURT:  Okay.  And your client's name is,

8  Mr. Gurewitz?

9              MR. GUREWITZ:  Tayal, No. 12.

10             THE COURT:  Okay.  That's who I thought I called

11 -- whose name I called.

12             Mr. Kriger, if you stand up, you have to listen

13 first.

14             MR. KRIGER:  I didn't hear you call a name, Your

15 Honor.

16             THE COURT:  That's because you were standing up,

17 trying to beat Mr. LaRene.

18             Go on, Mr. Gurewitz.

19             MR. GUREWITZ:  Your Honor, I did file a motion

20 asking for notice of any expert witness pursuant to the rule,

21 which includes a notification of --

22             THE COURT:  Well, let's find out.  Mr. --

23             MR. GUREWITZ:   -- a summary of testimony.

24             And I should add that we have received now

25 notification of one expert to be called by the Government, who

1    is a pharmacist, with a statement of the person's background.

2    I guess it's a CV.  But there is no description yet that

3    satisfies the part of the rule that requires a summary of

4    expected testimony.

5              THE COURT:  Well, the motion, as I have a

6    summary of it, is whether the Government intends to call

7    expert witnesses and their qualifications.  And the CV I think

8    is called satisfying that request.

9              What about a summary of their statement?

10             MR. NEAL:  Your Honor, a summary of the expert's

11   proposed opinions was provided in discovery in this case.  We

12   can discuss that offline if you'd like.

13             THE COURT:  Okay.  So, this motion is now moot.

14             MR. GUREWITZ:  I think so.

15             THE COURT:  Okay.  Thank you.

16             While you are up here, you have a motion for a

17   continuance?

18             MR. GUREWITZ:  That's moot also, Your Honor.

19             THE COURT:  Okay.

20             MR. PRATT:  He also has a motion to suppress

21   statements though, Your Honor.

22             THE COURT:  Do you have a motion to suppress

23   statements?

24             MR. GUREWITZ:  I have that, and there's another

25   one in addition to that, yes.

```
1              THE COURT:  Wait a minute.
2              I have -- you have a motion to compel discovery
3   of attorney-client communications between Defendant No. 1 and
4   his business lawyer Christopher Pencak?
5              MR. GUREWITZ:  Yes, I do.
6              THE COURT:  Okay.  And?
7              MR. GUREWITZ:  Your Honor --
8              THE COURT:  Is that still viable?
9              MR. GUREWITZ:  I'm sorry?
10             THE COURT:  That's not moot?
11             MR. GUREWITZ:  It is not moot.
12             Mr. Neal indicated today that he has made full
13  disclosure of all Title IIIs.  This is an exception.  We have
14  not received any Title III recordings of conversations
15  involving or about Mr. Pencak, to my knowledge.
16             THE COURT:  Do they exist?
17             MR. GUREWITZ:  I'm sorry?
18             THE COURT:  Do they exist?
19             MR. GUREWITZ:  It's my understanding they do.
20  And there's more than just a couple.
21             We have not received any e-mail communications
22  concerning the same subject or other evidence of
23  communications that might exist with the Government.
24             The Government's basis for excluding these is
25  they claim attorney-client privilege.
```

US v Patel, et. al. #11-cr-20468

1          We have said in response that the privilege

2     belongs to the client, Mr. Patel, in this case, who so far --

3     the record hasn't asserted it, but even if he did, it would

4     then be his burden to prove it.

5          There are a number of things which are

6     exceptions to the rule, including the crime fraud exception.

7     Others include, of course, whether or not the communications

8     were for the purpose of obtaining confidential advice; were

9     there third parties present.

10          The Government says they established a procedure

11    to provide that kind of information to their Filter Team, AUSA

12    David Morris.  And he has taken a conservative approach and

13    hasn't disclosed those, and therefore they say it's got to be

14    privileged.

15          The Filter Team approach is something

16    established for the benefit of the Government in order to

17    avoid problems with privilege between them and Mr. Patel.  It

18    has nothing to do with us, the third parties.

19          But we say, more importantly, that the procedure

20    which is established pursuant to United States v. Zolin

21    requires us only to make a minimal showing to a Court that

22    there's a reason to believe that there is evidence of crime

23    fraud in these documents, in these recordings, in the

24    transcripts.  And once that's done, the Court should conduct a

25    review.  And that's what happened in the Zolin case; the

1    Supreme Court sent it back to the district court to do that

2    review.

3              And, importantly, the -- even the showing of the

4    crime fraud exception only requires that there be some

5    evidence of a serious crime or fraud and a relationship

6    between the communications and that serious crime or fraud.

7              The indictment, which Mr. Tayal is charged in

8    only two counts, two conspiracies, each of them says that it

9    was one of the ways and means of the conspiracy to use sham

10   business entities in order to carry them out.

11             I have attached to our reply brief public

12   documents which show that there had been, in fact, name

13   changes in the corporations that owned the pharmacy where

14   Mr. Tayal worked that had Mr. Pencak's name associated with

15   those corporations and the changes.

16             We've also attached other public records which

17   exist for I think all but one of the pharmacies that show that

18   Mr. Pencak has been involved in the setup or is the registered

19   resident agent for each of those.

20             The Title III application indicates, quoted by

21   Mr. Neal in his response, that the Government found the

22   apparent applicability of the crime fraud exception in

23   listening to a couple of these recordings involving Mr. Pencak

24   or related to him, which was their motivation for consulting

25   with Mr. Lemish in the U.S. Attorney's office and then

1    establishing their internal Filter Team to protect themselves

2    from the possible taint of their evidence by listening to or

3    looking at what might later be claimed to be attorney-client

4    privilege on that.

5            We have also made reference to information that

6    appears in one of the interview reports of Mr. Chetan

7    Gujarathi, who is a Defendant in this case, but has done a

8    proffer.  The Government has provided us with a DEA-6 of his

9    interview.  And there he makes reference to the same thing;

10   that Mr. Pencak as an attorney for Mr. Patel, provided the

11   service of assisting and establishing these corporations which

12   the Government now alleges to have been a sham.

13           In fact, he also says that there were other

14   people who have the last name Pencak who were involved in that

15   process -- one is named Derek and the other one is a woman's

16   name -- that obviously appear to be part of Mr. Pencak's

17   family.

18           There's some indication that Mr. Pencak, in

19   fact, had a business in his own name.  So, it's not even clear

20   that he was really even providing legal services.

21           We believe that we have met the Zolin standard

22   for the Court to conduct a review --

23           THE COURT:  Okay, stop.

24           Mr. Neal, your response?

25           MR. NEAL:  Your Honor, our response is twofold.

1    One -- let me say upfront, we agree with many of the

2    assertions Ms. Gurewitz has made in his argument.

3                I think in terms of the way the communications

4    at issue were handled, a few things should be said.  One,

5    Mr. Pratt and I have not seen these communications.  These

6    communications were handled by a Filter Team at the U.S.

7    Attorney's office, and that Filter Team to date has not

8    disclosed any of the communications at issue to the Litigation

9    Team.

10               The attorney-client privilege can be -- you

11   know, it is narrowly construed because it is in derogation of

12   the truth.  However, where it exists -- and the case law is

13   clear on this.  Where it exists it is absolute.

14               I think before the Court could order those

15   communications disclosed, as Mr. Gurewitz suggests, the Court

16   would need to conduct a fairly exacting communication by

17   communication review and determine whether, A, the

18   communication was not privileged or, B, whether even if the

19   communication were privileged, an exception applies such as

20   the crime fraud exception.

21               The Government's position overall is I don't

22   think that's necessary for the Court to do that review.  And

23   it's not necessary because it's not clear what of relevance to

24   Mr. Tayal's defense would be in the communications between

25   Babubhai Patel and his business attorney.

1              Mr. Gurewitz suggests that there is

2      circumstantial evidence that would indicate that perhaps

3      Mr. Pencak was involved in furthering Mr. Patel's fraudulent

4      scheme.  Whether that's the case or not, I'm not sure it's

5      relevant to Mr. Tayal's defense in this case.  Mr. Tayal is --

6                   THE COURT:  How is it relevant, Mr. Gurewitz?

7                   MR. GUREWITZ:  Well, it wouldn't be relevant if

8      the Government wants to withdraw their allegation of sham

9      corporations being part of the conspiracy.

10                  It's my understanding that what the Government

11     does in a conspiracy case is say this is the conspiracy, it

12     was established by these other people, and your client had

13     knowledge of it and did something to further it.

14                  Those allegations then are something that we

15     have to defend against with regard to the whole conspiracy and

16     particularly with regard to the Grand River Pharmacy where he

17     worked.

18                  We need to have the opportunity to examine this

19     information to determine whether it establishes that, in fact,

20     these -- perhaps they were valid corporations with regard to

21     the Grand River Pharmacy or, on the other hand, that Mr. Tayal

22     had the absolute right to rely in good faith -- which is an

23     absolute defense to fraud -- on the relationship that he had

24     reason to believe existed between Mr. Pencak and Mr. Patel,

25     even though the Government may claim something different.

1          So, if it leads to admissible evidence, I think
2    we have every right to look at this to see whether or not the
3    Government in fact, unknowingly in this case, has failed to
4    expose Brady information because they haven't looked.
5          They haven't looked so far because of reasons --
6    because of their concern about privilege, but that doesn't
7    mean that if they are not going to use it, that we can't find
8    and we don't have the obligation -- I have the obligation to
9    investigate this in order to make sure that my client's
10   defense is presented.
11             THE COURT:  What relevance is the relationship
12   between Mr. Patel and his lawyer to your client?
13             MR. GUREWITZ:  It is --
14             THE COURT:  What would your client be relying
15   on?
16             MR. GUREWITZ:  It is relevant, Your Honor,
17   because the Government has alleged the existence and use of
18   sham corporations as part of the conspiracy which they charge
19   that he knowingly joined.  They allege that the Grand River
20   Pharmacy where he worked was part of that conspiracy.
21          I have submitted these documents -- and they are
22   attached to our reply -- which show that there were three
23   different corporations in fact which existed, that owned the
24   Grand River Pharmacy during the period of time my client was
25   an employee there.

