UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                       Case No. 11-cr-20468

          Plaintiff,         Hon. Arthur Tarnow

    vs.

BABUBHAI PATEL, R.Ph, et. al.,

          Defendants.
_____/

### TRANSCRIPT OF MOTIONS HEARING

BEFORE THE HONORABLE ARTHUR J. TARNOW
UNITED STATES DISTRICT COURT SENIOR JUDGE
Detroit, Michigan
Thursday, June 14, 2012

APPEARANCES:

FOR GOVERNMENT:     JOHN K. NEAL, ESQ.
                     WAYNE F. PRATT, ESQ.

FOR DEFENDANT      JOSEPH A. NISKAR, ESQ.
B. PATEL:           ASHISH JOSHI, ESQ.

FOR DEFENDANT      EDWARD C.WISHNOW, ESQ.
SHARMA:

FOR DEFENDANT      N.C. DEDAY LaRENE, ESQ.
RAWAL:             LaRene & Kriger

FOR DEFENDANT      FRANK J. SIMMONS, II, ESQ.
THAKER:

FOR DEFENDANT      HAROLD Z. GUREWITZ, ESQ.
TAYAL:

                   *    *    *

OFFICIAL COURT REPORTER:
Denise A. Mosby, CSR, RMR, CRR
313) 961-6230    www.transcriptorders.com

US v Patel, et al. #11-CR-20468

```
APPEARANCES CONTINUED:


FOR DEFENDANT        MARK J. KRIGER, ESQ.
SACHDEVA:            LaRene & Kriger

FOR DEFENDANT        JAMES L. FEINBERG, ESQ.
R. PATEL:

FOR DEFENDANT        RICHARD D. KORN, ESQ.
VAID:

FOR DEFENDANT        JAMES W. BURDICK, ESQ.
ACHARYA:             Burdick Law, PC

FOR DEFENDANT        SEYMOUR BERGER, ESQ.
ELLIOTT:
```

<pre>
             I   N   D   E   X
</pre>

**WITNESS:**                                              **PAGE**

**MOTION TO SUPPRESS**

**TYLER PARKISON**
    Direct-Examination by Mr. Pratt                      8
    Cross-Examination by Mr. LaRene                     24
    Cross-Examination by Mr. Burdick                    39
    Cross-Examination by Mr. Gurewitz                   49
    Cross-Examination by Mr. Niskar                     49
    Redirect-Examination by Mr. Pratt                   52
    Recross-Examination by Mr. Gurewitz                 53
    Recross-Examination by Mr. LaRene                   54
    Redirect-Examination by Mr. Pratt                   55

ORAL ARGUMENT                                            56

RULING BY THE COURT                                      77


**MOTION TO DISMISS**

ORAL ARGUMENT                                            79

RULING BY THE COURT                                      82


**MOTIONS IN LIMINE**                                     84


**PRE-TRIAL MATTERS**                                    102

**E X H I B I T S**

<u>EXHIBIT NO.</u>      <u>IDENTIFICATION</u>                    <u>PAGE</u>

(NONE.)

```
 1                        Detroit, Michigan

 2                        Thursday, June 14, 2012

 3                        10:25 a.m.

 4                    -      -      -

 5            MR. NEAL:  Good morning, Your Honor.  John Neal and

 6    Wayne Pratt, appearing on behalf of the United States.

 7            And with us at counsel table is Special Agent Tyler

 8    Parkison, with the DEA, P-A-R-K-I-S-O-N.

 9            MR. NISKAR:  Good morning, Your Honor.  May it please

10    the Court, Joseph Niskar and Ashish Joshi, on behalf of and

11    with Mr. Patel, who is seated to my right.

12            MR. KRIGER:  Good morning, Your Honor.  Mark Kriger,

13    on behalf of Mr. Sachdeva, who is seated to my right.

14            MR. WISHNOW:  Good morning.  Edward Wishnow, on

15    behalf of Ashwani Sharma, who is seated to my left.

16            MR. GUREWITZ:  Good morning, Your Honor.  Howard

17    Gurewitz, on behalf of Lokesh Tayal, who is seated here to my

18    right.

19            MR. BURDICK:  James Burdick, here and on behalf of

20    Komal Acharya, who is seated to my right.

21            MR. FEINBERG:  James L. Feinberg, attorney for Ramesh

22    Patel.  I am waving his presence.

23            MR. KORN:  Good morning, Your Honor.  Richard Korn,

24    on behalf of Mustak Vaid.  I am also waiving his presence.

25            MR. LaRENE:  And Deday LaRene for Brijesh Rawal, who
```

1    is present with me this morning.

2            MR. BERGER:  Seymour Berger, appearing on behalf of

3    Leodis Elliott.  I am waiving his presence, Your Honor.

4            THE COURT:  Anyone else?

5            I take it some of you are from trial two?

6            MR. FEINBERG:  Yes, Your Honor.

7            MR. BERGER:  Yes.

8            THE COURT:  Okay.  Is there anyone not here or

9    represented from trial one or trial two?

10           MR. LaRENE:  Yes.  Mr. Thaker, who is represented by

11   Frank Simmons, is not present.

12           I spoke to Mr. Simmons a few moments ago, and he said

13   that both he and his client were on their way.  There may have

14   been a -- some confusion about the time, but I will let

15   Mr. Simmons speak for himself.

16           THE COURT:  The record should reflect it is now 25

17   after ten for a ten o'clock hearing.  And the vast majority, if

18   not all, of the lawyers and Defendants were here at ten

19   o'clock.  Everyone was here except for the Court.

20           Mr. Neal, do you have any one who is supposed to be

21   here and not here?

22           MR. NEAL:  No, Your Honor.

23           THE COURT:  Okay.

24           How do you want to proceed?

25           Have you reached agreement on any of these motions?

1          MR. LaRENE:  No, sir.  It's not necessary.  I think

2     he only needs to be here for the final pretrial.

3          THE COURT:  No, no.  Have you reached agreement --

4          MR. LaRENE:  Oh, I'm sorry.

5          THE COURT:  -- on any of the motions?

6          MR. NEAL:  Your Honor, we have not reached agreement

7     on any of the motions that are pending.

8          MR. LaRENE:  If Mr. Neal would let me speak for the

9     Government, it would be easy, but he just won't.

10         MR. NEAL:  And the analogue of that is, if I could

11    speak for the Defense, it would be very easy.  But no.

12         As I see it, there are several motions that pending

13    before the Court today.  The first is that Defendants' omnibus

14    motion to suppress the fruits of the electronic surveillance in

15    this case, and the Court did order an evidentiary hearing on

16    that matter.

17         THE COURT:  Who is your witness?

18         MR. NEAL:  Tyler Parkinson from the DEA is our

19    witness.

20         THE COURT:  Okay.

21         MR. NEAL:  Should we proceed with that hearing at

22    this point, Your Honor?

23         THE COURT:  I would think so.

24         Any objection?

25         MR. LaRENE:  No, Your Honor.

1          THE COURT:  Okay.  That's what we are here for.

2          We just got word that Mr. Simmons is on his way from

3    Toledo.

4          Would you raise your right hand, please.

5          TYLER PARKISON , GOVERNMENT'S WITNESS, SWORN.

6          THE COURT:  You may proceed.

7                    DIRECT-EXAMINATION

8    BY MR. PRATT:

9    Q.  Sir, please state your full name for the record.

10   A.  My name is Tyler Parkinson.

11   Q.  How are you employed?

12   A.  I am employed by the Drug Enforcement Administration.

13   Q.  In what capacity are you employed by the DEA?

14   A.  I'm a Special Agent.

15   Q.  Did you have any participation in the investigation of the

16   case that's under indictment here, Patel and the 25 other

17   Defendants?

18   A.  Yes, I did.  I was a co-case agent on the case.

19   Q.  And when you say co-case agent, what does that mean in

20   terms of your duties and responsibilities?

21   A.  Myself and another agent were in charge of the

22   investigation and ran the investigation.

23   Q.  All right.  Did that include the time that the various

24   wiretaps were authorized and conducted?

25   A.  Yes.

1    Q.  All right.  Can you tell the Court specifically what was

2    your role as co-case agent in the time leading up to and

3    obtaining the initial wiretap authorization?

4    A.  My duties included helping with surveillance, managing

5    cooperating sources, writing the TIII affidavit and managing

6    the everyday activities of the case.

7    Q.  So, you say you wrote the initial wiretap affidavit; is

8    that correct?

9    A.  Yes.

10   Q.  All right.  And when was that wiretap presented to the

11   Court and when was it implemented?

12   A.  It was presented to the Court on January 10, 2011.

13            THE COURT:  At 4:30 p.m.?

14   A.  Sometime in the afternoon.

15            THE COURT:  Mm-hmm.

16   BY MR. PRATT:

17   Q.  All right.  Once you obtained the authorization, did you

18   have a direct role in the operation of the wiretap?

19   A.  Yes.  Once we had the affidavit signed and approved, we

20   then had it initiated later in the day.  But prior to that, we

21   did have a minimization meeting.

22   Q.  All right.  We will get to that in a minute, but I want to

23   ask you in terms of who was in charge, so-to-speak.

24            Can you tell us who was the supervisor or the

25   controller of the wiretap operation, which agent or agents?

1    A.   The controller of the wiretap was TFO Doug Carmack and

2    myself, the two co-case agents on the case.

3    Q.   All right.  Now, when you say you were in control of it,

4    can you tell the Court what that means to be in control of it,

5    all of the jobs and responsibilities you carried out?

6    A.   The responsibilities were to -- a schedule had to be made

7    in order to man the wire.  We had two shifts, a morning and

8    evening shift.  We --

9    Q.   How long were the shifts?

10   A.   They were eight hours.

11   Q.   So, what time did they start and what time did they run?

12   A.   They typically ran from eight a.m. to four p.m., and then

13   four p.m. to midnight.

14   Q.   And what happened after midnight?

15   A.   At midnight the wire was shut down, was turned off.

16   Q.   Okay.  Was it you that made that decision?

17   A.   Yes.  Myself and, again, TFO Carmack, we decided that that

18   would be the best time to run the wiretap.

19   Q.   All right.  When you say assign the shifts, what did you do

20   that was involved with that?

21   A.   Well, because a wire is very labor intensive and requires a

22   lot of manpower, first we had to figure out who we were going

23   to have to be able to help with the wire, and then we had to

24   assign -- make up a schedule for the length of, you know, the

25   first month of the wire for each shift.

1    Q.   Okay.  And so that was your responsibility as co-case

2    agent?

3    A.   Yes.

4    Q.   All right.  Once the wire was being monitored and calls

5    were coming in, what responsibilities did you have as the

6    co-case agent?

7    A.   My main responsibility -- one of my main responsibilities

8    is I reviewed the calls and I met with the agents who were

9    assigned to the shifts to get updates as to what was occurring,

10   and I also met with the translators as well.

11   Q.   Now, when you say there were agents and translators, how

12   did you utilize both agents and translators in the monitoring?

13   A.   There was an agent assigned to each shift, and then there

14   were also two translators assigned to each shift.  And the

15   reason for that was that we were up on two telephone lines.

16   So, we needed two translators to monitor those lines.  And we

17   also had the agent in there for supervision purposes, if there

18   were any questions; and also if there were calls that came in

19   in English, the supervising agent would typically transcribe

20   those calls.

21   Q.   All right.  When you say answer questions, were there any

22   questions that ever arose to your level in the operation of the

23   wiretap?

24   A.   Yes, there were.

25   Q.   Can you give us any examples?

1   A.  Well, the questions that came in for me typically were if

2   there was a certain meeting to happen, do we want to -- do we

3   want to do surveillance on that, is that something that we want

4   to do.  And also as far as I would typically indicate -- the

5   monitors usually made a summary of the calls.  I would read

6   those and let them know which ones needed to be fully

7   transcribed or not.

8   Q.  Why was there a question between summaries versus full

9   transcripts?

10  A.  It depended on how important I felt the call was.  If it

11  was something that was very incriminating, I definitely wanted

12  to get that transcribed right away.

13          As we were up on -- you know, you are authorized for

14  30 days, and in order to continue the wire, you need to write

15  another affidavit.

16          Well, part of that involves, in the re-app.

17  affidavits, placing a summary of calls in those affidavits.

18  So, therefore I wanted to have those transcribed so that I

19  could accurately indicate what the calls were saying.

20  Q.  Was there any other written product during the first 30

21  days you had to assist in preparing?

22  A.  Yes.  There were 10-day reports.

23  Q.  And what was your role as co-case agent in the 10-day

24  reports?

25  A.  Some of the 10-day reports I wrote; others, the co-case

1    agent wrote.  But even on the ones that I didn't write,

2    typically I would help with those by pulling out calls that I

3    felt should go into the 10-day report.

4    Q.  Were there any technical problems during the carrying out

5    of the wiretap?

6    A.  Yes, there were some technical problems.

7    Q.  And who handled those; would that be you or would that be

8    the interpreters?

9    A.  Myself or TFO Carmack.

10   Q.  And what kind of -- do you recall any examples of any kind

11   of technical problems you had?

12   A.  I remember at one point we were not receiving all of the

13   information that we typically got from Verizon Wireless as far

14   as the telephone numbers that Babubhai Patel was calling or who

15   was calling him.  We were only receiving the voice data, but

16   not the telephone numbers.

17   Q.  And what did you do to address the technical problem?

18   A.  What we did to address the technical problem was contact

19   Verizon Wireless, let them know what was occurring, and then

20   that solved the problem.

21   Q.  Now, did you take -- as someone who is co-in-charge of

22   this, did you take any efforts to insure that calls were

23   minimized?

24   A.  Yes, I did.

25   Q.  What did you do?

1   A.  I participated in the minimization meeting that occurred

2   prior to the initiation of the wiretap.  As the wire went on,

3   we did add some translators, additional translators and some

4   additional agents.

5           Prior to them monitoring, I informed them about the

6   minimization requirements.  I told them that they needed to

7   read the Title III affidavit and that they were not to monitor

8   the wire until they had spoken with one of the AUSAs working on

9   the case to be formally minimized.

10  Q.  Okay.  And "minimized" sounds like an interesting term.

11          What was involved in being minimized either at the

12  conference or subsequent to the conference, but before

13  monitoring?

14  A.  The minimization meeting was to let everybody know which

15  type of calls should be minimized, such as certain privileges,

16  attorney-client privilege.  And then also it was discussed that

17  if there are calls that do not relate to the investigation,

18  that there should be some minimization that is occurring during

19  those calls.

20  Q.  Did you as co-supervisor or co-case agent, once there were

21  these initial conferences on minimization, did minimization

22  ever come up again?  Did you ever do anything else regarding

23  minimization?

24  A.  Yes, I did.  I can remember on a couple of different

25  occasions reminding the translators about minimization.

1  Q.  Okay.  Did you ever in the course of conducting the wiretap

2  collect any kind of statistics on minimization?

3  A.  Yes, I did.

4  Q.  How did you do that?

5  A.  The way that I collected minimization data was through the

6  Title III equipment, which is the Red Wolf system.  On the Red

7  Wolf system there is a reports function.  And when you create

8  the report, one of the pieces of information that it provides

9  you with is the number of calls that were minimized.

10 Q.  All right.  And was there a purpose of collecting this

11 information?

12 A.  Yes.  It was required for each 10-day report that had to be

13 submitted to the court.

14 Q.  All right.  Now, I'd like you to briefly explain the

15 technical means by which the interception was accomplished and

16 how the recordings were preserved.  Can you try to briefly

17 explain that to the Court?

18 A.  Yes.

19        To kind of summarize, first of all, the TIII

20 intercept data came in from the telephone company.  And at DEA

21 there is what's called -- it's called a record server.  And as

22 the call comes in, the calls are recorded on this server.  And

23 then each work station that is monitoring the calls accesses

24 the calls by tapping into the record server.

25        The way that the calls are preserved is -- I believe

1    the first time we preserved the calls was after 60 days.  And

2    what is done is that there's a disc that is placed into the

3    record server.  There's an evidence disc and there's also a

4    working copy disc.  They are both placed into the record

5    server.  And the call data is downloaded onto the working in

6    evidence copy.  Then the evidence copy is placed into evidence

7    and the working copy is maintained by DEA.

8    Q.  Okay.  When you say the working in evidence copies, are

9    these discs or are these hard drives or are they serve -- what

10   are they?

11   A.  They are a type of hard disc.

12   Q.  All right.  Let me ask you -- let me ask you this.  In

13   determining -- have you had the opportunity to review the --

14   one of the pleadings filed by Defense counsel which contained

15   calls that they indicated ought to have been minimized, but

16   were not?

17   A.  Yes.

18   Q.  All right.  And I'm not sure if I -- I don't think I'm

19   going to ask you questions specifically about each one, but let

20   me ask you this.  During your monitoring, did you have any kind

21   of issues or any kind of procedure for dealing with minimizing

22   calls that were business-related, that were talking about the

23   business of Mr. Patel and his pharmacy group?

24   A.  Yes.  We did have some problems minimizing the business

25   calls because Babubhai Patel hired pharmacists to facilitate

1    his criminal activity.  And I would categorize these calls into

2    about two categories; first being calls that were very

3    blatantly incriminating, such as bribing doctors and discussing

4    drugs that they had billed for but not dispensed.

5          And then you also had what I would call the second

6    category, which were important calls, such as Babubhai Patel

7    discussing meeting up with potential doctors he was recruiting

8    or discussing opening or closing pharmacies.  And even though

9    these calls were not blatantly incriminating, the information

10   in them was still very important to the investigation.

11         And the fact that there were so many business calls

12   that were related to the investigation, it did make it

13   difficult to minimize them.

