UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                Case No. 11-cr-20468

       Plaintiff,       Hon. Arthur Tarnow

  vs.


D-36 VINOD PATEL,

      Defendant.

_____/


## DAY  2

### TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE ARTHUR J. TARNOW
UNITED STATES DISTRICT COURT SENIOR JUDGE
Detroit, Michigan
Friday, July 11, 2014


APPEARANCES:

For Government:          JOHN K. NEAL, ESQ.
                     WAYNE F. PRATT, ESQ.
                     U.S. Attorney's Office
                     211 W. Fort Street, Ste 2001
                     Detroit, Michigan 48226

For Defendant:          RICHARD M. BEUKE, ESQ.
                     53 W. Jackson, Suite 1410
                     Chicago, Illinois 60604

                     TIMOTHY M. BLACK, ESQ.
                     713 West Devon Avenue
                     Park Ridge, Illinois 60068


                    *    *    *
OFFICIAL COURT REPORTER:
Denise A. Mosby, CSR, RMR, CRR
313) 961-6230     www.transcriptorders.com

# I   N   D   E   X

**WITNESS:**                                                    **PAGE**

**OPENING STATEMENTS (Cont'd)**
    Opening Statement by Mr. Beuke
    (Not contained under this cover.)                   4

**DOUGLAS CARMACK**
    Direct-Examination by Mr. Pratt                    77
    Cross-Examination by Mr. Black


**MOTION TO CANCEL BOND**

Oral Argument by Counsel                                128

**PARESH K. PATEL**
    Direct-Examination by Mr. Neal                    133
    Cross-Examination by Mr. Beuke                    139

Oral Argument by Counsel                                150

Judge's Ruling                                          154

# E X H I B I T S

| EXHIBIT NO. | IDENTIFICATION | PAGE |
|---|---|---|
| **Government** | | |
| 1 | transcripts of calls | 30 |
| 2 | transcripts of calls | 30 |
| 3 | transcripts of calls | 30 |
| 10 | 13 apartment photos | 16 |
| | | |
| **Motion to Cancel Bond** | | |
| **Government** | | |
| 1 | DEA-6 report | |
| 2 | DEA-6 report (copy) | 149 |

```
 1                                    Detroit, Michigan
 2                                    Friday, July 11, 2014
 3                                    8:47 a.m.
 4                         –      –       –
 5           (Jury not present.)
 6               THE COURT:  Anybody want to put anything on the
 7     record?
 8               MR. NEAL:  No, Your Honor.
 9               MR. PRATT:  No, Your Honor.
10               MR. BEUKE:  No, Your Honor.
11               THE COURT:  How about who broke the screen?
12               (Jury enters the courtroom at 8:47 a.m.)
13               CASE MANAGER LANG:  United States District Court for
14     the Eastern District of Michigan is now in session, the
15     Honorable Arthur J. Tarnow, presiding.
16               You may be seated.
17               The Court calls Case No. 11-20468, the United States
18     of America versus Vinod Patel.
19               THE COURT:  Good morning.  Everybody is in their
20     place.  As you know, we don't have court Saturday or Sunday,
21     but you're welcome to come if you miss your chairs or --
22     actually by the third or fourth day of trial, I expect you to
23     come in in order with your seats.  You can come in tomorrow and
24     practice if you want.
25               Everybody ready?
```

1              MR. BEUKE:  Ready, Judge.

2              THE COURT:  Defense counsel, you may begin.

3              MR. BEUKE:  Thank you, Your Honor.

4              THE COURT:  Remember, it's not testimony, not

5    evidence.  Just to help you out.

6              *(Opening Statement by Mr. Beuke is not contained*

7              *under this cover.)*

8                          *    *    *

9              THE COURT:  Are we ready for our first witness?

10             MR. PRATT:  Yes, Your Honor.

11             THE COURT:  Please call the witness.

12             MR. PRATT:  The United States calls Douglas Carmack.

13             THE COURT:  Raise your right hand, please.

14        DOUGLAS CARMACK,  GOVERNMENT'S WITNESS, SWORN.

15             THE COURT:  Please be seated.  Adjust the microphone

16   so we can hear you.

17             And you may begin.

18                      DIRECT-EXAMINATION

19   BY MR. PRATT:

20   Q.  Good morning.  Please state your name for the record.

21   A.  Task Force Agent Douglas Carmack.

22             *(Off the record, concerning sound system issues.)*

23   BY MR. PRATT:

24   Q.  Could you spell your last name for the court reporter.

25   A.  C-A-R-M-A-C-K.

1    Q.   How are you currently employed?

2    A.   Grosse Ile Township Police Department as a police officer.

3              *(Off the record.)*

4    BY MR. PRATT:

5    Q.   How long have you been employed about the Grosse Ile Police

6    Department?

7    A.   About 13 years.

8    Q.   Did you have law enforcement experience before you became

9    employed there?

10   A.   Yes, I did.

11   Q.   What was that experience?

12   A.   I worked for other police departments.

13   Q.   Okay.  Did there come a point in your employment with the

14   Grosse Ile Police Department that, for lack of a better word, I

15   guess you went on assignment to another law enforcement agency?

16   A.   Yes.

17   Q.   Can you explain what happened?

18   A.   In 2006 the Police Department assigned me to a DEA task

19   force, where I'm currently assigned right now.

20   Q.   Okay.  And if you can keep your voice up.

21             So, you've been with the DEA task force since when?

22   A.   2006.

23   Q.   All right.  How did you view this change when you went from

24   being a police officer with Grosse Ile to being a Task Force

25   Officer with the Drug Enforcement Administration?

1    A.   Doing normal patrol work as a police officer, I conducted

2    drugs investigations on cases now currently -- there we go --

3    currently pharmacies and doctors.

4    Q.   Okay.  So, you've been doing that sort of work since 2006?

5    A.   Correct.

6    Q.   In connection with the investigation into Bob Patel and

7    other individuals associated with him, were you given any

8    particular role or title or assignment?

9    A.   I was one of the lead investigators in the investigation

10   with a couple other people.

11   Q.   All right.  One of the lead investigators.  As one of the

12   lead investigators, can you give us a general sense of what

13   your duties were?

14   A.   For this investigation, to investigate Bob Patel, Bob and

15   his pharmacies and his home health care businesses.

16   Q.   Can you give us a very brief timeline of your

17   investigation, starting out when you personally started being

18   involved in this investigation?

19   A.   I was not one of the original investigators.  I came on

20   early on in about 2009 until the present.

21   Q.   Okay.  So, you weren't the first investigator, but you were

22   assigned early on.  Is that what you said?

23   A.   Correct.

24   Q.   All right.  Was there a point where wiretap techniques were

25   used?  Can you give us a date as to when the investigation

1    progressed to that point?

2    A.   January 10th of 2011 is when we began our wiretap.

3    Q.   Okay.  How long did the wiretap run?

4    A.   Until July 30th, 2011.

5    Q.   What significant law enforcement efforts took place shortly

6    after the wiretap went down, if any?

7    A.   On August 2nd, 2011, that's when we executed several search

8    warrants and arrested several people and took down a portion of

9    the organization.

10   Q.   Okay.  And at that point, on August 2nd, with those

11   arrests, how many people were charged at that point?

12   A.   26.

13   Q.   All right.  Did the investigation end or did it continue at

14   that point?

15   A.   It continued.

16   Q.   Okay.  And can you give us a timeline, if any -- was there

17   a second series of searches and arrests?

18   A.   Yes.  On March 13, more indictments -- there were 13 more

19   individuals arrested on March 19, I believe, 2012.

20             MR. PRATT:  Okay.  Just a minute.

21   BY MR. PRATT:

22   Q.   2012 or 2013, by the way, for the second round?

23   A.   '13.  I'm sorry.

24   Q.   Okay.  I was trying to remember as well.

25             Okay.  And how many more people were charged at that

1    point?

2    A.  13.

3    Q.  Okay.  I want to briefly -- and not take too long, but

4    briefly want to go through the methods you used in your

5    investigation, the techniques you used against not just

6    Babubhai Patel, but other individuals.

7           Can you run through those for us?

8    A.  Besides the wiretap, we also did surveillance operations,

9    following people around, trash pulls, going through people's

10   trash for information, deploying GPS trackers on cars, tracking

11   people's cell phone by pings, delayed notice search warrants,

12   and other techniques.

13   Q.  All right.  How about undercover activities?

14   A.  Undercover activities, and we used confidential informants.

15   Q.  Okay.  Did you yourself, in fact, engage in an undercover

16   capacity on a couple of occasions?

17   A.  Yes, I did.

18   Q.  What did you do when you acted undercover?

19   A.  On two occasions I posed as a patient and I went to the

20   pharmacies to get my medications for the bill and not fill.

21   Q.  To see if they would bill but not dispense for you?

22   A.  Correct.

23           MR. BEUKE:  I'm going to object just as to

24   foundation.  Can we have when this is happening?

25           THE COURT:  You want to do a foundation.

1          MR. PRATT:  All right.  Yes.

2    BY MR. PRATT:

3    Q.  If you recall, what pharmacy did you go to when you engaged

4    in undercover activities?

5    A.  One was Glendale Pharmacy and one was Care For You

6    Pharmacy.

7    Q.  Were these both in the group of Babubhai Patel pharmacies?

8    A.  Yes, they were.

9    Q.  And approximately when were those undercover visits?

10   A.  I don't recall the exact date, but it was during the time

11   frame of the wiretap.

12   Q.  So, it would have been in the first half of 2011?

13   A.  Earlier.

14   Q.  Okay.  Early on.

15          All right.  I want to ask you about specifically this

16   technique called the Delayed Notice Search Warrant.

17          Can you describe to the jury how that type of search

18   warrant differs from an ordinary search warrant?

19   A.  In an ordinary search warrant when you are leaving the

20   residence, you leave a copy of the search warrant and you leave

21   a copy of the list or the tally of what was taken from the

22   location.

23          A Delayed Notice Search Warrant, you leave nothing.

24   There is no evidence you were there unless the people were

25   there at the residence.

1   Q.   Okay.  And then -- and let me ask you.  First of all, let's

2   start with a search warrant of any kind, regular or not.

3           A search warrant, is the DEA allowed to do that on

4   their own or does that have to be approved by somebody?

5   A.   A prosecutor later on and then approved by a judge.

6   Q.   And how about then the delayed notice aspect; is that

7   something that the DEA can decide on its own or does that have

8   to be approved by somebody?

9   A.   The same; the prosecutor and a judge.

10  Q.   Okay.  Tell us about the Delayed Notice Search Warrant in

11  this case.  What location was this Delayed Notice Search

12  Warrant executed on?

13  A.   The second one was at Chirag Soni's residence in Canton,

14  Michigan.

15  Q.   All right.  Who is Chirag Soni?

16  A.   He was a pharmacy tech who cared at Caring Pharmacy, which

17  was one of Bob's pharmacies.

18          MR. BEUKE:  I'm sorry.  I didn't hear what you said.

19  This is the second Delayed Search Warrant?

20          MR. PRATT:  Yes.

21          MR. BEUKE:  All right.

22  BY MR. PRATT:

23  Q.   What was the date of the Delayed Notice Search Warrant on

24  Chirag Soni's apartment?

25  A.   April 28th, 2011.

1   Q.  How did you -- let me ask you this before I get to that.

2           Were you investigating with this Delayed Notice

3   Search Warrant any particular aspect of the case?

4   A.  Throughout the wire and throughout the investigation,

5   conversations that they were taking stockpile medications and

6   hiding them in places outside the pharmacies, we determined one

7   of the locations and then we wrote -- I wrote the Delayed

8   Search Warrant to try to acquire those medications.

9           THE COURT:  Would you stop a minute.  I thought that

10  was a yes or no question.

11  A.  Oh.

12          MR. PRATT:  All right.

13          THE COURT:  And ...

14          MR. PRATT:  Well, let me ask a little broader

15  question, Your Honor, and maybe that will help.

16          THE COURT:  Go on.

17  BY MR. PRATT:

18  Q.  All right.  Can you describe very briefly what is billing

19  but not dispensed?

20  A.  The organization would get doctors to write medically

21  unnecessary prescriptions.  The pharmacies would bill for the

22  cost of the medication, plus the profit; take the medications

23  and not dispense them and then put them in a location to later

24  be returned to a distributor for more money or sold to another

25  pharmacy for additional money.

1 Q. Okay. How did that billing, but not dispensed process --

2 did -- how did that affect your desire to execute a Delayed

3 Notice Search Warrant? How did that interact?

4 A. On additional phone calls that we intercepted, Bob and

5 different pharmacists would talk about taking medications and

6 shorting the bottles, amassing medications on top of also

7 taking whole bottles or prescriptions and not dispensing them.

8 In doing that, they are intermixing loose medications that

9 could be comingled or -- different expiration dates and

10 different lot numbers. And if it goes back to a distributor or

11 back to another pharmacy, it could actually be a public health

12 risk.

13 Q. So, you wanted -- if you were able, you wanted to seize

14 these medications that were piling up?

15 A. Correct.

16 Q. Would that be a fair statement?

17 A. Correct.

18 Q. Okay. What happened on April 28th, 2011?

19 A. We executed the second Delayed Notice Search Warrant.

20 Q. How did you do that? Describe how that works.

21 A. Part of having a Delayed Notice Search Warrant is to not

22 tip your hand to the Defendants or future Defendants about the

23 investigation.

24 On that date, we went to the residence, knocked on

25 the door. We were in plain clothes, not looking like law

1    enforcement.  No one answered the door.  We executed the search

2    warrant on the residence and acquired a large amount of pills.

3    Q.  Okay.  And when you say executed the warrant, when there's

4    no one there physically how do you obtain entry into an

5    apartment?

6    A.  At that particular moment we just kicked the door in.

7    Q.  Okay.  What did you and your fellow agents find at Chirag

8    Soni's apartment in Canton, Michigan?

9    A.  About 30, 31 boxes.  They are U-Haul sized moving boxes

10   weighing about 1500 pounds.

11   Q.  Okay.  And when you say the boxes weighed 1500 pounds, were

12   there any contents in the boxes?

13   A.  A large array of noncontrolled medications.

14   Q.  Okay.  When you say noncontrolled medications, what are you

15   talking about?

16   A.  Medications that you needed a prescription for that are

17   noncontrolled substance.

18   Q.  I'm going to take a brief tour and ask you to explain to

19   the jury what's the difference between a -- if you can explain

20   to the jury the difference between a prescription medication

21   and a prescription medication that's a controlled substance?

22   A.  Both need prescriptions.  The controlled substance has a

23   greater potential of abuse or addiction versus a noncontrolled

24   doesn't; a noncontrolled being like antibiotics, blood pressure

25   medicine, stuff like that.

1  Q.  So, I would need a prescription for my blood pressure

2  medication?

3  A.  Right.

4  Q.  But that's not a controlled substance?

5  A.  Correct.

6  Q.  Okay.  Are all controlled substances the same or are they

7  categorized in schedules?

8  A.  They are categorized in five schedules, I through V.

9  Q.  All right.  And what, if any, role does the DEA or Drug

10  Enforcement Administration have in regulating the drugs in

11  Schedules I through V?

12  A.  The DEA, it is governed by and regulates them.

13  Q.  And give us some examples what's the difference between a

14  I, II, III or IV or Schedule V controlled substance?

15  A.  Schedule I has a higher level for potential abuse versus

16  Schedule V.  So, a Schedule I example would be heroin.  It's

17  not medically usable.  Schedule II would be Oxycontin, a

18  Schedule III would be Vicodin, a Schedule IV would be Xanax,

19  and an example of Schedule V would be Promethazine with

20  codeine.

21  Q.  What's Promethazine with codeine?

22  A.  Cough syrup.  And it has a street name to it.

23  Q.  And it has a street name like what?

24  A.  Purple Drink.

25  Q.  Okay.  So, just so we're clear you said then -- going back,

1   you said that the drugs that were seized at the search warrant

2   were noncontrolled prescription drugs; is that correct?

3   A.  Correct.

4   Q.  In addition to seizing the items there, did part of the

5   team take photographs of those items?

6   A.  Yes, we did.

7   Q.  Okay.  You've reviewed the photographs that are in

8   Government's proposed Exhibit No. 10; is that correct?

9   A.  Yes.

10  Q.  And do they fairly and accurately reflect the items both in

11  the location at the apartment and the items after they were

12  removed from the apartment?

13  A.  Yes.

14          MR. PRATT:  Your Honor, I would move the admission of

15  the 13 photographs contained in Government Exhibit 10.

16          MR. BEUKE:  No objections.

17          THE COURT:  Received.

18          (Government Exhibit 10 was admitted into evidence.)

19          MR. PRATT:  All right.  Ms. Drinkard, would you

20  display the first photograph in Government Exhibit 10.

21  BY MR. PRATT:

22  Q.  All right.  Can you tell us what we are seeing in the first

23  photograph, Agent Carmack?

24  A.  This is one of the boxes that was seized from the

25  residence, and these are preprinted but not filled in

1    prescriptions, and that's a stamp for the doctor in the

2    left-hand corner.

3    Q.  And what was the name of the preprinted prescriptions being

4    stored there?

5    A.  Visiting Doctors for America.

6    Q.  And what, if any, involvement did Visiting Doctors of

7    America have in your investigation and in the pharmacy aspect

8    of the business?

9    A.  Visiting Doctors for America, or what we call VDA, it had a

10   couple of doctors that worked for that organization, and they

11   had these marketers to bring patients in to write

12   prescriptions, medically unnecessary prescriptions, to be

13   filled at Bob Patel's pharmacies for controlled and

14   noncontrolled medications, prescription medications.

15   Q.  Okay.  Please go to the next photograph.

16         Can you identify what this is?  It's got some strange

17   markings on it.

18   A.  The plan for the Delayed Notice Search Warrant, we wanted

19   to leave a note at the residence of a nonthreatening manner to

20   see if Bob would talk about the note on the wire to show his

21   control of the situation.  So, on the top of the envelope is

22   his name in Gujarati, and on the bottom it says -- I believe it

23   says, "The oil burns throughout the night."

24   Q.  Okay.  So, not only did you not leave a notice saying the

25   federal government was here, you left something in Bob Patel's

1   own language, a note to him?

2   A.   Correct.

3   Q.   And since you had the wiretap at this time, what did you

4   expect to get after that?

5   A.   Our goal was to have Bob not realize it's law enforcement;

6   to believe someone in his own community or his own organization

7   had taken the medications, and to have him talk about it on the

8   phone, showing the ownership of the medications, control.

9   Q.   And did that happen?

10  A.   Yes.

11            MR. PRATT:   Okay.   Please go to the next photograph.

12  BY MR. PRATT:

13  Q.   What do we see in this one?

14  A.   That is the bedroom closet of the apartment.   These are the

15  U-Haul boxes that we had taken out of the closet, that were

16  stacked up in the closet full of medications.

17  Q.   So, we see not only a couple out here in front, but are

18  there any in the closet still as well?

19  A.   Correct.

20  Q.   Okay.

21            MR. PRATT:   All right.   Will you please turn to the

22  next photograph.

23  BY MR. PRATT:

24  Q.   And what do we see here?

25  A.   Inside one of the boxes where the medications are put in

1    garbage bags and then put in the box and sealed.

2              MR. PRATT:  Okay.  Please go to the next photograph.

3    BY MR. PRATT:

4    Q.  What do we see here?

5    A.  I believe that is the hallway closet, same thing, U-Haul

6    boxes full of medications.

7              MR. PRATT:  All right.  Will you please turn to the

8    next one.

9    BY MR. PRATT:

10   Q.  And what do we see here?

11   A.  The foyer closet, same thing.

12   Q.  Same thing in the boxes?

13   A.  Yes.

14             MR. PRATT:  Okay.  Please go to the next photograph.

15   BY MR. PRATT:

16   Q.  What do we see here?

17   A.  That is the family room with a mattress on the floor.

18   Q.  Okay.  Was there much furniture in the apartment?

19   A.  I believe a coffee table and that mattress.  No, there

20   wasn't.

21             MR. PRATT:  Okay.  Please go to the next photo.

22   BY MR. PRATT:

23   Q.  What is this group of boxes?

24   A.  I believe these are the boxes that DEA, after we brought

25   them back to DEA, this is a closeup of some of the boxes, a

1    closeup photo.

2            MR. PRATT:  Okay.  And can you go to the next

3    photograph.

4    A.  Those are all the boxes from the apartment.

5    BY MR. PRATT:

6    Q.  Okay.  But this is no longer at the apartment?

7    A.  No.  This is at DEA, in sort of cubicles.

8    Q.  All right.  And is this another one at DEA?

9    A.  A different angle, same picture, right.

10   Q.  How many --

11           MR. PRATT:  Can you please go to the next photo.

12   BY MR. PRATT:

13   Q.  All right.  Another shot at DEA?

14   A.  Correct.

15   Q.  All right.  All right.  What are we seeing in this

16   photograph?

17   A.  This is -- these are the noncontrolled medications that was

18   in one box.  These are the contents.  And the white pieces of

19   paper or it was like an inventory that was included with the

20   box.

21   Q.  All right.  Let me ask you about that, the white pieces of

22   paper or invoices.

23           Did you conduct a closer examination of those

24   invoices that were associated with the box?

25   A.  Yes.

1   Q.  What did you find when you looked not only just at the one

2   set in this box, but the invoices that were with every box?

3   A.  Not every box had them.  Two of them did not.  But the

4   majority of the boxings had these invoices.  It showed

5   inventory of the box, what was in the box and what the return

6   value would be to McKesson or the distributor.

