UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Case No. 11-cr-20468

Plaintiff,            Hon. Arthur Tarnow

vs.

D-36 VINOD PATEL,

Defendant.
_____/

DAY 3
TRANSCRIPT OF JURY TRIAL


BEFORE THE HONORABLE ARTHUR J. TARNOW
UNITED STATES DISTRICT COURT SENIOR JUDGE
Detroit, Michigan
Monday, July 14, 2014


APPEARANCES:

For Government:        JOHN K. NEAL, ESQ.
                      WAYNE F. PRATT, ESQ.
                      U.S. Attorney's Office
                      211 W. Fort Street, Ste 2001
                      Detroit, Michigan 48226

For Defendant:        RICHARD M. BEUKE, ESQ.
                      53 W. Jackson, Suite 1410
                      Chicago, Illinois 60604

                      TIMOTHY M. BLACK, ESQ.
                      713 West Devon Avenue
                      Park Ridge, Illinois 60068


*     *     *

OFFICIAL COURT REPORTER:
Denise A. Mosby, CSR, RMR, CRR
313) 961-6230     www.transcriptorders.com

<u>I   N   D   E   X</u>

<u>WITNESS</u>:                                          <u>PAGE</u>

**ATULKUMAR PATEL**
    Direct-Examination by Mr. Neal            10
    Cross-Examination by Mr. Beuke            82

**RAMESH PATEL**
    Direct-Examination by Mr. Pratt          162

## E X H I B I T S

| EXHIBIT NO. | IDENTIFICATION | PAGE |
|---|---|---|
| **Government** | | |
| 6B | First Mich referral summary | 178 |
| | | |
| **Defendant** | | |
| 1 | Atul Patel Plea Agreement | 101 |
| 2 | First Michigan forms | 118 |
| 3 | DEA-6 report | 156 |
| 4 | Atul Patel Cooperation Agreement | 159 |

```
 1                          Detroit, Michigan

 2                      Monday, July 14, 2014

 3                          8:45 a.m.

 4                      —      —      —

 5          (Jury not present.)

 6          MR. NEAL:  Good morning Your Honor.  John Neal and

 7  Wayne Pratt, appearing on behalf of the United States.

 8          MR. BEUKE:  Good morning, Judge.  Rick Beuke and Tim

 9  Black, here on behalf of Mr. Patel.

10          THE COURT:  Good morning.

11          Good morning, Mr. Patel.

12          MR. PATEL:  Good morning.

13          THE COURT:  Where do you want to start?

14          Well, we'll do the bond at a break, but there is a

15  note from the jury:

16          "Would it be possible for someone to restate the

17  specific charges against Vinod Patel?"

18          Who wants to do that?  Do you want to stipulate to a

19  summary of the charging document?

20          MR. BEUKE:  Can you read it to them, Judge?

21          THE COURT:  If you can give me a copy, I can read.

22          I thought maybe you would want to simplify it, but if

23  you want me to read it in toto, that's fine too.

24          MR. BEUKE:  Yeah, I would prefer.

25          THE COURT:  All right.  Do you have a copy?
```

1          MR. BEUKE:  I think ...

2          MR. NEAL:  Your Honor, I believe we have a copy

3     that -- the indictment is fairly lengthy.  Perhaps we could

4     work out a stipulation or perhaps even the Court could ...

5          THE COURT:  Why didn't I think of that?

6          MR. NEAL:  Yes.  Perhaps at a break or perhaps even

7     the Court could note that the jury will receive a copy of the

8     indictment that --

9          THE COURT:  Well, no.  They are asking now so they

10    can follow what the testimony is.  I think they are a little

11    bit confused by the broadness of the testimony so far.

12          And before we had the excitement at the end of

13    Friday, I had a list of questions and comments -- actually,

14    just a couple.

15          Can there be stipulations on anything?  I mean, so

16    much of that testimony was repetitive and it was about things

17    that nobody disagreed about.

18          MR. BEUKE:  You mean through the agent testimony?

19          THE COURT:  Through the attorneys.

20          Can you agree, for example, that Medicare is a, you

21    know, government program?  Can you agree -- all sorts of things

22    that were testified to by who owns which drugs stores that had

23    nothing really to do with the charges here.  I mean, it's all

24    background and it was all stuff that presumably both sides

25    stipulate to.

1          MR. BEUKE:  Well, the problem, Judge, is that -- you

2    know, at least I think Your Honor gets a sense of the Defense

3    theory, is that Vinod Patel doesn't have an interest in his

4    brother's pharmaceutical empire.

5          THE COURT:  Well, that's --

6          MR. BEUKE:  And the evidence that comes in against

7    his brother's pharmaceutical empire, we are saying they

8    shouldn't be considering for the purposes of deciding whether

9    or not he has any guilt or culpability in --

10          THE COURT:  Well, do you agree with that, Mr. Neal?

11          MR. NEAL:  No, we do not, Your Honor.

12          THE COURT:  I didn't think you might -- you would.

13          Anyway, think about that at the break.

14          MR. BEUKE:  Okay.

15          THE COURT:  And I do not want to hear the process of

16    wire tapping again.  Unless there's something I'm missing here,

17    it's really not relevant that a judge approved the wiretap.  I

18    don't think it helps either side.  It just takes time.

19          All right.  Anything else?

20          MR. NEAL:  Your Honor, the Government does have a

21    motion that we've filed this morning concerning the

22    admissibility of the threat evidence that came out at the

23    conclusion of the day Friday.

24          THE COURT:  Yes.

25          MR. NEAL:  I would like to proceed to argument on

1    that, if we could.

2              THE COURT:   What's the Defense -- does the Defense

3    stipulate to that?

4              MR. BLACK:   No such luck, Your Honor.

5              I just want to clarify first.   I'm not sure whether

6    the -- this motion is to allow just the threats, in and of

7    itself, or also the paperwork that was allegedly part of the

8    threat, the DEA-6 report of Pradeep Pandya.

9              MR. PRATT:   Your Honor, the Government is seeking to

10   introduce today through the testimony of Atul Patel the two

11   documents that he was handed and the statement that he received

12   when he was handed them, that this is from the Defendant Vinod

13   Patel, and those associated statements.

14             THE COURT:   And is that --

15             MR. BLACK:   Well, aside from our overall objection to

16   the admissibility of the threats in general, the specific

17   paperwork is -- first of all, in and of itself, it's hearsay,

18   and then the statements within it are also hearsay.

19             So, I don't think that -- it's our position that

20   those should not be admissible.

21             MR. PRATT:   Your Honor, those are going to be -- the

22   Government is going to be relying on these are statements of a

23   party-opponent and statements of an agent of a party-opponent.

24             We think the testimony from Friday and the testimony

25   from the witness is going to pretty clearly show that these are

1    statements of the Defendant Vinod Patel being transferred by

2    his agent, Paresh Patel.

3            THE COURT:  The answer is you cannot use it, because

4    you then have a trial within a trial.

5            Focus on what the charges are.  If you think there

6    were threats, charge him with that in another trial.

7            I mean, obviously I agreed that your showing was

8    strong enough to detain the man, but he's not going to be

9    convicted on these charges because of that evidence.

10           MR. PRATT:  I will, Your Honor.  And I -- I just --

11   it is somewhat bothersome to me and it was a point maybe buried

12   in my memorandum.  The Defense has already brought out this

13   idea that his client is so convinced in his innocence, that he

14   would come back from India where he was free and clear to face

15   these charges.  It's a concern to me that that's a license of

16   the Defense now to exploit that point to the maximum, when we

17   have evidence that would directly rebut that and say that he

18   came back because he figured he could intimidate witnesses.

19   So, that --

20           THE COURT:  You've made your record.

21           MR. PRATT:  Thank you, Your Honor.

22           THE COURT:  Anything else before we start?

23           MR. BLACK:  Not from the Defense, Your Honor.

24           MR. NEAL:  No, Your Honor.

25           THE COURT:  Okay.  All rise for the jury, please.

```
 1                    (Jury enters the courtroom at 8:57 a.m.)
 2              THE COURT:  Mr. Neal, do you have the charging
 3    document?
 4              MR. NEAL:  We do, Your Honor.
 5              CASE MANAGER LANG:  Court is in session.  You may be
 6    seated.
 7              THE COURT:  Everybody is in their place.
 8              We have a note from the jurors:
 9              "Would it be possible for someone to restate the
10    specific charges against Mr. Patel, Vinod Patel?"
11              And I have in front of me the First Superseding
12    Indictment, which is 32 pages.  I don't think you want me to
13    read the whole thing.
14              Why don't, Mr. Neal, you summarize the first part and
15    Defense summarize the second or ...
16              MR. NEAL:  Certainly, Your Honor.
17              Defendant Vinod Patel is facing two charges.  The
18    first is conspiracy to commit health care fraud, and the second
19    charge is conspiracy to pay or receive health care kickbacks.
20              THE COURT:  All right.  Is that accurate and
21    agreeable to you as a summary?
22              MR. BEUKE:  Yes, Judge.
23              THE COURT:  You don't want to hear me read 32 pages
24    on Monday morning?
25              MR. BEUKE:  I don't want you to do that, Judge.
```

```
1              THE COURT:  Okay.  Now, in terms of the elements and
2    things, I will be giving you orally and in writing at the end
3    of the trial the definitions and elements imposed.  But you've
4    got an idea of what he's charged with.
5              Do you have a witness?
6              MR. NEAL:  Yes, Your Honor.  The United States calls
7    Atul Patel.
8              THE COURT:  Raise your right hand.
9         ATULKUMAR PATEL, GOVERNMENT'S WITNESS, SWORN.
10             THE COURT:  Please sit down.  Adjust the microphone
11   so we can hear you.
12                          DIRECT-EXAMINATION
13   BY MR. NEAL:
14   Q.  Mr. Patel, could you state and spell your full name for the
15   benefit of the court reporter?
16   A.  A-T-U-L-K-U-M-A-R.
17   Q.  And what is your last name, sir?
18   A.  Patel, P-A-T-E-L.
19   Q.  You have the same last name as the Defendant, correct?
20   A.  Correct.
21   Q.  Are you related to the Defendant in any way?
22   A.  No.
23   Q.  How old a man are you, Mr. Patel?
24   A.  32.
25   Q.  Where were you born?
```

1    A.   Kenya.

2    Q.   Were you born to Indian parents in Kenya?

3    A.   Correct, sir.

4    Q.   Where did you grow up?

5    A.   In Kenya.

6    Q.   Did you eventually come to the United States?

7    A.   Yes, sir.

8    Q.   Approximately when did you come to the United States for

9    the first time?

10   A.   21st August 2007.

11   Q.   And for what purpose did you come to the United States?

12   A.   On higher studies.

13            MR. BEUKE:  I'm sorry, I didn't hear that, Your

14   Honor.

15   A.   Higher studies.

16            THE COURT:  Higher studies?

17   A.   Correct.

18            THE COURT:  You may go on.

19   BY MR. NEAL:

20   Q.   Where in the United States did you first locate?

21   A.   Pittsburgh, Pennsylvania.

22   Q.   And how long did you stay there?

23   A.   Less than six months.

24   Q.   And what did you do when you were living in Pittsburgh,

25   Pennsylvania?

1   A.  You enrolled in accounting.

2   Q.  Enrolled in accounting, is that what you said?

3   A.  Yes.

4   Q.  In what school?

5   A.  La Roche College.

6   Q.  And approximately how long were you in Pittsburgh?

7   A.  Six months.

8   Q.  What did you do after six months?

9   A.  I decided to move to Michigan and enroll into Saginaw State

10  University.

11  Q.  Why did you decide to come to Michigan?

12  A.  One is to be with my cousin and to study here at Saginaw

13  State University.

14  Q.  And who is your cousin?

15  A.  Paresh Patel.

16  Q.  And what does Paresh Patel do?

17  A.  He owns a liquor store in Canton, Michigan.

18  Q.  And where does he live?

19  A.  He lives in Canton, Michigan.

20  Q.  How far is Saginaw from Canton?

21  A.  An hour and a half drive.

22  Q.  You decided to come to Canton and you were going to commute

23  up to Saginaw; is that correct?

24  A.  Correct, sir.

25  Q.  Did you have a car?

1    A.  No.

2    Q.  What car did you have to get up to Saginaw?

3    A.  I used my cousin's car.

4    Q.  Approximately how many -- just to the jury a time frame,

5    approximately when was this that you first came to Michigan in

6    terms of the date?

7    A.  Early 2008, January 2008.

8    Q.  About how many days or week were you up in Saginaw?

9    A.  Sometimes it would be two days a week; sometimes it would

10   be three days a week.

11   Q.  What did you do on days that you were not at school in

12   Saginaw?

13   A.  I was working at a Dunkin' Donuts initially, and then later

14   when I quit that job I used to hang out around my cousin's

15   liquor store.

16   Q.  Let me ask you this.  What kind of a visa were you on at

17   this time?

18   A.  H1B visa.

19   Q.  Did that visa permit you to work for a wage?

20   A.  No, sir.

21   Q.  How did you receive money for Dunkin' Doughnuts if you

22   weren't permitted to work?

23   A.  Cash payments.

24   Q.  After you stopped working for Dunkin' Donuts, what would

25   you do on your off days?

1   A.  I was getting bored.  So, used to go to my cousin's liquor

2   store and spend time there.

3   Q.  Did you come to know someone by the name of Vinod Patel?

4   A.  Yes, sir.

5   Q.  How did you meet Vinod Patel?

6   A.  At my cousin's liquor store.

7   Q.  Why was he in your cousin's liquor store?

8           MR. BEUKE:  Objection, Your Honor.

9   A.  He was a regular customer there.

10           THE COURT:  Wait a minute.  There's an objection.

11           What's the objection?

12           MR. BEUKE:  How does he know why he was in the liquor

13   store?

14           THE COURT:  So, your objection is foundation.

15           MR. BEUKE:  Yes.

16           THE COURT:  Let's hear a response.

17           MR. NEAL:  Your Honor, I'm glad to lay a foundation.

18   That's appropriate.

19   BY MR. NEAL:

20   Q.  You met Vinod Patel for the first time where?

21   A.  At the liquor store.

22   Q.  All right.  What did he appear to be doing at the liquor

23   store the first time you met him?

24   A.  He was a regular customer over there.

25   Q.  Was he a friend of your cousin's as well?

1    A.   Yes, sir.

2    Q.   Did you come to know what Vinod Patel did for a living?

3    A.   Yeah.  He owned a home health agency.

4    Q.   Do you know the name of that home health agency?

5    A.   First Michigan Home Health Care.

6    Q.   Did there come a time when you actually left the liquor

7    store with Vinod Patel?

8    A.   Yeah.

9    Q.   How did that come about?

10   A.   After we came to know each other, well, he used to come

11   there in the evenings, one day he told me do you want to ride

12   with me --

13           MR. BEUKE:  Judge, foundation.  Where are we at now?

14           MR. NEAL:  Your Honor, I'm not sure what the

15   foundation objection is.

16           MR. BEUKE:  When, where, who else was present during

17   this conversation.

18           THE COURT:  You can cross-examine on that.

19           MR. NEAL:  I can restate the question briefly.

20   BY MR. NEAL:

21   Q.   The first time you left the liquor store with Vinod Patel,

22   can you describe how that came about?

23   A.   Yeah.  I was free at the liquor store.  I didn't have to go

24   to school and I had nothing to do there, and so he offered me

25   that do you want to come and drive around with me; I don't have

1    much to do today, so I'll be back soon.

2    Q.  All right.  Did you, in fact, leave with him?

3    A.  Yes, I did.

4    Q.  Can you describe for the jury where you went?

5    A.  The first time I left with him we went to one of his

6    brother Bob Patel's pharmacy in Detroit.  The name of the

7    pharmacy was Caring Pharmacy, which was located at the doctor's

8    clinic.  The name of the doctor was Roberto William.

9    Q.  You mentioned Vinod Patel's brother?

10   A.  Correct.

11   Q.  Who was Vinod Patel's brother?

12   A.  Babubhai Bob Patel.

13   Q.  How did you know that at the time?

14   A.  Many of my cousin's friends would talk about him.  He was a

15   big man in Canton.

16   Q.  You went with Vinod Patel to this pharmacy?

17   A.  Correct.

18   Q.  What did you do when you got there?

19   A.  Initially the first day I went over there, he told me to

20   sit in the pharmacy, and he went to see the doctor in the

21   clinic.

22   Q.  And just so the jury is not confused, who is "he"?

23   A.  Vinod Patel.  Sorry.

24   Q.  All right.  You went and sat in the pharmacy?

25   A.  Correct.

1    Q.   What happened after that?

2    A.   15 minutes later, Vinod Patel came back from the doctor's

3    clinic to the pharmacy, and he told me he's done, so let's go.

4    Q.   And where did you go?

5    A.   We left back to the liquor store in Canton.

6    Q.   This first time you left the liquor store with Vinod Patel

7    and took the drive that you just described, was that the only

8    time you went out of the liquor store with Vinod Patel?

9    A.   No.  We had another chance in the same week.

10   Q.  All right.  And did you have any subsequent chances after

11   that to ride around with Vinod Patel?

12   A.   Yeah.  And then it became very frequent.

13   Q.  All right.  For how long of a period, just in terms of

14   months, you know, or weeks, did you ride around with Vinod

15   Patel on a regular basis?

16   A.   All together I would say eight weeks.

17   Q.   Okay.  And I want to talk about some of the things that you

18   observed during those eight weeks.

19            You mentioned that the first time you rode around

20   with Vinod Patel, you went to a pharmacy that was located in a

21   doctor's office?

22   A.   Correct.

23   Q.   And remind the jury who was that doctor?

24   A.   Roberto William.

25   Q.   Over the course of this next eight weeks, did you have a

US v Vinod Patel #11-CR-20468-36

1   chance to visit Dr. William again with Vinod Patel?

2   A.  Yes, I had a chance.

3   Q.  Approximately how many times did you visit Dr. William?

4   A.  Eight to ten times.

5   Q.  Did you have a chance to meet Dr. William?

6   A.  Yes, I had a chance to meet him.

7   Q.  What did you observe the first time you met Dr. William?

8   A.  The first time he took me into his clinic, into his office.

9   And the first thing he mentioned is like who is this, why do

10  you bring him here.

11  Q.  When you say "he" mentioned, who are you referring to?

12  A.  Dr. William mentioned to Mr. Vinod Patel that who is he;

13  so, who am I and why do you bring him here.

14  Q.  All right.  And what, if anything, did Vinod Patel say in

15  response?

16  A.  He's my cousin.

17  Q.  Is that true?

18  A.  Yes -- no.

19  Q.  Are you Vinod Patel's cousin?

20  A.  No.  He told Dr. Roberto William that he's my cousin, you

21  don't have to worry about that.

22  Q.  Okay.  What happened after that?  What did you see?

23  A.  There was exchange of some paperwork and some money.

24  Q.  Who gave paperwork to whom?

25  A.  Dr. Roberto William gave paperwork to Vinod Patel.

1   Q.  And who gave money to whom?

2   A.  Mr. Vinod Patel gave money to Dr. Roberto William.

3   Q.  Was this a check?

4   A.  No.  It was cash.

5   Q.  Did you see how much cash?

6   A.  No.  I couldn't see how much cash, but it was cash.

7   Q.  And how was the transfer made?  Was it in an envelope?  Was

8   it --

9   A.  No.  It was in a fist.

10  Q.  It was in a fist?

11  A.  Yes.

12  Q.  Could you see there was cash in the fist?

13  A.  Yes, I could make it out that there was cash in the fist.

14  Q.  Okay.  You mentioned that is the first time you met Roberto

15  William --

16          Did you meet Roberto William on subsequent occasions?

17  A.  Yeah.  Later when we went down there, I used to meet him.

18  And then there were two occasions where we went to see him at

19  his apartment building because it was a weekend and he wasn't

20  working at his clinic.

21  Q.  On these subsequent visits, would you describe generally

22  what would happen when you would meet Mr. Roberto William?

23  A.  It would be same thing, like exchange of paperwork from Dr.

24  Roberto William to Mr. Vinod Patel and then an exchange of cash

25  from Vinod Patel to Roberto William.

1    Q.  Did you ever ask Vinod Patel what was going on in these

2    transfers?

3    A.  Yes.  He was receiving home health care referrals from

4    Dr. Roberto William.

5    Q.  And in exchange, he was giving Dr. Roberto William what?

6    A.  Money.

7    Q.  During this eight-week time frame you were riding around

8    with Vinod Patel, I want to talk about some of the other things

9    that you saw.

10            Did you observe anything else, anyone else that you

11   met with on a regular basis?

12   A.  Yeah.  There was one time we met a lady working in a clinic

13   in Highland Park.

14   Q.  All right.  You say this is a lady working in a clinic.

15   How do you know that?

16   A.  Because it was a clinic and she was wearing scrubs.

17   Q.  Okay.

18   A.  She was working there.

19   Q.  And what happened when you went to visit this clinic with

20   this lady?

21   A.  Yeah.  It was located next to a police station.  And we

22   drove up to the parking lot of the clinic, and Mr. Vinod Patel

23   made a phone call to the lady and --

24            MR. BEUKE:  Judge, objection.

25            THE COURT:  The objection is what?

1        MR. BEUKE:  Foundation.  How can he testify to that?

2   BY MR. NEAL:

3   Q.  You observed Mr. Vinod Patel make a phone call; is that

4   correct?

5   A.  Correct.

6   Q.  All right.  Do you know who the phone call was to?

7   A.  To the lady in the clinic.

8   Q.  How do you know that?

9   A.  After some time, I saw the lady come out of the clinic.

10  Q.  Okay.  And what happened when the lady came out of the

11  clinic?

12  A.  She came towards the driver's side of the car, and

13  Mr. Vinod Patel opened the window, handed her some cash, and he

14  made a phone call to First Michigan Home Health Care.

15  Q.  All right.  You say he made a phone call to First Michigan

16  Home Health Care.  How do you know that?

17        MR. BEUKE:  Objection.  Same objection.  Basis and

18  knowledge, Judge.

19        MR. NEAL:  I can lay a foundation.

20        THE COURT:  Why don't you lay the foundation before

21  he makes the objection.

22  BY MR. NEAL:

23  Q.  There was a phone call that you observed Vinod Patel make

24  after Vinod Patel handed this lady cash?

25  A.  Correct.

1    Q.  All right.  Do you know who that phone call was to?

2    A.  Ramesh Patel --

3            MR. BEUKE:  Objection.

4            THE COURT:  That's a yes or no answer.  Do you know

5    who the phone call was to?

6    A.  Yes.

7    BY MR. NEAL:

8    Q.  How do you know who the phone call was to?

9    A.  Because Mr. Ramesh, he did receive the facts.

10   Q.  And did you know who Ramesh was at the time?

11   A.  He was the office manager at First Michigan Home Health

12   Care.

13   Q.  How do you know that?

14   A.  Frequently during this eight-week period we would often go

15   to the First Michigan Home Health Care office, and I saw him

16   there.

17   Q.  You have had a chance to meet Mr. Ramesh Patel; is that

18   correct?

19   A.  Correct.

20   Q.  I want to go back to this event at Highland Park.

21           Did you have a chance to observe Vinod Patel's

22   demeanor during this exchange at Highland Park?

23   A.  The --

24   Q.  That is a yes or no.  Did you have a chance to observe his

25   demeanor?

1   A.   Yes.

2   Q.   What was his demeanor?

3   A.   He was nervous.

4   Q.   How do you know that?

5   A.   I could see, you know.  We left in a hurry and he wasn't

6   comfortable at that moment.

7   Q.   Can you remind the jury where this clinic was located?

8   A.   Next to a police station.

9   Q.   During this eight-week period do you recall visiting anyone

10  else, you know, with Vinod Patel?

11  A.   There was a black male that we often used to visit in

12  Detroit city.

13  Q.   All right.  And did this black male have a name that you

14  and Vinod Patel used?

15  A.   We nicknamed him Judu.

16  Q.   What does "Judu" mean?

17  A.   A fat person, J-U-D-U.

18  Q.   Can you describe for the jury what you observed when you

19  and Vinod Patel would visit with Judu during this 8-week

20  period.

21  A.   There was an exchange of cash most of the time and then

22  there was an exchange of patient information.

23  Q.   Which way did the cash go?

24  A.   From Mr. Vinod Patel to Judu.

25  Q.   And which way did the patient information go?

1   A.  From Judu to Mr. Vinod Patel.

2   Q.  Did you meet with Vinod Patel about who this Judu was.

3   A.  Yeah, I asked him.  He said he is one of our patient

4   recruiters for the company.

5   Q.  Did you have a chance to observe any conversations between

6   Judu and Vinod Patel.

7   A.  Yes, many times.

8   Q.  And can you summarize for the jury what the discussions

9   were?

10  A.  Sometimes it would be like the doctor doesn't have time to

11  go and visit his patients.  So, he would call back and say we

12  are waiting for the doctor, but the doctor did not show.  There

13  would be moments where the doctor did not prescribe the right

14  medications to the patients.  So, they don't agree with the

15  services for the First Michigan Home Health Care, and those

16  sort of arguments and conversations.

17  Q.  All right.  Let me ask you this.  After this eight-week

18  period -- we'll walk through what you did, but for right now

19  did you ever come to know about any problem with Judu?

20  A.  Yes.

21  Q.  Can you describe for the jury what that problem was?

22  A.  One day I was riding with Mr. Vinod Patel in his car and he

23  got a phone call from Ramesh Patel.

24  Q.  All right.

25  A.  And Ramesh Patel mentioned to him that --

1        MR. BEUKE:  Objection.  Unless he's able to hear the

2   phone call.

3        THE COURT:  You have to speak up, please, when you

4   object.

5        MR. BEUKE:  Judge, my objection is unless he's able

6   to hear the person on the other end of the call, I'm not sure

7   how he's able to testify to this.

8        MR. NEAL:  I can lay a foundation, Your Honor.

9   BY MR. NEAL:

10  Q.  You were riding with Vinod Patel?

11  A.  Correct.

12  Q.  All right.  Vinod Patel received a phone call?

13  A.  Correct.

14  Q.  Did Vinod Patel -- if you can recall, did Vinod Patel

15  identify who it was that called him?

16  A.  Ramesh Patel called him.

17  Q.  How do you know that?

18  A.  He said, "Yes, Ramesh, go ahead."

19  Q.  Okay.  And you only heard one part of that phone call.  You

20  didn't hear what Ramesh said; you just heard what Vinod said?