1          I think we have an obligation to investigate

2    these communications to determine how those were used and why

3    they were used and to establish that my client operated as an

4    employee in good faith.  And we can't do that without looking

5    at these documents.  I think this --

6              THE COURT:  Why couldn't you make that argument

7    without looking at the documents simply by saying, look, he

8    worked for X corporation, Y corporation and Z corporation; he

9    didn't know whatever he didn't know?

10             What difference does it make what Mr. Patel's

11   lawyer told Mr. Patel or what Mr. Patel told his lawyer?

12             MR. GUREWITZ:  I probably can make that

13   argument, Your Honor.  But the difference is I'm not going to

14   be able to make the argument based upon the evidence that

15   exists, that the Government has in their possession that they

16   won't give to us.

17             THE COURT:  Well, let me ask this.  Is there any

18   dispute as to the existence of those three corporations,

19   Mr. Neal?

20             MR. NEAL:  There is no dispute as to the

21   existence of the corporations.  That --

22             THE COURT:  I'm trying to figure out what -- and

23   obviously I can go through all of this if you can tell me a

24   reason to.  But what might be there that makes your argument

25   stronger?

1          It would make it weaker if there were in fact

2    the attorney telling Mr. Patel, you know, we're doing this for

3    a fraudulent reason.  That doesn't help your client.

4          The question is what your client knew and maybe

5    when he knew it if he knew it.  But the fact that it was a

6    legitimate corporation --

7          Let's take the evidence possibility the other

8    way.  What if those conversations show that there were

9    legitimate business reasons for setting up the three separate

10   corporations over time; how does that help your client?

11         You want to take a break so you can read his

12   handwriting?

13                  MR. GUREWITZ:  No.  I appreciate it, Mr. LaRene.

14         I can't read his handwriting very easily.

15                  THE COURT:  No, I'm serious.  We might get it

16   translated for you.

17                  MR. GUREWITZ:  That could be a separate motion

18   if I could have more time to file it.

19                  THE COURT:  All right.

20                  MR. GUREWITZ:  Your Honor, it does -- I am at

21   some deficit because obviously I haven't seen these recordings

22   or the documents --

23                  THE COURT:  Well, Mr. Gurewitz, you're a very

24   experienced attorney.  You've done a lot of fraud cases from

25   both sides of the courtroom.

```
 1              Give me an argument that you might be able to
 2   make that you can't make now with the --
 3              Now we have better handwriting.
 4              You know, we try and get an electronic
 5   recording --
 6              MR. GUREWITZ:  Now I see, okay.
 7              There are several specific kinds of arguments.
 8   One is obviously that if there are communications which
 9   establish that whatever it is that was going on between
10   Mr. Patel and Mr. Pencak did not involve any client, I think
11   it goes to show his good faith; that he had every reason to
12   rely upon the relationship that existed between those two
13   people in the conduct of his affairs.
14              There is a Sixth Circuit patterned jury
15   instruction on good faith, and I think it supports --
16              THE COURT:  No, I understand the good faith
17   defense.  But what I'm asking you and your team is what -- how
18   does the conversations --
19              And I should note for the record that I think it
20   was Mr. Patel's attorney who was giving you advice.  You might
21   ask him if he wants to waive the attorney-client privilege,
22   and then the Court won't have to decide any of this, but ...
23              And for the third time, I'm asking the same
24   question.  How does the fact that the attorney and Mr. Patel
25   didn't mention your client, or did mention your client, impact
```

1    the state of mind of your client if your client was not privy

2    to that conversation?

3              And we are assuming by definition, at this point

4    anyway, that in order to make this defense, you have to assume

5    that Mr. Patel and his attorney never said anything at least

6    to your client about the legitimacy of what he was doing.

7              Does that make sense to you?

8              MR. GUREWITZ:  No.

9              THE COURT:  Okay.  Well, then tell me again what

10   you expect to find or hope to find that would be helpful to

11   your defense, your client's defense of good faith.

12             MR. GUREWITZ:  There are two kinds of evidence

13   that point in directions that are not the same.  One is

14   evidence that shows that the corporations were established for

15   some other purpose than the one for which the Government

16   argues in the indictment was furthered by the existence of

17   sham corporations; to establish purposes related to business

18   relationships, to dealing with wholesale pharmacies and other

19   kinds of things that are not for purposes of furthering the

20   fraud that is alleged in the indictment --

21             THE COURT:  Well, let me ask you this.  Were

22   these corporations overlapping or were they in series?

23             MR. GUREWITZ:  I think they were both.  There

24   are so many of them and so many name changes, I haven't

25   charted out all of the --

US v Patel, et. al. #11-cr-20468

1          THE COURT:  You just told me there were three.

2          MR. GUREWITZ:  Oh.  There were three for my

3     client's purposes --

4          THE COURT:  That's what we were talking about,

5     your client.

6          MR. GUREWITZ:  Well, Your Honor, you can't limit

7     this, unless you are going to give an instruction to the jury

8     that my client has no responsibility for what happened at

9     other pharmacies.

10          This is a conspiracy-wide allegation that --

11          THE COURT:  Well, let's see if they'll take your

12     suggestion.

13          MR. NEAL:  Your Honor, we decline to take

14     Mr. Gurewitz's suggestion on that point.

15          You know, again, just turning back to the

16     evidence the Government is going to use to prove its

17     allegation, Mr. Gurewitz is correct; the allegation concerning

18     the manipulation of corporate entities by Mr. Patel is one of

19     the objects of the conspiracy or one of the manner and means

20     alleged in the conspiracy portion of the indictment.

21          The Government does not rely on the

22     communications between Mr. Patel and Mr. Pencak to further

23     that allegation.

24          Our sources of proof of that allegation come

25     entirely from other sources, sources which are available to

55

1    Mr. Gurewitz and all of the Defendants in this case in

2    discovery.

3                    So, again, it's just not clear to us how any of

4    the communications between Mr. Patel and Mr. Pencak or other

5    attorneys working for him would be relevant to the specific

6    allegations against Mr. Tayal in this case.

7                    MR. GUREWITZ:  They also go to establishing the

8    existence of reliance by Mr. Patel and Mr. Pencak and the

9    basis on which Mr. Tayal then could rely upon that apparent

10   relationship.  I think it's just really --

11                   THE COURT:  Well, certainly the Government would

12   acknowledge and concede that Mr. Patel was acting on advice of

13   counsel -- with the help of counsel.

14                   MR. NISKAR:  We so stipulate.

15                   MR. NEAL:  Mr. Patel has not, to the

16   Government's knowledge or to the knowledge of anyone, so far

17   as I'm aware, Mr. Patel has not agreed to waive the

18   presumptive privilege that exists over these communications.

19                   Mr. Patel had the communications.

20   Mr. Government has -- the Taint Team has disclosed the

21   communications at issue to Mr. Babubhai Patel.  He has not

22   agreed to waive his privilege, so far as I know, or

23   presumptive privilege over those communications.

24                   If there was the existence of some sort of

25   attorney-client privilege defense or if there was some sort of

US v Patel, et. al. #11-cr-20468

1    advice of counsel defense that could benefit Mr. Patel --

2    obviously that's available to him -- he would need to, of

3    course, waive the privilege and disclose those materials to

4    the Government in discovery, as well as to his Co-Defendants.

5                 MR. GUREWITZ:  Here, Your Honor, the Government

6    is really saying that while it believes that it has otherwise

7    performed its obligations under Brady to disclose exculpatory

8    information, here it says we don't know what's there and we

9    haven't relied upon it, so we don't have any need to go any

10   further.

11                I think that we've met our obligation under

12   Zolin to ask the Court to do a review.  The record should be

13   reviewed by the Court --

14                THE COURT:  Well, I'm going to take it under

15   advisement until I know more about the case.

16                Now, if I do decide to undertake the review, it

17   will be during the trial, and if there's anything there.  But

18   if I were to review it now, it wouldn't do either side any

19   good.

20                MR. GUREWITZ:  Well, I think it would, Your

21   Honor.  If the Government --

22                THE COURT:  It doesn't matter.

23                MR. GUREWITZ:  Well, it just -- to say that the

24   Government can limit this information to that which Mr. Morris

25   can find relates to any of the pharmacies with which my client

1   was associated -- it doesn't, it would seem to me, provide an

2   unnecessarily large burden to the Court to review in-camera

3   before the trial.  If there is information --

4                    THE COURT:  The burden to the Court is not the

5   number of pages.

6                    The burden to the Court is not, at this point,

7   having a handle on the entire case the way it fits in.

8                    And you've already told me that you didn't

9   understand what I was saying.  So, I better be a little bit

10  better prepared.  And I will read the Zolin case.  But I'm

11  saying now I'm not going to grant your motion.  That's all.

12                   MR. GUREWITZ:  So, it's not denied though

13  either.  Is that correct?

14                   THE COURT:  Well, if that makes you feel better,

15  it's not denied.

16                   MR. GUREWITZ:  Well --

17                   THE COURT:  Or I could deny it without

18  prejudice, which is the same thing.  It doesn't matter to me.

19                   What I'm telling you is I'm going to review it

20  again when I have more of a factual basis.

21                   MR. GUREWITZ:  I'm just asking because I think

22  that perhaps I haven't done a good enough job in making myself

23  clear.  And if I haven't, I would like to have the opportunity

24  to do that.

25                   THE COURT:  Well, if you haven't, maybe you have

1    the same problem I do.  Maybe we should both think about it a

2    little more.  But I certainly am willing to wait until I have

3    more information.

4              MR. GUREWITZ:  Judge, the only problem, I would

5    just point out, that that seems to me to present to the

6    Defense is that we have to wait until trial to review

7    information given to us then that isn't a small amount.  And

8    that is an unfair burden for us.