14   Q.  What about calls that were asset-related, that showed the

15   purchase or disposition of assets, did you have a minimization

16   procedure for those?

17   A.  Yes, we did.

18         It was difficult to minimize those as well, because

19   Babubhai Patel had many discussions about purchasing gas

20   stations, motels and other property.  And, again, even

21   though -- the reason this was important for our investigation

22   had to do with asset tracking and issues of money laundering.

23   So, again, even though they may not have been discussing the

24   specific criminal activity, it was important to the

25   investigation.

1    Q.  Now, were there some personal calls intercepted that you

2    had decisions to make as to whether or not they were

3    appropriately minimized?

4    A.  Yes, there were.

5    Q.  And what issues arose regarding personal calls?

6    A.  Well, personal calls, as an example, Babubhai Patel had

7    relationships with individuals on a personal and business

8    level.

9          For example, one of the individuals in this category

10   was Komal Acharya.  And there's a specific call that occurred

11   on January 13, 2011 on Target Telephone 2 where Babubhai Patel

12   and Komal Acharya, at the beginning of the call it was

13   personal.  Komal Acharya was upset that Babubhai Patel was not

14   calling her.  Babubhai Patel stated that he was in a state of

15   confusion because he did not want to separate from his family.

16   And at one point, shortly thereafter that, Komal Acharya said

17   that she loved Babubhai Patel.

18          But what's really significant about that is that 11

19   lines later in the line sheet, the call went from being a

20   personal communication to very business-related.  So --

21   Q.  When you say business-related, what do you mean?

22   A.  Well, for example, they were asking that there were six

23   corporations of Babubhai Patel's that were in Komal Acharya's

24   name, and that by June or December there would be $18 million

25   in that account, which is significant to the investigation.

1    And they also discussed Komal Acharya possibly recruiting

2    patients for Babubhai Patel's pharmacy, which is an integral

3    part of the investigation.

4            So, if we would have minimized that personal part at

5    the beginning, we could have possibly missed the very pertinent

6    portion of the call.

7    Q.  Now, there were some calls that were a category of calls

8    regarding the Defendants' family and family vehicles.

9            Did you review those calls and have a reaction to the

10   suggestion that they should have been -- if it involved the

11   family or the family vehicles, they should have been minimized?

12   A.  No, I don't feel that they should have been minimized,

13   because as we found out later -- well, first of all, Babubhai

14   Patel, at least one of his family members was intricately

15   involved in this criminal activity.  And what we found out

16   later was that Babubhai Patel, for example, had a bank account

17   in one of his family member's names, Anish Patel, with just

18   under $600,000 in it.

19           So, family members were involved in the

20   investigation; thus, making it difficult to minimize.

21   Q.  Now, I want to address the question of attorney-client

22   calls.  Did that come up fairly early in the wiretap?

23   A.  Yes, it did.

24   Q.  All right.  And what procedure was followed once you

25   started realizing you were intercepting attorney-client calls?

1    A.   Once we found this out, we immediately were transferring

2    the copies of the calls to AUSA Wayne Pratt for review.   It was

3    determined by the U.S. Attorney's office that a Taint Team

4    needed to be set up in order to monitor these calls.

5    Q.   Can you explain what the Taint Team was, how the Taint Team

6    worked?

7    A.   A Taint Team, there were agents and investigators selected

8    who were not a part of the investigation to monitor the

9    attorney-client calls that came in over the wire.

10            So, you know, we had translators who were monitoring

11   the two lines.   When an attorney call would come in, they would

12   grab one of the taint agents and they would monitor those

13   calls.   Once the call was done, we would access the call from a

14   different work station, write up a summary or transcribe it,

15   and they would then provide the call to AUSA Dave Morris, who

16   had been assigned to review those calls.

17            THE COURT:   When you say "they," you are referring to

18   the Taint Team?

19   A.   Yes, the taint agents.

20   BY MR. PRATT:

21   Q.   And Assistant US Attorney Dave Morris, what was his role?

22   A.   Dave Morris's role was to review the calls to see if they

23   were -- did not -- if there was an attorney-client privilege in

24   them.   And if not, then those calls were to be released to the

25   agents, myself and TFO Doug Carmack, for review.

US v Patel, et al. #11-CR-20468

1    Q.  All right.  Now, AUSA Dave Morris, was he someone who had

2    been working with you, was working on the prosecution and

3    investigation of the case?

4    A.  No, he was not.

5    Q.  So, his only role was to be this taint attorney?

6    A.  Yes.

7    Q.  All right.  And did he ever -- in the course of the

8    wiretap, did he ever ascertain that there were calls that were

9    not within the privilege and did he ever turn any over to you?

10   A.  No, he did not turn over any of the calls.

11   Q.  So, the only attorney-client calls you would have had

12   access to would have been the handful in the very beginning

13   that resulted in the setting up of the Taint Team?

14   A.  Yes.

15   Q.  Now, did you -- I want to ask you finally one final area

16   about statistics.  There have been a lot of statistics I think

17   dealing with how many calls were intercepted and how many calls

18   were minimized.

19          It seems like it should be simple, but were there any

20   issues in determining actually over the -- from January through

21   July of 2011 how many discrete audio calls were intercepted?

22   A.  Yes, there's a way to do that within the Red Wolf system.

23   Again, a report could be generated that would show all of the

24   calls that contained audio in them.

25   Q.  All right.  Were some of -- when you say all of the calls

1  that contained audio, are there calls that -- were there calls

2  or session numbers in the Red Wolf system that did not contain

3  audio?

4  A.  Yes.

5  Q.  Was that a few or was that a significant number?

6  A.  It was a significant number.

7  Q.  And in some calculations were each session number dealt

8  with as a separate call?

9  A.  Would you repeat that?

10  Q.  In the calculation of some of the statistics that have been

11  used, were they done where each session number would be

12  considered a separate call, whether or not it included audio?

13  A.  Yes.

14  Q.  All right.  Did you recalculate the number of separate

15  calls based on the number of calls with audio files?

16  A.  Yes, I did.

17  Q.  And did you calculate how many of those calls were in

18  excess of 60 seconds?

19  A.  Yes.

20  Q.  And what results did you get on that calculation?

21  A.  I would not know the exact numbers, but if you have a sheet

22  with that data, I can ...

23  Q.  Okay.  Well, I'm not sure -- I'm not sure I have that, but

24  in any event -- let's see.  Just a minute.  Maybe I do.

25          MR. PRATT:  May I approach the witness, Your Honor?

1        THE COURT:  Yes.  And you don't have to ask.  And

2   that goes for every Defense attorney.

3   BY MR. PRATT:

4   Q.  All right.  How many discrete audio calls did you find when

5   you took out the duplicates of the ones that didn't have any

6   audio data?

7   A.  On Target Telephone 1, there were 11,831 calls.  On Target

8   Telephone 2, there were 6,835.

9   Q.  All right.  And how many of those were 60 seconds or

10  greater?

11  A.  The total for both lines was 5,952.

12  Q.  All right.  And how many calls were minimized during the

13  wiretap?

14  A.  685.

15  Q.  And of the calls then of larger than one minute, what was

16  the percentage of minimized calls versus those who were one

17  mint or longer?

18  A.  11.5 percent.

19        MR. PRATT:  Thank you, Your Honor.  I have nothing

20  further from this witness.

21        THE COURT:  Have you, Defense, decided an order of

22  cross-examination?

23        MR. LaRENE:  With everyone's permission, I guess I'll

24  start.

25        THE COURT:  Do you want to ask the people in the back

1    too?

2              MR. LaRENE:  I beg your pardon, sir?

3              THE COURT:  Do you want to ask the people in the

4    audience.

5              MR. LaRENE:  Sure.  Anybody got a problem with that?

6              THE COURT:  All right.

7                           CROSS-EXAMINATION

8    BY MR. LARENE:

9    Q.  Special Agent Parkinson, I just want to review a couple of

10   the statements you made.

11             You indicated that you were the author of the first

12   Title III affidavit?

13   A.  Yes.

14   Q.  Were you similarly the author of the affidavits which

15   followed it?

16   A.  Yes.

17   Q.  Did you draft the orders that were entered by the various

18   judges who reviewed those affidavits?

19   A.  What do you mean by "orders"?

20   Q.  Okay.  Well, let me back up.

21             You indicated that when you took -- you started off

22   on this wiretap project, you had a meeting with the folks that

23   were going to actually help you do the work?

24   A.  Yes.

25   Q.  And you had the agents and the translators who were working

1    with them read the affidavit that you drafted?

2    A.  Yes.

3    Q.  And did you have them sign it?

4    A.  Yes.

5    Q.  Did you have them look at any other paperwork?

6    A.  Not that I recall, no.

7    Q.  Okay.  Now, when you took that order -- I'm sorry -- that

8    affidavit --

9            Did you take the affidavit to the judges who

10   authorized the interception or was that done by the United

11   States Attorney?

12   A.  That was done by me and the AUSA.

13   Q.  Okay.  And did you happen to notice whether the judge

14   signed anything, any paperwork, after he reviewed your

15   affidavit?

16   A.  Yes.

17   Q.  Okay.  The paperwork that he signed was an order, right?

18   A.  Yes.  I understand what you're talking about.

19   Q.  Okay.  But that's not something that you were involved in

20   the preparation of, the order?

21   A.  No.  I was involved in the preparation of the affidavit.

22   Q.  Okay.  And that was what you based your instructions to

23   your fellow agents and their -- the monitors, the translators

24   who were helping them, correct, the affidavits?

25   A.  Yes.

1   Q.  Okay.  Now, I want to talk a little bit about the mechanics

2   of how a wiretap worked.  And there was one thing you said that

3   I really did not understand and I'd like you to clarify it.

4           You indicated that there is a feed of some sort from

5   the carrier who is handling the calls on the phones that you

6   are intercepting.  Right?

7   A.  Yes.

8   Q.  And that goes into the DEA server?

9   A.  In some way, yes.

10  Q.  Okay.  I understand you are not a tech guy.

11  A.  Yes.

12  Q.  But just -- your understanding is that that feed goes

13  directly into the DEA server or does it go through anything

14  else?

15  A.  My understanding is that the information comes from Verizon

16  to the record server.

17  Q.  So, everything that is broadcast or communicated by Verizon

18  gets recorded on the DEA server?

19  A.  Yes.

20  Q.  All right.  Now, the actual execution of the monitoring --

21  it's in a room somewhere.  I'm probably not aware of what it is

22  or what it looks like.  But I take it there are computer work

23  stations there?

24  A.  Yes.

25  Q.  And you indicated there would have been a work station for

1    Target Telephone 1 and a work station for Target Telephone 2.

2    Correct?

3    A.  Yes.

4    Q.  And the monitors, the people who were actually listening to

5    the calls, will have the ability to interface with this Red

6    Wolf surveillance system through the use of the -- these work

7    stations and their peripherals, correct?

8    A.  Yes.

9            To kind of explain this a little better, there are

10   multiple work stations in the wire room.  And when one logs on,

11   you log on to a Red Wolf system and you have access to Red

12   Wolf.

13           In order to -- you then have to --

14           To listen to the calls live, you then have to perform

15   a different function to do that.  And then you are listening to

16   the telephone line.

17   Q.  And the Red Wolf system expects -- it gets some of its

18   information from the Verizon, correct?

19   A.  (No response.)

20   Q.  We have to have verbal answers.

21   A.  Yes.

22   Q.  And then the monitors who are actually manning these work

23   stations, they input some information too.  Correct?

24   A.  All of the information for the call comes from Verizon.

25   Q.  That's correct.

1           But the monitor has to have some input too, correct?

2   A.  I don't understand what you're saying.

3   Q.  For example -- well, for example -- I want to show you just

4   an example of a line sheet.  The content isn't important.

5           But the line sheets to which you refer, it has -- in

6   the heading it has a variety of information?

7   A.  Yes.

8   Q.  Like what, the time, the duration of the call, that kind of

9   stuff?

10  A.  Yes, it does.

11  Q.  It also -- and that information -- that is, the time, the

12  during, the direction of the call, the telephone number

13  called -- that probably comes from Verizon.  Right?

14  A.  The -- yes.

15  Q.  The call data comes from --

16  A.  Yes.  Yes.  Yes.

17  Q.  Okay.  Then it also asks who is actually doing the

18  monitoring, right?

19  A.  (No response.)

20  Q.  It says "monitored by"?

21  A.  Yes.

22  Q.  Okay.  And this particular one that I'm showing you in the

23  field for "Monitored By," are -- it says R-K-O-T-E-C-H-A.

24  A.  Okay.

25  Q.  Do you know who that is?

1    A.   (No response.)

2    Q.   It's one of the translators, isn't it?

3    A.   I'm not sure.

4    Q.   Okay.

5    A.   I'm not sure how that field is populated.

6    Q.   Well, it would make sense, would it not, that the

7    person who is -- it asks for who is monitoring it.  It would

8    make sense that the person who is monitoring it would put their

9    name in.  Right?

10   A.   I don't know if that field is automatically populated or if

11   that is something that is typed in by the individual monitoring

12   the call.

13   Q.   Okay.  Well, who -- you don't know who this person is.

14            He's not an agent, right?

15   A.   No, that's not -- I don't think that's an agent, but I --

16   Q.   If it were an agent, if it was one of your fellow agents,

17   you would know the name, right?

18   A.   Most likely I would, yes.

19   Q.   Right.

20            And that doesn't look like the name of one of the

21   agents who worked with you, right, one of your brother agents?

22   A.   No.

23   Q.   All right.  And here is another line sheet.  Again, the

24   identity of it isn't important.  Monitored by letters

25   H-R-A-M-A-N.

US v Patel, et al. #11-CR-20468

1           Do you recognize that name?

2   A.  No, I don't know.

3   Q.  But that is not the name of an agent?

4   A.  I don't think that's the name of an agent, no.

5   Q.  It also indicates -- one of the other fields that needs to

6   be populated in this line sheet is language.

7           Some of them have something written in and some of

8   them don't, right?

9   A.  Yes.

10  Q.  Okay.  That information -- that is, the language in which

11  the intercepted communication was carried on -- that's

12  something that the monitor puts in.  Right?

13  A.  Yes.

14  Q.  Okay.  And it asks -- another field in this line sheet asks

15  whether it is pertinent or not pertinent; that is, asks the

16  classification.  Correct?

17  A.  Yes.

18  Q.  All right.  And that is something obviously Verizon doesn't

19  know; the monitor has to put that in?

20  A.  Yes.

21  Q.  Okay.  Now, you didn't do any of the actual monitoring,

22  correct?

23  A.  Correct.

24  Q.  Now, you indicated in your direct testimony that you had

25  assembled before the first period of monitoring began a number

1   of translators who would help you in the monitoring.  Right?

2   A.  Yes.

3   Q.  Okay.  And that was because you knew, as one of the case

4   agents, and based on your investigation, that a substantial

5   number of the calls that you expected, that you anticipated

6   intercepting would be in either Hindi or Gujarati?

7   A.  Yes.

8   Q.  And that Gujarati is spelled G-U-J-A-R-A-T-I, correct?

9   A.  (No response.)

10  Q.  Something close enough for the court reporter.

11  A.  Yes.

12  Q.  And you knew that in advance of beginning the interception,

13  correct?

14  A.  Yes.

15  Q.  And when it came to actually deciding -- oh, I'm sorry.

16          When it came to actually listening to the calls, the

17  work stations, only one person would listen to any one call at

18  one time.  Correct?

19  A.  Correct.

20  Q.  Okay.  And that would have been typically these

21  translators?

22  A.  Yes.

23  Q.  Who are not DEA agents?

24  A.  No, they are not DEA agents.

25  Q.  Okay.  And you knew -- I'm sorry.

1        You knew before -- I'm sorry.

2              MR. LaRENE:  I'm sorry, Judge.  Let's go back.

3  BY MR. LARENE:

4  Q.   When a foreign language calls come in and you don't speak

5  the language, the decision about whether the call should be

6  minimized, whether it should be listened to in full or should

7  stop listening to, was made in this case in every instance by

8  the nonagent monitors, translators.  Correct?

9  A.   Yes.

10  Q.   They didn't stop when they were listening and say to you,

11  Special Agent Parkinson, they are talking about children's toys

12  here, what should we do.  They just made their own decision

13  based upon their judgment and presumably the instructions which

14  you had given them?

15  A.   That, I don't know, because there were supervising agents

16  in the room who they may have asked those questions to.

17  Q.   But you can't tell us, from your own personal knowledge,

18  that it ever happened, can you, Special Agent Parkinson; that

19  one of these nonagent translators asked the advice of one of

20  the supervising agents about whether to intercept a call?

21  A.   No, I don't know.

22  Q.   Okay.  And that was not part of the protocol that you had

23  in place; that is, that these translators were required to

24  consult with the agents who were attending, was it?

25  A.   No, it was never required, but they were informed if they

1    had questions, that they could ask the agents --

2    Q.  They certainly could have.

3              But you are not aware of any case where that actually

4    happened?

5    A.  No, I'm not.

6    Q.  Okay.  You also said that when there was a call in

7    English -- and there were many calls that were in English,

8    correct?

9    A.  Yeah, there were some calls that were in English.

10   Q.  Well, for example, after a period of time, familiarity with

11   the particulars of this particular interception, you can

12   certainly have identified some participants in conversations

13   who would likely be conducting their conversations in English.

14   Correct?

15   A.  Yes.

16   Q.  Dr. Greenbain, who is a Defendant in this case, does not

17   speak, to your knowledge, Hindi or Gujarati, right?