7   Q.  Okay.  So, an inventory.  It tells you how much is in the

8   box?

9   A.  Correct.

10  Q.  And you said it included a return value.

11         What would be a return value?

12  A.  When they would return the medication back to a

13  distributor, what they would get paid back, paid for them.

14  Q.  Did you add up the total of all the 1500 pounds -- how many

15  hundreds pounds was it?

16  A.  1500 pounds.

17  Q.  1500 pounds.

18         Did you add up the invoices, the return value of all

19  the drugs?

20  A.  It was right around 580,000.

21  Q.  Okay.  And did the invoices give any indication as to which

22  pharmacy or pharmacies the drugs had been initially shipped to?

23  A.  Yes.  In the boxes on each individual box, it had the

24  pharmacy's name written on them, where they came from.

25  Q.  Okay.  And do you recall the names of any of the pharmacies

US v Vinod Patel #11-CR-20468-36

1    that the prescription medications came from?

2    A.  Rapid Drugs, which became Noble Care -- which was Noble

3    Care, Detroit Pharmacy, Care For You Pharmacy, Tri-City

4    Pharmacy and Independent Pharmacy -- Independent, yeah,

5    Pharmacy.

6    Q.  All right.  Were they pretty much spread equally or was

7    there one pharmacy that had a larger quantity of drugs than any

8    other one?

9    A.  Tri-City had 16 boxes.  That was over half the boxes.

10   Q.  16 out of how many?

11   A.  31.

12   Q.  Okay.  Where is Tri-City Apothecary located?

13   A.  Saginaw.  I believe Saginaw.

14   Q.  You used --

15         MR. PRATT:  Let's go forward.  Is there another --

16   I'm not counting.  Tell me when they run out.

17         Is that the last one?

18         Oh, this one.

19   BY MR. PRATT:

20   Q.  And what do we see in this one?

21   A.  A different box being spread out across the table of

22   medications that came from one of the boxes.

23         MR. PRATT:  Okay.

24         THE COURT:  Counsel, is this all Exhibit 10?

25         MR. PRATT:  Yes, it is, Your Honor.

1           THE COURT:  Are they 10A through something?

2           MR. PRATT:  I think we just put -- it would be 10-1

3   through 13, Your Honor.

4           THE COURT:  Okay.  Thank you.

5           MR. PRATT:  All right.  You can turn that off.

6   BY MR. PRATT:

7   Q.  Special Agent Carmack, did -- I'm sorry.  "Special Agent."

8           Task force Agent Carmack, I apologize, did the

9   investigation try to determine if there were any other

10  quantities of noncontrolled drugs that were sort of the fruits

11  or results of the billing but not dispensed scheme that could

12  be seized?

13  A.  Yes.

14  Q.  Were you successful, and if so, how, in determining whether

15  there was any other location where similar amounts of drugs

16  were being stored?

17  A.  We didn't find possible other locations based on wiretap

18  calls, but we did identify a second one, confirmed a second one

19  later on in the investigation.

20  Q.  Okay.  So, later on.

21          And what location did you find later on that was

22  another location for these billed but not dispensed drugs?

23  A.  It was an apartment in Farmington Hills.

24  Q.  Okay.  And did you -- what, if anything, did you do to

25  confirm that this was in fact another location where these

1   drugs were being stored?

2   A.   On June 3rd, we intercepted a phone call where Babubhai

3   Patel instructed his accountant or bookkeeper Chetan Gujarathi

4   to go to a co-conspirator or associate's apartment to unload

5   the pills that were in the apartment and take them to one of

6   the pharmacies to prepare them to return to a distributor.

7   Q.   Okay.  So what, if anything, did the Drug Enforcement

8   Administration do?  Did you do another -- what, if anything,

9   did you do to verify that there really were more noncontrolled

10  pills?

11  A.   On June 4th we had two separate surveillances; one on

12  Chetan Gujarathi's residence and him; and the second one would

13  be on the suspected apartment where the pills would be stored.

14  Q.   What was the result of that?

15  A.   Chetan Gujarathi and another individual -- we have

16  photographs of them going in the apartment and moving basically

17  the same sized U-Haul boxes from that apartment to a boxed

18  truck, down to Detroit Care Pharmacy.

19  Q.   Okay.  Did DEA decide to seize those drugs on that

20  particular day?

21  A.   No.

22  Q.   What happened to the drugs that had been moved to Detroit

23  Care Pharmacy?

24  A.   Later on, on August 2nd, 2011, we executed a search warrant

25  on that pharmacy and acquired the same U-Haul boxes down in the

1    basement.

2    Q.  Okay.  So, about two months later you seized them from the

3    pharmacy.

4         And were they the same or similar or different than

5    the boxes we already saw photographs of?

6    A.  Same.

7    Q.  Okay.  You used the phrase a little bit earlier in your

8    testimony, in terms of the billing but not dispensed scheme,

9    about the use of marketers.

10        Can you explain to the jury in a little more detail

11   what marketers are in these types of -- in this type of

12   situation?

13   A.  A marketer is an individual who goes around and tries to

14   find patients with insurance cards, takes them to, in this

15   case, doctors, home care clinics, and their pharmacies to get

16   medications.  And, in turn, they get cash or the pills back as

17   their payment.

18   Q.  Okay.  I want to ask you now some questions about the

19   wiretap, which I think you've mentioned a couple of times.

20        In very basic terms, what is a wiretap?

21   A.  You get a court order signed by a judge giving us

22   permission to listen to an individual's hard line phone or cell

23   phone.

24   Q.  Okay.  Does the individual, are they given any kind of

25   notice or do they know that they are being listened on?

1   A.   No.   They should have no knowledge they are being listened

2   to.

3   Q.   Under -- how long can one court order last?   How long can

4   people listen to someone's phone calls under court order?

5   A.   30 days.

6   Q.   What happens if your investigation isn't over and you feel

7   like you need to listen to more calls?

8   A.   You submit a second additional affidavit for the search

9   warrant to continue the wiretap.

10  Q.   And how long can you get on the second one?

11  A.   30 days.

12  Q.   Okay.   So, in this case, in this case you indicated the

13  original wiretap began being conducted when?

14  A.   January 10th, 2011.

15  Q.   And with renewals, how long did the monitoring go on?

16  A.   Until July 30th, 2011.

17  Q.   What telephone or telephones were monitored?

18  A.   There are two telephones and they are all controlled by

19  Bob.   Two cell phones.

20  Q.   Two cell phones used by Babubhai Patel?

21  A.   Correct.

22  Q.   Did you monitor these phones 24/7?

23  A.   No, we did not.

24  Q.   When did you monitor them?

25  A.   The shifts that we set up, with different hours, but

1    generally it was 8 o'clock in the morning until midnight, two

2    shifts.

3    Q.  All right.  Approximately over that time period, during the

4    time you monitored, approximately how many separate audio calls

5    were intercepted?

6    A.  Voice calls, about 18,800, I believe, or 18,600.

7    Q.  Okay.  Did you sit there in the DEA and listen to all of

8    them yourself when they came in?

9    A.  No.

10   Q.  Tell us how that worked.

11   A.  There were calls that were in English, but a majority of

12   the calls were in his home language, which is Gujarat -- I may

13   be mispronouncing that wrong.  DEA hired or contracted monitors

14   who spoke the language, understood the language, and translated

15   the calls as they came in.

16   Q.  Okay.  And so as the calls -- tell us technically how this

17   works.  When a call comes in from the phone company under a

18   wiretap to the Drug Enforcement Administration, how does it --

19   what equipment is used and, more importantly, how are those

20   calls preserved?

21   A.  There's a program that's in the computer.  Unlike the

22   movies, it's just a basic computer.  It has a computer screen.

23   The call comes in.  They are saved to an evidentiary server, a

24   DEA working server.  So, we can use the working server for the

25   investigation.

1    Q.  Okay.  So, there's two servers or two copies that are being

2    made at the same time?

3    A.  Hard drives, yes.

4    Q.  Hard drives.  Okay.

5         What happens to the original one?

6    A.  They are placed into evidence, sealed and placed into

7    evidence.

8    Q.  Okay.  And what happens to the second copy, the working

9    copy?

10   A.  That's just our working copy.  We can go back and look up

11   calls, use it as a working copy, replay calls.

12   Q.  Okay.  And, of course, does DEA keep these calls to

13   themselves or what did they -- who did they make the calls

14   available to once the wiretap is over and once the case has

15   been charged?

16   A.  Every Defendant and their attorneys.

17   Q.  Okay.  Specifically, we've identified some calls, which I'm

18   going to indicate are Government's proposed Exhibit 1, 2 and 3

19   in this case.

20         Can you identify in general terms what Government

21   Exhibits 1, 2 and 3 are?

22   A.  They are transcripts of the calls that we intercepted.

23   Q.  Okay.  Can you tell us, first of all, as to the foreign

24   language calls, if they're in Gujarat or if they're in Hindi,

25   how is it that we ended up with the transcripts that are in

1    Government Exhibits 1, 2 and 3 for the foreign language calls?

2    A.   The monitors would listen to the calls and then transcribe

3    them into these other calls right here.

4    Q.   Okay.  And as to the English calls that we have, how did

5    they get preserved and ended up in transcripts here?

6    A.   Sometimes the monitors would do them and sometimes the

7    agents would do them or officers would do them.

8    Q.   Okay.  As to the English language calls, can you tell us

9    how you've been able to transmit the actual audio copy from DEA

10   to Ms. Drinkard's laptop in order to make sure that it's played

11   here in court?

12   A.   We would take the -- one of the copies of the server and

13   download them like you would your own audio video and we give

14   them to the prosecutor's office for discovery.

15   Q.   All right.  Let me ask you then about the transcripts.

16             Who goes over it and reviews and tries to make the

17   transcripts as accurate as possible as far as English language

18   transcripts?

19   A.   What we did with our wire is that one monitor would do the

20   original transcription, and we would have a second monitor to

21   double-check, and sometimes even a third to double-check the

22   transcripts to make sure they are accurate.

23   Q.   Or at least substantially accurate?

24   A.   Correct.

25   Q.   All right.  What about the identification?

1              I notice on the transcripts we have different

2    speakers that are going back and forth.

3              What techniques did you use to assign the correct

4    person to the transcript?

5    A.   One of the primary ways was some of these individuals would

6    have the phone registered in their name.  So, we would look at

7    the caller ID.  And secondly would be when they addressed each

8    other on the phone, what names they would use for each other a

9    lot of times would match the caller ID.

10   Q.   Okay.  And so is it your testimony that the transcripts and

11   as to the English calls, the audio, it's an accurate

12   representation of what was actually intercepted?

13   A.   Correct.

14              MR. PRATT:  Your Honor, I would move at this time the

15   admission of Government Exhibits 1, 2 and 3 in their entirety.

16              THE COURT:  Any objection?

17              MR. BEUKE:  There is, Judge, just with respect to

18   something that I'd like to be heard at sidebar.

19              THE COURT:  I will admit it subject to your

20   objections, which we can talk about at the break.

21              MR. BEUKE:  Thank you, Judge.  Okay.

22              *(Government Exhibits 1, 2 and 3 were admitted into*

23              *evidence.)*

24   BY MR. PRATT:

25   Q.   Do you have a copy of the transcripts that include

1    Government Exhibits 1, 2 and 3, as well as all the subexhibits,

2    in front of you?

3    A.  Yes.

4    Q.  All right.  I would direct your attention to Government

5    Exhibit 1A.

6            Can you identify Government Exhibit 1A?

7    A.  It is off of Target Telephone 1.  It took place on January

8    25, 2011.  The language is Gujarati.  The participants are

9    Babubhai Patel and an unknown male.

10   Q.  When you say Target Telephone No. 1, what is the difference

11   between Target Telephone 1 and 2?

12   A.  Two different phones, two different phone numbers; two

13   different cell phones, two different phone numbers.

14   Q.  And who possessed the two phones during the course of your

15   wiretap?

16   A.  Babubhai Patel.

17   Q.  Now, since this is a -- is this one of the English calls or

18   is this one of the translations?

19   A.  Translations.

20           MR. PRATT:  Your Honor, in order to display this to

21   the jury, I'm going to have our intern, Sam Fitzpatrick, read

22   the portions that I direct him into the record, and then I will

23   ask Task Force Officer Carmack some questions.  Since we --

24           THE COURT:  You know what.  That's a great idea.  But

25   so we can discuss the objection, we'll take our morning break a

1    little bit early.  It's ten after ten.  We'll be back at 10:30

2    or so.

3            While you are refreshing, we're going to decide a

4    legal issue, and then we'll get our break.

5            So, all rise for the jury, please.

6            And, remember, don't talk about it.  You've heard

7    very little of the case so far.  And keep an open mind.

8                *(Jury leaves the courtroom at 10:13 a.m.)*

9            THE COURT:  What's the nature of your objection?

10           MR. BEUKE:  Judge, the nature of the objection is

11   with respect to the people that are on the transcripts and

12   their being identified as certain individuals.  I think based

13   on what the agent has just testified to, he doesn't have any

14   way to speak with any certainty as to those names that are

15   attributed to being speakers on the transcript, are in fact

16   those speakers.  He doesn't have any familiarity with the

17   persons' voice.  There's no voice identifications.  There's no

18   acknowledgment by these people in any way, shape, or form

19   that --

20           THE COURT:  Okay.  I get it.

21           Mr. Pratt, what is your response?

22           MR. PRATT:  Well, my response is twofold, Your Honor.

23   First of all, I can lay a better foundation because there were

24   additional techniques he used, other than the two he mentioned,

25   as to the English calls.

1          As to the foreign language calls, the same foundation

2     would be laid by the translator.  And we were told that they

3     were waiving and not objecting to having the translators come.

4          And so I really -- we can lay that foundation, but

5     I'm really not understanding why suddenly we need to have

6     translator witnesses.

7          THE COURT:  Response?

8          MR. BEUKE:  No, Judge.

9          What we indicated is we didn't have any problems with

10    the accuracy of the transcripts, the words that are put in the

11    transcripts as being the words that come off of the phone call.

12    But based on what I'm hearing from the agent, I just -- when

13    they say it's Joe Blow who is speaking to Bob Patel on the

14    phone, there's no foundation that has been laid to say that he

15    or the prosecutor --

16         THE COURT:  What about the proffer the prosecutor

17    just made, would that satisfy you as to the English; that he

18    would ask more questions?

19         MR. BEUKE:  Judge, I'm not sure what -- it would

20    certainly help, but I'm not sure what to expect the agent to

21    say in terms of foundation.

22         THE COURT:  Well, my problem is somewhat similar to

23    the prosecutor's.  We had this discussion at the final pretrial

24    that any objections to the exhibits, which include the

25    transcripts, in terms of foundation, there were none.  And

1    now --

2              MR. BEUKE:  Judge -- I'm sorry.  I'm sorry.

3              THE COURT:   -- now there are.

4         I'm satisfied that your objections as to the English

5    go to the weight.  You can cross-examine and show how he knows

6    and so on.

7         In terms of the Indian language, do you want the

8    prosecutor to bring in the translators, assuming that he can

9    establish a foundation in similar terms to the foundation that

10   he's going to establish here?

11             MR. BEUKE:  Judge, I don't think we'll need to bring

12   in the Indian translators, because I don't believe that they

13   are in a position to say that I know the second speaker on this

14   phone call is Rick Beuke or I know the first speaker -- I think

15   we can clearly ...

16             THE COURT:  Doesn't the transcript speak for itself

17   in some of these cases?

18             MR. PRATT:  Exactly.

19        Your Honor, you look for example at 1B.  1B, the

20   first person, it says "Hello."  And Bob says "Mitesh."  And so,

21   you know, Mitesh is put as the other speaker.  And so --

22             MR. BEUKE:  Judge, those calls I have no issue with.

23             THE COURT:  All right.  You can cross-examine.  And

24   they are admitted.

25             *(Government Exhibits 1, 2 and 3 were admitted into*

US v Vinod Patel #11-CR-20468-36

```
 1              evidence.)
 2              MR. BEUKE:  Judge, the only other issue I had with
 3    it -- and I just wanted to make sure, and I'm not sure I knew
 4    this or not until just now.  But the calls that are going to be
 5    played, is the entirety of the conversation included in the
 6    transcripts or are there calls where just portions of the calls
 7    are being played --
 8              THE COURT:  Well, I think that's a conversation you
 9    can have with the prosecutor.
10              MR. BEUKE:  Okay.
11              THE COURT:  Clearly, I don't know the answer to that.
12              We are in recess.
13              Let's give ourselves 15 minutes.
14              (Recess held at 10:18 a.m.)
15              CASE MANAGER LANG:  All rise.
16              (Jury enters the courtroom at 10:41 a.m.)
17              CASE MANAGER LANG:  The court is again in session.
18    You may be seated.
19              THE COURT:  Everybody is in their place.
20              You may continue.
21    BY MR. PRATT:
22    Q.   Task Force Officer Carmack, as to Government Exhibit 1A,
23    would you identify the speakers and the date in that call?
24              THE COURT:  Hang on just a second.
25              The exhibit has been admitted.
```

1          Now you may continue.

2    A.   The date is January 25th, 2011.   The speakers are Babubhai

3    Patel and an unknown male.

4    Q.   In the course of your investigation, were you able to

5    definitively learn Bob Patel's voice?

6    A.   I became familiar with it, yes.

7    Q.   And how were you able to do that?

8    A.   I have spoken to him before, after he was arrested, and I

9    listened to the calls.

10   Q.   All right.   So, every place we see Babubhai Patel in these

11   transcripts, you're confident, from your own ability to

12   recognize him, that that's the right name?

13   A.   Correct.

14   Q.   Okay.

15        MR. PRATT:   All right.   I would ask in order to

16   display this to the jury, if we would start in the top section

17   at the beginning on page one, and I would ask Sam Fitzpatrick,

18   our assistant, to begin reading at the top of page one.

19        MR. FITZPATRICK:   "UM:  Hello.

20        "Bob:  Yes.

21        "UM:  Yes.

22        "Bob:  Krishna had called.  He is asking for cash,

23   with me ..., currently I get three, four thousand in cash,

24   right?

25        "UM:  Yes.

1              "Bob:  I need them to give it to the doctors?

2              "UM:  Yes.  Yes.

3              "Bob:  So in a month 15, 20 thousand cash go in

4     that."

5              MR. PRATT:  Stop for a second.

6     BY MR. PRATT:

7     Q.  Task Force Officer Carmack, the 15 to $20,000 a month going

8     to doctors, is there any specification in this particular call

9     as to whether that's going for the pharmacy business or for the

10    home health or some combination of that?

11    A.  It just states it's going to go to the doctors.

12    Q.  In this call there's no specification?

13    A.  Correct.

14    Q.  Okay.  Thank you.

15             MR. PRATT:  Please continue.

16             MR. FITZPATRICK:  "UM:  Huh, huh.

17             "Bob:  And that ..., cash checking has not yet

18    started, (unintelligible.) ... cash will be freed ...

19    (unintelligible) I said we will start after June.

20             "UM:  Yes.  All right.  If it cannot be done, no

21    problem.  If so then tomorrow it has to be withdrawn from the

22    bank, 25, in case he does not give me the cash.

23             "Bob:  I had ten with me, and today I had to give to

24    Hakim and all, and so I took it along with me.

25             "UM:  Huh.

US v Vinod Patel #11-CR-20468-36

1              "Bob:  Yesterday ten were collected.

2              "UM:  Can't you give them checks?

3              "Bob:  We can't give checks to the doctors.

4              "UM:  Can't give, huh.  Is it so.

5              "Bob:  Cannot have paper trail.

6              "(Voices overlap.)

7              "UM:  Oh, yeah.  Okay.  Because I have checks

8    accumulated for about one and thirty with me.

9              "Bob:  Yeah.  There should not remain a paper trail,

10   understood?

11             "UM:  Yeah.

12             "Bob:  With me, I have to take it out all in cash."

13             MR. PRATT:  All right.  The remainder of Exhibit 1A

14   is in evidence, Your Honor.  We will not be reading that at

15   this time.  We'll instead move to 1B.

16   BY MR. PRATT:

17   Q.  Officer Carmack, could you identify the speakers and the

18   date and time of 1B?

19   A.  March 2nd, 2011.  The speakers are Babubhai Patel and

20   Miteshkumar Patel.

21   Q.  And as for the identification of Miteshkumar Patel, let me

22   ask you this.  In this investigation did you find out whether

23   there was one or more Miteshkumar Patels?

24   A.  More than one.

25   Q.  Okay.  What did you do to try to identify or separate which

1    was which?

2    A.   During some of the interviews with one of the Mitesh

3    Patels, showing him the calls, showing for him his calls, and

4    also the caller ID to figure out who was who.

5           MR. BEUKE:   I'm going to object as to foundation,

6    that conversation.

7           MR. PRATT:   Let me lay a little better foundation,

8    Your Honor.

9    BY MR. PRATT:

10   Q.   Is there one Mitesh or Miteshkumar Patel that was a

11   pharmacist who was charged in this case?

12   A.   Yes.

13   Q.   All right.   And then there's another one who was

14   intercepted on some calls, but was not charged?

15   A.   Correct.

16   Q.   All right.   Did you become familiar with the Mitesh Patel,

17   the pharmacist that was charged in the case?

18   A.   Yes.

19   Q.   How did you become familiar with him and his voice?

20   A.   I interviewed him.

21   Q.   All right.   Now, as to the other Miteshkumar Patel, did he

22   have a different phone number than the pharmacist who was

23   charged in this case?