21  A.  Correct.

22  Q.  Did Vinod after that phone call summarize to you what the

23  phone call was?

24  A.  Yes, he did.  I asked him why are you getting mad.

25  Q.  What did Vinod Patel tell you?

1    A.  He started paying this Judu using First Michigan Home

2    Health Care checks and --

3    Q.  And what happened after that?

4    A.  Judu used the information from the check to pay one of his

5    personal bills.

6    Q.  Meaning -- well, strike that.

7            Okay.  What, if anything, after Vinod Patel told you

8    about this, that Judu had used First Michigan's bank account to

9    pay one of his personal bills?

10   A.  He made a phone call to Judu and told him that from today

11   on you're not going to work for us.

12   Q.  What happened after Vinod Patel got off the phone with

13   Judu?

14   A.  I mentioned to him that why don't you report this to the

15   police.

16   Q.  And what, if anything, did Vinod Patel say to you in

17   response?

18   A.  We can't do that.  He knows everything about us and it's

19   dangerous.

20   Q.  At the conclusion of this eight-week period, what happened

21   to change the situation, if anything?

22   A.  After the eight-week period, one day Bob Patel, Babubhai

23   Patel, showed up at the liquor store in the morning, and he

24   told me let's go with me.

25   Q.  Had you met Bob Patel at that point?

1    A.  No.  That was the first time I met him.

2    Q.  What did he say to do?  He said what to you now?

3    A.  He said come with me in the car.  I got to take you.

4    Q.  All right.  And did you, in fact, get in the car with him?

5    A.  Yes, I did.

6    Q.  Where did you go?

7    A.  We went to Flint, Michigan.

8    Q.  And what happened when you got to Flint?

9    A.  We went to a high-rise building, and he called a person

10   named Phil from his apartment, and he came in and hopped into

11   the car with us.

12   Q.  All right.  So, there were three of you in the car at that

13   point in time?

14   A.  Correct.

15   Q.  Where did you go after that?

16   A.  We went to see a black lady at Baker Street in Flint.

17   Q.  All right.  When you arrived -- was this an apartment

18   building or ...

19   A.  No.  This was a house.

20   Q.  All right.  When you arrived at this house on Baker Street

21   what happened?

22           MR. BEUKE:  Judge, my objection is foundation.  Just

23   an approximate time, what year, what month approximately are we

24   in?

25           MR. NEAL:  I would be glad to lay that foundation

1    Your Honor.

2              THE COURT:  Go ahead.

3    BY MR. NEAL:

4    Q.  Approximately what time frame are we talking about here in

5    terms of year, you know, season?

6    A.  2008 fall.

7    Q.  Okay.  All right.  You arrived at Baker Street, this

8    residence.

9              What happened?

10   A.  Phil and Babubhai -- Bob Patel went into the lady's house

11   on Baker Street, inside the house, and I was still in the car.

12   Q.  All right.  What happened after that?

13   A.  After like 12, 15 minutes, Bob Patel showed up out of the

14   door and he called me inside the house.

15   Q.  All right.  Did you go inside the house?

16   A.  Yes, I did go.

17   Q.  What happened when you arrived inside the house?

18   A.  Phil, Bob Patel and the lady were happy, and Bob Patel gave

19   her some money.  And they hugged each other.  They were happy.

20   And Bob Patel asked her to sign some receipts.

21   Q.  All right.  And did she, in fact, sign these documents?

22   A.  Yes, the lady signed the documents.

23   Q.  All right.  And what happened after that?

24   A.  Bob Patel told me this is how we do business.

25   Q.  And after that?

1    A.   We left and we got in the car again, the three of us.

2    Q.   Okay.  And where did you go when you got into the car?

3    A.   We went to drop Phil back at his apartment building.

4    Q.   And did you and Bob Patel have any conversation on the

5    drive from Flint back to Canton?

6    A.   Yeah.  He told me that -- when we were dropping off Phil

7    initially, he told Phil that Atul is going to be working with

8    you from tomorrow.

9    Q.   All right.  And did he tell you anything about what it was

10   you would be doing?

11   A.   No.  I mean he was busy on the phone, so he didn't mention

12   anything to me at that point, or at that point.

13   Q.   All right.  When you got back to Canton, where did you go?

14   A.   To the liquor store.

15   Q.   And who was at the liquor store when you got there?

16   A.   My cousin and Mr. Vinod Patel.

17   Q.   Did you have a conversation with Mr. Vinod Patel?

18   A.   Yes.

19   Q.   And can you summarize for the jury what happened in that

20   conversation?

21   A.   Yeah.  He asked me how was it with Bob Patel.  I said it

22   was okay.  And so you're going to be working with Phil up there

23   in Flint.

24   Q.   Did you have any understanding of what it was you would be

25   doing with Phil?

1   A.  Yeah.  He made me understand that you are going to be

2   recruiting patients like the way Judu did, with Phil.

3   Q.  And what, if anything, else did he say in this

4   conversation?

5   A.  And then we left from there and we went to Bob Patel's home

6   and they gave me a car.

7   Q.  All right.  And the car was for what purpose?

8   A.  To drive to Flint everyday.

9   Q.  All right.  At this point, was there any discussion of pay

10  for you?

11  A.  No.  At that moment, there was no discussion of pay.

12  Q.  All right.  What happened the next thing?

13  A.  I drove up to Flint and I went to the place where Phil was.

14  I called him.  He came down and jumped into the car, and we

15  started riding around.

16  Q.  All right.  And you were riding around.

17              Were you going anywhere in particular?  What were you

18  doing?

19  A.  No.  We were just riding on the streets.

20  Q.  And what happened next?  You were riding on the streets.

21  What were you doing?

22  A.  We were looking for patients on the streets, asking people

23  if they have the red, red, blue and white card.

24  Q.  What is the red, blue and white card?

25  A.  Medicare card.

1  Q.  And were you familiar at that time with red, blue and white

2  cards?

3  A.  Yeah.  I learned a little bit from Judu that it's an

4  insurance card.

5  Q.  All right.  And at that time did you have any understanding

6  of whether this insurance card was important for your

7  recruiting?

8  A.  Yeah.  I mean, it helps pay good for the home health care

9  services.

10  Q.  And who did you learn that from?

11  A.  Vinod Patel.

12  Q.  Okay.  So, you are riding around with Phil.

13        And did you stop and see patients or did you stop and

14  see someone on the streets?  What happened?

15  A.  I mean, we would stop, you know, some people that he knew

16  and ask them if they had the red, blue and white card, and some

17  of them would say yes, they got it.

18  Q.  And the people who would say yes, what would happen after

19  that?

20  A.  Phil would ask them that are you willing to see a doctor.

21  Q.  All right.  And assuming they said -- well, let me ask you

22  this.  What would patients say?  What would people say after

23  Phil asked this question?

24  A.  I mean if they had the Medicare card -- most of them would

25  ask, what do I get in return.

1  Q.  All right.  And what, if anything, did Phil say in response

2  to that question?

3  A.  You'll get Vicodin, soma, and Xanax.

4  Q.  And what are Vicodin, soma, and Xanax?

5  A.  They are controlled medications.

6  Q.  All right.  Approximately how long did you ride around with

7  Phil engaging in this process?

8  A.  Like two, two months.

9  Q.  Okay.  And were there any problems with Phil that you had?

10  A.  Yeah.  He constantly kept on asking for Vicodins.

11  Q.  All right.  And what, if anything, did you do in response?

12  A.  I told Mr. Vinod Patel that he's asking for Vicodins.

13  Q.  And what did Vinod Patel say to you?

14  A.  We can't give him Vicodins because we can't have Vicodins

15  without a prescription and it's really dangerous to travel with

16  Vicodins without a prescription in your car.  So, just tell him

17  that you can't give him Vicodins and try to offer him some

18  money.

19  Q.  All right.  Did you, in fact, offer Phil some money?

20  A.  Yeah.  I offered him a hundred dollars.

21  Q.  All right.  And what, if anything, did Phil say in

22  response?

23  A.  He didn't want the money.  He wanted the Vicodins.

24  Q.  All right.  At some point did you stop working with Phil?

25  A.  Yes, I did.

1    Q.  All right.  And how did that come about?

2    A.  One day I was driving with Phil, and we came to this place,

3    Marie's home at MLK Avenue.

4    Q.  All right.

5    A.  And there were a bunch of people on the porch at that

6    house.  People used to get together over there.  And we got on

7    the porch and we asked a couple of patients --

8    Q.  Well, let me stop you there.  I want to break this down.

9            You arrived at this house on MLK Avenue?

10   A.  Yes.

11   Q.  Whose house was that?

12   A.  Marie's house.

13   Q.  How did you know that?

14   A.  I learned that later.

15   Q.  All right.  You arrived at this home.

16           And what did you do when you got to this home?

17   A.  We asked a couple people if they had the red, blue and

18   white card.

19   Q.  And you mentioned earlier there were people out on the

20   porch?

21   A.  Correct.

22   Q.  And what did these folks say?

23   A.  Some of them said, yes, they have.

24   Q.  And what happened after that?

25   A.  Again, the same thing; what will I get out of it.

1    Q.  All right.  And what, if anything, did Phil tell them?

2    A.  Same thing; Vicodin, soma, and Xanax.

3    Q.  All right.  Eventually the owner of the home arrived at the

4    house?

5    A.  In a couple of minutes.

6    Q.  And who was the owner of this home?

7    A.  Marie.

8    Q.  And what, if anything, conversation did you have with

9    Marie?

10   A.  She asked who are these people.

11   Q.  All right.

12   A.  So, one of the persons sitting on the porch said that they

13   are here to bring a doctor to us over here.  And Marie said

14   that's nice.

15   Q.  Okay.  And did you speak with Marie at that point?

16   A.  No.  At that moment, I didn't speak with her.  We just took

17   information from the patients.

18   Q.  At some point subsequent to that, did you speak with Marie?

19   A.  Yeah.  Later after I got the information from the patients,

20   I saw that she had a good connection in the community, and I

21   thought that she would be helpful to me rather than Phil, who

22   is constantly asking me for Vicodins.  So, I asked her are you

23   willing to work with us.  And she said that I'm looking for

24   work.

25   Q.  Okay.  One thing I want to go back to, talking about this

1    experience with Phil, when you and Phil would find a patient

2    who would say yes, I'm glad to see a doctor, what would you do,

3    you and Phil?

4    A.  We would take their information like their name, their

5    address, their phone number, their Medicare number and Medicaid

6    number, if possible; and if they have any other insurance,

7    those numbers too.

8    Q.  All right.  And what would you do with that information?

9    You, Atul Patel, what would you do with that information?

10   A.  I would give it to Vinod Patel.

11   Q.  All right.  And do you know the purpose for which you were

12   giving it to Vinod Patel?

13   A.  He would forward it to a doctor and the doctor would later

14   call --

15           MR. BEUKE:  Objection, Your Honor.  Basis, knowledge.

16           MR. NEAL:  I'm glad to lay a foundation for that.

17   BY MR. NEAL:

18   Q.  Do you know what would happen with these documents with

19   patient information on them after you would give them to Vinod

20   Patel?

21   A.  They would go to a doctor --

22   Q.  Just yes or no.  Do you know what would happen to these

23   documents?

24   A.  Yes.

25   Q.  How do you know what would happen with these documents?

```
1    A.  Later these patients would receive a phone call from the

2    doctor's office --

3              MR. BEUKE:  Objection, Your Honor, unless he's

4    present.

5              MR. NEAL:  Let me ask --

6              THE COURT:  You do need a foundation.

7              MR. NEAL:  Let me rephrase.

8    BY MR. NEAL:

9    Q.  You know what would happen with these documents when you

10   would give them to Vinod Patel.  Correct?

11   A.  Yes.

12   Q.  How do you know that?

13   A.  Later the patients would receive a phone call from a

14   doctor.

15             MR. BEUKE:  Same objection.

16   BY MR. NEAL:

17   Q.  Again, how do you know that?  How do you know the patients

18   would receive a phone call from the doctor?

19   A.  Marie told me that these people would receive a phone call

20   from the doctor, because most of these people initially, to

21   start with, were on Marie's porch --

22             MR. BEUKE:  Objection, Your Honor.

23             THE COURT:  Sustained.

24   BY MR. NEAL:

25   Q.  Let me ask you this.  Did you have conversations with Vinod
```

1   Patel about what he was doing with this information?

2   A.  Sending it to -- faxing it to the doctor --

3           THE COURT:  No, no, no.  That's a yes or no answer.

4   A.  Yes.

5           THE COURT:  And let me tell the jury.  When I sustain

6   an objection, that means, to the best of your ability, forget

7   what the question was.  And if there was a partial answer,

8   forget that.  Neither is evidence.

9   BY MR. NEAL:

10  Q.  Let me just ask that question one more time.  Did you

11  discuss with Vinod Patel what he was doing with the information

12  you were giving him?

13  A.  Yes.  We had -- yes.

14  Q.  Okay.  And what, if anything, did Vinod Patel say about

15  that?

16  A.  He would give it to the doctor.

17  Q.  All right.  Let's go on.  You were talking about Marie.

18          After you decided to work with Marie, what did you

19  do?

20  A.  Okay.  I felt that she's a nice lady.  She knows her people

21  in the community.  She was very friendly and she had a good

22  personality.  So, I asked her, are you willing to work with me.

23  She said yeah, I'm looking for work and I'll be happy.

24          So, I made a phone call to Vinod Patel.

25  Q.  All right.  And what did you tell Vinod Patel in this phone

1    call?

2    A.   That I found a lady who I think can be better than Phil,

3    like better than Phil asking us for Vicodins everyday.   I

4    thought this lady would be better and it would work out with

5    some money rather than asking for controlled substances to give

6    to anyone else.

7    Q.   Okay.  So, what, if anything, did Vinod Patel say in

8    response?

9    A.   He said tomorrow morning I'll come up to Flint and meet up

10   with the lady.

11   Q.   Did he, in fact, come up to Flint the following morning?

12   A.   Yes, he was there.

13   Q.   All right.  And did you have a meeting with Marie, the

14   three of you?

15   A.   Yes.

16   Q.   What happened at this meeting?

17   A.   Vinod Patel asked her are you willing to work with us, and

18   she said yes, I'm willing to work with you.  And then she asked

19   what kind of work.

20           So, Vinod Patel mentioned that we are going to be

21   recruiting patients from here, and we want patients that have

22   the red, blue and white card, the Medicare card.

23   Q.   And what, if anything, did Marie say in response?

24   A.   Yes, she was happy.

25   Q.   All right.  Did she agree to --

1    A.  She agreed to work.

2    Q.  All right.  After that did you have a conversation with

3    Vinod Patel about money?

4    A.  Yes.

5    Q.  All right.  And can you describe for the jury what that

6    conversation was?

7    A.  I usually received $300 per patient that was opened by

8    First Michigan Home Health Care, and he asked me to give $100

9    to Marie to keep her motivated to work.

10   Q.  All right.  $100 per patient?

11   A.  Per patient.

12   Q.  Mr. Patel, how long did you work with Marie in total; what

13   would be the time frame?

14   A.  2010 December.

15   Q.  That was when you stopped working with Marie?

16   A.  I mean we stopped looking for patients.

17   Q.  You stopped looking for patients with Marie in 2010

18   December?

19   A.  Correct.

20   Q.  And you started working with her approximately when?

21   A.  Early 2009.

22   Q.  Okay.  I want to walk through the process through which you

23   and Marie recruited patients.

24           How did you and Marie go about finding patients?

25   A.  Same as we did -- same as we did with Phil.

1    Q.  Drive around?

2    A.  Drive around on the streets.  And she knew a lot of people

3    in Flint, and people really trusted her and would agree with

4    her.  So, we would just go around and ask them --

5         MR. BEUKE:  Objection as to what these people thought

6    of Marie and ...

7    BY MR. NEAL:

8    Q.  Mr. Patel, you rode around with Marie for a period of

9    nearly two years.  Isn't that correct?

10   A.  Correct.

11   Q.  All right.  You had a chance to observe Marie interacting

12   with people she saw on the street.  Is that correct?

13   A.  Correct.

14   Q.  Did you have a sense of how people reacted to Marie in

15   Flint, people that you would see on the street?  Did you did

16   you have a chance to see that?

17   A.  Yes.

18   Q.  And how did people tend to react to Marie when she would

19   interact with them?

20   A.  Most of them knew her.  So, they were friendly with her.

21   Q.  Okay.  Your recruiting method when you would ask the

22   patients questions, were they the same as what you described

23   with Phil?

24   A.  Yes.  They were the same all the time.

25   Q.  All right.  Did you and Marie ever recruit patients in any

1    senior living facilities or apartment facilities or anything

2    along those lines?

3    A.  No.

4    Q.  Where did you typically recruit patients with Marie?

5    A.  On the street.

6    Q.  When you were recruiting patients with Marie, did you have

7    a chance to observe the physical condition of most of the

8    patients you were recruiting?

9    A.  Yeah.  They could walk.  They could drive.

10   Q.  All right.  And, again, these patients were typically out

11   on the street?

12   A.  Correct.

13   Q.  All right.  Did you ever hear the term -- during your time

14   as a recruiter for First Michigan, did you ever hear the term

15   "homebound"?

16   A.  Yes.

17   Q.  Who did you hear that term from for the first time?

18   A.  Vinod Patel.

19   Q.  And in what context did it come up?

20   A.  He knew that we were looking for these patients on the

21   street, because he asked me once how are you getting these

22   people, so I mentioned to him that it's on the street, like the

23   way Judu did.  So, he told me you better be careful, because

24   those people are not homebound and we are billing them for

25   services.

1   Q.  And what significance did this term "homebound" have for

2   the recruiting you were doing?

3   A.  First Michigan is supposed to provide services to people

4   who are homebound.  And most of the patients that we had at

5   First Michigan from Flint were not homebound.  They could

6   drive.  They could walk around.

7   Q.  In the course of your two-plus years -- well, let me step

8   back.

9           What's your definition of home -- what's your

10  understanding of the definition "homebound"?

11  A.  Someone who cannot get out of the house or someone who

12  cannot get out of the bed.

13  Q.  In the two-plus years that you worked as a recruiter for

14  First Michigan, did you ever once recruit a patient who was

15  homebound?

16  A.  We just had one patient.

17  Q.  One patient total?

18  A.  In total, one patient.

19  Q.  The rest of the patients?

20  A.  Were not homebound.

21  Q.  Let me ask you this.  When you began in Flint with -- doing

22  this recruiting, did you have a particular doctor that you

23  worked with?

24  A.  To start with, we didn't have one particular doctor, but

25  later we came to just one particular doctor.

1  Q.  In the early stages you were working with multiple doctors;

2  is that correct?

3  A.  Correct.

4  Q.  All right.  And did there ever come a time where you

5  started sending patient information to doctors directly?

6  A.  Yes.

7  Q.  Okay.  How did that come about?

8  A.  It was getting hectic for me to send that information to

9  Vinod Patel and then Vinod Patel sending it to a doctor.  So,

10  we decided that I'm going to fax it to them straight.

11  Q.  And who told you which doctors to fax it to?

12  A.  Vinod Patel would give me the name of the doctor and the

13  fax number of the doctor.

14  Q.  All right.  What were you looking for the doctors to do

15  when you would fax them patient information?

16  A.  I wanted the doctor to come up there to Flint and see the

17  patients and give them the medication, what they want, which is

18  Vicodin, soma, and Xanax, and write a home health care referral

19  to First Michigan Home Health Care.

20  Q.  Why were the controlled substances important to you?

21  A.  That is what the patients wanted.

22  Q.  Why was the First Michigan Home Health Care referral

23  important to you?

24  A.  Because that is how I make money.

25  Q.  All right.  How could you be sure that the doctors would

1    refer the patients to First Michigan and write the controlled

2    substances that you wanted?

3    A.   Initially most of them, they write, some of them didn't

4    write to home health care referrals or they would write it to

5    some other home health care agency, or some of them would

6    promise the patient to write the controlled substances, but

7    then later say no, I don't feel like it.

8    Q.   Did you discuss any of these problems with Vinod Patel?

9    A.   Every time whenever we had a problem, I had to discuss it

10   with him.  So ...

11   Q.   And what, if anything, did Vinod Patel say in response to

12   these problems you were having with doctors?

13   A.   I mean if the patients didn't receive the controlled

14   substances they wanted, then he would call -- he would ask me

15   to call the pharmacy and check with the pharmacy, what's the

16   problem.  So, when I called the pharmacy, they would tell me

17   the doctor has not written the controlled substances for this

18   patient.

19            So, I would call back to Mr. Vinod Patel and tell him

20   that the doctor didn't write it.  So, he would stop working

21   with that doctor.

22   Q.   All right.  You mentioned pharmacies that you would call

23   that would receive the prescriptions from the doctors?

24   A.   Correct.

25   Q.   Which pharmacies were these?  Were you familiar with the

1   pharmacies?

2   A.   Yeah.  Most of them are -- not most.  It was always Bob

3   Patel's pharmacies.

4   Q.   And were these pharmacies located in Flint itself?

5   A.   No.  It was in Southfield.

6   Q.   All right.  And do you know the name of the pharmacy?

7   A.   Rapid Drugs Pharmacy.

8   Q.   And do you know the pharmacist at that particular pharmacy?

9   A.   Hiren Patel.

10   Q.   All right.  You mentioned a few minutes ago that eventually

11   you found a doctor that you know you worked with for a long

12   time; is that correct?

13   A.   Correct.

14   Q.   Who was that doctor?

15   A.   Dr. Burdette.

16   Q.   And how were you first introduced to Dr. Burdette?

17   A.   Through Vinod Patel.

18   Q.   All right.  And what did Vinod Patel say to you about

19   Dr. Burdette?

20   A.   We going to try one more doctor here, Dr. Burdette again.

21   Q.   Okay.  And did Dr. Burdette work with anyone?

22   A.   He worked with Dr. Paul Petre.

23   Q.   Was Dr. Burdette himself a medical doctor, to your

24   knowledge?

25   A.   He was a physician assistant.

1   Q.  Could he, to your knowledge again, write controlled

2   substance prescriptions?

3   A.  Yes, he would.  He could.  Yeah, he could.

4   Q.  All right.  How did -- after you were introduced to

5   Burdette, how did Burdette work out, from your perspective, as

6   a doctor to work with?

7   A.  When he promised the patients that he's going to give them

8   what they want, he would do that.  And when we asked him --

9           MR. BEUKE:  Objection, Judge.  Again, unless he's

10  present for these conversations, Your Honor, I don't know how

11  he's in a position --

12          THE COURT:  Any response?

13          MR. NEAL:  I can lay a foundation, Your Honor.

14  BY MR. NEAL:

15  Q.  You worked with Dr. Burdette for approximately how long

16  total?

17  A.  He started working with us I think in the spring 2009 until

18  August 2nd, 2011.

19  Q.  Okay.  And over the course of that time frame, did you have

20  a chance to have conversations with Dr. Burdette about his

21  work?

22  A.  Multiple.

23  Q.  All right.  You recruited patients that would see

24  Dr. Burdette; is that correct?

25  A.  Correct.

1    Q.  And you would also have a chance to observe what they would

2    receive from Dr. Burdette; is that right?

3    A.  Yes, sir.

4    Q.  All right.  You would know if Dr. Burdette referred them to

5    First Michigan?

6    A.  Yes, sir.

7    Q.  And you would know if they received controlled substances;

8    is that right?

9    A.  Yes, sir.

10   Q.  All right.  Over the course of your, you know, almost

11   two-year period of time that you were working with

12   Dr. Burdette, did you come to an opinion as to how well he was

13   working for you?

14   A.  We never had any problems with him.  He would always listen

15   to us and he would do what we asked him to do.

16   Q.  And when you say "we," who is "we"?

17   A.  Me, Mr. Vinod Patel, Bob Patel, First Michigan Home Health

18   Care.

19   Q.  All right.

20   A.  Bob Patel's pharmacies.

21   Q.  Patients that you would recruit and send to see

22   Dr. Burdette, approximately what percentage of them, to your

23   knowledge, would he refer to First Michigan Home Health Care?

24   A.  Most of them.

25   Q.  Patients you recruited to see Dr. Burdette, approximately

1    what percentage of them, to your knowledge, received controlled

2    substances?

3    A.  All of them.

4    Q.  Initially when you started working with Dr. Burdette, where

5    would Dr. Burdette see the patients, if you know?

6    A.  Initially he started going to each and every patient's

7    home.

8    Q.  All right.  At some point did that change?

9    A.  Yes, sir.

10   Q.  All right.  Why did that change?

11   A.  The number of patients were growing and it was really

12   getting hectic for Dr. Burdette to move from one patient to

13   another.  And that commuting, we wanted to eliminate that

14   commuting time.  So, we decided -- "we" meaning me and

15   Mr. Vinod Patel and Dr. Burdette.  We decided that it would be

16   easier and faster if we saw these patients at one location and

17   they would come to us rather than us going to them.

18   Q.  All right.  What location did you decide upon?

19   A.  Initially we decided to see these patients at Marie's home.

20   Q.  All right.  And can you walk through the process through

21   which patients, you know, would come to Marie's home for these

22   visits with Dr. Burdette?

23   A.  Every time when a patient was due to be seen by

24   Dr. Burdette, Dr. Burdette's office would make a phone call a

25   day before to all the patients that were supposed to be seen,

1    that you have an appointment tomorrow to come and see

2    Dr. Burdette.

3    Q.  All right.  And were you present at Marie's home when the

4    patients would come to see Dr. Burdette?

5    A.  Most of time.

6    Q.  All right.  And could you describe for the jury what the

7    environment -- what you would see when the patients would be

8    waiting to see Dr. Burdette?

9    A.  Most of them would wait on the porch of Marie's home, and

10   Dr. Burdette would see these patients in the dining room.

11   Q.  All right.  Approximately how many patients would typically

12   be at Marie's home at a time?

13   A.  Somewhere between 15 and 20.

14   Q.  What would the -- if you saw, what would the patients be

15   doing while they were waiting for Dr. Burdette to come?

16   A.  Sit on the porch, drink beer, smoke cigarettes.

17   Q.  And you said Dr. Burdette would see the patients in the

18   dining room; is that correct?