9              THE COURT:  You just told me it isn't a burden

10   on the Court.  But it's a burden on you?

11             MR. GUREWITZ:  Well ...

12             THE COURT:  No, you don't have to answer that.

13             MR. GUREWITZ:  But we have the Sixth Amendment

14   to deal with in protecting our clients' interest, yes.

15             THE COURT:  I understand that.  And I have the

16   same Sixth Amendment concerns.

17             MR. GUREWITZ:  Thank you.

18             MR. LaRENE:  May I speak briefly?  I joined in

19   the motion.

20             THE COURT:  Yes, you may.

21             MR. LaRENE:  What I was trying to suggest is

22   that -- and this is entirely hypothetical, but --

23             THE COURT:  Do you want to look at your note to

24   see if you can decipher it?

25             MR. LaRENE:  I know what is in the note.  I'm

 1   not proud of it.

 2              THE COURT:  Okay.

 3              MR. LaRENE:  Judge, I don't know what -- this is

 4   entirely hypothetical obviously.  We haven't seen the

 5   conversations.  But let us say, let's hypothesize that there

 6   were conversations in which Defendant No. 1 and his lawyer

 7   talked about keeping things from the pharmacist, one or

 8   another of the pharmacists, keeping the nature of their

 9   activities from the pharmacists or reassuring the pharmacists,

10   one or another of the pharmacists as to the legality of the

11   operation, the structure, anything like that.

12              That seems very clearly to me to be the kind of

13   information which would not otherwise be available and which

14   would be helpful -- relevant and helpful to the defense;

15   particularly, let's say, one or another of the Defendants

16   wanted to assert what I often think of as the mushroom

17   defense, that they were treated like a mushroom, kept in the

18   dark where they were fed mushrooms.

19              *(Off the record.)*

20              MR. LaRENE:  In any event, that is one thing

21   that the Court might consider worthwhile looking for, that

22   kind of stuff.  Whether it is there or not, obviously I have

23   no idea.  And I don't think Defendant No. 1 should be required

24   to waive his privilege --

25              THE COURT:  Even though it might help your

1    client, you don't care?

2              MR. LaRENE:  Well, it wouldn't be right, would

3    it?  In any event, that's what I wanted to say.

4              THE COURT:  All right.

5              MR. GUREWITZ:  Your Honor, I did have a separate

6    motion to suppress an oral statement.  And it is my

7    understanding we are not doing evidentiary hearings today.

8    Mr. Neal and I have had some conversation on that.  And based

9    on his response, I think we have a basic factual dispute which

10   has to be resolved by you.

11             MR. NEAL:  That's correct, Your Honor.

12             MR. PRATT:  Yes, Your Honor.  We need a date to

13   hear evidence on that motion.

14             THE COURT:  Okay.  I will make a note of it.

15             All right.  There are a series of motions by

16   Harpreet Sachdeva.

17             Have we decided most of these?

18             MR. KRIGER:  Some of these we have decided, Your

19   Honor.  The Brady and Giglio material we have decided.

20             THE COURT:  Yep.  Expert testimony, we've

21   already decided that.

22             MR. KRIGER:  Wait.  I'm ...

23             THE COURT:  Yes?

24             MR. KRIGER:  Well, there's two types of -- the

25   expert testimony on the lingo, are you referring to, Your

1     Honor?

2              THE COURT:  Yes.

3              MR. KRIGER:  Pardon?

4              THE COURT:  Yes.

5              MR. KRIGER:  I don't -- I didn't realize we had

6     decided it.

7              THE COURT:  Okay.

8              MR. PRATT:  Your Honor, Mr. Kriger and I talked

9     briefly beforehand.

10             The Government, unlike on the expert

11    pharmacists, which the Government has noticed up their expert,

12    we haven't why the noticed anyone up in terms of interpreting

13    these tapes.  Obviously, we have an obligation to do that.  We

14    are going to have to do that reasonably soon.

15             If we do, then I think this motion would be

16    ripe, but until we do that, I'm not sure we need to argue it

17    in the abstract.

18             THE COURT:  All right.

19             MR. KRIGER:  That's fine.

20             THE COURT:  What about vouching testimony during

21    admissions of recorded statements; what's that all about?

22             MR. KRIGER:  Your Honor, it's our position that

23    we feel it would be inappropriate for the Government to go

24    into how they go about getting the wiretap.  The only real

25    issue is the accuracy of it in order to lay the foundation.

1          THE COURT:  Do you intend to go into how you get

2  a wiretap?

3          MR. PRATT:  I would like to go into that in a

4  brief enough way so that the jury understands, unlike in

5  Hollywood, there just isn't a roomful of agents that just flip

6  a switch and they automatically listen to any phone they want

7  to.  I think probably five minutes worth of testimony would

8  probably be enough to disabuse them of that notion.

9          THE COURT:  And you don't intend to give the

10  opinion of the magistrate judge that there was probable cause

11  or anything like that?

12          MR. PRATT:  No, Your Honor.

13          I think it's helpful to understand that these

14  affidavits are lengthy, time consuming, and that sort of

15  thing.

16          THE COURT:  Well, what's the relevance of how

17  lengthy or time consuming?

18          Why don't we just stipulate that they were

19  authorized.

20          MR. PRATT:  Because I think, among other things,

21  as I've said in my motion, if the jury thinks all you have to

22  do is drop by chambers one afternoon, it may think the

23  Government should have had wiretaps on all 26 Defendants for

24  six months, and they won't understand why --

25          THE COURT:  Do I have to instruct them that all

US v Patel, et. al. #11-cr-20468

1    of the forensic investigation isn't done during the commercial

2    break too?

3            MR. PRATT:  Sometimes it -- sometimes factually

4    that this is a big deal and difficult to do is --

5            THE COURT:  Well, when you say it's a big deal,

6    you are telling them that somebody -- i.e., the magistrate or

7    your office -- had strong beliefs.  And that's really like

8    opinion testimony.

9            I think you are more than allowed to show

10   mechanically how the equipment works, if that's your intent,

11   which would make the point that the Government doesn't have an

12   unlimited budget to wiretap all of the Defendants.  But to

13   bring in that you were successful in convincing some judicial

14   officer, whether it be a judge or -- generally, a judge in

15   wiretaps, isn't relevant to the jury function of determining

16   whether what you received on the wiretaps proves beyond a

17   reasonable doubt or gets towards that goal that you have and

18   the burden you have.

19           MR. PRATT:  I think it's certainly --

20           THE COURT:  We've already spent more time

21   talking about it than the five minutes that you intend to use.

22   So, you can tailor your questions to avoid giving any opinion

23   or vouching by your office or some unknown judge.

24           MR. PRATT:  Very well.

25           THE COURT:  All right.  Mr. Kriger, what else?

1           MR. KRIGER:   The only other is the Enright

2    issue, Your Honor, how you are going to conduct the

3    co-conspirator statements.

4           This motion, specifically as to Mr. Sachdeva, is

5    a bit I think a little more difficult because he's not charged

6    in the drug conspiracy whatsoever.  And there's a real issue

7    in my mind, even if you take the Government's interpretation

8    of some of these conversations, which we dispute, that it's

9    even his conspiracy.  One could argue that there's a separate

10   conspiracy that's going on here.

11          And I think that at least as to those

12   conversations where Mr. Sachdeva is involved, we should have a

13   hearing prior to hearing those conversations where he's

14   mentioned.

15          THE COURT:   Response?

16          MR. PRATT:   Yes, Your Honor.

17          The hearing that the Government would be

18   required to prove its entire conspiracy would last almost as

19   long as Group 1.

20          As I said in the brief, if the Government hasn't

21   proven that Mr. Sachdeva is a co-conspirator at the

22   preponderance standard, at the end of the Government's proofs,

23   I think that it's going to be -- he's not going to have to

24   worry about that anymore.

25          I really think that, in addition, because you do

1   have some of these witnesses that will be putting testimony

2   in, as well as the wiretaps, that keeping track of this at

3   trial is the most expeditious way to handle this, and the

4   Court can make a ruling at the end of the Government's case.

5                 MR. KRIGER:  As to my client, Your Honor, there

6   are not a lot of conversations that mention my client's name

7   between co-conspirators.  In fact, there are --

8                 THE COURT:  So, what you are basically asking

9   for is a separate trial for every Defendant.

10                MR. KRIGER:  No.  I'm asking for -- I think

11  those statements that mention Mr. Sachdeva could be dealt with

12  in probably less than half an hour.  I mean, there's not that

13  many of them.

14                I mean, I've gone -- I can't agree I've gone

15  through every one.  But the line sheets, you have a searchable

16  database.  And I've gone through you know several thousand,

17  and he has come up three times so far.  So, I think as to

18  Mr. Sachdeva, it could be done very quickly and very

19  efficiently.

20                MR. PRATT:  But those aren't the only

21  co-conspirator statements that are going to be admitted.  Many

22  of the -- they may not be the only ones that mention him

23  specifically, but the whole purpose of the Defense winning a

24  motion under 801(d)(2)(E) is that all of this evidence is now

25  inadmissible because I'm not even a co-conspirator; not just

1    the evidence that mentions me.

2              And so you can't really limit the co-conspirator

3    statements to, well, we are just going to limit it to the ones

4    that mention him.  It's either all in under 801(d)(2)(E) or

5    it's out.

6              MR. KRIGER:  Well, I don't know that that's

7    necessarily true.  Some could be in furtherance of the

8    conspiracy charged in this indictment and some may not be.

9              THE COURT:  I can wait until the end of the

10   trial to make my ruling or the end of the preponderance stage,

11   whatever.  The motion is denied.

12             MR. KRIGER:  Okay.

13             THE COURT:  Who is representing Mr. Thaker,

14   Viral Thaker?

15             MR. SIMMONS:  I am, Judge.

16             THE COURT:  Okay.  You have a motion for

17   extension of time to file...