18   A.  Yes.

19   Q.  LaVar Carter, who is a Defendant in this case, Leodis

20   Elliott, they are not Gujarati speakers.  Correct?

21   A.  Correct.

22   Q.  And you would know -- you also became familiar, did you

23   not, over time, with the numbers that would be associated with

24   these conversants, correct?

25   A.  Yes.

1    Q.  So, if you had a call coming in from or going out to a

2    number associated with an English speaker, you could probably

3    figure out that the call that was about to ensue was going to

4    be communicated in English.  Correct?

5    A.  Yes.

6    Q.  Now, you indicated that the attending agents would monitor

7    or transcribe or listen to calls that were in English.

8            Did you ever see that happen?  Did you ever see an

9    agent take over the headphones from a translator and actually

10   do the interception?

11   A.  I cannot recall personally seeing --

12   Q.  So, you don't have any personal knowledge of that ever

13   happening.  Correct?

14   A.  Correct.

15   Q.  And, in fact, if we were to go and look at these calls,

16   these line sheets that indicate somehow or other who is doing

17   the monitoring of English calls, we would see time and time

18   again these same names that we have seen in the other documents

19   I showed you, R-K-O-T-E-C-H-A, H-R-A-M-A-N.  Isn't that right?

20   A.  Well, correct that is right, because we did not implement

21   that policy to have the agent jump over and try to monitor a

22   call.

23   Q.  Okay.

24           Now, your initial affidavit, the opening affidavit

25   does not tell the judge to whom it was to be submitted that you

US v Patel, et al. #11-CR-20468

1    are planning to use these nonagent translators to actually do

2    the listening to the calls, as we've described it.  Correct?

3    A.  Correct.

4           To my understanding, that is not required --

5    Q.  I don't think there was a question pending.  I think you've

6    answered that question, but if you want to speak up, go ahead.

7    A.  To my understanding, that is not a requirement.

8    Q.  Where did you understand that from?  Where did you get that

9    understanding?

10   A.  From one of the writeups that I read by AUSA Pratt.

11   Q.  So, you were informed by the government lawyers here that

12   you didn't have to tell the judge that it was going to be

13   nonagent translators who were going to be doing the actual

14   monitoring, as we've discussed it.  Correct?

15   A.  No, I was not informed of that by an AUSA.  I read that

16   after the wiretap was over and completed with.

17   Q.  Oh, this was after?  Okay.  Then I misunderstood.

18          At the time you submitted your affidavit -- well, I

19   don't even think there's a question.

20          THE COURT:  You don't want to answer it?

21          MR. LaRENE:  I don't remember what the question was

22   going to be, Judge, quite frankly.  So, I can take my time and

23   think of something, but...

24   BY MR. LARENE:

25   Q.  Okay.  I want to talk for a few minutes about the -- this

1    attorney-client call business.

2              In your original affidavit you told the authorizing

3    judge, whomever it might have been, that you were going to

4    monitor -- in your minimization efforts you were going to

5    give --

6              THE COURT:  Are you at page 35?

7              MR. LaRENE:  I'm looking at page 53 of the original

8    affidavit.

9              THE COURT:  Why don't you go back and --

10             MR. LaRENE:  It may be from an exhibit page 35.

11   BY MR. LARENE:

12   Q.  You told the judge that, "Special attention shall be given

13   to minimize all privileged conversations."  Correct?

14   A.  Yes.

15   Q.  Okay.  And what that meant at the time you started the

16   interception was that the monitors would treat the calls to or

17   from lawyers the same way you treated any other calls.  You

18   would listen to them and if they seemed interceptable, you

19   would intercept them, and otherwise you would minimize them.

20   Correct?

21   A.  Would you repeat that?

22   Q.  Sure.

23             At the beginning of the interception, the monitors

24   would actually listen to the incoming or outgoing calls that

25   involved a lawyer or I guess assistant lawyer or any other

1   privileged communication of that nature, correct?

2   A.  Yes.

3   Q.  And they would make a decision about those calls the same

4   as they would make a decision about any other call about

5   whether it ought to be listened to.  Correct?

6   A.  Yes.

7   Q.  Okay.  Now, after a period of time, that changed?

8   A.  Yes, it did.

9   Q.  Relatively early on in the first interception?

10  A.  Yes.

11  Q.  And after that point and until the end of the interception,

12  all attorney-client calls were monitored -- were recorded in

13  full.  Correct?

14  A.  I don't know.

15  Q.  You don't know.

16          Well, I think you told us that the protocol was that

17  a taint agent would take over the monitoring --

18          So, now you would have three agents present -- or,

19  I'm sorry -- two agents present in the wire room?

20  A.  Yes.

21  Q.  And a taint agent would take over the interception where an

22  attorney-client call was involved.  Correct?

23  A.  Yes.

24  Q.  And I thought you said he would record that call and then

25  take it to an Assistant United States Attorney David Morris for

US v Patel, et al. #11-CR-20468

1    review about whether it should be -- whether it should be

2    minimized or not minimized, privileged or not privileged.

3    Correct?

4    A.  No.

5             The taint agent sat on the wire when the call came

6    in.  And they were instructed, if this call needs to be

7    minimized, that the standard minimization practices apply.

8    They would listen to the call.  If the call needed to be

9    minimized, they would minimize it.  If not, they would listen

10   to it.

11            After the call ended, they would write up a summary

12   or a transcription, and then the taint agent would take those

13   to Dave Morris for review.

14   Q.  All right.  And would the line sheets pertaining -- so

15   that -- strike that.  Let me go back.

16            When a call was minimized -- that is, when a monitor

17   pressed the appropriate button or clicked on the appropriate

18   field or whatever the physical act of minimization called

19   for -- that act would generate an entry into the Red Wolf

20   system.  Correct?

21   A.  Yes.

22   Q.  Okay.  You can, by running a report, recall those -- the

23   instances in which minimization occurred?

24   A.  Yes.

25   Q.  Ordinarily, with all else being equal, that act of

1    minimization would also generate an entry into the minimized

2    field of the line sheets.  Correct?

3    A.  Yes.

4    Q.  In this case, there was a glitch as to some of the data

5    that probably we don't need to get into in great detail here.

6    But if we had an accurate line sheet for a minimized call, the

7    line sheet would reflect the fact that it was minimized?

8    A.  Yes.

9    Q.  Now, have you seen the line sheets for the attorney-client

10   calls?

11   A.  No.

12   Q.  Well, that makes two of us.

13           MR. LaRENE:  All right.  Well, thank you very much,

14   Special Agent Parkinson.  I have no other questions at this

15   time.

16                       CROSS-EXAMINATION

17   BY MR. BURDICK:

18   Q.  Agent Parkinson, when you testified on direct, you began to

19   discuss, through the questioning of Mr. Pratt, minimization of

20   personal calls and sometimes the difficulty of minimizing

21   personal calls.  Correct?

22   A.  Yes.

23   Q.  You used an example of a telephone call between Komal

24   Acharya and Babubhai Patel to illustrate your point.

25   A.  Yes.

US v Patel, et al. #11-CR-20468

1  Q.  When you prepared for this testimony today -- I assume you

2  prepared for today's testimony.

3  A.  Yes.

4  Q.  When you prepared for today's testimony, you were made

5  aware or became aware of the issues which the Defense was

6  raising regarding the problems that the Defense sees with

7  respect to the way the tape recording was done -- the

8  monitoring of the tape recording was done?

9  A.  Yes.

10  Q.  When you planned your testimony, you planned to use

11  examples that you've used today?

12  A.  Yes.

13  Q.  You planned to use the Komal and Patel telephone

14  conversations to which you've made reference?

15  A.  Yes.

16  Q.  And you planned to use that as an example of personal calls

17  turning into criminal calls when you were asked about that by

18  Mr. Pratt?

19  A.  Yes.

20  Q.  Did you plan to use other calls or just that call?

21  A.  We planned to use that call because it was brought up in

22  one of the motions submitted by the Defense.

23  Q.  Do you happen to have that call with you, the translation

24  of that call with you?

25  A.  No, I do not.

1    Q.  You referred to that call as -- for a while you said Phone

2    No. 2.  I assume you mean the (586) number as opposed to the

3    (313) number?

4    A.  No.  Target Telephone 2 is the (313).

5    Q.  (313).

6            You talked about some discussion between -- there

7    obviously was some personal discussion between Ms. Acharya and

8    Mr. Patel.

9            How much of the transcription is taken up by the

10   personal conversation?

11   A.  I don't know the exact amount.

12   Q.  You said, that 11 lines later -- after some discussion of

13   fondness for one another, you said it was 11 lines later when

14   things turned.

15           You remember it was 11 lines, correct?

16   A.  Yes.

17   Q.  You remember that coming in to today?

18   A.  Yes, I did.

19   Q.  Do you remember how many pages the translation of that

20   conversation was?

21   A.  I believe it was a couple pages.

22   Q.  Could it have been as many as three pages?

23   A.  Possibly, yes.

24   Q.  When you prepared, you looked at that translation very

25   carefully, correct?

1    A.  Yes.

2    Q.  You said that -- you said that it referred to six

3    corporations that had been placed in Ms. Acharya's name,

4    correct?

5    A.  Yes.

6    Q.  And it referred to, by June or December, there would be $18

7    million in the account?

8    A.  In one of the corporations.

9    Q.  You said account.  But now you're saying corporations, not

10   account, if you recall?

11   A.  I recall that there would be 18 million in one of the

12   corporation accounts.

13          MR. BURDICK:  Thank you very much.

14   BY MR. BURDICK:

15   Q.  I'm sorry.  One of the corporations.

16          Not a corporation account, not a bank account, but

17   the value of a corporation; that's what you were saying?

18   A.  Yes.

19   Q.  Okay.  And you said to -- you said that there was

20   discussion of Komal recruiting patients for pharmacies of

21   Mr. Patel's, correct?

22   A.  Yes.

23   Q.  Do you remember how many times in that conversation whoever

24   translated it, typed it up, used the term "laughs," "both

25   laugh," "giggles," things of that nature?

1    MR. BURDICK:  Are these expensive?  I think I broke

2    it.

3    THE COURT:  I think it's appropriate, given the topic

4    you're talking about, you will do anything for a giggle or a

5    laugh.

6    BY MR. BURDICK:

7    Q.  Do you recall, for example, a statement that's typed in

8    here:

9    "Komal:  What had I said.  I don't remember what I

10   had said.  Yes, when your people -- when your people -- you --

11   (Voices overlap.) -- against you.  They speak against you.

12   Then you know they are moving forward.  (Laughs.)"

13   A.  Yes, I recall that.

14   Q.  Do you recall:

15   "I am proud" -- Bob says -- "I am that type of person

16   who does not want to leave his family.  And that put me in

17   confusion friend.  (Both laugh."

18   A.  I remember reading that line, yes.

19   Q.  Do you remember him saying:

20   "But friend that I don't know (Laughs) you could come

21   and disperse it."

22   Do you recall that?

23   A.  I don't recall it directly.  If I saw the line sheet, yes,

24   I probably would.

25   Q.  I hope you have better eyes than I do, because I'm

1    straining.

2           Do you recognize that as the conversation that you

3    were discussing?

4           THE COURT:  I think the question is does it refresh

5    your recollection.

6    BY MR. BURDICK:

7    Q.  Does it refresh your recollection?

8    A.  Yes.

9    Q.  So, there was laughter there.

10          That's page one, correct?

11   A.  Yes.

12   Q.  And page two, more laughter, correct?

13   A.  If I can see it, then yes.

14   Q.  Does this refresh your recollection?

15   A.  Yes.

16          THE COURT:  There is a way of making that print

17   bigger.

18          MR. BURDICK:  I know, Your Honor.  I'm sure there is.

19          THE COURT:  I'm sure somebody's grandchild can do

20   that for us.

21          MR. BURDICK:  Well, let me turn to something even

22   better.

23          THE COURT:  Your choice.

24   BY MR. BURDICK:

25   Q.  So, now you saw two pages of laughing conversation,

1    correct?

2    A.   Yes.

3    Q.   If I show you line sheet for line (313)434-8686, Session

4    No. 283, and ask you to count the pages, would you do that for

5    me, the pages of that conversation that was translated?

6    A.   There are nine sheets.

7    Q.   Nine pages, correct?

8    A.   Yes.

9    Q.   Okay.  And throughout, would you agree that there was:

10           "(Laugh.)  (Laugh.)

11           "For little sisters let me -- I have little less --

12   let me tell you honestly.

13           "(Laugh.)

14           "Komal:  What if I was your brother?

15           "(Bob and Komal laugh.)

16           "Your attachment would be a lot for me.

17           "(Giggles.)"

18           Do you remember that on page four?

19   A.   Yes, I recall that there were instances --

20   Q.   Okay.  So, now we're into four pages out of nine and they

21   are still laughing, correct?

22   A.   Correct.

23   Q.   Well, you don't suggest that those pages contain evidence

24   of criminal conduct, correct?

25           We are in the personal part still, right?

1  A.  No.  As we discussed, the beginning of the call was a

2  personal call.

3  THE COURT:  Is this still the same call that used to

4  be a three-page thing?

5  MR. BURDICK:  Same call, Your Honor.

6  BY MR. BURDICK:

7  Q.  And, in fact, throughout the portion of the call where

8  there's discussion about the $18 million, there's laughter

9  throughout, isn't there?

10  A.  (No response.)

11  Q.  Giggles, laughter, both laugh, one laughs, the other

12  laughs.  Is that a fair assessment of this conversation?

13  A.  Yes, there's laughter in the call.

14  Q.  Okay.  You've listened to this call or someone working

15  under you listened to this call all the way through, hearing

16  laughter and didn't minimize it.  Correct?

17  A.  Correct.

18  Q.  Just so that I have an understanding as well about the

19  procedure that you describe, it was my understanding that you

20  said the procedure for attorney-client calls was that a Taint

21  Team was created in the U.S. Attorney's office, staffed by

22  David Morris, an Assistant U.S. Attorney, and taint agents were

23  posted to the listening post.  Correct?

24  A.  Yes.

25  Q.  You said that the taint agents at the listening post were

US v Patel, et al. #11-CR-20468

1    to grab all attorney calls immediately.  I think that was your

2    term, grab the calls.

3    A.  I don't know if that was my term or not.  But what they did

4    is the translators were listening live on both of the two

5    telephone numbers.  When an attorney call came in, the

6    translator would say to the taint agent there's an attorney

7    call, come over and monitor the call.

8    Q.  So, the taint agent would then take the headphones and sit

9    at that station?

10   A.  Yes.

11   Q.  And the translator would go some place else or stand next

12   to him or something?

13   A.  Yes.

14   Q.  But that whole conversation -- all those conversations were

15   recorded in full.  Correct?

16   A.  I do not know.

17   Q.  You do not know?

18   A.  No.

19   Q.  Was there ever a process in the what you refer to as the

20   attorney-client call procedures that was developed by Mr. Pratt

21   or with Mr. Pratt and you, was there anything in there that

22   suggested that those calls should not be taped in full?

23   A.  Would you repeat that?

24   Q.  You said that you talked with Mr. Pratt, and either he or

25   the two of you came up with an attorney-client call procedure,

1    you said.

2    A.  The taint agents were instructed to, during the

3    attorney-client calls, to still perform the standard

4    minimization procedures.

5    Q.  Well, what calls were not recorded then if you don't know

6    whether or not the attorney-client calls were recorded?  What

7    calls were not recorded under your procedure?

8    A.  What calls were not recorded?

9    Q.  I asked you earlier and you were asked previously whether

10   or not the calls that were classified as attorney-client calls

11   were nonetheless recorded, so that Mr. Morris can make a

12   determination as to whether or not they should be part of the

13   investigation.

14   A.  Yes.

15   Q.  How would he do that if those calls were not recorded?

16   A.  Well, the calls were recorded.  I don't --

17   Q.  That's all I asked you.  That's all I asked you.

18   A.  Okay, yes.

19   Q.  The calls were recorded.  And then those calls were turned

20   over to Mr. Morris, and he made whatever decisions he made.

21   Correct?

22   A.  Yes.

23             MR. BURDICK:  Thank you, Your Honor.

24             THE COURT:  Next?

25             Does that mean everyone to the left of Mr. Burdick

1   does not have questions, or are we going to be going in this

2   order throughout the trial?

3           MR. WISHNOW:  I have no questions to ask.

4           MR. KRIGER:  I have no questions of the witness, but

5   I am not sure that that means that that's going to be the order

6   during the trial, Judge.

7           MR. GUREWITZ:  No, I do have just one question.

8                       CROSS-EXAMINATION

9   BY MR. GUREWITZ:

10  Q.  Mr. Parkinson, with regard to the line sheets of the

11  attorney-client calls --

12  A.  Yes.

13  Q.  -- was there something put in the field to indicate that

14  they were attorney-client?

15  A.  I do not know.

16  Q.  Was there someone other than the taint agent, whoever

17  reviewed that before it went to Mr. Morris?

18  A.  No.

19          MR. GUREWITZ:  That's all I have.

20          MR. NISKAR:  May I?

21          THE COURT:  Yes.

22          MR. NISKAR:  Thank you.

23                      CROSS-EXAMINATION

24  BY MR. NISKAR:

25  Q.  Agent Parkinson, on direct-examination you indicated that

1    11.5 percent of the calls on Target Telephone 1 and 2 were

2    minimized.  Correct?

3    A.  Of the voice calls greater than one minute.

4    Q.  Okay.  With regard to the attorney-client calls, did those

5    calls come in on Target Telephone 1 or Target Telephone 2?

6    A.  I believe they came in on both lines.

7    Q.  And of those calls, how many calls were attorney-client

8    calls out of the almost 18,000 calls?