24   A.   Yes.

25   Q.   All right.   So, on that basis are you able to say whether

1    the Mitesh we see in Government Exhibit 1B is the pharmacist

2    who was charged in the case or whether he's the other one?

3    A.   I believe he's the other one.   And I don't remember the

4    other one's phone number.   So, I believe it's the other one;

5    not the one that's charged.

6    Q.   Okay.   All right.   And you've identified the speakers.

7    You've identified the call.

8            MR. PRATT:   Mr. Fitzpatrick, if you could turn to the

9    bottom of the last few lines of page three to read an excerpt

10   from this call.

11           MR. FITZPATRICK:   "Bob:   Are they going to come from

12   Detroit?

13           "Mitesh:   Yes.

14           "Bob:   But if he ..., if he does not write for

15   controlled, you know, no one will come."

16   BY MR. PRATT:

17   Q.   All right.   I know I'm trying to stop from reading all of

18   these.   But based on the context before, he writing controlled,

19   what type of person is that being referred to?

20   A.   A doctor.

21           MR. PRATT:   All right.   If you could go to the top

22   section on page four.   And after it's enlarged, so the jury can

23   read if they choose, if you could continue reading.

24           MR. FITZPATRICK:   "Mitesh:   Now I don't know, how he

25   is going to work out, I don't have a great lot of idea

1    regarding that.

2            "Bob:  (Unintelligible).

3            "Mitesh:  Once, sure they had come once, huh.

4            "Bob:  But had he written controlled?

5            "Mitesh:  Huh?

6            "Bob:  Does he write controlled?

7            "Mitesh:  He writes a few.  He had written in certain

8    ones, like he had written for three or four, hmm.  As such he

9    writes, he will write whatever prescription we want, since we

10   are the ones who will be making the prescriptions, because I

11   had given the list that these many patients need the medicine,

12   so he had written them all up.  He had written Oxy, Lotrel,

13   Vicodin, written them for all, Xanax.

14           "Bob:  But as for patients, I will get them for him.

15   It's not a question of getting them?

16           "Mitesh:  Yeah.

17           "Bob:  But if he does not write Vicodin or Lortab,

18   then it's useless, isn't it?"

19           MR. PRATT:  All right.  If you can stop there.

20   BY MR. PRATT:

21   Q.  I'm going to ask you a couple questions about those drugs

22   that are referenced.

23           The Vicodin, the Lortab, the Oxy, the Xanax, what are

24   those drugs, what classifications?

25   A.  Controlled substances.

1  Q.  And is there some particular -- are they also prescription

2  controlled substances?

3  A.  Yes.

4  Q.  And do they have any particular use or value on the street

5  or resale market?

6  A.  They are highly sought after on the street for drug users,

7  that are sold.

8  Q.  All right.  And so -- and in this particular context, is

9  there any difficulty to get patients if the doctor does not

10  write for these controlled drugs?

11          MR. BEUKE:  Objection, Your Honor.  His basis and

12  knowledge.

13  BY MR. PRATT:

14  Q.  All right.  Agent Carmack, in your experience investigating

15  these types of operations, do you have an understanding of what

16  brings patients to pharmacies and what does not bring patients

17  to pharmacies?

18          MR. BEUKE:  Same objection, Your Honor.

19          MR. PRATT:  Well, I believe that's a yes or no

20  question that he can answer.

21          THE COURT:  You can answer it yes or no.

22  A.  Yes.

23  BY MR. PRATT:

24  Q.  How did you obtain this information about how these

25  patients are recruited into these pharmacy schemes?

1    A.   Interviewing co-conspirators in this investigation.

2    Q.   Did you have any training in work, as well as your work in

3    an undercover capacity?

4    A.   Yes.

5    Q.   All right.  And based on that training and your own work,

6    do you know what the problem is if the patients that are being

7    recruited do not get controlled drugs?

8    A.   Yes.

9    Q.   And what is the problem that it would pose if the doctor

10   won't write controlled drugs?

11   A.   The marketers or the patients won't go to the doctor;

12   hence, no prescriptions will be written to go to the pharmacy.

13   Q.   Okay.

14           MR. PRATT:  I'd like to move forward to page five of

15   the same call, the second section from the bottom, "Bob."

16           MR. FITZPATRICK:  "Bob:  But he will have to write

17   whatever he is told to write.  Lortab, Xanax, he will have to

18   write it all."

19           MR. PRATT:  All right.  Could you turn then to page

20   six and the middle of the page, starting with "Bob:  The main

21   thing."

22           MR. FITZPATRICK:  "Bob:  The main thing is ..., and

23   then if they are for Oxy, et cetera, don't worry, go ahead and

24   fill them up, no problem in that, since the doctor is ours.

25           "Mitesh:  Huh?

1              "Bob:  If the patients have narcotic and all that,

2    then, then no problem, you know?

3              "Mitesh:  Hmm, hmm.

4              "Bob:  If the doctor is ours, then there is no

5    worry."

6              MR. PRATT:  All right.  If you could stop.

7    BY MR. PRATT:

8    Q.  Let me ask you this.  For the pharmacy, he says the worry

9    or problem.

10             What would the worry or problem be for a pharmacy if

11   they filled a lot of Oxycontin?

12   A.  Oxycontin is a Schedule II narcotic.  It has higher

13   guidelines, and if it is inappropriately dispensed or diverted,

14   it would draw more attention.

15   Q.  All right.  Thank you.

16             Let's turn to Government Exhibit 1C and ask if you

17   can identify this call?

18   A.  March 7, 2011.  The speakers are Babubhai Patel and Manoj,

19   last name unknown.

20   Q.  Okay.  And as to the identification of Babubhai Patel, I

21   think you've already explained you are thoroughly familiar with

22   his voice.  Correct?

23   A.  Correct.

24   Q.  And as to Manoj, is there what we call a

25   self-identification in this call?

1   A.   In the second line of the call, Bob addresses the other

2   caller by the name of Manoj.

3   Q.   Now, you have the reference of "last name unknown."

4        Were you ever able to actually identify who this

5   Manoj person was?

6   A.   To my knowledge, no.

7        MR. PRATT:   Okay.  Could you please begin at the top,

8   Mr. Fitzpatrick, and begin reading this call to the jury.

9        MR. FITZPATRICK:  "Manoj:  Yes, Babubhai.

10       "Bob:  Manoj, how did it go?

11       "Manoj:  Well, it's going on.

12       "Bob:  Now, in this you need a little bit of

13  training, so you will have to take some training, because ...

14       "Manoj:  That's no problem.

15       "Bob:  At certain times you have to do a lot of

16  things, and for that you need training.  First the training.

17  So from tomorrow I am sending you to Brijesh, because it's

18  important for you to get the training."

19       MR. PRATT:  Now, if you could wait for a minute.

20  BY MR. PRATT:

21  Q.   Task Force Officer Carmack, who is Brijesh?

22  A.   Brijesh Rawal was a pharmacist charged in this case that

23  worked for Independent Pharmacy that was owned by Bob.

24       MR. PRATT:  Okay.  Now, will you please continue

25  reading further in the call.

1          MR. FITZPATRICK:  "Manoj:  No problem.

2          "Bob:  Because only then you will ... now there is no

3     meaning in just opening the store, right?

4          "Manoj:  Hmm.

5          "Bob:  If you get no benefit, and if I get no

6     benefit, then it's meaningless.

7          "Manoj:  Hmm.

8          "Bob:  So get some training, and it's important for

9     you to learn how to do zigzag."

10         MR. PRATT:  Please continue on page two.

11         MR. FITZPATRICK:  "Manoj:  Mm-hmm.

12         "Bob:  So I'm sending you to Brijesh.  You learn it,

13    and see if you feel it's right, otherwise there is no meaning

14    in it.  So from this weekend and for three weeks or four weeks,

15    take the complete training, you'll get paid up, no problem,

16    don't worry about your pay, but the training should be full,

17    and it should make you perfect.

18         "Manoj:  Yeah, but you know I should get a chance,

19    then I will do it my way, but I get very little chance to do it

20    my way.

21         "Bob:  No, no.  The main reason I'm sending you to

22    Brijesh is because I will tell Brijesh ..., in this a lot, in a

23    pharmacy, in a private pharmacy, Manoj, you have to learn a

24    lot, because at what time you recognize a customer, at which

25    time, and how you earn from them, you have to learn."

1              MR. PRATT:  Please continue.

2              MR. FITZPATRICK:  "Manoj:  Hmm, hmm, hmm.

3         "Bob:  If you are strict, you never make money.  Not

4    only do you not make money, but you lose it.

5              "Manoj:  Hmm, hmm.

6         "Bob:  You know our Mitesh.  One time I have a store

7    to Mitesh to run?

8              "Manoj:  Hmm, hmm, hmm.

9         "Bob:  Mitesh used to do 40 prescriptions.  I would

10   ask Mitesh how come it was like that.  He said if there is no

11   one, what can I do.  Later I sent Hiren, and in eight days he

12   took it up to two hundred and fifty."

13   BY MR. PRATT:

14   Q.  Okay.  Who is Hiren?

15   A.  Hiren Patel is another Co-Defendant in this case, a

16   pharmacist at Rapid Drugs.

17   Q.  Okay.  He was a pharmacist who worked at Rapid Drugs.  He

18   was charged.

19              And in eight days Babubhai Patel said what happened

20   with him?

21   A.  He took the existing prescriptions and brought it up

22   significantly to 250 prescriptions.

23   Q.  Okay.  Let's turn to Government Exhibit 1F.

24              Would you identify this call and the participants?

25   A.  May 9, 2011.  The speakers are Sanyani Edwards, Dinesh

1   Patel and Babubhai Patel.

2   Q.  Can you personally -- have you personally talked to each of

3   these three individuals and heard these three individuals talk?

4   A.  Yes.

5   Q.  In English?

6   A.  Yes.

7   Q.  And so you are confident that based on your personal

8   conversation, you've got the correct identification of the

9   speakers in this call?

10  A.  Yes.

11          MR. PRATT:  All right.  Since this is an English

12  call, Your Honor, we will be playing the audio, and the

13  transcript should be scrolling.

14          Hopefully we can get the volume up so that everyone

15  can hear.  And if anyone can't hear, please let me know.

16          THE COURT:  Let me tell the jury that the transcript

17  is an aid for you.  The evidence is the tape, the audio.

18          So, if the audio says something different than what's

19  on the tape, you are the judges of the fact.

20          MR. PRATT:  Okay, Ms. Drinkard.

21          (Government Exhibit 1F,  audio phone call, played in

22          open court, as follows:)

23          "Sanyani:  Hey Bob.

24          "Dinesh:  What's up, bro?  This is Dan.

25          "Sanyani:  Oh, Dan, what's going on.

1              "Dinesh:  (Laughs) You completely forgot about me,

2    man."

3    BY MR. PRATT:

4    Q.  Who is Dan?

5    A.  Dinesh.  Dan is Dinesh's nickname.

6    Q.  Okay.  And what role -- what employment did Dinesh Patel

7    have?

8    A.  He was a pharmacist at Caring pharmacy and later at Detroit

9    Care Pharmacy.

10   Q.  Was he charged in this case?

11   A.  Yes.

12   Q.  And how about Sanyani Edwards, who is he?

13   A.  He was also charged in the case.  He is a person who helped

14   recruit doctors and worked to get unnecessary prescriptions to

15   Bob's pharmacies.

16   Q.  Okay.  Was there a particular doctor he worked with?

17   A.  Dr. Mark Greenbain.

18   Q.  All right.  And was Dr. Mark Greenbain also charged?

19   A.  Yes.

20              MR. PRATT:  All right.  Please continue.

21              *(Government Exhibit 1F,  audio phone call, continued*

22              *playing in open court, as follows:)*

23              "Dinesh:  (Laughs) You completely forgot about me,

24   man.

25              "Sanyani:  Been running ever since man, thought I was

1    going to have a minute, what's going on?

2            "Dinesh:  Nothing much, did you uh... what's the

3    progress on those, um, Flint ones?  I couldn't make it that

4    day.

5            "Sanyani:  Okay. I went out there.

6            "Dinesh:  Uh huh.

7            "Sanyani:  He said he was ah... definitely

8    interested.

9            "Dinesh:  Uh huh.

10           "Sanyani:  Except he has to figure out what his

11   relationship is with CNA, like what he has in the contract,

12   what he can't outsource, and what he can outsource.  I told

13   him...

14           "[VOICES OVERLAP.]

15           "Dinesh:   What is CNA? What is, what is CNA?

16           "Sanyani:  CNS?

17           "Dinesh:  CNS?

18           "Sanyani:  It's like Gateway or um...

19           "Dinesh:  Oh, is it like an agency?

20           "Sanyani:  Yeah, but it's out there in Flint, in

21   Genesee county.

22           "Dinesh:  Uh huh.

23           "Sanyani:  So I told him I said um..., you know I

24   don't want to put you in a situation where you have to lose

25   your clients or anything like that.  All I want to do is

1  provide a service that ancillary to them.

2          "Dinesh:  Uh huh.

3          "Sanyani:  He said you know, he would be interested

4  in working it out based on the numbers.

5          "Dinesh:  Now...

6          "[VOICES OVERLAP.]

7          "Sanyani:  I said well what are you looking for?

8          "Dinesh:  Uh huh.

9          "Sanyani:  He said, well right now I know if I had

10  um..., the pharmacy that he has coming in there is part of the

11  CNS.  He doesn't get anything off of them."

12          MR. PRATT:  If you can stop.

13  BY MR. PRATT:

14  Q.  So, the reference to he doesn't get anything off of them,

15  what's that referring to?

16  A.  That means money.

17  Q.  And who is not getting money from the pharmacy?

18  A.  The doctor.

19  Q.  Okay.  Please continue then.

20          (Government Exhibit 1F,  audio phone call, continued

21          playing in open court, as follows:)

22          "Sanyani:  So, I said well if you get like fifteen

23  hundred or a thousand in your pocket a month, what would you

24  do?

25          "Dinesh:  Uh-huh.

1          "Sanyani:  He said that wouldn't be enough for me to

2     lose the clients that I have.  Because then I have to explain

3     to CNS why I'm using another pharmacy and they gonna realize

4     it's because of the money.  So, I said what are you talking

5     about.  He was saying something like five or 6,000.

6          "Dinesh:  No.

7          "[Voices overlap.]

8          "Sanyani:  I was saying that was a lot of money man.

9     Even though you got a hundred twenty clients, that's a lot of

10    money.

11         "Dinesh:  That's a lot of money, man.  Uh uh."

12         MR. PRATT:  If you can stop again.

13    BY MR. PRATT:

14    Q.  What's the -- 120 clients, 120 pharmacy patients, why is

15    five or 6,000 a lot of money?

16    A.  Typically in this investigation, in order to pay a doctor,

17    it was not that much to pay a lower amount of money.  The

18    kickback would be based on the amount of patients they bring in

19    that generate the prescriptions.

20    Q.  And that's in the pharmacy setting?

21    A.  Correct.

22         MR. PRATT:  All right.  Please continue.

23         (Government Exhibit 1F,  audio phone call, continued

24         playing in open court, as follows:)

25         "Sanyani:  So he said, it's a risk management

1    situation.  If he loses, if he has to lose his contract with

2    CNS, what does he have?

3            "Dinesh:  Now, let me tell you.  As far as I know

4    Gateway and Kelling there is no such contract they got to use

5    one pharmacy.  There is always Advance Care on the top, but

6    Advance Care is contracted pharmacy for those two agencies.

7    Anybody that walks in without insurance, Advance Care can fill

8    it and the agency will pay the Advance Care only, not to

9    anybody else, but ...

10           "Sanyani:  Right.

11           "Dinesh:  They can go with the insurance, any patient

12   with the insurance they can go anywhere they want.  I been, all

13   the AFC home the group home that I work with, they are all with

14   Gateway or Kelling" --

15           MR. PRATT:  Stop.

16   BY MR. PRATT:

17   Q.  There is a reference to an AFC home or a group home.

18           Can you tell us what that is in the context of this

19   investigation?

20   A.  AFC stands for adult foster care homes.  That was one of

21   the places they would recruit patients to be seen by doctors,

22   home health care, pharmacies.

23           MR. PRATT:  Okay.  Please continue.

24           *(Government Exhibit 1F,  audio phone call, continued*

25           *playing in open court, as follows:)*

US v Vinod Patel #11-CR-20468-36

1          -- "and there is no point of losing patient, because

2     of whatever he got it, they cannot pull him back, no problem,

3     no way he going to pull them back because he's got a contract

4     and he's got a license you know.

5          "Sanyani:  They can't pull them back, but he can stop

6     sending them clients. Which is his issue.

7          "Dinesh:  That actually is a possibility, depends on

8     however he is with the agency and how his placement guy who

9     does the placement you know. But if he is full then he doesn't

10    need no clients. I mean as you said, you telling me he's full,

11    right?

12         "Sanyani:  Well he's full with a caveat.  He's full

13    with the idea that the CNS, they have the home care the um ...

14    day treatment, the pharmacy and um ... somebody else in there

15    too, I can't remember what they are called" --

16    BY MR. PRATT:

17    Q.  Okay.  There is a reference to the home care, the day

18    treatment and the pharmacy.

19         Can you explain the difference between those three?

20    A.  A pharmacy is where you get the prescriptions filled.  Day

21    care would be some programs where they would monitor people

22    throughout the day, a setting.  And home care is where the

23    people would go to the patients' home -- they are homebound and

24    they have trouble leaving their house -- for treatment.

25         MR. PRATT:  Okay.  Please continue.

1          *(Government Exhibit 1F,  audio phone call, continued*

2          *playing in open court, as follows:)*

3          -- "but all of these people ... oh case managers,

4     that's what they are called."

5          "Dinesh:  Case managers...

6          "Sanyani:  But all of these people can send his

7     clients to the hospital at a moments notice; send em to a

8     nursing home at a moment's notice. So he said they deal with a

9     different type of burden out there because if he doesn't quote

10    on quote play ball, then one of his clients all of his clients

11    can just end up sent to a nursing home because they have

12    behavior problems; all of 'em have behavior problems all the

13    time. And that's how they, they manage them by sending them to

14    a nursing home.  Because if they send them to a nursing home,

15    they don't have an agreement to send them back to him, they can

16    send them anywhere at that point.

17         "Dinesh:  I see. No, no, I, I agree with that part,

18    but then, five, five six grand is too much for hundred twenty

19    patients. I mean...

20         "Sanyani:  Well, I know ...

21         "Dinesh:  If you show up with like two grand or two

22    twenty five or something, because the way that we gotta work is

23    with all hundred twenty patients you going send it in then,

24    then he refers -- I mean we not going to stuck with the price

25    like I said earlier, if you think like we can tell him in, like

1    some else, we can always make him happy, you know eventually,

2    but well it's up to him. He can definitely figure it out with

3    CNS, but you know?

4              "Sanyani:  I told him this. I told him Bob has a home

5    care.

6              "Dinesh:  Yeah, Bob has a home care."

7              MR. PRATT:  Stop.

8    BY MR. PRATT:

9    Q.  What was Bob's home care?

10   A.  First Michigan.

11             MR. PRATT:  Okay.  Please continue.

12             *(Government Exhibit 1F,  audio phone call, continued*

13             *playing in open court, as follows:)*

14             "Sanyani:  Right.  I said if he sends us, not only

15   the psychiatrist...

16             "Dinesh:  Uh huh.

17             "Sanyani:  The um medicine, but also the home care

18   and the day treatment, the five thousand might not be a bad

19   idea.

20             "Dinesh:  I mean yes that's, that is...

21             "[VOICES OVERLAP.]

22             "Sanyani:  But it's gotta be all three of those

23   services.

24             "Dinesh:  That is absolutely fine, if you talking

25   about home care, pharmacy, day treatment, everything, five

1    thousand is no problem.

2            "Sanyani:  Right.

3            "Dinesh:  But I'm talking about only pharmacy, but

4    now Bob is right next to me. He said go ahead. Make a packet

5    and go ahead.  If it is that good thing than you can go ahead.

6    I was just thinking...

7            "Sanyani:  Right.

8            "Dinesh:  Pharmacy all the way around you know?

9            "Sanyani:  Yeah but he said he gonna have to think

10   about that one. I told him if you think you are gonna pull the

11   trigger on one, you might as well pull it on all if it's worth

12   the while so.

13           "Dinesh:  Right now, right, now one second let me

14   give it to Bob you know.

15           "Sanyani:  Okay.

16           "[Telephone handed to Bob.]

17           "Bob:  Ed, my brother.

18           "Sanyani:  Hey Bob what's going on man?

19           "Bob:  Yeah, just go ahead and make a deal.

20           "Sanyani:  Just go ahead and make a deal whatever he

21   says?

22           "Bob:  Yep. Include everything.

23           "[VOICES OVERLAP.]

24           "Sanyani:  You know eventually we'll get everything,

25   the way I was telling Dan even if he accepts one of um you

US v Vinod Patel #11-CR-20468-36

1    know, and he sees the money is good, I think he'll accept them

2    all, so eventually we'll get them all.

3              "Bob:  No, but all, let's see, make a deal.

4              "Sanyani:  Okay.

5              "Bob:  You have a time and he set the meeting.

6              "Sanyani:  Okay. So what I'll do is I'll call him up

7    again tomorrow. If he says he's got some time in the morning.

8    I'll call him up again tomorrow, and say look I just want to

9    come down there and talk with him in person and if accepts the

10   deal then we'll go from there.

11             "Bob:  Sounds good. Also Karshin [ph] and Hardway

12   [ph]?  Did you talk to them?

13             "Sanyani:  Yeah, what's his name Harve, Harvey....