19   A.  Correct, sir.

20   Q.  Were you ever present in the dining room when Dr. Burdette

21   would actually be examining the patients?

22   A.  Sometimes.

23   Q.  Did Dr. Burdette -- did you have a chance to observe

24   Dr. Burdette's prescribing medications to patients?

25   A.  He didn't prescribe the medications.  He used to make a

1    phone call to the pharmacy.

2    Q.  Okay.  And you were present when he would make this phone

3    call to the pharmacy on some occasions?

4    A.  Some occasions.

5    Q.  All right.  Did you have a chance to observe, you know, or

6    listen to the prescriptions that he was calling in to the

7    pharmacy?

8    A.  Sometimes, yes.

9    Q.  Okay.  And can you describe for the jury what kinds of

10   prescriptions he would typically call in to the pharmacy for a

11   particular patient?

12   A.  All the three controlled substances to start with, Vicodin,

13   soma and Xanax, and depending on their health issue, he would

14   prescribe some more.

15   Q.  Okay.  And you said he would prescribe some more

16   medications?

17   A.  Correct.

18   Q.  Approximately how many more medications would he prescribe?

19   A.  On an average, each patient had eight to nine

20   prescriptions.

21   Q.  After Dr. Burdette would make a phone call to the pharmacy

22   and issue these prescriptions for the patients, how did the

23   patients actually receive the medications?  Are you familiar

24   with that process?

25   A.  They would fill up the prescriptions in Southfield and then

1    a driver would rush the medications to Flint.

2    Q.  And where would the medications actually be distributed to

3    the patients?

4    A.   Initially to start with, the driver would go to each and

5    every patient's home, but given the same problem we had, as the

6    number of patients was growing bigger, we decided that we are

7    going to bring the medications to Marie's home, and the

8    patients would wait there or come when the driver would arrive,

9    to pick up their medications.

10   Q.  Were you present on occasions when the medications were

11   actually being delivered to the patients?

12   A.   Yes.

13   Q.  All right.  Did you ever actually help distribute the

14   medications to the patients?

15   A.   Sometimes.

16   Q.  All right.  Did you have a chance to observe what

17   medications patients would actually be receiving when these

18   medications were delivered?

19   A.   Vicodins, soma, and Xanax.

20   Q.  How about these other medications that Dr. Burdette

21   prescribed for the patients; would they be delivered?

22   A.   Very few.

23   Q.  All right.  Did you ever have an opportunity to talk with

24   Vinod Patel about that practice?

25   A.   Yeah.

1          I mentioned to him that, you know, sometimes the

2    patients do complain.  Like they are being billed for like

3    eight to ten medications.  And then when you give them three

4    medications and you ask them to sign the receipts for eight to

5    nine medications, they would ask you a question, like, I just

6    received three and what about the rest.  So, we would tell them

7    that the pharmacy is out of stock right now.  So, as soon as it

8    comes in, we'll give it to you.

9    Q.  All right.  Did you ever talk with Vinod Patel about that

10   process?

11   A.  Yes.  I mentioned it to him.

12   Q.  And what, if anything, did Vinod Patel say to you?

13   A.  That's how Bob Patel makes money.

14   Q.  Now, you said that the prescriptions were coming from a

15   pharmacy in Southfield; is that correct?

16   A.  Correct.

17   Q.  All right.  Did that ever change?

18   A.  Yeah.

19   Q.  Okay.  And where did it change -- what changed about that

20   process?

21   A.  It moved to Tri-City Pharmacy in Saginaw.

22   Q.  All right.  Is that another Babubhai Patel pharmacy, to

23   your knowledge?

24   A.  Correct.

25   Q.  Did you ever have occasion to visit either Rapid Drugs or

1    Tri-City Pharmacy?

2    A.  A couple of times, multiple times.

3    Q.  All right.  And did you typically do that alone or with

4    someone?

5    A.  Sometimes it would be me, myself, and sometimes it would be

6    with Mr. Vinod Patel.

7    Q.  All right.  Do you recall visiting Rapid Drugs with

8    Mr. Vinod Patel?

9    A.  Yes, I do recall that.

10   Q.  Did you and Vinod Patel have occasion to have conversations

11   with the pharmacist at Rapid Drugs during these visits?

12   A.  Yes.  There was one occasion that the pharmacist was

13   complaining to Mr. Vinod Patel --

14          MR. BEUKE:  Objection, foundation.  When is this

15   happening?

16   BY MR. NEAL:

17   Q.  And do you have an approximate date on when this visit was

18   to Rapid Drugs with Mr. Vinod Patel that you are talking about?

19   A.  I don't remember the date.

20   Q.  Do you remember who was present for the conversation?

21   A.  The pharmacist, Hiren Patel, Mr. Vinod Patel and I.

22   Q.  Okay.  And do you remember the substance of the

23   conversation?

24          MR. BEUKE:  Objection, Judge.  Foundation.

25          THE COURT:  It's a yes or no answer.

1    BY MR. NEAL:

2    Q.  Do you remember the substance of the conversation?

3    A.  Yes.

4    Q.  Can you describe the substance of the conversation for that

5    jury?

6              THE COURT:  How about how do you remember?

7    BY MR. NEAL:

8    Q.  How do you remember?  How do you remember that

9    conversation?

10   A.  Because that was the first conversation with Hiren Patel in

11   my life.

12   Q.  Okay.  And can you describe what was said in this

13   conversation?

14   A.  He had been working for a long time with Bob Patel.  So, he

15   was mentioning to Mr. Vinod Patel that Bob needs to come here

16   and get rid of these medications.

17   Q.  All right.  Did you have an understanding of what he meant

18   by medications?

19   A.  At that moment, I didn't know.

20   Q.  Okay.  Did you come to know what he meant by medications?

21   A.  Later I learned.

22   Q.  How did you come to know what he meant by medications?

23   A.  Mr. Vinod Patel told me.

24   Q.  All right.  And what did Mr. Vinod Patel tell you about

25   these medications that Hiren was complaining about?

1    A.  Those are the billed but not dispensed medications.

2    Q.  Let's turn to a new topic.

3           Did there come a time when you stopped bringing

4    patients that you recruited to see Dr. Burdette at Marie's

5    house?

6    A.  Yes.

7    Q.  All right.  And how did that come about?

8    A.  One day Mr. Vinod Patel called me and told me that we have

9    this black male known as Mr. Glenn English who has a proposal

10    for us to -- he wants to open an adult day program.  And

11    Mr. Vinod Patel thought that Flint is a good location for right

12    now because we have a number of patients over there, we know

13    them.  We have Marie working with us, and we have Dr. Burdette

14    whom we can trust, and I think that Flint is a good location

15    for him and Mr. Glenn English to open an adult day facility up

16    there in Flint.

17    Q.  Okay.  Let me ask you this.  At this time did you have any

18    concerns about continuing to use Marie's house as a place for

19    the doctor to come and the drugs to be delivered?

20    A.  Yes.

21    Q.  Okay.  And what were your concerns?

22    A.  The number of patients were growing, and it was a house

23    which belonged to Marie.  And there would be a bunch of people

24    when the doctor comes up there, to be seen by the doctor.  And,

25    I mean, we noticed the cops were moving up and down the

1    streets.  One day they asked us what's happening here.  You

2    know, so it raised a concern like this is not a safe location

3    to have a doctor or have a clinic up here like this.

4    Q.  Did you discuss that concern with Vinod Patel?

5    A.  Yes.

6    Q.  So, in any event, Vinod Patel tells you about this

7    conversation he had with Glenn English; is that correct?

8    A.  Correct.

9    Q.  Okay.  About an adult day facility?

10   A.  Correct.

11   Q.  What happened after that?

12   A.  So, I told him I don't have any problem with that.  So, he

13   mentioned to me that he's going to bring Glenn English to Flint

14   and have a chance to look at the number of patients we have and

15   the practice that we have at Marie's home.

16   Q.  Did he, in fact, bring Glenn English to Flint?

17   A.  The very next day.

18   Q.  Did you have a chance to meet Glenn English on that

19   occasion?

20   A.  Yes, I did.

21   Q.  What, if anything, happened when Glenn English came up?

22   A.  He was happy to see the number of patients that were going

23   in to see Dr. Burdette.  And he knew that most of them had

24   insurance.  And Vinod Patel was ready for him to open an adult

25   day program up there.

1    Q.  What was the next thing you heard about opening an adult

2    day program?

3              MR. BEUKE:  Judge, objection just foundationally, if

4    we can approximate a year or month.

5              THE COURT:  He's asking for when, which would call

6    for an answer, a year or a date.  So, I think he's trying to do

7    a foundation.

8              MR. NEAL:  I can lay a foundation right now.

9    BY MR. NEAL:

10   Q.  Do you have a sense of when this first conversation with

11   Glenn English about opening an adult day facility was in terms

12   of time?

13   A.  The fall 2009.

14   Q.  Okay.  And did you have any sense -- well, in any event,

15   fall of 2009.

16              After you had this initial conversation and met Glenn

17   English, what was the next thing that happened with respect to

18   this adult day facility, from your perspective?

19   A.  We mentioned to him that in order to open -- in order to

20   operate this adult day facility in a proper way, to make sure

21   that we have people coming in there, you have to make sure that

22   Dr. Burdette has a clinic in that adult day facility.

23   Q.  And you say "we mentioned" this.  Who is "we"?

24   A.  Me and Mr. Vinod Patel mentioned to Glenn English.

25   Q.  All right.  And why was that important to you to have

1   Mr. Burdette there in this adult day facility?

2   A.  These patients would always follow Dr. Burdette.

3   Q.  All right.  Did, in fact, this adult day facility open in

4   Flint?

5   A.  Yes, it did.

6   Q.  All right.  Are you familiar with the monetary arrangement

7   with respect to opening this adult day facility?

8   A.  Yeah.

9             Mr. Glenn English came up there.  A week later he

10  came to Flint to observe Marie's home.  And he had a list of

11  vacant properties in Flint.  And me, Mr. Vinod Patel and Glenn

12  English, we moved around to see these properties, and

13  eventually we landed at 400 South Dort Highway.

14  Q.  All right.  And what did you find at 400 South Dort

15  Highway?

16  A.  It was a building for an adult facility.  It was huge.  It

17  was mint clean.

18  Q.  All right.  This adult day facility, were you a partner in

19  this adult day facility?

20  A.  No, sir.

21  Q.  Are you familiar with who the partners were in opening this

22  adult day facility?

23  A.  Mr. Glenn English and Mr. Vinod Patel.

24  Q.  How do you know that?

25  A.  Because they discussed that in front of me, and they

1   mentioned that Glenn English is going to be the operational

2   manager and responsible for all the operations in that

3   business, and Mr. Vinod Patel would finance the business.

4   Q.  Did you hear any discussion of the financial arrangements

5   about opening the business?

6   A.  They say that -- they came to a conclusion that they would

7   need $70,000.

8   Q.  And who was the provide the $70,000?

9   A.  Mr. Vinod Patel.

10  Q.  And how was that -- how, if at all, would that money be

11  recouped?

12  A.  Sorry?

13  Q.  How, if at all, was that money to be paid back, the

14  $70,000?

15  A.  Once the adult day facility starts receiving these billed

16  payments, they would make an installment of $10,000 a month.

17  Q.  This adult day facility did open; is that correct?

18  A.  Correct.

19  Q.  And what was it called?

20  A.  New Century Adult Day Program.

21  Q.  Did you and Marie start bringing your patients to New

22  Century at that point?

23  A.  Yes, we did, once it open.

24  Q.  Did Dr. Burdette transfer his work to New Century?

25  A.  Yes, he did.

1   Q.  All right.  And were medications delivered to the patients

2   at New Century the same way they had been at Marie's house?

3   A.  Yes.

4   Q.  And patients came to the facility to see Dr. Burdette the

5   same way they had at Marie's house?

6   A.  Yes, the same way.

7   Q.  Were there any doctors other than Dr. Burdette who

8   practiced at New Century?

9   A.  Dr. Mark Greenbain and Dr. Anmy Tran.

10  Q.  Let's start with Dr. Greenbain.  What kind of a doctor is

11  Dr. Greenbain?

12  A.  He's a psychiatric doctor.

13  Q.  When did you first come to know about Dr. Greenbain?

14  A.  One day he just showed up at the adult day facility.

15  Q.  What did you do when this strange doctor showed up at the

16  adult day facility, if anything?

17  A.  I asked Glenn English who is this and why is he here.  So,

18  he said I've already talked to Mr. Vinod Patel.  So, you don't

19  need to ask me these questions.

20  Q.  After you spoke with is Mr. English, did you speak with

21  anyone else about Dr. Greenbain's presence?

22  A.  I called Mr. Vinod Patel.

23  Q.  And what did you -- what, if anything, did you say to

24  Mr. Vinod Patel when you called?

25  A.  I told him that there's a strange doctor up here and I

1    don't know why he's up here and do you have any knowledge about

2    it.  So, yes.

3    Q.  All right.  And what did Vinod Patel say to you at that

4    point?

5    A.  He's up there because of Mr. Glenn English and he needs

6    this doctor to certify that these patients are mentally ill so

7    he can recruit them into this adult day program.

8    Q.  All right.  Did Dr. Greenbain serve any other purpose that

9    was relevant to your work during the time he was at New

10   Century?

11   A.  He wrote prescriptions for the patients.

12   Q.  All right.  And were any of the prescriptions particularly

13   important to you, Atul Patel, in terms of doing what you were

14   doing at New Century?

15   A.  Yes, sir.

16   Q.  And what prescriptions was that?

17   A.  Basically Dr. Burdette is not supposed to write 2 milligram

18   Xanax.  So, he used to write 1 milligram Xanax.  But we find

19   that if Dr. Mark Greenbain writes 2 milligram prescriptions to

20   his patients for Xanax, we would have a raising of the number

21   of patients.

22   Q.  And you mentioned that Greenbain would write prescriptions

23   for the patients.

24          Are you aware of any additional prescriptions that

25   Greenbain would write for the patient up there?

1   A.   He would generally write on an average five to six

2   prescriptions per patient.

3   Q.   Do you know where those prescriptions went to be filled?

4   A.   One of Babubhai Bob Patel's pharmacies.

5   Q.   Were you present when Greenbain's prescriptions were

6   delivered to patients as well?

7   A.   Sometimes.

8   Q.   And did you have a chance to observe what patients actually

9   received?

10  A.   Xanax 2 milligram.

11  Q.   Anything else?

12  A.   No.

13  Q.   Did Mark Greenbain make referrals to First Michigan?

14  A.   No.

15  Q.   You mentioned another doctor by the name of Anmy Tran?

16  A.   Correct.

17  Q.   What kind of a doctor was Anmy Tran?

18  A.   She was a podiatrist.

19  Q.   Okay.  And who, if anyone, told you that Tran would be

20  coming to New Century?

21  A.   Mr. Vinod Patel.

22  Q.   And what did Vinod Patel tell you when he informed you of

23  this?

24  A.   He told me that there's another doctor who's going to be

25  coming up there in Flint to see these patients and that she is

1    a podiatrist.  So, I asked Mr. Vinod Patel why do we need this

2    new doctor again up here; we already have two.  So, he

3    mentioned Babubhai Bob Patel is the one who wants her up here,

4    because a podiatrist can write some expensive foot creams and

5    powders, and he wanted prescriptions for those medications.

6    Q.  All right.  Did Dr. Tran make referrals to First Michigan?

7    A.  Yes, sir.

8    Q.  Did that have any impact on you, Atul Patel, and your

9    bottom line?

10   A.  Yes, it had an impact on me.

11   Q.  And can you describe for the jury what that impact was?

12   A.  Dr. Anmy Tran told Mr. Vinod Patel and Ramesh Patel that

13   for each and every referral that she would send to First

14   Michigan from Flint, from the New Century Adult Day Program,

15   she would want a hundred dollars for each referral.

16   Q.  All right.  And how, if at all, did that impact you, Atul

17   Patel?

18   A.  Vinod Patel and Ramesh Patel personally told me that their

19   marketings cost per patient is $300, and we cannot afford to go

20   up to 400 or 500, so it has to come out of your commission.

21   Q.  So, for patients that you had recruited that Tran referred

22   to First Michigan, how much money did you end up making?

23   A.  200.  And then after the 200, I gave a hundred to Marie.

24   So, I made a hundred if there was a referral from Anmy Tran,

25   because she would take a hundred dollars.

1    Q.   How about from Burdette; how much money would you, Atul

2    Patel, make for a patient that was recruited to First Michigan

3    by James Burdette?

4    A.   I would receive 300, out of which I would give a hundred

5    dollars to Marie.  So, I would make $200.

6    Q.   Did you complain about Dr. Tran being there given that it,

7    you know, affected your bottom line?

8    A.   I didn't like it.

9    Q.   All right.

10   A.   But he mentioned that Bob Patel wants her up there, so we

11   cannot do anything.  We were trying to avoid that.  But

12   eventually Bob Patel ended up paying some money to Glenn

13   English so he would allow her to be there.  So, I couldn't do

14   anything about it.

15   Q.   Let me ask you this while we are talking about money.  The

16   money that you were paid from First Michigan Home Health Care,

17   did that come to you in the form of checks?

18   A.   Not to me.

19   Q.   Okay.  Who did it come to?

20   A.   They wrote checks to my cousin.

21   Q.   All right.  And what was the purpose of writing checks in

22   your cousin's name as opposed to writing checks to you, Atul

23   Patel?

24   A.   According to my status at that moment, I could not work.

25   So, I could not receive a check.

1    Q.  Your cousin would take the money that was written in checks

2    to him and do what with it, to your knowledge?

3    A.  He would deposit them in the bank and then give me the

4    money.

5    Q.  All right.  Did there come a time when you and Marie and

6    the patients you recruited left New Century?

7    A.  Yes.

8    Q.  Do you know approximately when that was?

9    A.  Fall 2010.

10   Q.  Okay.  And can you describe for the jury what it was that

11   happened that led to you and Marie leaving New Century?

12   A.  I used to visit New Century everyday.  And there came a

13   time when I saw Glenn English having the patients sign in for

14   their daily attendance sheet from date one to date 30th or

15   31st, without even looking at Saturdays and Sundays, which he

16   is closed, and having them to sign for the coming month.

17                And I got worried, that you might never know.  This

18   patient might end up in the hospital.  He would be somewhere

19   else.  He would be out of state.  He would be visiting another

20   doctor.  And if you bill, there will be a clash.

21   Q.  And why were you concerned about that?

22   A.  That was a straight way to get caught.  You are billing

23   someone on a Sunday.  You don't even look if it's a Sunday or a

24   Monday.  And you know that you are closed on a Sunday.  You

25   can't bill that person.  You can't have that patient sign in on

1    a Sunday or a holiday when you are closed.

2    Q.  What, if anything, did you do when you saw Glenn English

3    doing this?

4    A.  I called Mr. Vinod Patel right away.

5    Q.  All right.  And what did you say to Mr. Vinod Patel?

6    A.  I explained to him the whole situation; that he's having

7    these patients sign for this all of this month and the coming

8    month without even looking at holidays and Sundays and without

9    even having the knowledge of where this patient would end up

10   next month.

11   Q.  What, if anything, did Vinod Patel say to you about that?

12   A.  Hang up the phone and I'm coming to Flint.

13   Q.  All right.  And did Vinod Patel, in fact, come to Flint?

14   A.  In one hour.

15   Q.  All right.  And where, if anywhere, did you meet him in

16   Flint?

17   A.  There was a Taco Bell on Dort Highway.

18   Q.  All right.  Who was present at this meeting?

19   A.  Mr. Vinod Patel, Marie and I.

20   Q.  And what was the substance of that discussion?

21   A.  We explained to him again the whole situation, and

22   Mr. Vinod Patel told us do not return to New Century Adult Day

23   Program.

24   Q.  Now, after you had this conversation with Vinod Patel, did

25   you go back to New Century?

1    A.  No, sir.

2    Q.  How about the patients you recruited, did they continue

3    going to New Century?

4    A.  Yes, sir.

5    Q.  And what, if anything, were you planning on doing about

6    that?

7    A.  I was concerned that, you know, Dr. Burdette is there and

8    I'm not supposed to go there anymore; so I would lose his

9    patients.  So, I made a phone call to Dr. Burdette and told him

10   that I'm not going to be returning in there because I observed

11   something that was not right.

12           So, I was concerned about his patients and I told him

13   what am I going to do now.  So, he's like you've been loyal to

14   me; so I'm going to be loyal to you.  I'll make sure that you

15   receive your First Michigan Home Health Care referrals from me

16   for the patients I see at New Century.

17   Q.  Did Burdette continue to stay at New Century after you

18   left?

19   A.  Yes, he did remain there.

20   Q.  Okay.  Do you know approximately how long he remained there

21   after you left?

22   A.  Two weeks.

23   Q.  What happened after these two weeks?

24   A.  I got a phone call from Dr. Burdette that Mr. Glenn English

25   has given him a one-week notice to leave the building.

1    Q.  All right.  And what did you do in response to that?

2    A.  I told him, if you want to, you can leave right now.  And

3    the very next day we moved back to Marie's home, and we

4    informed all the patients that Dr. Burdette is going to be

5    coming -- from now he is going to come to Marie's home rather

6    than New Century Adult Day Program.

7    Q.  All right.  And did Dr. Burdette begin coming to Marie's

8    home at that point?

9    A.  Yes.

10   Q.  And the process was the same as it was before you got to

11   New Century; is that correct?

12   A.  Correct.  It remained the same.

13   Q.  And did you eventually locate another place for Burdette's

14   prescriptions to go -- or, Burdette's patients to go?

15   A.  Sorry, come again.

16   Q.  Did you eventually locate another place for Dr. Burdette

17   and these patients you had recruited to go?

18   A.  Yes.

19           Then as it was a concern for us, because there was a

20   huge number of patients, so we started looking for a vacant

21   building that would specifically just be a clinic and nothing

22   else.

23   Q.  All right.  And did you, in fact, find such a building?

24   A.  In Mt. Morris, Michigan.

25   Q.  And Mt. Morris is close to what city?

1    A.  Flint.

2    Q.  And after you located this building, what happened?

3    A.  Dr. Burdette relocated there and all the patients started

4    coming to that clinic.

5    Q.  I want to step back a little bit.  You've mentioned a

6    couple of Bob Patel's pharmacies.  You've mentioned Rapid Drugs

7    and you mentioned Tri-City Apothecary.  Is that right?

8    A.  Yes.

9    Q.  And Tri-City Apothecary was located where?

10   A.  In Saginaw.

11   Q.  Did you have any role in opening Tri-City Apothecary?

12   A.  Yes.  I was the one who looked for the location.

13   Q.  All right.  And how did Tri-City -- how did you come to

14   have that role?  Who talked to you about it?

15   A.  One day I received a phone call from Mr. Vinod Patel.  And

16   he mentioned to me that he's looking forward to open pharmacies

17   with Bob Patel in north Michigan, Bay City area and Saginaw

18   area, and he would be part of the operations and profits.

19   Q.  Okay.  And what, if anything, happened after that?

20           He told you about this.  What did this have to do

21   with you?

22   A.  So, he asked me that let's go up there and look for a

23   location and help me out, figure out how we're going to open

24   all these pharmacies.

25   Q.  Okay.  And did you, in fact, go up there and help Vinod

1    Patel out?

2    A.  Yes, I did.

3    Q.  What did you do?

4    A.  I had a friend named Vikas Sharma.  I introduced Vikas

5    Sharma to Mr. Patel.  He is a therapist working at Covenant

6    Hospital in Saginaw, and he has connections with doctors.

7    Q.  What -- okay.  You mentioned he's a therapist?

8    A.  Correct.

9    Q.  He has connections with doctors?

10   A.  Because he was working at the hospital.

11   Q.  Did you ever have a meeting with Vikas Sharma and Vinod

12   Patel?

13   A.  Yes.  We had a chance to meet, the three of us together.

14   Q.  Okay.  And what happened in this meeting with Vinod Patel

15   and Vikas Sharma?

16   A.  Vinod Patel asked if Vikas Sharma would help us, and then

17   Vikas Sharma wanted to know specifically what kind of help he

18   wanted.  So, Vinod Patel mentioned to him I want you to help me

19   get in touch with these doctors and help us open a pharmacy in

20   their clinics.

21   Q.  Okay.  And what, if anything, did Vikas Sharma say?

22   A.  He said okay, I don't have any problem with that.  I can

23   try my best.

24   Q.  Was there any discussion of money at that point?

25   A.  Mr. Vinod Patel handed him a check for $2,000 at the first

1  meeting.

2  Q.  And did Vinod Patel describe what that check was for?

3  A.  It was for Vikas Sharma to help us out, and he would pay

4  him monthly $2,000.

5  Q.  Did you have any role in locating the facility where

6  Tri-City Apothecary would be located?

7  A.  Yeah.  I'm the one that looked for that building.

8  Q.  And what building did you find?

9  A.  It was a building located to several doctors' clinics.

10  There were like seven to eight clinics around that building.

11  Q.  Okay.  And ultimately was a pharmacy put in there?

12  A.  Correct.

13  Q.  All right.  And that pharmacy became Tri-City Apothecary.

14  Isn't that right?

15  A.  Correct, sir.

16  Q.  And after that pharmacy opened, did that become the

17  pharmacy that was supplying the prescriptions to Burdette's

18  patients in Flint?