18             MR. SIMMONS:  It was one day, Judge.

19             THE COURT:  Okay.  And that's moot.

20             MR. SIMMONS:  Yes.

21             The motion to suppress is the motion that I

22   actually filed.  And at this juncture, I think that it would

23   probably be -- I think I'm joined in also with the wiretap.

24             Most of the Government -- Defendant No. 1 had

25   some contact with my client.  The wiretap motion may determine

1    the existence of whether that would be presented to the jury.

2    That is my main concern in the suppression hearing, his name

3    being mentioned in certain conversations.

4                    So, at this point, I would just probably wait to

5    see what happens with the wiretap motion.

6                    THE COURT:  All right.  I will deny it without

7    prejudice.

8                    MR. SIMMONS:  Thank you, Judge.

9                    THE COURT:  Or would you rather it be moot on

10   your resume?

11                   MR. SIMMONS:  Denied without prejudice.

12                   THE COURT:  Okay.  Mr. Vaid?

13                   MR. KORN:  May it please the Court, Richard

14   Korn, appearing on behalf of Dr. Mustak Vaid, Your Honor.

15                   It would seem to me -- Your Honor, I filed

16   motions, as the Court is aware, and the first motion I believe

17   is Document No. 413.

18                   THE COURT:  Okay.  That's the one, you want the

19   statements after your client withdrew from the conspiracy?

20                   MR. KORN:  That's correct, Your Honor.

21                   THE COURT:  And?

22                   MR. KORN:  Your Honor, in United States v.

23   United States Gypsum Company, the United States Supreme Court

24   made it clear that in order to withdraw from a conspiracy, a

25   Defendant does not have to affirmatively notify every other

1    member of the alleged conspiracy that he is no longer

2    participating in the conspiracy.

3                    It is true that a Defendant charged with a

4    conspiracy, in order to withdraw from the alleged conspiracy,

5    has to take an affirmative act that is inconsistent with the

6    object of the conspiracy.

7                    THE COURT:  What was the act in this case?

8                    MR. KORN:  In this particular case -- and it is

9    my understanding of the case alleged against Dr. Vaid, that

10   Dr. Vaid's alleged participation in the conspiracy stems from

11   his employment with Defendant No. 2 -- that's Dr. Paul

12   Petre -- and in August of 2010, Dr. Vaid, who had an

13   employment relationship with Dr. Petre, told Dr. Petre that I

14   am no longer going to see any patient in Michigan; that I am

15   no longer going to work for your clinic; that I am no longer

16   going to write any prescriptions in Michigan; that I have

17   obtained new employment with a different employer in New York

18   City --

19                   THE COURT:  What was the date?

20                   MR. KORN:  August of 2010.

21                   THE COURT:  Okay.  When was he alleged to have

22   started in the conspiracy?

23                   MR. KORN:  He was alleged to have started in the

24   conspiracy in I believe August or September of 2009 when he

25   began working -- when he had an employment relationship --

US v Patel, et. al. #11-cr-20468

```
 1                    THE COURT:  Okay.  So, you want it limited to
 2   the one year.
 3                    MR. KORN:  Excuse me?
 4                    THE COURT:  You want any references limited to
 5   the one year between those dates?
 6                    MR. KORN:  That's correct, Your Honor.
 7                    It would be my position --
 8                    THE COURT:  What is the Government's response?
 9                    MR. PRATT:  Your Honor, the problem with that is
10   that in order to establish a withdrawal, it's more than just
11   "I quit."
12                    When you talk about an affirmative act, they
13   talk about either notifying everybody -- not just notifying
14   everybody, but notifying law enforcement.  Or, in the Gypsum
15   case, you are going to know that I am not fixing prices with
16   you anymore because I'm actually out there competing with you
17   and undercutting.  That is the kind of affirmative act.
18                    Simply quitting and moving to Switzerland,
19   coming to Switzerland and becoming neutral is not the
20   affirmative act.
21                    THE COURT:  He went to New York though.
22                    MR. PRATT:  Not just as neutral as Switzerland
23   maybe.  But moving to another place is not the affirmative act
24   of withdrawal.
25                    What we are talking about is the wiretap calls
```

US v Patel, et. al. #11-cr-20468

1   that happened in the next year; none of which, by the way,

2   mention Mustak Vaid.

3              As a factual matter, they are not going to do

4   very darned much to incriminate him because he's gone.

5              What he's really doing is saying that none of

6   that stuff can come in, and it really ends up being a

7   severance motion, not a you need to keep all of this

8   prejudicial evidence --

9              THE COURT:  Why can't it come in with an

10  instruction?

11             MR. KORN:  Your Honor, because the -- first of

12  all -- and this is basically related to the Government's

13  argument with respect to another Defendant.  Even though

14  Mr. Vaid actually -- he's mentioned in one of the telephone

15  conversations, in which I believe Babubhai Patel --

16             THE COURT:  One of the conversations after his

17  quit date?

18             MR. KORN:  After his quit date, in which

19  Co-Defendant No. 1, Babubhai Patel, became confused and

20  thought that someone he was talking to had mentioned

21  Dr. Vaid's name.  And then it became clear that the person he

22  was talking to -- and it was made clear to Babubhai Patel that

23  the person he was talking to was not talking about Dr. Vaid.

24  And Dr. Vaid said -- I mean, Babubhai Patel said, oh, I

25  remember or I've heard of Dr. Vaid; he's crazy.

US v Patel, et. al. #11-cr-20468

1            As far as I could tell, that's the only

2    reference to Dr. Vaid.  But the problem is -- the problem

3    is --

4            THE COURT:  How does that hurt your client?

5            MR. KORN:  Excuse me?

6            THE COURT:  How does it hurt your client.

7            MR. KORN:  It doesn't hurt my client.

8            What hurts my client, Your Honor, is that all --

9    what hurts my client is that all of these telephone calls in

10   which my client is not named are going to be used to prove the

11   conspiracy.  That's how they're going to prove the conspiracy.

12           One of the ways they're going to prove the

13   conspiracy against my client is to say, hey, we have all these

14   telephone calls which show this giant conspiracy involving all

15   of these people.  Then they are going to take an act, a video

16   of him doing medical examinations on January 8th of 2010, and

17   say this is proof that he's part of this larger conspiracy.

18           Without all of those telephone calls, that would

19   not be admissible against Dr. Vaid if he was tried by himself,

20   because he had clearly withdrawn from the conspiracy.  They

21   wouldn't be able to do that.

22           So that the impact against Dr. Vaid would be

23   huge, the prejudicial impact.

24           And I don't see -- after the jury hears I don't

25   know how many of these telephone conversations about a larger

1   conspiracy and the Government's argument that Dr. Vaid, based

2   on what happened at the Rio Grande Motel, which is where the

3   video was made, was part of this larger conspiracy, I don't

4   see how a curative instruction at that point could cure the

5   error.

6               THE COURT:  What's the Government have to say?

7               MR. PRATT:  Your Honor, the Government's proof

8   as to the Defendant acting in a criminal manner is going to

9   rise and fall on the events in January of 2010.  The

10  Government is going to have plenty of evidence to show --

11              THE COURT:  What's the quit date again?

12              MR. PRATT:  August --

13              MR. KORN:  He quit --

14              MR. PRATT:  August of 2010.

15              MR. KORN:  He quit in August of 2010 and he

16  started another job in September of 2010.

17              THE COURT:  How are you arguing that what he did

18  between the time he started and the time he quit is not

19  relevant?

20              The January date is in between those dates, on

21  my calender.

22              MR. KORN:  That's correct.

23              I am not arguing that the video is not relevant.

24  What I'm arguing is in August of 2010, he withdrew from the

25  conspiracy.

US v Patel, et. al. #11-cr-20468

 1              THE COURT:  Okay.

 2              MR. KORN:  Therefore, all of the intercepted

 3   telephone calls which were first intercepted in -- it's my

 4   understanding January 10th of 2011 is the date of the first

 5   order.  All those things happened after he withdrew from the

 6   conspiracy.

 7              THE COURT:  All right.  I understand.

 8              MR. KORN:  So they would not be admissible

 9   against him under 801(d)(2)(E).

10              MR. PRATT:  It's not like the Government's

11   conspiracy proof of a conspiracy doesn't start until January

12   of 2011.  The Government has evidence other than wiretap calls

13   that are going to show that there was a conspiracy going on.

14              The question is and the Court's instruction is

15   can you link the Defendant to that conspiracy.

16              And to say that -- to say that brother counsel

17   won't be able to emphasize to the jury that this wiretap

18   evidence you're hearing is long after my client left for New

19   York, I think the Court's idea of a cautionary instruction, as

20   well as Defense counsel's advocacy, is more than enough to

21   eliminate any prejudice.

22              And like I say, I still don't think simply

23   quitting meets the standard of withdrawal.

24              THE COURT:  I will deny it without prejudice

25   until I see all of the testimony.

1          MR. KORN:  Thank you, Your Honor.

2          And the next motion is a motion for severance,

3   which is based very heavily on my argument that the Title 3

4   wiretap intercepted telephone calls should not be admissible

5   against Dr. Vaid, and therefore he should get a separate

6   trial.

7          In addition, I think that if you look at the

8   evidence against Dr. Vaid, his alleged participation in the

9   conspiracy -- and this is the spillover of that.  It's just so

10  small compared to all of the other evidence that's going to --

11  that I anticipate will be admitted in the case.

12         I think in this particular case, if there's a

13  case where somebody's case -- and I know it doesn't happen

14  often.  If there's a case where a Defendant should be severed

15  based on a potential spillover effect, it would be my position

16  that this is it.

17         THE COURT:  Same ruling.

18         MR. KORN:  Thank you, Your Honor.

19         THE COURT:  Now, you have ...

20         MR. KORN:  A motion to -- I'm sorry, Judge.  If

21  you want to go by number?  I'm going by the way it happened in

22  my book.