9    A.  I don't know.

10   Q.  Who prepared the working copy or evidence copy of the

11   attorney-client calls to be turned over to the U.S. Attorney's

12   office and to be maintained as evidence?

13   A.  I believe those calls were dumped onto the evidence and

14   working copies that were made during the normal investigation.

15   Q.  Okay.  So, is it then your testimony that all

16   attorney-client calls were dumped onto the working copy and the

17   evidence copy?

18   A.  I do not know for sure, but I think they were.

19         MR. NISKAR:  May I have one second, Your Honor?

20         THE COURT:  Sure.

21         (Off the record.)

22         MR. NISKAR:  Your Honor, I believe at this time

23   there's a stipulation between the parties that the

24   attorney-client calls that Agent Parkinson has testified to

25   providing to the Taint Team were transferred to a working copy,

1    an evidence disc, and then all of the calls were provided to
2    me.
3              THE COURT:  All of the calls were provided to you?
4              MR. NISKAR:  Yes.
5              THE COURT:  Are you satisfied with that?
6              MR. PRATT:  Yes, Your Honor.
7              Since Mr. Niskar represents Babubhai Patel, who would
8    have had the attorney-client privilege, without listening or
9    reviewing them, the entire wiretap was copied and given to him.
10             THE COURT:  Look, I have a couple of questions for
11   this witness.
12             When you said they were dumped onto a working copy or
13   an evidence copy, was that available to all of the Defendants?
14   A.  The working copy discs and the evidence discs were not.
15             THE COURT:  Okay.  Were they available to these two
16   prosecutors?
17   A.  They were never -- they would be available, but all of the
18   calls are maintained on the Red Wolf system.  Therefore, when
19   copies of the calls were made, they were made from the Red Wolf
20   system and copied onto discs.  And then those discs were
21   provided to the attorneys and the Defense.
22             The evidence copies are available and --
23             THE COURT:  Of the attorney-client -- that's all I'm
24   talking about.
25             The attorney-client category that was given to the

1    Taint Team, who else had access to those?

2    A.  The taint agents were in charge of those.

3              THE COURT:  I understand who was in charge.

4              Who else had access to those?

5    A.  Well, how the Red Wolf system is set up, I mean the

6    calls --

7              THE COURT:  Who else had access to those?

8    A.  Everybody who was working on the Red Wolf system had access

9    to them.

10             THE COURT:  Do you have follow-up questions?

11                         REDIRECT-EXAMINATION

12   BY MR. PRATT:

13   Q.  By "access," I'm not asking theoretically could have, I

14   guess.  Could you say who actually accessed, who actually

15   looked at those calls, not who theoretically might have been

16   able to obtain them?

17   A.  The taint agents.

18   Q.  What about the Assistant US Attorneys assigned to the case,

19   were they actually looking at them on the Red Wolf system or

20   actually given discs that contained them?

21   A.  I am not sure that they were given the discs.  I know that

22   transcripts were taken to them, but as far as actual --

23   Q.  Which attorneys?  Are you talking about Mr. Neal and

24   myself --

25   A.  No.

1    Q.  -- or are you talking about the taint attorney?

2    A.  I'm talking about the taint attorney, Dave Morris.

3    Q.  What about Mr. Neal and myself, instead of using access,

4    were we actually given copies of the transcripts or copies of

5    the discs which contained the conversations?

6    A.  No.

7              THE COURT:  Or summaries?

8    A.  No.

9              THE COURT:  What is it, the Red Wolf system; does

10   that track who accesses it online or from the server?

11   A.  I'm not sure if it does or not.

12             THE COURT:  Well, then don't answer it if you don't

13   know.

14             Okay.  Any redirect?

15             I'm sorry.  Mr. Gurewitz?

16             MR. GUREWITZ:  I will just attempt to ask it from

17   here, Your Honor, if that's okay.

18             THE COURT:  Sure.

19                        RECROSS-EXAMINATION

20   BY MR. GUREWITZ:

21   Q.  Was there something in the Red Wolf system that designated

22   a particular call as one that was determined to be

23   attorney-client?

24   A.  I'm not sure.  I think there is a function, a button

25   that --

US v Patel, et al. #11-CR-20468

1          THE COURT:  Well, stop.  If you're not sure, don't

2   answer it.

3   A.  I'm not sure.

4          MR. GUREWITZ:  That's all I have.

5          THE COURT:  Any redirect?

6          MR. LaRENE:  If I could just have a couple, please?

7          THE COURT:  Whoa, whoa, whoa.  It's their turn.

8          MR. LaRENE:  I thought you meant follow-up to the

9   Court.  I'm sorry.

10         THE COURT:  Okay.

11         MR. PRATT:  Nothing further, Your Honor.

12                    RECROSS-EXAMINATION

13  BY MR. LARENE:

14  Q.  Special Agent Parkinson, the line sheet that is generated

15  by the Red Wolf system does not have a field that particularly

16  asks whether the call is privileged or possibly privileged or

17  attorney-client or anything like that, does it?

18  A.  (No response.)

19  Q.  You could enter it somewhere, but it doesn't have a

20  specific function for that?

21  A.  On this line sheet it does not.

22  Q.  Okay.  And do you have any reason to believe, by the way,

23  that based on the totality of your investigation, that

24  Mr. Patel would have had conversations with any lawyers with

25  whom he was in contact other than in English?

1      THE COURT:  And by Mr. Patel, you mean Defendant No.

2   1.

3   BY MR. LARENE:

4   Q.  Babubhai Patel.  I'm sorry.

5   A.  I don't know.

6      MR. LaRENE:  Thank you.  Nothing further.

7      MR. PRATT:  I have follow-up with one thing.

8                    REDIRECT-EXAMINATION

9   BY MR. PRATT:

10  Q.  Technically, how were you able to give discovery to the

11  rest of the Defense attorneys and to Mr. Neal and myself, how

12  were you able to divide out the wiretap calls between attorney

13  and non-attorney calls?

14  A.  The way that we were able to do that is taint agents tagged

15  the -- there is a function in the Red Wolf system that you can

16  state if a call has -- the review status of the call.  So, what

17  the taint agents did is they -- all the attorney calls, they

18  tagged that function as "needs further review."

19       So, when the calls were dumped onto the discs, you

20  were able to clarify by call status which calls you wanted.

21  And so the taint agents pulled out the calls that needed

22  further -- needs further review.

23       For the other calls that were not attorney-client,

24  they were in a different status.  And therefore when we dumped

25  those, it did not contain the attorney-client calls.

1              MR. PRATT:  Thank you, Your Honor.

2              THE COURT:  Any follow-up by the Defense?

3              You may step down.  Thank you.

4              You may call your next witness.

5              Do you have a next witness?

6              MR. PRATT:  I don't, Your Honor.

7              THE COURT:  Does Mr. Neal?

8              MR. LaRENE:  I think that closes the record, as far

9      as we're concerned.

10             THE COURT:  Okay.  Who wants to present their

11     argument first?

12             MR. LaRENE:  Judge, the -- a couple of things are

13     really striking about Special Agent Parkinson's testimony to

14     me.

15             THE COURT:  Well, before you get to that, tell me

16     exactly what your objections are to.  Because whoever used the

17     word "omnibus" used it correctly.  There's everything in here.

18             Is there an objection to the interpreters being

19     monitors?

20             MR. LaRENE:  There is an objection to the

21     interpreters serving as monitors during the first period of the

22     interception without the Court being advised of it.

23             THE COURT:  Okay.  What's your response to that,

24     prosecutor?

25             MR. PRATT:  Your Honor, my response to that is that

1    the statute specifically says, in the case of foreign language,

2    nonagent interpreters may be used.  And so it doesn't have a

3    notification requirement.

4           And my argument is that he is suggesting some kind

5    of -- there's clearly not a statutory violation.  So, I'm not

6    really sure where you get the argument that there was an

7    obligation to inform them before the first 10-day report, which

8    as we attached to our motion, there was a notice that

9    interpreters were being used in the first 10-day report.

10           THE COURT:  And that is page 39 from the February

11   report?

12           MR. PRATT:  I believe it was in the January report.

13           THE COURT:  Okay.  But it certainly was in the

14   February report as well.

15           MR. PRATT:  Yes, Your Honor.

16           THE COURT:  Okay.

17           MR. LaRENE:  Judge, I cited a case of United States

18   v. Lopez in the opening brief, from the First Circuit I guess

19   by Judge Torruella, which clearly says and puts the Government

20   on notice that it has a duty to advise the Court if it is the

21   intention of the Government to use nonsworn monitors --

22   nonsworn, nonagent monitors.

23           Each of the orders in the case indicated that it was

24   the intention of the Court to authorize special agents, sworn

25   agents of the DEA to actually conduct the interception.

1          It is simply -- I'm sorry.

2          It is simply not true, that at any time during the

3    first period of interception, that the Court was advised that

4    the, quote, translators would actually be conducting the

5    interception, but it's very clear that that is what happened

6    here.

7          THE COURT:  Well, I'm looking at page 35 of one of

8    the exhibits, which is the application perhaps for the 10-day

9    ...

10         MR. LaRENE:  I'm sorry.  Are we looking at the 10-day

11   report?

12         THE COURT:  No, no.  Hang on a minute.

13         MR. LaRENE:  Can you give me a Bates number, Judge?

14         THE COURT:  It would be easy if there were one.

15         MR. LaRENE:  Oh, well, then I guess the answer would

16   be no.

17         THE COURT:  I could.  I could make it up.

18         MR. LaRENE:  Sure, go ahead.

19         THE COURT:  This is Government Exhibit C, Affidavit

20   in Support of Application to Intercept Wire Communications, and

21   it is attached to an authorization from the Assistant Attorney

22   General, dated February 8, 2011.

23         MR. LaRENE:  That's the second order.

24         THE COURT:  Yes.

25         MR. LaRENE:  Yes.

```
 1              THE COURT:  Okay.  And page 35.  It's the second
 2     application, I believe.
 3              MR. LaRENE:  Yes.  The second period of interception.
 4              THE COURT:  Okay.  Paragraph 60:
 5                  "It is anticipated that all monitoring will
 6              be performed by police officers, detectives,
 7              contract interpreters/monitors for the Hindi
 8              language, DEA, FBI or HHS language specialists or
 9              agents/investigators who will be instructed that
10              all communications intercepted," and so on.
11              MR. LaRENE:  Yes.  That language was not present in
12     the first --
13              THE COURT:  I understand that.
14              MR. LaRENE:  -- in the first application.
15              The 10-day reports -- and this has been briefed, but
16     the 10-day reports submitted during the course of the first
17     period of interception did not advise the Court that the
18     Government intended to use or was using, unilaterally had chose
19     to use nonsworn, nonDEA agents to actually do the interception.
20              THE COURT:  So, for the purposes of this argument,
21     the only objection is to that first period?
22              MR. LaRENE:  No.  The --
23              THE COURT:  Why doesn't this cure subsequent?
24              MR. LaRENE:  This particular -- that is, the failure
25     to advise the Court, if that's his argument, that's correct.
```

US v Patel, et al. #11-CR-20468

1    The failure to advise this Court only applies to the first

2    period of interception.

3             The -- there is an additional argument regarding the

4    participation of the monitors in subsequent interceptions, but

5    the failure to advise argument only goes to the first period.

6             If the Court agrees that that was wrongful, then of

7    course I present the poisonous tree argument that goes to that

8    which follows.  You couldn't have the second interception if

9    you didn't have the fruits of the first interception, et

10   cetera, et cetera.

11            THE COURT:  Okay.  Mr. Pratt?

12            MR. PRATT:  Your Honor, I believe that I had attached

13   the first 10-day progress report or at least referenced it.

14            The first 10-day progress report was dated -- was

15   signed as reviewed by Judge Sean Cox on January 24, 2011.

16            THE COURT:  On what date?  I am sorry.

17            MR. PRATT:  January 24, 2011.

18            THE COURT:  What exhibit is this?  Is this Exhibit A

19   or B or ...

20            MR. PRATT:  I'm sorry, I don't have its label right

21   in front of me, Your Honor.

22            MR. LaRENE:  I can hand it up.

23            MR. PRATT:  Yeah, I have it.  I have it as well.

24            MR. NISKAR:  Is there a page ID in the top right-hand

25   corner?

US v Patel, et al. #11-CR-20468

1          THE COURT:  No.  None of these exhibits have Bates

2     numbers or page ID number.  The documents are page numbered,

3     and I --

4          MR. LaRENE:  I believe Mr. Pratt is looking at

5     paragraph 23 of the first 10-day report, which I am handing up

6     to the Court.

7          THE COURT:  Okay.

8          MR. PRATT:  Your Honor, and if I could for the

9     record, paragraph 23 says:

10              "The great majority of the conversations are

11              in a Hindu dialect.  Although the agents/officers

12              are have engaged the services of four Hindu

13              interpreters to translate those calls, the large

14              number of calls and the time it takes to do each

15              translation has meant that the great majority of

16              the calls have still not been translated into

17              English for a determination of whether or not

18              they are pertinent.  The agents/officers are in

19              the process of adding a fifth Hindu interpreter

20              in an effort to address the backlog and remain

21              more current on future intercepted calls."

22          So, it's the Government's position that as of the

23     first 10-day report, January 24th, the Court was informed not

24     only that there were interpreters being used, but that, in

25     fact, that the great majority of the conversations were in this

US v Patel, et al. #11-CR-20468

1     other dialect.  So ...

2               THE COURT:  All right.  Here is what's going to

3     happen now.  I have a commitment next door at noon.

4               We will come back at --

5               Is 1:30 enough time for you to have lunch?

6               MR. PRATT:  Yes, Your Honor.

7               MR. LaRENE:  Yes, sir.

8               THE COURT:  And maybe Mr. Simmons, if he comes, will

9     be here by then.

10              *(Off the record.)*

11              THE COURT:  All right.  We are in recess.  We will

12    come back at 1:30.

13              ***(Recess held from 11:50 a.m. until 1:35 p.m.)***

14              THE COURT:  You may be seated.

15              It appears that everybody is in their place.  If you

16    are not in your place, please let me know.

17              MR. GUREWITZ:  Mr. Burdick has been here.  He stepped

18    out for a minute.  He will be right back.

19              THE COURT:  All right.  And we have Mr. Simmons here?

20              MR. SIMMONS:  Yes, Judge.

21              THE COURT:  You weren't here this morning.  I assume

22    you have been filled in.

23              MR. SIMMONS:  Yes, Judge, I have.

24              THE COURT:  I have not made any decisions yet.

25              What about your client?

1              MR. SIMMONS:  He's here.

2              THE COURT:  Were you here this morning?

3              MR. SIMMONS:  No.  He came with me, Judge.

4              THE COURT:  All right.  Do you have any problems with

5    catching up?

6              MR. SIMMONS:  No.

7              THE COURT:  I'm asking your client.

8              MR. THAKER:  No.

9              THE COURT:  Okay.  Then we are still on the first

10   part of the motion.

11             And whose turn is it?

12             MR. LaRENE:  I think I was in the middle of

13   argument --

14             THE COURT:  So, that --

15             MR. LaRENE:  -- I think.  And I think you had broken

16   it down to -- well, maybe -- you had broken it down to one

17   particular kind of species of subargument.  And, that is, the

18   impact of the failure to notify the Court about the nonagent

19   monitors' involvement in connection with the first period of

20   interception.

21             I'm not sure if I was addressing the Court when we

22   broke or if Mr. Pratt was.

23             He's shaking his head like he doesn't remember

24   either.

25             But our position is that Lopez, the thinking in Lopez

1    would require those disclosures; that is, the disclosure that

2    in effect the agents transferred responsibility for the

3    interception --

4             THE COURT:  Well, first of all, the statute allows

5    it.  Correct?

6             MR. LaRENE:  Yes, sir.  But the Court needs to be

7    informed --

8             THE COURT:  Well, I don't think Lopez says that.

9             MR. LaRENE:  Well --

10            THE COURT:  And further, even assuming that it was

11   error, there was no showing that it was deliberately done by

12   the Government.  And I will read the last paragraph of Lopez.

13            "In sum, Title III imposes an obligation on

14            the Government to disclose" -- which is

15            consistent with your argument -- "to the issuing

16            judge any plans to use civilian monitors in the

17            execution of a wiretap warrant.  In the case at

18            hand, however, the Government's failure to make

19            that disclosure, along with the Government's

20            seeming violation of an order that did not permit

21            the use of civilian monitors" --

22            And we don't have such an order here.

23            MR. LaRENE:  Yes, we do, Judge.  The first order only

24   allowed agents of the DEA to execute its contents.

25            THE COURT:  If I may finish now.

US v Patel, et al. #11-CR-20468

1              "The use of civilian monitors, does not

2              provide a valid basis for suppressing the

3              intercepted communications."

4         MR. LaRENE:  Because in that case, the Court found

5    that the civilian monitor -- two things.  One, it was the first

6    case that so held.  That was several years ago, and the

7    Government I think is on notice of its legal obligations.  And

8    two --

9         THE COURT:  It's First Circuit.

10        MR. LaRENE:  Well --

11        THE COURT:  Anyway, go on.

12        MR. LaRENE:  -- no, Judge.  I kind of I guess have a

13   more.

14        THE COURT:  Naturalistic view, yes.

15        MR. LaRENE:  If a federal judge speaks, then we all

16   need to listen to that judge, especially --

17        THE COURT:  That's what I say at home.

18        MR. LaRENE:  Yes, but we are not at home now.

19        THE COURT:  I know.

20        MR. LaRENE:  And the other thing was that Judge

21   Torruella was at pains to point out that the monitors in that

22   case were beyond fastidious in their obedience to the

23   minimization command.