14             "Bob:  Hargrace.

15             "Sanyani:  Harvice or whatever, Hardgrass.

16             "Bob:  Yeah.

17             "Sanyani:  Guys just not accepting my phone calls

18   anymore.

19             "Bob:  Really?

20             "Sanyani:  Yeah but you said you were going to get me

21   the number to this other lady so I could call her.

22             "Bob:  I'll give it you to their number.

23             "Sanyani:  Okay.

24             "Bob:  Those are big, I'll give you their number.

25             "[VOICES OVERLAP.]

1          "Sanyani:  So um Richmond. Um...um...Chuck?

2    Cryderman (ph]?

3          "Bob:  Uh, huh.

4          "Sanyani:  I sat down with him last week, you

5    know...he's one of those really loyal people in terms of he

6    pharmacy.  Any ideas?  Hello.

7          "Bob:  Uh, huh?

8          "Sanyani:  Any ideas on how to deal with that?

9          "Bob:  We gonna rent the space.  Just tell him, you

10   know I cannot offer, but if he accept, you know, how many

11   patient he has?"

12   BY MR. PRATT:

13   Q.  There is a reference here to renting space.

14          Did Bob Patel have a practice of renting space from

15   doctors in his enterprise?

16   A.  Yes.

17   Q.  Why did he rent space from doctors?

18          MR. BEUKE:  Objection.

19          THE COURT:  If you know.

20   BY MR. PRATT:

21   Q.  If you know?

22   A.  Yes, I do know.

23   Q.  Why did he want to rent space from doctors?

24   A.  He would pay an overinflated rate for rent as a form of

25   kickback to the doctors.

1          MR. PRATT:  Okay.  Please continue with the call.

2          *(Government Exhibit 1F,  audio phone call, continued*

3          *playing in open court, as follows:)*

4          "Sanyani:  One forty.

5          "Bob:  Offer, you know the like three, four grand.

6     Offer three grand.

7          "Sanyani:  Okay.  He seemed to like uh ... I started

8     to talking about you.  He says he knows about uh ... Dan, I

9     think it is ... yeah, I use Dan.  He said he knows about the

10    pharmacy because Greenbain has brought him up a number of

11    times, but, uhm, he's just loyal to, I think it's Smitty is the

12    one he uses.

13         "Bob:  Just tell him, we gonna rent the space, you

14    know, the make the lease and we going to pay the $3,000.

15    That's fine.

16         "Sanyani:  Okay.  Okay.

17         "Bob:  You know.  That way, you don't want to say,

18    like you know the kickback or something, but we gonna make the

19    lease if he wants."

20         MR. PRATT:  Okay.

21    BY MR. PRATT:

22    Q.  Okay.  And so the reference to we don't want to say

23    kickback, we are going to be make the lease, what kind of lease

24    was he talking about?

25    A.  Renting space from the doctor.

1          MR. PRATT:  All right.  Now, please continue.

2          *(Government Exhibit 1F, audio tape, continues playing*

3          *in open court as follows:)*

4          "Sanyani:  Okay.

5          "Bob:  What do you think?

6          "Sanyani:  I think it's good, man.

7          "Bob:  Talk to him.

8          "Sanyani:  Okay.  I will make it happen, man.

9          "Bob:  Just tell him, [stutters] you can get extra

10    income, you know."

11          MR. PRATT:  That's enough.

12          Let's go to the next call, which is 1G.

13    BY MR. PRATT:

14    Q.  Can you identify 1G?

15    A.  February 25th, 2011.  The speakers are Babubhai Patel and

16    Sanyani Edwards.

17          MR. PRATT:  Could you please play this English call.

18          *(Government Exhibit 1G,  audio phone call, played in*

19          *open court, as follows:)*

20          "Sanyani:  Hey Bob, what's going on?

21          "Bob:  Edward.

22          "Sanyani:  How are you?

23          "Bob:  How are you?  What time are you going to meet

24    with this fella.

25          "[BACKGROUND MUSIC.]

1          "Sanyani:  I, I wanna really do this early in the

2    morning man, if we can.  If, If we can't do it early in the

3    morning, you know, I can meet you guys anywhere in, in the

4    evening.

5          "Bob:  No, you know the, we have to, you, me, Walla

6    [PH], and if you have a confident you can, you know, handle the

7    Greenbain there, you know.

8          "Sanyani:  End of the week at best?

9          "Bob:  No, no, no, you can handle Greenbain.  If

10   Greenbain doesn't wanna come, you know, today he didn't show

11   up, right?"

12   BY MR. PRATT:

13   Q.  And, again, who is the Greenbain they are discussing?

14   A.  Dr. Mark Greenbain.

15          MR. PRATT:  Okay.  Please continue.

16          (Government Exhibit 1G,  audio phone call, continued

17          playing in open court, as follows:)

18          "Sanyani:  But I already explained to you guys how

19   this was going to go, okay.

20          "Bob:  No, no, it's so.

21          "[Voices overlap.]

22          "Sanyani:  Here, here, Bob, Bob, Bob, hear me out.

23          "Bob:  Okay.

24          "Sanyani:  You make more money with him not being

25   there.

1              "Bob:  Uh-huh.

2              "Sanyani:  When I, when he's not there, I can put

3      anything on the script that needs to be there, anything."

4      BY MR. PRATT:

5      Q.  Was -- Dr. Mark Greenbain, was he someone who was licensed

6      to write prescriptions and controlled substance prescriptions?

7      A.  Yes.

8      Q.  How about Sanyani Edwards, Edward, was he a doctor?

9      A.  No.

10     Q.  Did he have the legal ability to write prescriptions or

11     prescribe?

12     A.  No.

13             MR. PRATT:  All right.  Please continue.

14             (Government Exhibit 1G,  audio phone call, continued

15             playing in open court, as follows:)

16             "Bob:  No, but new patient, Edward.  Don't forget

17     that we get the new patient.  That's a [unintelligible].

18             "Sanyani:  Right, new patient or old patient, I can

19     get the script for flipping I want it to be, with him not

20     there.  With him there, he, he can't -- like today we, we saw

21     new patient, and I had, you know, the script sent in.

22             "Bob:  Uh-huh.

23             "Sanyani:  For whatever it is that the client wanted.

24     But when he's there that can't happen.  You see what I'm

25     saying?

1              "Bob:  I got it.  I got it.

2              "Sanyani:  So it's more better when he's not there

3    because I can make the script whatever it is it needs to be,

4    which means you are going to make more money."

5              MR. PRATT:  All right.  Let's move to 1H.

6    BY MR. PRATT:

7    Q.  Can you identify the speakers and the date and time?

8    A.  March 5th, 2011.  Speakers are Sanyani Edwards and Babubhai

9    Patel.

10             MR. PRATT:  Would you please play from the beginning

11   of the call.

12             *(Government Exhibit 1H, audio phone call, played in*

13             *open court, as follows:)*

14             "Sanyani:  Hey Bob.  What's going on, man?

15             "Bob:  Hey, Edward.  How are ya?

16             "Sanyani:  Man, got the deal of the century for you.

17             "Bob:  Really!

18             "Sanyani:  Really.

19             "Bob:  I love my brother.

20             "Sanyani:  Man, two psychiatric nurses that can write

21   their own scripts.  They're gonna do it of no charge to you.

22             "Bob:  Really?

23             "Sanyani:  Really.  All you're gonna have to do is

24   keep payin' Greenbain."

25

1    BY MR. PRATT:

2    Q.  Does DEA allow certain nurses to have some prescribing

3    privileges?

4    A.  Yes.

5    Q.  And Greenbain refers to who?

6    A.  Dr. Mark Greenbain.

7            MR. PRATT:  All right.  Let's move forward to 2C.

8    BY MR. PRATT:

9    Q.  If you could identify this particular call?

10   A.  June 7, 2011.  The speakers are Vinod Patel and Babubhai

11   Patel.

12   Q.  And what's the time of the call?

13   A.  4:07, p.m.

14           MR. PRATT:  All right.  And this being a translation,

15   Mr. Fitzpatrick, would you start from the top and begin reading

16   this call.

17           MR. FITZPATRICK:  "Vinod:  Hello.

18           "Bob:  Go ahead.

19           "Vinod:  Not much, this leg person has with all of

20   Akim's, you know, all those patients ... all those:  The

21   different, different ones from there ...

22           "Bob:  Whose?

23           "Vinod:  Akim.

24           "Bob:  Akim?

25           "Vinod:  Yeah, our ... this leg person has taken all

1    of his or her own selfish purposes ...

2              "(Voices overlap.)

3              "Vinod:  ... for selfish purposes, she took his, so

4    he's doing outside mischief ... he has started conducting

5    business on the outside.

6              "Bob:  Then break it up.

7              "Vinod:  So now it will have to be broken.  You'll

8    have to tell Tran that you stop this mischief or else I'll pick

9    her up from here and throw her out."

10   BY MR. PRATT:

11   Q.  Okay.  Who is Tran?

12   A.  Dr. Anmy Tran.

13   Q.  Was she one of the individuals charged in this case?

14   A.  Yes.

15   Q.  Where did -- what type of doctor was she?

16   A.  Podiatrist.

17   Q.  And where did she have her offices?

18   A.  In Warren, Michigan.

19   Q.  Did she have any lease arrangement with Babubhai Patel?

20   A.  Bob rented space in her office and placed a pharmacy there.

21   Q.  Let me ask you this.  Have you ever been in any of Babubhai

22   Patel's pharmacies?

23   A.  A couple of them; not all of them.

24   Q.  Okay.  Can you describe for the ones that you have personal

25   knowledge, having been in or -- having personally been in, are

 1   these pharmacies like CVS that have chips and auto parts and
 2   all that other stuff?
 3   A.  No.
 4   Q.  No?
 5           What do they have?  What do they sell there?
 6   A.  Medications, and that's it.
 7   Q.  Can you describe the size of the pharmacies that you were
 8   in as compared to maybe a CVS or Rite-Aid?
 9   A.  It would be better if I used the jury box, the size of the
10   jury box.  Sometimes the pharmacies would be about twice the
11   size of the jury box, sometimes smaller, some would be larger,
12   a variety of sizes.
13   Q.  Okay.  All right.  And how about the -- were you ever at
14   the pharmacy that was in Tran's office?
15   A.  Yes.
16   Q.  And how big was that pharmacy?
17   A.  Maybe a little smaller than the jury box.
18   Q.  Okay.  So, anyway and -- so --
19           MR. PRATT:  If you could continue reading then from
20   where Vinod says, "So now it will have to be broken."
21           MR. FITZPATRICK:  "Vinod:  So now it will have to be
22   broken.  You'll have to tell Tran that you stop this mischief
23   or else I'll pick her up from here and throw her out.
24           "Bob:  So, did he take Tran's?
25           "Vinod:  No, when Tran comes over here, doesn't she

1   come over here to see them, so when someone comes from there,

2   then ... huh?

3               "(Voices overlap.)

4               "Bob:  Where does Akim send?

5               "Vinod:  Other, to other home care.

6               "Bob:  Then catch hold of Akim first.

7               "Vinod:  He says that these are mine.  I said since

8   when are they yours, until now they were ours.

9               "Bob:"  --

10              MR. PRATT:  If you could stop.

11  BY MR. PRATT:

12  Q.  So, this reference here to the patient being yours and

13  ours, is this in connection with pharmacy or is this in

14  connection with home care?

15  A.  Home care.

16              MR. PRATT:  All right.  Please continue.

17              MR. FITZPATRICK:  "Bob:  Break it up then, bring in

18  another doctor and break up with this one.

19              "Vinod:  So now that's what will have to be done now.

20  With that one, if you talk with that one, go ahead and tell her

21  that you stop this, because she took his for her own selfish

22  reasons.  She ... she ... in her name, how to say it ... she

23  can't do it in her name, you know, so she gives that one and

24  that one in his name ... but that's fine.  He took two, three,

25  four.  That's all right.  But this one, everything that's here,

1    transferred it all, so that one comes to know about it, and he

2    then starts creating problems from the outside.

3                "Bob:  Is there another doctor in Flint?

4                "Vinod:  There's no one in Flint; our black person,

5    just him.

6                "Bob:  No, no, but our ... uh ... our

7    (unintelligible) Rana will see them.

8                "Vinod:  Huh?

9                "Bob:  The one our Harpreet had brought, that Raina.

10               "Vinod:  Huh."

11               MR. PRATT:  Will you stop.

12   BY MR. PRATT:

13   Q.  Who is Harpreet?

14   A.  Harpreet Sachdeva is another person charged in this case

15   and he owned a home care company.

16   Q.  Okay.  So, wasn't a pharmacist?

17   A.  No.

18   Q.  He was in what business?

19   A.  Home care.

20               MR. PRATT:  All right.  Please continue.

21               MR. FITZPATRICK:  "Vinod:  Huh?

22               "Bob:  That one will see them.

23               "Vinod:  Then to her ... to her ... I'll give the

24   whole list to her, and you tell her to see everyone

25   (unintelligible), and get rid of all this.  This one has all

US v Vinod Patel #11-CR-20468-36

1    the charts, you know, so this one forwards all to that one and

2    then he doesn't do it and sends most of the compounds

3    elsewhere.

4              "Bob:  No, no, change it all.  I'll do the

5    (unintelligible)."

6              MR. PRATT:  Please continue on page three.

7              MR. FITZPATRICK:  "Vinod:  No.  And tell her, what's

8    all this, what have you started.

9              "Bob:  No, no, I'll do it.

10             "Vinod:  Tell her to stop it.  Tell her if you want

11   for yourself, then say so.  I'll tell the black one.  He'll

12   give you some, but stop giving to that one.

13             "Bob:  I was going to come.  Did she stop since I was

14   supposed to come?

15             "Vinod:  She's a bitch, that one.

16             "Bob:  If it was me, I would have said it, I would

17   have broken it up between the two.

18             "Vinod:  That's no problem.  Tell her that your work

19   with that one, with that Muslim guy ... should not happen.

20             "Bob:  No, there's Della Cruz.  You know Della Cruz.

21             "Vinod:  Huh.

22             "Bob:  We are bringing Della Cruz."

23   BY MR. PRATT:

24   Q.  Officer Carmack, who is Della Cruz?

25   A.  Dr. Fannie Della Cruz.

1              MR. PRATT:  Please continue.

2              MR. FITZPATRICK:  "Vinod:  She's stuck with this one,

3    you know, that one (Unintelligible).

4              "Bob:  We'll break it, break it, Della Cruz will

5    break it up.

6              "Vinod:  Her work is huge.

7              "Bob:  Huh?

8              "Vinod:  Her work is huge.

9              "Bob:  Della Cruz's?

10             "Vinod:  Yeah.

11             "Bob:  In Flint?

12             "Vinod:  Yeah.

13             "Bob:  We'll bring Della Cruz here, I guarantee.

14             "Vinod:  Her work is huge.

15             "Bob:  Yeah, I'll call her.

16             "Vinod:  This one is three, (unintelligible), doesn't

17   (unintelligible) come to two.  I said I'll get rid of you.

18             "Bob:  Okay."

19             MR. PRATT:  Please turn to Government Exhibit 2E.

20   BY MR. PRATT:

21   Q.  Can you identify the participants and speakers here?

22   A.  The date is July 14, 2011.  The speakers are Vinod Patel

23   and Babubhai Patel.

24             MR. PRATT:  All right.  Would you begin to read from

25   the beginning of the call.

1          MR. FITZPATRICK:  "Vinod:  Hello.

2          "Bob:  Go ahead.

3          "Vinod:  So, that white person's fellow who comes,

4    that black person who comes, how's your relationship with him?

5          "Bob:  Which white person and black person?

6          "Vinod:  You know that Greenbain who comes.

7          "Bob:  Huh?

8          "Vinod:  Greenbain.

9          "Bob:  Hmm.

10         "Vinod:  That other black person who is with him, you

11   know.

12         "Bob:  Uh-huh.

13         "Vinod:  How is your relationship with him?

14         "Bob:  With Edward?"

15   BY MR. PRATT:

16   Q.  Officer Carmack, who is Edward in this context, the one

17   that works with Greenbain?

18   A.  Sanyani Edwards.

19         MR. PRATT:  Okay.  Please continue.

20         MR. FITZPATRICK:  "Vinod:  Hmm.

21         "Bob:  Good.

22         "Vinod:  Hmm.  Him, to him:  That day program which

23   is at the back, were they given?

24         "Bob:  No.  No one's been given.  Why?

25         "Vinod:  No, because that Marie was saying that they

1    were given ..."

2    BY MR. PRATT:

3    Q.  Okay.  Who is Marie?

4    A.  Marie Lewis.

5    Q.  Who is she?

6    A.  She lives in Flint and she's a marketer.

7              MR. PRATT:  Okay.  Please continue.

8              MR. FITZPATRICK:  "What is the necessity of giving it

9    to them.  After applying for the provider number, then those

10   people will come, you know, these H.I.V. ones, their billing

11   can be done then.

12             "Bob:  No one has been given (unintelligible).

13             "Vinod:  (Unintelligible.)

14             "Bob:  Yes, well he had transportation with him, you

15   know.

16             "Vinod:  Huh.

17             "Bob:  With transportation these people pay cash, you

18   know.

19             "Vinod:  They don't give any.

20             "Bob:  They must be giving $60 per day, you know.

21             "Vinod:  No, no, they couldn't be paying that much.

22   That one must be just saying, I know, that is they give for

23   those people, but they don't give for certain people.  He ...

24   he and Atula, these two people have ... that is this black

25   person together, both of them on Sunday, uh, they take some of

1    them over there, and then, there's some company owned by a

2    white person by the name of Reliable, they give patients to

3    them.

4            "Bob:  Who, our this black person ... uh, Edward goes

5    there?

6            "Vinod:  Yes.  So you have to talk to him and ask him

7    what's the truth, what are the facts in this."

8            MR. PRATT:  Please stop.

9    BY MR. PRATT:

10   Q.  So, what's the problem if a marketer gives patients to

11   another location?

12   A.  Depending on the patient's billing, if they have been

13   billed for the month, they can't be billed by a separate entity

14   for home care or pharmacy prescriptions or doctor visits for

15   the same thing in the same month.

16           MR. PRATT:  All right.  Please continue on page

17   three.

18           MR. FITZPATRICK:  "Bob:  And then along with him this

19   Atula goes, is that it?

20           "Vinod:  Yes.

21           "Bob:  Doesn't Marie know about this?

22           "Vinod:  She knows about it.  Marie's the one who

23   caught it all.  So I spoke to that black person yesterday that

24   you were doing all this he says (unintelligible) something like

25   that.  So, uh, then ... so that I could get it confirmed ...

1    that one phoned, James did, to that black person.

2            "Bob:  Huh.

3            "Vinod:  So ... so, he says that ... yeah, I, I, I

4    ... I first give to Reliable and then I give to this one, the

5    remaining ones that have to be given.

6            "Bob:  Hmm.

7            "Vinod:  Just a minute ... so (clears his throat) get

8    it confirmed with that black person.

9            "Bob:  Yes, that I will ... today, today itself I

10   will call him.

11           "Vinod:  Yes, that is have him confirm it, tell him

12   to leave this one.

13           "Bob:  Okay.

14           "Vinod:  Okay.

15           "Bob:  I'll call him.

16           "Vinod:  Yes, have him confirm that they are doing

17   this sort of a thing.

18           "Bob:  So, then this one has the patients and that

19   one is attached with him, is that how it is?

20           "Vinod:  Uh ... uh ... it's not that, uh ...

21           "Bob:  Patients ...

22           "Vinod:  They are all ours.

23           "Bob:  Uh-huh.

24           "(Voices overlap.)

25           "Vinod:  That is, that one must have set it up.  I

US v Vinod Patel #11-CR-20468-36

1    don't know, that black person must have set it up.  That's what

2    she says.  That's what that Marie said, that the black person

3    set it up.

4            "Bob:  Okay.  Then, I'll call Edward today.

5            "Vinod:  Just ask him as to what's going on, talk

6    clearly and speak the truth.

7            "Bob:  No, no, he will have to tell, there's no

8    question about it.

9            "Vinod:  Because all of ours go, so, let's see how

10   many about 20 to 25, 20 to 25 are taken away every month.

11           "Bob:  That is the reason we'll have to get rid of

12   Atula, we'll have to let him go.

13           "Vinod:  So, confirm it with him so that I can ... I

14   can decide what should be my next move.

15           "Bob:  Yeah, okay, okay."

16   BY MR. PRATT:

17   Q.  All right.  And the 20 or 25, are they talking pharmacy or

18   are they talking home health here?

19   A.  Home health.

20           MR. PRATT:  Thank you.

21           Okay.  That is all the calls that we are going to

22   display at this point.

23           And I will indicate, Your Honor, I will be recalling

24   Agent Carmack to the stand at a later date.  However, I will

25   make him available for cross-examination by the Defense at this

1    time on his testimony.

2             THE COURT:  Defense?

3             MR. BLACK:  Thank you, Your Honor.

4                       CROSS-EXAMINATION

5    BY MR. BLACK:

6    Q.  Good morning, Officer Carmack.

7    A.  Good morning.

8    Q.  I just want to be clear.  I didn't understand the Police

9    Department you worked for.

10            Is that Roseville or Grosse Ile?

11   A.  Grosse Ile.  It's an island southwest of Detroit.

12   Q.  And you've been there for ten years; is that correct?

13   A.  13.

14   Q.  13 years now?

15            And you came to this investigation in 2006 or you

16   came to DEA task force in 2006?