19  A.  Correct, sir.

20  Q.  All right.  In late 2010, did you have any conversations

21  with Vinod Patel about his work in the northern pharmacies for

22  Bob Patel?

23  A.  With Vikas Sharma we ended up with a psychiatric group in

24  the Bay City area.  And Bob came down.  As he heard that there

25  was a group of psychiatric doctors willing to work with us, and

| | |
|---|---|
| 1 | he was constantly looking for psychiatric doctors, he came up |
| 2 | there and he talked to these psychiatric doctors.  And they |
| 3 | came to a conclusion where they would allow Bob Patel and Vinod |
| 4 | Patel to open a pharmacy in their building. |
| 5 | Q.  All right.  And that was the second pharmacy located up in |
| 6 | the Saginaw area.  Is that correct? |
| 7 | A.  Correct. |
| 8 | Q.  All right.  Ultimately did you have a conversation with |
| 9 | Vinod Patel about his ownership interest in the northern |
| 10 | pharmacies for Bob Patel? |
| 11 | A.  Yeah.  Initially he told me that he's going to be part of |
| 12 | the operations and part of the profits. |
| 13 | Q.  All right.  Later did you have a conversation with him |
| 14 | where he had a different understanding? |
| 15 | A.  One day he called me and he was really frustrated.  So, I |
| 16 | went to see him down in Canton.  And he was really mad at Bob |
| 17 | Patel. |
| 18 | Q.  Okay.  Can you describe what happened in this meeting? |
| 19 | A.  Babubhai bob Patel came to a point where he told him that |
| 20 | you're not going to be anymore part of these pharmacies in the |
| 21 | northern area. |
| 22 | Q.  And what, if anything, did Vinod Patel propose to do about |
| 23 | this? |
| 24 | A.  He mentioned to me that we are going to open our own |
| 25 | pharmacy, meaning Mr. Vinod Patel and I. |

1    Q.   Okay.  And what did you say in response?

2    A.   I said yes, no problem.

3    Q.   All right.  And what happened next?

4    A.   We opened a pharmacy in the Mt. Morris area next to

5    Dr. Burdette's clinic.

6    Q.   All right.  And do you know approximately when this was?

7    A.   January 2011.

8    Q.   And what was this pharmacy called?

9    A.   Beecher Pharmacy.

10   Q.   And who selected the building where this pharmacy was to be

11   located?

12   A.   I selected the building.

13   Q.   Did you discuss it with Vinod Patel?

14   A.   Yes.

15   Q.   What was the financial arrangement that you came to

16   concerning the ownership of Beecher Pharmacy?

17   A.   The pharmacist, Mr. Vinod Patel and I would have equal

18   share in the pharmacy.

19   Q.   And did you select a pharmacist that you were going to use

20   at Beecher Pharmacy?

21   A.   Yes.

22   Q.   Who was that pharmacist?

23   A.   Lalit Patel.

24   Q.   And what, if anything, was Lalit Patel doing at the time

25   that you agreed to do this?

1    A.  He was working for Babubhai Bob Patel.

2    Q.  Before Beecher Pharmacy opened did you and Lalit Patel have

3    a chance to have a conversation with Vinod Patel about the

4    ownership of the pharmacy?

5    A.  Multiple times.

6    Q.  All right.  And ultimately what conclusion was reached?

7    A.  The day we opened the pharmacy, he mentioned that both of

8    you are not part of this pharmacy.  You're just going to be

9    working here and I'm going to be the owner of this place.

10   Q.  What was your reaction after Vinod Patel told you you were

11   not going to be a partner in this pharmacy?

12   A.  I was upset with him the way he was upset with Bob Patel.

13   Q.  At Beecher Pharmacy what was to be your source of

14   prescription referrals?

15   A.  Dr. Burdette.

16   Q.  At this time in January of 2011, did you continue

17   recruiting patients for First Michigan?

18   A.  No.  I had stopped.

19   Q.  Okay.  But Dr. Burdette had the patients you recruited

20   coming to him; is that correct?

21   A.  Correct.

22   Q.  That was going to be your source of referrals?

23   A.  Correct.

24   Q.  Did Vinod Patel direct you to engage in any particular

25   billing practices at Beecher Pharmacy with respect to

1    Burdette's prescriptions?

2    A.  Yes.  He mentioned to us that bill but do not dispense.

3    Q.  What, if anything, did you say in response to the billing

4    but not dispensing?

5    A.  We mentioned to him that if we bill these medications and

6    we do not dispense them, then we're going to have a stock of

7    inventory.

8    Q.  And why, if at all, was that a problem for you?

9    A.  If an inspector -- a pharmacy inspector comes to a pharmacy

10   and sees a stockpile of medications, then that would be a

11   concern; like why are they here and why do you keep on ordering

12   them if you have a stockpile.

13   Q.  At that point, in January of 2011, were you familiar with

14   how Babubhai Patel dealt with billed but not dispensed

15   medications?

16   A.  Yeah, I was aware of it.

17   Q.  And what was Babubhai Patel's method of dealing with these

18   medications?

19   A.  He would return these pharmacies at a particular time when

20   he would receive some phone calls from McKesson.

21   Q.  All right.  What, if anything, did you say to Mr. Vinod

22   Patel after you told him these medications would be lying

23   around here?

24   A.  We told him first go and look for a way that we can get rid

25   of the stockpile, that we can bill for and not dispense.  So,

1    he said okay, I'll look for a way how we can do it.  And so we

2    told him the day you look for a way that we can get rid of the

3    stockpile, we will start billing but not dispensing.

4    Q.  When you say get rid of the stockpile, do you mean destroy

5    the stockpile?

6    A.  I'm sorry.  What?

7    Q.  When you say get rid of the stockpile of medications that

8    had been billed but not dispensed, do you mean destroy the

9    stockpile?

10   A.  No, not destroy the stockpile.  Find a way of selling those

11   medications or returning those medications to the wholesaler.

12   Q.  What did Vinod Patel say in response to this?

13   A.  He will find a way.

14   Q.  All right.  Did he ever find a way during your time at

15   Beecher Pharmacy?

16   A.  No, he didn't find a way.

17   Q.  You mentioned that Dr. Burdette was your principal source

18   of referrals at Beecher Pharmacy.  Is that correct?

19   A.  Correct.

20   Q.  At some point did Dr. Greenbain become involved?

21   A.  Yeah.

22   Q.  How did that come about?

23   A.  We wanted to have some psychiatric medications billed in

24   the pharmacy.  So, we encouraged Dr. Mark Greenbain to see the

25   patients where Dr. Burdette was seeing them.

1   Q.  How did that come about?  Who actually reached out to

2   Greenbain, if you know?

3   A.  Me and Mr. Vinod Patel went and we talked to Dr. Greenbain.

4   Q.  All right.  And what, if anything, did Dr. Greenbain

5   request in exchange for sending prescriptions to Beecher

6   Pharmacy?

7   A.  He wanted $3.50 for each prescription that he will give us.

8   Q.  And when you say each prescription, do you mean each piece

9   of paper?

10  A.  No.

11  Q.  What do you mean?

12  A.  The number of medications written to a patient, one

13  particular patient.

14  Q.  Were you ever present when Dr. Greenbain was actually paid

15  for writing these medications?

16  A.  Yes.

17  Q.  And who else was present when this happened?

18  A.  Initially when we discussed about paying Dr. Greenbain, it

19  was Dr. Greenbain that was present there, Mr. Vinod Patel and

20  I.

21  Q.  Okay.  And when Dr. Greenbain was actually paid for writing

22  the prescriptions, who was present then?

23  A.  I and Dr. Greenbain.

24  Q.  Okay.  Where did you get the money to pay Dr. Greenbain for

25  these prescriptions?

1   A.  I used to run down to Mr. Vinod Patel's home and collect

2   the money from there and then rush to Dr. Greenbain's home and

3   collect those prescriptions and hand it over to Lalit Patel.

4   Q.  Okay.  And where did Dr. Greenbain live?

5   A.  Farmington.

6   Q.  Let me ask you this.  You indicated earlier that Vinod

7   Patel asked you to bill and not dispense for medications at

8   Beecher Pharmacy.  Is that correct?

9   A.  Correct.

10  Q.  You told him no, we're not going to do that until you find

11  out a way to return the medication or profit from the

12  medication.  Is that right?

13  A.  Correct, sir.

14  Q.  All right.  Did you, in fact, bill but not dispense for

15  medications at Beecher Pharmacy?

16  A.  Yes, I did.

17  Q.  And did you conceal that from Vinod Patel?

18  A.  Yes.

19  Q.  Why did you conceal that from Vinod Patel?

20  A.  Because he came to a point where he -- we came up with this

21  pharmacy and he mentioned to us that you are not going to be

22  any part of this pharmacy.  He betrayed us the way Bob did to

23  him.

24  Q.  Did you and Lalit Patel come up with a way, a method, of

25  how you were going to profit from these medications that were

1    billed but not dispensed?

2    A.  Yes.

3    Q.  What was that method?

4    A.  We would carry the billed but not dispensed medications to

5    New Jersey and sell them there.

6    Q.  And who would you sell them to in New Jersey?

7    A.  There was a man known as Manoj who had multiple pharmacies

8    in New York.

9    Q.  And who had the connection to Manoj?

10   A.  Lalit Patel.

11   Q.  Approximately how much money did you make selling billed

12   but not dispensed medications to Manoj in New York during your

13   time at Beecher Pharmacy?

14   A.  Including the share of mine and Mr. Lalit Patel, we made

15   $200,000.

16   Q.  You mentioned earlier in your testimony August 2nd, 2011.

17   Is that a significant date for you?

18   A.  Yes.

19   Q.  What happened on August 2nd of 2011?

20   A.  Bob Patel was indicted.

21   Q.  All right.  Did you have any conversations with Vinod Patel

22   on August 2nd, 2011?

23   A.  He came running to Flint.  He was worried.  And he told me

24   shut down everything and disappear.

25   Q.  All right.  Did you, in fact, shut down Beecher Pharmacy at

1    that point?

2    A.  For a couple of days.

3    Q.  All right.  Beecher reopened after a couple of days; is

4    that right?

5    A.  Correct.

6    Q.  How long did Beecher continue to operate after August 2nd,

7    2011?

8    A.  After August 7th (sic), I was in Michigan for two weeks,

9    and then later I left.  So, I have no idea then what happened.

10

11   Q.  Where did you go after you left?

12   A.  I went to Georgia.

13   Q.  Is that where you live today?

14   A.  Correct.

15   Q.  What do you do today?

16   A.  My wife owns a gas station, which I manage.

17   Q.  In March of 2013, what, if anything, happened to you

18   pertaining to this case?

19   A.  I got indicted.

20   Q.  All right.  And do you know what you were charged with?

21   A.  Health care fraud.

22   Q.  How did you decide to resolve that charge ultimately?

23   A.  I talked to my lawyer, and I was guilty, so we decided to

24   plead guilty.

25   Q.  Did you sign a Plea Agreement in connection with your

1    guilty plea?

2    A.  Yes.

3    Q.  And does that Plea Agreement have certain Sentencing

4    Guidelines contained within it?

5    A.  37 months to 46 months.

6    Q.  Does the Plea Agreement include a Cooperation Agreement?

7    A.  Correct.

8    Q.  All right.  Does that Cooperation Agreement require you to

9    testify truthfully here today?

10   A.  Yes, sir.

11   Q.  Have you been sentenced?

12   A.  Not yet.

13   Q.  Do you hope that the Government will ask for a reduction in

14   your sentence as a result of your testimony here today?

15   A.  I hope they do.

16   Q.  Do you have any promises that the Government will ask for a

17   specific amount of time to be reduced from your sentencing as a

18   result of your testimony?

19   A.  I don't have a promise.

20   Q.  You mentioned that when you came to this country for the

21   first time, you came to pursue higher studies.  Is that

22   correct?

23   A.  Correct, sir.

24   Q.  All right.  You had to apply for a student visa in order to

25   come to the United States; is that right?

1    A.  Correct, sir.

2    Q.  Were you honest in your visa application?

3    A.  No, sir.

4    Q.  What did you lie about?

5    A.  I lied that I had a Bachelor's Degree.

6    Q.  In fact, you do not have a Bachelor's Degree from India?

7    A.  No.

8    Q.  You're not a citizen of the United States at this point,

9    are you?

10   A.  No.

11   Q.  What's your understanding of what will happen to you after

12   you serve whatever sentence this Court imposes?

13   A.  I will be deported.

14          MR. NEAL:  I have nothing further for this witness,

15   Your Honor.

16          THE COURT:  Cross-examination?

17          MR. BEUKE:  Thank you, Judge.

18                   CROSS-EXAMINATION

19   BY MR. BEUKE:

20   Q.  Mr. Patel, you pled guilty to this offense a number of

21   months ago, correct?

22   A.  Correct.

23   Q.  And you said you pled guilty because you were guilty,

24   correct?

25   A.  Correct.

1    Q.  And you're not a citizen, correct?

2    A.  Correct.

3    Q.  And you expect to be deported, correct?

4    A.  Correct.

5    Q.  And you haven't been deported, correct?

6    A.  Correct.

7    Q.  You've been allowed to move to Georgia, correct?

8    A.  Correct.

9    Q.  And your wife bought a gas station down in Georgia,

10   correct?

11   A.  Correct.

12   Q.  How much did she pay for the gas station?

13   A.  $40,000.

14   Q.  And that was money that you used that you made during your

15   involvement in this scheme, correct?

16   A.  No, sir.

17   Q.  So, this is money that your wife had and she used on her

18   own, correct?

19   A.  No, sir.

20   Q.  Well, where did she get the money?

21   A.  Before we got into the gas station business, she had a

22   friend in Georgia.  And as this indictment took place in 2011,

23   I had nothing to do down here.  So, she asked her friend is

24   there an opportunity for us in Georgia.  The friend mentioned

25   that he has a store with one of his partners who is not showing

1  him profit and would build to give us inventory without any

2  goodwill payment or anything.

3  Q.  You told the ladies and gentlemen that you made $100,000

4  based on your involvement with Lalit Patel, correct?

5  A.  Correct.

6  Q.  As part of your agreement, you've agreed to forfeit all of

7  the monies that you made during the course of your involvement

8  in this scheme, correct?

9  A.  Correct.

10  Q.  Tell the ladies and gentlemen of the jury, if you would,

11  how much money have you given back to the United States of

12  America?

13  A.  Zero.

14  Q.  Zero.

15          And tell the ladies and gentlemen how much money you

16  plan to give back to the United States of America and where

17  it's going to come from?

18  A.  I don't have any money.

19  Q.  Okay.  So, that forfeiture part of the agreement really is

20  nothing that you're worried about, correct, because you don't

21  have any money?

22  A.  No, I don't have any money.

23  Q.  Okay.  Let's talk about 2007.

24          You had migrated through India, correct?  You were

25  living in India, correct?

1    A.  I was living in India.

2    Q.  And with your family?

3    A.  No.  Alone.

4    Q.  Okay.  And you knew while you were in India that you wanted

5    to come to the United States, correct?

6    A.  Correct.

7    Q.  And you made a decision -- correct me if I'm wrong -- that

8    I'm going to apply for a student visa.  Correct?

9    A.  Correct.

10   Q.  And you went ahead and you made certain decisions about how

11   to get a student visa.  Correct?

12   A.  Correct.

13   Q.  And you actually went to somebody and you bought a degree.

14   Correct?

15   A.  Correct.

16   Q.  And the degree that you bought was in the field of

17   commerce.  Is that correct?

18   A.  Correct.

19   Q.  The person that you bought the degree from, he gave you a

20   certificate.  Correct?

21   A.  Correct.

22   Q.  And you took that certificate and you went to the

23   Immigration Department and you gave them the certificate.

24   Correct?

25   A.  They never asked me for a certificate.

1    Q.  Well, in order to process your visa request, you had to

2    prove that you had a degree.  Correct?

3    A.  Correct.

4    Q.  And you showed somebody in India your degree.  Correct?

5    A.  I went with my degree to the embassy and --

6    Q.  Right.

7    A.   -- and they didn't ask me for the degree.

8    Q.  Well, when you went with your degree to the embassy, you

9    knew if you were applying for a student visa, that they might

10   ask for the degree under which you want to ask to go to the

11   United States and study.  Correct?

12   A.  Correct.

13   Q.  And that's why you bought the degree.  Correct?

14   A.  Correct.

15   Q.  And when you went to the embassy, you lied to the people at

16   the embassy.  Correct?

17   A.  Correct.

18   Q.  You told the people at the embassy that I studied for years

19   of my life in order to get this degree.  Correct?

20   A.  Correct.

21   Q.  And when you went there, you knew you had to lie to those

22   people in order to have a chance to get to the United States.

23   Correct?

24   A.  Correct.

25   Q.  And the people that you lied to at the embassy took your

1    word for the fact that you had a degree, and at some point

2    after the process approved your visa.  Correct?

3    A.  Correct.

4    Q.  You traveled to Pittsburgh, Pennsylvania?

5    A.  Correct.

6    Q.  Forged -- not forged visa, but under false pretenses.

7    Correct?

8    A.  Correct.

9    Q.  When you got to the United States, you never corrected the

10   information to anybody in the United States about the fact that

11   I bought my degree in India, did you?

12   A.  No.

13   Q.  You lied to everybody in India -- or, I'm sorry -- in the

14   United States about your educational background.  Correct?

15   A.  Correct.

16   Q.  Including the ladies and gentlemen at this table over here,

17   until a few days ago.  Correct?

18   A.  Correct.

19   Q.  When you sat down with the gentlemen from the prosecution,

20   they asked you about your educational background.  Correct?

21   A.  Correct.

22   Q.  Numerous times.  Correct?

23   A.  The first time that they asked me, I told them that I have

24   a -- I don't have a Bachelor's Degree.

25   Q.  Well, that first time was back in October of 2013.

1   Correct?

2   A.  I don't remember.

3   Q.  Well, in any event, when you arrived in the city of

4   Pittsburgh, Pennsylvania, you went to college out there.

5   Correct?

6   A.  Correct.

7   Q.  I think you told Mr. Neal La Roche College, correct?

8   A.  Correct.

9   Q.  And when you went up to the doors of La Roche College, did

10  you have your fake degree from India?

11  A.  Correct.  I had one.

12  Q.  Did you show those people at La Roche College your fake

13  degree from India?

14  A.  Yes.

15  Q.  And the people at La Roche College, they asked you

16  questions about your studies in India.  Correct?

17  A.  Correct.

18  Q.  You lied to those people, correct?

19  A.  Yes, sir.

20  Q.  You had no problem looking them in the face and lying about

21  everything that you claim to have done to get that degree.  Is

22  it fair to say?

23  A.  Yes, sir.

24  Q.  Okay.  And those people fell for your lies and they let you

25  in school, didn't they?

1   A.   Yes.

2   Q.   And when they let you in school in La Roche College.  You

3   stayed there for about six months.  Is that right?

4   A.   Correct.

5   Q.   Okay.  And you didn't graduate from La Roche College, did

6   you?

7   A.   No.

8   Q.   Who were you staying with in Pittsburgh?

9   A.   Apartment building.

10  Q.   With your wife?

11  A.   No.

12  Q.   You weren't married then?

13  A.   No.

14  Q.   Okay.  And the visa that you were here on, the student

15  visa, didn't allow you to work.  I think that was your

16  testimony.  Is that right?

17  A.   Right.

18  Q.   How did you support yourself for six months in Pittsburgh,

19  Pennsylvania?

20  A.   I came with some money from home.

21  Q.   So, you had your savings from home, correct?

22  A.   My parents gave me some money.

23  Q.   Well, less the money that you had to pay to get your

24  degree, correct?

25  A.   Correct.

1   Q.   And so you lived on that money in Pittsburgh, correct?

2   A.   Correct.

3   Q.   And at some point, you left La Roche College and you

4   decided to come to the beautiful state of Michigan.  Correct?

5   A.   Correct.

6   Q.   To be and live with your cousin Paresh, correct?

7   A.   Correct.

8   Q.   Who owned this liquor store in Canton, Michigan, correct?

9   A.   Correct.

10   Q.   And you decided when you got here, I think I'm going to

11   apply to get a Master's Degree.  Correct?

12   A.   I applied for my Master's -- I applied for my Master school

13   first and then I moved here.

14   Q.   Well, when you applied to get into the Master's program

15   at -- was it Saginaw Valley or were there a number of places

16   that you applied?

17   A.   Saginaw Valley.

18   Q.   Pardon?

19   A.   Saginaw Valley.

20   Q.   Did you apply at any other schools?

21   A.   I tried to apply to some other schools, but they told me

22   that for that particular year they were done enrolling the

23   students.

24   Q.   Well, so each one of these schools that you applied to,

25   correct me if I'm wrong, but you lied in the applications in

1   order to get into the Master's program.  Correct?

2   A.  Correct.

3   Q.  You had to tell them that you actually went and studied and

4   had a degree in India.  Correct?

5   A.  Correct.

6   Q.  All lies.  Correct?

7   A.  Correct.

8   Q.  And, again, some college -- this time Saginaw Valley --

9   decided that they are going to trust Atul Patel.  Correct?

10  A.  Correct.

11  Q.  And they took your word or your representations on that

12  piece of paper, that application, that you actually had studied

13  and got a degree in India.  Correct?

14  A.  Correct.

15  Q.  And they allowed you to enter into their Master's program.

16  Correct?

17  A.  Yes.

18  Q.  And Saginaw Valley was an hour and a half from Canton,

19  Michigan, correct?

20  A.  Yes.

21  Q.  And Atul Patel didn't have a car, correct?

22  A.  Yes.

23  Q.  And the Master's program began in when?

24  A.  January 2008.

25  Q.  Okay.  In January 2008, tell the ladies and gentlemen of

1    the jury how many courses did you have that semester?

2    A.  Three.

3    Q.  What were the courses?

4    A.  Accounting, ethics.

5    Q.  Ethics?

6    A.  Yes.

7    Q.  How did you do in that course?

8    A.  I did okay.

9    Q.  Good?  You get an A?

10           THE COURT:  Please keep your voice down a little bit.

11           MR. BEUKE:  Sorry, Your Honor.

12           THE COURT:  You could wake up the judge.

13           MR. BEUKE:  Okay, Judge.  It's that Italian in me,

14   Judge.

15   BY MR. BEUKE:

16   Q.  How did you do in ethics?

17   A.  I had a B.

18   Q.  Oh.

19           Well, how did you get from Canton, Michigan, to

20   Saginaw Valley everyday?

21   A.  It wasn't everyday.

22   Q.  How many days a week were you going to school?

23   A.  Some semesters, it was two days a week; some semesters, it

24   was three days a week.

25   Q.  How did you get to Saginaw Valley; tell the ladies and

1   gentlemen?

2   A.  I used my cousin's car.

3   Q.  Okay, so you borrowed Paresh's car, correct?

4   A.  Correct.

5   Q.  Did you have to take Paresh to work at the liquor store?

6   A.  No.  The school was in the evening.

7   Q.  Oh.  So, you went up there in the evening?

8   A.  Correct.

9   Q.  Okay.  Now, during this five-month or so period of time,

10  you got bored on occasion, I think you told the ladies and

11  gentlemen?

12  A.  Correct.

13  Q.  And you started hanging out at your cousin's liquor store,

14  correct?

15  A.  Correct.

16  Q.  And when you hung out at your cousin's liquor store, at one

17  point you say you met a gentleman who was a regular customer.

18  Correct?

19  A.  Correct.

20  Q.  That's Mr. Vinod Patel, correct?

21  A.  Correct.

22  Q.  You knew Mr. Patel or you learned that Mr. Patel was

23  married, correct?

24  A.  Correct.

25  Q.  You met his wife, correct?

1   A.  Correct.

2   Q.  You knew that he and his wife were friends with your

3   cousin, correct?

4   A.  Correct.

5   Q.  You knew he had two children, correct?

6   A.  Yes.

7   Q.  They were back then around ten and six.  Fair to say?

8   A.  Somewhere in there.

9   Q.  You met his children, correct?

10  A.  Yes.

11  Q.  And Paresh, your cousin, has children also.  Correct?

12  A.  Yes.

13  Q.  Their kids are friends with the Patels.  Correct?

14  A.  Yes.

15  Q.  Did you learn that your cousin worked for Vinod

16  occasionally at First Michigan?

17  A.  He never worked with Vinod Patel at First Michigan.

18  Q.  So, he was never an employee or never had any relationship

19  with that business?

20  A.  No.

21  Q.  Okay.  Well, at some point you said that after you met

22  Vinod Patel, one day in or around May of 2008, Vinod Patel says

23  to Atul Patel come on and take a ride with me.  Correct?

24  A.  Yes.

25  Q.  Did you have class that day?

1    A.  No.

2    Q.  Did you have class that evening?

3    A.  No.

4    Q.  Do you remember for sure you didn't have class?

5    A.  This is --

6    Q.  What day was it in May?

7    A.  This is somewhere in 2008 and right now we are in 2014.

8    So, I'm not sure about it.

9    Q.  Good point.  Good point.

10           Well, what day was it in May of 2008?

11   A.  I don't remember.

12   Q.  What did you do or what time did you get up that morning?

13   A.  At ten o'clock I was at the liquor store.

14   Q.  Ten o'clock.

15           You are sure that you went to the liquor store at ten

16   o'clock in the morning in May of 2008?

17   A.  Yes.

18   Q.  And who did you talk to when you got to the liquor store?

19   A.  I was with my cousin.

20   Q.  Anybody come into the store, any customers?

21   A.  Customers and then Mr. Vinod Patel.

22   Q.  Who is the first guy you talked to at the liquor store?

23   A.  I don't remember that.

24   Q.  How about three days later; who did you talk to the liquor

25   store that day?

1    A.   I don't remember that.

2    Q.   How about a week later; who did you talk to that day?

3    A.   What meal did you have in 2008 on that same day?

4    Q.   Well, here, you've related to the ladies and gentlemen of

5    the jury for the last two hours about conversations that you

6    had with people that happened in 2008, 2009, 2010 and 2011.

7            You're able to sit here and recall those, according

8    to you.  Correct?

9    A.   Yes.

10   Q.   June 15th of 2008, what did you do?

11   A.   I don't remember.

12   Q.   June 18th?

13   A.   I don't remember.

14   Q.   July 27th?

15   A.   There are some occasions in my life that are planted in my

16   brain.  And others, I cannot.

17   Q.   Well, was one of the occasions in your life everyday

18   driving up to Flint, Michigan?

19   A.   Yes, everyday.

20   Q.   All right.  The second week that you went up to Flint,

21   Michigan, who did you go up there with?

22   A.   Alone.

23   Q.   Alone.

24   A.   Because most of the time I was alone.

25   Q.   Who did you speak to that second week, the first day,

1   Monday?

2   A.  I don't remember.

3   Q.  Okay.  How about Tuesday?

4   A.  I don't -- I spoke to some people.  I don't remember.

5   Q.  How about Thursday?

6   A.  I don't remember that.

7   Q.  Okay.  Well, in any event, your testimony is that Vinod

8   Patel said, Atul, come on and jump in the car with me.

9   Correct?

10  A.  Yes.

11  Q.  And, again, the very first time -- tell the ladies and

12  gentlemen the very first time that you were asked to remember

13  what you did back in May of 2008 and relate that to somebody

14  about this investigation?