23         THE COURT:  You have a motion for an Enright

24  hearing as well?

25         MR. KORN:  And I think the Court has already

1    ruled on that.

2            THE COURT:  Okay.  And Brady material?

3            MR. KORN:  I think the Court has already ruled

4    on that.

5            I have basically spelled out, if the Government

6    has this information, this is the kind of information that

7    should be provided.

8            THE COURT:  What about entrapment?

9            MR. KORN:  Entrapment I think --

10           THE COURT:  Hang on a second.

11           MR. KORN:  Sure, I'm sorry, Judge.

12           THE COURT:  Does the Government have any Brady

13   material?

14           MR. PRATT:  Not that we haven't already turned

15   over, Your Honor.

16           THE COURT:  Okay.  What about your motion then

17   for entrapment?

18           MR. KORN:  I have to admit that's a more

19   complicated motion, Your Honor, but it would be my position

20   that -- it's both a motion for entrapment; and also if the

21   motion for entrapment as a matter of law is not granted, then

22   it's also a motion to suppress the video based on what I would

23   call outrageous Government conduct.

24           And I would think that we need an evidentiary

25   hearing in connection with that motion.

1          THE COURT:  The Government?

2          MR. PRATT:  Your Honor, I don't think we need an

3     evidentiary hearing.  I think it's clear the evidentiary

4     hearing we need is the trial where a properly instructed jury

5     can make their own determination as to whether the Defendant

6     was entrapped.

7          As far as being outrageous Government conduct,

8     you know, he -- you know, I'm not really sure why he can't

9     summarize for the Court what's so outrageous.

10          All the Government did was give him an

11     opportunity to go in and write a bunch of prescriptions for --

12          THE COURT:  Where is the Rio Grande Motel?

13          MR. KORN:  It's in Detroit.

14          THE COURT:  Do you have streets?  It's a big

15     city.

16          MR. KORN:  I don't have the address.

17          MR. PRATT:  I'm not sure, Your Honor.

18          THE COURT:  Pardon?

19          MR. PRATT:  I'm not sure, Your Honor.

20          But we have a video tape of the supposed

21     examination in this run-down hotel room.  And any semblance

22     between that and real physical examination in a doctor's

23     office is, as they say, purely accidental.

24          The outrageous Government conduct that's alleged

25     is apparently having a patient recruiter bring five or six

1    patients in, ran them through the doctor, and they got

2    controlled substance prescriptions.

3              That's a question for the jury, in the

4    Government's opinion, and I'm not sure what an evidentiary

5    hearing would add to this.

6              MR. KORN:  Well, Judge, I think the -- there are

7    issues that need to be resolved with an evidentiary hearing,

8    and that is --

9              THE COURT:  What is -- go on.

10             MR. KORN:  And that is, first of all -- and I

11   can summarize what I think is the outrageous conduct, which

12   is, that the Government obtained the hotel room.  They set up

13   the hotel room.  They somehow recruited -- and I think that

14   needs to be addressed in an evidentiary hearing.  They

15   recruited these people to come to the Rio Grande Motel.

16             THE COURT:  You can try and convince the jury

17   that it's outrageous, but as a matter of law it is not

18   outrageous conduct, from your allegations.

19             MR. KORN:  But I also --

20             THE COURT:  But it may raise a jury question.

21             MR. KORN:  Thank you, Your Honor.  Again, there

22   is another prong --

23             THE COURT:  Which brings your client's

24   predisposition into the equation.

25             MR. KORN:  That's correct, Your Honor.  If I

```
 1        raise entrapment in front of the jury, that is correct.
 2                    THE COURT:  Okay.
 3                    MR. KORN:  But the other issue --
 4                    THE COURT:  So, it's -- go on.
 5                    MR. KORN:  The other issue is I'm asking the
 6        Court to suppress the video based on the Government's conduct.
 7                    I mean, what happened here, Judge, is they set
 8        up this room --
 9                    THE COURT:  I -- you've said that three times.
10                    MR. KORN:  Right.
11                    THE COURT:  The Government said it once.
12                    I'm not sure if it was the second, third or
13        fourth time that I understood it, but I now understand it.
14                    MR. KORN:  I would just -- and I apologize,
15        Judge.
16                    THE COURT:  No, you don't have to apologize.
17                    MR. KORN:  I was trying to get to my third
18        sentence and I couldn't get there.
19                    THE COURT:  Okay.
20                    MR. KORN:  Which is that --
21                    THE COURT:  Did somebody interrupt you?
22                    MR. KORN:  No.
23                    THE COURT:  Okay.  Which is --
24                    MR. KORN:  Which is that --
25                    THE COURT:  Go on.
```

US v Patel, et. al. #11-cr-20468

1          MR. KORN:  -- it goes beyond just setting up the
2    room.
3          They put him in a position -- first of all, it
4    wasn't set up for him.  It was set up for Dr. Paul Petre.
5          And he called and he spoke with the cooperating
6    witness, Johnnie Wilson.  They knew that Paul Petre, who was
7    the target of this scam, they knew that Paul Petre couldn't be
8    there because he was sick, and they knew that somebody else
9    was being called at the last minute to take his place, and
10   that was Dr. Vaid.
11         And knowing that, knowing what they had set up,
12   knowing they set up a situation where it was almost
13   impossible, because there were so many people in the room, to
14   do a physical examination --
15         THE COURT:  I have not seen the tape.  But from
16   the description of you and others, the Government attorneys, I
17   would guess that your client was arguably offered a temptation
18   that he couldn't resist.  And I may be wrong.  I didn't see
19   the tape.  And that's all I'm going to say, but ...
20         MR. KORN:  I would have to say that that's not
21   the way I would characterize it.
22         THE COURT:  Okay.
23         MR. KORN:  I understand.
24         THE COURT:  If you walked into that room -- all
25   right.  Go on.

```
1              MR. KORN:  I understand.

2              THE COURT:  The motion to redact inadmissible

3    evidence?

4              MR. KORN:  That is correct, Your Honor.  Let me

5    get back to that.

6              THE COURT:  What's the gist of this motion?

7              MR. KORN:  Well, sure, sure.

8              And part of it, the Government and I are in

9    agreement.

10             THE COURT:  Well, then you don't have to talk

11   about that.

12             MR. KORN:  That's correct.

13             But there are two aspects of the video that I

14   think are objectionable and I would ask the Court to redact.

15             And there's one section of this video at the Rio

16   Grande Motel where -- and it's pretty much towards the end of

17   the video.  So, it would not be -- it should be relatively

18   easy to redact.  But there's one section where Dr. Vaid has

19   completed his examinations, and -- I believe there were five

20   patients, and one of the patients towards the end -- Dr. Vaid

21   is at a table in the back of the room calling in the

22   prescriptions for these patients.

23             And as this patient -- after he has been

24   examined by Dr. Vaid -- and Dr. Vaid is in the back of the

25   room calling in these prescriptions.  As the patient is
```

1    walking out of the room, right in front of the camera, almost

2    looks deliberate, the FBI agent takes out cash and hands it to

3    the patient as the patient is leaving the room.  The patient

4    puts it in his pocket and he walks out.

5                    And it would be my position, Your Honor, that

6    that is -- first of all, there's no evidence -- because he was

7    called in at the last minute.  There is no evidence that

8    Dr. Vaid knew that any of these patients were going to be

9    paid, and that this is a deliberate attempt to prejudice the

10   Defendant in front of the jury by deliberately making it so

11   visible on the tape.  It would be my position that that is a

12   violation --

13                    THE COURT:  Are you intending to use that?  I am

14   asking the Government.

15                    MR. PRATT:  Pardon?

16                    THE COURT:  Are you intending to use that

17   portion of the video?

18                    MR. PRATT:  Yes, we are, Your Honor.

19                    THE COURT:  Okay.  I think you've now rehearsed

20   your closing argument, and it will be nicely presented.

21                    MR. KORN:  Thank you, Your Honor.

22                    THE COURT:  The request is denied.

23                    MR. KORN:  And just because -- I did mention it

24   in the argument.  There's a similar argument with respect to

25   the cooperating witness smoking in front of the camera.

1              THE COURT:  Did they cough?

2              MR. KORN:  No.

3              THE COURT:  Denied.

4              MR. KORN:  Then in -- there are several audio

5    tapes that were produced after -- either that day or a day

6    later after the examinations at the Rio Grande Motel in

7    connection with the Rio Grande Motel.  And in audio tape N

8    48 --

9              THE COURT:  Which, by the way, is on Grand

10   Boulevard between Dexter and Linwood.

11             MR. KORN:  Thank you, Your Honor.

12             THE COURT:  Obviously, you guys haven't gone to

13   the scene to examine it.

14             MR. KORN:  Not yet.

15             THE COURT:  Go on.

16             MR. KORN:  In audio tape n 48, the cooperating

17   witness deliberately -- and this is again -- it's clear that

18   the cooperating witness is asking Babubhai Patel questions to

19   incriminate Dr. Vaid.  He says, "Didn't we work with Dr. Vaid

20   before at the Montgomery," which I think is an apartment

21   building.  And Babubhai Patel offhandedly answers "Yes."

22             Then he says -- he asks him again in tape N 53,

23   that -- and this is all within the same day or a couple of

24   days.  In tape N 53, he asks -- the cooperating witness again

25   asks Defendant Babubhai Patel has he ever worked with Dr. Vaid

1    before, and he says, "No."

2                    But I have to admit -- and I put a footnote in

3    the motion -- the answer is somewhat ambiguous as to -- it's

4    ambiguous as to what question he's answering.

5                    But like I said, there's also a tape where

6    Babubhai Patel says he heard of Mustak Vaid, whatever.

7                    I think that that particular colloquy between

8    the cooperating witness and Babubhai Patel doesn't have much

9    probative value, and certainly if there's an allegation --

10                   THE COURT:  This is different than "I know him,

11   he's crazy"?