24             That is not, we think, the situation here.

25             And even if, even if the violation of the

1   minimization requirement were not such -- and we think it is,

2   but even if it were not such, as to independently require

3   suppression, we do think it's sufficient to require suppression

4   under the Lopez analysis.

5        You know, the -- we think there are fundamental

6   structural problems with the way the Government executed the

7   orders in this case.  But if you -- and I don't think it's an

8   appropriate use of our time here to quarrel with this call or

9   that call or the other call.

10       But what happened this morning, the call that the --

11   the evidence regarding the call that the Government did chose

12   to highlight, the January 13th call -- it's Session No. 283 on

13   Target Telephone 2 -- illustrates how the apparent lack of

14   standards -- and although Special Agent Parkinson spoke about

15   giving minimization instructions and the difficulties that he

16   perceived in making minimization decisions, we didn't hear any

17   evidence that any concrete standards were conveyed to the

18   monitors.  And you have civilians, unsworn --

19            THE COURT:  Let's hear a response.

20            MR. LaRENE:  Let me just finish one point about Call

21   283.

22       The vagueness of the instructions under which these

23   agents, nonagents were operating was such that it permitted

24   them to listen to eight minutes and 53 seconds of the most

25   personal possible conversation before anything even remotely

US v Patel, et al. #11-CR-20468

1    considered relevant to the investigation -- that is,

2    Ms. Acharya's involvement in various corporations -- was

3    brought to the fore.  This is Exhibit 6 to our --

4              THE COURT:  How are you suggesting -- and maybe this

5    should be a rhetorical question.  But how do you know at the

6    beginning when the criminal activity is going to be discussed?

7              MR. LaRENE:  You don't --

8              THE COURT:  Or can you advise your client, if it were

9    not unethical, that if you talk about personal things for five

10   minutes, then you can talk about anything else you want because

11   they have to turn it off?  Is that your position?

12             MR. LaRENE:  I think you are turning the analysis on

13   its head.  This is wiretapping --

14             THE COURT:  Well, it's similar to when a federal

15   court speaks, you should listen.

16             The question is how do you do it?  You are saying

17   there are vague standards and so on.

18             The man testified that he was aware of it.  And

19   presumably once -- whether it's 11 lines later or eight minutes

20   later, at some point there's some relevant information.

21             How do you know when that's coming if you are the

22   monitor?

23             MR. LaRENE:  A number of different approaches have

24   been used.

25             THE COURT:  Just give me one.

1          MR. LaRENE:  One approach has been to allow an

2   initial period of two minutes of monitoring.  To adopt --

3          THE COURT:  So, then your client, who reads federal

4   court decisions or handbooks of the government, will know we'll

5   talk two minutes and they will be gone and we can talk about

6   whatever we want.

7          MR. LaRENE:  It's not our job and I wouldn't suggest

8   it's the Court's job to give hard and fast guidelines for

9   somebody as ephemeral perhaps as minimization.  But if the

10  Court's analysis is correct, then an agent could just keep on

11  listening until something ever came up, and if nothing ever

12  came up, they would have to shrug their shoulders and say,

13  sorry, we must have missed it.  And that's not minimization.

14         THE COURT:  Okay.

15         MR. LaRENE:  That's the opposite.  That's a general

16  search warrant, which is what we have going on here.

17         THE COURT:  The Government?

18         MR. PRATT:  Your Honor, the statutory requirement is

19  simply that the -- in 18 USC 2518(5), it says:

20             "An interception under this chapter may be

21             conducted, in whole or in part, by government

22             personnel or by an individual operating under a

23             contract with the government, acting under the

24             supervision of an investigative or law

25             enforcement officer authorized to conduct the

US v Patel, et al. #11-CR-20468

1          interception."

2          I disagree with the analysis that there was any

3  violation of the Court's order.  The Court's order to the agent

4  told him you are authorized to conduct this investigation.

5          We heard testimony this morning from Special Agent

6  Parkinson that he was one of the two coagents that conducted

7  the wiretap by supervising the interpreters.

8          I think it's kind of a language game to say that the

9  interpreters are the ones conducting the wiretap when they were

10  given the minimization instructions by the lawyer at a meeting

11  that the agent was present at; that there were minimization

12  reminders given by the agent; that there were in fact --

13          THE COURT:  What is your understanding of the

14  minimization requirements?  What is the agent supposed to do

15  when there's discussion on the tap, wiretap of a personal

16  nature?

17          MR. PRATT:  My understanding is that that has to be

18  something that's developed over the course of the wiretap,

19  because the first day of the wiretap you don't even sometimes

20  really know who you are talking with.  And so it's something

21  that evolves over time in the sense that once you hear some

22  personal conversations, you know who they are from and you

23  understand --

24          THE COURT:  Okay.  Let's say you are on day six of

25  the wiretap and you hear personal conversations.

1          What's the obligation required by minimization?

2          MR. PRATT:  I believe the obligation is to the point

3     where -- if it's the first time that you have ever intercepted

4     those two people, first time ever, I think the interception

5     would have to go on for an awful long time before they would

6     say that this is a hundred percent personal.

7          I think it could reach a point where it's just clear

8     it's personal and never going to go to anything else, but I

9     think their obligation is to --

10         THE COURT:  Well, how do you know that?

11         MR. PRATT:  Well, you don't.  That's why it's an art.

12    That's why it's very difficult to get hard and firm standards.

13         I think that the directions -- that my understanding

14    is you do two things.  First of all, you figure out which

15    relationships are totally personal, and that allows to you

16    pretty much minimize those completely.

17         So, you have a father talking to his 10-year old

18    daughter.  Frankly, if you could figure that out, you might

19    even figure that out in the first -- you know, in the first

20    call, and know there's not going to be anything criminal here

21    and we need to minimize this in every other call.

22         You can also find over time that other relationships

23    just are not business-related at all, that these people have no

24    business relationship.

25         You also then -- as to the people that have both the

1    personal and the business relationships, I think the most that

2    you can ask the agents to do, the absolute most that you can

3    ask them to do is sometimes stop listening for a while and then

4    spot-check back in.

5              And that instruction was discussed at the briefing

6    with them.  They understood that concept.

7              I'm told in the minimization sometimes that method

8    was done when, in their judgment, they felt that this might one

9    of those totally personal calls.

10             And I think that's what you are really down to, is

11   trying to second-guess a judgment.  And this call would have

12   been --

13             THE COURT:  The one you used as an example, before

14   that call came in, did you have any evidence or notion that the

15   caller was involved in criminal activity as well as having a

16   personal relationship?

17             MR. PRATT:  Well, Your Honor, that's why they are

18   asked to read the affidavit in its entirety and sign it,

19   because the affidavit itself -- it's one of the reasons that it

20   lists all the people --

21             THE COURT:  Did it have anything that contained any

22   of that information?

23             MR. PRATT:  It contains -- Your Honor, I'm not sure

24   that I have the first wiretap affidavit right in front of me,

25   but there is an extensive list of individuals that are believed

1    to have been involved in the criminal activity that is set

2    forth in the initial pages of the first wiretap.  And that is

3    why --

4                THE COURT:  Is her name one of those names?

5                Mr. LaRene?

6                MR. LaRENE:  I'm handing the first three pages of the

7    first order to Mr. Pratt.

8                MR. PRATT:  No, Your Honor, she wasn't -- she wasn't

9    listed as one of the interceptees in the initial wiretap.

10               So, having read through the affidavit for the

11   subjects, they would have had a person that they would have not

12   known.

13               I think the testimony was the interception started,

14   for example, on January 10th.

15               This call that was being referenced was one on

16   January 13th.  So, you are talking the fourth day of the

17   intercept.  You are talking someone whom they don't know or

18   have information about.  And you're asking them, having not

19   known one way or another about this person what's going on,

20   you're suggesting that there had to be an immediate --

21               THE COURT:  What about the factual dispute between

22   whether it was 11 lines or eight and a half minutes?

23               MR. PRATT:  Well, Your Honor, I think that the reason

24   those kinds of call-by-call factual disputes are really not

25   before the Court, is that in order to obtain a suppression

US v Patel, et al. #11-CR-20468

1    remedy, I think they have to show that there was a wholesale

2    disregard; not that there can be an argument on any particular

3    call.  And that's why I think the standard is --

4          THE COURT:  And you are citing Lopez for that?

5          MR. PRATT:  Well, I'm citing the Scott case.

6          THE COURT:  Amongst other cases.

7          MR. PRATT:  I'm citing Scott as well.  But there has

8    to be a wholesale disregard for the obligation.

9          And where we have over 800 calls that were minimized,

10   11 point-some percent of the calls that were over one minute, I

11   think it's hard to say that there's a wholesale disregard of

12   the obligation, especially given that the procedures that the

13   agent testified, you know, his instructions were in place.  He

14   was available.  He reminded them of the obligation.

15         I think that in order to avoid suppression, that's

16   what the Government has to do.

17         And as far as the Lopez case, specifically -- I mean,

18   I will rely on my brief.  I don't think that you can amend the

19   statute to impose a notification requirement that doesn't

20   obtain one by having dicta in a First Circuit opinion.

21         I mean, with all due respect to the Court, you know,

22   I don't think that amends the statute and I don't think --

23         THE COURT:  Their Court or to me?

24         MR. PRATT:  To their Court in that instance.

25         I don't think they can amend the statute by imposing

1    a nationwide obligation to immediately inform.

2            And I think that there wasn't any kind of bad faith

3    effort to hide it from the Court because --

4            THE COURT:  Do you take the radical position that

5    Scott, being a Supreme Court case, may have more weight than a

6    First Circuit case?

7            MR. PRATT:  Yes, Your Honor.

8            THE COURT:  All right.  Any last words for the

9    Defense?

10            MR. LaRENE:  If I might, please, Judge.

11            Let me just outline what I consider to be some of the

12    basic structure failings here.

13            There was simply no meaningful supervision of these

14    civilian monitors as was promised in the order.  The agents

15    turned everything over to them, even to the extent that -- and

16    I can -- I can point to call after call after call in the line

17    sheets where the monitors -- the interpreter monitors are

18    identified as doing the monitoring of calls entirely in English

19    and obviously going to be in English.

20            And although Special Agent Parkinson said this

21    morning that there was a procedure, he thought, whereby the

22    attending agent would take over a call that was anticipated to

23    be in English, he never saw it happen.

24            They didn't even read the orders.  The starting point

25    for any warrant-driven search is the court's order.  They

1    didn't -- the people who were charged with the responsibility

2    of enforcing these orders didn't even read the order.  That is

3    the hallmark of a general search.

4            There was also some testimony from Special Agent

5    Parkinson this morning that the system --

6            THE COURT:  But they did read the affidavit.

7            MR. LaRENE:  But the affidavit in many regards is

8    different from the order.  For example, the affidavit -- the

9    order specifically authorized, for example, realtime

10   monitoring -- realtime minimization of attorney-client calls.

11   And that's apparently not what happened.

12           The affidavit spoke of another procedure, but that's

13   not what the order said.  And, clearly, it's not the affidavit

14   that counts; it's the Court's order that counts.

15           Special Agent Parkinson's testimony this morning was

16   to the effect that the way the system is configured, it

17   recorded everything.  Perhaps the agents didn't listen, the

18   monitors didn't listen to everything.  But according to the

19   testimony on both direct and cross-examination, they recorded

20   everything.

21           It is a Fourth Amendment violation -- excuse me.  It

22   impinges upon the Fourth Amendment privacy of any individual to

23   record his or her -- excuse me -- wire communications whether

24   or not they are ultimately audited through this -- through a

25   minimization procedure, whether it's an attorney call or a

1    non-attorney call.

2          According to the testimony, they recorded everything.

3    That's a fundamental violation of the statute.

4          And even if it's not -- even if it's not a -- it's

5    not sufficient to justify suppression under the minimization

6    provisions -- and I really think it is, especially when you

7    couple it with everything else that we've indicated happened --

8    it certainly is a violation under Lopez.

9          And I believe Lopez certainly is not in any way

10   inconsistent with Scott, not in any way inconsistent with the

11   statute, but entirely consistent with the duty of candor that

12   the Government owes the Court when asking the Court to invoke

13   its power to allow and authorize the kind of intrusion that a

14   wiretap represents.

15         This is unique in all investigative procedure.  And

16   it is for that reason the standards are higher and the

17   standards are unique.

18         I just don't see how the Court can dismiss the

19   wholesale violations here of the duties that the law imposes

20   upon the Government.

21         We submitted as Exhibits 5 and 6 to our reply to the

22   response to the motion to suppress the results of a summary

23   analysis of 6,000 calls throughout the entire period -- over

24   the entire period of the interception.  These aren't calls on

25   the first day, second day, fourth day.  These are calls that go

1    up to the 200th and some-odd day.

2            And, sure, minimization is and can be a learning

3    experience.  The thing that we learn when we look at these

4    calls, when we look at the survey they did, it never changed.

5    The agents -- excuse me.  They were not agents.  The monitors

6    never did anything different.  It was pervasive.  It was

7    continuous and it was systemic.  And it is for that reason that

8    suppression is required.

9            Thank you.

10           THE COURT:  Anyone else from the Defense?

11           Well, I agree that there's no real difference in

12    Lopez and the Supreme Court case, but I think I disagree as to

13    how you reconcile them.

14           I think there has to be some showing of deliberate

15    violation of the rules.  And I think, one, setting up the Taint

16    Team to isolate the attorney-client or insulate it, insulate

17    the agents in charge of the case from attorney-client violation

18    is an indication that there was an attempt to substantially

19    comply with the rules.

20           I think the adding of the reference to the

21    interpreters having a dual function as monitors as well, and to

22    the extent that it was a technical violation, not to do that in

23    the first place -- and I don't think it was, but even if it

24    were, it doesn't show bad faith or deliberate intention to

25    circumvent or violate the purpose of the wiretap authorization

1      statutes.

2              I don't think the Defendants have carried their

3      burden of showing a deliberate violation.  I think the

4      Government has carried their burden of showing substantial

5      compliance, if not exact compliance.  Therefore, the motion to

6      suppress is denied.

7              I don't have to discuss the fruit of the poisonous

8      tree because I am making a finding that the tree was not

9      poisoned in the first place.

10             Is there anything else?

11             MR. LaRENE:  There was another ground asserted in the

12     motion.  I'm satisfied to rely on the briefs.  That is, the

13     sufficiency of the affidavits to comply with the requirement --

14     the necessity requirements in the statute.

15             We both briefed it back and forth.  I don't think the

16     Court has decided it, but it needs to at some point.

17             THE COURT:  Well, it doesn't change the result.

18             MR. LaRENE:  I understand.

19             THE COURT:  Okay.  And if you want me to -- I'm not

20     sure if -- if you want me to speak to it, I can.  But I'm

21     not -- it seems to me the affidavits are sufficient.

22             MR. LaRENE:  Very well, sir.

23             THE COURT:  And having read a number of them, they

24     usually err, as does this one, on the side of being too

25     sufficient.  But going through as many levels of review,

 1   everyone has to have their two pages or, in the old days, their

 2   two cents worth.

 3           All right.  What other motion does we have today?

 4           MR. NEAL:  Your Honor, there's a Motion to Dismiss

 5   the case due to purported violation of the Speedy Trial Act.

 6           THE COURT:  Yeah.  How many have made that motion?

 7           MR. NISKAR:  Just Mr. Patel, I believe.

 8           MR. LaRENE:  I think other counsel whose clients are

 9   not in custody had agreed to the continuance.

10           THE COURT:  Okay.

11           MR. LaRENE:  Mr. Niskar, on behalf of Mr. Patel,

12   objected to it.

13           THE COURT:  And, again, we are talking about the No.

14   1, Mr. Patel.

15           MR. LaRENE:  I'm sorry.  Mr. Babubhai Patel.

16           THE COURT:  Because there are several.

17           You want to go?

18           MR. NISKAR:  Sure.

19           THE COURT:  Respond to the Government's response that

20   a number of these time periods have either been consented to or

21   are a part of the decisional process for this last motion.

22           MR. NISKAR:  Well, in regards to the decisional

23   process of the last motion and the Court taking it under

24   advisement, the statute 18 USC 3161(5), I believe, indicates

25   that in situations like this, no more than 30 days can be

1    attributed to the Court taking a motion under advisement.

2    Otherwise, what courts could do is delay the decision-making

3    process until the eve before trial, and we would have a similar

4    issue in every case if courts were allowed to do that.

5             So, by statute, no more than 30 days are allowed

6    to --

7             THE COURT:  Wasn't part of that time, if I use the

8    language "under advisement," inherent or implicit in that

9    language was under advisement until we had the evidentiary

10   hearing?

11            MR. NISKAR:  No.  Because at that time the Court had

12   not made a decision whether or not to grant an evidentiary

13   hearing.

14            THE COURT:  Well, when did I make that decision?

15            Would you agree that from the date I made that

16   decision until the date of the evidentiary hearing, that's

17   excludable?

18            MR. NISKAR:  No.  I would say no more than 30 days

19   regarding that entire process --

20            THE COURT:  Okay.

21            MR. NISKAR:   -- can be counted towards the...

22            THE COURT:  And your authority for that is which

23   Supreme Court case?

24            MR. NISKAR:  The statute, Your Honor, 3161(5).

25            THE COURT:  Okay.  What's the Government's response?

US v Patel, et al. #11-CR-20468

1          MR. NEAL:  Your Honor, under the Henderson Supreme

2    Court case, as well as under the Jenkins and Mentz cases from

3    this circuit, so long as the Court reasonably expects

4    additional papers or briefing on any pending motion, that time

5    frame is automatically excluded.