17   A.  I joined the task force -- my department assigned me to the

18   DEA in 2006.  I joined the investigation in 2009.

19   Q.  Okay.  So, since 2009 you've been investigating the Bob

20   Patel pharmacy organization.  Is that correct?

21   A.  Correct.

22   Q.  Okay.  During your investigation you said you are one of

23   the lead investigators?

24   A.  Correct.

25   Q.  Okay.  That means you're in charge of the investigation?

1    A.   With others.

2    Q.   With how many others are you in charge of this

3    investigation with?

4    A.   Currently there's two of us in charge of it now.

5    Q.   Two agents in charge of the investigation right now?

6    A.   Myself and Special Agent Christopher Gould.

7    Q.   And throughout the investigation how many agents were in

8    charge?

9    A.   My original partner in the case was Tyler Parkison, Special

10   Agent, and then we got assisted by the FBI.  There were five or

11   six of us that played different roles throughout the

12   investigation.

13   Q.   You said you were assisted by the FBI.

14           The task force consists of several agencies; is that

15   right?

16   A.   The DEA task force, the current arrangement is there's four

17   agents, seven TFOs, task force officers like myself, and two

18   diversion investigators.

19   Q.   And it's comprised of agents from the DEA?

20   A.   DEA.  And Agent Gould is from OIG, Medicare.

21   Q.   That's the Office of the Inspector General?

22   A.   Yes.

23   Q.   Okay.  There are also agents from the FBI Health Care Task

24   Force, is that correct, or Health Care Fraud Unit?

25   A.   FBI.

1    Q.   Okay.  And there are also local police officers like

2    yourself?

3    A.   Correct.

4    Q.   Okay.  And throughout the investigation -- Mr. Pratt went

5    over it with you briefly -- you used several different methods

6    of investigation.  Isn't that correct?

7    A.   Correct.

8    Q.   You used wiretaps, which you just went over at length?

9    A.   (Witness nodding head.)

10   Q.   You used surveillance, which is you following around

11   targets.  Is that correct?

12   A.   There's different versions of surveillance.  That's one of

13   them, yes.

14   Q.   You used trash pulls, which is where when somebody puts

15   their trash on the curb, you put on rubber gloves and dig

16   through the trash.  Isn't that right?

17   A.   Correct.

18   Q.   You try to find evidence in the trash?

19   A.   Information, evidence.

20   Q.   Okay.  Documents?

21   A.   Bank accounts.

22   Q.   What they ate last night?

23   A.   Unfortunately, at times, yes.

24   Q.   Okay.  You used GPS trackers.

25            Can you tell me what that is?

1    A.   There's different types of trackers.   Like with your cell

2    phone, you have a GPS attached to it.   In order to get it, you

3    have to get a court order to ping where the phone is located or

4    you place trackers on cars.

5    Q.   Okay.   That leads into my next question.   Cell phone pings,

6    that's where you track the location of a cell phone, right?

7    A.   Correct.

8    Q.   You get data from the towers, from the cell phone company?

9    A.   Depending on the signaling you have.   I am not an expert on

10   it, but on the signaling you have.   How many towers you have

11   will give you a greater zone.   Whether there's one or two

12   towers, you have a wider area.

13   Q.   Okay.   You used delayed search warrants?

14   A.   Correct.

15   Q.   You talked a little bit about that.

16          Did you use regular search warrants as well where you

17   would show up -- what we see on TV; you show up with the search

18   warrant and you ask if you can look around?

19   A.   Well ...

20   Q.   Just look around?

21   A.   Yes.

22   Q.   Okay.   You used undercover officers?

23   A.   Correct.

24   Q.   You were one of the undercover officers?

25   A.   Correct.

1    Q.   And you used confidential informants?

2    A.   Correct.

3    Q.   And some of those confidential informants -- let's talk

4    about that for a minute.

5              There are two different types of confidential

6    informants, right?

7    A.   There are several different types.

8    Q.   Okay.  Well, how many were used in this -- how many types

9    of confidential informants were used in this investigation?

10   A.   Without being a hundred percent certain, I believe there

11   was one type.

12   Q.   And that is?

13   A.   A Defendant who was cooperating.

14   Q.   Okay.  A cooperating witness where they are charged and

15   then they say -- usually for leniency, they say I can help you,

16   I have information?

17   A.   I'm not part of that agreement.

18   Q.   Is that your understanding though?

19   A.   Yes.  Future consideration.

20   Q.   Okay.  Are there also people that may be involved in the

21   organization or other organizations that can work their way

22   into this organization, that you'll pay for information?

23   A.   A paid confidential informant?  Yes.

24   Q.   Okay.  And did you use those in this case as well?

25   A.   That's why I hesitated before.  I can't remember if we did

US v Vinod Patel #11-CR-20468-36

1  or did not.  I believe we -- no, I don't remember the different

2  classifications of people we used.

3  Q.  Okay.  And those informants, one of the methods of

4  gathering information through them, sometimes they wear wires?

5  A.  Correct.

6  Q.  Sometimes you -- at your direction, they'll go and perform

7  a task and then report back to you.  Is that right?

8  A.  Correct.

9  Q.  Okay.  But with the cooperating witnesses, they'll-- they

10  did -- they did what they did on their own usually, right, and

11  then they are charged for it?

12  A.  You mean prior to me having any interaction with them?

13  Q.  Exactly.

14  A.  Correct.

15  Q.  And then after they are charged for it, that's when they

16  decide to come to you with information?

17  A.  Correct.

18  Q.  Okay.  Going back to undercover operations for a moment,

19  you stated in this case that you posed as a patient --

20  A.  Correct.

21  Q.  -- in an undercover operation.

22      Sometime in the winter of 2011?

23  A.  Yes.

24  Q.  And you did that a couple of times?

25  A.  Two, that I can remember.

US v Vinod Patel #11-CR-20468-36

1    Q.   Okay.   The first one you went to Glendale Pharmacy?

2    A.   I can't remember if it was Glendale or Care For You, which

3    one was first.   I don't remember the dates.

4    Q.   Is it fair to say you went to Glendale and Care For You?

5    A.   Correct.

6    Q.   Both in December of 2011?

7    A.   I believe so, yes.

8    Q.   When you were at Glendale Pharmacy, did you come in contact

9    with Vinod Patel?

10   A.   No, I did not.

11   Q.   When you went to Care For You Pharmacy, did you come into

12   contact with Vinod Patel?

13   A.   No, I did not.

14   Q.   Okay.   So, you used wiretaps.   Title III, they're also

15   called.   Right?

16   A.   (Nodding head.)

17   Q.   You used wire traps.   You used surveillance, trash pulls,

18   GPS trackers, cell phone pings, confidential informants,

19   cooperating witnesses, search warrants, Delayed Notice Search

20   Warrants, undercover officers.   You used all of those

21   investigation techniques in this investigation.   Right?

22   A.   Correct.

23   Q.   Over a period of three, four years?

24   A.   It would be about two years.

25   Q.   Okay.   And in those two years that you used all of these

US v Vinod Patel #11-CR-20468-36

1   different investigation techniques, you came up with a list of

2   26 Defendants for an indictment.  Isn't that correct?

3   A.  On the first wave, yes.

4   Q.  Okay.  August of 2011?

5   A.  August 2nd, yes.

6   Q.  26 Defendants?

7   A.  Correct.

8   Q.  Was Vinod Patel one of those Defendants?

9   A.  He was not.

10  Q.  Now, I want to talk a little bit about the Delayed Notice

11  Search Warrant.

12          You said you broke into Chirag Soni's house.  You

13  staged a robbery at Chirag Soni's house.  Isn't that correct?

14  A.  We entered the residence.  They took it as a robbery.

15  Q.  Okay.  Well, nobody was there?

16  A.  Correct.

17  Q.  And you took the things that were inside?

18  A.  Correct.

19  Q.  And you left a note?

20  A.  Correct.

21  Q.  You wanted to make it look like a robbery, right?

22  A.  To some extent, yes.

23  Q.  Is it fair to say?

24  A.  Yes.

25  Q.  Okay.  And Chirag Soni, you said he's a pharmacy tech at

1  Caring Pharmacy?

2  A.  Correct.

3  Q.  Okay.  Vinod Patel, he didn't work at Caring Pharmacy, did

4  he?

5  A.  Not to my knowledge.

6  Q.  Okay.  And you went inside, and there were 30 to 31 big

7  U-Haul boxes, you said?

8  A.  Correct.

9  Q.  1500 pounds worth of prescription meds.?

10  A.  About that amount, yes.

11  Q.  And blank Visiting Doctors of America pads, you said?

12  A.  Yes.

13  Q.  Okay.  Were there any First Michigan Home Health Care

14  prescription pads in there?

15  A.  First Michigan is a home care company.  They are not an

16  individual doctor that would write a prescription to go from a

17  doctor.  But to my knowledge, I don't recall any.

18  Q.  Okay.  Were there any medications recovered -- let me ask

19  you this.  Did First Michigan Home Health Care keep medications

20  as part of its business?

21  A.  You mean inside their corporate office?

22  Q.  No.  As a home health care agency, is it part of the

23  business of a home health care agency to hang onto medication

24  -- or, to dole out medication?

25  A.  I'm not fully -- I don't know all of the rules of the home

1   care businesses, but I don't believe so.

2   Q.  Okay.  So, none of the medication that you found in this

3   30, 31 boxes, 1500 pounds, none of it came from First Michigan

4   Home Health Care?

5   A.  Yes.

6   Q.  And none of -- and home health care agencies write

7   prescriptions.  So none of the prescription pads came from

8   First Michigan Home Health Care?

9   A.  Correct.

10  Q.  And none of them had Vinod Patel's name on them?

11  A.  None of the prescription pads?

12  Q.  That's correct.

13  A.  That's correct.

14  Q.  And you said there were inventory lists in there.

15           None of the inventory lists had Vinod Patel's name on

16  them.  Is that right?

17  A.  To my knowledge, right, I do not believe.

18  Q.  Okay.  "The oil burns throughout the night," you said that

19  was the phrase that you left a note on?

20  A.  Correct.

21  Q.  Why did you leave that phrase?

22  A.  We wanted to leave a phrase that was not threatening, that

23  was not intimidating; something that made no sense, that they

24  would talk about it and try to understand what it meant.

25  Q.  Okay.  And it was written in Gujarati?

1    A.   Correct.

2    Q.   Which is Bob Patel's native language?

3    A.   Correct.

4    Q.   And is that the native language of most of the people in

5    Bob Patel's organization?

6    A.   Most of them, yes.

7    Q.   Okay.  So, you wanted to leave a note that was maybe a

8    little bit confusing, something they might talk about?

9    A.   That was the reason for the note, yes.

10   Q.   Okay.  Because you had wiretaps up on Bob Patel at that

11   point, right?

12   A.   Correct.

13   Q.   You were listening to his phone calls?

14   A.   Correct.

15   Q.   So, you wanted to hear if maybe he would talk about the

16   note that was left?

17          THE COURT:   That's three times you've asked that

18   question.

19   A.   Yes.

20   BY MR. BLACK:

21   Q.   Okay.  Did he talk about the note that was left?

22   A.   Yes.

23   Q.   Did he talk about the note that was left with several

24   different people?

25   A.   Yes.

1   Q.  He didn't talk about the note that was left with Vinod, did

2   he?

3   A.  I can't recall the people he spoke with those days

4   afterwards.  I don't recall.

5   Q.  Is it safe to say that had he talked to Vinod about it, it

6   would have been in a report?

7   A.  Not every call gets put in a report.  The shear volume of

8   the calls, when I wrote the report I put a couple instances.

9   Q.  Well, is it safe to say that calls involving Defendants are

10  important?

11  A.  Yes.

12  Q.  Okay.  So, is it safe to say that the important calls made

13  it in the reports?

14  A.  No.

15  Q.  Okay.  You just pick and choose which calls make it in the

16  reports?

17  A.  For my own personal thinking, if we do an event and there

18  are calls related to that event, I would try to document it;

19  not on every occasion.

20  Q.  Okay.

21  A.  Does that answer your question?

22  Q.  Well, how do you decide which ones to document?

23  A.  Like I said, based on certain events that take place.

24  Q.  Okay.  Well, to your knowledge, Vinod Patel was not on any

25  of the calls regarding this note?

1   A.  Per my recollection, I don't believe he was.

2   Q.  And to your knowledge, to your recollection, none of the

3   people that did talk to Bob Patel about this note talked about

4   Vinod.  Is that right?

5   A.  I believe so, but I don't remember.

6   Q.  Okay.  To the best of your knowledge?

7   A.  Yes.

8   Q.  All right.  Now, in the pictures that the Government put up

9   on the screen, there were some white notes that you said were

10  inventory reports?

11  A.  Yes.

12  Q.  That cataloged everything that was in the box?

13  A.  Correct.

14  Q.  And it also cataloged the return value?

15  A.  Yes.

16  Q.  You said over $580,000 was the return value --

17  A.  About that.

18  Q.  Okay.  And none of that $580,000 return value was from

19  First Michigan Home Health Care.  Is that correct?

20  A.  Correct.

21  Q.  Okay.  You said some of the names were Rapid Drugs?

22  A.  Correct.

23  Q.  Care For You?

24  A.  Correct.

25  Q.  Detroit Pharmacy?

```
1    A.   Correct.

2    Q.   Independent Pharmacy?

3    A.   Correct.

4    Q.   Tri-City Apothecary?

5    A.   Correct.

6    Q.   Beecher Pharmacy wasn't one of them, was it?

7    A.   Correct.

8    Q.   Neither was First Michigan Home Health Care?

9    A.   Correct.

10   Q.   Okay.  I want to take a minute to talk -- well, you said

11   there were some other locations where you did delayed notice

12   search warrants; is that right?

13   A.   There was one additional location.

14   Q.   And that was in Farmington Hills?

15   A.   No.  That was -- Farmington Hills I believe was where there

16   was another stash location that we watched be unloaded.

17   Q.   Okay.  So, at that location where you watched the location

18   be unloaded, you picked up on that information through a

19   wiretap again.  Right?

20   A.   Correct.

21   Q.   And that was a call between Bob and Chetan Gujarathi?

22   A.   Yes.

23   Q.   And you say Chetan Gujarathi was the accountant for Bob's

24   pharmacies?

25   A.   I'm using your co-attorney's term, accountant/bookkeeper.
```

```
1    Q.  Fair to say.  Okay.  All right.

2            And Bob told Chetan to go pick up drugs and bring

3    them to another location; is that right?

4    A.  Correct.

5    Q.  And the drugs, they were located at a Farmington Hills

6    apartment?

7    A.  Correct.

8    Q.  And that wasn't Vinod Patel's apartment, was it?

9    A.  No.

10   Q.  Okay.  And he told them to bring the drugs to Detroit Care

11   Pharmacy?

12   A.  Correct.

13   Q.  Did he specifically say that or is that just where the

14   drugs ended up?

15   A.  I would have to read the call again, but that is where they

16   ended up.  I don't remember -- if he directed them to go there,

17   I don't recall.

18   Q.  Okay.  Either way, at Bob's direction, Chetan took the

19   drugs to a pharmacy?

20   A.  Correct.

21   Q.  And it was Detroit Care Pharmacy?

22   A.  Correct.

23   Q.  Vinod Patel doesn't own Detroit Care Pharmacy, does he?

24   A.  No.

25   Q.  He's not a pharmacist there, is he?
```

1   A.  No.

2   Q.  He's not a pharmacist at all?

3   A.  I don't recall what his status is, but I don't believe he

4   is.

5   Q.  Okay.  So, you ran surveillance on this operation with

6   Chetan and an unidentified male bringing the stash of drugs

7   from the stash house to Detroit Care Pharmacy, right?

8   A.  Correct.

9   Q.  And you watched them bring these drugs into the pharmacy in

10  big boxes?

11  A.  Back door, yes.

12  Q.  Okay.  And you mentioned earlier that the reason that this

13  is a dangerous practice is because the pharmacist will maybe

14  short a bottle and the pills will get mixed in together.

15  Expiration dates, they might be different in different stashes.

16  Is that right?

17  A.  For the original -- for the second Delayed Search Warrant,

18  that's correct, I was referencing that.

19  Q.  Well, in general, part of the scheme -- correct me if I'm

20  wrong, but part of the scheme that Bob was involved with was he

21  would instruct his pharmacists to maybe take a pill or two out

22  of a bottle, and then as that adds up, you end up with an extra

23  bottle and maybe nobody notices?

24  A.  Correct.

25  Q.  And that's dangerous for the public; isn't that right?

1    A.   It could be, yes.

2    Q.   And you say that because maybe some of the pills that are

3    taken out and added to a bottle, when that makes a full bottle,

4    they will have different expiration dates?

5    A.   They could be comingled with other pills, yes.

6    Q.   Maybe not even the same kind of pill?

7    A.   Correct.

8    Q.   Okay.  So, it's dangerous -- the operation that Bob was

9    running through his pharmacies, that was dangerous to public

10   health?

11   A.   Not only the shorting of pills was widespread, the billed

12   not filled was more prevalent than the shorting of pills, I

13   believe.

14   Q.   Okay.  The operation where Chetan took drugs to Detroit

15   Care Pharmacy --

16   A.   Correct.

17   Q.   -- were there any shorted pill collections in that box?

18   A.   I have no idea.

19   Q.   And why don't you know?

20   A.   Because we did not seize those until the take-down.

21   Q.   You didn't seize the box?

22   A.   Boxes, correct.

23   Q.   You didn't seize the boxes --

24   A.   Correct.

25   Q.   -- full of potentially dangerous hazardous material?

1    A.  I have no knowledge if they were dangerous or not.

2    Q.  But potentially?

3    A.  I have no knowledge if they were or not.

4    Q.  Okay.  Let's talk a little bit about drugs and the way that

5    they're scheduled?

6    A.  Okay.

7    Q.  You said that there's noncontrolled prescription drugs and

8    there's controlled prescription drugs.  Is that correct?

9    A.  Yes.

10   Q.  Either way, you've got to get a prescription.

11   Noncontrolled drugs don't really have a risk of abuse or

12   addiction.  Is that right?

13   A.  Potential for abuse, yes.

14   Q.  Okay.  But controlled drugs, they do, potential for abuse

15   or addiction.  Right?

16   A.  Correct.

17   Q.  Okay.  And it's Schedule I through Schedule V?

18   A.  Correct.

19   Q.  Schedule I drugs, you said heroin is a Schedule I drug?

20   A.  Correct.

21   Q.  You said there's no medical use of Schedule I drugs, right?

22   A.  Correct.

23   Q.  Schedule II through V though, those do have medical use.

24   Right?

25   A.  Correct.

1   Q.   There's medical value to every drug in Schedule II through
2   Schedule V, right?
3   A.   Correct.
4   Q.   And you didn't decide that there's medical value to those
5   drugs?
6   A.   No.
7   Q.   The DEA or the FDA -- a federal agency decided that?
8   A.   The DEA regulates it.  I'm not fully -- I don't know how
9   they actually pick the drugs or not, but --
10  Q.   Is it fair to say there were some doctors that decided
11  that?
12  A.   I have no idea.
13  Q.   Okay.  In these delayed notice search warrants and, you
14  know, for example, this transporting of drugs from Chetan --
15  the house in Farmington Hills to Detroit Care Pharmacy, you
16  didn't find any Schedule I narcotics in those searches, did
17  you?
18  A.   When we did the take-down two months later?
19  Q.   No.  At the Delayed Notice Search Warrant.
20  A.   Oh, I'm sorry.
21       No, we did not.
22  Q.   And in the boxes that were transported from Farmington
23  Hills to Detroit Care?
24  A.   Like I said, they were moved into the back of the pharmacy,
25  and then we did not -- it was two months later when I believe

1   we acquired the boxes from the Farmington Hills apartment.

2   Q.   Okay.   Now, you spent a lot of time with Mr. Pratt going

3   through wiretaps and you explained kind of the process that you

4   go through.

5           Actually, before I get into the wiretaps I want to

6   talk a little bit -- so, there was the first take-down in

7   August of 2011.

8   A.   Correct.

9   Q.   And then there was a second take-down in March of 2013?

10  A.   Correct.

11  Q.   13 additional individuals?

12  A.   Correct.

13  Q.   12 of them were arrested; is that right?

14  A.   Correct.

15  Q.   One of them went to India?

16  A.   Correct.

17  Q.   And he's still in India?

18  A.   To my knowledge.   I really don't know where he is, but I

19  believe so.

20  Q.   He's not in custody, right?

21  A.   Correct.

22  Q.   He isn't -- okay.   He hasn't come to trial?

23  A.   No.

24  Q.   Okay.   So, you did most of the arresting on March 19; is

25  that right?

1    A.   Correct.   There may have been a day or two on some of them,

2    but yes.

3    Q.   Okay.   To your knowledge, was Vinod Patel arrested on March

4    19th?

5    A.   I don't remember what day he was arrested.

6    Q.   Okay.   Is it fair to say that on March 19th Vinod Patel was

7    in India?

8    A.   I don't remember where he was at that time.   I was in the

9    building and was not out making the arrests.

10   Q.   You weren't part of the arrests?

11   A.   No, for both take-downs.

12   Q.   Okay.   Is there anything that would refresh your memory

13   about -- well, let me put it this way.   In May -- on May 20th

14   of 2013, Vinod Patel was eventually arrested.   Is that right?

15   A.   I don't believe the day -- if you believe he was in India,

16   I'll go with --

17   Q.   But you were the one that arrested him, weren't you?

18   A.   I don't recall.

19   Q.   If there's a report, called Arrest Report, where you wrote

20   saying that you arrested Vinod Patel, is it fair to say you

21   arrested Vinod Patel?