15  A.  Sorry, come again?

16  Q.  Well, when was the first time that you told somebody, hey,

17  I remember what I did in May of 2008 when I met with Vinod

18  Patel for the first time?

19  A.  That was the first meeting, so I remember.  I remember the

20  first day of school.

21  Q.  No.  My question is when did you first tell somebody about

22  that first meeting?

23  A.  I told that to Mr. John Neal.

24  Q.  Was that October 2nd of 2013?

25  A.  Somewhere in there.

1    Q.  Five and a half years after you claim you first met Vinod

2    Patel?

3    A.  Yes.

4    Q.  And after you had been indicted in the case.  Correct?

5    A.  Correct.

6    Q.  And after you had made a decision, along with talking with

7    your lawyer, to plead guilty and try to get the lowest sentence

8    you could.  Correct?

9    A.  I didn't ask for the lowest sentence.

10   Q.  Well, you hope you get probation, don't you?  You know

11   that's a possibility.

12   A.  That's up to the judge.

13   Q.  Well, I know it's up to the judge.  But it's a possibility

14   that you are aware of, correct, Mr. Patel?

15   A.  I'm not aware of any of those things.  I know that I have a

16   guidelines of 37 months to 46 months as of right now.

17   Q.  And you know based on the Plea Agreement that you signed

18   that Mr. Neal and Mr. Pratt negotiated with you and your

19   lawyer, correct?

20   A.  (No response.)

21   Q.  You went through that Plea Agreement, didn't you?

22   A.  Negotiation?

23   Q.  Yes.

24   A.  I don't remember any negotiation.

25   Q.  The Plea Agreement that you signed, you signed that in a

1    courtroom.  Correct?

2    A.  They will talk to the judge, but I don't know what they're

3    going to talk to the judge about.

4    Q.  Well, here.  Mr. Patel, you went at some point and you met

5    with Mr. Neal and Mr. Pratt.  Correct?

6    A.  Correct.

7    Q.  And there was a document called a Rule 11 Plea Agreement?

8    A.  Yeah.  I remember the document like that.

9    Q.  Remember that one?

10   A.  Mm-hmm.

11   Q.  Okay.  That day was what day?

12   A.  I don't remember the date.

13   Q.  Well, what time did you come down to this building?

14   A.  It was in the morning.

15   Q.  Okay.  And who did you come down here with?

16   A.  Mr. Jim Burdick.

17   Q.  That was your lawyer, correct?

18   A.  Correct.

19   Q.  And before you came down with Mr. Burdick, Mr. Burdick

20   showed you some documents.  Correct?

21   A.  Correct.

22   Q.  You don't remember the date, correct?

23   A.  No.

24   Q.  Do you remember anything about the documents that

25   Mr. Burdick showed you?

1    A.   I trust Mr. Burdick.  So, he told me that this is your Plea

2    Agreement and you have to sign it.  So, I signed it.

3    Q.   Well, you say you trusted Mr. Burdick.

4         Did you ask Mr. Burdick to explain to you what you

5    were signing?

6    A.   He told me that it is my Plea Agreement.

7    Q.   Okay.  When he told you it was your Plea Agreement, did he

8    explain to you that the Plea Agreement suggested the guideline

9    range was going to be 37 to 46 months?

10   A.   Yeah, he mentioned that.

11        MR. NEAL:  Judge, I'm going to object to the

12   questions about the communications between Atul Patel and Jim

13   Burdick, his attorney.

14        MR. BEUKE:  Judge, I'm trying -- I don't want to go

15   into the privilege, but --

16        THE COURT:  You just did.  You can't go into it,

17   but --

18        I thought the objection was going to be asked and

19   answered, but ...

20        MR. NEAL:  That too, Judge.

21        THE COURT:  It's evidence before the jury what the

22   Plea Agreement was.

23        MR. BEUKE:  Can I approach, Judge?

24        THE COURT:  He said, approaching.

25        Oh.  Approach the witness?

```
 1                    MR. BEUKE:  Yes.
 2                    THE COURT:  Oh, absolutely anytime.  The courtroom is
 3       yours.
 4                    MR. BEUKE:  Thank you, Your Honor.
 5       BY MR. BEUKE:
 6       Q.  Mr. Patel, I'm going to show you what I've marked as
 7       Defendant's No. 1 and ask you to take a look at that document,
 8       and tell the ladies and gentlemen of the jury if you recognize
 9       it, and if you do, what you recognize it to be?
10       A.  It's a Plea Agreement.
11       Q.  A Plea Agreement that you signed, correct?
12       A.  That's my signature.
13       Q.  And your lawyer's signature is on there, correct?
14       A.  Correct.
15       Q.  Mr. Neal, Mr. Pratt, their signatures are on there,
16       correct?
17       A.  Yes.  They signed it.
18       Q.  Okay.  And that was done on October 10th of 2013, correct?
19       A.  I just read the date on it.
20       Q.  Pardon?
21       A.  I just read the date on it.
22       Q.  Okay.  And you understood when you signed this some of the
23       things that you were agreeing to, correct?
24       A.  I was agreeing to the things that I committed.
25       Q.  Well, some of the things that you were concerned about were
```

1    the what is going to happen to Atul Patel if I sign this.   Fair

2    to say?

3    A.   Yes.   I'm going to prison.

4    Q.   And you knew that you could go to prison.   Correct?

5    A.   That's what the guidelines say.

6    Q.   Well, and you knew that if the Government decided to make a

7    motion -- well, they -- it was explained to you that if your

8    cooperation rose to a level of what they call substantial

9    assistance, that they were going to ask the judge to go

10   underneath the 37-month range.   Correct?

11   A.   They didn't tell me nothing like that.

12   Q.   That was never explained to you?

13   A.   No.

14   Q.   So, it was never told to you by anybody that your lawyer

15   could come in front of a judge and ask for a lower sentence

16   than 37 months?

17   A.   No one has promised me that.

18   Q.   No one has ever explained to you, no one at this table, the

19   gentlemen of the prosecution, ever explained to you that if we

20   believe your testimony rises to the level of substantial

21   assistance, we can come in front of a judge and make a

22   recommendation for a lower sentence.   Nobody has ever told you

23   that?

24   A.   No.

25   Q.   And you never asked anybody for that?

1    A.   They told me it's 37 months to 46 months.

2    Q.   So, as you sit here today, it's your understanding that you

3    will be sentenced between 37 months and 46 months?  Is that

4    your testimony?

5    A.   That is what I understand.

6    Q.   And you will be deported, correct?

7    A.   Correct.

8    Q.   Is it your understanding, as you sit here today, that it's

9    possible for somebody to recommend to the judge that you not be

10   deported?

11   A.   I don't know about that.

12   Q.   You never asked anybody about that?

13   A.   No.

14   Q.   Any conversation that you had, you weren't concerned enough

15   about the future of Atul Patel to try to understand the

16   complete details of what you were signing.  That's what you are

17   telling the ladies and gentlemen?

18   A.   Sorry.  Come again?

19   Q.   Patel, you rode around, according to you, with Vinod Patel

20   a couple times a week for a few months.  That's your testimony,

21   correct?

22   A.   Correct.

23   Q.   And during these times when you would ride around with

24   Vinod Patel, you would go to certain places in and around the

25   Detroit area.  Correct?

1   A.  Correct.

2   Q.  And you saw him meet with people.  Correct?

3   A.  Correct.

4   Q.  And you saw him, according to you, give money to people.

5   Correct?

6   A.  Correct.

7   Q.  And you saw him take papers from people.  Correct?

8   A.  Correct.

9   Q.  Were you out with Vinod Patel on July 3rd of 2008?

10  A.  I don't remember.

11  Q.  How about June 27th of 2008?

12  A.  I might have.

13  Q.  You don't remember?

14  A.  No.

15  Q.  Okay.  You have come down to this building or the building

16  across the street a number of times and met with Mr. Neal and

17  Mr. Pratt.  Correct?

18  A.  Mr. Neal.

19  Q.  Okay.  And when you met with Mr. Neal a number of times,

20  you've gone over your testimony as to what he would ask you

21  when you were called as a witness in this case.  Correct?

22  A.  Sorry.  Come again?

23  Q.  Did you and Mr. Neal go over the questions that he would

24  ask you when you got on the witness stand here today?

25  A.  He told me to say the truth and he --

1    Q.  My question is did he tell you the questions -- did you go

2    over the questions that he was going to ask you?  Yes or no.

3    A.  Some questions.

4    Q.  Well, so you and Mr. Neal had practiced your testimony

5    before you came here today.  Correct?

6    A.  Practice the testimony?

7    Q.  Yes or no.  Yes.

8    A.  He told me to say the truth.

9    Q.  You went over a series of questions, just like he went

10   through with you today, in his office, didn't you?

11   A.  Some questions.  Not all of them.

12   Q.  Which questions?

13   A.  I'm going to ask you your name, where you were born, and

14   then I'm going to ask you about a number of questions regarding

15   you and Mr. Vinod Patel and then you and Lalit Patel, and then

16   you and Tri-City Pharmacy, and you and Rapid Drugs, you and

17   Beecher Pharmacy.

18   Q.  You went through the series of questions that he asked you

19   here today, in his office, didn't you?

20   A.  Some of them.

21   Q.  When was the last time?

22   A.  Last week.

23   Q.  What day?

24   A.  Tuesday.

25   Q.  And when you came down and met with Mr. Neal last Tuesday,

1  did the conversation come around to a topic of your visa

2  status?

3  A.   That happened on Thursday.

4  Q.   Oh.  So, when you and Mr. Neal went over your testimony on

5  Tuesday, Atul Patel didn't decide to bring it up about the fact

6  that he had lied to the Indian government, lied to the United

7  States government, lied to La Roche College, lied to Saginaw

8  Valley college, lied to the U.S. Immigration Department.  That

9  didn't come up in the conversation, did it?

10  A.   He didn't ask me about my educational background.

11  Q.   Well, and you knew that you were going to be asked about

12  your educational background when you got on the stand.

13  Correct?

14  A.   He asked me for it.  So, I told him the truth.

15  Q.   Well, you didn't tell him the truth on last Tuesday, did

16  you, Mr. Patel?

17  A.   On Thursday I did.

18  Q.   My question was on Tuesday, did you tell him the truth?

19  A.   He didn't ask for it.

20  Q.   You lied to him, correct?

21  A.   He didn't ask for it.

22  Q.   You knew that he was there to try to get all the

23  information about Atul Patel.  Correct?

24  A.   Yes.

25  Q.   Okay.  And you didn't tell him, hey, John, I bought my

1    degree, I lied to La Roche College, I lied to the Indian

2    government, this is all a fraud.  You never told that to him.

3    Correct?

4    A.  When he asked me --

5             MR. NEAL:  Your Honor, I believe this has been asked

6    and answered a number of times now.

7             THE COURT:  Sustained.

8    BY MR. BEUKE:

9    Q.  Well, you were in Mr. Neal's office on June 24th of this

10   year, correct?

11   A.  Was that a Thursday?

12   Q.  I don't know what day it was.

13   A.  I was there on Thursday, I know that.  I don't remember the

14   date.

15   Q.  Well, Thursday last week?

16   A.  Yes.

17   Q.  How about three weeks before that, do you remember being in

18   Mr. Neal's office?

19   A.  Yeah.  He called me down here.

20   Q.  Okay.  And you went over your testimony again.  Correct?

21   A.  We didn't go over our testimony.  He asked me to say the

22   truth.

23   Q.  Well, I know he asked you to say the truth, Mr. Patel.  But

24   you went over your testimony on June 24th, 2013 in his office,

25   didn't you?

```
1    A.  I have to speak the truth, so I don't need to go through

2    the testimony.  It's in my brain.  I know what I'm talking

3    about.

4             You need to practice yours.

5    Q.  Listen to my question.  Did you come down to the building

6    across the street and go to Mr. Neal's office on June 24th of

7    2014?  Yes or no.

8    A.  Yes.

9    Q.  And when you went to Mr. Neal's office, he called you to

10   come down here, correct?

11   A.  Yeah, he did.

12   Q.  And when you and Mr. Neal sat down, you discussed your

13   testimony.  Correct?

14   A.  Yes.

15   Q.  You met with him for a few hours, correct?

16   A.  A couple hours.

17   Q.  And at no time in that couple hours that you spent with

18   Mr. Neal did you ever tell him, hey, John, I bought my degree

19   in India?

20   A.  But he didn't ask me for it.

21   Q.  My question is did you tell him that I bought my degree in

22   India?

23   A.  No, I didn't.

24   Q.  And you didn't tell him that on July 2nd -- or, July 6th,

25   did you?
```

1    A.  On that Thursday I told him, because he asked me.

2    Q.  Well, that was on July 8th, correct?

3    A.  I don't know the date.  It was Thursday of last week.  You

4    can check the calender.

5    Q.  Well, what date did you go over and meet with your buddy

6    Glenn English?  Tell the ladies and gentlemen about that.

7    A.  Once again, the question again?

8    Q.  What date did you first meet your pal Glenn English?

9    A.  He's not my pal.

10   Q.  What date did you meet Glenn English?

11   A.  I don't remember.

12   Q.  What date did you meet Sanyani Edwards for the first time?

13   A.  I don't remember.

14   Q.  What date did you meet Anmy Tran for the first time?

15   A.  I don't remember.  Those are --

16   Q.  What date did you meet James Burdette for the first time?

17   A.  I don't remember that date.

18   Q.  Well, let's try it this way, Mr. Patel.

19          You say that after riding around with Vinod Patel for

20   a few months, that you met Bob Patel.  Correct?

21   A.  Bob Patel came to me.

22   Q.  Well, Bob Patel came to you?

23   A.  Correct.

24   Q.  And Bob Patel didn't even know Atul Patel at that point in

25   time, correct?

1    A.  I don't know how he got that information.

2    Q.  Well, you don't -- you've never met him, correct?

3    A.  Never.

4    Q.  You say you've heard of him?

5    A.  Yes.

6    Q.  Okay.  You've heard his name, correct?

7    A.  Correct.

8    Q.  And you've been riding around with his brother, according

9    to you, for a few months.  Correct?

10   A.  Yes.

11   Q.  And Bob says get in the car, Atul.  Correct?

12   A.  Correct.

13   Q.  And Atul Patel jumps in Bob Patel's car?

14   A.  Correct.

15   Q.  And you take a ride somewhere, correct?

16   A.  Flint, Michigan.

17   Q.  And then after you had a meeting, a business meeting with

18   somebody, on the way back Bob Patel says you're going to be

19   working for me now.  Right?

20   A.  Working with Phil.

21   Q.  Well, you're going to be working for Bob Patel, correct?

22   A.  Correct.

23   Q.  With Phil?

24   A.  Correct.

25   Q.  Phil was a guy who worked for Bob Patel, correct?

1    A.   Why is.

2    Q.   He was a marketer or a recruiter or a hustler, correct?

3    A.   Something like that.

4    Q.   And he told you that, "he" being Bob Patel, that you and

5    Phil are going to be together day and night.   Correct?

6    A.   Day and night?

7    Q.   Yeah.

8    A.   Day.

9    Q.   Well, he took you back to his house, according to you.

10   Correct?

11   A.   Sorry, come again?

12   Q.   Bob Patel took you back to his house; is that right?

13   A.   He took me back to the liquor store.

14   Q.   Back to the liquor store.

15        And he gave you a car?

16   A.   Vinod Patel took me to his home, and they did give me a

17   car.

18   Q.   My question is Bob Patel was the one who gave you the car,

19   correct?

20   A.   (No response.)

21   Q.   Yes or no.

22   A.   His wife handed me over the keys.

23   Q.   Bob Patel's wife?

24   A.   Correct.

25   Q.   And when he handed you over the keys, he showed you that's

1    the car that's going to be Atul Patel's car.  Correct?

2    A.  I didn't own that car.  They didn't tell me it's your car

3    now.

4    Q.  What kind of car was it?

5    A.  Honda Civic.

6    Q.  What year?

7    A.  I never asked for that.  I never checked on that.

8    Q.  My question was what year was it, sir?

9    A.  (No response.)

10   Q.  What year vehicle?

11   A.  What year vehicle?

12   Q.  Yes.

13   A.  I don't know.  I never checked on that.

14   Q.  Well, you drove this car for how long?

15   A.  Four months, I guess.

16   Q.  And you drove this car in order to allow you to meet with

17   Phil, correct?

18   A.  Correct.

19   Q.  And Phil was a male, black, correct?

20   A.  Correct.

21   Q.  Who lived in Flint, correct?

22   A.  Correct.

23   Q.  And you and fill Phil would go out everyday together

24   hustling to try to get patients.  Correct?

25   A.  Correct.

1   Q.   And you would try to get patients who wanted to get

2   charges.   Correct?

3   A.   Correct.

4   Q.   The patients and the narcotics were part of the Bob Patel's

5   scheme.   Correct?

6   A.   Yes.

7   Q.   And you and Phil hustled the patients day in and day out

8   for four months or longer, fair to say?

9   A.   In order for those patients to agree to the First Michigan

10   Home Health Care services, it was necessary to make sure that

11   they got their narcotics, because that's what they were looking

12   for.

13   Q.   My question, sir, is those patients were being hustled by

14   you and Phil to get them narcotics.   Correct?

15   A.   Correct.

16   Q.   To get a doctor to sign prescriptions to send to Bob

17   Patel's pharmacies.   Correct?

18   A.   Correct.

19   Q.   Okay.   And at some point, you knew or you learned about a

20   business called First Michigan Home Health Care.   Correct?

21   A.   No.   The first I learned about a business known as First

22   Michigan Home Health Care and then I learned about Bob Patel's

23   pharmacies.

24   Q.   My question, sir, is when you began your employment for Bob

25   Patel, that was you and Phil going out hustling patients.

1    Correct?

2    A.  Correct.

3    Q.  And getting their information, correct?

4    A.  Correct.

5    Q.  You didn't know anything about home health care or how it

6    works, did you?

7    A.  You didn't know how it works.

8    Q.  At some point, I think you told the ladies and gentlemen

9    that you went to First Michigan.  Correct?

10   A.  Correct.

11   Q.  You saw the operation firsthand, didn't you?

12   A.  Operation?

13   Q.  Well, where did you go when you when you saw First Michigan

14   for the first time?

15   A.  I went to Vinod Patel's office.

16   Q.  Where was that, sir?

17   A.  Oak Park.

18   Q.  Oak Park where?

19   A.  Michigan.

20   Q.  What was the address?

21   A.  I don't remember.

22   Q.  What was the date?

23   A.  Sir, what date were you born on?

24   Q.  The date the first time you went to First Michigan.

25   A.  I don't remember the date.

1    Q.  Well, was it in 2011?

2    A.  No.

3    Q.  2010?

4    A.  No.

5    Q.  2009?

6    A.  No.

7    Q.  2008?

8    A.  Somewhere in there.

9    Q.  We're making progress.

10          What month?

11   A.  I don't remember.

12   Q.  August?

13   A.  You know, it was hot.  So, summertime.

14   Q.  Pardon?

15   A.  Yeah, it was summertime.

16   Q.  Summertime?

17   A.  Yeah, summertime.

18   Q.  And when you got to the office, describe the office.

19   A.  It had like three or four rooms.

20   Q.  And there were people working there, correct?

21   A.  Yes.

22   Q.  There was a medical director, doctor, wasn't there?

23   A.  Yes.

24   Q.  There was a Clinical Director, a young man by the name of

25   Dwayne Galloway.  Correct?

1    A.   I remember the first name, but I don't remember the -- no

2    one told me his last name.

3    Q.   There was a Quality Assurance Director, a person by the

4    name of Jessica Pollard, a nurse, correct?

5    A.   I never heard that name.

6    Q.   There was office staff there, correct?

7    A.   Yes.

8    Q.   There was a receptionist?

9    A.   Yes.

10   Q.   Do you remember meeting a young lady named Kuar?

11   A.   I don't remember the name.

12   Q.   There was an Office Manager there, correct?

13   A.   Ramesh Patel.

14   Q.   Well, was Ramesh Patel the Office Manager when you went

15   there in, let's say, summer of 2008?

16   A.   Yes.

17   Q.   You saw Ramesh there, correct?

18   A.   Yes.

19   Q.   And he was in an office within First Michigan Home Health

20   Care, correct?

21   A.   Correct.

22   Q.   Do you remember meeting a Billing Manager named Phillipino

23   Perez?

24   A.   No, I never met her.

25   Q.   There were a number of nurses in and around the office,

1    weren't there?

2    A.  A number of nurses around the office?

3    Q.  Ever seen nurses in the office?

4    A.  They would come and leave.

5    Q.  They would come and go, correct?

6    A.  Correct.

7    Q.  Physical therapists, they would come and go also, correct?

8    A.  Yes.

9    Q.  And there were social workers; they would come and go also,

10   correct?

11   A.  I don't know about the social workers.

12   Q.  Well, at some point, Mr. Patel, you learned that First

13   Michigan Home Health Care, their business that they were

14   involved in required nurses and physical therapists and social

15   workers to go out to the homes of patients.  Is that fair to

16   say?

17   A.  (No response.)

18   Q.  That's what their business was?

19   A.  They told me about the nurses and the physical therapists.

20   Social workers?  Nobody told me about that.

21   Q.  Okay.  So, you knew about the nurses and physical

22   therapists; is that correct?

23   A.  (No response.)

24   Q.  Correct?

25   A.  Yeah.

1    Q.  You learned, or did you learn, about the process of the

2    home health care business and how they were paid?

3    A.  Who is paid what?

4    Q.  Well, did you ever -- Mr. Patel, did you ever see a First

5    Michigan Home Health Care package, a folder with a number of

6    documents inside?  Did you ever see that?

7    A.  I've seen the folder.

8    Q.  Okay.  I'm going to show you what I've marked as

9    Defendant's No. 2.  Take a look at this folder and take a look

10   at the paperwork inside, if you would.  Tell me when you've had

11   an opportunity to read and review it.

12          (Brief pause.)

13   Q.  Let me know when you're done, Mr. Patel.

14          (Brief pause.)

15   Q.  Done?

16   A.  Yes.

17   Q.  You've seen those forms and that pamphlet before, haven't

18   you?

19   A.  I've seen the pamphlet.  I've never seen the forms before.

20   I never went through them.

21   Q.  You never went through them?

22   A.  Never.

23   Q.  So, did you in your relationship with First Michigan Home

24   Health Care -- you said you were familiar with a form called a

25   Referral Form, correct?

1    A.   That is what was exchanged with the doctor.

2    Q.   Well, the Referral Form actually comes from the doctor's

3    office and goes to the health care provider, correct?

4    A.   Correct.

5    Q.   And that's how the whole process gets started, fair to say?

6    A.   Correct.

7    Q.   And the doctor has to fill out a Patient Referral Form with

8    all of the information regarding the patient's personal

9    information, Medicare number, and things like that.  Correct?

10   A.   I've never seen one.  So, I don't know.

11   Q.   Well, you said that you gave papers to Mr. Patel on

12   occasion, correct?

13   A.   Those were the intake forms.  When I go out in the field, I

14   ask the patient for his name, his phone number, his address,

15   his --

16   Q.   What was on the intake forms?  What company was on the

17   intake forms, or was it Atul Patel's personal intake forms?

18   A.   First Michigan Home Health Care.

19   Q.   Okay.  So, you had the intake forms with you, correct?

20   A.   Correct.

21   Q.   Okay.  And you gave one of those intake forms to Mr. Neal

22   or Mr. Pratt when you decided to become a witness for them in

23   this case, didn't you?

24   A.   Sorry.  Me --

25   Q.   You never gave any of those forms to anybody, did you?

1    A.   No.

2    Q.   And so I'm clear, what you're telling the ladies and

3    gentlemen is that Atul Patel got a certain amount of money for

4    each one of those intake forms he gave to First Michigan.

5    Correct?

6    A.   You don't get paid for the intake form.

7    Q.   Well ...

8    A.   The patient has to accept the services.  They have to

9    complete those services.

10   Q.   Okay.

11   A.   And once First Michigan receives their payment, and then I

12   get my payment.

13   Q.   Well, let's talk about that.  Just getting patient

14   information -- you told the ladies and gentlemen about driving

15   around Flint and driving around Detroit day in and --

16   A.   Never Detroit.  Only Flint, please.

17   Q.   Okay.  You specialized in Flint, correct?

18   A.   There's nothing I specialized.

19   Q.   Well, you and your first partner was a guy named Judu,

20   correct.

21   A.   My partner?

22   Q.   Your first associate was some guy named Judu, correct?

23   A.   My associate?

24   Q.   Yes.

25   A.   No, you're wrong on that part.

1   Q.  Well, you and Judu worked together for a couple weeks,

2   correct?

3   A.  Never.

4   Q.  Did you and Judu ever go out and look for patients?

5   A.  Never.

6   Q.  Okay.  Well, at some point Bob Patel introduced you to

7   Phil, correct?

8   A.  That's correct.

9   Q.  And Bob Patel, after he told you you were going to work

10  with Phil, you and Phil began to go out and drive up and down

11  the streets of Flint, Michigan.  Correct?

12  A.  Correct.

13  Q.  And you and Phil were looking for people on the street who

14  would give you their Medicare numbers and Medicare information.

15  Correct?

16  A.  Correct.

17  Q.  And you solicited people day in and day out, five days a

18  week.  That's your testimony.  Correct?

19  A.  Correct.

20  Q.  And you were driving your Honda civic, correct?

21  A.  Not mine.

22  Q.  Well, Bob's.  Correct?

23  A.  That's correct.

24  Q.  Okay.  In driving up and down the streets of Flint, you got

25  certain people to give you their Medicare or Medicaid

1    information.  Correct?

2    A.  Correct.

3    Q.  But that -- according to you, that doesn't get Atul Patel

4    paid, does it?

5    A.  No.

6    Q.  What happens is if somebody, a doctor, refers a patient to

7    the home health care agency, all of that information needs to

8    be submitted to Medicare.  Correct?

9    A.  I don't know the --

10   Q.  That is your understanding?

11   A.  It has to be.

12   Q.  Okay.  And the nurse has to go out to the patient's home

13   and meet with the patient.  Correct?

14   A.  Correct.

15   Q.  And after the nurse meets with the patient, the nurse has

16   to submit a very detailed plan of care for the patient.