12                   MR. KORN:  Yes.  Yes, it is.

13                   "I know him, he's crazy," is one of the

14   intercepted telephone calls.  This is --

15                   THE COURT:  All right.  What's the Government's

16   response?

17                   MR. PRATT:  Your Honor, given that -- and I

18   believe that the conversations he's referring to may be

19   between the cooperating source and Babubhai Patel.

20                   Any kind of conversations like that wouldn't be

21   directly coming in under the co-conspirator exception, because

22   they are not between two co-conspirators.

23                   The reason that they would come in would be for

24   a nonhearsay purpose; for example, to show that there was a

25   knowledge between the two men.

US v Patel, et. al. #11-cr-20468

1          And if they come in for that limited purpose to

2   show that Babubhai Patel, the alleged ringleader of this

3   conspiracy, knows the Defendant, then I think the Court would

4   give an appropriate limiting instruction saying that they only

5   come in to show the knowledge of each other; not for the

6   contents of the communication.

7          I can discuss a potential limiting instruction

8   with co-counsel, with brother counsel.

9          THE COURT:  All right.  You can try and work

10  that out, but I'm not ruling on whether the possible prejudice

11  outweighs that limited relevance that you've just described,

12  because I will have to know more facts during the trial.

13         So, you still have a chance on that one,

14  counsel.

15         MR. KORN:  Thank you, Your Honor.

16         Then the other tape, which is N 66 -- and I

17  think this is particularly egregious -- you have what I've

18  been calling the cooperating witness, who we all know is

19  Johnnie Wilson, and they call him the cooperating subject.

20  Johnnie Wilson is talking to the pharmacist at Caring

21  Pharmacy -- and this is, again, like a day or so after the Rio

22  Grande -- and he's talking about Dr. Vaid.

23         And the pharmacist says, oh, yeah, Dr. Vaid.

24  And then the cooperating subject starts, saying, "Oh, is he

25  from India, is he from India," trying to inject that aspect of

1    the case before the jury.

2                    I don't see how that's relevant at all --

3                    THE COURT:  How is that relevant?

4                    MR. KORN:  -- and I think it's unduly

5    prejudicial.

6                    MR. PRATT:  I can't imagine wanting to introduce

7    anything that discusses what country he's from.

8                    THE COURT:  If you are not going to introduce

9    it, then...

10                   MR. PRATT:  The only thing -- not that

11   statement.  Something that might show that he knows who

12   Dr. Vaid is, again, would be offered for the nonhearsay

13   purpose of showing guilt --

14                   THE COURT:  Well, if you are not getting into

15   where he's from --

16                   MR. PRATT:  But we can do that probably in a

17   different part of the conversation and not admit that.

18                   THE COURT:  Okay.  You've made your point.  They

19   are not going to put that in.

20                   MR. KORN:  Thank you, Your Honor.

21                   THE COURT:  Have you found the five patients?

22                   MR. KORN:  Not yet, but the Government I believe

23   -- my understanding is they are going to help me do that, Your

24   Honor.

25                   THE COURT:  Okay.

```
1              MR. KORN:  Is that correct?

2              MR. PRATT:  Yes.

3              MR. KORN:  Yes.

4              THE COURT:  Okay.  So, we'll mark that as moot.

5              Okay.  There's a motion to seal an exhibit that

6    has been granted.  That's 472.

7              Defendant No. 1 wants to adjourn the trial.

8              Is that still a request?

9              MR. NISKAR:  That has been ruled upon.

10             THE COURT:  Okay.  And how did I rule?  Denied?

11             MR. NISKAR:  No.  There was a stipulation.  So,

12   we took you out of the mix.

13             THE COURT:  Oh, okay.  Broke my heart.

14             What about the motion to move to Group No. 2?

15             MR. LaRENE:  Are you talking about my motion to

16   have Mr. Rawal moved to Group No. 2?

17             THE COURT:  Yes.

18             MR. LaRENE:  I don't think the Government has

19   had a chance to respond to that, Judge.

20             THE COURT:  Okay.  Then we won't discuss that.

21             Do you like the uniforms better in Group 2?

22             MR. LaRENE:  No.  I just like -- you know, the

23   Government told us they were going to divide up the Defendants

24   by who had the good lawyers and who had the bad lawyers, and I

25   wanted to get into the group with the good lawyers, that's
```

1     all.

2                    THE COURT:  We'll all have to have separate

3     trials, won't we.

4                    Do you we need an evidentiary hearing for the

5     motion to suppress electronic surveillance?

6                    MR. LaRENE:  I think at one point, the

7     Government said we didn't.  I can't imagine that's their

8     position, but I can't speak for Mr. Pratt.

9                    THE COURT:  Then why did you stand up?

10                   MR. LaRENE:  Just to be polite, Judge.

11                   THE COURT:  Okay.

12                   MR. PRATT:  Judge, I don't see what issues we

13    are going to have an evidentiary hearing on.

14                   You know, maybe -- as I understand, we submitted

15    the agent's representation as to what calls have been

16    minimized based upon his reading of the equipment.

17                   I don't know whether Mr. LaRene, you know, feels

18    he needs to cross-examine the agent.  I would probably offer

19    him to go over to the -- you know, go over with the agent and

20    show how it's done.  But, you know, I don't think

21    fundamentally there are any factual disputes here.  I could be

22    wrong.

23                   MR. LaRENE:  Well, let me just outline the most

24    basic areas.  There are more.

25                   One of the factual -- one of the areas that is

1    subject to factual dispute is whether -- excuse me.  Let me go
2    back.
3                Section 2518(5), which allows the agents to
4    employ civilian monitors, also requires that they work -- that
5    the civilian monitors work under the supervision of the agents
6    who are tasked with executing the wiretap orders.
7                We have alleged that the -- and we have set
8    forth facts, which we think support the claim, that the
9    supervision -- there was no real supervision in this case or
10   that it was not adequate to meet the statutory requirement.
11               For example -- this is pretty fact heavy, but in
12   any event, I think it requires the Court to make a finding of
13   fact, which I don't think it can do on the papers.
14               We alleged in our original submission what --
15   what we did was we took the -- we took the line sheets which
16   the monitors maintain as they are executing the order, and
17   they are word searchable, and we looked for entries in that --
18   in every single one of the 75,000 intercepted communications
19   that indicated that the call had been minimized.  We presented
20   the results of that search in our first motion -- in the
21   motion -- in the brief in support of the motion.
22               And if the result of that search was correct,
23   the Court would have had to conclude that the agents did not
24   minimize a single call during the execution of the first order
25   of one target telephone and did not minimize a single call

1    during the execution of the first three orders as to the other

2    target telephone.

3              In response, the Government has offered an

4    affidavit from Special Agent Parkison basically saying that

5    these line sheets don't fairly, truthfully, or accurately

6    reflect what the monitors did; that, instead, the Court should

7    rely on the reports that are generated by the electronic

8    surveillance equipment and software.  And he has offered us

9    the reports that were generated.

10             I have no doubt that Special Agent Parkison is

11   operating in good faith here, but when we tried to go and

12   validate the accuracy of the data that were submitted in those

13   reports, we found a host of difficulties, which I outlined you

14   know at great burdensome length in the reply of the motion.

15             The Court is going to have to make factual

16   findings as to what happened in the course of the

17   interception.

18             We allege that the agents -- I'm sorry.

19             We did a sample of 6,000 calls during the entire

20   course of the interception.  During these calls, the agent --

21   the information submitted by the Government in response to the

22   motion says that they intercepted X number of calls in this

23   period, Y number of calls in this period, Z, et cetera.

24             When we went back to verify that data, we found,

25   we believe, that that data is incorrect and -- or that we

1    couldn't verify it because of difficulties with the

2    recordkeeping or recording system.

3                    I can go into this in the same kind of

4    excruciating detail that I tried to in the reply, but what it

5    comes down to is that there are factual issues as to what

6    happened here --

7                    THE COURT:  How much time do you want for your

8    factual hearing?

9                    MR. LaRENE:  I would think this is -- half a

10   day?

11                   THE COURT:  The Government?

12                   MR. PRATT:  Well, Your Honor, one of the

13   problems is -- they say that they can't verify it, but one of

14   the reasons they couldn't was because they thought that the --

15   because they thought that the times were misnumbered.

16                   And I subsequently e-mailed them last week and

17   explained to them that they can get the correct time for every

18   session.

19                   They were going off the time that the call was

20   archived; not the time the call was actually made.

21                   THE COURT:  I hate when that happens.

22                   MR. PRATT:  They now have the data when the

23   calls were actually made.

24                   My problem is, to have this vague open-ended

25   hearing into the process doesn't really get to the ultimate

1    point, which is that if the bottom line was that there was

2    adequate minimization, the Court doesn't need to make factual

3    findings about the process.

4            And I see this being a wide-ranging tell me,

5    agent, how often were you in the wire room; did you buy

6    Starbucks or whatever for the listeners.

7            To me, the bottom line is --

8            THE COURT:  How many civilians were involved in

9    this?

10           MR. PRATT:  I believe that there were five

11   interpreters that were used at various times, five different

12   interpreters.

13           THE COURT:  By themselves?

14           MR. PRATT:  No.

15           THE COURT:  Was there always an agent or a sworn

16   law enforcement official in the room?

17           MR. PRATT:  That's what I'm told, yes, Your

18   Honor.

19           THE COURT:  Do you dispute that?

20           MR. LaRENE:  I have absolutely no idea.

21           I don't know what the presence of the agents

22   means, however, if the agents don't understand the words that

23   are being intercepted.  So, realistically --

24           THE COURT:  Well, that's why the interpreters

25   were in the room.

1          MR. LaRENE:  Who is making the decision to turn

2    off the wire or not?

3          It seems to me that -- and, I don't know.

4    Perhaps the testimony will be that Monitor A is listening to

5    the call and he's saying to the agent, well, now they are

6    talking about buying a new car, shall I turn it off.  And the

7    agent says oh, yes, turn it off.  Maybe the --

8          THE COURT:  Why don't you ask?

9          MR. LaRENE:  I'm sorry?

10          THE COURT:  Why don't you ask?

11          MR. LaRENE:  Well, that's what an evidentiary

12    hearing would be for, sir.