6               So, as a legal matter, under the provisions of the

7    Speedy Trial Act, the motion to suppress the fruits of

8    electronic surveillance was never under advisement by the

9    Court.  When we had the hearing back on March the 12th, the

10   Court directed the parties to try to resolve certain factual

11   issues and then to come back to the Court if an evidentiary

12   hearing would be sought or some sort of notification to the

13   Court as a result of that process.

14               On I believe it was May the 4th, the parties did

15   exactly that.  The Defense, you know, in a motion that was

16   joined by Mr. Babubhai Patel, approached the Court and

17   requested an evidentiary hearing.  The Government responded.

18   And the Court ordered an evidentiary hearing.

19               The Government's position is that that motion was

20   never ruled upon and was never under advisement, because the

21   Court reasonably expected the parties to attempt to resolve

22   outstanding factual issues and then to report back to the Court

23   as a result of that process.

24               THE COURT:  Okay.  Let me back up a step, Mr. Niskar.

25               You are not making a constitutional challenge on

1    speedy trial, are you?

2            MR. NISKAR:  No, not a Sixth Amendment claim.

3            THE COURT:  Okay.  In violation of the statute, if I

4    were to agree with you, the next step would be to determine

5    whether it was with prejudice or without prejudice to

6    rebringing the charges.  Is that correct?

7            MR. NISKAR:  That's correct.

8            THE COURT:  So, to convince me to dismiss it with

9    prejudice, you would have to show what?  Deliberate --

10           MR. NISKAR:  Deliberate and intentional delay on the

11   part of the Government.

12           THE COURT:  And can you show that here?

13           MR. NISKAR:  No, I don't believe that Mr. Pratt's

14   developing of shingles or anything else that the Government did

15   was in this case deliberate or intentional, no.

16           THE COURT:  Okay.  I just ask those questions so it

17   puts it in perspective for all of the Defendants and the folks

18   in the audience and, if there's a conviction, for the Sixth

19   Circuit.  Because even if I'm wrong in denying this motion, it

20   really doesn't harm your client.

21           I'm going to find that the time is excludable, was

22   excludable; that there was -- certainly everyone agrees that

23   there was no deliberate intent either on the Court's part or on

24   the prosecutor's part to delay this.  And this case has been

25   given very high priority because your client is in jail, and

1    that's why we are starting on Monday.

2              So, the motion is denied for the reason that the time

3    limits have not been violated.  And if the reviewing Court were

4    to find that they had been, for there is the additional reason

5    that the case would be dismissed without prejudice to

6    rebringing it, which all that would do is maybe give your

7    client a couple days out of jail before he has to start over,

8    waiting for another speedy trial.

9              What other motion does we have?

10             MR. NEAL:  Your Honor, just briefly on that point.

11   The Government would ask the Court to enter an ends of justice

12   continuance from this point through the time period of the

13   second trial as to the Defendants that are in that second trial

14   group.

15             THE COURT:  Anyone object to that from the second

16   Defendant group?

17             MR. NEAL:  I've spoken with the attorneys or at least

18   did back in March, and none of them had any objection.

19             THE COURT:  Okay.  Prepare the order and I will sign

20   it.

21             MR. NEAL:  Very well, Your Honor.

22             THE COURT:  The record should reflect that none of

23   the attorneys here objected to it either.

24             Next?

25             MR. LaRENE:  Mr. Rawal has a motion to be transferred

```
1    to Trial Group 2.  I expect --
2              THE COURT:  Why do you get to talk when that other
3    guy has been standing up for about five minutes?
4              MR. LaRENE:  Oh, I'm sorry.
5              MR. BURDICK:  No.  Let him go first.  I think his is
6    quicker than mine.
7              THE COURT:  No, you can go.
8              MR. BURDICK:  I have a motion --
9              THE COURT:  Even if you were to hold it up facing me,
10   I couldn't read it.
11             MR. BURDICK:  I started to explain it to you.
12             I have a motion to exclude evidence as to a violation
13   of Rule 404(b).  I don't know whether the Court has read the
14   motion or the response from the Government.  I was slightly
15   dilatory in filing my reply last night.  I don't know whether
16   the Court has had the opportunity or --
17             THE COURT:  I had the opportunity.  I stayed here all
18   night waiting to see if there were any --
19             MR. BURDICK:  Well, I filed it before last night.  It
20   was around 5:15, I think.
21             THE COURT:  All right.
22             MR. BURDICK:  But, Your Honor ...
23             THE COURT:  You have to understand that I am a nine
24   to fiver now that I'm a senior judge.
25             MR. BURDICK:  Oh, that's right.
```

1      Your Honor, after we filed this motion and after the

2   Government filed its response -- and I think it was after --

3   well, it was after I filed my reply, I reviewed some documents

4   that the Government had Fed Exed to us that we received

5   yesterday, but I never got to until later.

6          THE COURT:  I'm chuckling because, after waiting

7   whatever time this trial has been pending, you guys are still

8   changing papers and exhibits the day before trial, but --

9          MR. BURDICK:  Well, that goes --

10          THE COURT:  And -- where is your office?

11          MR. BURDICK:  I beg your pardon?

12          THE COURT:  Where is your office, what city?

13          MR. BURDICK:  Telegraph and Square Lake Road in

14   Bloomfield Hills.

15          THE COURT:  All right.  So, the Government had to pay

16   10 or 15 bucks to FedEx it to you.  They could have faxed it to

17   you for free.

18          MR. BURDICK:  They could not faxed all of the

19   exhibits.  What the Government did send us --

20          THE COURT:  Did they send you some of the pills and

21   stuff?

22          MR. BURDICK:  They sent us the exhibit book

23   essentially in digital form for us to print off, and suggested

24   that the Government would provide a single exhibit book for all

25   of the Defendants.  So, I assume pretty much everybody is going

1    to print their own off.

2            We have had the exhibits -- the Government has

3    several weeks ago provided us with a preliminary exhibit list

4    and a supplemental, I think, exhibit list and a preliminary --

5            THE COURT:  Okay.  You don't have to go through all

6    of that.

7            MR. BURDICK:  Thank you.

8            All I wanted to say, Your Honor, is after I filed

9    this reply and opened up these CDs, I did discover that I think

10   I know the issue, the problem with the Government's response

11   with respect to the Tri-Star matter.  There were several

12   matters.

13           We asserted in our motion that all that business

14   about Tri-Star had nothing to do with this case.  It had

15   nothing to do with the conspiracy.  It's 404(b) it should be

16   out.

17           The Government said no, it's interrelated,

18   essentially.  It's intrinsically related to the conspiracy

19   because of, as the Government put it I think -- and I hope I'm

20   quoting it properly -- common patients and common doctors

21   prescribing to patients who went to the Patel Pharmacies, and

22   so forth.

23           Anyway, to make a long story short, Government

24   Exhibit 25-A and 25-B that I reviewed last night reflect a list

25   of doctors.  It says Tri-Star Home Health Care Analysis and

1    Tri-Star patients shared with Patel Pharmacies, Komal Acharya

2    as VP and President of Tri-Star, Top 10 Prescribing Providers.

3              I have provided some information to the Government

4    earlier today that, number one, Komal Acharya was never a

5    Vice-President of this company.  This company existed for quite

6    a long time before she -- that fateful day when she purchased

7    it, probably without sufficient due diligence.

8              The doctors who are listed, the referring providers

9    who are listed, with the possibility of one exception, 12 or so

10   had never sent patients to Tri-Star.  These are doctors --

11             THE COURT:  Was this the motion that you filed, the

12   motion in limine?

13             MR. BURDICK:  Yes, Your Honor.

14             THE COURT:  Okay.  I think I indicated I would be

15   much better informed about it after the trial started.

16             MR. BURDICK:  If I may though, Your Honor, one of the

17   problems with that is opening statements, number one.

18             And number two, I have provided some information

19   today to the Government, to Government counsel that may clear

20   up that part of the matter, the Tri-Star part of our --

21             THE COURT:  Well, that's another reason we can wait.

22             MR. BURDICK:  But then does the Government discuss it

23   in its opening statement?  Do I discuss it in my opening

24   statement?

25             If we don't know what the Court's ruling is, how are

1    we going to be able to --

2              THE COURT:  Well, you just told me that the Court may

3    not have to make a ruling because you think you can convince

4    the Government, at least part of it --

5              MR. BURDICK:  On Tri-Star.

6              THE COURT:  -- on Tri-Star.

7              MR. BURDICK:  Yes.  Tri-Star, but the other items --

8              THE COURT:  And the answer is very simple.  Neither

9    of you will be able to mention it in opening statement, but if

10   I then admit it, you can mention it in closing argument.

11             MR. BURDICK:  All right.  And with respect to the

12   other two items that were raised in the motion to exclude,

13   which includes $160,000 that was transferred by Mr. Patel into

14   Komal Acharya's bank account, for which he then wrote checks --

15   wrote out the blank checks that he had had her sign and give to

16   him, to send the money to bring Brijesh Rawal, we would ask the

17   Court to exclude that because, first of all, it reflects money

18   laundering activity.  There are no money laundering charges in

19   this indictment.  It brings up a whole new criminal allegation.

20   It really has nothing to do -- there's really no need for it

21   either, for the Government's purposes, to bring that in.  And

22   I'm not going to repeat everything.  It's in the brief.

23             The other thing --

24             THE COURT:  But you understand that if I do allow it

25   in and if there is a conviction, that gives you an issue on

US v Patel, et al. #11-CR-20468

1    appeal.

2            MR. BURDICK:  Well, that would be great, Judge.

3            THE COURT:  Yeah.

4            MR. BURDICK:  Thanks.

5            But, on the other hand, there's then --

6            THE COURT:  You are not suggesting the Government

7    would overtry the case.

8            If the Government doesn't need it, I would trust that

9    the Government wouldn't use it.  But, again, that's the kind of

10   issue that I can better evaluate after I've heard some of the

11   evidence.  Neither side can refer to it in opening statement.

12           I would trust that the Government with him approach

13   your request with an open mind in terms of --

14           MR. BURDICK:  I trust they will too.

15           THE COURT:  And if you had a rearview mirror, you

16   would see that at least half of the Government team jumped to

17   give us some information.

18           MR. PRATT:  Well, Judge, I was one wondering if I

19   could be heard.

20           Particularly, you said that neither side was going to

21   mention stuff in opening statement.  I would like to at least

22   be heard on that before you make a ruling.

23           THE COURT:  You may.

24           MR. PRATT:  I appreciate that it's extremely

25   difficult for a Court, based on some briefs before trial, to

US v Patel, et al. #11-CR-20468

```
 1    figure out what's intrinsic of the conspiracy and what isn't.

 2    But the problem is that --

 3              THE COURT:  It's even difficult after trial.  But go

 4    on.

 5              MR. PRATT:  It is.  It is.

 6              But here's the problem.  Both these 404(b) motions,

 7    on behalf of Ms. Acharya and Mr. Sachdeva, is that they have

 8    essentially taken a large amount of the Government's best

 9    evidence in the case, from the Government's view, labeled it

10    404(b).

11              From our view, this is intrinsic to the case.  If we

12    are prohibited from mentioning it in opening statement, there

13    may be some scraps left, but it's -- you know, it's a lot of

14    these recordings that are mentioned --

15              THE COURT:  I will look more seriously and let you

16    know on the morning of trial, on Monday morning.

17              MR. PRATT:  I'm just saying, Your Honor, is that --

18              THE COURT:  I understand what you are saying.

19              MR. PRATT:  -- is that it really makes it almost

20    impossible for us to do this without at least getting a level

21    of this in.

22              THE COURT:  Well, the alternative is that you both

23    may mention it, and then I will instruct the jury if I decide

24    that it is 404(b).

25              MR. PRATT:  Well, that would be far preferable, Your
```

1      Honor.  And frankly --

2                THE COURT:  Well, I thought you'd think that.

3                MR. PRATT:  And frankly, Your Honor, we feel

4      strongly --

5                THE COURT:  You should have a rearview mirror too.

6      You would see...

7                MR. PRATT:  I will tell you this, Your Honor.  We

8      feel strongly enough about it to the extent that if at the end

9      of the case the Court was convinced that, you know, here's the

10     conspiracy and all of this stuff that the Government has put in

11     is 404(b) and it's outside and it doesn't fall out of an

12     exception, really the Court would have no choice but to grant

13     the Defendant a mistrial at that point.

14               And we feel confident enough in going forward with

15     our proofs --

16               THE COURT:  You know what.  With that suggestion, I'm

17     going to let both sides mention it in opening argument, and

18     with the understanding that if the Defendant is right, you are

19     going to do this over again.

20               MR. PRATT:  Absolutely.

21               THE COURT:  Or maybe not.

22               MR. PRATT:  Or maybe not if there's not enough

23     admissible evidence, exactly.

24               We would rather be able to go forward with our

25     case --

1           THE COURT:  All right.  Mr. Kriger has a comment.

2           MR. BURDICK:  I just want to follow up real quickly,

3    Your Honor.

4           One of the things that the Government talked about in

5    its response was that, this business of the $18 million.

6           Well, coincidentally or maybe not so coincidentally

7    today, the Government's only witness in the evidentiary hearing

8    regarding the Title III, the case -- the co-case agent

9    testified it was his plan to bring forward in that testimony in

10   direct Session 283, I think it was the 283, a conversation

11   between my client and Defendant No. 1, Babubhai Patel.

12          The $18 million or $16 million referred to by the

13   Government comes out of that conversation.  And part of the

14   problem for the Government is they don't have any direct

15   evidence about Komal Acharya's involvement in the conspiracy

16   with Mr. Patel and his Co-Defendants, Mr. Patel Defendant 1 and

17   his Co-Defendants.  There's no other evidence.

18          All there is is this ancillary stuff; with Tri-Star,

19   which really isn't related; and the $18 million, which as the

20   government agent admitted on the stand, the co-case agent, was

21   a conversation filled for the first eight and a half minutes

22   with personal stuff, and then after that they were laughing and

23   making jokes and giggling and laughing all the way through,

24   according to the Government's translators.

25          THE COURT:  Should I deduct this time from your

1    closing argument?

2         MR. BURDICK:  No, Your Honor.  But it's not a closing

3    argument.

4         The problem I have is that I don't want to try this

5    case twice.  I don't want to appeal the conviction if there's

6    an issue like that.

7         THE COURT:  I understand.

8         MR. BURDICK:  And I don't want to take the chance

9    that I'm not sufficiently forceful in my Rule 29 motion to

10   convince the Court, which I believe the Court -- to convince

11   the Court to grant 29, which I think ...

12        THE COURT:  You want me to grant that now?

13        MR. BURDICK:  I would like that right now, Your

14   Honor.

15        MR. LaRENE:  Me too.

16        MR. BURDICK:  Mr. LaRene as well, and I think

17   Mr. Kriger wants the same thing.

18        But it's not my fault that all the stuff they have as

19   reeling against Komal Acharya has nothing to do with the

20   conspiracy at all.  It's --

21        THE COURT:  All right.  You've made your argument.

22   You've made your point.

23        MR. BURDICK:  Thank you, Your Honor.

24        MR. KRIGER:  Your Honor, when I briefed this, one of

25   the suggestions I made was to have the Court reserve ruling,

US v Patel, et al. #11-CR-20468

1    but that neither party could refer to it in opening statement.

2    That would certainly be my preference.

3            As to Mr. Sachdeva, there really are two types of

4    evidence that are at issue here.  One is these kickbacks for --

5    the discussion about kickbacks or payments to doctors for

6    referral for the home health care agency.  The other is what

7    I'll call, generically, insurance fraud.

8            As to -- let's talk first about the insurance fraud.

9            There is a conversation that is intercepted after the

10   Government executes a search warrant on Mr. Soni's room and the

11   Government makes it look as if it was a break-in, not the

12   execution of a search warrant.  There's a note left that would

13   lead someone to believe it was a break inbreak-in.  And I

14   assume that the purpose of it was sort of to tickle the wire,

15   to get conversations going.

16           What happens is my client then has a conversation

17   with Babubhai Patel on how he can recover the money that was

18   lost for the medications, because they were not in a secure

19   location and he never reported the theft of the medications to

20   the police when he reported the break-in.

21           There's no showing that my client -- and I don't

22   think the Government will dispute this -- that at that time

23   he -- not until the indictment, that he knew that these were

24   prescriptions that had been billed but never dispensed.

25   There's no evidence that he was aware of the fact that they

1    were to be returned to the pharmacy; it's just an out-and-out

2    insurance fraud.

3            But, more importantly, the insurance fraud never took

4    place.  This discussion took place and no steps were taken in

5    furtherance of it.  And the Government doesn't -- I don't think

6    will dispute that.  They never called an insurance agency.

7    They never did anything other than have that one simple

8    discussion.

9            So, even if one was to say it's intrinsic, it

10   certainly is more prejudicial and probative, because there is

11   no showing that they ever acted on it.

12           There's also a discussion similar to that where they

13   talk about, he says, well, why didn't you report these.  It

14   didn't make any sense to Mr. Sachdeva.  Well, why didn't you

15   report that the medication wrest stolen to the police.  And

16   Mr. Patel replies, well, they weren't in a secure location, and

17   if I had, I could be in trouble with the Board of Pharmacy.  He

18   says, well, you know, you could have backdated an invoice to

19   show that a security system had been installed and that would

20   have solved your problem.

21           But, again, they never did it.  Nothing ever took

22   place.  So that's one species.

23           The second species of it is these kickbacks to

24   doctors.

25           I sort of went through, in preparation of this

1    argument, how many calls I did not object to.  And I think

2    there's 11 calls where the pharmacies are discussed.  But the

3    ones that I have focused on are only -- are clearly in the

4    context of the home health care.