22   A.   Yes.

23   Q.   Okay.   Is it fair to say that you met Vinod Patel at the

24   Detroit Airport on May 20th?

25   A.   Yes.   I do recall that, yes.

1   Q.  Okay.  And it was on a return flight from India; isn't that

2   right?

3   A.  Yes.

4   Q.  Vinod Patel was in India when the indictment came down?

5   A.  Correct.

6   Q.  And he was alerted through some channel of communication

7   that the DEA was searching for him?

8   A.  Correct.

9   Q.  And he was in India?

10  A.  Correct.

11  Q.  And he could have stayed in India?

12  A.  Correct.

13  Q.  Some people did?

14  A.  Correct.

15  Q.  But he didn't.  He came back.  Right?

16  A.  Correct.

17  Q.  He arranged actually to meet you at the Airport, right?

18  A.  Through his attorney, yes.

19  Q.  He called the DEA and said I'm coming back on this day.

20  You can meet me at the Airport when I get off the airplane.

21  Right?

22  A.  His attorney arranged it, but either way it's --

23  Q.  Through Vinod, right?

24  A.  Yes.

25  Q.  I want to ask you a little bit -- well, I'll go into the

1    Title III wiretaps.

2           You explained, you talked with Mr. Pratt and the jury

3    here at length about the process of getting a writer tap.

4    Right?

5    A.   Yes.

6    Q.   You get a search warrant.  You go in front of a judge.  You

7    ask them for permission and they have to grant you permission

8    to get on a wiretap.  Right?

9    A.   They don't have to grant it.

10   Q.   Well --

11   A.   They approve it.

12   Q.   Good point.

13          But if they approve, if they grant you permission,

14   then, and only then, you can start listening to the phone

15   calls.  Is that right?

16   A.   Correct.

17   Q.   Okay.  In this task force involved with Bob's

18   investigation, you got two wiretaps, right?

19   A.   Two lines.

20   Q.   Two lines.

21          Those were two lines controlled by Bob Patel?

22   A.   Yes.

23   Q.   Okay.  And throughout the investigation Bob received a lot

24   of phone calls, right?

25   A.   Yes.

1    Q.  I mean, you were up during the daytime from eight a.m. to

2    12 p.m., I think you said -- or, 12 a.m. midnight?

3    A.  We were monitoring, give or take some hours, depending on

4    what's going on, about eight a.m., in the night.

5    Q.  And during those hours for seven months, is it fair to say

6    you were up seven months on Bob's phones?

7    A.  Yes.

8    Q.  So, during those hours of the day for seven months, over

9    18,000 calls, right?

10   A.  Voice calls, yes.

11   Q.  Voice calls.

12            And then there were text messages in addition to

13   that?

14   A.  We didn't get the text messages.

15   Q.  Okay.  When you say voice call, what is a voice call?

16   A.  Voice calls are like if you and I are now on the phone

17   talking to each other --

18   Q.  Okay.

19   A.  -- versus sometimes there could be some data packets

20   between a phone and a phone company that's not a voice

21   transmission.

22   Q.  Okay.  Is it fair to say that those data packets are

23   usually text messages or e-mails?

24   A.  Not always.  They could always be sitting on your phone,

25   hanging up -- just glitches in the system, going between

1    towers.  It could be a whole bunch of things.

2    Q.  Okay.  So, over 18,000 -- you said 18,600 roughly phone

3    calls came in to Bob's phone in the seven months that you were

4    up on both lines during the daytime hours, more or less?

5    A.  Correct.

6    Q.  Okay.  And every 30 days you had to go re-up an additional

7    warrant to get more information -- or, to get permission to

8    keep listening to his phone calls, right?

9    A.  To continue, yes.

10   Q.  Okay.  And throughout listening to these phone calls, you

11   could see who was calling in, right?  You could see the

12   telephone number of who was calling him?

13   A.  Most of the time, yes.

14   Q.  And then if you didn't know whose telephone number that

15   was, you would send out a subpoena to the telephone company to

16   find out?

17   A.  Would try to, yes.

18   Q.  Okay.  In those seven months that you were up on Bob's two

19   lines, did you ever seek a search warrant for any of the other

20   phones that -- of the people that Bob was talking to?

21   A.  Can you define like when you say did I seek a search

22   warrant --

23   Q.  My fault.  Forgive me.

24          Did you ask for permission -- did you seek an order

25   allowing you to listen in on phone calls, to wiretap other

1    people's phones?

2    A.  No, we did not.

3    Q.  Okay.  Seven months, 18,000 calls.

4            How many different people do you think called Bob's

5    phone at that time?

6    A.  A very large volume.  I can't guess.

7    Q.  Now, in the 18,600 phone calls that Bob had in that period

8    of time, January 2011 to July 2011, how many phone calls did he

9    have with his brother Vinod?

10   A.  I can't answer that.  I don't know.

11   Q.  Well, was it more than ten?

12   A.  I really -- I can't answer that.  I don't know.

13   Q.  Okay.

14   A.  Sorry.

15   Q.  If I said it was 13, would you believe me?

16   A.  If you say it's 13, I'll take your word for it, but I can't

17   verify that, that's all.

18   Q.  Okay.  13 out of 18,600, that's less than a tenth of a

19   percent.  Isn't that right?

20   A.  Yes.

21   Q.  With his brother?

22   A.  Right.

23   Q.  His co-conspirator, as you guys say?

24   A.  (No response.)

25   Q.  Now, you talked a little bit about your ability to -- or,

1    the system you used to identify the people on the telephone

2    calls.

3              Mr. Pratt put some telephone calls up on the screen

4    and it had names next to the words that they were speaking.

5    Right?

6    A.  Correct.

7    Q.  And you said you used caller ID to find out those names?

8    A.  One of the ways, yes.

9    Q.  And caller ID, that's something like I program a name in my

10   phone and then -- say, I program your name in my phone with

11   your phone number, and then when you call your name comes up?

12   A.  What I meant by caller ID is, as you said earlier about

13   subpoenaing a phone to get the subscriber information, that

14   would be the caller ID, we would know that number goes to the

15   phone based on the subscriber information from the phone

16   company.

17   Q.  Okay.  And the subscriber information, that's the person

18   that signs the contract for the phone?

19   A.  Correct.

20   Q.  And I mean essentially I know it's always the case where

21   it's the person who pays for the phone?

22   A.  Correct.

23   Q.  Not necessarily the person that talks on the phone though,

24   right?

25   A.  Once the phone leaves the building, anybody can be on that

1    phone.

2    Q.  Anybody can be on the phone?

3    A.  Yes.

4    Q.  Now, you also said you decided who was on these phone calls

5    based on names that were thrown around in the phone calls?

6    A.  How they addressed each other in the beginning of the phone

7    calls or during phone calls, yes.

8    Q.  Okay.  Now, the first call that was played, I think it was

9    Government Exhibit 1A.  That was a phone call between Bob and

10   unknown male.  Right?

11   A.  Correct.

12   Q.  Unknown male, that's not the guy's name, right?

13   A.  No.

14   Q.  That's a guy, you don't know his name?

15   A.  I have no idea who he is.

16   Q.  You have no idea who Bob was talking to on this phone call,

17   right?

18   A.  No, I don't.

19   Q.  Is it safe to say it was not one of the Defendants?

20   A.  I don't know.

21   Q.  Well, if it was one of the Defendants, do you think that's

22   something that you would know?  You've talked to all of the

23   Defendants, right?

24   A.  I can't think -- I can't speculate whether I would be able

25   to identify the voice or not.  Some of the voices I know as

1    Bob's.  And other ones, I'm not familiar with.

2    Q.  Okay.

3    A.  So, I can't tell you who that person is.

4    Q.  So, is this a voice -- you're not familiar with that voice

5    at all?

6    A.  I would have to hear the call.

7    Q.  That brings me to a point.  Most of these calls that you

8    listened to, the 18,600 of them, they were in Gujarati.  Right?

9    A.  Correct.

10   Q.  That's an Indian language?

11   A.  A dialect, yes.

12   Q.  Okay.  Do you speak Gujarati?

13   A.  No.

14   Q.  Okay.  So, you weren't the one that translated the calls?

15   A.  No.

16   Q.  Did you listen to the calls in Gujarati?

17   A.  I listened to some of them, but not all 18,000.

18   Q.  Okay.  How did you decide which calls you would listen to?

19   A.  A lot of calls when I would read to the transcripts and you

20   go to the data D use server or the hard drive for the use --

21   the -- what we can use to recall stuff on, when you pull that

22   call up, it automatically plays the audio as you read the

23   transcription.  So, you can turn off the audio or listen to it

24   and follow along.  But I don't -- that's how I get ...

25   Q.  You don't speak Gujarati, so there's no reason to follow

1    along?

2    A.   No.  I would listen to some of the calls.

3    Q.   Okay.  Since you don't speak Gujarati, someone who does

4    speak Gujarati, that's the person who transcribed the calls in

5    English for us.  Right?

6    A.   The monitors, yes.

7    Q.   Okay.  How many monitors did you say were on this?

8    A.   It's six total, but five would primarily be on -- four to

9    five, depending on what month and what was going on.

10   Q.   Okay.  And are they all in a room together listening to

11   calls constantly or are they -- how does that work?

12   A.   They are broken into shifts.  So, one monitor per line.

13   Later on when we fell behind on the calls, we had an additional

14   monitor come in to help catch up on calls.

15   Q.   Okay.  Are they monitoring the call as it happens in

16   realtime?

17   A.   Yes.

18   Q.   Are they transcribing the call as it happens in realtime?

19   A.   Trying to.

20   Q.   You know, maybe like the court reporter, they take down --

21   they do a very good job taking down everything they can, but if

22   maybe they miss a word, they go back and check their notes or

23   relisten to the ...

24   A.   Right.

25   Q.   Okay.  Now, the first phone call, phone call 1A, between

US v Vinod Patel #11-CR-20468-36

1   Bob and the unknown male, do you remember that phone call?

2   A.  Can I --

3   Q.  Yeah, you can take a look at it.

4   A.  If I remember, back in January this call --

5   Q.  No, no.  I mean do you remember talking about it with

6   Mr. Pratt.

7   A.  Yes.  Okay.

8   Q.  And you said unknown male.  That's not Vinod Patel, to your

9   knowledge?

10  A.  It could be; it might not be.  I'm not sure.

11  Q.  Okay.  And if you look on the fourth line down, Bob says:

12  "Krishna had called.  He's asking for cash with me, currently I

13  get three, 4,000 in cash, right?"

14              Who is Krishna?

15  A.  I'm not sure.

16  Q.  Did you take any steps to identify who Krishna is?

17  A.  Not to my knowledge.

18  Q.  Okay.  In your knowledge, as lead case agent, there's no

19  Krishna that came up throughout your investigation?

20  A.  I do recall the name, but I don't know if it's from the

21  T-III calls or from interviews.

22  Q.  Okay.  Is it safe to say you don't know what Krishna does

23  for a living?

24  A.  I'm not sure.

25  Q.  You don't know if Krishna is a pharmacist or a bookie or

1    you don't know what he does?

2    A.   Correct.

3    Q.   Okay.  And then further down in the call, the last line on

4    page one, Bob says:  "I had ten with me.  And today I had to

5    give to Hakim and all.  And so I had to take it along with me."

6                Who is Hakim in this phone call?

7    A.   I can't say who is Hakim.

8    Q.   Is there a Defendant named Hakim in this case?

9    A.   No.

10   Q.   Okay.  And you were never able to identify who Hakim was in

11   this phone call?

12   A.   I don't -- I don't -- my recollection, I don't know who he

13   is.

14   Q.   Okay.

15           Is it safe to say if you don't know who he is, you

16   don't know what he does?

17   A.   Like I said, I don't know every single person in this

18   investigation.

19   Q.   Okay.  Is it safe to say that this phone call is not about

20   Vinod Patel?

21   A.   You would have to give me a second to go over it again.

22   Q.   Sure.

23           *(Brief pause.)*

24   A.   I would agree with that.

25   Q.   Okay.  And if you'll look on page two -- it's about half

1   way down -- Bob says:  "With me, I have to take it all out in

2   cash."

3           What is he referring to there?

4   A.  Money.

5   Q.  He's referring to money, right?

6           Did you ever find the cash that he's talking about

7   here?

8   A.  In that particular phone call?

9   Q.  Yeah.

10  A.  We seized a lot of money at the end.  So, I don't know if

11  we got that particular cash or not.

12          MR. BLACK:  Okay.  Can I have one moment, Your Honor?

13          THE COURT:  Sure.

14  BY MR. BLACK:

15  Q.  As part of your investigation, you -- you got a bunch of --

16  you got several subpoenas for bank records.  Is that right?

17  A.  I personally did not.

18  Q.  Well, the task force; is that right?

19  A.  People working the investigation did, yes.

20  Q.  Okay.  And I think there were, is it safe to say, a hundred

21  forty or so bank accounts that were seized?

22  A.  I didn't deal with the banking side of it, but I believe

23  you are about right.

24  Q.  Somewhere around there, 125, 150 ballpark.

25          And if you look on page two, shortly after where the

1    part I just had you read, the unknown male says:  "I will let

2    you know if perhaps from Bank of America."

3            And then Bob says:  "Maybe I can withdraw five or

4    seven from my account, from all three, from Bank of America,

5    Chase, probably five odd, five can be withdrawn.  That's it."

6            He's talking about money there, right?

7    A.  Correct.

8    Q.  He's talking about withdrawing cash from his bank account

9    to cover presumably a payment to somebody.  Right?

10   A.  He says "Maybe I can withdraw," correct.

11   Q.  Because earlier in the call he says we don't use checks

12   because that leaves a paper trail?

13   A.  Correct.

14   Q.  So, he says we need to use cash, right?

15   A.  Correct.

16   Q.  And the unknown male, he doesn't have enough cash to cover

17   the payments that need to be made.  Right?

18   A.  From the calls, he said, yes.

19   Q.  So, he and Bob discussed withdrawing as much money as they

20   can from all of their bank accounts in order to have enough

21   cash, right?

22   A.  "Maybe I can withdraw," yes.

23   Q.  Okay.  So, as part of your search warrants you seized Bob's

24   bank accounts.  Right?

25   A.  Yes.

1  Q.  Bank accounts from Bank of America?

2  A.  I'm not sure what banks were seized from.

3  Q.  All right.  So, you can't say whether Chase was one of them

4  either?

5  A.  I wasn't involved in the financial part of this.

6  Q.  Okay.  So, to your knowledge, there's no record of $5,000

7  being withdrawn from Bob's Bank of America account, right?

8  A.  From personal knowledge?

9  Q.  Yeah.

10  A.  I have no idea if there was or not.

11  Q.  I mean, to your personal knowledge, Chase -- you don't know

12  if $5,000 --

13          THE COURT:  That's the fourth time for that question.

14  BY MR. BLACK:

15  Q.  And in that call they are talking about paying doctors,

16  right, 15,000 to $20,000 to doctors?

17  A.  Can you direct me to where that is in here?

18  Q.  Well, you testified on direct that that's what they are

19  talking about.  They are talking about paying doctors?

20  A.  Correct.

21  Q.  You don't know which doctors they are talking about paying,

22  do you?

23  A.  No.

24  Q.  They never say?

25  A.  I don't believe they do.

1   Q.  Okay.  Moving on to the next phone call we talked about,

2   that was phone call 1B.

3           And this is between Bob Patel and a man named

4   Miteshkumar Patel, right?

5   A.  Correct.

6   Q.  And you said that's not the Mitesh Patel that was indicted

7   in this case?

8   A.  Correct.

9   Q.  The Mitesh Patel that was indicted in this case, he's a

10  pharmacist.  Right?

11  A.  Correct.

12  Q.  This Mitesh Patel, what does he do for a living?

13  A.  I've never met him.  So, I don't know.

14  Q.  Did you learn -- did you come to know who he was throughout

15  this investigation?

16  A.  I don't recall.

17  Q.  Okay.  Is it safe to say he's the only other Mitesh Patel

18  in this investigation?

19  A.  I believe there were two Miteshs.  I believe there were

20  two.

21  Q.  The one that was indicted and the one on this phone call?

22  A.  I believe so.

23  Q.  Okay.  Now, in this conversation he and Bob are talking

24  about getting doctors to write prescriptions.  Right?

25  A.  Correct.

1   Q.  Do you know which doctors they're talking about getting

2   prescriptions for?

3   A.  May I have a moment to review this?

4         I don't believe I can identify the doctor.

5   Q.  Okay.  Is it safe to say, though, that Vinod Patel is not a

6   doctor, right?

7   A.  Correct.

8   Q.  He doesn't have the -- he's not a pharmacist either, right?

9   A.  I don't believe he is.

10  Q.  Right.

11        And he doesn't have the ability to write

12  prescriptions, does he?

13  A.  Correct.

14  Q.  Okay.  In this call -- let me find where it was.  Page

15  four, around the middle.  Mr. Pratt -- in the phone call they

16  talk about he "had written Oxy, Lotrel (sic), Vicodin, written

17  them for Xanax," is what the call says, right?

18  A.  Correct.

19  Q.  And you talked a little bit with Mr. Pratt about that.  And

20  he took you through Oxy.

21        That's Oxycontin, right?

22  A.  Right.

23  Q.  And Lotrel, Vicodin, Xanax, those are all controlled

24  substances, right?

25  A.  I believe "Lotrel" may be Lortab.  But yes.

1    Q.   Okay.  Those are controlled substances, right?

2    A.   Correct.

3    Q.   They are not Schedule I controlled substances, right?

4    A.   Correct.

5    Q.   They have medical value to them, right?

6    A.   Correct.

7    Q.   They are something a doctor would write a prescription for

8    because they have medical value?

9    A.   (No response.)

10   Q.   Just in general, they have medical value?

11   A.   Correct.  But this case has a different angle on it.

12   Q.   Drugs don't have medical -- strike that.

13           We talked a moment ago about the cash withdrawals in

14   Bob's bank accounts.

15           And you weren't involved with the financial aspect,

16   so you don't know one way or another whether those particular

17   withdrawals were made from Bob's bank accounts; is that right?

18   A.   Correct.

19   Q.   Is it safe to say that if cash was withdrawn from a bank

20   account, any bank account, it would show up on bank statements?

21   A.   Correct.

22   Q.   That would be part of the information that you would

23   receive from a bank?

24   A.   Correct.

25   Q.   Okay.  Moving on to the next call, Exhibit 1C, that's the

1    call between Bob and Manoj.

2              You never learned Manoj's last name?

3    A.  To my knowledge, I don't know who he is.

4    Q.  Okay.  You don't know what Manoj does for a living?

5    A.  No.

6    Q.  Okay.  In that call they talk about Brijesh Rawal, right?

7    A.  Correct.

8    Q.  And he's a pharmacist?

9    A.  Correct.

10   Q.  They talk about Mitesh.  Now, is that right they're talking

11   about Mitesh?  That's page two?

12   A.  Correct.

13   Q.  Okay.  Is that Mitesh, is that the Mitesh in this

14   indictment or is that the other Mitesh?

15   A.  I believe it's the one in the indictment, but I'm not for

16   certain.

17   Q.  What leads you to believe it's the one in the indictment as

18   opposed to the other one?

19   A.  The other one, I don't know what -- as I said, I'm not for

20   certain.  The other one, I'm not sure what that person does for

21   a living.

22              This one, by the way the call is described,

23   prescriptions, I take it he's a pharmacist.

24   Q.  Mitesh is a pharmacist?

25   A.  Yes.

1    Q.  And it also talks about Hiren in that same section, right?

2    A.  Hiren.

3    Q.  And he's also a pharmacist, right?

4    A.  Correct.

5    Q.  They don't talk about Manoj in that call, do they?

6    A.  I would have to review it again.

7         I don't believe they do.

8    Q.  Vinod is not a pharmacist?

9    A.  Correct.

10   Q.  In fact, this call is strictly about pharmacies, right?

11   A.  Correct.  Training.

12   Q.  On page two Bob says:  "This is a lot.  In a pharmacy, in a

13   private pharmacy you have to learn a lot."

14         He's talking about teaching Manoj the ways of running

15   a pharmacy, the way he runs a pharmacy.  Right?

16   A.  I was not part of the phone call, I don't know what was in

17   their heads, but I believe you're correct.

18   Q.  That's the way you understand it, from your experience in

19   this case?

20   A.  Correct.

21   Q.  Okay.  Now, the next call that was talked about was

22   Government Exhibit 1F, right?

23   A.  I believe so.

24   Q.  And that was a call they played for you.  It was a call

25   between Sanyani Edwards and Bob Patel.  Right?

1    A.   And Dinesh.

2    Q.   And Dinesh Patel?

3    A.   Right.

4    Q.   Dinesh called from Bob's phone; is that what happened?

5    A.   Yes.

6    Q.   Okay.  And Dinesh and Sanyani Edwards got into a discussion

7    about pharmacies, right?

8    A.   They got into a discussion about multiple things, but

9    pharmacies, patients, clients.

10   Q.   Dr. Greenbain?

11   A.   Doctors, it's kind of wide range.

12   Q.   Bob's home care, that comes up in there.  Right?

13   A.   Correct.

14   Q.   Okay.  In fact, Sanyani says:  "I told him.  I told him Bob

15   has home care."

16            And Dinesh says:  "Yeah, Bob has a home care."

17   A.   Can you tell me where you're reading --

18   Q.   I'm sorry.  Page five.

19   A.   Where on the page are you reading that?

20   Q.   It's near on the top.  It's the third line down.

21            Sanyani says:  "I told him this.  I told him Bob has

22   a home care.