17   Correct?

18   A.  She has to fill out some paperwork.  That's what I know.  I

19   don't know about --

20   Q.  Well, the paperwork that she fills out, that has to go to

21   the patient for the patient's signature and agreement.

22   Correct?

23   A.  Yes, the patient has to sign those papers.

24   Q.  And then the paperwork has to go back to the doctor or the

25   Clinical Director at First Michigan Home Health Care for his

1    review.  Correct?

2    A.  I don't know anything about that.

3    Q.  And then it has to go to Medicare for their approval.

4    Correct?

5    A.  I don't know all those procedures.

6    Q.  Well, if all of those procedures are followed, your

7    understanding of the home health care business is that either a

8    nurse or a physical therapist will physically go out and see

9    the patient to treat whatever it is that's wrong with the

10   patient.  Isn't that your understanding?

11   A.  Correct.

12   Q.  That's how First Michigan Home Health Care gets paid.

13   Correct?

14   A.  Correct.

15   Q.  By going to the patients' homes and providing the service.

16   Correct?

17   A.  Correct.

18   Q.  And after the service is provided, the nurses' forms are

19   submitted back to First Michigan, and they bill Medicare,

20   correct?

21   A.  Yes, something like that.

22   Q.  Okay.  And you knew several of the nurses that worked for

23   First Michigan.  Correct?

24   A.  I met them.

25   Q.  And you had an opportunity to make some judgments about

1    those people.  Correct?

2    A.  Judgment about what people?

3    Q.  Well, you told me, the prosecutors, and you told the agents

4    that the nurses that worked for First Michigan were all honest.

5    Correct?

6    A.  Yes.

7    Q.  They were, according to you.  Correct?

8    A.  Not according to me.

9    Q.  Well, you told them, in your opinion, the nurses were

10   honest.  Correct?

11   A.  Correct.

12   Q.  Okay.  Sir --

13           THE COURT:  Is this a good time to break?

14           MR. BEUKE:  Yes, sir.

15           THE COURT:  Okay.  It's 11 o'clock.  We'll take a

16   17-minute break.

17           All rise for the jury.

18           Don't talk about this.  Don't speculate.  And we'll

19   see you back here.

20           *(Jury leaves the courtroom at 10:59 a.m.)*

21           THE COURT:  Anything anyone wants to put on the

22   record?

23           MR. BEUKE:  Well, Judge, I would just ask that

24   Mr. Patel be instructed not to discuss his testimony during the

25   break with anybody.

```
 1              THE COURT:  You understand that?
 2   A.  Yes, sir, I do understand.
 3              THE COURT:  All right.  We'll be back here in, say,
 4   20 minutes.
 5              (Recess taken.)
 6              CASE MANAGER LANG:  Please rise.
 7              (Jury enters the courtroom at 11:21 a.m.)
 8              CASE MANAGER LANG:  Court is again in session.  You
 9   may be seated.
10              THE COURT:  Everybody is in their place.  You may
11   continue.
12              MR. BEUKE:  Thank you, Your Honor.
13   BY MR. BEUKE:
14   Q.  Mr. Patel, I left off with -- you indicated that you did
15   not ever work with Judu.  Correct?
16   A.  No.
17   Q.  And you worked with Phil.  Correct?
18   A.  Correct.
19   Q.  And at some point in that relationship, I think you told
20   the ladies and gentlemen that Phil was constantly asking you
21   for Vicodins.  Correct?
22   A.  Correct.
23   Q.  And the Vicodins that he was asking you for, did you ever
24   give him Vicodins?
25   A.  No, I couldn't give him Vicodins.
```

1    Q.  And at some point you brought this information to Vinod

2    Patel.  Correct?

3    A.  Yes.

4    Q.  And you informed Vinod Patel about Phil asking you for

5    narcotics.  Correct?

6    A.  Correct.

7    Q.  And what Vinod Patel did was that he fired Phil, didn't he?

8    A.  He didn't fire Phil.

9    Q.  Well, did you and Phil continue to work together?

10   A.  Vinod Patel told me we cannot give him Vicodins.

11   Q.  My question is, did Phil continue to work with you; yes or

12   no?

13   A.  Yes.

14   Q.  How long did Phil continue to work with you?

15   A.  Until I got to Marie's home.

16   Q.  Well, how long was that?

17   A.  Less than two months.

18   Q.  Okay.  And did Phil continue to ask you for Vicodins?

19   A.  Constantly.

20   Q.  Did you ever give him Vicodins?

21   A.  No.

22   Q.  At some point you brought Phil's request up to Vinod Patel

23   a second time.  Correct?

24   A.  Correct.

25   Q.  And when you brought it up to Mr. Patel the second time, he

1    fired Phil, didn't he?

2    A.  He did not fire Phil.

3    Q.  Who fired Phil?

4    A.  No one fired Phil.

5    Q.  Who told Phil you're not coming to work with your buddy

6    Atul Patel anymore?

7    A.  No one told him nothing.

8    Q.  You never picked him up anymore, correct?

9    A.  I stopped.

10   Q.  You met a new friend, correct?

11   A.  Correct.

12   Q.  Marie?

13   A.  Correct.

14   Q.  And Marie, this is a woman that you happened to meet

15   through Bob.  Correct?

16   A.  I told you I met her at her house.

17   Q.  My question is who introduced you to Marie?

18   A.  Phil.

19   Q.  Okay.  That's Phil, the same guy who was asking you for the

20   Vicodins.  Correct?

21   A.  Correct.

22   Q.  And at some point after you met Marie, did you make a

23   decision I'm not going to work with Phil anymore?

24   A.  Yes.

25   Q.  Okay.  So, that was Atul Patel's decision.  Correct?

1    A.  Correct.

2    Q.  Because Marie, according to you -- when you were introduced

3    to Marie, you were at her house.  Correct?

4    A.  Correct.

5    Q.  On a street in Flint, Michigan.  Correct?

6    A.  Correct.

7    Q.  And there were a whole number of other people in front of

8    her house.  Correct?

9    A.  Correct.

10   Q.  And you introduced yourself to Marie.  Correct?

11   A.  Correct.

12   Q.  And you told Marie about this job opportunity that you had

13   for her.  Correct?

14   A.  Correct.

15   Q.  And Marie was interested because she was out of work.

16   Correct?

17   A.  Correct.

18   Q.  And you and Marie formed kind of a partnership.  Correct?

19   A.  We had instructions to do so.

20   Q.  My question is you and Marie worked together everyday.

21   Correct?

22   A.  Correct.

23   Q.  And you and Marie, instead of you and Phil, went out and

24   drove up and down the streets of Flint, Michigan looking for

25   people to sign up and get prescription drugs.  Correct?

1    A.   Correct.

2    Q.   And you gave those prescriptions or you gave those forms to

3    a doctor that you were familiar with.   Correct?

4    A.   Yes.

5    Q.   Dr. Burdette, correct?

6    A.   Correct.

7    Q.   And he was a doctor that you knew, correct?

8    A.   Yes.

9    Q.   He was a doctor that when you would give him these forms,

10   he would write prescriptions for these patients.   Correct?

11   A.   Correct.

12   Q.   And the prescriptions that he would write would be sent to

13   Bob Patel's pharmacies.   Correct?

14   A.   Correct.

15   Q.   Some in Flint or Saginaw, correct?

16   A.   Either one of those.

17   Q.   Any one of the pharmacies, correct?

18   A.   Mm-hmm.

19   Q.   Now, you knew -- well, you worked with Marie, I think you

20   told the ladies and gentlemen, for how long, Atul?

21   A.   Two years.

22   Q.   Okay.   And you and Marie pretty much worked together

23   everyday, correct, other than the weekends?

24   A.   Yeah.

25   Q.   Okay.   And cruising up and down the streets of Flint,

1   correct?

2   A.  Correct.

3   Q.  Sometimes you would meet people at her home, correct?

4   A.  Sometimes.

5   Q.  And in any event, the prescriptions that your doctor,

6   Dr. Burdette, was prescribing were being filled at the

7   pharmacies.  Correct?

8   A.  He wasn't my doctor.

9   Q.  Well, he was a guy that you knew, correct?

10  A.  Correct.

11  Q.  And he was a guy that was doing business with Atul Patel,

12  correct?

13  A.  Business with me?

14  Q.  Yeah.

15          I mean the prescriptions that he was prescribing were

16  for people that you brought to him.  Correct?

17  A.  He was doing business with Bob.

18  Q.  Well, okay.  The business that he was doing with Bob, the

19  prescriptions were being filled at Bob's pharmacies.  Correct?

20  A.  Correct.

21  Q.  And there was another arrangement about delivery, I think

22  Mr. Neal asked you about.  There was a delivery guy that was

23  bringing the drugs from Bob's pharmacies to Marie's house.

24  Correct?

25  A.  Correct.

1    Q.  Or to Dr. Burdette's office sometimes, correct?

2    A.  Correct.

3    Q.  And the delivery guy that was bringing the drugs would have

4    to have the patients sign for the drugs.  Correct?

5    A.  Correct.

6    Q.  That's how this drug business worked, correct?

7    A.  Yeah, they have to sign.

8    Q.  Okay.  And you and Dr. Burdette and Marie and Bob worked

9    this business for almost two years.  Correct?

10   A.  Correct.

11   Q.  At some point, Atul, you indicated that you got involved or

12   met a young man by the name of Glenn English.  Correct?

13   A.  Yes.

14   Q.  And Glenn English had an idea to open an adult day care

15   facility.  Correct?

16   A.  Yes.

17   Q.  And you brought the idea to Vinod Patel.  Is that correct?

18   A.  That is incorrect, absolutely.

19   Q.  Okay.  Did he bring the idea to you?

20   A.  No.

21   Q.  Did Glenn English bring the idea to you?

22   A.  No.

23   Q.  Incidentally, how was studying going at Saginaw Valley --

24   A.  Good.

25   Q.   -- that fall?

1              Good?

2    A.  Yes.

3    Q.  Classes good?

4    A.  Yep.

5    Q.  You remember what classes you were taking in the fall?  How

6    did we do in those?

7    A.  I don't remember the classes I had in the fall.

8    Q.  How about in the spring of 2010 -- or, 2009?

9    A.  I don't remember.

10   Q.  Did you graduate from Saginaw Valley?

11   A.  Yes.

12   Q.  Okay.  And did you tell the Saginaw Valley people, when

13   they went to present you with your Master's Degree, that, hey,

14   I should probably tell you guys that I bought my Bachelor

15   degree over in India?  Did you tell them that?

16   A.  No.

17   Q.  Did you ever call Saginaw Valley since you've been indicted

18   or since you pled guilty and say, hey, I got some information

19   from you guys?

20   A.  I told --

21              MR. NEAL:  Judge, I object on the grounds that it has

22   been asked and answered a number of times now.

23              THE COURT:  Your response?

24              MR. BEUKE:  Saginaw Valley degree, Judge?  I don't

25   believe I've gone into that before.

1          THE COURT:  You just did.  I mean ...

2          MR. BEUKE:  For the first time.

3          THE COURT:  No, I understand that.  But ask the

4    question again.

5    BY MR. BEUKE:

6    Q.  Did you ever contact the people at Saginaw Valley and tell

7    them I have information, that you should know about my

8    fraudulent educational background?

9          THE COURT:  That has been asked and answered a minute

10   ago.

11   BY MR. BEUKE:

12   Q.  All right.  Sir, at some point Glenn English, you told the

13   ladies and gentlemen, opened up this adult day care facility.

14   Correct?

15   A.  Me specifically?  Vinod Patel and Glenn English; not me.

16   Q.  Do you understand my question?

17          At some point, Glenn English opened up this adult day

18   care facility.  Correct?

19   A.  With Mr. Vinod Patel.

20   Q.  Well, and from that point on, you and Marie spent everyday

21   for the next several months at the New Century day care

22   facility.  Correct?

23   A.  Most of the days.

24   Q.  Well, do you remember any days specifically, as you sit

25   here now, that you and Marie didn't go there?

1   A.   There were some days we didn't go he there.  I don't

2   remember which days are those.

3   Q.   Well, in any event, sir, with respect to -- that lasted for

4   a period of six months.  Correct?

5   A.   Less than six months.

6   Q.   How much less?

7   A.   Five months, five and a half months, in there.

8   Q.   Okay.  And when you went to the day care facility almost

9   everyday for those five months, what would you do when you got

10  there?

11  A.   I would make sure that the patients are being seen by

12  Burdette and --

13  Q.   All right.  Let's ask about that.

14          You made sure the patients were being seen by the

15  doctor.  Your doctor, correct?

16  A.   He's not my doctor.

17  Q.   Well, your friend, Mr. Burdette, correct?

18  A.   Okay.

19  Q.   Right?

20  A.   Mm-hmm.

21  Q.   You made sure that these patients would go in and were seen

22  by him.  Correct?

23  A.   Correct.

24  Q.   You made sure that Burdette was writing prescriptions for

25  them.  Correct?

1  A.  Correct.

2  Q.  You made sure that the prescriptions got to Bob Patel's

3  pharmacies.  Correct?

4  A.  I didn't have to make sure of that, because Bob instructed

5  Burdette make sure that these prescriptions come to my

6  pharmacy.  That was between Bob and Burdette.

7  Q.  You were working along with them, correct?

8  A.  Okay.

9  Q.  And everyday the prescriptions came from the pharmacy to

10  the day care facility and they were given to the patients.

11  Correct?

12  A.  Correct.

13  Q.  Everybody was making money, correct?

14  A.  Everybody.

15  Q.  Everybody was happy, correct?

16  A.  Yep.

17  Q.  And you knew that these patients that were getting these

18  narcotics, they weren't being prescribed for any legitimate

19  medical purpose, didn't you?

20  A.  I'm not a doctor.  So, how would I know that.

21  Q.  Well, that's my question.  Did you think that the

22  prescriptions that Mr. Burdette was writing to these people

23  were for ailments that they had; yes or no?

24  A.  I don't know.

25  Q.  Okay.  So, the prescriptions that the doctor was writing

1  for these people could have been for legitimate medical uses.

2  Correct?

3  A.  Probably.

4  Q.  Okay.  So, after all of that was happening for those five

5  months, at some point you told the ladies and gentlemen that

6  you happened to be by the records room one day.  Correct?

7  A.  Yes.

8  Q.  And you happened to see a patient signing multiple sheets,

9  correct?

10  A.  Yes.

11  Q.  And you -- when you saw that, did you go up to the patient?

12  A.  I went close and I saw what was happening.

13  Q.  You saw that he signed his name multiple times on that

14  sign-in sheet.  Correct?

15  A.  Correct.

16  Q.  And Atul Patel thought that was improper.  Correct?

17  A.  Correct.

18  Q.  And Atul Patel decided at that point to take it to Glenn

19  English.  Correct?

20  A.  No.

21  Q.  Well, did you tell Mr. English?

22  A.  I asked him.

23  Q.  Did you tell him, listen, Glenn, there's a patient who

24  signed in for two months on your attendance sheets?  Did you

25  tell him that?

1    A.   Glenn English was present there and he was the one telling

2    the patients to sign in there.

3    Q.   Did you tell Mr. English, Glenn, you can't do that?

4    A.   I told him that whatever you're doing, it's not right; you

5    might get caught with this.

6    Q.   Okay.  So, the fact that these patients were being brought

7    by you to Mr. Burdette and you were getting a kickback of $400,

8    you didn't have a problem with that, did you?

9    A.   He told me it's none of my business.  So, I called Vinod

10   Patel --

11   Q.   My question is, did you have a problem with bringing these

12   patients to Dr. Burdette and getting a $400 kickback?

13   A.   No, I didn't.

14   Q.   You didn't have a problem with that, did you?

15   A.   No.

16   Q.   But after you saw this process going on a second time where

17   patients were signing multiple sheets in your presence, you

18   decided I'm going to blow the whistle on this.  Correct?

19   A.   Blow the whistle?

20   Q.   Yeah.

21   A.   What do you mean?

22   Q.   What did you do?  Tell the ladies and gentlemen what you

23   claim you did.

24   A.   I called Vinod Patel.

25   Q.   Okay.  And when you told Mr. Patel about that, you asked

US v Vinod Patel #11-CR-20468-36

1   him to come down to the facility or he came down to the

2   facility.  Correct?

3   A.  He didn't come down to the facility.

4   Q.  Well, did he tell you to get out of there?

5   A.  He told me I'm going to meet you in one hour.

6   Q.  And he came down near the facility, correct?

7   A.  Near the facility.

8   Q.  And he told you we're not coming back here ever again?

9   A.  Yes.

10  Q.  Correct?

11  A.  Yes.

12  Q.  And you told him what you had seen at the facility.

13  Correct?

14  A.  Correct.

15  Q.  You told Vinod Patel about this improper thing that you

16  witnessed firsthand.  Correct?

17  A.  Correct.

18  Q.  And he told you we're not ever coming back there.  Correct?

19  A.  Correct.

20  Q.  And to your knowledge, Mr. Patel never went back there, did

21  he?

22  A.  No.

23  Q.  Nor did you, correct?

24  A.  No.

25  Q.  Now, after you blew the whistle on New Century day care, at

1  some point you talked about Beecher Pharmacy.  Correct?

2  A.  Correct.

3  Q.  And you weren't a pharmacist, were you, Mr. Patel?

4  A.  No.

5  Q.  You never went to school or trained in that field, did you?

6  A.  No.

7  Q.  You and -- I think you told the ladies and gentlemen that

8  you and Mr. Patel opened up a pharmacy called Beecher Pharmacy.

9  Correct?

10  A.  Correct.

11  Q.  And you also helped Vinod Patel and Bob Patel look for

12  sites in the northern part of Michigan.  Correct?

13  A.  Correct.

14  Q.  And you actually went out and looked at properties.

15  Correct?

16  A.  One property.

17  Q.  Well, and you found the property and told Bob Patel about

18  it.  Correct?

19  A.  Both Bob Patel and Vinod Patel.

20  Q.  Bob Patel opened up a pharmacy there.  Correct?

21  A.  Correct.

22  Q.  In fact, he opened up, according to you, more than one in

23  that area.  Correct?

24  A.  Correct.

25  Q.  And those pharmacies that Bob Patel opened up, you know

1   that Vinod Patel was never an owner in any of those pharmacies.

2   Correct?

3   A.  He was told that he would be one, but then later I learned

4   that he was told that he wasn't.

5   Q.  Well, that's what you told the ladies and gentlemen.  That

6   according to you, Bob Patel told his younger brother that

7   you'll have an interest in these pharmacies.  Correct?

8   A.  Correct.

9   Q.  And that never happened, did it?

10   A.  No, it never happened.

11   Q.  In fact, you told the prosecutors and the agents that you

12   met with that Vinod Patel had absolutely no value to his

13   family, didn't you?

14   A.  Yes.

15   Q.  And you knew that, correct?

16   A.  Yes.

17   Q.  That Vinod Patel was told that by his brother, correct?

18   A.  Correct.

19   Q.  And you knew that there was that relationship where Bob

20   Patel thought his brother was dumb.  Correct?

21   A.  I didn't say "dumb."

22   Q.  Well, when you say no value to his family, what does that

23   mean to you?

24   A.  Bob Patel, when it comes to money, he doesn't care about

25   anyone; not even his brother.

1    Q.  Well, his brother was not important to him in terms of his

2    making money.  Correct?

3    A.  Correct.

4    Q.  And Bob Patel had partners, didn't he?

5    A.  Yes.

6    Q.  Ramesh Patel was a partner of Bob's, his brother-in-law.

7    Correct?

8    A.  Correct.

9    Q.  Now, I think you mentioned to the ladies and gentlemen that

10   at some point you and Vinod Patel decided to open up this

11   pharmacy.  Correct?

12   A.  Beecher Pharmacy.

13   Q.  Yeah.

14           And you had to get a pharmacist, didn't you?  You

15   can't open up a pharmacy without a pharmacist, can you?

16   A.  You're correct.

17   Q.  And you got a pharmacist, correct?

18   A.  Me?

19   Q.  Yeah.

20   A.  Not me.

21   Q.  Lalit Patel, who is he?  Tell the ladies and gentlemen.

22   A.  He was introduced to me by Vinod Patel.

23   Q.  Well, Lalit Patel was somebody that worked at the pharmacy

24   day in and day out with you.  Correct?

25   A.  Correct.

1    Q.  He was the pharmacist and you were the pharmacy technician.

2    Correct?

3    A.  Correct.

4    Q.  Do you have to go to school to get that degree?

5    A.  No.

6    Q.  Okay.  So, you just appointed yourself the pharmacy

7    technician?

8    A.  Yes.

9    Q.  And you and Lalit Patel began to run Beecher Pharmacy day

10   in and day out.  Correct?

11   A.  Correct.

12   Q.  And your understanding was, when this idea was first

13   hatched, that Vinod Patel was going to cut you in for a third.

14   Correct?

15   A.  Correct.

16   Q.  And your -- Lalit Patel was going to get a third.  Correct?

17   A.  Not "your Lalit," please.

18   Q.  Pardon?

19   A.  Not "your Lalit Patel."  He's not mine.

20   Q.  Lalit Patel was going to get a third, correct?

21   A.  He don't belong to me.

22   Q.  Do you understand my question, sir?

23   A.  Yes.

24   Q.  Was that your understanding, Lalit Patel was going to get a

25   third; yes or no?

1   A.  Yes.

2   Q.  And Vinod Patel was going to get a third.  Correct?

3   A.  Yes.

4   Q.  How much money did you bring to the table?

5   A.  Zero.

6   Q.  How much money did you invest in Beecher Pharmacy?

7   A.  Zero.

8   Q.  How much did Lalit Patel invest in Beecher Pharmacy?

9   A.  Zero.

10  Q.  So, for no money in, you were expecting to get a third of

11  the business.  Correct?

12  A.  Correct.

13  Q.  And at some point Vinod Patel told you, no, you're not

14  getting a third of the business.  Correct?

15  A.  Correct.

16  Q.  And he told Lalit Patel that also.  Correct?

17  A.  Correct.

18  Q.  And when he told you guys that, you were upset.  Correct?

19  A.  Correct.

20  Q.  And Lalit was upset.  Correct?

21  A.  Correct.

22  Q.  Now, Mr. Neal asked you some questions about this bill but

23  not dispensed scheme.  Do you remember those questions?

24  A.  Yes.

25  Q.  And you told him I know what that is, correct?

1   A.  I know.

2   Q.  And that's when you get your prescriptions from

3   Dr. Burdette; there's some prescriptions that he writes on the

4   form that you give to the patient and there's a bunch that you

5   don't give to the patient.  Correct?

6   A.  Yes.

7   Q.  And your understanding of the scheme was that the stuff you

8   don't give to the patient, those bottles of pills that aren't

9   ever given to the people who come to the pharmacy are kept by

10   you guys.  Correct?

11   A.  Correct.

12   Q.  And your testimony today to the ladies and gentlemen is

13   that Vinod Patel wanted us to do that.  Correct?

14   A.  Correct.

15   Q.  And Vinod Patel wanted Lalit and myself to participate in

16   that scheme.  Correct?

17   A.  Correct.

18   Q.  And we decided not to do that.  Correct?

19   A.  Correct.

20   Q.  But you and Lalit had a secret deal, didn't you?

21   A.  Yes, we had one.

22   Q.  You had a secret deal where you were going to do that.

23   Correct?

24   A.  Yes.

25   Q.  And you did do that, correct?

1    A.  Yes.

2    Q.  And you and him, Lalit, you kept all those nondispensed

3    prescriptions that Burdette wrote for you in a place somewhere.

4    Correct?

5    A.  Correct.

6    Q.  Where?

7    A.  Behind the pharmacy.

8    Q.  Behind the pharmacy.

9            And when you got up enough pills, you returned them

10   to McKesson.  Correct?

11   A.  No.

12   Q.  Well, what did you do?

13   A.  Sold them in New Jersey.

14   Q.  Yeah.

15           Who is the guy who found Mr. Manoj in New Jersey?

16   A.  Lalit Patel.

17   Q.  Who?

18   A.  Lalit Patel.

19   Q.  Oh.  It wasn't you, was it?

20   A.  No.

21   Q.  That was his connection?

22   A.  Yes.

23   Q.  And you guys actually took the drugs and had to drive out

24   to New Jersey?

25   A.  Correct.

1    Q.  And how many times did you make that trip?  Tell the ladies

2    and gentlemen.

3    A.  Four to five times.

4    Q.  Four or five times.

5            And when you went out there, you met with Manoj,

6    correct?

7    A.  Correct.

8    Q.  And you gave him all this dope, correct?

9    A.  Dope?

10   Q.  Drugs.

11   A.  Noncontrolled drugs.

12   Q.  Well, the drugs that you gave him, you knew that they were

13   drugs that you had stolen.  Correct?

14   A.  Yes.

15   Q.  Through this scheme?

16           You knew that they were the drugs that you and your

17   partner Lalit had stole.  Correct?

18   A.  Noncontrolled drugs.

19   Q.  My question is, you and your partner stole the drugs,

20   didn't you?

21   A.  We stole noncontrolled drugs.

22   Q.  Okay.  Well, the noncontrolled drugs that you stole, you

23   told Vinod Patel nothing about that, did you?

24   A.  No.

25   Q.  You never told him that you weren't dispensing any

1   medications, did you?

2   A.  Sorry, come again?

3   Q.  You never told Vinod Patel that you weren't

4   dispensing everything, did you?

5   A.  No.  We told him we were dispensing everything.

6   Q.  And you knew -- the first time you went out to New Jersey

7   or to New York to meet Manoj, when was that?

8   A.  I don't remember exactly.  Somewhere in March.

9   Q.  Did you have a phone call with Manoj telling him you were

10  coming out?

11  A.  Lalit Patel made that phone call.

12  Q.  Well, were you there?

13  A.  Yes, I was there.

14  Q.  Do you remember the arrangements as to how you guys were

15  going to drive the drugs out to New Jersey?

16  A.  A rental van.

17  Q.  You rented a van, correct?

18          And you and who went out to New Jersey?

19  A.  Me and Lalit Patel.

20  Q.  Okay.  And you drove the drugs out to New Jersey.  Correct?

21  A.  Drove the van.

22  Q.  Where did you meet him?

23  A.  At his home.

24  Q.  When you met him at his home, did you unload the van?

25  A.  Yes.

1    Q.  Did he give you cash?

2    A.  Yes.

3    Q.  And did you take the cash and split it up with Lalit?

4    A.  Yes.

5    Q.  How long after the first time was the second time that you

6    drove out there?