13          THE COURT:  Well, I understand.  But before you

14    have an evidentiary hearing, you have to do some factual

15    investigation.

16          And I'm certain that the -- well, I'm not

17    certain, but --

18          MR. LaRENE:  Judge, I have done an awful lot of

19    factual investigation in this case and -- into the

20    minimization in this case.  And I'm telling you there are more

21    questions -- everything I look at -- every time I look at

22    something else, it raises more questions than it answers.

23          For example, the Government tells me that during

24    sample period one, or sample period whatever it is, they

25    minimized so many calls.  We go back and we look at the line

1    sheets.  These are agent activity logs that the Government now

2    says don't really log the activities of the agent.

3              I find during that sample period there are 100

4    calls -- 50 or a hundred calls which are potentially

5    minimizable.  They are marked nonpertinent.  They have

6    lengths.  They have sometimes 30, 40 minutes of -- why weren't

7    they minimized?

8              Well, I go and I look at the -- we try to listen

9    to the calls, and I find that the recordings have no data in

10   them.

11             This isn't a question of the --

12             THE COURT:  What do you mean, no data in them?

13             MR. LaRENE:  No data.  There's no recording.

14   There's no audio.  There's 216 bytes.

15             It is -- now, why does the -- why does the line

16   sheet reflect -- and this portion, this part of the line sheet

17   I believe is generated by software that reflected that

18   something was intercepted for 35 minutes when there's no

19   recording, no corresponding recording.  How can it be?

20             And we illustrate this in the reply.  There are

21   four calls, four sessions that occur at the same time, over

22   the same -- over the same target telephone.  There is no audio

23   data for three of them.

24             How can there be four calls all at the same

25   time, three of which are ghosts?

1              These are facts.  These are factual questions,
2       factual issues.
3              And I don't doubt the good faith of anybody at
4       that table.  I don't doubt Special Agent Parkison's good
5       faith, but I think there are serious questions that call into
6       question the integrity of this entire process, and I think --
7              THE COURT:  Let's hear a response.
8              MR. PRATT:  Your Honor, most of that question
9       revolves around the fact that these times that they have on
10      the audio portion were not the accurate ones.
11             There was a second file associated with that.
12      And that was when the call was actually taped -- actually took
13      place.  These archive times, the system, as explained to me --
14             THE COURT:  Okay.  You can stop.  You've already
15      explained to me.
16             Mr. LaRene, here's what I want from you -- first
17      of all, have you gone over their explanation?
18             MR. LaRENE:  Yes.
19             And that explanation -- what we are talking
20      about now, about the start times of the calls, have absolutely
21      nothing to do with the start times of the recordings.
22             I'm talking about calls that are reflected in
23      both the SRI, what they are calling the SRI files, which is
24      the System Record Information, and the line sheets.  The line
25      sheets are these times that I get, that I was just talking

1    about, where we have calls 807 through 810 which clearly

2    overlap.

3              And Exhibit 7 shows hundreds of these calls that

4    I found in just an examination of sample periods.

5              There are thousands and thousands of these calls

6    throughout the period of the interception where you have line

7    sheets that are reflecting either calls at the same time,

8    calls with significant recording duration, but no data.

9              Now, how did this happen?  I don't know.  And

10   I'm not prepared to make assumptions.  And these are not

11   explained.

12             Mr. Pratt was helpful in answering one of the

13   questions, but it's hardly the most profound question.

14             Where's the data?

15             And I think it's too important a question, you

16   know, to be settled with, you know, a handshake and a kiss.

17             Now, I will be happy to meet with Special Agent

18   Parkison, with Mr. Neal and with Mr. Pratt, and ask all of the

19   questions that I have, although there's a lot of them.

20             But, quite frankly, I brought the motion, we

21   brought the motion because we felt that the data was

22   disturbing and required the solemnity of a hearing and a

23   determination by you as a fact-finder as to whether or not

24   these recordings are trustworthy enough, whether the conduct

25   of the agents and the monitors in collecting these recordings

US v Patel, et. al. #11-cr-20468

1    and exercising the -- excuse me -- executing the orders of the

2    Court was sufficient.

3                    THE COURT:  Mr. LaRene, you have made your

4    point.

5                    MR. LaRENE:  All right.  Well, then I'll sit

6    down and shut up.

7                    THE COURT:  But that point leads me to the

8    conclusion that your last suggestion is your best suggestion,

9    which is to sit down with the agent and with the Government

10   and let them attempt to explain to you, to your satisfaction,

11   why their SRIs are different than their DVDs, or whatever the

12   letters are.

13                    And you may find that it's just because you're

14   asking -- you are making correlations between one set and

15   another, which -- and you may find that you are absolutely

16   right.

17                    So, do it.

18                    MR. LaRENE:  Absolutely.

19                    THE COURT:  And then if you want an evidentiary

20   hearing, come back with two or three pages on the point of

21   where the inconsistencies are in the recordkeeping between

22   what you find in the data bank; and, two -- and just as

23   important -- your leading cases, two or three leading cases

24   that say that a failure to supervise or a failure to minimize

25   is grounds for suppressing all of the wiretaps.

1          MR. LaRENE:  I'm happy to do that.  We've

2     already given you some of that.

3          THE COURT:  I understand.

4          MR. LaRENE:  No matter what we come up with on

5     this data -- and I -- you know, I've never seen a brief I

6     didn't want to write.  But we're still going to be left with

7     the question of -- the factual question as to -- putting aside

8     the anomalies, there's still going to be factual issues about

9     what got minimized, what didn't get minimized that shouldn't

10    have been minimized.  Those are factual issues, and I have put

11    that --

12         THE COURT:  That's fine.  And then you can tell

13    me where failure to minimalize is a basis for --

14         MR. LaRENE:  I would be happy to do that.  I

15    think we are kind of putting the --

16         THE COURT:  And what is required to be

17    suppressed.

18         MR. LaRENE:  Remember also, Judge, that

19    Defendant No. 1, who is a party to all of these cases -- all

20    of these conversations, his telephone, has joined in this

21    motion.  So, the issue --

22         THE COURT:  Why don't you work with him also?

23    He has an attorney.

24         MR. LaRENE:  Everything -- all of the

25    conversations are on the table.  I mean, there's also a

1    subissue of standing which --

2                    THE COURT:  Do you want to represent Defendant

3    No. 1?

4                    I haven't heard him join in what you are

5    suggesting now, but he may as well if he wants to.

6                    MR. LaRENE:  He signed the papers, Judge.

7                    THE COURT:  I understand that.

8                    MR. LaRENE:  The other thing, what I was going

9    to say is the question of remedy -- and I'm happy to write the

10   brief, but the question of remedy depends to a great extent on

11   the degree of violation.  In other words --

12                   THE COURT:  That's why I'm suggesting that you

13   keep it very short and give me some choices.

14                   MR. LaRENE:  Well, I will keep it as short as I

15   possibly can.

16                   Our position is, however, that there's

17   persistent failure to minimize throughout the course of the

18   interception that is to such a degree that it requires the

19   Court to invoke the total suppression remedy.

20                   I'll do the law --

21                   THE COURT:  Mr. Niskar?

22                   MR. LaRENE:  -- but it still is going to be

23   based on a question of fact, which can only be resolved at an

24   evidentiary hearing, but...

25                   THE COURT:  That's four.  The record is six.

US v Patel, et. al. #11-cr-20468

```
 1              Mr. Niskar?

 2              MR. NISKAR:  Yes.

 3              THE COURT:  Do you have anything --

 4              MR. NISKAR:  I have nothing further to state.

 5              THE COURT:  -- to add?

 6              All right.  Do you have anything to add, was the

 7   question?

 8              MR. NISKAR:  No.

 9              THE COURT:  All right.  What other motions do we

10   have?

11              There's the motions to severe?  Are those now

12   moot by the groupings of 1 and 2?

13              MR. BURDICK:  No, Your Honor.

14              Mr. Kriger and I have joined various motions to

15   sever.  We have more or less done concurring opinions as

16   opposed to joining the writer of the opinion in the sense that

17   we have different reasons.

18              The primary reason Mr. Kriger and I have sought

19   to be tried separately -- our clients to be tried separately

20   is they are the only two Defendants in this case who are not

21   charged with this massive -- these massive drug allegations.

22   The drug allegations are even more extensive than anything

23   else in the case, and anything else is more or less drowned

24   out by them.  We are not charged with any violation of any

25   kind relating to controlled substances and, yet, being tried
```

1   not only with five or six others who are, but one of whom is

2   Mr. Babubhai Patel who is going to be referred to repeatedly

3   in various levels of denigrating terms and sitting virtually

4   next to our clients.

5           We think it's -- I don't want to speak for

6   Mr. Kriger, but I feel it's massively prejudicial with very

7   little benefit to the Government and --

8           THE COURT:  So, you're in Group 1?

9           MR. BURDICK:  Pardon?

10          THE COURT:  You're in Group 1?

11          MR. BURDICK:  We are.

12          And Group 1 and Group 2 are fairly similar.

13  Group 1 is worse because it's got Defendant No. 1 in it.  But

14  it seems to me that a trial with just two Defendants,

15  Mr. Kriger's and mine, even though it would mean presenting

16  some of the same evidence a third time, would be very...

17          THE COURT:  Are you the only two who have

18  motions to sever?

19          MR. BURDICK:  We have joined motions to sever.

20          Mr. Kriger has filed?

21          MR. KRIGER:  I have not, not once.  I haven't

22  joined, because I am still waiting for that one answer --

23          THE COURT:  All right.  Well, then sit down.

24          MR. BURDICK:  We both raised it at the February

25  29th hearing.  As I say, it's sort of a concurring opinion to

1    the majority --

2                    THE COURT:  Who raised it?

3                    MR. BURDICK:  Well, Dr. Vaid's counsel raised

4    one, and one attorney who is not here was the primary one --

5    when I say "we," I don't mean Mr. Kriger and me.