5           And it's interesting because one of the conversations

6    that I plan to play is a conversation wherein Bob Patel is

7    speaking to a Defendant who will now be testifying, where he

8    says Harpreet didn't know anything, my only business with him

9    was the home health care.

10          So, I would ask either that you do, you know, follow

11   your initial instinct, at least as to Mr. Sachdeva, and not

12   allow any mention of the calls that are in dispute.

13          THE COURT:  The Government, response?

14          MR. PRATT:  Yes, Your Honor.

15          As to the attempt to retrieve or make up for the

16   proceeds that they believed were stolen, I'm not sure what the

17   analysis of, hey, we never actually did that, does to make it

18   404(b) or not.

19          The fact is it's either intrinsic to the conspiracy,

20   which is we've lost a whole lot of money, we lost a half a

21   million dollars worth of assets, and this Defendant, showing

22   his agreement and his wanting to further the conspiracy with

23   Defendant No. 1, is discussing various methods and means by

24   which they can make up for the loss.

25          That seems to me to be very clearly not only

1    intrinsic to the conspiracy, but then to say it's more

2    prejudicial than probative -- I mean, I guess it's less

3    prejudicial because they didn't actually do it, but the fact is

4    the Government needs to show an agreement between Mr. Sachdeva

5    and Mr. Babubhai Patel.

6          If he's going to exclude conversations that are

7    inside the conspiracy about how to recover the conspiracy's

8    assets, that goes to the core of the Government's proofs.  And

9    we believe that we ought to be able to introduce that as

10   admissible evidence.

11         As to the second aspect, as to the issue with the

12   home health care, again, we thoroughly briefed this.  But one

13   of the questions that I'm sure Mr. Kriger and, I'm sure, the

14   jury will be asking is, well, the Government says that

15   Mr. Sachdeva has joined in this conspiracy with Mr. Babubhai

16   Patel and, yet, he's not an employee, he doesn't get any money

17   off of this, what's his incentive for doing this.

18         And as the Government indicated in its brief,

19   Mr. Sachdeva does have a home health care business which

20   benefits financially from going out, essentially bribing

21   doctors, getting them to refer prescriptions to the pharmacy

22   business, and Mr. Sachdeva receives financial benefit by the

23   people going to the home health care.

24         And so that clearly falls within the cases cited in

25   the Government's brief; whereas, if we are essentially talking

1    about the payment of benefits to the Defendant, that's

2    intrinsic to the conspiracy.

3            So, we think, again, the Court ought to follow the

4    same procedure.

5            The Government realizes we are at risk here.  If

6    we're wrong, if the Court concludes at the end of the case that

7    this is not only 404(b), but it's not admissible under a 404(b)

8    exception, then we're where we are.  But we believe that this

9    fits within our proofs and we ought to be able to mention it in

10   opening and go forward with our case.

11           MR. KRIGER:  May I just briefly respond?

12           THE COURT:  Sure.

13           MR. KRIGER:  Your Honor, the Government -- I will

14   just do it from here.

15           The Government is cavalier about what a Defendant

16   goes through by sitting in a criminal trial, as if sitting here

17   for three to four weeks and then getting a mistrial is really

18   of no consequence to this Defendant.

19           Number one, the anxiety that is associated with a

20   criminal trial is huge, not to mention the expense that you

21   will have to go through a second time.

22           Your Honor, the conspiracy that's charged here is the

23   conspiracy to bill for medications never dispensed and then to

24   return those medications on top of it.

25           If the Government had some proof or does introduce

US v Patel, et al. #11-CR-20468

1    some proof at trial that Mr. Sachdeva had knowledge of that,

2    that would be one thing.  But I don't believe there's going to

3    be a single conversation played where that inference can be

4    drawn.

5            If, for example, suppose all of these drugs that

6    were, quote, taken in the search that everyone believed to be

7    stolen, that there was no illegality attached to that, and he

8    suggested for whatever reason he decided not to disclose that

9    to the police and he suggests how he can still get the

10   insurance money, that wouldn't be part of the conspiracy.

11           And the point I am trying to make is they don't have

12   the logical link to show that he had knowledge of what was

13   going on in order to say then to recover the assets as part of

14   the conspiracy.  If that link was there, I wouldn't be making

15   this motion, Your Honor.

16           I think the Court needs to hear the proofs and I

17   think the Court will be convinced that that, in fact, is what

18   occurred.

19           THE COURT:  I understand.  Thank you.

20           Just so it's clear, and what I'm hearing the

21   Government say, and it's clear to the Defense, if the

22   Government chooses to put this in their opening statement and

23   offer it, and it turns out that it's not intrinsic after I hear

24   the whole case, the likelihood is not only will there be a

25   mistrial, but there will be no retrial.

US v Patel, et al. #11-CR-20468

1          MR. PRATT:  Yes, we understand that.

2          THE COURT:  So, that's a decision you're going to

3    have to either make now and live with or change your mind on

4    Monday.

5          MR. KRIGER:  Well ...

6          THE COURT:  So, the concerns that you've indicated

7    about the cost of a second trial and the hardships related to

8    sitting through a second trial are minimized.

9          MR. KRIGER:  Well, in all due respect, I'm not

10   convinced that that's true.

11         If the Sixth Circuit disagrees -- I mean, if the

12   Government disagrees that this case is dismissed with

13   prejudice, they have a right to appeal.  And who knows what the

14   Sixth Circuit will do.

15         THE COURT:  I will know what the Sixth Circuit will

16   do, because the Government just indicated they understood they

17   were not going to appeal --

18         MR. KRIGER:  Oh, I didn't --

19         THE COURT:  -- on that single issue.

20         MR. KRIGER:  I didn't understand that was the case --

21         THE COURT:  Mr. Kriger, do I get a turn?

22         MR. KRIGER:  Yes.

23         THE COURT:  And you talk to me, not to them.  I get

24   to talk to you guys.

25         Is that my understanding of what you said, Mr. Pratt?

1        MR. PRATT:  I really didn't say -- I really didn't

2   even get to the point of an appeal.  But, Your Honor, I think

3   the chances of the Government appealing such a decision would

4   be very remote.

5        THE COURT:  Okay.  Anything else?

6        MR. WISHNOW:  Yes, Your Honor.

7        THE COURT:  Yes, Mr. Wishnow?

8        MR. WISHNOW:  Procedurally, Mr. Ashwani Sharma would

9   like to be excused.  He has employment obligations.  He was

10  under the impression that we would be done by now.

11       I waive his presence.  May he be excused?

12       THE COURT:  Yes, he may be excused.

13       MR. NEAL:  Your Honor, there is one procedural

14  matter.  Perhaps we can take care of that now since Mr. Sharma

15  is going to be excused.

16       THE COURT:  Okay.

17       MR. NEAL:  Your Honor, in light of the recent Supreme

18  Court decisions in Frye and Lafler concerning plea

19  negotiations, I think it's important that we create a record

20  today of plea discussions that have taken place between the

21  Government and the Defendants.  Specifically, what I would like

22  to have the Defendant place on the record is an answer simply

23  to three questions --

24       THE COURT:  No.  We will do that on the day of trial.

25       MR. NEAL:  Very well.

US v Patel, et al. #11-CR-20468

1          THE COURT:  And I've done that for years and I wrote

2     those decisions five and six years ago, and the Sixth Circuit

3     affirmed it.

4          I applaud the Supreme Court for coming to that

5     decision, but it's not radically new that you are entitled to

6     an attorney at a guilty plea.

7          MR. NEAL:  Agreed, Your Honor.  Agreed, Your Honor.

8     That's fine.

9          THE COURT:  You may be excused.

10          MR. SHARMA:  Thank you, Your Honor.

11          THE COURT:  Are there any other -- Mr. Feinberg, do

12     you have a work obligation too?

13          MR. FEINBERG:  No, Your Honor.  But I think

14     everything else that's being discussed has to do with the Tier

15     1 Trial.  My client is in Tier 2.

16          THE COURT:  Do you have any objections to more people

17     being sent to Tier 2?

18          MR. FEINBERG:  Pardon?

19          THE COURT:  Do you have any objections?

20          There are a couple of motions here for people wanting

21     to go to Tier 2.

22          MR. FEINBERG:  I have no objection as long as I get

23     put in Tier 3.

24          THE COURT:  Okay.

25          MR. LaRENE:  I'll go for Tier 3, Judge.  I'm not

US v Patel, et al. #11-CR-20468

1    really attached to 2 or anything.

2           THE COURT:  All right.  Can somebody answer my

3    question.  Are there any other motions?

4           MR. NISKAR:  No other motions, but --

5           THE COURT:  Yes?

6           MR. LaRENE:  There was actually, Your Honor.  I did

7    file something in the form of a motion asking that Mr. Rawal be

8    reassigned to Trial Group 2.  The Court has not formally ruled

9    on it.

10          THE COURT:  And somebody else has joined that motion,

11   as I understand it?

12          MR. LaRENE:  I believe Mr. Burdick.

13          MR. BURDICK:  Yes, sir.

14          THE COURT:  Your client too, Mr. Burdick?

15          MR. BURDICK:  Pardon me?

16          THE COURT:  Your client also or just you?

17          MR. BURDICK:  Just me, Your Honor.  No, my client as

18   well.

19          THE COURT:  Mr. Neal?

20          MR. NEAL:  Your Honor, I think the grouping of the

21   Defendants into groups for trial purposes was done with a great

22   deal of consideration, wanting to make sure that the trial

23   groupings would have the most consistent groups and would

24   involve the most consistent evidence so as to not duplicate

25   efforts on the part of the Court and on the part of the

1    Government --

2           THE COURT:  Your objection is noted.  And I'm not

3    going to grant the motion, having considered the reasons.

4           Probably the strongest reason is that there are

5    clients that are less guilty than other people, but no matter

6    what group you're in, somebody is going to be in that

7    situation.

8           Now, practical questions.  Are those the seats that

9    you're going to have during the trial?  Have you thought that

10   far ahead?

11          MR. LaRENE:  We have.  And we're not sure where we

12   want to sit, but we are pretty sure it's not going to look like

13   this.

14          If the Court will allow us to jointly adjust

15   ourselves, we can do that.

16          THE COURT:  Okay.  One of the concerns I have, while

17   you're adjusting yourselves, is the sight line from the jury

18   box to the Defendants.  And because of the nature of the

19   electronic equipment and the podium, there are going to be

20   people who are going to be unable to view all of the jurors.

21          And the question I have is when you are making your

22   determinations, do you also want to make provision for

23   rotation?

24          MR. LaRENE:  Judge, that's certainly fine with us.

25          One of the things we wanted to talk to you about,

```
 1    when you get to it, is the order of go.  We wanted to keep that
 2    flexible.
 3              THE COURT:  The order of what?
 4              MR. LaRENE:  The order in which we would proceed to
 5    examine witnesses.
 6              THE COURT:  Well, the order will be the same once you
 7    decide the order.
 8              MR. LaRENE:  Might we have the permission to adjust
 9    that amongst ourselves depending on a witness-to-witness basis?
10              We can furnish the Court with a sheet, for example,
11    during the direct-examination --
12              THE COURT:  That's fine.  That's fine.
13              MR. LaRENE:  And we will just select and then the
14    Court can recognize --
15              THE COURT:  And then you can put on your resume that
16    you did Witness No. 4, 7 and 11.
17              MR. LaRENE:  That was the plan.
18              THE COURT:  Okay.
19              MR. BURDICK:  Your Honor, I would point out that some
20    of us, we've been discussing this.  And it seems to me and some
21    of the others that it would be better to have these tables in
22    the ordinary course of -- there are seven Defendants going to
23    trial.  If we had two, two and two tables, it would work better
24    that way than this.  Because this is very, very difficult.
25              THE COURT:  I have no problem with that.
```

US v Patel, et al. #11-CR-20468

1    MR. BURDICK:  All right.  Thank you, Your Honor.

2    THE COURT:  The folks who are going to be here

3 tomorrow moving tables might not be happy, but I'll tell them

4 it was your idea.

5    But what you are suggesting is move the table that's

6 this way farther back and then move these tables to make three

7 rows of tables?

8    MR. BURDICK:  Yes, Your Honor.

9    THE COURT:  Okay.  There's still going to be the same

10 problem with the podium.

11    MR. LaRENE:  We can rotate, as you suggest.

12    THE COURT:  Okay.

13    MR. LaRENE:  So, that's fine.

14    THE COURT:  Now, are you going to rotate like they do

15 in volleyball?

16    MR. LaRENE:  I was going to actually rotate in my

17 seat.

18    THE COURT:  You've been doing that all day,

19 Mr. LaRene?

20    MR. LaRENE:  Well, yeah, a nervous tick, Judge.

21    THE COURT:  All right.  Anything else you want to

22 talk about?

23    MR. LaRENE:  Jury selection.

24    THE COURT:  Yes, we'll do that.

25    MR. LaRENE:  Well, we need to select one.

1          We presume the Court will follow the rule and seat

2   and challenge alternates -- trial jurors and alternates

3   separately, and we would prefer that.  We would --

4          THE COURT:  That's not going to happen.

5          MR. LaRENE:  I'm sorry?

6          THE COURT:  That's not going to happen, because the

7   persons who are designated alternates tend not to listen as

8   well.

9          MR. LaRENE:  They don't have to know they are

10  alternates, Judge.  We don't have to tell them.

11         THE COURT:  Well, if you want to do it by blind draw

12  somehow out of their presence, that's fine.

13         MR. LaRENE:  That's exactly what we don't want to do,

14  Judge, is blind draw.  We want to know who the alternates

15  are --

16         THE COURT:  No, no.  You will know them.  They won't

17  know them.  We can do the blind draw right after you select the

18  jury.

19         MR. LaRENE:  Judge, why don't we just seat them the

20  way the rule provides, and that way we will know the value of

21  each challenge?

22         A challenge to a trial juror may be more significant

23  to us than a challenge to an alternate.  So, it really helps us

24  all do our job better if we know who the jurors are.  And I

25  think that's why the rule is done the way it is.

US v Patel, et al. #11-CR-20468

1            It's very simple.  We just don't have the tell the
2    jurors in Seats 13, 14, 15 and 16 that they are alternates.
3    There's no reason that they need to be told that.
4            THE COURT:  What about the Government; is that okay
5    with you?
6            MR. PRATT:  That's fine with us, Your Honor.
7            THE COURT:  All right.  Do it that way.
8            MR. PRATT:  We won't tell them they are alternates
9    and --
10           THE COURT:  Put that on your resume too, Mr. LaRene.
11           MR. LaRENE:  And we were going to ask -- we were
12   going to suggest, that as to the 12 trial juror seats, that the
13   Defendants be allowed 20 challenges that we would exercise
14   jointly, and then the Government be allowed 12, which would
15   keep the 10 to 6 proportion that is provided by the rule.
16           MR. PRATT:  That's fine with the Government, Your
17   Honor, although I'm not --
18           And then what would happen?  Would there be separate
19   challenges for the alternates?
20           MR. LaRENE:  The rule provides if we seat, for
21   example, four alternates, each side would get two challenges to
22   the alternates.
23           MR. PRATT:  That would be fine, Your Honor.
24           THE COURT:  As long as we get the jury picked by ten
25   o'clock, that's fine.

1          MR. LaRENE:  Can we have until 10:15, Judge?

2          THE COURT:  Sure.

3          MR. LaRENE:  Thank you.

4          MR. BURDICK:  One other thing, Your Honor, with

5     respect to challenges.

6          Would the Court consider using the passing the note

7     kind of challenges rather than give them out loud in front of

8     the jurors where they --

9          THE COURT:  Are you talking about for cause or

10    peremptory?

11         MR. BURDICK:  Peremptory.

12         THE COURT:  Okay.  So, you don't have any problems

13    challenge for cause out loud?

14         MR. LaRENE:  No.  I think that's part of the

15    excitement.

16         THE COURT:  Okay.  And what's the advantage of using

17    notes and destroying trees?

18         MR. BURDICK:  None of the jurors know who challenged

19    whom.

20         THE COURT:  I don't get it.  I mean, they know the

21    Defense challenged or the prosecutor --

22         MR. BURDICK:  Well, they don't know that.

23         THE COURT:  Pardon?

24         MR. BURDICK:  What is done is the clerk provides a

25    piece of paper that is written on by the Government and the

1    Defense, and things are written down on this note, and the

2    Court collects the notes and gives it to the --

3            THE COURT:  So, then you can challenge more than one

4    at a time.

5            MR. BURDICK:  Yes.

6            Well, it's per round, each round.  The Government

7    would go first in round one.  We would go second.  In the

8    second round, the Defense would go first and the Government

9    would go second.  There's different notes each time.

10           MR. LaRENE:  In other words, we have a piece of paper

11   that circulates to the tables and then goes to the Court.  The

12   Court announces the challenges without announcing who is the

13   source of the challenge.

14           THE COURT:  Mr. Pratt?

15           MR. PRATT:  I'm not sure that the Court has indicated

16   it's going to use a round system.  I thought ...

17           THE COURT:  I don't know what a round system is.  We

18   just do one at a time.

19           MR. PRATT:  Yeah, one at a time.

20           So, I don't think you can use a note unless -- when

21   you have a jury and the perempts are to one side, it is up to

22   them to exercise one or more perempts.  That's what I thought

23   we were going to do.

24           MR. WISHNOW:  Before we get to that, I think the

25   first question is are we using the strike system?

US v Patel, et al. #11-CR-20468

1              And this note sharing is more appropriate to the

2     strike system, which I would request the Court utilize in this

3     case.  Where the strike system the whole panel is voir dired

4     and then we collectively, the Defense and the Prosecution,

5     decide through the note system who we want to be excused.  That

6     is very efficient and precise, and we end up with our jurors

7     that way without histrionics and melodrama.