23            And Dinesh says:  "Bob has a home care."

24            Do you see that?

25   A.   Yes.

1    Q.  Bob did have a home care, right?

2    A.  Correct.

3    Q.  You said on direct that it was First Michigan Home Health

4    Care?

5    A.  Correct.

6    Q.  You don't know that he's talking about First Michigan Home

7    Health Care there, though, do you?

8    A.  Correct.

9    Q.  Bob had more than one home health care at that time?

10   A.  Correct.

11   Q.  He might have been talking about Anrex?

12   A.  Bob didn't own Anrex, but he used Anrex.

13   Q.  Bob was involved in Anrex, right?

14   A.  Right.

15   Q.  He could have been talking about Anrex?

16   A.  Yes.

17   Q.  Bob didn't own First Michigan, right?

18   A.  From my understanding, he owned part of it.

19   Q.  Now, moving on to the next call, call 1G, that's again

20   between Bob and Sanyani Edwards.  Right?

21   A.  Yes.

22   Q.  And they speak about Dr. Greenbain?

23   A.  Yes.

24   Q.  They talk about paying Dr. Greenbain?

25   A.  They talk about Bob making more money when Greenbain is not

US v Vinod Patel #11-CR-20468-36

1    around.

2    Q.  Okay.  They are not talking about Vinod during this call,

3    right?

4    A.  Give me a second to skim it.

5           Correct.

6    Q.  And they're not talking about First Michigan Home Health

7    Care in this call, are they?

8    A.  I don't believe they are.

9    Q.  And, again, on the next call, Government Exhibit 1H, again,

10   it's between Sanyani and Bob.  Is that right?

11   A.  Correct.

12   Q.  And, again, they are talking about Dr. Greenbain?

13   A.  Right.

14   Q.  They are not talking about Vinod?

15   A.  To my knowledge, yes.

16   Q.  They are not talking about First Michigan Home Health Care?

17   A.  I don't believe they are.

18   Q.  And Vinod's not a party to this call?

19   A.  Meaning a participant?

20   Q.  He's not in this call, is he?

21   A.  He --

22   Q.  Bob and Sanyani?

23   A.  Correct.

24   Q.  Nobody else?

25   A.  Correct.

1   Q.  I've got two more phone calls.  These are phone calls

2   between Vinod and Bob, right, Government Exhibit 2C and

3   Government Exhibit 2E.

4         These are two of the less than a tenth of a percent

5   of phone calls between Vinod and Bob the entire time you were

6   up on Bob's phone.  Right?

7   A.  You said C and E?

8   Q.  Correct, C and 2E, yeah.

9   A.  I guess I don't know the exact number of Vinod's calls,

10  but I'll take your word for it.

11  Q.  It sounds about right?

12  A.  Yes.

13  Q.  Okay.  So, on 2C, on page two, five lines down or five

14  stanzas down, Vinod Patel says:  "He says that these are mine.

15  I said since when are they yours, until now they were ours."

16         Do you see that?

17  A.  Yes.

18  Q.  And on direct Mr. Pratt asked you to interpret that.  Do

19  you remember that?

20  A.  Yes.

21  Q.  And you said he's talking about patients there?

22  A.  I believe so.

23  Q.  Where in this -- where in that sentence, where in the

24  sentences beforehand, where is it that Vinod says that he's

25  talking about patients there?

1   A.   I'm basing that off of the entirety of the case.

2   Q.   Off the fact that there were patients involved in the case?

3   A.   They would trade -- or, patients would be used around in

4   the investigation.

5   Q.   Down at the bottom of the page, the second-to-the-last

6   stanza, Vinod says:   "Then to her, to her.   I'll give the whole

7   list to her and you tell her see everyone, (unintelligible) and

8   get rid of all this."

9            Do you see that part?

10  A.   Yes.

11  Q.   That's what Vinod said, right?

12  A.   Correct.

13  Q.   He's talking about Dr. Tran there, right? -- or I'm sorry.

14  Not Dr. Tran.

15           He's talking about a doctor though, right?

16  A.   Correct.

17  Q.   He's telling Bob, tell that doctor to see everybody?

18  A.   I believe so.

19  Q.   Okay.   On the next page, page three, about the seventh

20  stanza down, Vinod says:   "That's no problem.   Tell her you

21  will work with them, with the Muslim guy, it should not

22  happen."

23           Who is the Muslim guy they are speaking of?

24  A.   I can't say for certain.

25  Q.   You don't know if he's a doctor?

1    A.  No.

2    Q.  You don't no if he's part of Bob's organization?

3    A.  I have no idea who that is.

4    Q.  Okay.  Can you point out for me in that telephone call

5    where Bob and Vinod discuss money?

6    A.  The actual term "cash" or "money"?

7    Q.  Or a slang term for money.

8    A.  I don't see one.

9    Q.  It's not in there, is it?

10   A.  No.

11   Q.  They don't talk about money?

12   A.  I don't believe so.  I guess that wasn't part of the phone

13   call.

14   Q.  You read the transcript though?

15   A.  Right.

16   Q.  Okay.  Part of your job as an investigator is to interpret

17   what the phone calls mean?

18   A.  To the best of my ability.

19   Q.  Right.

20          You gain some knowledge through listening to the

21   phone calls and talking to the players and probably your

22   confidential informants and cooperating witnesses, you learn

23   what certain terms mean?

24   A.  Yes.

25   Q.  You come to know what they're talking about even if they

1    are not explicitly saying it?

2    A.  Not at all times, but we try to.

3    Q.  Generally though?

4    A.  Yes.

5    Q.  Okay.  Moving on then finally to call 2E, again, that's

6    between Bob and Vinod.  Right?

7    A.  Correct.

8    Q.  On the fourth line down -- well, on the second line down

9    Vinod says:  "So that white person's fellow who comes, that

10   black who comes, how is your relationship with him?"

11          Who is the white person he's talking about?

12   A.  Later on he says, "you know, that Greenbain who comes."

13          By that statement, Mark Greenbain.

14   Q.  Is Greenbain a white guy or black guy?

15   A.  White guy.

16   Q.  Okay.  Who is the black guy he's talking about?

17   A.  Later down on the bottom of the page he says with "Edward."

18   Q.  And it's your understanding that "Edward" is Sanyani

19   Edwards?

20   A.  Correct.

21   Q.  Okay.  Now, on page two, three lines up or three stanzas

22   up, about halfway through that Vinod says:  "He...he and

23   Atulya, these two people have...that is this black person

24   together, both of them on Sunday, uhh, they take some of them

25   over there and then there's some company owned by a white

1    person by the name of Reliable, they give patients to him."

2          Atulya, do you know who Atulya is?

3    A.  Later on in the call they reference Atulya being a male.  I

4    believe that to be Atul.

5    Q.  Atul Patel?

6    A.  I believe so.

7    Q.  And he's -- he's on the witness list in this case; is that

8    right?

9    A.  Correct.

10   Q.  Okay.  And he was part of -- he was indicted in this case,

11   right?

12   A.  Correct.

13   Q.  He's one of your cooperating witnesses?

14   A.  Correct.

15   Q.  So, you got a chance to sit down with Atul?

16   A.  Yes.

17   Q.  And talk to him?

18   A.  Correct.

19   Q.  Get his side of the story?

20   A.  I didn't do all of the interviews with him, but yes, I have

21   done some.

22   Q.  Well, is it your understanding through your investigation

23   that Atul had First Michigan Home Health Care by 2010?

24   A.  Yes, I believe so.

25   Q.  Okay.  And this phone call is July 14th, 2011, right?

1    A.   Correct.

2    Q.   And so when this call happens, Atul has cut ties with First

3    Michigan Home Health Care.   Isn't that right?

4    A.   Yes, I believe so.

5            MR. BLACK:   Your Honor, can I have just a moment?

6            THE COURT:   Sure.

7    BY MR. BLACK:

8    Q.   One last thing, Task Force Officer Carmack.

9            We talked at length at the beginning of this about

10   all the various investigation techniques you employed

11   throughout this investigation.   Right?

12   A.   Correct.

13   Q.   Okay.   Wiretaps, first of all.   We just talked a bunch

14   about wiretaps.

15           Did you ever tap any of Vinod Patel's telephones?

16   A.   No.

17   Q.   Okay.   We talked about surveillance where you might follow

18   around or watch different members of this case, right?

19   A.   Right.

20   Q.   Did you perform surveillance on Vinod Patel?

21   A.   Personally myself, no.   If others did an investigation, I

22   can't recall.

23   Q.   Trash pulls.   Did you ever pull trash from Vinod Patel?

24   A.   Personally, no.

25   Q.   Or from First Michigan Home Health Care?

US v Vinod Patel #11-CR-20468-36

1    A.  No.

2    Q.  And to your knowledge, neither did anyone else in this

3    case.  Right?

4    A.  I can't recall if he -- I don't know if they did or not,

5    but I don't believe so.

6    Q.  Is it safe to say there would be a report about it if they

7    had?

8    A.  Yes.

9    Q.  Okay.  GPS trackers.  You talked about placing GPS trackers

10   on people's cars or their phones.

11           You didn't place a GPS tracker on Vinod Patel's car,

12   did you?

13   A.  No.

14   Q.  Nor his cell phone?

15   A.  Correct.

16   Q.  Okay.  Cell phone pinging.

17           You didn't ping Vinod's cell phone, to your

18   knowledge, did you?

19   A.  No.

20   Q.  Okay.  Search warrants.

21           You never searched Vinod Patel's house, did you?

22   A.  No.

23   Q.  In fact, you never even searched First Michigan Home Health

24   Care, did you?

25   A.  Correct.

1   Q.  You posed as an undercover officer, and other agents in the

2   investigation also did.  Is that right?

3   A.  Correct.

4   Q.  You talked about that.

5   A.  Correct.

6   Q.  You never posed as an undercover officer and went into

7   First Michigan Home Health Care, did you?

8   A.  I don't believe patients were seen at First Michigan.

9   That's why they are home health care; they come to your home.

10  Q.  Okay.  Well, you never posed as a patient in your home and

11  had someone from First Michigan come to you, did you?

12  A.  Correct.

13  Q.  Nor did anybody else in the investigation?

14  A.  Correct.

15          MR. BLACK:  All right.  I think that's it.  Thank

16  you.

17          THE COURT:  Redirect?

18          MR. PRATT:  No, Your Honor.  Thank you.

19          THE COURT:  Any questions from the jurors?

20          You may step down.

21  A.  Thank you.

22          THE COURT:  You mall call your next witness.

23          MR. NEAL:  Your Honor, our next witness is going to

24  stretch well beyond the one o'clock deadline for today.

25          There are actually a couple of matters that I would

US v Vinod Patel #11-CR-20468-36

1    like to take up with the Court outside the presence of the

2    jury.

3              Would perhaps now be a good time to break for the

4    day?

5              THE COURT:  Any objections from the jurors?

6              You still get your same paycheck.

7              All right.  It's Friday afternoon.  Enjoy yourself

8    and enjoy your weekend.

9              Just to be clear, don't come in tomorrow or Sunday.

10   And don't talk about this with anybody.  Don't do any

11   independent research.  And we'll see you Monday morning at 8

12   o'clock and go from there.

13             All rise for the jury.

14             *(Jury leaves the courtroom at 12:29 p.m. )*

15             THE COURT:  What do you want to put on the record?

16             MR. NEAL:  Your Honor, at this time, the United

17   States would move to have Defendant Vinod Patel's bond revoked

18   on the basis of witness intimidation, and we are prepared to

19   present testimony to that effect.

20             THE COURT:  When did this allegedly happen?

21             MR. NEAL:  The last incident was two days ago.  We

22   interviewed the relevant party last night.

23             THE COURT:  What's the position of the Defendant?

24             MR. BEUKE:  Judge, I'm just hearing this for the

25   first time.  I ...

1          THE COURT:  Well, I think you are entitled to a

2    hearing.

3          MR. NEAL:  We have a witness.  We are prepared to

4    offer live testimony, as well as a proffer of some additional

5    facts.

6          THE COURT:  Why don't you do the proffer first, and

7    then maybe the Defense will stipulate.

8          MR. NEAL:  Very well.

9          Your Honor, the next witness is an individual by the

10   name of Atul Patel, and his cousin owns a liquor store in

11   Canton, Michigan, which Vinod Patel frequently -- well, he

12   frequents.  He's a customer there regularly.

13         Back on July the 2nd of 2014, Vinod Patel came into

14   the liquor store, was sweating, very upset.  He instructed

15   Paresh Patel, who is Atul's cousin, the owner of the liquor

16   store, he instructed Paresh Patel to tell Atul Patel not to

17   mess with him.  And Paresh Patel asked Vinod Patel if Vinod

18   Patel -- why don't you just talk to Atul, call Atul.  And Vinod

19   said no, I can't do that.  I'm not allowed to.  But you tell

20   him not to mess with me.

21         On July the 7th, 2014, Vinod Patel returned to the

22   business.  And Vinod Patel at that time told Paresh, he said if

23   Atul testifies against me and doesn't testify the way I want

24   him to testify, that I'm going to drag you into this, you

25   Paresh, I'm going to drag you into court.

1           The reason for that is, as the Government knew,

2   during Atul Patel's time of employment with First Michigan, he

3   was on a student visa and was not eligible to receive checks in

4   his name.  So, checks from First Michigan went through Paresh

5   Patel.

6           And Vinod Patel was essentially threatening Paresh

7   Patel, saying I will drag you into this and get you in trouble

8   if Atul testifies for the Government.

9           MR. BEUKE:  Judge, I don't mean to interrupt, but can

10  I just -- can we go through that one more time?

11          The Government was aware of -- I don't think I caught

12  that part.

13          MR. NEAL:  Sure.

14          So, with respect to Atul Patel's reimbursement for

15  his services from First Michigan, the checks were actually

16  written to his cousin Paresh Patel.  And that's how Atul Patel

17  was paid.

18          Two days ago on, July the 9th of 2014, Vinod Patel

19  and his wife entered the liquor store, and they handed Paresh

20  Patel a document.  It's actually a report of interview from

21  this case.  And a certain portion of that report of interview

22  was highlighted.  And they told Paresh Patel give this to Atul

23  Patel and tell him to tell the truth.

24          The DEA-6 report that was given to Paresh Patel was a

25  DEA-6 report of an interview with Pradeep Pandya, who is

1    another witness in this case.  And the highlighted portion of

2    that report reads as follows:

3              "Pandya called Vinod Patel to tell him that

4              he would not fill Pradeep's prescriptions because

5              he was worried about losing his license and his

6              job.  Vinod Patel told Pandya not to worry about

7              Pradeep's prescriptions because Pradeep is 'our

8              doctor' and is a good doctor.  Pandya then told

9              Vinod Patel he wanted to see Pradeep's operation

10             in Flint.  This got Vinod Patel mad.  Vinod Patel

11             then asked Pandya if he visited all of the

12             offices of the doctors who had written

13             prescriptions that he filled.  Vinod Patel

14             threatened Pandya, telling Pandya that he would

15             physically beat him and that he would fire

16             Pandya.  Vinod Patel also remind Pandya that he

17             was connected to influential people back in India

18             and that Pandya's extended family in India could

19             be harassed."

20             There's additional verbiage in the paragraph --

21             THE COURT:  No, just stop now.

22             We are going to take a five-minute break so that you

23    can consult with your client and take a position on whether or

24    not you want the witnesses to come in or not, but ...

25             It's 25 to.  If you need more than five minutes, let

1        us know, but I think you can talk about it in five minutes.

2                  We're in recess.

3                  *(Recess held from 12:35 p.m. until 12:47 p.m.)*

4                  CASE MANAGER LANG:  Please rise.

5                  This court is again in session.  You may be seated.

6                  THE COURT:  How do you want to proceed, counsel?

7                  MR. BEUKE:  Judge, I can orally proffer to you what

8        I've learned in my conversation with my client in the last

9        couple minutes.

10                 THE COURT:  Well, I don't need to know your

11       conversation.  I need to know how you want to proceed.

12                 Do you want him to call the witnesses or not?

13                 MR. BEUKE:  Uhm ...

14                 THE COURT:  Because based on the proffer, if you have

15       no objection, then I am inclined to grant the motion.  But if

16       you challenge the basis of the proffer, then you are entitled

17       to have the witnesses called.

18                 MR. BEUKE:  Well, Judge, I think we need to call the

19       witnesses then.

20                 I made a suggestion to Mr. Neal, some sort of a

21       middle ground.  I don't know if there's any way that that would

22       meet --

23                 THE COURT:  Well, if he agrees to it, then -- if he

24       doesn't, then I don't need to know what it was.

25                 MR. BEUKE:  Okay.

1          THE COURT:  You can make that suggestion to me ...

2          MR. BEUKE:  All right.  Judge, we would ask that we

3    start the hearing.

4          THE COURT:  All right.

5          MR. NEAL:  Your Honor, the United States calls Paresh

6    Patel.

7          THE COURT:  Raise your right hand, please.

8      PARESH K. PATEL, GOVERNMENT'S WITNESS, SWORN.

9          THE COURT:  Please be seated.  Adjust the microphone.

10   And you may proceed.

11                        DIRECT-EXAMINATION

12   BY MR. NEAL:

13   Q.  Mr. Patel, could you state and spell your name for the

14   record?

15   A.  PA-R-E-S-H, Paresh K. Patel.

16   Q.  Mr. Patel, where do you work?

17   A.  I am self-employed.  I own a liquor store.

18   Q.  Where is that liquor store located?

19   A.  Canton.

20   Q.  Do you have a cousin by the name of Atul Patel?

21   A.  Yes, sir.

22   Q.  Do you have a customer by the name of Vinod Patel?

23   A.  Yes, sir.

24   Q.  Approximately how long has Vinod Patel been a customer of

25   yours?

1    A.   Almost for four years.

2    Q.   Did Vinod Patel visit you two days ago on July the 9th,

3    2011?

4    A.   Yes, sir.

5    Q.   And was he accompanied by anyone?

6    A.   With his wife.

7    Q.   And on that occasion what happened when Vinod Patel and his

8    wife entered the liquor store?

9    A.   Just came in, give me a couple papers, say give to your

10   cousin.

11   Q.   All right.  And did he say anything else?

12   A.   Just said, tell the truth, tell the truth, to tell the

13   truth.

14   Q.   All right.  Did you look at those papers at that time?

15   A.   No, sir.

16   Q.   Did you give those papers to your cousin?

17   A.   Yeah.

18   Q.   All right.  After you gave them to your cousin, did you

19   have occasion to look at those papers?

20   A.   After that, he gave them to me.

21   Q.   Okay.  He gave them to you and you saw what was on those

22   papers?

23   A.   Yes.

24   Q.   Okay.  I'm going to show you what we can mark as Government

25   Exhibit 1.  And if you can take a look at that and in

1    particular take a look at this paragraph here.

2              THE COURT:  Have you provided a copy to ...

3              MR. NEAL:  No, I have not.  I have only one copy,

4    although they should have a copy of it in discovery.

5              THE COURT:  Okay.

6    BY MR. NEAL:

7    Q.  Just let me know when you've had a chance to look it over.

8    A.  Yes, that's the one.

9    Q.  All right.  Let me take this back from you and ask you.

10   Was the paragraph that I just showed you what was highlighted

11   in the papers?

12   A.  Some of them were highlighted, sir, yeah.

13             MR. BEUKE:  I'm sorry, Your Honor, I didn't hear the

14   answer.

15   BY MR. NEAL:

16   Q.  I'm sorry.  Did you say some of them were highlighted?

17   A.  Some of them were highlighted, yes.

18   Q.  Was part of the highlighted portion of the report you

19   received the portion containing this language:

20             "Vinod Patel threatened Pandya, telling

21             Pandya that he would physically beat him and that

22             he would fire Pandya.  Vinod Patel also reminded

23             Pandya that he was connected to influential

24             people back in India and that Pandya's extended

25             family in India could be harassed."

US v Vinod Patel #11-CR-20468-36

1          Was that part of the highlighted portion?

2     A.   I'm not sure, sir, right now, but some of them were

3     highlighted, the top one and the middle one too.

4     Q.   Do you recall that language being in the paper?

5     A.   Yes.

6          MR. BEUKE:   Judge, I ask if I could just see

7     counsel's document?

8          MR. NEAL:   One moment, Your Honor.

9          *(Off the record.)*

10    BY MR. NEAL:

11    Q.   Mr. Patel, I'm going to show you another document that

12    we're going to mark as Government Exhibit 2.

13          I know the copying is a little bit worse, but is that

14    a representation of the actual document that you were given to

15    pass on to your cousin?

16    A.   Yes, sir.

17    Q.   Okay.  And if you'll notice, there's a highlighted portion

18    there that says:

19          "Vinod Patel also reminded Pandya that he

20          was connected to influential people back in India

21          and that Pandya's extended family in India could

22          be harassed."?

23    A.   Yes, that's the copy.

24    Q.   All right.  Was this the first time, two days ago, that

25    Vinod Patel visited you and talked with you about your cousin?

1    A.  Yeah.

2    Q.  I'm sorry.  The most recent time, July 9th, was that the

3    only time you ever talked about your cousin, Atul Patel, with

4    Vinod Patel?

5    A.  Before he talked to me about it.

6    Q.  All right.  Was one of those occasions before on

7    approximately July 7th of 2014?

8    A.  Yeah.

9    Q.  Okay.  And on that occasion, Vinod Patel came to your

10   liquor store.  Is that right?