7    A.  After A month.

8    Q.  Same thing, rented a van and went out to New Jersey?

9    A.  Around four or five times, yeah.

10   Q.  Okay.  And when you went out to New Jersey the second time,

11   he gave you cash?

12   A.  All the times he gave us cash.

13   Q.  And you did this on four or five occasions, correct?

14   A.  Yes.

15   Q.  And never once did you ever tell Vinod Patel about you and

16   your partner Lalit Patel's scheme, did you?

17   A.  No.

18   Q.  And you claim eventually to have made $100,000, correct?

19   A.  Correct.

20   Q.  And Lalit made a hundred thousand dollars?

21   A.  Correct.

22   Q.  And could it have been more or are you positive it was

23   right on the button, a hundred thousand dollars?

24   A.  I'm not sure that it was exactly a hundred thousand; a

25   little bit less or more.

1    Q.   It could have been more; it could have been less?

2    A.   Yes.

3    Q.   The hundred thousand dollars, did you turn it over to the

4    U.S. Government?

5    A.   No.

6    Q.   Did you give it to the agents when you met with them?

7    A.   No.

8    Q.   Did you tell the agents that, listen, I bought a car or I

9    bought a house or I did this with the money, and you guys,

10   under my agreement, can seize those assets?

11   A.   No one asked me that.

12   Q.   Well, you never turned any assets over to the Government,

13   did you?

14   A.   I don't have any assets.

15   Q.   Well, you got away with all the money that you garnered in

16   your involvement with Bob Patel and Lalit Patel, didn't you?

17   A.   Bob Patel?

18   Q.   Yeah.

19   A.   I wasn't involved with Bob Patel.

20   Q.   Well, the prescriptions that Burdette was filling were

21   going to Bob Patel's pharmacies, correct?

22   A.   Those were Bob Patel's instructions.

23   Q.   All right.  Well, in any event, sir, Mr. Neal asked you

24   about August 2nd, 2011, if that was an important day for you.

25   Correct?

1    A.   I remember that day.

2    Q.   Well, that was the day that the agents, a bunch of federal

3    agents swept down and arrested a number of people in this

4    indictment.   Correct?

5    A.   Correct.

6    Q.   Well, not this indictment, but an indictment.   Correct?

7    A.   Yes.

8    Q.   Bob Patel was one of those people, correct?

9    A.   Yes.

10   Q.   Hiren Patel was one of those people, correct?

11   A.   Yep.

12   Q.   Ramesh Patel was one of those people?

13   A.   Yeah.

14   Q.   And how about Atul Patel?

15   A.   I wasn't there.

16   Q.   How about Vinod Patel?

17   A.   He wasn't there.

18   Q.   So, from August 2011, you said that Bob Patel came down to

19   see you at Beecher Pharmacy.   Correct?

20   A.   Bob Patel was arrested.   That's what you just mentioned a

21   moment ago.   How would he come and meet me?

22   Q.   My questions is you said -- I think you testified --

23   correct me if I'm wrong, Atul -- that on August 2nd Bob Patel

24   came down and told you to close down the pharmacy.   Do you

25   remember that?

1    A.  Bob Patel?

2    Q.  Yes.

3    A.  It was Vinod Patel who came down.

4    Q.  Oh, okay.  It was Vinod Patel.  Not Bob.

5            And you closed down the pharmacy because of these

6    indictments and these arrests.  Correct?

7    A.  Correct.

8    Q.  And you kept the pharmacy closed for what, two days?

9    A.  Yes.

10   Q.  And then you opened it back up, you and Lalit, correct?

11   A.  Yes.

12   Q.  And you continued to work your scam at the pharmacy for a

13   number of months.  Correct?

14   A.  No, you're wrong there.

15   Q.  Well, how long did you continue the scam?

16   A.  Once the indictment took place on August the 2nd, we

17   stopped taking any prescriptions at the pharmacy.

18   Q.  Did you go to New Jersey to see your pal Manoj?

19   A.  No, we didn't do that.

20   Q.  What did you do with the narcotics that you had billed but

21   not distributed?

22   A.  I think someone needs to talk to you and make you

23   understand what is narcotics and what is controlled.  Please do

24   that first.

25   Q.  My question is what did you do with the drugs that you and

1   Vinod -- or, you and Lalit Patel did not dispense as of the

2   date of August 2nd, 2011?

3   A.  We had a trip just a week before this thing happened.  So,

4   all the drugs were in New Jersey.  We didn't have any stock --

5   Q.  So, that last week you didn't have an opportunity to get

6   anymore of a stockpile?

7   A.  No.

8   Q.  Now, sir, with respect to the next -- you moved to Georgia,

9   correct?

10   A.  Correct.

11   Q.  And that was how long after August 2nd of 2013?

12   A.  17 days.

13   Q.  Okay.  And you took your wife down there, correct?

14   A.  Correct.

15   Q.  And when did you buy the gas station?

16   A.  March 1st, 2013.

17   Q.  Okay.  And at some point while you were in Georgia, did you

18   ever upgrade your visa so you could work?

19   A.  Yes.

20   Q.  Okay.  And you were allowed to work on a new visa, correct?

21   A.  Correct.

22   Q.  Okay.  And in March of 2013, March 19th, you were arrested,

23   correct?

24   A.  Correct.

25   Q.  And that was down in Georgia, correct?

1    A.   Correct.

2    Q.   And when you were arrested down in Georgia, you were taken

3    in front of a judge down there, correct?

4    A.   Yeah.

5    Q.   And you spent approximately ten days in custody getting

6    back to Michigan, correct?

7    A.   You're wrong.

8    Q.   Well, how long was it before you were released on bond?

9    A.   The second day.

10   Q.   Okay.  And when you were released on bond, you had to

11   sign -- you didn't have to put up any money, did you?

12   A.   No.

13   Q.   You walked out with a signature, correct?

14   A.   That's what the judge told me to do.

15   Q.   Well, before you went in front of the judge, you spoke with

16   a pretrial officer, correct?

17   A.   Yes.

18   Q.   You gave the officer information about your background,

19   correct?

20   A.   Correct.

21   Q.   And the officer asked you about your immigration status,

22   correct?

23   A.   Yes.

24   Q.   The officer -- you didn't tell the officer that you had

25   bought a diploma in India and that all of your educational

1  background was a fraud, did you?

2  A.  He didn't ask me for that.

3  Q.  My question is did you ever tell him that?

4  A.  No.

5  Q.  He asked you about your immigration status, correct?

6  A.  Yes.

7  Q.  Did you tell him you bought your way into the country by

8  buying a diploma in India?  Yes or no.

9  A.  No.

10 Q.  When you went in front of that judge, you were sworn to

11 tell the truth.  Correct?

12 A.  Yes.

13 Q.  And you never told the judge down in Georgia that you

14 bought your way into the country by buying this diploma, did

15 you?

16 A.  He didn't ask me.

17 Q.  Did you ever tell the judge, Your Honor, there's something

18 you need to know about this?

19 A.  He didn't ask me, so I said nothing.

20 Q.  Well, in any way, sir, after you got back to Detroit, you

21 were served or went in front of a judge for the purposes of

22 your arraignment on these charges.  Correct?

23 A.  Correct.

24 Q.  And sometime in October of 2013 you made a decision,

25 correct?

1    A.   Yes.

2    Q.   You made a decision that you were going to cooperate with

3    the Government, correct?

4    A.   Correct.

5    Q.   And you sat down actually on October 2nd of 2013, correct?

6    A.   Yes.

7    Q.   And you came down to this building with your lawyer,

8    correct?

9    A.   Yes.

10   Q.   And who did you meet with on October 2nd of 2013?

11   A.   (No response.)

12   Q.   Who?

13   A.   I guess Mr. Neal.

14   Q.   Well, do you remember?

15   A.   I said I guess.

16   Q.   Well, that was a pretty important day in Atul Patel's life,

17   wasn't it?

18   A.   Yeah.

19   Q.   You were coming down here to meet with the federal

20   prosecutor, the guy who was trying to put you in jail, for the

21   purposes of talking with him about the case.  Correct?

22   A.   Correct.

23   Q.   You don't remember who you met with?

24   A.   There were a bunch of agents.

25   Q.   Well, how many agents?

1    A.   Probably seven, eight.

2    Q.   Eight?

3    A.   Yeah.

4    Q.   Mr. Neal wasn't there, was he?

5    A.   He was there.

6    Q.   He was there for the whole conversation?

7    A.   Yes.

8    Q.   Okay.  Now, they spoke to you about Beecher Pharmacy,

9    didn't they?

10   A.   I told them that.  They didn't ask me for that.

11   Q.   Well, the subject of Beecher Pharmacy came up, didn't it,

12   sir?

13   A.   Yes.

14   Q.   I'm going to show you what I'll mark as Defendant's No. 3.

15   Take a look at that.  It's a report.

16              You've seen that report before, haven't you?

17   A.   (No response.)

18   Q.   Yes or no.

19   A.   Let me read it.

20   Q.   Take your time.

21              *(Brief pause.)*

22   A.   Yes.

23   Q.   Okay.  I want you to turn to page 13.

24              All right.  Now, you've read that report before,

25   haven't you?

1    A.   Yep.

2    Q.   You've seen it a number of times, haven't you?

3    A.   Once.

4    Q.   Okay.  That is a report prepared by the agents that you sat

5    down with about your conversations with them on October 2nd,

6    2013.  Correct?

7    A.   Yep.

8    Q.   On page 13 it refers to your involvement with Beecher

9    Pharmacy, does it not?

10   A.   Yep.

11   Q.   Okay.  At any time in that conversation that you had with

12   the agents or with Mr. Neal on October 2nd of 2013, did you

13   ever tell them that you and Lalit made a hundred thousand

14   dollars apiece?  Yes or no.

15   A.   No.  They didn't ask me.

16   Q.   So, those agents, the guys who have been working this case

17   for almost four years, when you sat with those agents and

18   Mr. Neal for a couple hours discussing this case, they never

19   asked you if you made any money from the billing but not

20   dispensing scheme at Beecher Pharmacy?  They never asked you

21   that?

22   A.   No.

23   Q.   That's what you're telling the ladies and gentlemen?

24   A.   Yeah, they never -- at that moment, on this date?

25   Q.   Yeah.

1    A.   No.

2    Q.   And you never told them, hey, guys, you know what; this

3    bill but not dispense scheme that I was involved in with Lalit,

4    we actually made some money on this?

5    A.   I told them we made some money.  They never asked for the

6    amount.

7    Q.   Who did you tell you made money to?

8    A.   Mr. Neal and the agents.

9    Q.   Did they ask you, well, Atul, how much money did you make?

10   A.   No.

11   Q.   Sir, you didn't meet with the agents again until about

12   three weeks ago, June 24th of 2014.  Correct?

13   A.   Correct.

14   Q.   They told you we've got to fly you up here from Georgia.

15   Correct?

16   A.   Correct.

17   Q.   We're going to sit down and go over your testimony.

18   Correct?

19   A.   Correct.

20   Q.   And you did that, correct?

21   A.   Correct.

22   Q.   That was the first time you ever told anybody that you made

23   a hundred thousand dollars as part of your involvement in the

24   Beecher Pharmacy bill but not dispense scheme.  Isn't that

25   right?

1    A.   That was the first time someone asked me about it.

2    Q.   That was the first time you told anybody.  Correct?

3    A.   Yeah.

4    Q.   Mr. Patel, back on October 2nd of 2013, you told us a

5    little bit about the fact that --

6              MR. BEUKE:  May I have one moment, Judge.

7    BY MR. BEUKE:

8    Q.   Before you signed your Plea Agreement with your lawyer and

9    Mr. Neal and Mr. Pratt, you signed another document called a

10   Cooperation Agreement.  Correct?

11   A.   Correct.

12   Q.   And you went through that Cooperation Agreement with

13   Mr. Neal and Mr. Pratt and your lawyer, didn't you?

14   A.   Mr. Pratt wasn't there.

15   Q.   Well, Mr. Neal and your attorney, correct?

16   A.   Correct.

17   Q.   And the agreement was explained to you by your lawyer.  Is

18   that fair to say?

19   A.   To some extent.

20   Q.   Okay.  And you went through the document page-by-page.

21   Correct?

22   A.   Yeah, once.

23   Q.   Okay.  And I'm going to show you what I'll mark as

24   Defendant's 4.  Take a look at that three-page document.

25              Tell the ladies and gentlemen of the jury if you

1    recognize it, and if you do, what you recognize it to be.

2              *(Brief pause.)*

3    Q.  Do you recognize it, sir?

4    A.  Yes.

5    Q.  Is that the Cooperation Agreement you and your attorney

6    signed?

7    A.  Correct.

8    Q.  Is it signed by Mr. Pratt?

9    A.  Yeah, it's signed by him.

10   Q.  It's signed by Mr. Neal?

11   A.  Yeah.

12   Q.  And after it was explained to you -- you read it, didn't

13   you?

14   A.  Yeah.

15   Q.  Okay.  The first page, I'd like to direct you to the bottom

16   of the page.  It says:

17              "Defendant agrees to be available for

18              interviews and preparation of all testimony.  The

19              Defendant further agrees to submit, upon request,

20              to government administered polygraph examinations

21              to verify Defendant's full and truthful

22              cooperation."

23              You read that, correct?

24   A.  Yeah.

25   Q.  That was explained to you, correct?

1   A.  Yeah.

2   Q.  Tell the ladies and gentlemen when you went down there to

3   take that polygraph --

4            MR. NEAL:  Judge, I'm going to object to this line of

5   testimony.

6            THE COURT:  Sustained.

7            MR. BEUKE:  Judge, it's their agreement with him; not

8   mine.

9            THE COURT:  It's sustained.

10           MR. BEUKE:  May I have a moment, Your Honor?

11           I have nothing else, Judge.

12           THE COURT:  The jury will disregard the reference to

13  a polygraph, whether it was given or not given.  The State of

14  Michigan policy is against the use of polygraphs, and the rules

15  of evidence do not allow them to even be mentioned.

16           You may --

17           MR. NEAL:  Your Honor, I have no further questions of

18  this witness at this time.

19           THE COURT:  Do the jurors have any questions?

20           Mr. Pratt, can you see okay?

21           MR. PRATT:  I can, Your Honor.  Thank you.

22           THE COURT:  Okay.  Do you have questions?

23           MR. PRATT:  No, Your Honor.

24           THE COURT:  Okay.  Do any jurors have questions?

25           Okay.  You may step down.

```
 1              You may call your next witness.
 2              MR. PRATT:  Your Honor, the United States calls
 3     Ramesh Patel.
 4              THE COURT:  Raise your right hand, please.
 5          RAMESH PATEL, GOVERNMENT'S WITNESS, SWORN.
 6              THE COURT:  Please be seated.  Keep your voice up.
 7     Adjust the microphone so we can hear you.
 8     A.  Thank you.
 9              THE COURT:  You may begin.
10                        DIRECT-EXAMINATION
11     BY MR. PRATT:
12     Q.  Sir, would you please state your full name for the record?
13     A.  My first name is Ramesh, R-A-M-E-S-H, and the last name is
14     Patel, P-A-T-E-L.
15     Q.  How old are you, sir?
16     A.  I am 53 years old.
17     Q.  What country are you from originally?
18     A.  I am from India.
19     Q.  Is English your first language?
20     A.  No.  Gujarati is my first language.
21     Q.  All right.  Do you speak English?
22     A.  Yes, I do.
23     Q.  All right.  What training did you have in English?  What
24     experience have you had in English?
25     A.  I went to school for my undergraduate which was in English,
```

1    and I did Master's which was in the English language.

2    Q.  All right.  What year did you first come in the United

3    States?

4    A.  I came in May of 1999.

5    Q.  Where did you go in the United States?

6    A.  I went to the Ferris State University in the program

7    Information Systems Management to achieve the Master's Degree.

8    Q.  Did you obtain a degree in Information Systems Management

9    from Ferris State University?

10   A.  Yes, that's correct.

11   Q.  All right.  Did you -- if you obtained a Master's there,

12   did you have an education before coming to Ferris State in

13   Michigan?

14   A.  Yes, I did.

15   Q.  What was that?

16   A.  It was in chemical engineering.  That was my undergraduate.

17   Q.  Where did you obtain your chemical engineering degree?

18   A.  That was from back home, India.

19   Q.  All right.  Did you -- after you obtained your Master's

20   from Ferris State, what did you do?

21   A.  After obtaining the Master's Degree, I started working for

22   the Aztec Group in September of 2000.

23   Q.  Okay.  What is the Aztec Group?

24   A.  Aztec, they have two kinds of companies.  Aztec has like a

25   computer placement company, which is like they do the

1   placements for the IT persons in the different -- like GM, BCDM

2   or any of the -- wherever they have a need for the IT persons.

3          They have another company which is called Accelerated

4   Computer Training --

5          (Interjection by court reporter.)

6   A.  ACT.  It's the name of the like training place.  They do

7   the training in the different programs like Java, networking,

8   and other things.  So, another one was the training of me.  One

9   was like a placement company, a contracting company for the IT

10  places.

11  Q.  What was your employment?  What did you do for the Aztec

12  Corp?  Did you work training people or did you work in the

13  employment placement half of it?

14  A.  I had different roles.  I had one of the projects.  I

15  worked in the Aztec Group.

16  Q.  Okay.  How long did you work for them?

17  A.  I worked until June of 2001.

18  Q.  And then what happened in June of 2001?

19  A.  After -- in June of 2001, Aztec sold the company and they

20  had their own staff.  So, I didn't have a job over there.

21  Q.  What did you do at that point?

22  A.  After that I went to Canada.

23  Q.  Why did you go to Canada?

24  A.  Because I didn't have a job.

25  Q.  Okay.  At that point, 2001, what country were you a citizen

1   of?

2   A.  I was a citizenship of India at that point.

3   Q.  All right.  Did you eventually obtain citizenship in

4   another country?

5   A.  Yes, I did.

6   Q.  And what country was that?

7   A.  That was from Canada.

8   Q.  And when did you obtain your citizenship in Canada?

9   A.  That was in 2004.

10  Q.  All right.  Did there come a time that you -- and are you a

11  Canadian citizen right now?

12  A.  Yes, I am.

13  Q.  Okay.  Did there come a time that you came back to the

14  United States?

15  A.  Yes, I did.

16  Q.  When did you come back to the United States?

17  A.  I came to the United States in March of 2003.

18  Q.  What was your purpose for coming to the United States?

19  A.  I was looking for a job in the U.S., and I found a job in

20  one of the companies in the United States.

21  Q.  Okay.  What line of work?  What did you do?

22  A.  I found a job in chemical engineering and Excel

23  Electrocircuit, Inc. was the name of the company that sponsored

24  my H1B visa at that time.

25  Q.  How long did you work as a chemical engineer?

1    A.   I worked until May of 2007 at Excel.

2    Q.   What, if anything, did you do after May of 2007?

3    A.   May of 2007, I found another opportunity named First

4    Michigan Home Health Care, and I joined.

5    Q.   All right.  Where was First Michigan Home Health Care

6    located?

7    A.   At that point, First Michigan Home Health Care was located

8    in Oak Park, Michigan.

9    Q.   Who owned -- how did you find out about this job

10   opportunity with First Michigan Home Health Care?

11   A.   First Michigan Home Health Care was bought by Babu and

12   Vinod.  Vinod was the owner at that point for First Michigan

13   Home Health Care.

14   Q.   All right.  You mentioned Babubhai Patel, who I think --

15   A.   Yes.

16   Q.   He's also sometimes called Bob Patel.

17           How do you know Babubhai Patel?

18   A.   Babubhai Patel is my brother-in-law.

19   Q.   You say your brother-in-law.

20           Who is married to who?

21   A.   He is married to my younger sister.

22   Q.   Do you know approximately how long ago they were married?

23   A.   It was very long, maybe 1981, they married in 1981.

24   Q.   Okay.  Were they married here or were they married in

25   India?

1   A.   They were married back home.

2   Q.   And who is Vinod Patel?

3   A.   Vinod Patel is the brother of Babubhai Patel.

4   Q.   Do you know if he's an older brother or a younger brother?

5   A.   He's a younger brother of Babubhai Patel.

6   Q.   All right.  So, this opportunity to work for First Michigan

7   home care, how did -- I'm not sure.  I may have not heard it.

8   How did you find out about the opportunity with these folks?

9   A.   Babubhai Patel wanted me to work in home care like in order

10   to get a business opportunity in the future, but the first time

11   they sponsored my TN visa in the First Michigan Home Health

12   Care as a systems analyst.  And home care has one software

13   which requires some kind of IT knowledge.  So, they did sponsor

14   my -- it's TN visa in the home care.

15   Q.   Okay.  Explain a little bit about how this visa worked.

16   Before you talked about an H1 visa and now you're talking about

17   a TN visa.  You've had both kinds.

18   A.   Right.

19   Q.   Can you explain what the difference is?

20   A.   Okay.  The difference between H1B visa, it's like a

21   temporary work visa until a company has a sponsorship.  So, any

22   of the countries can get an H1B visa; whereas, the TN visa is

23   like a treaty between the U.S. Canada and Mexico.

24         If you are a citizen of like Canada or Mexico, you

25   have to go to the border and you need to implement it later in

1    order to get the TN visa.  So, that's the only difference

2    between those two.

3    Q.  All right.  But in any event, you were sponsored for the TN

4    visa by who?

5    A.  By First Michigan Home Health Care.

6    Q.  All right.  And you indicated the initial -- you say there

7    was a business opportunity.

8              Did anyone tell you that you were going to have an

9    opportunity to become an owner?

10   A.  Yes.  Babubhai Patel verbally told me that I would have an

11   opportunity to get the profit sharing from this business.

12   Q.  All right.  You indicated, I think, you had had experience

13   in chemical engineering and in computers.

14             Had you had any experience in home health care before

15   this point?

16   A.  No, I did not.

17   Q.  Okay.  Did there come a time -- I know we are starting in

18   2007.  I want to skip forward.

19             Did there come a time that you actually were given a

20   share of the profits, an ownership share?

21   A.  Not in 2007.  But the time came in 2009 when the home care

22   started making a profit.  At that time, the share was decided.

23   Q.  All right.  And at that time when the business was making a

24   profit in 2009, how were the profits split up?

25   A.  At that time the profits were shared; like Babubhai Patel

1    had 40 percent share, and Vinod had 30 percent share, and

2    myself had 30 percent share in the profit sharing.

3    Q.   Okay.  And by the way, when you say -- I notice your last

4    name is Patel and your brother-in-law's last name is Patel.

5           Was there any -- was there any blood relationship

6    before you came, related to him by the marriage of your younger

7    sister?

8    A.   No.   Actually we have like a society and it is like a

9    certain relation in that they do the marriage.   Before that, we

10   didn't have any relationship before the marriage of my sister.

11   Q.   Okay.   Can you tell us what your role was initially when

12   you first started working for First Michigan Home Health Care?

13   A.   My role initially was to take care of any issue related to

14   like the software, networking and like managing the office

15   initially.

16   Q.   Okay.   What was involved in managing the office?

17   A.   Managing the office, like when any referral comes, we have

18   to verify the insurance, assign it to the different discipline.

19   And there were multiple disciplines involved, like nursing,

20   therapy, occupational therapy, all of the disciplines had to be

21   assigned to the patient or not.

22   Q.   Okay.   As opposed to what you were doing, were there other

23   people who were working for First Michigan when you started?

24   A.   Yes.   Mr. Rana Naeem and Vinod -- anyway, he was the owner,

25   but he was home care too.

1    Q.  Let's break this down, what the roles of someone named Rana

2    Naeem were, first of all, and then what Vinod Patel was doing.

3              What did Rana Naeem in 2007, when you started, what

4    was his role?

5    A.  Initially like Rana Naeem and Vinod Patel both had the role

6    to bring the patients to First Michigan Home Health Care.

7    Q.  To what the patient?

8    A.  To bring the patient, patient referrals for the First

9    Michigan Home Health Care.

10   Q.  All right.  Is there a name for the person who brings the

11   patients in?

12   A.  There was like Rana and Vinod, their job was to contact the

13   marketer, and the marketer would refer the patients to the

14   First Michigan Home Health Care.

15   Q.  All right.  Did you learn whether or not marketers were

16   being paid for patients?

17   A.  Yes.

18   Q.  How did you learn that marketers were being paid for

19   patients?

20   A.  We know that Rana Naeem at that time told me that they made

21   a deal with the marketer, that if the marketer brings the

22   patients, they have to pay per patient.

23   Q.  All right.  Did you have any discussions with Vinod Patel

24   and Rana Naeem as to whether there was concern about people

25   finding out that they were paying the marketers by the patient?

1    A.   Yes.   They had a concern --

2                MR. BEUKE:   Objection, foundation.

3                MR. PRATT:   I think I asked a yes or no question,

4    Your Honor, and I think the answer was yes.   And I think now

5    I'm going to lay the foundation of how he knows that.

6                THE COURT:   You may.

7                MR. BEUKE:   Judge, my concern is just approximate

8    date, time, who else was present, where the conversation

9    happens.   Those are my foundation issues.

10   BY MR. PRATT:

11   Q.   I'm directing your attention -- and tell me if I'm off.   I

12   think we're still back in 2007 when you're starting and

13   Mr. Naeem is still there.

14   A.   Right, yes.

15   Q.   So, if you're telling me something that's from later, why,

16   let me know.   Okay?

17   A.   Okay.

18   Q.   So, you say you knew they had a concern about people

19   finding out about this.

20                How do you know that they had in 2007 this concern

21   about people finding out that they were paying for patients?

22   A.   Okay.   Initially this marketer was paid by check and it was

23   paid from the First Michigan Home Health Care checkbook and it

24   was --

25   Q.   How do you know that?

1    A.   Yeah.   I myself used to -- Vinod used to tell me that this

2    is the patient that came from this marketer, so you have to

3    write a check for that marketer's name.

4    Q.   Okay.   And, by the way, who would sign the checks to the

5    marketers?

6    A.   Vinod Patel.

7    Q.   Who had signature authority for the First Michigan

8    checkbook account?

9    A.   He's the only one that had signature authority to sign the

10   check.

11   Q.   Okay.   And so you indicate the marketers are getting paid

12   by check.