6                    THE COURT:  Mr. Elder?

7                    MR. ELDER:  Yes, Your Honor.  I filed a motion

8    to sever.  Based on the fact that we have two groups, Your

9    Honor, it's a moot point as to my client.

10                   THE COURT:  Okay.  Does the Government want to

11   respond to Mr. Burdick's singular motion?

12                   MR. NEAL:  Just briefly, Your Honor.

13                   There's significant preference in the case law

14   for joint trials.  Defendants are charged -- or tried together

15   in situations where they are charged with different things all

16   the time in this district and I believe in every district

17   around the country.

18                   The Defendant would need to point to some

19   specific right that is prejudiced by being joined in a trial

20   with his or her Co-Defendants in order to justify a severance.

21   And no such circumstances exist in this case.

22                   The evidence being presented against

23   Mr. Burdick's client is very tightly focused, very, very

24   consistent with the evidence that will be presented against

25   Babubhai Patel and many of the other Defendants she is being

1    tried with.  There is simply no basis for a severance in this

2    case.

3                    MR. BURDICK:  A brief reply.

4                    I would point out that that's correct, as far as

5    it goes, with respect to the 1349 conspiracy, the health care

6    fraud conspiracy.

7                    But, Judge, you know, when you have 12 people,

8    or 14 or whatever we are having, sitting there in the jury box

9    listening to the issue of whether or not my client, for

10   example, is involved in health care fraud, and sitting next to

11   her or down the path is Babubhai Patel and I think five other

12   Defendants, all of whom are involved in extensive -- or,

13   alleged to have been involved in extensive violations of Title

14   21, controlled substances statute, it overwhelms jurors --

15                    THE COURT:  You can actually use that to your

16   advantage.

17                    MR. BURDICK:  It overwhelms jurors, Judge.  It

18   is not a hiding in the weeds in that case.  Hiding in the

19   weeds --

20                    THE COURT:  No pun intended?

21                    MR. BURDICK:  No pun intended.

22                    If that's what we are referring to, if everybody

23   is charged with the same or similar things -- I mean, here it

24   is -- one is a 10-year offense and one is a minimum mandatory

25   10-year.

US v Patel, et. al. #11-cr-20468

1          MR. NEAL:  Not under these circumstances.

2    There's no mandatory minimum.

3          MR. BURDICK:  But, you know, you talk to the

4    jury about, well, did -- my client is basically going to be

5    alleged to have had a connection with Babubhai Patel in terms

6    of some conversations that she was involved in, three or four

7    or five telephone conversations that reflect --

8          THE COURT:  Okay.  I understand.

9          MR. BURDICK:   -- very minimal participation in

10   that regard.  And then all of a sudden, boom, there are all

11   these conversations about drugs.

12          At one point, Mr. Patel had asked her apparently

13   to store some boxes in her apartment that she agreed to.

14   There was nothing in any of those conversations that reflected

15   or suggested that she knew what was in there.  She merely said

16   yes to a fellow who had been her mentor who --

17          THE COURT:  Are you going to produce that?

18          MR. BURDICK:  The Government is.

19          THE COURT:  I'm asking Mr. Neal.

20          MR. NEAL:  Yes, the Government does intend to

21   introduce that conversation.

22          THE COURT:  Okay.

23          MR. NEAL:  Your Honor, just responding to the

24   merits of Mr. Burdick's --

25          MR. BURDICK:  If I may, counsel.  I'm sorry.

US v Patel, et. al. #11-cr-20468

```
 1              If there is a witness or two, particularly --
 2    but one of the Co-Defendants who has decided to cooperate who
 3    is testifying separately from that conversation, is testifying
 4    that he had some conversation with her and that she knew they
 5    were medications.  Not the drugs, not the controlled
 6    substances that you are talking about.  But the drugs, the
 7    medications that were billed but not provided to the people
 8    with the prescriptions for whom they were written.
 9              MR. NEAL:  Your Honor, it strikes me that a
10    properly instructed jury, accompanied by a zealous advocate,
11    as Mr. Burdick is, can certainly sort out who is charged with
12    what and what evidence presented in the case goes to what
13    allegations as to each of the Defendants.
14              THE COURT:  I'm going to deny the motion,
15    Mr. Burdick.
16              Anything else?
17              MR. NEAL:  Your Honor, I believe the only
18    pending motion is the jury selection and services act motion.
19              THE COURT:  Didn't we just get a Sixth Circuit
20    verdict on this?  No?
21              Go on.
22              MR. NISKAR:  I don't think so, Your Honor.
23    However it's --
24              THE COURT:  What's your point on this?
25              MR. NISKAR:  Our point is that unless we are
```

1    allowed to present the testimony of the jury clerk, we are not

2    able to show that there is or may be a disparity between the

3    Asian Indians on the jury list who are actually registered to

4    vote and those that are eligible but not registered.

5            So, unless we can do that, unless we can present

6    that testimony by way of an evidentiary hearing -- that's the

7    way we can make our prima facie case.

8            THE COURT:  Have you interviewed the jury clerk?

9            MR. NISKAR:  No.  I don't think we are allowed

10   to unless the Court allows us or enters an order allowing us

11   to do that --

12           THE COURT:  Let me look at that.  We have got a

13   new administrative rule that tells us what we are allowed to

14   do or not.  I have not looked at that.

15           MR. NISKAR:  All right.

16           THE COURT:  So, that one will be dealt with.

17           MR. NISKAR:  Thank you.

18           THE COURT:  Anything else?

19           MR. NEAL:  I don't believe so, Your Honor.

20           MR. LaRENE:  Move to adjourn?

21           THE COURT:  I think so.

22           Anyone who he hasn't spoken who has anything to

23   say?

24           MR. BURDICK:  Your Honor, may Mr. Neal and I

25   approach the bench?

US v Patel, et. al. #11-cr-20468

```
 1                    THE COURT:  I don't think so.

 2                    MR. BURDICK:  Mr. Neal, Mr. Pratt and I approach

 3          the bench, off the record?

 4                    THE COURT:  I don't think so.

 5                    MR. BURDICK:  May we approach the bench on a

 6          separate record?

 7                    THE COURT:  I guess.

 8                    Anyone have any objection?

 9                    MR. NISKAR:  I don't have any objection.

10                    MR. LaRENE:  No, we don't, Judge.

11                    THE COURT:  Okay.  But it's on the record.

12                    (Bench Conference held out of the hearing of the

13                    courtroom audience, between the Court and

14                    counsel, on the record, as follows:)

15                    MR. BURDICK:  As briefly as possible, my client

16          lived in India.  When she was coming to the United States to

17          work as a physical therapist, her relatives and Babubhai Patel

18          knew one another.  She was sent to -- he agreed to sort of

19          mentor her, live in his house with his wife and his children,

20          and so forth, and he helped her along in getting started.

21                    THE COURT:  So, what is the relevance?

22                    MR. BURDICK:  There may be during the course of

23          the testimony, if he's in part of the case that we're in, some

24          allusions to a more different kind of relationship than the

25          standard kind of mentor relationship.  And if she is not with
```

1   him, it may have a significantly lesser social and familial

2   impact.

3                    I've talked briefly with Mr. Neal about it.  I

4   have not spoken with Mr. Pratt.  And I -- Mr. Neal considered

5   my suggestion, but ultimately declined the opportunity to not

6   be tried with Mr. Babubhai Patel.  That's as much as I want to

7   say on the record.

8                    Suffice it to say, that counsel does know

9   exactly what I'm talking about.

10                   MR. NEAL:  I am familiar with what Mr. Burdick

11  is referring to.

12                   THE COURT:  Use your sidebar voice.

13                   MR. NEAL:  Again, I don't think that that's any

14  justification for a severance in this case.

15                   THE COURT:  Well, you are not going to raise it?

16                   MR. NEAL:  Excuse me?

17                   THE COURT:  You are not going to refer to it?

18                   MR. NEAL:  Well, I think it may well come out,

19  and I think --

20                   THE COURT:  Well, you are going to instruct the

21  witnesses that it may well not come out.

22                   MR. NEAL:  It's possible that it's relevant.

23  The relationship between Babubhai Patel and Ms. Acharya goes a

24  long way to explaining -- again --

25                   THE COURT:  A mentee, he will stipulate to.  A

1    sponsor, he will stipulate to.

2              MR. NEAL:  I think there's reference to the

3    nature of their relationship in some of the calls we intend to

4    use.

5              THE COURT:  Excuse me?

6              MR. NEAL:  In some of the calls we intend to

7    use, I think there are references to it.  To the extent we

8    can --

9              THE COURT:  We won't have a trial within a trial

10   on the relationship.

11             MR. NEAL:  Agreed.

12             THE COURT:  All right.  Thank you.

13             MR. BURDICK:  Thanks.

14             *(End of Bench conference.)*

15             THE COURT:  We will see you next time.

16             MR. NEAL:  Thank you, Judge.

17             MR. BURDICK:  Thank you, Your Honor.

18             *(Proceedings adjourned at 4:44 p.m.)*

19                        _      _      _

20

21

22

23

24

25

STATE OF MICHIGAN )
                  ) ss.
COUNTY OF WAYNE   )


I, Denise A. Mosby, Federal Official Court Reporter, do
certify that the foregoing is a correct transcript from the
record of proceedings in the above matter.


                              s/ Denise A. Mosby
                              _____
                              DENISE A. MOSBY, CSR, RMR, CRR
                              United States Court Reporter
                              124 Theodore Levin U.S. Courthouse
                              231 W. Lafayette Boulevard
                              Detroit, MI 48226
                              313.961.6230
                              Denise_Mosby@mied.uscourts.gov

Dated:   April 18, 2013