8              MR. BURDICK:  We thank and excuse Juror No. -- and,

9     you know, that kind of stuff, that doesn't help anybody.

10             MR. WISHNOW:  Well, with this amount of

11    challenges and --

12             THE COURT:  Well, maybe the answer is to give fewer

13    challenges.

14             MR. WISHNOW:  I think with this amount of Defendants,

15    the strike system works better anyways with the notes passing

16    amongst the counsel table and then the clerk reads the names or

17    the Court may read the names.

18             MR. PRATT:  Judge, I understand some other courts use

19    the strike system.  I have used both systems.  But I would

20    defer to what --

21             If the Court is comfortable and I think everyone is

22    very comfortable with putting them in a box and asking one side

23    or the other if they would like to excuse anybody, I think that

24    works pretty efficiently.

25             THE COURT:  Yes, that's what I'm comfortable with.

1            And I have a question.  If one side passes and the

2     other side uses a peremptory, can the side that passed

3     challenge anyone other than the new juror?

4            MR. LaRENE:  I think we should be able to, Judge.

5            MR. BURDICK:  Absolutely.  Absolutely, Your Honor.

6            THE COURT:  Okay.

7            MR. PRATT:  I think so, Your Honor.

8            MR. BURDICK:  With the jury selection, a new juror

9     can --

10           MR. LaRENE:  He's saying he agrees.

11           MR. WISHNOW:  Well, all of that is avoided with the

12    strike system --

13           THE COURT:  It's avoided with a waiver trial too.

14           Mr. Wishnow, it's avoided with a waiver trial also.

15    And it's also avoided with all sorts of other forms of trial

16    that we don't use.

17           All right.  We will --

18           MR. WISHNOW:  Your Honor, the other thing, if I may?

19           THE COURT:  Yeah.

20           MR. WISHNOW:  With the strike system, as opposed to

21    the more traditional way, at the end of the jury selection the

22    more traditional way, you get more perfunctory answers that's

23    not really in-depth, and I find that wanting in the jury

24    selection process as opposed to the strike system where

25    everybody gets the same input from all the jurors.  And it goes

1    much faster, much faster.

2              THE COURT:  Well, but your side started with the

3    emphasis on rules and now you're going to a system that's not

4    in the rules.

5              All right.  Anything else?

6              MR. NISKAR:  Yes, Your Honor.

7              MR. LaRENE:  Go ahead.

8              MR. NISKAR:  Your Honor, we just received in the last

9    couple of days some of the Government's proposed exhibits and

10   summaries.

11             THE COURT:  You want an adjournment?

12             MR. NISKAR:  No.

13             THE COURT:  Go on.

14             MR. NISKAR:  But in reviewing some of these exhibits,

15   I brought it to the Government's attention that I believe that

16   some of the icons and pictures and other things that they are

17   using in their exhibits are very prejudicial and should not be

18   in the exhibits.  I'm asking the Court to -- and what I don't

19   want to happen --

20             THE COURT:  Mr. Wishnow just stood in amazement

21   because he doesn't think they are prejudicial at all.

22             MR. WISHNOW:  No.  I don't know what icons is.

23             THE COURT:  Do you want to walk to the other side,

24   Mr. Wishnow, for this one?

25             MR. NISKAR:  So, what I don't want to happen over the

1    weekend is for the Government to compile 25 exhibit books and

2    then have to, over my objection, redo the entire exhibit books.

3    I'm going to try and work with the Government to do this, but I

4    believe that -- I'd like to place an objection.

5              For example, Government Exhibit 63, in characterizing

6    one of the corporations allegedly owned by Mr. Patel, there is

7    a picture of a snail shell in order to infer that this was a

8    shell corporation.

9              I have not seen the balance --

10             THE COURT:  Is it yellow and red?

11             MR. NISKAR:  No, this is not color.  I do not know if

12   they have a color copy that they are intending to use.

13             MR. BURDICK:  It is in color in digital form.

14             MR. NISKAR:  Not that kind of shell.

15             THE COURT:  Okay.

16             MR. NISKAR:  Like a crab hermit type of shell.

17             So, I don't know if there are --

18             THE COURT:  What do you think yellow and red shell

19   oil is?  It's a hermit crab too.

20             MR. NISKAR:  It's a sand dollar, I think.

21             THE COURT:  Okay.

22             MR. NISKAR:  So, I don't know if there are -- that

23   might be more appropriate.

24             But I'm asking the Government to please provide me

25   with their proposed exhibit prior to compiling the books, so I

1       can make formal objections and not waste their time and money.

2                   THE COURT:  Okay.

3                   MR. NEAL:  We have no objection to that.  We will

4       work with Mr. Niskar and others over the next couple of days.

5                   THE COURT:  And I will put this on the record.  We

6       talked about this before not on the record.  I expect a set of

7       jury instructions on Monday morning, stipulated to where they

8       can be, and if there are any disputes, the alternatives

9       presented.

10                  I expect a list of witnesses, preferably in order,

11      with guesstimates as to the time for each witness.

12                  MR. NEAL:  Judge, we have provided a list of

13      witnesses with estimates of the direct time to the Defense.

14                  THE COURT:  All right.  I just want to put all of

15      this on the record.

16                  MR. NEAL:  Very well.

17                  THE COURT:  And I think once we get started with the

18      presentation, we are going to go more like the Pennsylvania

19      case, which finished three days or a week early.  The Penn

20      State case.

21                  MR. BURDICK:  The Court ought not to compare us to

22      that.

23                  THE COURT:  What?

24                  MR. BURDICK:  The Court ought not to compare us to

25      Jerry Sandusky.

1          THE COURT:   No.   I was comparing the prosecutors to

2    the prosecutors in terms of presenting all they need, the heart

3    of their case, without having to go into redundancies.   And I

4    certainly am not comparing Mr. Sandusky to anybody.

5          I put on the record that we are going to have jurors

6    asking questions, taking notes.

7          For the record, whenever there's a question, there

8    will be a sidebar conference.   And you are all free to come to

9    sidebar or you can designate a delegation or whatever.   But if

10   I don't ask the question, it will be because I have chosen not

11   to.   I will not say who objected.

12          And be here at 8 o'clock.

13          Is there anything else?

14          MR. LaRENE:   Judge, there's one other matter.

15          We have been through -- we have all been through the

16   jury questionnaires now, and we've looked at the answers to --

17   the answers to Question 26, the hardship question.

18          THE COURT:   Mm-hmm.

19          MR. LaRENE:   We've given the Government our

20   collective suggestions about jurors who probably need not be

21   brought in at all.   The Government is reviewing them.   They are

22   going to make their suggestions.

23          If we can get a group of jurors whom we agree need

24   not be brought in because the hardship seems like it -- it

25   doesn't require further airing, would the Court have them

US v Patel, et al. #11-CR-20468

1    excused --

2             THE COURT:  Do you want to say it a third time?

3             MR. LaRENE:  I'm sorry?

4             THE COURT:  Do you want to say it a third time, a

5    hardship?

6             Yes, they can be excused.

7             MR. LaRENE:  I like to say "hardship," Judge.

8             THE COURT:  No.  Trial lawyers are three-peaters.

9    They say things three times.

10            MR. LaRENE:  Very well, sir.

11            THE COURT:  You've given up your interest in

12   basketball, I take it?

13            MR. NEAL:  Judge, one other question about the trial

14   schedule.

15            In terms of time of the trial everyday, is that going

16   to vary or do you have a set schedule with --

17            THE COURT:  No.  It will vary.  But everyday we will

18   start at 8:30, and we will either end at one or four.

19            MR. NEAL:  All right.

20            MR. BURDICK:  Your Honor, I'm sorry.  The Court

21   advised us earlier that other than jury selection we will be

22   going 8:30 to one.  And I have made plans for --

23            THE COURT:  What did I just say?

24            MR. BURDICK:  -- afternoon activities that --

25            THE COURT:  You'll get enough notice for afternoons.

US v Patel, et al. #11-CR-20468

1     It's only going to go afternoons if it slows.

2              MR. BURDICK:  Not counting the second week of the

3     trial?  You're not counting that as part of the slow?  That is

4     not going to count as the trial slowing down?

5              THE COURT:  No.

6              MR. BURDICK:  Because we aren't going to be here the

7     second week, right?

8              THE COURT:  Whatever I told you is true.

9              MR. BURDICK:  Thank you, sir.

10             THE COURT:  It would have been the fourth week if

11    everyone's health held out.

12             MR. WISHNOW:  You did say 8 o'clock on Monday,

13    though?

14             THE COURT:  Yes, I did say 8 o'clock on Monday.

15    That's when the big hand is on the 12 and the little hand is on

16    the eight.  Or digitally, you'll figure it out.

17             Mr. Niskar?

18             MR. NISKAR:  Is the Court going to impose a time

19    limitation on the opening statements?  So, we can have some

20    guidance.

21             THE COURT:  You guys should be able to figure that

22    out amongst yourselves.  It's got to be long enough to cover

23    the subject and short enough to keep our interests.

24             MR. NISKAR:  But there's not going to be a red light,

25    yellow light, right?

```
1              THE COURT:  I don't see one.

2              MR. NISKAR:  All right.  Good.

3              THE COURT:  But remember -- and I'm going to tell the

4    jury this several times, Mr. Niskar.

5              MR. NISKAR:  I didn't hear you.

6              THE COURT:  I'm going to tell the jury this several

7    times.  This is an opening statement.

8              MR. NISKAR:  Yes.

9              THE COURT:  Not an opening argument.

10             MR. NISKAR:  Yes.

11             MR. PRATT:  Judge, I had one issue on the jurors.

12             I know that there was some e-mail exchanged back and

13   forth between counsel and I believe with the Court's clerk.

14   And I believe I am going to be allowed to ask the jurors in

15   jury selection if they have anything such as prior felony

16   convictions.

17             It's going to be the Government's position that once

18   we seat the 16 jurors, we would like the Court to order us to

19   have access to their date of birth so we can check the

20   truthfulness of their answers.

21             I have raised that with brother counsel.  I'm not

22   sure it needs to be dealt with today, but I wanted everyone to

23   know that that would be an issue that would come up perhaps

24   Monday if we have the 16 --

25             THE COURT:  Does everybody agree with you?
```

1          MR. LaRENE:  What Mr. Pratt said is that he has

2    advised us that that's what he wants to do, not that we agree

3    with it.

4          THE COURT:  Well, I'm asking do you agree or

5    disagree?

6          MR. LaRENE:  No.  I think the jury clerk does the

7    screening.  We put them under oath here.  I don't think they

8    need to be snooped.

9          THE COURT:  Under Michigan law aren't they eligible

10   to be on the jury as soon as they are off of parole or out of

11   prison, one or the other?

12         MR. PRATT:  They are ...

13         THE COURT:  Under Michigan law --

14         MR. BURDICK:  Out of prison.

15         THE COURT:  It's out of prison.

16         MR. BURDICK:  Yes, Your Honor.

17         THE COURT:  So, I can take judicial notice, if they

18   are sitting there, they're not in prison.

19         MR. PRATT:  I believe there are two issues, Your

20   Honor.  One is that the federal rule I think may require a

21   five-year period of time.

22         The other thing is that, first of all -- the second

23   thing is that the clerk's office does not pre-run jurors and

24   does not exclude jurors based on prior criminal convictions.

25   So, the only thing we have is their word in the courtroom

1    and --

2            THE COURT:  Well, we have their word that they are

3    not prejudiced or they are not this or they are not that.  We

4    are relying on their word for the whole process.

5            MR. PRATT:  We are, Your Honor.  But I have had cases

6    where other judges have ordered a post-verdict -- rather, a

7    post-selection process.  I have, in fact, had convicted felons

8    that were on juries that gave various excuses such as I didn't

9    hear the question or --

10           THE COURT:  And how many times has this happened to

11   you?

12           MR. PRATT:  It has happened twice, Your Honor.

13           THE COURT:  And how many years have you been doing

14   this?

15           MR. PRATT:  I've been doing it a while, Your Honor.

16           But having a jury contaminate -- the Government has a

17   right not to have convicted felons on the jury.  It is in the

18   statute.  And I think that's a very reasonable and nonobtrusive

19   means to enforce that right.

20           We take their word that they are not prejudiced

21   because we can't spend a minute typing their name in a machine

22   and finding out whether or not they are being truthful.  We

23   can --

24           THE COURT:  Well, let me think about it.

25           MR. PRATT:  All right.

US v Patel, et al. #11-CR-20468

```
1              THE COURT:  Do you agree, Mr. Neal?

2              MR. NEAL:  I'm with Mr. Pratt.

3              THE COURT:  All right.

4              MR. NEAL:  Full agreement.  No daylight between us.

5              THE COURT:  Yeah.

6              MR. NEAL:  Your Honor, there is one other thing I

7    have discussed with Mr. Niskar on several occasions in the

8    past.

9              Mr. Niskar represents a Defendant in another case who

10   is somewhat tangentially involved in this case.  The Government

11   does not see it as a conflict, but would like a formal waiver

12   on the record of any potential conflict from Mr. Babubhai

13   Patel.  We can do that on Monday.  I think there's a colloquy

14   in the judges' bench book that the Sixth Circuit has approved

15   for use in these kinds of circumstances.

16             THE COURT:  Mr. Niskar?

17             MR. NISKAR:  I have discussed it with my client, Your

18   Honor.  We can put that on the record on Monday.

19             THE COURT:  Why don't we do that right now.

20             MR. NISKAR:  We can do it right now.

21             THE COURT:  All right.  Okay.  Do you want to tell me

22   what the conflict, potential conflict is, Mr. Niskar or

23   Mr. Neal?

24             MR. NISKAR:  I will let Mr. Neal do that.

25             THE COURT:  Mr. Neal.
```

1           MR. NEAL:  Sure, Your Honor.

2           Mr. Niskar represents a physician by the name of

3    Pramod Raval in another case; spelled P-R-A-M-O-D, first name,

4    and the last name is Raval, R-A-V-A-L.

5           Mr. Raval is a physician who worked in close

6    proximity to one of the pharmacies that are at issue in this

7    case.  Mr. Babubhai Patel had some contact and a relationship

8    with this physician.

9           This physician is not charged in this case.  The

10   charges that he is facing are entirely separate, involving an

11   entirely separate scheme.  Nonetheless, Mr. Raval has come up

12   in the context of the investigation in this case.  His name is

13   mentioned in some of the DEA-6 memoranda which have been

14   disclosed to the Defense in this case, and he was captured on

15   the electronic intercepts on several occasions.  And, you know,

16   Mr. Patel and the other Defendants have viewed that.

17          The Government does not see any sort of unwaivable

18   conflict in this situation, and I have spoken about it with

19   Mr. Niskar, and Mr. Niskar has informed me that he has

20   discussed it thoroughly with his client.

21          We think would be safe for the record, and safest for

22   everyone, if that conflict or potential conflict, I should say,

23   was waived at this point.

24          THE COURT:  Mr. Patel, raise your right hand.

25          **BABUBHAI PATEL, DEFENDANT, SWORN.**

US v Patel, et al. #11-CR-20468

1          THE COURT:  Do you understand you don't have an

2     obligation to answer my questions because you have a

3     constitutional right to remain silent?

4          MR. BABHUBAI PATEL:  Yes.

5          THE COURT:  Do you also understand that if you do

6     answer these particular questions for this particular purpose,

7     it's not admissible for anything else unless it's used for

8     impeachment?  Do you understand that?

9          MR. BABHUBAI PATEL:  Yes.

10          THE COURT:  You have to answer yes or no.

11          MR. BABHUBAI PATEL:  Yes.

12          THE COURT:  Okay.  You've heard what Mr. Neal has

13     said?

14          MR. BABHUBAI PATEL:  Yes.

15          THE COURT:  You've discussed it with your client --

16     excuse me -- with your attorney.

17          Do you agree to waive any possible right to challenge

18     based on a conflict?

19          MR. BABHUBAI PATEL:  Yes, sir.

20          THE COURT:  Okay.  Anything else I should ask,

21     Mr. Niskar?

22          MR. NISKAR:  No thank you, Your Honor.

23          THE COURT:  Mr. Neal?

24          MR. NEAL:  No thank you, Your Honor.

25          THE COURT:  Okay.  Anything else we can do now?

1                    MR. NEAL:  The Government is satisfied, Your Honor.

2                    THE COURT:  All right.  And I have not taken up your

3       offer to do the Lafler and other case waiver because there's

4       always a chance the final plea offer will change between now

5       and then.  So, we will do that first thing Monday morning.

6                    MR. NEAL:  Very well, Your Honor.

7                    THE COURT:  Thank you.

8                    MR. NEAL:  Thank you.

9                    *(Proceedings adjourned at 3:00 p.m.)*

10                        —    —    —

11

12

13

14

15      STATE OF MICHIGAN )
                          ) ss.
16      COUNTY OF WAYNE   )

17

        I, Denise A. Mosby, Federal Official Court Reporter, do
18      certify that the foregoing is a correct transcript from the
        record of proceedings in the above matter.

19

20                               s/ Denise A. Mosby

21                               _____
                                 DENISE A. MOSBY, CSR, RMR, CRR
                                 United States Court Reporter
22                               124 Theodore Levin U.S. Courthouse
                                 231 W. Lafayette Boulevard
23                               Detroit, MI 48226
                                 313.961.6230
24                               Denise_Mosby@mied.uscourts.gov

25      Dated:   April 30, 2013


                    US v Patel, et al. #11-CR-20468