11   A.  Yeah.

12   Q.  And he told you on that occasion --

13            MR. BEUKE:  Your Honor, I'm going to object to the

14   leading.

15   BY MR. NEAL:

16   Q.  All right.  What did he tell you on that occasion, the

17   visit before this most recent one?

18   A.  Just tell your cousin don't mess with me.

19   Q.  All right.  Did he say anything about you, Paresh Patel?

20   A.  He told me if you -- tell your cousin if he don't, uhm, uhm

21   -- tell the truth right now.  He told me tell the truth.  If he

22   don't tell the truth, I will take you to the court.

23   Q.  When you say I will take you to the court, how did you

24   interpret that?  What did he mean?

25   A.  He told me, tell your cousin to tell the truth.

1   Q.   Okay.

2   A.   If you don't tell the truth, I will take you to the court.

3   Q.   "I will take you," meaning Paresh Patel?

4   A.   Take me to the court, yeah.

5   Q.   All right.  And prior to July 7th of 2014, did he visit you

6   earlier in the month of July and discuss Atul Patel with you?

7   A.   Yeah.

8   Q.   All right.  And what did he say on that occasion on

9   approximately July 2nd of 2014?

10  A.   Just he wants to -- I told him why are you talking to me?

11  Just talk with Atul Patel and -- I don't know anything about

12  you, you know.

13  Q.   Mm-hmm.

14          Let me ask you this.  Prior to any of these recent

15  visits about Atul Patel, did Vinod Patel come into your liquor

16  store?

17  A.   Yeah.

18  Q.   All right.  Did Vinod Patel come into your liquor store

19  during the year of 2011?

20  A.   Yeah.

21          MR. BEUKE:  Judge, I'm going to object.  How is this

22  relevant to what we're doing today?

23          MR. NEAL:  Your Honor, if you will allow a couple

24  more questions, I'll get to it.

25          THE COURT:  Just a couple.

1              MR. NEAL:  All right.

2    BY MR. NEAL:

3    Q.  Did you ever discuss an individual by the name of Ramesh

4    Patel with Vinod Patel?

5    A.  Yeah.

6    Q.  All right.  Who is Ramesh Patel?

7    A.  I'm not sure.  There are so many Ramesh Patels that are my

8    friends.  You know, they have a liquor store, one of them.  One

9    of them is -- I used to work with them, yeah.

10   Q.  On any occasion did Vinod Patel talk to you about Ramesh

11   Patel?

12   A.  Yeah, one time he talked to me about it.

13   Q.  What did he say?

14              MR. BEUKE:  Judge --

15              THE COURT:  When are we talking about?  And if this

16   is part of a threat, it should have been brought to the

17   attention a long time ago, if it's from 2011.

18   BY MR. NEAL:

19   Q.  Approximately when did he talk to you about Ramesh Patel?

20   A.  Around 2011, yeah.

21   Q.  And what did he say?

22   A.  He said Ramesh Patel -- like if you do something wrong or

23   Ramesh Patel do something wrong, I will see you in India.

24              MR. NEAL:  I have no further questions of this

25   witness.

```
 1              THE COURT:  Cross-examination?

 2                      CROSS-EXAMINATION

 3   BY MR. BEUKE:

 4   Q.  Mr. Patel, you -- you're married, correct?

 5   A.  Yes, sir.

 6   Q.  You have a liquor store that you've owned for a number of

 7   years, fair to say?

 8   A.  From 2006.

 9   Q.  Okay.  And since 2006, Mr. Vinod Patel has been a customer

10   of yours.  Is that correct?

11   A.  At the liquor store, sir.

12   Q.  Okay.  And he comes into the liquor store on a regular

13   basis, doesn't he?

14   A.  A couple times.  Sometimes, you know, yeah.

15   Q.  And over these almost what, eight years now, you have

16   become friends with Mr. Patel?

17   A.  Yes.

18   Q.  Is that fair to say?

19   A.  Yes.

20   Q.  Not only are you and Mr. Patel friends, but your wives are

21   also friend, aren't you?

22   A.  Yes.

23   Q.  And you've been over to his house a number of times?

24   A.  Yes.

25   Q.  Correct?
```

1    A.  Yes, sir.

2    Q.  And he has been over to your house a number of times?

3    A.  Yes, sir.

4    Q.  Even most recently within the last month.  You guys have

5    had dinners together.  Correct?

6    A.  Yeah.

7    Q.  Okay.  And that was both by your invitation to Vinod

8    Patel's family, correct?

9    A.  My wife.  Usually they -- all of my friends, they get

10   together, yeah.

11   Q.  And during all this time, Mr. Patel, you were aware in 2011

12   when his brother was indicted, correct?

13   A.  Yes, sir.

14   Q.  And you were aware of the fact that his brother went to

15   trial sometime in 2012, correct?

16   A.  Mm-hmm.

17   Q.  And during that time that you became -- or, you remained

18   friends with Mr. Patel, didn't you, Vinod Patel?

19   A.  Yeah.

20   Q.  And you would see him again on a daily basis almost?

21   A.  Yeah.

22   Q.  Okay.  And there were never any problems between you and

23   Mr. Patel during between 2011 until last week, fair to say?

24   A.  So far we okay, yeah.

25   Q.  Now, you said last week he came to see -- he came into your

1    liquor store, correct?

2    A.  Yeah.

3    Q.  And when he came into your liquor store, he asked about

4    Atul Patel; is that correct?

5    A.  Yes, sir.

6    Q.  Okay.  And when he asked about Atul Patel, what he told you

7    about -- he knew -- strike that.

8              Atul Patel is your cousin, correct?

9    A.  Yes.

10   Q.  And at some point, for almost a year now, you've known that

11   Atul Patel was going to be a witness against Vinod Patel,

12   correct?

13   A.  I was not sure, sir.

14   Q.  Okay.

15   A.  Because I don't know anything about the case.  I don't ask

16   anybody at all.

17   Q.  Fair enough.

18   A.  Yeah.

19   Q.  My question is, at some point did you learn that your

20   cousin was possibly going to be a witness against Vinod Patel?

21   A.  No, sir.

22   Q.  Okay.  So, when Mr. Patel came into your liquor store a

23   week ago or so, when he came in there, what he said to you was

24   to tell your cousin to tell the truth?

25   A.  Yes.

1    Q.  Correct?

2    A.  Yes, sir.

3    Q.  And you didn't know what the truth was, did you?

4    A.  No, sir.

5    Q.  You don't know anything about the case?

6    A.  No.  I don't know anything about it, no.

7    Q.  And he came into your liquor store a second time, I think

8    you said, on July 2nd.  Is that right?

9    A.  Around there, sir, yeah.

10   Q.  And when he came into the liquor store at that time, what

11   he told you again was to tell your cousin to tell the truth?

12   A.  Yes.

13   Q.  Correct?

14   A.  Yes, sir.

15   Q.  Now, on July 9th, Mr. Patel, that was a few days ago,

16   correct?

17   A.  Yeah.

18   Q.  Or yesterday, right?

19   A.  The day before yesterday, sir.

20   Q.  Okay.  Well, when he came into the door he came in with his

21   wife, correct?

22   A.  Yes, sir.

23   Q.  That's the young lady in the first row, correct?

24   A.  Yes, she comes to meet my wife, you know.  They are friends

25   always, you know.

1   Q.   And they are still friends?

2   A.   Oh, yeah.

3   Q.   And when he came in with his wife, you said he gave you

4   some papers?

5   A.   Yeah.

6   Q.   The papers that he asked you to give the papers to

7   somebody, correct?

8   A.   Yes.

9   Q.   And that was to your cousin?

10   A.   Yeah.

11   Q.   Now, your cousin, was he in the store?  He wasn't in the

12   store, was he?

13   A.   No.  No, no.

14   Q.   And after he gave you the papers, he didn't tell you to say

15   anything to your cousin, did he?

16   A.   He just told me to tell the truth.  So, I just told her --

17   Vinod Patel I don't know anything about it --

18   Q.   My question is when gave you the papers --

19   A.   Yeah.

20   Q.   -- he said tell your cousin to tell the truth, correct?

21   A.   Yes.

22   Q.   And when you gave the papers to your cousin, you didn't

23   read the papers, did you?

24   A.   No.  I didn't read it, and after that he gave to me.

25   Q.   My question is when he received the papers from you, you

1  didn't read the papers?

2  A.  No.

3  Q.  So, you didn't know anything about what was in the papers,

4  correct?

5  A.  No, sir.

6  Q.  He never threatened you, did he?

7  A.  No.

8  Q.  And you did what he asked you to do, and that was to give

9  the papers to your cousin, correct?

10  A.  Yes, sir.

11  Q.  And after you gave the papers to your cousin, did your

12  cousin -- where did you give the papers to your cousin?

13  A.  I just told him come to the store -- meet me at the store,

14  sir.

15  Q.  Because your store is a busy store?

16  A.  Yes.

17  Q.  When your cousin came to the store, did you hand him the

18  papers?

19  A.  Yes.

20  Q.  Did he leave the store?

21  A.  No.  He was with me on that time.

22  Q.  Did he stay with you the whole time?

23  A.  No.  Maybe a half an hour, yeah.

24  Q.  All right.  And then did he come back?

25  A.  No.  After that he left, sir.

1   Q.  Okay.  Did he give you the papers back?

2   A.  He showed me the papers and he took it.

3   Q.  And you don't know what -- how many papers were there?

4   A.  There were two papers.

5   Q.  Okay.  And after he gave you the papers --

6   A.  Yeah.

7   Q.   -- did you read the papers?

8   A.  Yes.

9   Q.  Okay.  And after he gave you the papers, what happened to

10  the papers?

11  A.  I give them to him back.

12  Q.  Okay.  And do you know --

13  A.  I don't know anything about Ramesh Patel or anything -- you

14  know.

15  Q.  You don't even know who that guy is, do you?

16  A.  No, sir.  I haven't met anybody, no.

17  Q.  Do you know where the papers are today?

18  A.  With him.

19  Q.  With Atul?

20  A.  Yeah.

21       *(Off the record.)*

22  BY MR. BEUKE:

23  Q.  Well, let me ask you this.  Mr. Patel, when you got the

24  papers from your cousin Atul --

25  A.  Yeah.

1    Q.   -- you said there was -- when you looked at the papers,

2    there was highlighted portions?

3    A.   Yes.

4    Q.   You know what a highlighter is, right, with like a yellow

5    or pink color --

6    A.   No.  It was in pencils.

7    Q.   Pencils?

8    A.   Yeah.

9    Q.   Okay.  And Mr. Neal showed you I think Government's No. 2.

10             Are these the papers that ...

11   A.   Yes, sir.

12   Q.   Now, on both -- Mr. Neal referred to one particular

13   section, but both of these pieces of paper, there's highlighted

14   portions on both pages, correct?

15   A.   Yes, sir.

16   Q.   There's all different paragraphs that are highlighted,

17   correct?

18   A.   Yeah.

19   Q.   There's all different paragraphs that have circles around

20   them, correct?

21   A.   Yes.  Yes.

22   Q.   So, nobody took a yellow highlighter and highlighted these

23   papers in front of you, correct?

24   A.   No.  It was in pencil, sir.

25             MR. BEUKE:  Judge, I don't have anything else.

US v Vinod Patel #11-CR-20468-36

1          THE COURT:  The Government?

2          MR. NEAL:  I have nothing else for this witness, Your

3    Honor.

4          THE COURT:  How about moving for the admission of the

5    exhibit if you want it to be considered.

6          MR. NEAL:  Yes, I will do that actually.  Let me move

7    for the admission of Government Exhibit 2.

8          THE COURT:  What's Exhibit 1?

9          MR. NEAL:  Exhibit 1 was a copy that I had from

10   discovery of what actually is Exhibit 2.  Exhibit 2 is the

11   original.

12         THE COURT:  With the pencil marks on it?

13         MR. NEAL:  With the pencil marks on it.

14         THE COURT:  Any objection?

15         MR. BEUKE:  Judge, just in terms of accuracy, I would

16   just -- I believe Mr. Neal was given these two pieces of paper

17   by Atul Patel.

18         Is that correct?

19         MR. NEAL:  I can put an agent on to --

20         MR. BEUKE:  Oh.  No.

21         MR. NEAL:  Yes.  These two pieces of paper were given

22   to an agent by Atul Patel as the documents his cousin gave to

23   him originally coming from Vinod.  And I have those in my hand.

24              *(Off the record.)*

25         MR. NEAL:  Let me put it on the record.

1            Yesterday afternoon during a meeting with Atul Patel,

2      Atul Patel provided what is Government -- let's just call it

3      Government Exhibit 1 -- what is Government Exhibit 1, the

4      photocopy pages that I have in my hand, and represented that

5      they had come from his cousin Paresh.

6            THE COURT:  Your -- you started to say something,

7      counsel.

8            MR. BEUKE:  No, Judge.  I just would apprise the

9      Court that if it was given to Mr. Neal yesterday, this

10     afternoon is the first time that I have seen it or I've been

11     notified.

12           THE COURT:  All right.  It's admitted.

13           *(Government Exhibit 2 was admitted into evidence.)*

14           MR. NEAL:  Very well.

15           THE COURT:  Do you want me to come down there and

16     read it?

17           MR. NEAL:  No.  I can provide it to the Court.

18           MR. BEUKE:  Judge, may the witness be allowed to

19     leave or do you want him to remain on the stand?

20           THE COURT:  He can remain for a minute.

21           MR. BEUKE:  Okay.

22           *(Brief pause.)*

23           THE COURT:  Okay.  Now, this exhibit has been in the

24     file for how many years that I'm reading, without the

25     highlights?

1          MR. NEAL:  Shortly after that was prepared.  So, the

2  date it was prepared was December 10th, 2013.

3          That was provided in discovery to opposing counsel.

4          Your Honor, I would just like to note after we are

5  finished with this witness, I would like to put on some

6  additional facts.

7          THE COURT:  Okay.  But this includes highlighted

8  material that says, "Vinod Patel called Pandya the next day and

9  apologized to Pandya.  Pandya said he felt threatened, that he

10  was worried about" and so on.  And that's in the first

11  paragraph, page one.

12          *(Brief pause.)*

13          THE COURT:  All right.  What else do you have?

14          You can step down.  Thank you.

15  A.  Thank you.

16          THE COURT:  Well, let me ask you one question before

17  you go.

18          Never mind.  You can go.

19  A.  Thank you.

20          THE COURT:  You've already answered it.

21          MR. NEAL:  Your Honor, I would like to proffer

22  certain additional facts.

23          There's a fairly lengthy history of this kind of

24  involvement with potential witnesses on the part of Vinod

25  Patel.

1          Back in 2011, Vinod Patel was not a Defendant at that

2     point, but he went and visited several prospective Government

3     witnesses on the eve of their pleas of guilty and cooperation

4     in this case.  On --

5          MR. BEUKE:  Judge, can we just acknowledge our

6     objection to this.

7          THE COURT:  Your objection is noted.

8          MR. BEUKE:  Thank you.

9          MR. NEAL:  Defendant Pinakeen Patel, who was the

10    first Defendant to plead guilty in connection with this case,

11    several days before his plea was visited by Vinod Patel late at

12    night.  And Vinod Patel took him out of the house and told him

13    not to plead guilty, and that pleading guilty would, you know,

14    be bad for him.

15         And, again, it did not rise to the level of a direct

16    threat, but it certainly was, you know, an unusual time to

17    visit Pinakeen Patel, an unusual interaction.

18         He did the same thing with Government Anish Bhavsar,

19    who pled guilty several months later.  On one occasion, Vinod

20    Patel and Sanyani Edwards actually picked Anish Bhavsar up in a

21    van at night and took him to a parking lot and sat there and

22    worked on him for over a period of approximately an hour,

23    telling him not to plead guilty and it would be bad for him if

24    he did.

25         Again, it never rose to the level of a direct threat,

1    but it was certainly a very unusual interaction that Vinod

2    Patel had with these witnesses.

3              Pradeep Pandya, whom you've seen the DEA-6 of one of

4    his reports of interview, in which he said that during the

5    course of the scheme, he was threatened by Vinod Patel and told

6    that Vinod Patel had influential relatives back in India and

7    that, you know, those relatives could hurt Pandya's family.

8              That was memorialized in a report.  And, again, as

9    we've just heard from the witness stand, two days ago Vinod

10   Patel provided that to an intermediary saying give that to a

11   witness, that highlighted portion.

12             From the Government's perspective, that is witness

13   intimidation.  That is an attempt to influence the process.

14   There's a history of it with respect to this Defendant.

15             Your Honor, the United States does not want its

16   witnesses intimidated.  And I think for the integrity of the

17   process, Defendant Vinod Patel needs to be remanded into

18   custody.

19             THE COURT:  What's the Defendant's position?

20             MR. BEUKE:  Judge, obviously our position is that we

21   would think that that is a draconian, measure given what's been

22   presented to you at this point.

23             I don't believe, Your Honor -- as Your Honor knows, I

24   did not come into the case and file an appearance until

25   December of this year I believe and --

US v Vinod Patel #11-CR-20468-36

1          THE COURT:  Last year.

2          MR. BEUKE:  Last year.  I'm sorry.

3          And I'm not aware of any instances that were brought

4    to the Court's attention or to the magistrate's attention

5    concerning the Government's concerns about witnesses and

6    Mr. Patel's interaction with any witnesses.

7          I believe what Mr. Neal has just referred to

8    certainly could have been brought before Your Honor.  This

9    could have been done well in advance of his jury trial if

10   not --

11         THE COURT:  Well, if you are talking about the

12   incidents from 2011 or anything before today -- before the

13   trial started or before the last week or so, they may be

14   relevant, they may be admissible, but they're not persuasive.

15   But what I heard today is much more persuasive.

16         Your client knew enough, according to the witness,

17   that he, your client, should not have any contact with any

18   witness.  And to have this man basically threatened if he

19   didn't pass it on is --

20         The two considerations, as you know probably better

21   than I do, for bond are risk of flight, which is not being

22   argued here, and -- nor is there any basis for my finding a

23   risk of flight -- but danger to the community; more

24   specifically, danger to witnesses in this case.

25         If I make a mistake on that, it doesn't do the

1    witnesses any good if they are injured and I put him in jail

2    after that.

3             But you said you had a middle position.  What's that?

4             MR. BEUKE:  Judge, I suppose if Your Honor is

5    persuaded by what you've heard from the witness stand, I would

6    just reinforce to the Court that the statements that Mr. Patel

7    allegedly made to the other Mr. Patel was that he asked his

8    cousin to tell the truth.

9             But understanding Your Honor's position, I think we

10   could place Mr. Patel on home confinement, electronic

11   monitoring, so he's not allowed to leave the house during the

12   remainder of the trial.  And after --

13            THE COURT:  Where is his house?

14            MR. BEUKE:  In Canton, Michigan, Your Honor.

15            THE COURT:  How far from his brother's house, former

16   house?

17            MR. BEUKE:  From brother Bob, Your Honor?

18            THE COURT:  Yes.

19            *(Off the record.)*

20            MR. BEUKE:  It's four miles away, Your Honor.

21            THE COURT:  Okay.

22            MR. BEUKE:  His wife is in court.  They have two

23   children --

24            THE COURT:  Well, I understand that.  And I have

25   checked with Pretrial, and he's always reported on time and

1    complied with the conditions of bond.

2            And you may or may not know that this district has

3    one of the highest rates of people on bond, and to a lot of

4    people's surprise, we have one of the highest rates of people

5    showing up.  And I think I just want us to look at bond first.

6            But I've been here a long time and I've not had

7    anything like this come up during a trial or even before trial.

8    I've had some folks on bond who didn't show up, but it's --

9            This is very serious, and I'm going to cancel bond

10   and set a detention order, which will be prepared.

11           MR. BEUKE:  Judge, would Your Honor consider

12   electronic monitoring and confine him to the home?

13           There have been a number of things that we were --

14   you know, we're in the middle of the trial, and my ability to

15   meet and confer with Mr. Patel is kind of crucial.  And that

16   certainly is going to, you know, cause us to have a significant

17   problem.

18           I know it's not the Court who created the problem,

19   but --

20           THE COURT:  Well, I can have the marshals locate him

21   in a facility close to where you -- well, where you want him,

22   whether that be in Detroit or Milan.

23           He's detained.  And the marshals are here and you can

24   work it out with them and Mr. Lang, who will get the detention

25   order for us.

1              We're in recess.

2              MR. BEUKE:  Judge, we're going to ask that he be

3    detained at Milan.  Is that all right with the Court?

4              THE COURT:  Talk to the marshals.  It's certainly

5    okay with me.

6              And, counsel?

7              MR. BEUKE:  Yes, Judge.

8              THE COURT:  If Milan has any rules restricting your

9    access to him at any time, including this weekend, the marshals

10   have my home number.  But I know that they do have visiting

11   rooms and things that should be open on the weekend.

12              *(Proceedings adjourned at 1:19 p.m.)*

13                           _    _    _

14

15   STATE OF MICHIGAN )
                        ) ss.
16   COUNTY OF WAYNE   )

17

     I, Denise A. Mosby, Federal Official Court Reporter, do
18   certify that the foregoing is a correct transcript from the
     record of proceedings in the above matter.

19

20                        s/ Denise A. Mosby

21                        _____
                          DENISE A. MOSBY, CSR, RMR, CRR
                          United States Court Reporter
22                        124 Theodore Levin U.S. Courthouse
                          231 W. Lafayette Boulevard
23                        Detroit, MI 48226
                          313.961.6230
24                        Denise_Mosby@mied.uscourts.gov

25   Dated:   September 8, 2014