13           And what conversation, if any, did you have with

14   Vinod Patel about that?

15   A.   Like whenever the patient comes, the patient is seen by the

16   home care, and when the services get started, then Vinod said

17   that this patient is open, so we need to write the check for

18   this marketer's name.

19   Q.   Okay.   And did he ever say anything to you that showed that

20   he had some concern about this becoming known?

21   A.   Yes.   So far, just like paying the marketer was like a

22   paper trail or the check on record, and it was a concern.   So,

23   he -- after that, then it started that we call that person to

24   the doctor's office.   And for the doctor, they are trying to

25   make a deal of paying cash so that there won't be any paper

1   trail.

2   Q.  Okay.  So, he had a concern.

3        And did you come to learn why he wanted there to be

4   no paper trail?  What was -- did you learn from him why he did

5   not want any paper trail?

6   A.  Because it was easier to pay the marketer or the doctor for

7   the home care referral.

8   Q.  Okay.  Do you recall approximately when the switch took

9   place, the switch from paying marketers by check and paying --

10  and doctors -- by cash?

11  A.  That's the end of 2008, the beginning of 2009.

12  Q.  Okay.  Can you tell us, if you know, who the person was

13  that would talk with doctors on behalf of First Michigan in

14  order to engage in this negotiation and get these patients?

15  A.  Vinod was the only one who had contact with the doctor to

16  make the deal, to get the patient referrals.

17  Q.  And how do you know he was the only one that had that role

18  or responsibility?

19  A.  So, he shared this information with me, that he, I mean,

20  talked to this doctor, and if the patient comes from that

21  doctor and if we see or provide the services, then we have to

22  pay him whatever it is.

23  Q.  All right.  And as far as the actual payment of the

24  doctors -- and, again, I'm talking in this same time period.

25  Okay?

1   A.   Mm-hmm.

2   Q.   -- who was responsible at that point for actually giving

3   the cash to the doctors?

4   A.   He, himself, was responsible for paying to the doctors.

5   Q.   And how do you know that?

6   A.   He shared that he paid the doctors so on and so much in

7   dollars to the doctors.

8   Q.   All right.  Do you know any of the names -- do you recall

9   any of the names of the doctors that the Defendant said he was

10  paying?

11  A.   Yes.  Dr. Anmy Tran, Dr. Roberto William, Dr. Stanislaus

12  Orowe.

13            *(Interjection by court reporter.)*

14  Q.   Those were some of the doctors.

15            Were there more than three doctors?

16  A.   Yes, there were some more doctors also.

17            MR. PRATT:   Okay.  Your Honor, at this time, with the

18  Court's permission, I would like to show Government Exhibit 6B

19  to the witness.  This is an exhibit that we have not yet laid

20  the -- although it may be stipulated, we have not laid the

21  foundation to, but we have the witnesses lined up.

22            So, with the Court's permission, subject to

23  connecting it up later, I would like to show the exhibit to the

24  witness at this time.

25            THE COURT:   Any objection?

1            MR. BEUKE:  Yes, Judge.

2            THE COURT:  Pardon?

3            MR. BEUKE:  Yes.

4            THE COURT:  To the process or to the whole exhibit?

5            MR. BEUKE:  To both, Judge.

6            THE COURT:  Do you have other questions you can ask

7    this man or should we take a sidebar?

8            MR. PRATT:  I think -- I think this is a point to

9    take a sidebar, Your Honor.

10            THE COURT:  You know what.  Rather than the noise,

11    we're going to excuse you for five minutes.

12            All rise for the jury.

13            *(Jury leaves the courtroom at 12:20 p.m.)*

14            THE COURT:  What's your objection?

15            MR. BEUKE:  Foundation, Judge.  I don't know that

16    anybody has established that any of the people that are

17    referred to in 6B -- and there are a number of people.

18            I think preliminarily they need to establish that the

19    people whose names are on these charts are the people that this

20    witness is talking about.

21            MR. PRATT:  Your Honor -- and I can put 6B on the

22    screen if you like.  But 6B is essentially a list of doctors

23    that wrote referrals -- the main doctors that wrote referrals

24    for home health care by dollar amount to First Michigan.  So,

25    the exhibit itself comes from the billing data.  It indicates

1    that during this time period Dr. A, his people were billed so

2    much by First Michigan, and so on.

3            Defense counsel knew, both from the opening statement

4    and an e-mail I sent them, that I had shown that exhibit to

5    this witness, and he was going to go down the list and indicate

6    which ones he knew about and, of course, which ones he does not

7    know about, all of which gave referrals to a company that he

8    worked for.

9            And so what's missing is the foundation to show that

10   the Medicare records are accurate.  And I'm making an offer of

11   proof to this Court that we'll either have a stipulation or

12   we'll have a witness that will show that the Medicare record is

13   correct.

14           So, rather than going out of order and bringing him

15   back for this one question, I think, both because they knew we

16   were going to go there --

17           THE COURT:  Do you have any objection to my accepting

18   it as an exhibit subject to completing the foundation?

19           MR. BEUKE:  Judge, I do, because I assume that by

20   doing it in that process, what you're going to do is allow the

21   jury to hear all of this evidence through this witness.  And my

22   objection, Judge, is, you know, the people -- if they want to

23   put the doctors on the stand to testify that Paul Petre, I'm

24   the one who wrote $9 million worth of referrals to First

25   Michigan --

1          THE COURT:  What's your response to that, counsel?

2          Yeah, you're the one standing there.

3          MR. PRATT:  Your Honor, the Medicare record is what

4    the Medicare record is.  It shows that there were referrals

5    from Paul Petre, for example, for how many ever million.

6          I can ask this witness, these are the doctors that

7    apparently referred a lot of business to First Michigan; what

8    do you know about these doctors.  And some of them he'll say he

9    knows that there was a payment relationship and some of them

10   he'll same he has no knowledge of.

11         I don't think -- I don't think there's --

12         THE COURT:  Isn't this admissible under several

13   exceptions to hearsay; business records, government

14   documents --

15         MR. PRATT:  It is, Your Honor.  We don't have to

16   bring the individual doctors in in order to get the --

17         THE COURT:  Objection is overruled.

18         Please bring in the jury.

19         MR. BEUKE:  Judge, can I -- just, can we have one

20   second?

21         THE COURT:  Hang on a second.  Close the door,

22   please.

23         *(Off the record.)*

24         THE COURT:  Yes?

25         MR. BEUKE:  Judge, just for purposes of the

| | |
|---|---|
| 1 | recovered, I don't believe 6B is a business record.  It's a |
| 2 | chart that has been created by the prosecutors based on their |
| 3 | review of materials provided to their office by Medicare -- |
| 4 | THE COURT:  We had this discussion a week ago about |
| 5 | any objections to exhibits. |
| 6 | It might go to weight, but it certainly doesn't go to |
| 7 | admissibility. |
| 8 | *(Government Exhibit 6B was admitted into evidence.)* |
| 9 | THE COURT:  Bring in the jury. |
| 10 | *(Jury enters the courtroom at 12:24 p.m.)* |
| 11 | THE COURT:  Everybody is in their place.  You may be |
| 12 | seated. |
| 13 | You may continue. |
| 14 | MR. PRATT:  Thank you, Your Honor. |
| 15 | Ms. Drinkard, would please put proposed Government |
| 16 | Exhibit 6B on the screen. |
| 17 | BY MR. PRATT: |
| 18 | Q.  And, Mr. Patel, I'm going to ask you a few questions about |
| 19 | 6B. |
| 20 | A.  Okay. |
| 21 | Q.  All right.  Sir, have you been shown this document before? |
| 22 | A.  No. |
| 23 | Q.  All right.  Well, let me ask you this then.  Are you |
| 24 | familiar with any of the names of the doctors listed on the |
| 25 | list? |

1    A.  Yes.

2    Q.  All right.  Let's go through them one-by-one.

3            Paul Petre, are you familiar with Paul Petre?

4    A.  Yes, I do.

5    Q.  How do you know Paul Petre?

6    A.  That was a doctor who used to send referrals from the Flint

7    area.

8    Q.  All right.  The doctor would send referrals from the Flint

9    area.

10           Did he have someone else, another medical person that

11   worked closely with him?

12   A.  Yes.  Mr. Burdette, Jim Burdette.

13   Q.  If you know, what was his certification or title?

14   A.  He was a physician assistant.

15   Q.  Okay.  Do you know if there was any -- let's go down the

16   list.

17           Do you know if there was any relationship between

18   Vinod Patel, First Michigan and Paul Petre and Mr. Burdette?

19   A.  Yes, I do.

20           Vinod Patel used to work with Atul Patel.  Atul Patel

21   was doing the marketing in the Flint area, and he used to find

22   the patients and refer the patients to Paul Petre.

23   Q.  How do you know that, by conversations with who?

24   A.  By Vinod Patel, conversations with Vinod Patel.

25   Q.  All right.  Were you actually up in Flint doing the work

1    with the patients or were you in the office in Oak Park?

2    A.  My role was to stay in the office, not to work outside the

3    office.

4    Q.  Okay.  Let's go down the list then.

5              Roberto William, are you familiar with that doctor?

6    A.  Yes, I do.

7    Q.  And do you know if he had any relationship with First

8    Michigan, particularly in terms of being paid for referrals?

9    A.  Yes, I do.

10   Q.  How do you know that?

11   A.  The doctor was paid by cash for referring the patient.

12   Q.  And how do you know that?  Who told you that?

13   A.  Vinod told me about that.

14   Q.  Okay.  Did he tell you who did the actual paying of cash?

15   A.  Yes.  He did.

16   Q.  What did he say?

17   A.  He said that he actually paid to the doctor for referring

18   the patients, the actual doctor.

19   Q.  All right.  What about Stanislaus Orowe, did Vinod Patel

20   tell you about his relationship with that doctor?

21   A.  Yes, he did.

22   Q.  What did he tell you?

23   A.  He told me that this doctor, like we have to pay him $500.

24   Whenever the patient comes, we have to pay to that doctor.

25   Q.  Okay.  The payment was $500 per patient?

1    A.  Right, yes.

2    Q.  All right.  What about Kenneth Mitchell, what did the

3    Defendant tell you about his relationship with him?

4    A.  Yeah.  That doctor also got paid by referring the patients

5    to the home care.

6    Q.  All right.  What about Malik Dababneh, do you know anything

7    about him?

8    A.  I don't have any knowledge about paying that doctor.

9    Q.  Okay.  Innocent Agbazzi, what information did Vinod Patel

10   give you about him?

11   A.  Yeah.  There were different patients that worked with -- I

12   mean, the doctor got paid for referring the patients to home

13   health care.

14   Q.  And, again, that was information received from who?

15   A.  Vinod Patel.

16   Q.  Anmy Tran, what information did Vinod Patel give you about

17   his relationship with her?

18   A.  Yeah.  He told me one of the problems with that doctor, it

19   depends on how much we have to pay, $500 from his office and

20   $100 from the patients.  That's what he shared with me.

21   Q.  All right.  Let's have you explain that a little bit.

22          You say that the payment to Dr. Tran would vary.

23   Sometimes it would be $500 and sometimes it would be $100?

24   A.  That's correct.

25   Q.  Why would -- can you walk us through why the payment would

1  be different for different patients that were referred to First

2  Michigan Home Health Care?

3  A.  The payment was for $500 because that comes directly from

4  Dr. Tran's office and the patient was owned or directly came

5  from Dr. Tran's office.

6  Q.  So, coming from the office, you mean a regular patient of

7  hers?

8  A.  Yeah.  A regular patient referral which comes to see

9  Dr. Tran and she referred to First Michigan.  The doctor do not

10  have to go find the patient.

11  Q.  Okay.  And which patients did she earn a $100 fee for?

12  A.  Then some marketer finds the patient and the doctor goes

13  visit the patient and she writes the order for the home care,

14  and then she got paid $100 only.

15  Q.  All right.  Can you go down to the next one.

16          Sameer Sawalha, did you have any conversation with

17  the Defendant about that doctor?

18  A.  No, I do not have any knowledge of paying that doctor.

19  Q.  Okay.  How about Ramesh Chheda, do you have any another of

20  that?

21  A.  No, I do not have any knowledge of paying that doctor.

22  Q.  How about Dr. Saha?

23  A.  Yeah, the doctor got paid.  The person that was working in

24  the office got paid for that.

25  Q.  Okay.  When you say the person that worked in the office,

1    what do you mean?

2    A.   Like there was a person named Melinda who used to work in

3    Dr. Saha's office in the administration -- or, in the reception

4    area, and she used to refer the patients for the home care.

5    Q.   And who paid her?

6    A.   Initially Vinod paid.  He contacted her to refer the

7    patients.

8         MR. PRATT:  All right.  You can put that down now.

9    BY MR. PRATT:

10   Q.   I think you were starting to explain a little bit, but I'd

11   like you to explain in some detail.  Did First Michigan pay

12   these payments to the doctors and their associates when you

13   immediately got a new patient name and a patient number, or did

14   some things have to happen first?

15   A.   No.  Actually there's a process.  Let me explain a little

16   bit about the home care process?

17   Q.   Please.

18   A.   Yeah, sure.

19        So, home care is a program where the government has

20   designed for like the patients who are having like Medicare or

21   Medicaid, and if they need any services, nursing, therapy,

22   occupational, social worker, nutritional service at home, then

23   home care can provide the services.  So, the government has

24   designed this program in order to avoid hospitalization so that

25   the government can save the money by providing the home care

1    rather than the patient go to the hospital.

2              So, how the program worked, like the doctor have to

3    have him sign -- it's a referral order from the doctor in order

4    to get -- start the services for the home care.

5              So, the process like that, just like this marketer

6    contacted -- or, the person whose role was to bring the patient

7    for the home care, they contacted the marketer or the doctor,

8    and they are responsible to send the patient to home care by

9    fax or they bring personally.

10             So, when the referral comes, then the home care

11   verifies the insurance, that this patient qualifies for the

12   home care or not.  Mainly, the main insurance was the Medicare

13   for the home care.

14   Q.  All right.  In your experiencing working in the office,

15   would there be problems where, oh, you've got a new name,

16   you've got new insurance information, you've got a new patient,

17   and then would there be a problem with the insurance?

18   A.  Yeah.  I mean, it's like if the referral comes in and if

19   the patient doesn't have Medicare or whatever, like Medicaid

20   insurance, for the home care, then we cannot see that patient.

21             Another problem was that -- I mean, it's like if a

22   patient was opened by another home care, then it would show in

23   the system.  In that case, we cannot provide the services to

24   that patient.

25   Q.  All right.  So, let's assume this is not one of the

1    problems.  Let's assume that this one has valid insurance,

2    hasn't been opened by someone else.

3              Does the marketer or the doctor get paid yet?

4    A.   Okay.  So, let's say, I mean as an example, the marketer or

5    doctor sends the patient.  We verify the insurance.  The

6    insurance is good.  The diagnosis is good.  Then we arrange a

7    contact with the patient.  And they will talk about like the

8    doctor has signed the order, so we would like to come out and

9    send a nurse to start the services for the home care.

10             So, the order has like all the nursing, therapy and

11   whatever the order requires for the services.  The doctor

12   checkmarks that, whatever the discipline.

13   Q.   So, based on what you saw in the office, we're not

14   talking -- in talking home care, we're not talking about one

15   visit.  We are talking about a series of visits typically?

16   A.   Yeah.  It is usually a two-month program, a series of

17   visits.  So, the very first time the nurse goes to see the

18   patient, at that time she will decide how many visits need to

19   be provided to this patient, maybe four weeks, five weeks, and

20   how many visits in a week.  She will figure out.

21   Q.   All right.  And so if the nurse is able to have a visit

22   with the patient, then what happens in terms of the billing

23   process?

24   A.   Okay.  So, once the nurse is able to open or start the

25   services with that patient, then the opening packet comes to

1   the office, that the nurse opens that patient.

2               So, the paperwork has like all of the information

3   about the patient.

4               So, based on the information, we will code and create

5   the start-up care.  And once it is coded, then home care will

6   bill -- initiate payment, which is called RAP, Request for

7   Anticipated Payment.  So, that's part of the --

8   Q.  So, you submit something called an anticipated payment?

9   A.  It's a Request for Anticipated Payment, which is called

10  RAP.

11              So, once the visit has been made, coded, we submit

12  the claim to the Medicare, and Medicare pays 60 percent of the

13  money upfront for home care for the patient.

14  Q.  So, when you say that Medicare will pay 60 percent upfront,

15  that's 60 percent of the total cost of the services, whether

16  it's four weeks or eight weeks?

17  A.  Right.

18              So, like once start-up care comes, like it's coded.

19  Once it's coded in the system, the software determines how much

20  a month it is going to bill for this patient.

21  Q.  Tell us again from your work in the office how much would

22  the total bills run, what would the range be, and how much

23  would 60 percent of that be?

24  A.  Okay.  So, like most of the patients were ranging about

25  $4,000 to $4500; and 60 percent of like let's say $4,000 was

1    paid upfront.  So, 60 percent of 4,000, like 2400 was paid

2    upfront within the first week of the billing.

3    Q.  Okay.  And was the billing -- was the response very quick

4    from the Medicare system?

5    A.  Yeah.  Within one week, they will pay.

6    Q.  Okay.  And so once the billing takes place, what happens in

7    terms of paying the doctor or the marketer?

8    A.  So, once the visit occurs and the claim has been processed,

9    then there was a process of paying to the marketer or the

10   doctor.

11   Q.  Okay.  And then if the course of treatment, whether it's

12   four weeks or eight weeks or whatever, is completed, then what

13   billing is done?

14   A.  So like, let's say when like -- again, I mentioned in the

15   start-up care, it's like when the nurse or therapist decides

16   how many visits are going to be made for that patient.  Then

17   they make the plan-up care, which is called 485.  The plan-up

18   care, that has to be signed by the doctor in order to do the

19   final billing, which is at the end of the cycle, after the two

20   months, which has to be signed by the doctor in order to submit

21   the final claim.

22   Q.  Okay.  So, the doctor has to sign both the referral and

23   later on the 485?

24   A.  485, that's correct.

25   Q.  All right.  You say they averaged about $4,000.

1         What's the highest that the bills would go for a

2    course of treatment?

3    A.   It may go up to 6,000 also, depending on the patient's

4    condition, but in very rare cases it used to go that high.

5    Q.   Okay.  Did -- you may have made reference to it earlier,

6    but was there a point in time that through this process First

7    Michigan Home Health Care started making some money?

8    A.   Yes.

9    Q.   How much money was First Michigan making when you started

10   to be able to get a share of the profits?

11   A.   At that time in 2009, First Michigan started making a

12   profit.  And I can say about 400, 600,000 profit at that time.

13   Q.   And you got how much of a share?

14   A.   I got a 30 percent share.

15   Q.   And how much did the Defendant, Vinod Patel, get?

16   A.   He got a 30 percent share.

17   Q.   Okay.  Now, in terms of the -- in terms of what actually

18   went on out in the patient visits, out in the homes with the

19   nursing staff and that sort of thing, were you involved in that

20   end of the business?  Did you actually go out with the

21   personnel and see patients?

22   A.   No.  I never go out to see any patients or in the market.

23   Q.   Did you know -- did you have any personal knowledge

24   regarding the homebound level of these patients; in other

25   words, whether they were really homebound or not?

1    A.   No, actually, I don't have any knowledge of --

2                MR. BEUKE:   Objection.

3    A.   -- the homebound market --

4                THE COURT:   Okay.   Stop.   When you say you have no

5    knowledge, that answers the question.

6                You may ask your next question.

7                MR. PRATT:   Yes, Your Honor.

8    BY MR. PRATT:

9    Q.   Did there come a time that the duties or the roles of the

10   people at First Michigan Home Health Care changed?

11   A.   Yes.

12   Q.   Tell us when that was.

13   A.   That was like in October, November of 2010 when Vinod went

14   to India, and he gave me the responsibility of taking care of

15   those doctors.

16   Q.   Okay.   I want to go a little bit before November of 2010.

17                Were there some people that left -- was there someone

18   that left First Michigan?

19   A.   Yeah.   Rana Naeem left in early 2008.

20   Q.   Okay.   And why did he leave?

21   A.   Because he wasn't honest to his duty.   He was staying -- he

22   was drawing the salary, but wasn't bringing in the patient

23   referrals.

24   Q.   Okay.   And who made the decision to get rid of him because

25   he wasn't bringing in enough patient referrals?

1    A.   Babubhai Patel.

2    Q.   All right.  So, you said that the Defendant Vinod Patel

3    went back to India approximately when?

4    A.   October or November 2010.

5    Q.   All right.  And did he have any conversation with you about

6    what was going to happen while he was away in India?

7    A.   Yeah.

8         He said that while away in India, I'm supposed to

9    take care of the doctors and the marketers, whatever we need to

10   pay whatever the payment arrangements we had for paying those

11   doctors.

12   Q.   Okay.  And when you say take care of them, what did he want

13   you to do specifically?

14   A.   He specifically told that if -- let's say an example, that

15   Dr. Tran signs this order and we see the patient, we are

16   supposed to pay her per patient $500.  For Orowe, if we see the

17   patient, we are supposed to pay him $100 per patient.  For

18   Roberto William, if he sends the order and we are able to see,

19   then we are supposed to pay him 300 to $400 per patient.

20   Q.   Okay.  So, was that clear to you from the Defendant?

21   A.   Yes.

22   Q.   All right.  How -- did Vinod Patel stay in India for quite

23   sometime?

24   A.   Yeah.  I think he stayed a couple of the months.

25   Q.   Okay.  What, if anything, happened when Vinod Patel came

1   back to the United States -- came back to Michigan?  What

2   happened?

3   A.  He became more less active in the home care at that point.

4   Q.  All right.  Do you have any reason to know why he became

5   less active in the home care?

6   A.  Yeah.  There was some dispute with his brother, that's

7   what.  And I think as per his brother, he mentioned he opened a

8   pharmacy in the Flint area, that's why; he had more interest in

9   that pharmacy.

10  Q.  Okay.  You say a dispute with his brother?

11  A.  Yeah.  Because he told him not to open the pharmacy and he

12  opened the pharmacy, and ...

13  Q.  You're doing a bunch of he's.  So, let's break that down a

14  little bit.

15        The Defendant Vinod Patel had a dispute with who?

16  A.  With Babubhai Patel.

17  Q.  All right.  And the dispute, according to Vinod Patel, what

18  was the dispute over?

19  A.  Because Babubhai Patel was refusing him to not open the

20  pharmacy, because Babubhai Patel was in the pharmacy business,

21  and he overruled and opened --

22  Q.  Who?

23  A.  Vinod.

24  Q.  Okay.

25  A.  Vinod overruled and opened a pharmacy in the Flint area.

1    So, he was mad at him and ...

2    Q.  Okay.  And what pharmacy, if you know, did Vinod Patel open

3    in the Flint area?

4    A.  Beecher Pharmacy.

5    Q.  All right.  When you said he had less role in First

6    Michigan, tell us how First Michigan ran after about December

7    of 2010?  Who was responsible day-to-day --

8    A.  Yeah.  When he came back from India, he wanted me to

9    continue to take this responsibility of paying doctors.  He

10   didn't took that responsibility back, and ...

11   Q.  So, did you continue to pay doctors on your own initiative

12   or on the order of the Defendant?

13   A.  Yeah.  I mean Vinod Patel wanted me to continue paying to

14   the doctors.

15   Q.  Did he tell you that?

16   A.  Yes.

17   Q.  Okay.  Tell us ...

18           THE COURT:  Are you almost done?

19           MR. PRATT:  No, Your Honor, but I may be at a good

20   place to -- it may be a good place to stop, because we're going

21   to switch over to some telephone calls, which I know are

22   everyone's most exciting part of the testimony.

23           THE COURT:  We will stop now.

24           All rise for the jury.

25           Please be here tomorrow, same time.  Thank you for

1    being on time today.

2              Don't talk about this with anyone.  Don't do any

3    research.  See you tomorrow.

4              *(Jury leaves the courtroom at 12:45 p.m.)*

5              THE COURT:  You may step down.  Thank you.

6              Anything anyone wants to put on the record?

7              MR. PRATT:  No, Your Honor.

8              MR. BEUKE:  Judge, we have our issue regarding the

9    Defendant's bail.

10             THE COURT:  Yes, you do.  And I'll look at that this

11   afternoon.  I'm not inclined to grant it, but I will at least

12   read it properly and ...

13             MR. BEUKE:  Judge, one other thing.  Defendant is a

14   vegetarian.  He hasn't eaten in a couple days.

15             Is there any way Your Honor could sign an order --

16             THE COURT:  Where is he?  Which facility?

17             MR. BEUKE:  Dickerson, Your Honor.

18             THE COURT:  What happened to Milan?  I thought that

19   was where he was going to ...

20             MR. BEUKE:  We were told on Friday, Your Honor, that

21   they didn't have enough staff to get him out there and it

22   wasn't going to work.

23             THE COURT:  He'll be at Milan and you'll make

24   arrangements -- and I'm speaking to the marshal here.  Your

25   office will make arrangements so that he will get vegetarian

1   food.

2            MARSHAL:  I'll let my supervisor know, Your Honor.

3            THE COURT:  Pardon?

4            MARSHAL:  I will let my supervisor know.

5            THE COURT:  Who is your supervisor?

6            MARSHAL:  Currently it is Kevin Petit.

7            THE COURT:  Okay.  Thank you.

8            MR. BEUKE:  Thank you, Your Honor.

9            THE COURT:  That would have been worth a call at home

10   this weekend, by the way.

11            *(Proceedings adjourned at 12:48 p.m.)*

12                        —     —     —

13

14

15   STATE OF MICHIGAN )
                       ) ss.
16   COUNTY OF WAYNE   )

17

18   I, Denise A. Mosby, Federal Official Court Reporter, do
     certify that the foregoing is a correct transcript from the
     record of proceedings in the above matter.

19

20                              s/ Denise A. Mosby

21                              _____
                                DENISE A. MOSBY, CSR, RMR, CRR
                                United States Court Reporter
22                              124 Theodore Levin U.S. Courthouse
                                231 W. Lafayette Boulevard
23                              Detroit, MI 48226
                                313.961.6230
24                              Denise_Mosby@mied.uscourts.gov

25   Dated:   September 8, 2014

US v Vinod Patel #11-CR-20468-36