UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,

   vs.

D-36 VINOD PATEL,

              Defendant.

_____/

Case No. 11-cr-20468

Hon. Arthur Tarnow

**DAY 4**
**TRANSCRIPT OF JURY TRIAL**

BEFORE THE HONORABLE ARTHUR J. TARNOW
UNITED STATES DISTRICT COURT SENIOR JUDGE
Detroit, Michigan
Tuesday, July 15, 2014

APPEARANCES:

For Government:      JOHN K. NEAL, ESQ.
                     WAYNE F. PRATT, ESQ.
                     U.S. Attorney's Office
                     211 W. Fort Street, Ste 2001
                     Detroit, Michigan 48226

For Defendant:       RICHARD M. BEUKE, ESQ.
                     53 W. Jackson, Suite 1410
                     Chicago, Illinois 60604

                     TIMOTHY M. BLACK, ESQ.
                     713 West Devon Avenue
                     Park Ridge, Illinois 60068

                     *    *    *

OFFICIAL COURT REPORTER:
Denise A. Mosby, CSR, RMR, CRR
313) 961-6230    www.transcriptorders.com

## I   N   D   E   X

| WITNESS: | PAGE |
|---|---|
| **RAMESHKUMAR PATEL** | |
| Continued Direct-Examination by Mr. Pratt | 5 |
| Cross-Examination by Mr. Beuke | 39 |
| Redirect-Examination by Mr. Pratt | 133 |
| Recross-Examination by Mr. Beuke | 136 |
| **PRADEEP PANDYA** | |
| Direct-Examination by Mr. Neal | 139 |

# E X H I B I T S

| EXHIBIT NO. | IDENTIFICATION | PAGE |
|---|---|---|
| **Government** | | |
| 2A | 4/2/11 phone call | 10 |
| 2B | 5/31/11 phone call | 11 |
| 2C | 6/7/11 phone call | 11 |
| 2D | 6/10/11 phone call | 11 |
| 2E | 7/14/11 phone call | 11 |
| 2F | 7/14/11 phone call | 11 |
| 2H | 7/6/11 phone call | 11 |
| 3F | 2/4/11 phone call | 10 |
| 3G | 2/4/11 phone call | 10 |
| 3H | 5/4/11 phone call | 10 |
| 3I | 4/27/11 phone call | 10 |
| 3J | 4/1/11 phone call | 10 |
| 13A | Tri-City controlled prescriptions | 156 |
| 13B | Tri-City noncontrolled prescripts | 156 |
| | | |
| **Defendant** | | |
| 2 | start-up care package | 73 |
| 5 | 10/25/12 Ramesh Patel letter | 117 |
| 6 | 10/14/09 First Mich. certificate | 119 |
| 7A&B | Two First Mich patient files | 120 |

```
 1                                    Detroit, Michigan
 2                                    Tuesday, July 15, 2014
 3                                    8:55 a.m.
 4                          –      –      –
 5            (Jury not present.)
 6            THE COURT:  Good morning.  Everyone is in place
 7   except for the jury.
 8            You may be seated.
 9            I've reconsidered on the bond, and I'm not going to
10   change my decision for the reasons stated originally.  There's
11   really nothing new in the motion.
12            Are we ready to proceed?
13            MR. PRATT:  Yes, Your Honor.
14            THE COURT:  Defense?
15            MR. BEUKE:  Judge, we are.
16            May we approach maybe just at sidebar to discuss
17   something with Your Honor?
18            I don't think that it will be long.
19            THE COURT:  Well, why can't we just do it here?
20            MR. BEUKE:  Well, we can.  Well, I'll wait until we
21   take a break, Judge.
22            THE COURT:  All right.  Bring in the jury.
23            All rise for the jury.
24            (Jury enters the courtroom at 8:56 a.m.)
25            CASE MANAGER LANG:  Court is in session.  You may be
```

1    seated.

2            THE COURT:  Good morning.

3            JURORS:  Good morning.

4            THE COURT:  Everybody is in their place.

5            You may continue.

6            MR. PRATT:  Thank you, Your Honor.

7                RAMESH PATEL, WITNESS, PREVIOUSLY SWORN.

8                    CONTINUED DIRECT-EXAMINATION

9    BY MR. PRATT:

10   Q.  Mr. Patel, yesterday you were testifying about those checks

11   that were paid to the marketers early on at First Michigan.  Do

12   you recall that testimony?

13   A.  That's correct, yes, sir.

14   Q.  And what, if any, was the concern that Vinod Patel had

15   about writing those checks?

16   A.  There was the paper trail and it is on the record.  So, if

17   any auditing in the home care, then one wonders why was that

18   check written.  So that is the scary part of the check.

19   Q.  You said the scary part?

20   A.  Yes.

21   Q.  Do you remember the names of the marketers, the individuals

22   that were getting these checks written to them by Vinod Patel

23   at that time for First Michigan?

24   A.  Yes, I did remember some.  For example, I do remember

25   Nicole Pennell, Gerald Dixon, Laurie Singleton, Melinda

1    Harrison, Kimberly Simpson.

2    Q.   Okay.  And these were individuals that were doing marketing

3    and getting paid by the patient?

4    A.   That's correct.

5    Q.   Okay.  Now, during the time -- again, going back to the

6    2008-2009 time period at First Michigan, based on the paperwork

7    you were receiving, do you know where -- by that, I mean

8    geographically -- where were the patients coming from for First

9    Michigan; do you know that?

10   A.   Basically in 2009 like we had 50 percent of the patients

11   from the Flint area.

12   Q.   And how do you know that?  How could you tell that the

13   patients were coming from the Flint area?

14   A.   Because the patient had the name address of the Flint area.

15   Q.   All right.  So, you would see that paperwork in the office?

16   A.   That's correct, yes, sir.

17   Q.   What was your own personal contact with the business in

18   Flint?  Were you going up and meeting with patients and meeting

19   with doctors?

20   A.   No.  I didn't used to go out, but we had a person named

21   Atul who used to be in the market in the Flint area.

22   Q.   Okay.  You say we had this person named Atul.  Do you know

23   Atul's last name?

24   A.   His last name is Patel.

25   Q.   Was he related, if you know, to you or to the Defendant

1    Vinod Patel?

2    A.  No.  He's not related.  And Vinod came in contact with him

3    and he just hired him to market for the patients in Flint.

4    Q.  Okay.  So, what, if anything, did Vinod tell you about what

5    Atul Patel was doing for First Michigan?

6    A.  What Vinod said, that Atul is working in the Flint area

7    with a lady named Marie Lewis.  Marie will find some patients

8    in the Flint area and Atul will find the doctor to see these

9    patients.

10   Q.  Okay.  Did Vinod explain to you how it was Atul was going

11   to have access to money, how he was going to be paid or how he

12   was going to have money to do his business?

13   A.  Okay.  I mean just like Atul did not have like legal

14   status.  So, what Vinod said, to pay Atul through a man named

15   Paresh Patel and a check was paid to Paresh Patel.

16   Q.  If I get what you said, you said Atul did not have legal

17   status?

18   A.  Yes.  He was on a student visa.

19   Q.  So, who was going to get the money then?

20   A.  Paresh Patel was going to get the money.  And how he give,

21   I don't know about that.  But he told me to write the check on

22   Paresh Patel's name and he is supposed to give it to Atul

23   Patel.

24   Q.  All right.  And you say you don't know how it got from

25   Paresh Patel to Atul Patel?

1   A.   No.   I don't have any information on that.

2   Q.   Okay.   I want to ask you a question about control of the

3   First Michigan corporation.

4        Did you have any control at all over the business

5   when you first started in the computer aspect?

6   A.   No, not at all.

7   Q.   Okay.   Did that change over time?   Did you get more

8   control?

9   A.   More control, I mean to say like home care have a position

10  named administrator.   And if you have one year of health care

11  experience, then you can have the title of the administrator.

12       In 2009, I had like more like over one years of

13  experience.   And that's the title, administrator, I can say --

14  I mean I became administrator of the home care.   And the

15  administrator had a role to look at the eligibility

16  requirements, to submit quarterly reports --

17           *(Interjection by court reporter.)*

18  A.   Like quarterly records review, like the charge review,

19  submitting like invoices to Medicare, and like whatever is the

20  eligibility requirement, that is something that I'm supposed to

21  look over.

22  Q.   Okay.   So, as you moved into this administrative position

23  and you got more control -- let me ask you this question.   Were

24  you the only person exercising control over First Michigan?

25  A.    No.   Vinod still had control over First Michigan Home

1    Health Care.

2              I had control over the office work, paper work and

3    anything related to charge review and the regulatory

4    requirements.

5    Q.   What about in the end of 2010, beginning of 2011, how did

6    the control change, if any, during that period of time?

7    A.   The end of 2010 to the beginning of 2011, Vinod became less

8    active in the marketing area.   So, Bob tried to train me in the

9    market area.

10   Q.   Let me ask you this.   Even though he was less active, did

11   you -- did you change your business principles or the way you

12   operated First Michigan from what Vinod Patel had set up?

13   A.   No, there wasn't any change.   The only thing, he was going

14   less out to the doctor for marketing.   That's what I mean to

15   say.

16   Q.   All right.   And he was still one of the principals, one of

17   the owners of the corporation?

18   A.   Yes, he was.

19   Q.   All right.   Let me ask you.   Did you become aware in the

20   course of the -- after you were indicted, after you were

21   arrested, that there was a wiretap conducted in this case?

22   A.   Yes, mm-hmm.

23   Q.   How did you find out about that?

24   A.   The wiretap?   That's when I was indicted, my attorney gave

25   me some wiretap transcripts.

1    Q.  All right.  So, your attorney gets information from the

2    Government; is that correct?

3    A.  Yes, that's correct.

4    Q.  All right.  And is that before or after you eventually

5    decided to plead guilty and cooperate?

6    A.  Before I plead guilty.

7    Q.  You get the information?

8    A.  The information, yes.

9    Q.  All right.  Have you had a chance to go over particularly

10   wiretap calls not only before you decided to cooperate, but

11   then have you listened and read calls after you decided to

12   cooperate in preparation for your testimony?

13   A.  Yeah.  After listening and reviewing the calls, I decided

14   to plead guilty.

15   Q.  All right.  I'm going to ask you particularly, because I

16   know there are some calls --

17            MR. PRATT:  And for the record, I'm going to identify

18   them as 2A, 3F, 3G, 3H, 3I and 3J.

19   BY MR. PRATT:

20   Q.  Were you played calls where the transcripts identified

21   yourself, Ramesh Patel, as being one of the participants?

22   A.  Yes, I can.

23   Q.  All right.  And when you were played those calls I believe

24   within the last week or so, could you definitively identify in

25   the calls who was participating?

1  A.  Yeah.  I mean, definitely I identified with whom I'm

2  talking in the calls.

3  Q.  All right.  And who were you talking to?

4  A.  Bob Patel.

5  Q.  All right.  And in the transcripts that were going along

6  with the calls, were they correctly identifying you and

7  correctly identifying Bob Patel?

8  A.  Yes.  That's correct.  Yeah, mm-hmm.

9  Q.  Were you also played some calls -- again, and these are the

10  ones in the Gujarat language.  Is that correct?

11  A.  That's correct, Gujarati, yes.

12  Q.  You were played some that involved Vinod Patel; is that

13  correct?

14  A.  Pardon?

15  Q.  They played some that involved Vinod Patel?

16  A.  Yes.  They did, yes.

17  Q.  All right.  Are you familiar with his voice from your work

18  at First Michigan with him?

19  A.  Yes, I do.

20  Q.  All right.  And did you identify on those calls --

21        MR. PRATT:  And I would indicate for the record, Your

22  Honor -- let's see.  It's 2B, 2C, 2D, 2E, 2F and 2H.

23  BY MR. PRATT:

24  Q.  Did you identify those calls as involving Bob Patel -- I

25  mean Vinod Patel's voice?

1    A.  Yes, I did.

2    Q.  All right.  And who is he talking to?

3    A.  Bob Patel.

4    Q.  All right.  And, again, the transcripts that went along

5    with those, did they seem to be accurate to you?

6    A.  Yes.

7    Q.  Okay.  I'm going to turn your attention to some of the

8    calls.

9          MR. PRATT:  If we could go to -- if we could go to

10   Government Exhibit No. 3G.

11   A.  Okay.

12          MR. PRATT:  Your Honor, previously admitted.

13   BY MR. PRATT:

14   Q.  If you could go to page two, the top half of the page.

15          Mr. Patel, are you familiar with this call as you see

16   that page?

17   A.  Yes, I am.

18   Q.  All right.  There's a section right here that says:

19          "Yeah, that's it.  They have gone towards Flint

20   today.  In between their fax had come about Medicaid, that

21   McKesson's withdrawal was about 39,000 withdrawal, auto debit.

22          "Bob:  Uh-huh.

23          "Ramesh:  About medication, I don't know.  Two week

24   or I don't know, maybe a month, two week.  That is, they were

25   asking that this medication, how is it, returning back, and

1    that should be in McKesson, that's what they were asking me.

2    (laughs)."

3              Do you recall this conversation?

4    A.  Yes.

5    Q.  Can you tell us -- first of all, there's a reference to

6    they were asking and they were doing things.

7              Who is the "they" that you are talking with Bob Patel

8    about?

9    A.  "They" is Vinod and Atul that we are talking about.

10   Q.  Vinod Patel, the Defendant?

11   A.  Yes.

12   Q.  And Atul Patel, the marketer?

13   A.  The person who works in Flint, yes.

14   Q.  All right.  And so you are talking about them and you're

15   doing what -- you're telling Bob about what in the

16   conversation?

17   A.  I was talking to Bob that one of the faxes came about the

18   McKesson withdrawal, and just like I mentioned, that I don't

19   know what is that fax about, but that's what I was talking

20   about at that time.

21   Q.  All right.  The part where you were talking about the

22   returning and it should be McKesson and then you ended up

23   laughing, what were you telling Bob there?

24   A.  Okay.  So, that's something Vinod asked me, about how to

25   return to McKesson.  And that's what me and Bob were talking

1    about, about returning the medication to McKesson.

2    Q.  And why was this a subject of humor?  Why was it funny to

3    have medication from a drugstore and then trying to return it

4    to McKesson?

5    A.  Because it was like Vinod Patel didn't know and was asking

6    the question, and Bob was laughing because it was a challenge

7    for him to have it returned.  And so that's what he was talking

8    on the phone about.

9             MR. BEUKE:  I'm sorry, Judge.  May I have that read

10   back?  I didn't hear it.

11            THE COURT:  Could you repeat that slower, please.

12   A.  Yeah, sure.

13            MR. BEUKE:  Thanks, Your Honor.

14   A.  Okay.  So, like Vinod is not a health care person or a

15   pharmacy person, even though he has a pharmacy.  And just like

16   he asked me the question about to return the medication to

17   McKesson.  So, Bob was laughing about the challenge of the

18   pharmacy and what it should be like initially when he opened

19   the pharmacy.

20   Q.  When you say he opened the pharmacy, what pharmacy was

21   Vinod Patel running at this time?

22   A.  Beecher Pharmacy.

23   Q.  And you are saying that Vinod Patel asked you what

24   question -- what question was Vinod asking you?

25   A.  He asked me the question that how to return the medication

1    to the McKesson.

2    Q.  Okay.  Did you know how that could be accomplished?

3    A.  I don't know.

4    Q.  All right.  Okay.  Let's turn to page five and the middle

5    of the page right below "voices overlap."

6            Babubhai Patel says:  "I know their plan.  To have

7    the pharmacy, and distribute the money of home care.  That's

8    ... I know their whole plan, what their project is."

9            You say:  "What, home care money?"

10           Bob says:  "What will be done."

11           You say:  "Oh, yeah, he will do it on the side."

12           Can you tell the ladies and gentlemen what you meant

13   when you were talking about the home care money and he will do

14   it on the side?

15   A.  Okay.  So, just like in this call, like Bob had mentioned

16   that he do have like income from pharmacy and he's going to

17   open another home care on the side and he will distribute the

18   money from the current home care also.

19   Q.  Okay.  The current home care meaning --

20   A.  First Michigan Home Health Care.

21   Q.  Okay.  So, let me ask you this.  Even though we are in

22   2011, was Vinod Patel, was he -- just because he opened a

23   pharmacy, did that mean he was out of the home care business?

24   A.  No, he wasn't.  He was still in the home care business.

25

1          MR. PRATT:  Okay.  If you could turn to the bottom of

2   page eight after, "Ramesh:  Yes, yes."

3   BY MR. PRATT:

4   Q.  At this portion of the call, Babubhai Patel says:  "So we

5   should deal with these kinds of doctors.  We may have to bribe

6   them a bit more.  We'll bribe them."

7          You say:  "You are right, yeah."

8          "Bob:  More, by bribing more, one thing is settled.

9          "Ramesh:  Yes.  That is we need those type of genuine

10  solid patients."

11         Can you explain to the jury what Babubhai Patel was

12  telling you when he talked about bribing the doctors a bit

13  more?

14  A.  Yeah.  Just like when Bob Patel started training to me how

15  to get the patients for the home care, he teached me two ways

16  to market the patients.  One was like bribing the doctor.  One

17  was like continuously follow-up with the doctor.

18         So, what we are talking over here, like even though

19  like if we have a doctor who is --

20         *(Interjection by court reporter.)*

21  A.  Okay.  So, here, I'm talking about like a doctor that

22  already takes money for referring the home care.  So, Babu is

23  saying that we will pay them more, bribe them more, and we will

24  settle down those doctors to send the patients.

25  Q.  All right.  And was this some new proposal or had this kind

1   of paying doctors been going on at First Michigan for a while?

2   A.  No.  It was going on before also for a while.

3        MR. PRATT:  Okay.  Let's move to Government Exhibit

4   3J.  Ms. Drinkard, if you could go to the middle of page one.

5   BY MR. PRATT:

6   Q.  Mr. Patel, in this call you're saying:  "On the road ...

7   because English was there, reason for being at the home care,

8   afterward on the way back picking up the kid, what happened was

9   two inspectors came from the OIG."

10       First of all, can you tell us what you are talking

11   about in terms of English was there?

12  A.  Okay.  I'm talking in this call with Bob that Vinod

13  mentioned that English is coming to the home care.  English is

14  the person who used to work in the day care in the Flint area.

15  And there was some inspector came in the day care, and English

16  wanted to talk to Vinod.  So that's why he was heading to the

17  home care, to discuss the matter.

18  Q.  Okay.  And do you know the relationship that Mr. English

19  and Vinod had in relationship to the home care?

20  A.  Yes.  I think -- Vinod had an interest in the day care.  I

21  think they had a partnership in the day care, in New Century

22  day care.

23  Q.  How do you know that?  When you say you think that, were

24  you up there or was this based on something Vinod told you?

25  A.  No.  I heard -- Bob told me that they have an interest in

1    the New Century day care.

2    Q.  All right.  So, if you turn to the top of page three, the

3    first half, and you say he:  "He has stocks, he's been getting

4    checks from it, and so on."

5            "Babubhai Patel says:  "But that doesn't count.  That

6    doesn't count.  Provider is a different thing."

7            And then Bob says a little later: "But it is on

8    English name."

9            And you say:  "Yes, it is on English name."

10           What are you and Bob discussing here?

11   A.  So, here, Bob and me were discussing about the provider it

12   is under whose name, and the provider is under Mr. English's

13   name for the day care.

14   Q.  Okay.  All right.  And then going to the bottom of page

15   three, again, are you relating -- well, let's start with

16   Ramesh.

17           Well, Bob says:  "What did you say?"

18           "Ramesh:  He had got a loan and paid back the loan.

19   So the bottom line they had come for, then indirectly ... ah

20   ... and they start asking questions about Burdette."

21           What are you relating to Babubhai here?

22   A.  Yeah, just like we are talking about Burdette, who is like

23   a PA that used to work with Paul Petre's office.  And

24   Mr. English, he's talking about Jim Burdette, PA.

25   Q.  All right.  And what, if any, relationship do you know that

1    Paul Petre and Jim Burdette have with Vinod Patel at First

2    Michigan?

3    A.  Okay.  Jim Burdette used to sign the referral orders for

4    First Michigan from the Flint area.  He used to write the

5    referrals and send to the First Michigan Home Health Care.

6    Q.  All right.  And he worked with which doctor?

7    A.  Paul Petre.

8    Q.  Okay.  Then a little bit later, you indicate:  "I thought

9    they must be behind inquiring Petre."

10           Babubhai says:  "No thoughts.  Petre is in line, I

11   have told you.  Petre is in line."

12           What does it mean; "Petre is in line"?

13   A.  He means to say Petre is under government watch and he will

14   be raided soon.  That's what we are saying --

15   Q.  He will be what soon?

16   A.  He will be raided.  The government can go behind and indict

17   him, just to catch him.  The government is watching him.  He's

18   in line under the government watch.  That's what he is saying.

19   Q.  All right.  So, if we turn to the next page, page four --

20           THE COURT:  Hang on a second.

21           MR. BEUKE:  Judge, can I just have that read back?

22           THE COURT:  Ms. Mosby, I think that would be the

23   easiest, if you could read it back, please.

24           MR. BEUKE:  Thank you, Your Honor.

25           *(Record read.)*

1              THE COURT:  Thank you.

2              MR. BEUKE:  Thank you, Your Honor.

3    BY MR. PRATT:

4    Q.  And finally, for this call, we're going to the middle of

5    page four, halfway down.

6              Babubhai Patel at the bottom says:  "Good to know

7    Burdette is not with us, good to know."

8              What is Babubhai Patel saying here?

9    A.  Okay.  So, at that point, Burdette wasn't referring any

10   patients with us.  He wasn't working the Flint area to send the

11   patients.

12   Q.  All right.  So, this was -- this would have been April of

13   2011?

14   A.  Yes.

15   Q.  Let's turn to 3H.  If you could go to page one.

16             This, again, do you recognize this call between

17   yourself and Bob Patel?

18   A.  Yes, that's correct.

19   Q.  All right.  And about down at the bottom here, you start

20   talking, you say:  "One with Dr. Ibrahim."

21             Bob says:  "Alright."

22             And you said:  "He told me that he will need one kilo

23   of Sutarfeni/sweets.  I told him that it does not come in that

24   packing."

25             Can you tell us what you are discussing with Bob

1    about Dr. Ibrahim and his sweets?

2    A.  Okay.  In this call we are talking about the bribes.  One

3    kilo means 1,000 grams.  1,000 means $1,000.  That is what

4    Ibrahim is asking in order to send the referrals to the home

5    care.  And I said that it doesn't come in packing.  We cannot

6    pay that much dollar amount of $1,000 for referring the

7    patients.

8    Q.  Okay.  So, you are using the word "one kilo of sweets"

9    instead of "$1,000" in discussing this with Bob Patel.

10          Why are you substituting "one kilo" for "$1,000"?

11   A.  Because $1,000 is a straight term, in case if anybody is

12   listening or watching.  So, it is illegal to offer to the

13   doctor or marketer this term.  So, that's why this code word

14   was used, in order to say to the doctor or marketer.

15   Q.  Okay.  Let's go to 3I, in the middle of the first page.

16          There's a reference -- there's a reference here

17   toward the bottom of the page where Babubhai Patel says:  "If

18   he says ... then we'll go over there.  I'll come to Tran's

19   place first.  Let's pamper her first."

20          What did Babubhai Patel -- what was he suggesting you

21   do?

22   A.  Yeah.  He was suggesting that he will be there and he will

23   talk to Dr. Tran.  In case we have to pay a little bit more, we

24   can pay more, and talk to Dr. Tran to send some more referral

25   orders to the home care.

1    Q.  All right.  So this, again, is what you talked about

2    earlier yesterday with the payment of Tran in exchange for the

3    health care referrals?

4    A.  That's correct, yes.

5    Q.  Let's turn to Exhibit 2A another call between yourself and

6    Bob Patel.  If we go to the top half of the first page.

7            You say:  "Hello, huh, the reason I called, I said,

8    Vinodkumar was saying, that there English, don't know, all

9    that, English's investigation must be going on."

10           Can you tell us what you were saying to Bob Patel

11   there?

12   A.  We are talking about just like we first mentioned, that the

13   inspector was there.  So, Mr. English, who owns the day care,

14   some investigation is going on under the day care.

15   Q.  All right.  So, there's an investigation into the day care.

16   There's someone that you say, Vinodkumar.

17           Who is Vinodkumar referring to?

18   A.  Vinodkumar is Vinod Patel, the same person who is the owner

19   of the home care.

20   Q.  All right.  And so you are relating a conversation that you

21   had with Vinod Patel, the Defendant?

22   A.  Pardon?

23   Q.  Are you relating or discussing with Bob a conversation you

24   had with Vinod?

25   A.  Yes.  That's correct, mm-hmm.

1  Q.  Can you tell us in the actual conversation with Vinod, did

2  he express any concerns or any fears to you?

3  A.  Yes.  He had a concern about like in the day care there was

4  an investigation going on, and he's talking about Rapid Drugs,

5  which is under his name.  So, if an audit comes in the day

6  care, then he will be again in trouble.

7  Q.  All right.  So, let's go down, if we go down a little bit

8  to the middle of the page, where you say -- actually the bottom

9  here:  "So, don't know, he had some forms on which Rapid Drugs,

10 and that, sent to First Michigan, and so he said:  Just inform

11 Babubhai, something like this."

12      Bob says:  "We, we have nothing to do in this,

13 nothing."

14      You say:  "Yeah, I said:  Where have you to worry in

15 this.  So he said:  Everything comes back here and Rapid Drug

16 is in my name."

17      Tell us what Vinod's fear or concern was there?

18 A.  So, Vinod's fear is like Rapid Drug is in his name, and I

19 guess -- I'm not sure about the medication going to Rapid Drug,

20 but I think there we are talking about Rapid Drugs.

21 Q.  All right.  So, he's expressing some kind of fear about

22 Rapid Drugs?

23 A.  Right, yes.

24 Q.  Do you have any personal knowledge about what was going on

25 between Vinod Patel and Rapid Drugs?

```
1    A.  No, I don't have any knowledge about that.
2    Q.  Okay.  If you could turn to the top of page two.
3            Bob says:  "Rapid Drug is gone."
4            And then you say:  "Then he said:  If I will change
5    the name and keep it, then Sonam ..., employee from here and
6    there and [U/I] and all.  So he said."
7            First of all, who is the "he" here?  Who is relating
8    something to you?
9    A.  Okay.  So, here, this conversation is about Rapid Drugs --
10   Q.  Let's break it down.  Who is "he" you are talking about,
11   "he said"?
12   A.  Vinod Patel.
13   Q.  All right.  And what did Vinod Patel say to you?
14   A.  He said that the pharmacy is in my name and Bob is saying
15   that the pharmacy is gone.  And just like in the first line,
16   he's going to transfer to the name of the person named Sonam.
17           MR. PRATT:  Okay.  Let's go down to the middle of the
18   page where you -- where you say -- it's down at the bottom.
19   Give us the middle of that, in the middle of the page.
20           Yes.
21   BY MR. PRATT:
22   Q.  Where you say:  "So he is saying that:  Atul's call has
23   come and that FBI guys are going around with photos of five
24   people, those social workers, that Thunder, Thunderbird or
25   that, some company."
```

1          Bob says:  "Huh."

2          You say:  "Are of day care, he has billed and we have

3     billed too."

4          First of all, you say "Atul's call has come."  What

5     does that mean?

6     A.  So, just like Atul called from the Flint area, like in

7     Mr. English's day care, some FBI people -- like they are moving

8     around with the photos and they are after the day care, and

9     what it means to say, that day care has been -- one patient was

10    billed under the day care provider, I think up under -- I don't

11    know who is Thunderbird, but I think it's the billing company.

12    So, he might have all the information of the day care patient,

13    of the New Century, and he might have billed another day care.

14    And that's what he's talking about.

15    Q.  Okay.  Let's turn to page three, at the top of the page.

16          You say:  "So I told him:  In this what have you to

17    worry about?"

18          And Bob Patel says:  "In this we have done nothing

19    wrong, that's all, what have we?"

20          And you say.  "No, that is it, where have we, with us

21    where have we anything."

22          What are you and Babubhai Patel discussing here?

23    A.  So, we are talking about that day care provider, double

24    billing.  And just like we are discussing that Medicare

25    perfectly paid the two different day care providers and they

1   wanted to check who has provided the genuine visit.  And what

2   I'm to say, if New Century provided the genuine visit for the

3   day care, then why do we have to worry about that.

4   Q.  All right.  And are you and Babubhai Patel actually

5   believing with each other that the two of you have done nothing

6   wrong in the whole enterprise, in the whole business; is that

7   what you're saying?  Not just day care, but in the whole home

8   health business?

9   A.  No.  We did wrong in the home health care business, yes.

10  Q.  Okay.  Let's turn to the bottom of page four.

11          Babubhai Patel says:   "... I will get you legitimate

12  doctors."

13          You say:  "Not to him.  Meaning, no problem, we will

14  put it in transfer in my name."

15          Bob says:  "In this we will get legitimate patients,

16  just like Harpreet, Harpreet, isn't Harpreet's name in it."

17  A.  Harpreet is the person who used Anrex Home Care.  That's

18  what we are talking about.

19  Q.  Okay.  And so the legitimate patients, are you talking

20  about patients that went to his home health care or ones that

21  went to First Michigan?

22  A.  No.  So, we are talking about here like if the home health

23  care is transferred to my name or we open the new home care,

24  then that means -- I was looking for like legitimate patients

25  with no kickbacks, no anything; solid, genuine, real patients.

1    Q.   When you say "legitimate," ones with no kickbacks?

2    A.   No kickback, homebound and qualified under the Medicare

3    guidelines.

4         MR. PRATT:   Okay.  All right.  Let's turn to No. 2D,

5    a conversation between Vinod Patel and Babubhai Patel.  And if

6    you could turn to page six, and if you could go to the middle

7    of the page under the section about "voice of unknown female."

8    BY MR. PRATT:

9    Q.   There's a discussion here, Babubhai says:  "Let's see I'm

10   going to go ahead and work it out.  I'll ask Ashokbhai today if

11   there's any medical ..."

12        Vinod says:  "This is Chedda's.  Chedda's has been

13   closed down, you know."

14        Bob says:  "Chedda's been closed down, we don't want

15   Chedda, Chedda too is a scoundrel."

16        First of all, do you know who Chedda is?

17   A.   Chedda is a doctor.  He refers some patients to First

18   Michigan Home Health Care.  Then they shut down.

19   Q.   When Babubhai Patel refers to someone as a scoundrel or a

20   thief, do you have some kind of understanding of what he's

21   saying or what he's meaning when he calls a doctor that?

22        MR. BEUKE:  Objection.

23   A.   I do not have any knowledge --

24        MR. BEUKE:  Objection.

25        MR. PRATT:  The question was does he have any

1    knowledge, Your Honor.

2             THE COURT:  He just answered no.  So, you can go to

3    the next question.

4             MR. PRATT:  Yes, Your Honor.

5    BY MR. PRATT:

6    Q.  Let me ask you this.  Did there come a time that you had

7    conversations with Babubhai Patel about assets or money

8    belonging to Vinod Patel in India?

9    A.  Yeah.  One time Vinod asked me --

10            MR. BEUKE:  Your Honor, I would object as to

11   foundation.

12   BY MR. PRATT:

13   Q.  All right.  Can you tell us --

14            THE COURT:  Wait.  Time out.

15            When he asks a yes or no question --

16   A.  Okay.

17            THE COURT:   -- just answer yes or no.  If he wants

18   to follow up, he'll ask you another question.

19            It's like when you were in school.  There are true

20   and false case; there are essay questions.

21   A.  Okay.

22            THE COURT:  And they are to be answered that way.

23   And if you don't know, say I don't know.

24   A.  Okay.  Thank you, Your Honor.

25

1   BY MR. PRATT:

2   Q.  So, we'll go back.  I take it, yes or no, did you have a

3   conversation with Babubhai Patel about Vinod Patel's assets in

4   India?

5   A.  Yes, I do.

6   Q.  And when did this take place approximately?

7   A.  About in 2011.  I don't remember, but there was something

8   in 2011.

9   Q.  All right.  And did you review some calls on the wiretap

10  that related to those discussions?

11  A.  Yes, sir.

12  Q.  All right.  Can you tell us what conversation Bob had with

13  you -- first of all, conversation Bob had with you about this?

14  A.  About that conversation, like Vinod was asking -- I mean

15  he --

16          MR. BEUKE:  Judge, I'm going to object.  Again, is

17  this a conversation that's on the wire we're referring to or is

18  this some conversation with him and whoever?

19          THE COURT:  Your response?

20          MR. PRATT:  Well, Your Honor, I -- fine, I'll go

21  through them individually.  I thought we could save a little

22  time by summarizing the gist of them, but let's go through them

23  one at a time.

24          Let's turn to Government Exhibit 2B.

25

1    BY MR. PRATT:

2    Q.  First of all, at page one, are you familiar with someone

3    called Raj or Rajnikant?

4    A.  Yes, I do.

5    Q.  Who is that?

6    A.  He is the brother-in-law of Babubhai Patel and Vinod Patel.

7    Q.  Okay.  And then at the top of the page on page one, Vinod

8    Patel says:  "Did, so in two days he will be returning the

9    monies.

10              "Bob:  Oh, did he say that?

11              "Vinod:  Hmm, of all.

12              "Bob:  Hmm, so he was asking, don't you want to be

13   in?  I said, no, a project is going on going between Mukesh and

14   me.

15              "Vinod:  Hmm, hmm.

16              "Bob:  So I want to get out, so give the money to

17   Mukesh."

18              Did you have any knowledge or any conversations of

19   these transactions between Bob and Vinod?

20   A.  Yeah.  I mean, I don't have a figure, but I do have

21   knowledge of like the transactions they are talking about.

22              Like Vinod, Babu and his brother-in-law invested

23   money in land in India, and they sold the land, and they are

24   talking about whether the money has come back or not from that

25   investment.

1  Q.  Okay.  And so then if we also go to 2G, a conversation

2  between Bob and Raj -- whom I think you've already

3  identified -- if we look at page two at the very top of the

4  page, Bob says:  "But in ours it's such that ... Vinod was

5  telling Ramesh that first we'll get 50 and later 48, what is

6  all this I don't know, I said I don't know anything.  So in

7  this, in what way is this ... how are they giving the

8  installments.

9            "Raj:  Whatever will come was divided in half and

10  then we three divided our half into three between us."

11            Did you, in fact, have a conversation with Vinod

12  about this?

13  A.  No, actually, I don't have any conversation about that.

14  Q.  All right.  Can you tell us what conversation you did have

15  with Vinod?

16  A.  I had only the conversation with Vinod that he asked me

17  that did Babu get the money from his stock or not, from this

18  investment.

19  Q.  Okay.  I think you referenced earlier that you yourself,

20  after consulting with your lawyer, decided to enter into a Plea

21  Agreement in this case?

22  A.  Yes, that's correct.

23  Q.  All right.  Can you tell the ladies and gentlemen of the

24  jury what -- under your Plea Agreement what offense you pled

25  guilty to?

1   A.   I pled guilty under the money laundering.

2   Q.   Can you tell the jury what you did that made you guilty of

3   money laundering?

4   A.   Yeah.  From the Bob pharmacies, I mean Bob gave me the

5   checks and I deposit it in my account and I transferred that

6   money to the pharmacy -- I wrote the checks to the pharmacies,

7   which wasn't right.  It was from fraudulent activity.  And I'm

8   guilty on that.

9   Q.   You say it was from the illegal -- it was dirty money?

10  A.   Yes.  It was dirty money, yes.

11  Q.   And you passed it on to who Babubhai Patel directed you to

12  pass it on to?

13  A.   To the pharmacists, who used to work for Bob.

14  Q.   All right.  You were also charged -- that was a new charge.

15       You were initially charged with a different offense;

16  is that correct?

17  A.   Yes, sir, that's correct.

18  Q.   And what offense were you originally charged with?

19  A.   I was charged under the conspiracy.

20  Q.   Okay.  Well, "the conspiracy."  You are talking about --

21       Were you charged in the first group of 26; is that

22  correct?

23  A.   Yes, sir, that's correct.

24  Q.   And you were charged in a pharmacy conspiracy; is that

25  correct?

1    A.   That's correct.

2    Q.   Did you have some issue or some concern about being charged

3    in the pharmacy conspiracy?

4    A.   Yes, because I thought that I'm not a part of the

5    conspiracy in the pharmacy business.   Only the part I was

6    guilty on was the money laundering.

7              And that's what my attorney negotiated or talked to

8    the prosecutor, and that's how I pled guilty on money

9    laundering.   And they moved my charge from conspiracy to money

10   laundering.

11   Q.   Okay.  Did the Government ever bring a home health care

12   fraud charge against you or a kickback charge against you?   Is

13   that in that first indictment?

14   A.   No.

15   Q.   Okay.  As part of your Plea Agreement, did the parties

16   estimate what the Sentencing Guidelines would be when it comes

17   time to be sentenced by Judge Tarnow?

18   A.   It's 37 to 46 months.

19   Q.   All right.  And you understand that the Government can

20   choose to make a recommendation to the judge to give you a

21   lower sentence?

22   A.   Yes, they may.  That's up to the Government to file the

23   motion to lower the sentence.  But that's up to the prosecutor.

24   Q.   Okay.  Did you also sign something called a Cooperation

25   Agreement with the Government?

1    A.  Yes, I did.

2    Q.  All right.  And what is your understanding of the

3    Cooperation Agreement?

4    A.  I'm supposed to truthfully and honestly tell the Government

5    what I have knowledge of the questions I have been asked.

6    Q.  Did you also agree that whenever you are called, you will

7    testify in court?

8    A.  Yes, I did.

9    Q.  Is this the first time the Government has called on you to

10   testify in court?

11   A.  No.  This is the second time I'm testifying.

12           MR. BEUKE:  Objection, Judge -- well, I'll withdraw

13   the objection.

14   BY MR. PRATT:

15   Q.  All right.  And when you testified last time, who were the

16   Defendants?

17   A.  Dr. Anmy Tran --

18           MR. BEUKE:  Objection.

19           THE COURT:  There's an objection.  Sustained.  It's

20   not relevant.

21   BY MR. PRATT:

22   Q.  Okay.  Well, let me ask you this.  Before you elected to

23   plead guilty and cooperate with the Government, did you give an

24   interview with the Government after you were arrested?

25   A.  Yes, I did.

1    Q.   What date was it that you were arrested?

2    A.   That was on August 3rd.

3    Q.   Of?

4    A.   Of 2011.

5    Q.   All right.  Did they read you your rights?

6    A.   Yes.  They did read me the Miranda rights.

7    Q.   All right.  And did you talk with them -- did you tell them

8    a little bit or did you talk with them quite a while?

9    A.   I talked with them quite a while.

10   Q.   All right.  Were there some things at that point the day

11   you were arrested that you did not want to tell the Government?

12   A.   Yes.  There was some points I didn't want to let the

13   Government know about that.

14   Q.   All right.  Was there a particular point that you actually

15   lied to the Government about at that point?

16   A.   Yes.  Yes, I did.

17   Q.   What did you lie about the day you were arrested?

18   A.   I was asked about Dr. Tran, Dr.  Edwards and Dr. Greenbain,

19   and I said I don't know that one.

20   Q.   And was that true?

21   A.   It wasn't true.  I knew them and I knew them before.

22   Q.   Okay.  Why didn't you want the Government to know you knew

23   them?

24   A.   Yeah, because this Dr. Tran was related to the First

25   Michigan Home Health Care and fraudulent activity that was

1   going on with Anmy Tran by paying kickbacks, and I didn't want

2   it to go further down that route because really I was scared at

3   that point.

4   Q.  All right.  Now, when Government arrested you, did the

5   Government also seize some of your assets and money?

6   A.  Yes.  They did seize my car, jewelry and assets, yes.

7   Q.  All right.  Let's break that down a little bit.  You say

8   car, jewelry and assets.

9           Can you tell us how much, how much the Government

10  took?

11  A.  The Government took a car -- so, out of everything, the

12  Government took 140,000 from my assets.

13  Q.  140,000?

14  A.  Dollars from my bank balance.

15  Q.  Okay.

16  A.  And they returned my car, and they did return to me all the

17  jewelry of my wife, which belongs to my wife, my kids' and some

18  of mine.  And they did return $100,000 from my bank account.

19  Q.  Okay.  And who was that negotiated with?

20  A.  My attorney negotiated with Ms. Julie Beck, who is the

21  forfeiture attorney.

22  Q.  Okay.  As to the jewelry of your wife, was that jewelry

23  that was -- how was that jewelry obtained?

24  A.  How it was returned back to me?

25  Q.  No.

1      How was it originally purchased?  Was this like --

2    A.   It was given to her by both of the parents -- just like we

3    have a custom of giving a lot more gold during the weddings.

4    So, my parents gave her a lot more jewelry and her parents also

5    gave the jewelry to her.

6    Q.   So, was this jewelry that you purchased from the money you

7    were making from First Michigan and you gave it to her?

8    A.   No, not at all.  It's like a very small amount I purchased,

9    but the majority, I can say about 90 percent of the jewelry was

10   from both of the parents.

11   Q.   Okay.  Now, speaking of your wife, did you have an idea

12   that you executed that would allow your wife to eventually get

13   some more money?

14   A.   I'm not real clear about the question.

15   Q.   Let me ask you this.  What is Elite Pharmacy Management?

16   A.   That's a pharmacy -- Bob Patel owns and manages the

17   pharmacy, Babubhai Patel.

18   Q.   All right.  Did your wife work for the pharmacy company,

19   for Elite Pharmacy Management?

20   A.   No, actually she didn't work for Elite Pharmacy, but I did

21   work part-time maybe a couple of hours in the day, like five,

22   ten hours in a week.  And she got paid for that one.

23   Q.   So, you worked, but the payments went in her name?

24   A.   Yes.  That's ...

25   Q.   Whose idea was that?

```
1   A.  That was my idea.

2   Q.  Why did you do that?

3   A.  I just -- so, I put the check in her name in order to count

4   for like SSI quarterly, so it could count for SS.

5   Q.  So, she would have credit for an SSI or Social Security

6   quarter, correct?

7   A.  That's correct, yes, sir.

8   Q.  And that was not true?

9   A.  No, that wasn't true.

10  Q.  And so you wanted her down the road to be able to get

11  benefits that she wasn't entitled to?

12  A.  Yes.  That's correct, yes.

13  Q.  All right.  Let me ask you, Mr. Patel.  As you sit here

14  today, was all of that worth it?

15          MR. BEUKE:  Objection, Judge, to the form of the

16  question.

17          MR. PRATT:  I'm not sure form of the question is --

18  I'm not sure which rule of evidence he's referring to, Your

19  Honor.

20          I think I can ask this witness if he feels like, as

21  he sits here today, the things he did he thinks are worth it.

22          THE COURT:  I think what makes America great, that

23  you can ask any question in the world.  But it's not relevant.

24          MR. PRATT:  Okay.

25
```

1    BY MR. PRATT:

2    Q.  Mr. Patel, what's going to happen to you after you receive

3    your sentence from the judge and do whatever prison time he

4    sentences you to?

5    A.  I will be deported to Canada.

6    Q.  Just a couple follow-up questions.

7            As far as the banking of First Michigan corporation,

8    do you know if First Michigan had a debit card?

9    A.  Yes, they had.

10   Q.  All right.  And who had that -- who had possession or

11   control of the debit card?

12   A.  One Vinod Patel had and one I had a debit card.

13   Q.  All right.  And who was in charge of the First Michigan

14   bank account as far as the signature authority on that account?

15   A.  Vinod Patel.

16           MR. PRATT:  Thank you, Your Honor.  I have no further

17   questions of this witness.

18           THE COURT:  Cross-examination?

19           MR. BEUKE:  Thank you, Judge.

20                        CROSS-EXAMINATION

21   BY MR. BEUKE:

22   Q.  Mr. Patel, with respect to the charges that were originally

23   brought against you, you were arrested on August 3rd of 2011,

24   correct?

25   A.  That's correct.

1    Q.  So almost three years ago?

2    A.  Yes.

3    Q.  Correct?

4    A.  Yes.

5    Q.  And when you were arrested, you were arrested at your home.

6    Correct?

7    A.  Yes, that's correct.

8    Q.  And agents came to your house.  Correct?

9    A.  Yes, that's correct.

10   Q.  Nobody gave you any advance warning that you were under

11   indictment or you were going to be arrested.  Correct?

12   A.  Yes.  My sister did inform me that I'm a part of the

13   indictment.  I was heading to the downtown to present myself in

14   the court, but halfway I talked to my sister and she talked to

15   one of the attorneys at that time in the court, and he said it

16   would be too late today to go to the court.  And he said the

17   attorney will take me tomorrow morning.  And that's why I went

18   home back again.

19   Q.  Okay.  And your sister, that's Bob Patel's wife, correct?

20   A.  Yes.  That's correct, right.

21   Q.  And she called you and told you that Bob Patel had been

22   taken into custody, correct?

23   A.  Yes, that's correct.

24   Q.  And she told you that the agents were looking for you too,

25   correct?

1    A.  She told me that my name is on the list there, is too.

2    Q.  Okay.  So, you knew or you made a decision to go back home,

3    correct?

4    A.  Yes.

5    Q.  And when you got back home, that's when the agents showed

6    up at your house?

7    A.  Yes.

8    Q.  And they placed you under arrest, correct?

9    A.  Yes, that's correct.

10   Q.  And you were taken to the DEA offices in downtown Detroit,

11   correct?

12   A.  Yes.

13   Q.  And when they processed you, they fingerprinted you and

14   photographed you, all of those things happened?

15   A.  Yes.

16   Q.  You had never done those things before, had you?

17   A.  No.

18   Q.  You had never been arrested before?

19   A.  No.

20   Q.  And to your knowledge your brother Bob Patel also hadn't

21   been arrested before.  Correct?

22   A.  No.

23   Q.  So, at that time, after you were fingerprinted and after

24   you were processed, you were taken from the DEA offices out to

25   Grosse Ile Police Department, correct?

1    A.  That's correct.

2    Q.  And you were placed in a jail cell there.  Correct?

3    A.  That's correct.

4    Q.  You spent the entire night in the jail cell.  Correct?

5    A.  Yes, sir.

6    Q.  Then the following morning, at about 8:30 in the morning,

7    that gentleman in the back of the room, you met him for the

8    first time.  Correct?

9    A.  That's correct.

10   Q.  That's Agent Carmack, correct?

11   A.  Yes.

12   Q.  He took you out of a cell, correct?

13   A.  Yes.

14   Q.  He took you into an interview room, correct?

15   A.  Yes.

16   Q.  And he told you that he was one of the agents involved in

17   the investigation, correct?

18   A.  No, he didn't tell that he's one of the agents in the

19   investigation.

20   Q.  Did he tell you who he was?

21   A.  He like -- he told me that he's one of the agents -- I

22   don't recall what he told me at that time.

23   Q.  Well, that was a pretty strange day in your life.  Would

24   that be fair to say?

25   A.  That's correct, yes.

1    Q.  And when he took you out of the cell and took you into

2    another room, he was with another gentleman also, correct?

3    A.  Yes, that's correct.

4    Q.  And do you remember that they informed you that they would

5    like to speak with you?

6    A.  No.  He first wrote -- he just informed me about the

7    Miranda rights.

8    Q.  Okay.  The very first thing that the agent did with you was

9    tell you all of your rights --

10   A.  Yes, he did.

11   Q.  Your constitutional rights?

12   A.  He read each and every line and then initial on every

13   subject.

14   Q.  He read you a form.  It had all of your rights on the form.

15   Correct?

16   A.  Yes.

17   Q.  Your right to remain silent, correct?

18   A.  Yes.

19   Q.  Your right to have an attorney, correct?

20   A.  Yes.

21   Q.  And that anything you said to him, if you waived those

22   rights, could be used against you in the case that you had been

23   arrested for.  Fair to say?

24   A.  Yes.

25   Q.  Okay.  And you told him that you were willing to speak with

1    him.  You wanted to speak with him.  Right?

2    A.  Yes.

3    Q.  So, he had you initial each one of the rights.  Correct?

4    A.  Yes.

5    Q.  He had you sign at the bottom of the form that you were

6    waiving your rights.  Fair to say?

7    A.  Yes.

8    Q.  And at that point, Agent Carmack took you from the Grosse

9    Ile Police Department and you went back down to the DEA

10   offices.  Correct?

11   A.  Yes.

12   Q.  On the ride down from Grosse Ile to DEA, he didn't speak

13   with you about the investigation, did he?

14   A.  No.  He didn't talk anything about that.

15   Q.  He told you that we'll wait until we get down to my offices

16   down at DEA.  Correct?

17   A.  Yes, that's correct.

18   Q.  And when you got down to the DEA offices, again, you were

19   taken up and placed in an interview room.  Correct?

20   A.  Yes.

21   Q.  You weren't handcuffed, correct?

22   A.  Yes.

23   Q.  And there was even a translator that was brought into the

24   room if there was any problem that you were having

25   understanding English --

1    A.   Mm-hmm.

2    Q.   -- or if you wanted anything translated.   Correct?

3    A.   Yes.

4    Q.   Agent Carmack provided that person for the purposes of

5    making you more comfortable in having a conversation with him.

6    Correct?

7    A.   Yes.

8    Q.   And you understand English, correct?

9    A.   Yes.

10   Q.   And you speak very well, correct?

11   A.   Yes.

12   Q.   Okay.   And during that conversation did he readvise you of

13   your Miranda rights?

14   A.   Yes, he did readvise me that ...

15   Q.   So, again, he told you about your right to remain silent

16   and all of those things.   Correct?

17   A.   Yes, he did.

18   Q.   You told him again Agent Carmack I want to talk to you,

19   okay, I want to talk to you about the investigation and about

20   what I am charged with.   Correct?

21   A.   Yes.

22   Q.   Okay.   Now, Agent Carmack -- well, at that point did he

23   explain to you that you had been indicted along with 28 other

24   individuals?

25   A.   Yeah.   He just showed me all the pictures of all the people

1   who had been indicted.

2   Q.  Okay.  And when showed you the pictures, he asked you which

3   ones you knew and which ones you didn't know.  Correct?

4   A.  Yes.

5   Q.  Some of the people you knew; some of the people you didn't

6   know?

7   A.  Yes, that's correct.

8   Q.  You obviously knew Bob Patel, correct?

9   A.  Yes.

10  Q.  And you knew Hiren Patel, correct?

11  A.  Yeah.

12  Q.  And you knew Ramesh Patel, your picture, correct?

13  A.  Yes.

14  Q.  And he never -- did he show you a picture of Atul Patel?

15  A.  No.

16  Q.  Okay.  In either event, after showed you all of these

17  pictures, Agent Carmack said I'd like to speak to you about

18  this investigation and what you are charged with, Ramesh.

19  A.  Yes.

20  Q.  And you and him began to have a conversation, correct?

21  A.  Yes.

22  Q.  That conversation lasted for several hours, correct?

23  A.  Not several hours.  I do remember maybe at least one hour,

24  maybe more.  I don't know.

25  Q.  Okay.  And there was another gentleman that was there with

1    Agent Carmack in addition to the interpreter, correct?

2    A.  Yes.

3    Q.  He was introduced to you also, correct?

4    A.  Yes.

5    Q.  He was a person who was a DEA intelligence officer,

6    correct?

7    A.  Yes.

8    Q.  And you -- they had a tape recorder there.  Correct?

9    A.  Yes.

10   Q.  And you were not aware of the fact that the federal

11   government had been taping Bob Patel's phone calls for seven

12   months prior to your being arrested.  Correct?

13   A.  Yes.  I don't know about the recording of the phone calls,

14   but --

15   Q.  Well, you didn't know it that day.  Correct?

16   A.  That day, yeah.

17   Q.  Okay.  And you didn't know that your voice was on the phone

18   talking with Bob Patel, did you?

19   A.  No.

20   Q.  Okay.  And you knew that the indictment charged you with

21   having participated in that conspiracy to commit fraud in terms

22   of this pharmacy operation.  Correct?

23   A.  That's correct.

24   Q.  And you're telling the ladies and gentlemen that you didn't

25   believe that you had any part in the conspiracy from the

1    pharmacy aspect.  Correct?

2    A.  Yes, that's correct.

3    Q.  And part of the conspiracy in the pharmacy aspect,

4    according to your understanding, was making payments to Hiren

5    Patel so he could make payments to doctors.  Correct?

6    A.  Not to doctors.  He was paid up to only Hiren Patel.

7    That's all I know.

8    Q.  Okay.  But you knew Bob Patel was paying doctors, correct?

9    A.  That -- not for like home care.

10   Q.  I'm talking about the pharmacy -- Bob Patel owned 20-some

11   pharmacies, didn't he?

12   A.  26 pharmacies.

13   Q.  You knew that, right?

14   A.  Yes.

15   Q.  He was your brother-in-law?

16   A.  Yeah.

17   Q.  You talked with Bob Patel almost everyday, didn't you?

18   A.  Not everyday, but a couple of times in the week, yes.

19   Q.  We'll get back to that.

20   A.  All right.

21   Q.  Now, I think you told the ladies and gentlemen that you

22   believed that you only participated in money laundering.

23   Correct?

24   A.  That's correct.

25   Q.  That was what you believed your guilt or your

```
1    responsibility was.  Correct?

2    A.  Yes, sir.

3    Q.  Okay.  Now, just if we could start a little earlier.  In

4    1981 Bob Patel married your younger sister.  Correct?

5    A.  That's correct.

6    Q.  You ultimately came to know Vinod Patel at some point in

7    your life.  Correct?

8    A.  That's correct.

9    Q.  You didn't meet Vinod Patel until when?

10   A.  Until I came to school.  During the graduation, I met him

11   the first time in the U.S.

12   Q.  When was that?

13   A.  It was in August -- June of 2000.

14   Q.  June of 2000?

15   A.  June of 2000.

16   Q.  Okay.  That is the first time you met him, correct?

17   A.  Yes.

18   Q.  He was in the United States, correct?

19   A.  Yes.

20   Q.  He had just recently been married himself, hadn't he?

21   A.  Yes.  He was married, yes.

22   Q.  And his wife came over from India, correct?

23   A.  Yes.

24   Q.  And you met her also?

25   A.  Yes.
```

1    Q.   That's the young lady in the second row, correct?

2    A.   Yes.

3    Q.   And you knew that Vinod Patel was a number of years younger

4    than his older brother, your brother-in-law Bob, correct?

5    A.   That's correct.

6    Q.   Okay.  And you had been brother-in-laws with Bob at that

7    point in time for almost 20 years, correct?

8    A.   That's correct.

9    Q.   Okay.  And Bob and you were very close friend; fair to say?

10   A.   Yes, we can say.

11   Q.   You went to college in India, correct?

12   A.   Yes.

13   Q.   And your degree was in what?

14   A.   Chemical engineering.

15   Q.   So, you came to this country under a work visa, correct?

16   A.   No.  A student visa the first time.

17   Q.   That was in the 90's, correct?

18   A.   That was in May '99.

19   Q.   And you went to Ferris State University?

20   A.   That's correct.

21   Q.   And you got your Master's Degree in?

22   A.   Information Systems Management.

23   Q.   Okay.  So, in addition to being a chemical engineer --

24   A.   Yes.

25   Q.   -- you had a Master's Degree in systems management,

1   correct?

2   A.  Yes.

3   Q.  And you were hired by a company in the United States,

4   correct?

5   A.  Yes.

6   Q.  Worked here for a number of years?

7   A.  Yes.

8   Q.  And at some point, as a chemical engineer, were you ever

9   hired by any company for your chemical engineering knowledge?

10  A.  Yes.

11  Q.  What company?

12  A.  It was Excel Electocircuit.

13  Q.  That is when you came back from Canada, correct?

14  A.  Yes.

15  Q.  And you worked for them for a number of years?

16  A.  Right.

17  Q.  Is it fair to say, Mr. Patel?

18        Your chemical engineering degree, when you worked for

19  Excel, you made a lot of money working for them, correct?

20  A.  Yes.

21  Q.  And at some point you lost that job or they didn't need

22  your help anymore?  Is that how it ended?

23  A.  No.  It is not a lost job, but this was a large opportunity

24  Bob offered me, and so that's why I joined First Michigan.

25  Q.  All right.  So, when you left Excel as a chemical engineer,

1    it was as a result of Bob coming to you with an opportunity.

2    Correct?

3    A.  Yes.

4    Q.  And Bob was your brother-in-law at that point of almost 26

5    years.  Correct?

6    A.  Yeah.

7    Q.  This was in 2007, right?

8    A.  Yes, mm-hmm.

9    Q.  And when Bob came to you with this opportunity, he told you

10   that he was going to pay you how much money a year?

11   A.  He was going to pay me at that time $35,000.

12   Q.  Okay.  So, you left the chemical engineering job?

13   A.  Yes.

14   Q.  Where you were making how much money?

15   A.  About $40,000.

16   Q.  And you said I'm going to take this opportunity that my

17   brother-in-law is giving me --

18   A.  Mm-hmm.

19   Q.   -- for 35,000?

20   A.  Right.

21   Q.  And he told you he wanted you to go to work with his

22   brother at First Michigan Home Health Care, correct?

23   A.  That's correct.

24   Q.  Bob never told you I want you to go work at one of my

25   pharmacies or my stores, correct?

1    A.   No.

2    Q.   He never wanted you to run or be an IT director for any of

3    his pharmacies.   Correct?

4    A.   No, that's correct.

5    Q.   And the next five years until you and Bob were indicted,

6    you never worked for any of the pharmacies.   Is that correct?

7    A.   No.

8    Q.   But you did, Mr. Patel, you had some of the pharmacies

9    actually put in your name, didn't you?

10   A.   That's correct.

11   Q.   Yeah.   Bob came to you and said, Ramesh, I need to use your

12   name in order to apply for a license for one of my additional

13   pharmacies.   Correct?

14   A.   But I don't --

15   Q.   That's a yes or no.

16   A.   No.   I opposed that one.

17   Q.   Well, when the pharmacy that was put in your name -- what

18   pharmacy was that?

19   A.   Davenport Pharmacy.

20   Q.   Okay.   And when did Bob approach you about wanting to use

21   your name for the license from the State of Michigan for

22   Davenport Pharmacy?

23   A.   That was --

24   Q.   When did he approach you to do that?

25   A.   That was after, as soon as I got my green card in 2009.

1  Q.  Okay.  So, you had been working for First Michigan for two

2  years at that point.  Correct?

3  A.  Yes.  That was on the TN visa I was working with First

4  Michigan.

5  Q.  And when your pal, brother-in-law Bob Patel, came to you

6  and said I want to use your name, Ramesh, to apply for this

7  pharmacy certificate, you said yes.

8  A.  No.  I said no.

9  Q.  Okay.  So, you told Bob Patel in 2009 you can't use my

10  name.  Correct?

11  A.  Yes, that's correct.

12  Q.  Bob Patel didn't listen to you, did he?

13  A.  No.

14  Q.  Bob Patel used your name, correct?

15  A.  Yes, he did.

16  Q.  You -- you never found out about that until when?

17  A.  Until I -- I mean until when the time came to move that

18  pharmacy, Davenport, that time I came to know.  That was in

19  2010.

20  Q.  Okay.  So, when you found out that your brother-in-law had,

21  without your permission, used your name to get a license from

22  the State of Michigan for Davenport Pharmacy, it had already

23  been up and operating for almost a year.  Correct?

24  A.  Yes, that's correct.

25  Q.  And how did you find out about that?  Tell the ladies and

1    gentlemen.

2    A.   There was a time when in 2010 Bob wanted to shut down that

3    pharmacy that he opened in the Saginaw area.  And that wasn't a

4    business.  So, he wanted to move to the Detroit area.  At that

5    time, I came to know that this pharmacy I opened under your

6    name.

7    Q.   And who told you?

8    A.   Bob told me.

9    Q.   Bob told you, hey, we've lot a little problem, Ramesh,

10   because I'm going to move this pharmacy up to Saginaw and it's

11   in your name.  Correct?

12   A.   Yes.  That's correct.

13   Q.   And did you tell him, Bob, I told you not to use my name?

14   A.   Yeah.  I told him to transfer it to somebody else's name.

15   And he said okay, we will transfer.  Just like he mentioned,

16   like Vinod so many times about the home care, he --

17   Q.   You had to sign some documents, didn't you?

18   A.   No.

19   Q.   For Davenport?

20   A.   He signed himself.

21   Q.   Okay.  But --

22   A.   I didn't sign any documents.

23   Q.   You were on the State paperwork saying that the pharmacy

24   was Ramesh Patel's pharmacy.  Correct?

25   A.   Yes.  The pharmacy --

1    Q.  And in order for that license to be transferred, Ramesh

2    Patel had to sign some documents.  Correct?

3    A.  That's correct.

4    Q.  And you signed some documents?

5    A.  No.  He used my signature and he signed my name.

6    Q.  So, your brother-in-law not only used your name for this

7    pharmacy to be licensed in the State of Michigan, he forged

8    your signature.  Correct?

9    A.  Yes.

10   Q.  And did he tell you, don't worry about it, Ramesh, I'll

11   forge your signature in order to transfer the license?

12   A.  No, he didn't tell me.

13   Q.  Okay.  You found out about that too, didn't you?

14   A.  I found out in 2010, yes.

15   Q.  Yeah.  You found out that not only did your brother-in-law,

16   your good friend of 27 years, used your name to open up

17   fictitious pharmacies, but he also forged your signatures.

18   Correct?

19   A.  Yes.

20   Q.  Okay.  Now, this was the guy that you were talking to

21   several times a week.  Correct?

22   A.  Yes.

23   Q.  That had given you this opportunity to be involved in his

24   empire.  Correct?

25   A.  Not in his empire.

1    Q.  Well, it wasn't your empire, was it?

2    A.  No.

3    Q.  Okay.  Well, let's go back to 2007.

4         When you decided to seize on the opportunity that

5    your brother-in-law gave you --

6    A.  Yes.

7    Q.  -- he told you that he wanted you to go to work at First

8    Michigan.  Correct?

9    A.  Yes, that's correct.

10   Q.  And you had absolutely no idea what home health care

11   business involved, did you?

12   A.  No, that's correct.

13   Q.  You had never been trained in it, correct?

14   A.  No.

15   Q.  You had never been involved in the business, correct?

16   A.  No.

17   Q.  You were a chemical engineer?

18   A.  Right.

19   Q.  With a Master's Degree in programming, correct?

20   A.  That's correct.

21   Q.  Okay.  When you came to First Michigan, your first day, do

22   you remember that?

23   A.  Yes, I do remember it.

24   Q.  I think you told Agent Carmack on August 3rd that that was

25   May 2nd of 2007.  Is that right?

1    A.   Yes.   Yes.

2    Q.   And when you got there, you got certain assignments as to

3    Ramesh Patel's job was supposed to be, correct?

4    A.   That's correct.

5    Q.   For 35,000 a year, right?

6    A.   That's correct.

7    Q.   And that was to be the IT person?

8    A.   That's correct.

9    Q.   I'm not a computer guy, but what does the IT person or what

10   did the IT person do for First Michigan Home Health Care

11   starting on May 2nd of 2007?

12   A.   They had one software and they had working on the

13   computers, printers.   So, they had some requirements, at least

14   I can say 30, 40 percent requirement of IT in the home health

15   care.

16   Q.   Well, do you mean that the home health care system, the

17   business was pretty much run on computer?

18   A.   Right.   I mean they have one software program named Health

19   Care Synergy.

20   Q.   The health care program that they had in their computer and

21   that First Michigan used back then was a program that was

22   provided to them by Medicare.   Correct?

23   A.   No, not Medicare.   That was another company named Health

24   Care Synergy, provided by that company.

25   Q.   Okay.   Specifically designed to allow you to input the

1    necessary documents to document all of the work that the health

2    care business did in order to allow you to bill for that.  Is

3    that fair to say?

4    A.  That's correct.  To input all the information, yes.

5    Q.  When you got there on May 2nd, you began that office work

6    for -- First Michigan was at what location?

7    A.  It was at the Oak Park location.

8    Q.  Okay.  It was in what city?

9    A.  It was in Oak Park city of Michigan.

10   Q.  Okay.  Now, in May of 2007, I think you told Mr. Pratt that

11   you were not an owner.  Correct?

12   A.  No.

13   Q.  And the opportunity that had been explained to you by your

14   brother-in-law, he didn't tell you that you were going to

15   become an owner at that time, did he?

16   A.  No.  It wasn't like a solid commitment.

17   Q.  Okay.

18   A.  In the future when the home care started making some

19   profit, then there will be some talk about that.

20   Q.  Do you remember that in 2007 that Vinod Patel, when you

21   came to work there, was actually in India?

22   A.  No.  Actually when he came, at that time only we

23   transferred the home care in May 2007.

24   Q.  Yeah.  It was transferred while he was in India, wasn't it?

25   A.  He was in India, but it was purchased before that.

1   Q.  The purchase that was made, that purchase was made by Bob

2   Patel, wasn't it?

3   A.  Yes, that's correct.

4   Q.  And while his younger brother was in India, he had his

5   younger brother come back from India, correct?

6   A.  Yes.

7   Q.  And he put the home health care business in his younger

8   brother's name, correct?

9   A.  Yes.

10  Q.  You knew that, correct?

11  A.  Mm-hmm.

12  Q.  And when Vinod got back from India, that wasn't until June

13  or July of 2007, wasn't it?

14  A.  No.  I think he was back in June -- I think May.  Before

15  May I think.  It was April or something.

16  Q.  Well, in any event, at that point your understanding was

17  that even though Bob bought the business, he put the business

18  in Vinod's name, you were not one of the owners at that point

19  in time.  Correct?

20  A.  I did not have legal status.  So, I cannot own the

21  business.

22  Q.  Okay.  So, part of the problem was your citizenship

23  situation?

24  A.  My residence card, yes.

25  Q.  And that ultimately your citizenship got resolved when,

1    Mr. Patel?

2    A.  I didn't get your question.

3    Q.  Okay.  Let me try to ask a better question.

4           Mr. Pratt asked you about a couple of different types

5    of visas.

6    A.  Yes.

7    Q.  And you mentioned that there is a TN visa or something like

8    that?

9    A.  Yes, that's correct.

10   Q.  Okay.  The TN visa is an agreement between Canada, the

11   United States and Mexico that if you have a certain job or --

12   A.  Right.  Just like I explained to Mr. Pratt, there's two

13   kinds of work visas, who doesn't have a residence card or a

14   citizen, the company sponsors in the United States.  They can

15   get either an H1B visa or a TN visa.

16          So, just like I explained, as a Canadian citizen and

17   a Mexican citizen, you can have a TN visa, which is easier to

18   process at the border only.

19   Q.  Okay.  When did you get the TN visa?

20   A.  In May.

21   Q.  May of 2007?

22   A.  2007, yeah, before I joined the home care.

23   Q.  All right.  Now, once you got the TN visa, did that solve

24   the problem of you having an ownership interest in an American

25   company?

1  A.  Not the ownership -- it means I have legal status to work

2  for that company.

3  Q.  Okay.  So, now you had a legal right to go to work for

4  First Michigan, correct?

5  A.  Correct.

6  Q.  It had no bearing on whether or not you could own stock in

7  a company in the United States, did it?

8  A.  No.

9  Q.  You were able to do that even if you were a Canadian

10  citizen or if you were from Afghanistan?

11  A.  I don't know whether I can own the business as a Canadian

12  citizen.  So, I don't know.

13  Q.  All right.  In any event, May through December of 2007, you

14  stayed in that position as the IT person.  Correct?

15  A.  That's correct.

16  Q.  You came to work at First Michigan on a daily basis, didn't

17  you?

18  A.  Yes, I did.

19  Q.  And when you came to work that was Monday through Friday,

20  correct?

21  A.  Yes.

22  Q.  You began to understand the business yourself, didn't you?

23  A.  Yes.

24  Q.  You met all the people that worked at First Michigan,

25  correct?

1  A.  Yes.

2  Q.  And during those several months in 2007, you knew that

3  there was a Medical Director that was employed by First

4  Michigan, correct?

5  A.  The Medical Director is not an employee.  The Medical

6  Director, he's the person who attends the home care right in

7  the quarterly professional advisory meeting.

8  Q.  Did you ever meet a doctor named Dr. Gupta?

9  A.  Yes, I did.

10  Q.  He was the Medical Director for First Michigan Home Health

11  Care.  Correct?

12  A.  Yes, that's correct.

13  Q.  He was there pretty much the entire time that you were

14  there, correct?

15  A.  Yes.

16  Q.  And Dr. Gupta's responsibilities at First Michigan included

17  what?

18  A.  His responsibility is only to come and attend in the

19  professional advisory meeting, which is a quarterly meeting

20  requirement from the Medicare.  So, he used to come in the

21  meetings and just talk about like the government of the company

22  and what could be done.

23  Q.  All right.  And Dr. Gupta did that?

24  A.  Yes, he did.

25  Q.  The five years you were there?

1    A.  Yes.

2    Q.  Any time there was a medical question that you or any

3    member of the staff had, Dr. Gupta was available to answer the

4    question.  Correct?

5    A.  That's correct.

6    Q.  And he participated in four meetings a year with you and

7    the other directors, correct?

8    A.  Yes.

9    Q.  So, back then you knew Dr. Gupta and you interacted with

10   him a number of times, didn't you?

11   A.  Yes, I did.

12   Q.  There was also, in addition to Dr. Gupta, there was a

13   position called a Clinical Director, correct?

14   A.  Yes.

15   Q.  The Clinical Director at First Michigan when you got there

16   was who?

17   A.  Jean Pinkard.

18   Q.  And then ultimately over the next few years the Clinical

19   Director changed from time to time, correct?

20   A.  Yes.

21   Q.  There was a young man by the name of Duane Galloway,

22   correct?

23   A.  Yes.  The person stayed pretty much longer, yeah.

24   Q.  So, you knew Mr. Galloway was at the office everyday,

25   correct?

1    A.   Yes.

2    Q.   And the Clinical Director's role in the company was what?

3    Explain that for the ladies and gentlemen.

4    A.   The Clinical Director's role is to make sure that whatever

5    the orders that come from like the doctor's office, to review

6    the order, that it does have the proper diagnosis, what are the

7    like disciplines.  So, review that order and then make them

8    okay to assign to the patient.

9    Q.   Okay.  So, the Clinical Director, your understanding,

10   Mr. Patel, is that the Clinical Director had to believe a

11   Registered Nurse, correct?

12   A.   Yes, that's correct.

13   Q.   And he had to have a degree in that --

14   A.   Nursing, yeah.

15   Q.   Okay.  And both those gentleman that you referred to, they

16   were both Registered Nurses, correct?

17   A.   That's correct, yes.

18   Q.   And when a referral would come from a referring doctor, the

19   referral would be given to the Clinical Director, correct?

20   A.   Right, yes.

21   Q.   And the way First Michigan worked was when he got this

22   referral, he began to investigate what was being asked to be

23   done for the patient.  Correct?

24   A.   Right.  He reviewed the order form and diagnosis.

25   Q.   Okay.  And those order forms or those diagnoses, they came

1    from the doctors, correct?

2    A.  The doctor's office, yes.

3    Q.  And after the Clinical Director reviewed that, he made

4    certain decisions as to how the patient was going to be treated

5    by your company.  Fair to say?

6    A.  Not to decide.  He just okayed to assign the patient to the

7    nurse to start the services.

8    Q.  Just so I'm clear and just so the ladies and gentlemen are

9    clear, he's the person who evaluated the referral form sent by

10   the doctor.  And then based on his review of that form, he

11   decided what particular treatments were going to be needed.

12   Correct?

13   A.  Right.  So, looking at the diagnoses, he will decide that

14   this person is okay, he really needs to services.  He will

15   assign to the intake.  And the intake person will assign to the

16   particular nurse in that area.

17   Q.  So, there were a number of different services that First

18   Michigan provided.  Correct?

19   A.  That's correct.

20   Q.  There were nursing services, correct?

21   A.  Nursing services, therapy --

22   Q.  Physical therapy, correct?

23   A.  Yes.

24   Q.  Occupational therapy, correct?

25   A.  Yes.

1    Q.   There was social services, correct?

2    A.   That's correct.

3    Q.   What else?

4    A.   Home health services.

5    Q.   The home health services are what kind of services,

6    Mr. Patel?

7    A.   Home health services is services -- let's say as an

8    example, if a patient is sick and bed bound and needs to be

9    cleaned or changed or bathing, then the home health service

10   will help the patient for that.

11   Q.   Okay.  All of those services were performed not by you,

12   correct?

13   A.   No.

14   Q.   Not by the Clinical Director, correct?

15   A.   No.

16   Q.   They were performed by people that you also employed at

17   First Michigan Home Health Care, correct?

18   A.   That's correct.

19   Q.   You employed nurses, correct?

20   A.   Yes.

21   Q.   You employed physical therapists, correct?

22   A.   Yes.

23   Q.   You employed occupational therapists, correct?

24   A.   Yes.

25   Q.   Social workers?

1    A.  Yes.

2    Q.  Home health aid people, correct?

3    A.  Yes.

4    Q.  And all of those people were on your staff when you arrived

5    in May 2007?

6    A.  Yes, that's correct.

7    Q.  And after the Clinical Director reviewed the referral form,

8    the Clinical Director made certain decisions regarding who to

9    assign this particular case to.  Correct?

10   A.  Yes.

11   Q.  If it was a nurse or if it was a physical therapist,

12   correct?

13   A.  Right, yes.

14   Q.  That, again, wasn't your role, correct?

15   A.  No.

16   Q.  But that -- a plan of care had to be developed.  Is that

17   fair to say, sir?

18   A.  That will be developed once the particular discipline is

19   assigned, whether it's a nurse or physical therapy.  So, after

20   the first visit, then the --

21   Q.  Who was responsible for doing the plan of care?

22   A.  That is automatically -- we have a software that generates

23   the plan of care, which is a form.  But the plan of care is

24   designed by the discipline who opened the services or provides

25   the services.

1    Q.  All right.  Now, with regard to the paper paperwork that

2    needed to be filled out in order to initiate the services at

3    First Michigan to a particular patient, how it would work was

4    after the referral came to you, you did certain things to check

5    on whether or not the patient had insurance.  Is that correct?

6    A.  That's correct.

7    Q.  Some of the referrals that came to you, the patients didn't

8    have insurance.  Correct?

9    A.  Yes, that's correct.

10   Q.  Some of the people's insurance had either expired or lapsed

11   or they didn't have coverage.  Is that correct?

12   A.  That's correct.

13   Q.  A number of people that came to you were covered by

14   Medicare or Medicaid.  Correct?

15   A.  That's correct.

16   Q.  And you or somebody under your direction made certain

17   inquiries as to whether or not insurance was available to be

18   billed, correct?

19   A.  That's correct.

20   Q.  Okay.  Who did -- was that your job?

21   A.  Actually, we had an intake person who verified the

22   insurance.

23   Q.  Who was that, Mr. Patel, the intake person?

24   A.  Intake is like a receptionist kind of --

25   Q.  Would that have been a gentleman named Kuar or a young lady

1    named Kuar?

2    A.  No.  Before we had a person named Tiffany Cross.

3    Q.  So, that was their responsibility?

4    A.  Right, to verify the insurance.

5    Q.  Okay.  Once the insurance was verified --

6    A.  Mm-hmm.

7    Q.  -- somebody had to contact the patient.  Correct?

8    A.  Right.

9    Q.  Okay.  Was that your job?

10   A.  No.

11   Q.  Okay.  The patient was contacted by someone who worked for

12   First Michigan, correct?

13   A.  That's correct.

14   Q.  And the purpose of contacting the patient was to try to

15   make sure that the patient wanted the care.  Correct?

16   A.  Yes, that's correct.

17   Q.  And once that was verified by members of your firm --

18   A.  Intake person, yes.

19   Q.  -- then an appointment was made, and a nurse or a physical

20   therapist or one of your staff went out to meet the patient.

21   Correct?

22   A.  That's correct.

23   Q.  And let's assume that a nurse went out to meet the patient.

24   They would go to the patient's home.  Correct?

25   A.  That's correct.

1    Q.   That was your understanding?

2    A.   Yeah.

3    Q.   That was the way you understand your business operated.

4    Correct?

5    A.   Yes.

6    Q.   And when the nurse went out to the home, the nurse went out

7    to the home with a --

8    A.   Start-up care package.

9    Q.   -- with a start-up care package?

10   A.   Yes.

11   Q.   Right?

12   A.   Yes.

13   Q.   I'm going to show you what I've previously marked as

14   Defense No. 2.

15             Can you take a look at this?

16   A.   Yes, mm-hmm.

17   Q.   Is that the start-up care package that your company First

18   Michigan used?

19   A.   Yes, that's correct.

20   Q.   In the start-up care package there's a number of forms that

21   the nurse or the physical therapist takes with them --

22   A.   Yes.

23   Q.   -- when she visits the patient.  Correct?

24   A.   Yes.

25   Q.   All of those forms in that package have to be filled out.

1    Correct?

2    A.  Filled out and signed by the patient, yes.

3    Q.  Signed not only by the patient, but also the nurse.

4    Correct?

5    A.  Nurse, yes.

6    Q.  And there's -- I don't want to go through it, Mr. Patel,

7    but that was required by your firm, correct?

8    A.  Yes, that's correct.

9    Q.  And all of that paperwork had to be filled out for Medicare

10   too, correct?

11   A.  Medicare?

12   Q.  I mean --

13   A.  It depends on who started up the services.  Like the nurse

14   or the -- they have to fill out all of this form and the entire

15   package on every page.

16   Q.  And that folder and those forms, they were the folder and

17   the forms that your company used from 2007 through 2011 when

18   you were indicted in this case.  Correct?

19   A.  That's correct, yes.

20   Q.  They truly and accurately depict the forms and the folders

21   that you used.  Correct?

22   A.  Yes.

23          MR. BEUKE:  Judge, I'm going to ask that Defendant's

24   No. 2 be admitted into evidence.

25          THE COURT:  Any objection?

1          MR. PRATT:  If I may review it briefly, Your Honor.

2    I don't think there's going to be, but I haven't seen it.

3          MR. BEUKE:  Sorry, Judge.  You.

4          *(Off the record.)*

5          MR. PRATT:  Your Honor, I have no objection.

6          THE COURT:  Received.

7          *(Defendant Exhibit 2 was admitted into evidence.)*

8    BY MR. BLACK:

9    Q.  Mr. Patel, after -- let's assume that the nurse went out to

10   a particular patient's home and the agreements were signed and

11   they were brought back to the office.

12         Would they have then been given to you, the IT

13   director?

14   A.  No.

15   Q.  Okay.  Now, in that packet there is an Admission Agreement,

16   correct?

17   A.  Yes.

18   Q.  That's an agreement that's signed by both the nurse and the

19   patient.  Correct?

20   A.  Yes.

21   Q.  A release of information and a consent for care form,

22   correct?

23   A.  Right, yes.

24   Q.  Signed again by both the nurse and the patient?

25   A.  Patient, yes.

1  Q.  And all of these things are kept within the file, your

2  files at First Michigan, correct?

3  A.  Yeah.  We make a chart.  In the folder it's filed, yes.

4  Q.  There's some instances where a particular patient is

5  currently under the care of a different home health care

6  agency.  Correct?

7  A.  That's correct.

8  Q.  And there were occasions when those particular individuals

9  wanted to transfer from health care agency one to your company.

10  Correct?

11  A.  Sometimes, yeah.  It's possible, yeah.

12  Q.  And there's a form for that, if this particular requires a

13  beneficiary request for transfer?

14  A.  Yeah.

15  Q.  That's able to be signed and in that packet in that

16  situation.  Fair to say?

17  A.  Yes.

18  Q.  There's emergency preparedness forms, staff assignment

19  forms.  Correct?

20  A.  Yes.

21  Q.  There's Notice of Medicare Noncoverage, correct, in case

22  there is no Medicare coverage?

23  A.  Right.

24  Q.  And that form explains to the patient that who is to be

25  billed in the event that services are provided.  Fair to say?

1    A.  Yes, that's correct.

2    Q.  There's a comprehensive adult nursing assessment, correct?

3    A.  Yes.

4    Q.  That is actually an 18-page form that the nurse goes over

5    with each patient, correct?

6    A.  Yes.

7    Q.  And in that interview process you were aware of how that

8    worked.  Correct?

9    A.  Yeah.  It's like the nurse goes through each and every

10   form, yes.  I know about the process, yes.

11   Q.  The nurse, while she's in the patient's home, goes through

12   a very detailed series of questions --

13   A.  Questions.

14   Q.   -- in order to get as much information as she can to

15   decide how to treat the person's needs.  Fair to say?

16          MR. PRATT:  Your Honor, can we have a foundation for

17   this as to how this witness would know this?

18          MR. BEUKE:  Judge, with -- I'll try to ...

19   BY MR. BEUKE:

20   Q.  You have had -- over your years at First Michigan Home

21   Health Care, you've had the opportunity to speak on a number of

22   occasions with nurses that worked for your company.  Correct?

23   A.  I have like -- here is the thing.  I have occasion to talk

24   to the nurses.

25   Q.  Okay.

1    A.  But they go through all of the sections.  I don't have any

2    control over that, being in the office.

3    Q.  My question is you've had a chance to speak with nurses and

4    physical therapists and occupational therapists on a number of

5    occasions while you were working at First Michigan Home Health

6    Care?

7    A.  Yeah.  We want to make sure that they go through each and

8    every question and fill it.  But, again, what they do in the

9    field, I don't of any control over that.

10   Q.  Your instructions to your people that worked for you were

11   that you go through every one of these procedures with the

12   patients, correct?

13   A.  Yes.  And then I trust them, that they do correctly.

14   Q.  Okay.

15   A.  Yes.

16   Q.  And your instructions to the people that worked with you

17   were similar to the instructions that Vinod Patel gave to the

18   people that worked for you.  Correct?

19   A.  That's correct.

20   Q.  You wanted your people to do things the right way.  Fair to

21   say?

22   A.  Yes.

23   Q.  Okay.

24   A.  Per their discipline, yes.

25   Q.  And after that paperwork was brought back to the office,

1 again, that was given to the Clinical Director.  Correct?

2 A.  Yes, correct.

3 Q.  And after the Clinical Director was given this

4 comprehensive assessment, was the case -- was there a coding

5 process?

6 A.  Yes.

7 Q.  Explain for the ladies and gentlemen, if you would, what

8 the coding process was.

9 A.  Okay.  So, just like I mentioned previously yesterday, once

10 we assign the patient, the nurse goes to see the patient, and

11 there's like an 18 to 20 pages of information, it's the

12 paperwork.

13   So, once that paperwork comes to the office, it does

14 have all of the information about the whole health history

15 about the patient.  Based on the health history or the

16 diagnoses, we have a coder who codes which code is applicable

17 for this patient, which is the coding process.

18 Q.  Now, after the coding process -- who makes the

19 determination as to how this particular file would believe

20 coded?  Is that the Clinical Director's responsibility?

21 A.  That's the Clinical Director, yeah.

22 Q.  All right.  After the Clinical Director makes that

23 decision, there is a physical therapy or a home health care

24 certification plan of care that's prepared.  Correct?

25 A.  That's correct, yes.

1    Q.   That's one of the pieces of information in that folder.

2    Correct?

3    A.   Right.

4    Q.   Okay.  And that plan of care details what First Michigan

5    Home Health Care proposes to do on a visit-by-visit basis for

6    any of your patients.  Correct?

7    A.   That's correct, yes.

8    Q.   The plan of care has to go somewhere after it's decided or

9    after it's written up by your Clinical Director.  Correct?

10   A.   Right.

11   Q.   It goes back to the referring doctor.  Correct?

12   A.   Yes.

13   Q.   And in order for the treatment to start, it has to be

14   signed by the referring doctor.  Correct?

15   A.   Yes, that's correct.

16   Q.   Who would take the plan of cares to the referring doctor?

17   You?

18   A.   That will be the mail.  Sometimes it has been taken by

19   Vinod.  Sometimes I do take with me.

20   Q.   Okay.  So, you've done that, right?

21   A.   Yes.  I did that in 2011, yes.

22   Q.   Okay.  So, once it's signed, then the treatment process can

23   begin.  Correct?

24   A.   No.  I mean we can start the services.

25                So, plan of care, if it's not signed, we cannot do

1   the final billing, which is at the end of the certification

2   period.

3   Q.   Okay.  You talked a little -- we'll get to that, but you

4   talked a little bit that yesterday.

5   A.   Right, yeah.

6   Q.   In any event, there is a -- nursing notes or visit notes

7   that are prepared, correct?

8   A.   That's correct.

9   Q.   Each time one of your staff, nurse or physical therapist or

10  whatever, goes to see a patient, they have to fill out

11  everything that they did for the patient in that visit.

12  Correct?

13  A.   Yes.

14  Q.   And that's returned to the file, correct?

15  A.   Yes.  That comes to the office.

16  Q.   And once they come back -- once they come back, they give

17  that to your staff so they can be compiled --

18  A.   That's given to the quality assurance people.

19  Q.   Okay.  The quality assurance people, what were their roles

20  at First Michigan?

21  A.   So, their role is to make sure that the notes are filled

22  out completely, all the paperwork is done correctly.

23  Q.   Okay.  And the quality assurance people, those were people

24  that wanted to make sure that the other people were doing their

25  job correctly.  Correct?

1    A.   That's correct.

2    Q.   And after all of that information got back to your office,

3    at some point you sent a notice to Medicare for billing.

4    Correct?

5    A.   Yes.  The very first visit, after the first visit.

6    Q.   I think you talked about this yesterday, but if you didn't,

7    let me ask this question.

8    A.   Yes.

9    Q.   Typically in the home health care industry that you were in

10   for those four years --

11   A.   Yes.

12   Q.    -- it lasted only for two-month intervals.  Correct?

13   A.   Yes, that's correct.

14   Q.   That's the maximum amount of care your company could

15   provide?

16   A.   60 days maximum can provide, yes.

17   Q.   Occasionally it could be extended.  Correct?

18   A.   Yes.  It's called recertification.  It could be extended,

19   yes.

20   Q.   But most of the majority of your patients were treated for

21   that 60-day window?

22   A.   60 days, yes.

23   Q.   Okay.  And the purpose of the program was to try to help

24   these people get better over that 60-day period.  Correct?

25   A.   Yes, that's correct.

1    Q.  Have them learn to adapt for certain problems that they

2    were having in their life, correct?

3    A.  Yes.

4    Q.  And I think you told Mr. Pratt yesterday that this was the

5    government program to try to save some money in order to

6    prevent people from going to the hospital?

7    A.  That's correct, yes.

8    Q.  Now, you mentioned, Mr. Patel, about the fact that there

9    was a prebilling or an amount that Medicare provided your

10   company prior to the -- or, when the program began.  Correct?

11        There was 60 percent that may have been sent to you

12   once the program had been approved.  Correct?

13   A.  Yes, that's correct.

14   Q.  And that was to allow your company to pay the people that

15   were in charge of all of these responsibilities you've just

16   explained for the ladies and gentlemen, correct?

17        To pay your staff, to pay your receptionist, to pay

18   your billing people, your Clinical Director, your Medical

19   Director, your quality assurance people, your IT people.

20   Correct?

21   A.  And we paid the marketer and the doctor too out of that

22   one.

23   Q.  Well, I mean you never knew about that when you came to

24   First Michigan.  Correct?

25   A.  Yeah.  When I came to the first Michigan, at that time I

1    knew.

2    Q.  All right.  Well, let me ask you about that.  With respect

3    to -- when you took the opportunity from your brother-in-law

4    and you decided to come to work for First Michigan --

5    A.  Yes.

6    Q.   -- did you have a conversation with him, Bob Patel, about

7    what your role was going to be?

8    A.  Yes.

9    Q.  Bob Patel explained to you that he wanted you to be in

10   charge of the IT section, correct?

11   A.  IT and to manage the office.

12   Q.  Okay.  And that was your job, correct?

13   A.  That's correct.

14   Q.  I think you told Mr. Pratt that after a year, you got all

15   the experience, and you then became the administrative person.

16   Correct?

17   A.  Yes.  That's the next level of the position, yes.

18   Q.  You got to that next level, correct?

19   A.  That's in 2009, yes.

20   Q.  In 2009 you now are the person who was in charge of

21   everything.  Correct?

22   A.  Not everything.  Only the office administration.

23   Q.  Well, that was in order to do all of the billing, correct?

24   A.  No.

25   Q.  In order the run the day-to-day business, correct?

1    A.  Yeah.  Run the day-to-day operation, the office, yes.

2    Q.  In 2009 is that when your brother-in-law came to you and

3    said, you know, I think it's time to give you a piece of the

4    pie or a piece of the business?

5    A.  Yes.

6    Q.  And Bob Patel came to you and said I'm going to split up

7    the company.  Correct?

8    A.  Yes, that's correct.

9    Q.  And I'm going to take 40 percent, correct?

10   A.  Yes.

11   Q.  And Bob Patel was never at the company on a day-to-day

12   basis.  Correct?

13   A.  No, not at all.

14   Q.  And I'm going to give you, Ramesh, my brother-in-law, 30

15   percent.  Correct?

16   A.  Yes.

17   Q.  And I'm going to give my little brother 30 percent.

18   Correct?

19   A.  That's correct, yes.

20   Q.  Okay.  And over the next several years, you were -- you

21   believed you to be one of the owners of the company.  Correct?

22   A.  Yeah.  Profit sharing owner.

23   Q.  Well, you got profits from the company.  Is that correct?

24   A.  Yes, I did.

25   Q.  And you got a paycheck, correct?

US v Vinod Patel #11-cr-20468-36

1    A.  Yes, I did.

2    Q.  Okay.  Now, let's jump ahead to August 3rd of 2011 when

3    Agent Carmack came and you met him for the first time and were

4    now sitting in the DEA interview room with another agent and an

5    interpreter.  And you were aware of the fact that Ramesh Patel

6    had been indicted in a massive conspiracy to commit home --

7    health care fraud.  Okay?

8    A.  Yes, mm-hmm.

9    Q.  And you told the agents I want to tell you everything that

10   I know about this operation.  Correct?

11   A.  Yes.

12   Q.  And you wanted to cooperate.  Correct?

13   A.  Not -- I mean cooperate, but he read me like the Miranda

14   rights.  That's optional --

15   Q.  Well --

16   A.  Yeah, I wanted to disclose information.

17   Q.  You knew then, Mr. Patel, that you wanted to help yourself.

18   Correct?

19   A.  Yeah, you can say that.

20   Q.  And you knew that if you -- he told you that if you speak

21   with me, maybe we can help you.  Correct?

22   A.  No.  No.  He didn't -- we didn't have any conversation kind

23   of like that.

24   Q.  He told you let's talk.  Right, Ramesh?

25   A.  Yeah, he said let's talk.

1   Q.  And the conversation began with Agent Carmack about your

2   educational background and how you got to the United States and

3   your degrees and all of those things.  Correct?

4   A.  Right.  Yes.

5   Q.  And the agents, when you were talking to them, they were

6   writing down notes.  Correct?

7   A.  Yes.

8   Q.  And they were asking questions and you were giving answers.

9   Correct?

10  A.  Yes.

11  Q.  Now, one of the very first questions that they asked you

12  was how did you get to First Michigan.  Correct?

13  A.  Yes.

14  Q.  And you told them you started there in May of 2007.

15  Correct?

16  A.  Yes.

17  Q.  And that it was owned by Vinod Patel --

18  A.  Yes.

19  Q.   -- and who?

20  A.  Babubhai Patel.

21  Q.  So, it was owned by Bob Patel and Vinod Patel?

22  A.  That wasn't like -- it was like a verbal commitment.  It

23  wasn't like a solid commitment at that point.

24  Q.  Well, you never mentioned a person in that August 3rd

25  interview by the name of Rana Naeem, did you?

1   A.  I did I think.

2   Q.  Well, in that first interview on August 3rd of 2011, you

3   never told them about Rana Naeem, did you?

4   A.  I don't recall that one.

5   Q.  Who was Rana Naeem, tell the ladies and gentlemen?

6   A.  Rana Naeem is the person who helped Bob Patel to buy this

7   home care.

8   Q.  Okay.  Rana Naeem and Bob Patel bought First Michigan,

9   correct?

10  A.  Yes.

11  Q.  And Rana Naeem and Bob Patel owned First Michigan, correct?

12  A.  Yes.  Rana Naeem had an interest in First Michigan Home

13  Health Care.

14  Q.  You didn't tell that to the agents the first time you spoke

15  to them, did you?

16  A.  I don't remember that one, no.

17  Q.  All right.  Well, in any event, you told us that at some

18  point Vinod Patel came back from India in you think around June

19  of 2007.  Correct?

20  A.  Yes.

21  Q.  And you were told that the company was put in Vinod Patel's

22  name.  Correct?

23  A.  But Vinod Patel was I think over here before the company

24  was put under his name.

25  Q.  Well, you told the agents that Vinod Patel was the owner.

1    Correct?

2    A.  Yes.

3    Q.  And you didn't tell them that Bob Patel, your

4    brother-in-law, had any interest in the company in that first

5    meeting you had with them.  Correct?

6    A.  No.  I told them that he had an interest in First Michigan.

7    Q.  You remember telling that to them, correct?

8    A.  Yes.

9    Q.  All right.  With respect to -- the next topic that they

10   came to with you, was they asked you about what your job was

11   with the company.  Correct?

12   A.  Yes.

13   Q.  And you told them that you were brought over to be the IT

14   person.  Correct?

15   A.  Yes.

16   Q.  And then you became the administration person.  Correct?

17   A.  Yes, that's correct.

18   Q.  And the words you used were you controlled the operation.

19   Correct?  That's what you told them back then?

20   A.  Not controlled.  I mean it's like administration of the

21   office.

22   Q.  So, you never told Agent Carmack on August 3rd of 2011 that

23   you controlled the operation --

24   A.  No.

25   Q.   -- that's your testimony?

1           Well, okay.

2           They asked you about how long you had known Bob

3    Patel.  Correct?

4    A.  Yes.

5    Q.  And you told them that you knew him many, many years.

6    Correct?

7    A.  That's correct, yes.

8    Q.  The truth was you met him back in 1981 or even before that,

9    correct?

10   A.  Yes.

11   Q.  You told them that you were his brother-in-law, correct?

12   A.  Yes.

13   Q.  And you told them that he was married to your younger

14   sister.  Correct?

15   A.  Yes.

16   Q.  Now, they asked you about when it was that you became aware

17   of the fact that Bob Patel was running an illegal operation.

18           Do you remember them talking to you about that?

19   A.  Right.  So, that's like one year before the indictment or

20   maybe even --

21   Q.  Okay.  So, you've told them that I've known about my

22   brother-in-law's illegal activities for about a year.  Correct?

23   A.  Right.

24   Q.  So, just to do the math, you were in that interview room on

25   August 3rd of 2011.  So, you were trying to tell them that

1    you've known about it since August of 2010.  Correct?

2    A.  Yeah.

3    Q.  So, what you looked those agents in the face and told them,

4    I didn't know Bob was doing anything wrong before August of

5    2010.  Correct?

6    A.  Yes.

7    Q.  Okay.  And that was a lie.  Correct?

8    A.  No.

9    Q.  So, the first time that you learned that your

10   brother-in-law was illegally billing Medicare and illegally

11   billing but not dispensing medication was in 2010?

12   A.  Yes.

13   Q.  Is that your testimony?

14   A.  Yes.

15   Q.  And so in '07, '08, '09 and prior to August of 2010, you

16   had no idea that there was anything illegal going on?

17   A.  No.

18   Q.  Correct?

19   A.  No.

20   Q.  That was your statement to the agents.  Correct?

21   A.  Right.

22   Q.  And that's your statement under oath to these ladies and

23   gentlemen.  Correct?

24   A.  Yes.

25   Q.  Okay.  But what you became aware of in August of 2010 was

1    that Bob Patel was reselling medications back to distributors

2    to make a profit.   Correct?

3    A.   Yes.

4    Q.   And that he was fraudulently billing insurance companies.

5    Correct?

6    A.   Yes.

7    Q.   That's all you knew he was doing wrong.   Correct?

8    A.   Yes.

9    Q.   You never mentioned to the agents that you knew he was

10   paying doctors, did you?

11   A.   No.

12   Q.   You never mentioned that you knew he was billing but not

13   dispensing medications, did you?

14   A.   No.  I didn't know that he was --

15   Q.   You never mentioned that your company, First Michigan, was

16   doing anything illegal, did you?

17   A.   No.  I mean --

18   Q.   All right.

19   A.   No.  This case was about the pharmacy and they never asked

20   me anything --

21   Q.   My question, Mr. Patel, is you never told those agents

22   anything about what you are telling these ladies and gentlemen

23   today, and that is that your company was doing something that

24   you thought was illegal.  Isn't that correct?

25   A.   Pardon me?

1    Q.   That's correct, right?

2    A.   Can you repeat the question?

3    Q.   Here.  Mr. Patel, they continued to speak with you, didn't

4    they?

5    A.   Yes, they did.

6    Q.   Okay.  They asked you about Bob's other income --

7    A.   Yes.

8    Q.   -- or if he had any other way to make money other than his

9    pharmacies.  Correct?

10   A.   Yeah.

11   Q.   You told them that was his only income, correct?

12   A.   Yes.

13   Q.   But then they asked you some questions about your

14   involvement with Bob Patel, didn't they?

15   A.   Yes.

16   Q.   And the agents asked you some questions about whether or

17   not you ever got into business or did anything with Bob Patel

18   or for Bob Patel to help his illegal business profit, didn't

19   they?

20   A.   Yes.

21   Q.   They asked you some questions about some checks.  Isn't

22   that correct?

23   A.   Yes.

24   Q.   And at that point, you knew that there was a problem for

25   Ramesh Patel, didn't you?

1    A.  Yes.

2    Q.  You knew that you had let your brother-in-law use you and

3    funnel money through your accounts, correct?

4    A.  Yes, that's correct.

5    Q.  Well, they asked you some questions about what did Bob and

6    you -- or, what did you agree to do for Bob.  Correct?

7    A.  Yes.

8    Q.  The first thing they asked you about was a $50,000 check

9    that Bob Patel wrote to you.  Correct?

10   A.  Yes.

11   Q.  And they showed you the check, didn't they?

12   A.  Yes.  Well, he gave me the check, yes.

13   Q.  And when he brought out the check and showed you the check,

14   he asked you to explain to him what this was all about, Ramesh.

15   Right?

16   A.  Yes.

17   Q.  And you told him that this was a check that Bob gave to me.

18   Correct?

19   A.  Yes.

20   Q.  And Bob gave to me and had me put in my account.  Correct?

21   A.  Yes.

22   Q.  And then I let it go through my account.  Correct?

23   A.  Yes.

24   Q.  And then I wrote a check from my account to who?

25   A.  To Hiren Patel.

1    Q.   Okay.  Hiren Patel was a guy had you met before?

2    A.   Yes.

3    Q.   He was a friend of yours, correct?

4    A.   Not friend.  But when there's a gathering on occasion, we

5    meet, yeah.

6    Q.   He was surely a friend of Bob's, correct?

7    A.   Yes.

8    Q.   He was a person that worked with Bob, correct?

9    A.   Yes.  He's a person that worked for Bob, that's all I know.

10   Q.   Well, he was one of Bob's pharmacy guys, correct?

11   A.   Exactly, yes.

12   Q.   And when Bob gave you the check for $50,000, he told you

13   what it was for, correct?

14   A.   Yes.  He told me to give it to Hiren Patel.

15   Q.   Well, after it went through your account, you had a check

16   drafted from Ramesh Patel to Hiren Patel.  Correct?

17   A.   Yes.

18   Q.   Or did you withdraw cash and give him the cash?

19   A.   No.  I gave a check.

20   Q.   Okay.  And then he asked you to do that again, correct?

21   A.   Yes.

22   Q.   And when he asked you to do it the second time, it was also

23   for $50,000?

24   A.   That's correct.

25   Q.   When was that?

1    A.  It was in 2010.

2    Q.  Okay.  In what month?

3    A.  I don't remember that.

4    Q.  Was it before your epiphany that your brother-in-law was

5    doing something wrong in August of 2010?

6    A.  No.  It was in 2010.  I don't remember what was the date or

7    month, but it was --

8    Q.  Well, the second time that he gave you this 50,000, do you

9    remember having a conversation with Bob Patel?

10   A.  Yes.

11   Q.  And what did he say to you?

12   A.  He said take the check, deposit it, and just write the

13   check for Hiren Patel.

14   Q.  Well, he told you what the check was for.  Right?

15   A.  Yes.

16   Q.  And he told you that it was to pay Hiren for illegally

17   billing these medications.  Correct?

18   A.  Yes.

19   Q.  And you knew that your brother-in-law was a thief.

20   Correct?

21   A.  Yes.

22   Q.  You knew that your brother-in-law was a crook.  Correct?

23   A.  Yes, mm-hmm.

24   Q.  And you were joining into your brother-in-law's conspiracy

25   to commit fraud, weren't you?

US v Vinod Patel #11-cr-20468-36

1    A.  I can't say money laundering.  I ...

2    Q.  Well, you were letting your accounts be used to funnel

3    money from your brother-in-law to one of his other

4    co-conspirators.  Correct?

5    A.  Right.  But I don't --

6    Q.  Yes or no.

7    A.  I do not know the illegality of this conspiracy.  That's

8    something my lawyer knows.

9    Q.  Well, when Bob came to you and said, hey, Ramesh, I need

10   you to take this 50,000 and I need you to run it through your

11   account and give it to one of my pharmacists, did you think

12   something was going wrong?

13   A.  (No response.)

14   Q.  Did you think there might be something illegal about what

15   he was asking you to do?  Yes or no.

16   A.  Yes.

17   Q.  I mean, you weren't a constitutional scholar, but you knew

18   something was up.  Correct?

19   A.  Yes, something was up.

20   Q.  And you continued to work with your brother-in-law.

21   Correct?

22   A.  Yes.

23   Q.  He had already given you 30 percent of First Michigan,

24   according to you.  Correct?

25   A.  Yes.

1   Q.  You've never put in a dime to First Michigan, did you?

2   A.  No.

3   Q.  Well, then the agent brought out a third check, didn't he?

4   A.  Yes.

5   Q.  A check for $75,000.  Correct?

6   A.  That's correct.

7   Q.  And he asked you about that check, didn't he?

8   A.  Yes, he did.

9   Q.  And when he asked you about that check, you told him that

10  this was another one that Bob asked me to run through my

11  account and give it to Kartik Shah.  Correct?

12  A.  Yes, that's correct.

13  Q.  And that was also for payment of all of Bob's billed, but

14  not dispensed stuff.  Correct?

15  A.  Yes, that's correct.

16  Q.  That was part of his conspiracy, the pharmacy conspiracy?

17  A.  The pharmacy, yes.

18  Q.  That you had no involvement in, correct?

19  A.  Yes.  My money was there and --

20  Q.  You are running money from point A to point B, correct?

21  A.  Yes.

22  Q.  Finally, they pulled out a fourth check, didn't they?

23  A.  No.  There was only three checks.

24  Q.  Okay.  Well, let's talk about that fourth transaction.

25  A.  Okay.

1    Q.  Agent Carmack asked you about $150,000, correct?

2    A.  That's correct.

3    Q.  $150,000 that Bob gave to whom?

4    A.  To me.

5    Q.  Oh.

6    A.  As a loan.

7    Q.  When did Bob Patel give his brother-in-law and partner

8    Ramesh Patel $150,000?  Tell the ladies and gentlemen.

9    A.  When I purchased a house, to pay on the loan, on the

10   mortgage at that time.

11   Q.  So, you and your wife bought a house, correct?

12   A.  Yes.

13   Q.  When?

14   A.  In 2009.

15   Q.  Okay.  Did he give you the $150,000 check in 2009?

16   A.  Yes.

17   Q.  And you never paid him back, did you?

18   A.  I did.

19   Q.  When did you pay him back?

20           Did you give those checks to the Government that you

21   paid back Bob Patel?

22   A.  I didn't give, but I do have -- I did pay him back.

23   Q.  Did you give any checks to the Government or to your lawyer

24   or to Agent Carmack to prove that I paid back Bob Patel the

25   $150,000?  Yes or no.

1    A.   They didn't ask me to give the checks --

2    Q.   Where are they, Mr. Patel?

3    A.   They are with me.  I couldn't give --

4    Q.   Tell the truth.

5    A.   I couldn't --

6             THE COURT:  Please keep your voice down.

7    BY MR. BEUKE:

8    Q.   The $150,000 you said was given to you by your partner.

9    Correct?

10   A.   Correct.

11   Q.   They asked you, Mr. Patel, about a guy by the name of

12   Chetan Gujarathi.  Correct?

13   A.   Yes.

14   Q.   And you knew who he was, correct?

15   A.   Yes.

16   Q.   And they wanted to talk to you about him, didn't they?

17   A.   Yes.

18   Q.   And when they asked you about Chetan Gujarathi, did you

19   tell them that he was Bob's accountant?

20   A.   Yeah.  He's the accountant.  He had --

21   Q.   Did you tell them that he was Bob's guy who took care of

22   Bob's money?

23   A.   Not care of the money, but he was the accountant.  He

24   worked in the office for Bob.

25   Q.   Well, that's when the topic of Davenport Pharmacy came up.

1    Correct?

2    A.  Right.

3    Q.  And Davenport Pharmacy was the one that was in your name.

4    Correct?

5    A.  Yes.

6    Q.  And did the agents tell you that they knew that one of

7    Bob's pharmacies was in your name?

8    A.  Yes.

9    Q.  And you didn't tell them that I had no knowledge of that,

10   did you?

11   A.  No, I told them.

12   Q.  Oh.  You told Agent Carmack back on August 3rd of 2011 that

13   you knew that Davenport Pharmacy -- or, you did not know that

14   Davenport Pharmacy was in your name?

15   A.  Before.  But at that point I knew it was in my name.

16   Q.  Well, did you tell the agent that Bob Patel asked you to

17   place Davenport Pharmacy in your name?

18   A.  He --

19   Q.  Did you tell that to the agent?  Yes or no.

20   A.  No, I didn't tell the agent.

21   Q.  Did you tell the agent that you agreed to do it and signed

22   all the necessary paperwork?  Yes or no.

23   A.  No.

24   Q.  Okay.  So, that's your testimony that Agent Carmack was

25   never told that you signed the paperwork to put Davenport

1   Pharmacy in your name and that you knew and you agreed to that.

2   Correct?

3   A.  I came to know later --

4   Q.  My question is did you tell Agent Carmack on August 3rd of

5   2011 that you knew that it was being put in your name and that

6   you agreed to it?  Yes or no.

7   A.  I didn't agree, but it was put under my name.

8   Q.  My question, sir, is this.  Did you tell Agent Carmack that

9   you knew it was being put in your name --

10  A.  Yes.

11  Q.   -- and that you agreed to it being put in your name?  Yes

12  or no?

13  A.  Not agreed.  Yes.

14  Q.  You told him you didn't agree to it?

15  A.  No.

16  Q.  Okay.  Did you tell Agent Carmack that Davenport -- did he

17  ask you about Davenport Pharmacy?

18  A.  Yes, he did.

19  Q.  When he asked you about Davenport Pharmacy, you knew about

20  the history of Davenport Pharmacy, didn't you?

21  A.  Yes.

22  Q.  You knew that Davenport Pharmacy didn't do too well.

23  Correct?

24  A.  Yes.

25  Q.  And you knew that it actually was closed.  Correct?

1    A.  Yes.

2    Q.  It wasn't sold.  Right?

3    A.  No.

4    Q.  It was closed.

5    A.  It wasn't closed.  It was moved to Detroit from Saginaw.

6    Q.  Well, you told the agent that Davenport Pharmacy didn't do

7    well and it was closed.  Correct?

8    A.  Not closed.  It was moved.  It was planning -- they were

9    planning to move to Detroit.

10   Q.  Did the agent talk to you about Chetan Gujarathi and you in

11   your brand new house that you and your wife bought with the

12   $150,000 that Bob gave you, did he ask you if Chetan Gujarathi

13   had ever been to your house?

14   A.  Yeah.  He had been in my house, yes.

15   Q.  Okay.  And when he asked you that question, Mr. Patel, you

16   knew that Chetan Gujarathi had been to your house.  Correct?

17   A.  Yes.

18   Q.  And then Agent Carmack did something during the course of

19   your interview with him.  He pulled out the tape recorder.

20   Right?

21   A.  I don't recall about the tape recorder.

22   Q.  Well, do you remember him playing a call for you?

23   A.  Yeah.  I think, yeah, he did mention something like that.

24   Q.  And it was a call between Bob Patel and Gujarathi, correct?

25   A.  He just talked to me about the calls.  Not playing the

1    recording.

2    Q.  Well, when he talked -- he never played the call?

3    A.  No.  He just talked to me about the calls.

4    Q.  Okay.  Well, when you talked about the call --

5    A.  Mm-hmm.

6    Q.  -- he asked you about you allowing your basement to be

7    used to hide drugs.  Correct?

8    A.  Not hide drugs.

9         Like here's what this is.  Davenport Pharmacy was

10   under my name and it was transferred to the Detroit area and

11   there was two boxes of medications.  And Chetan Gujarathi

12   talked to the pharmacy attorney, and he said without

13   transferring the license, you cannot store the medication in

14   the pharmacy.  So, the pharmacy is under my name, so they said

15   that you just put it in your house.  So, that's how I just

16   allowed to put it --

17   Q.  So, you did know the pharmacy was under your name.

18   Correct?

19   A.  At that time I knew, yes.

20   Q.  And Gujarathi called -- or, Bob Patel called you and said

21   Gujarathi is bringing over drugs to put in your basement.

22   Correct?

23   A.  Yes, that's correct.

24   Q.  And when you were told by your brother-in-law, your

25   partner, that we're bringing over drugs to put in your

1    basement, is that okay with you --

2    A.  Yes, they did.

3    Q.  -- and you said bring it over.  Correct?

4    A.  Yes.

5    Q.  And Gujarathi and another guy came over with two boxes full

6    of drugs.  Correct?

7    A.  That's correct.

8    Q.  And you walked them down in the basement, correct?

9    A.  They did put it in the basement, yes, but they --

10   Q.  You told them where to put it, correct?

11   A.  Yes.

12   Q.  You didn't want it just laying around, did you?

13   A.  No.

14   Q.  You knew that it was illegal drugs, correct, that Bob had

15   gotten through his billed but not dispensed scheme?

16   A.  That wasn't illegal.  It was like closing one place to

17   another.

18   Q.  Did you ever ask him, Bob, how did you get these drugs?

19   A.  I didn't ask him.

20   Q.  Well, you consulted a lawyer, didn't you?

21   A.  No.

22   Q.  Okay.  Well, after you told the agent that you let your

23   basement be used as a storage --

24   A.  Right.

25   Q.  -- facility --

1    A.   Yeah --

2    Q.   -- they talked to you -- they switched the conversation a

3    little, didn't they?

4    A.   I do not recall.

5    Q.   Well, who is Paul?

6    A.   That's the person -- actually I had knowledge that Paul is

7    the person with whom Bob used to work for the online pharmacy.

8    That's the knowledge that I do have.

9    Q.   Well, they asked you about Paul, right?

10   A.   Yes, they did.

11   Q.   And when they asked you about Paul, you told them you knew

12   a Paul.  Correct?

13   A.   Yes.

14   Q.   And you told them that Bob, your brother-in-law, opens

15   pharmacies for Paul.  Correct?

16   A.   Yes.

17   Q.   And you told them that Bob gets large sums of money from

18   Paul for opening these pharmacies.  Correct?

19   A.   No, I didn't say that.

20   Q.   Well, did you ever tell the agents on August 3rd of 2011

21   that Ramesh Patel stated that Bob Patel opens pharmacies for

22   Paul and that Bob Patel gets large sums of money for opening

23   the pharmacies for Paul?

24   A.   I mentioned that Bob Patel opens the online pharmacies with

25   Paul.

1    Q.  You never told that agent that your brother-in-law made a

2    lot of money doing that for Paul?

3    A.  No, I didn't make any statement like that.

4    Q.  The agents didn't believe you, did they?

5    A.  No.  They didn't believe --

6    Q.  They told you that, didn't they?

7    A.  Yeah, they did.

8    Q.  They told you that they believed you had a lot more

9    information about Paul.  Correct?

10   A.  Yes.

11   Q.  That's when the interview started going bad, didn't it,

12   Ramesh?

13   A.  Yes.

14   Q.  Okay.  Well, they asked you about your brother-in-law's

15   assets, didn't they?

16   A.  Yes.

17   Q.  And they asked you what you knew about his assets, correct?

18   A.  Yes.

19   Q.  And when they asked you that, you told them about property

20   that he owns in Texas.  Correct?

21   A.  Yes.

22   Q.  And you told them he had partners in that property.

23   Correct?

24   A.  Yes, that's correct.

25   Q.  You told them that his partners were who?

1    A.   Dinesh Patel, Lokesh Tayal, Mehul Patel.

2    Q.   Mehul Patel also, correct?

3    A.   Yes.

4    Q.   So, those guys that were partners with your brother-in-law

5    on the properties in Texas, Vinod Patel wasn't a partner with

6    him in those properties, was he?

7    A.   No.

8    Q.   They asked you about Fenkell Pharmacy and Commerce Pharmacy

9    and a number of different other pharmacies, correct?

10   A.   That's correct.

11   Q.   And you told them that my brother-in-law also owns a flat

12   in India.  Correct?

13   A.   Yeah, that's correct.

14   Q.   What kind of flat in India did your brother-in-law own?

15   A.   Flat means apartment.  Here we can say apartment.

16   Q.   Okay.  Was it an apartment building?

17   A.   No, not -- just one single building of the apartment.

18   Q.   You told the agents that Bob Patel -- about a meeting with

19   the Michigan Attorney General's office.  Correct?

20   A.   Yes.

21   Q.   When did that meeting take place, according to your

22   knowledge?

23   A.   No.  He asked me that Bob mentioned to me that he's going

24   to meet with the Attorney General in Lansing.

25   Q.   Okay.  For what?

1    A.   Just like in case there's any problems, then he can help

2    him to solve his problems.

3    Q.   So, he was going to try to go to the Michigan Attorney

4    General's to try to see if he could take care of any problems

5    that he might be having with his pharmacy businesses.   Correct?

6    A.   Yes.

7    Q.   That was his plan.   Correct?

8    A.   Yes.

9    Q.   That was his plan before you guys all got busted on August

10   2nd.   Correct?

11   A.   Yes.

12   Q.   When did he go to the Michigan Attorney General's?   When

13   did he tell you he did that?

14   A.   I don't recall when did he go.   He just talked to me about

15   that one.

16   Q.   Okay.   Finally, the agents asked you about some doctors,

17   correct?

18   A.   Yes.

19   Q.   They asked you about three doctors specifically.   Correct?

20   A.   Right, yes.

21   Q.   Dr. Tran, correct?

22   A.   Yes.

23   Q.   Dr. Greenbain, correct?

24   A.   Yes.

25   Q.   And the other one was Dr. Edwards, correct?

1    A.  Yes.

2    Q.  And you looked the agents in the face and you told the

3    agents what?

4    A.  Yeah.  I said I didn't know these doctors.

5    Q.  Okay.  You lied to them?

6    A.  Yeah, I did lie.

7    Q.  You lied to them about Paul, correct?

8    A.  Paul, no.  I said -- I didn't lie about Paul, but I did lie

9    about the doctors.

10   Q.  Well, when the agents finally got around to asking you

11   about these doctors and you lied to them, they actually played

12   some calls for you, didn't they?

13   A.  Yeah.  They did brought some calls, yes.

14   Q.  And this time they actually played them for you, correct?

15   A.  What do you mean by "this time"?

16   Q.  Well, in the conversation, on August 3rd of 2011.

17   A.  Yes.  Yeah.

18   Q.  So, you heard the conversations, correct?

19   A.  Not played.  They showed me the transcripts.

20   Q.  The transcripts.  Okay.

21   A.  Yes.

22   Q.  And at that point, Mr. Patel, they told you that they

23   didn't believe a word you were telling them, correct, and that

24   the conversation was over?  Correct?

25   A.  Yes.

1    Q.   Okay.  And you knew you had blown your chance to help

2    Ramesh Patel.  Correct?

3    A.   Yes.

4    Q.   They told you they were going to search your house.

5    Correct?

6    A.   No.  I mean, it's like -- I mean, I told them that there

7    were two boxes of medications in my house, and they had a

8    concern.

9    Q.   Oh.

10   A.   So, I just told them that they can go and search my

11   house --

12   Q.   So, the medications that Chetan Gujarathi brought over to

13   your house, they were in your house that afternoon.  Correct?

14   A.   Yes.

15   Q.   And you told them if you want to go get them, you can go

16   get this.  Correct?

17   A.   Right, yes.

18   Q.   And you signed a consent to search to let them go get the

19   drugs.  Correct?

20   A.   Yes, that's correct.

21   Q.   Well, when they got there, they searched the house and they

22   found a lot of jewelry.  Correct?

23   A.   Yes.

24   Q.   Five gold necklaces, a silver necklace, one gold necklace

25   with charms, financial documents, First Home Health Care

1  documents.  Correct?

2  A.  Yes.

3  Q.  And they found a lot of cash.  Correct?

4  A.  No.  That was in the safe deposit.

5  Q.  Well, where was the safety deposit box?

6  A.  It was in the Chase Bank.

7  Q.  Okay.  So, did you tell them that there was a safety

8  deposit box or did they find out about the safety deposit box?

9  A.  They found out about that one.

10  Q.  Yeah.  You didn't tell them about it, did you?

11  A.  I did tell them that some cash is there in my safe box.

12  Q.  Okay.  Did you give them a consent to search the safety

13  deposit box?

14  A.  They didn't ask for the safety deposit box.

15  Q.  Okay.  Well, how did they get in your box?

16  A.  They might have had a search warrant to go over there.  I

17  don't know.

18  Q.  So, you didn't give them a consent to search Ramesh Patel's

19  safety deposit box, did you?

20  A.  No.

21  Q.  And you knew when you were sitting in that interview that

22  there was a whole bunch of cash in that safety deposit box?

23  A.  Yes.

24  Q.  Didn't you?

25  A.  Yes.

1   Q.   How much cash was it, Mr. Patel?  Tell the ladies and

2   gentlemen.

3   A.   It was $135,000 cash.

4   Q.   $135,000 in cash that you didn't tell them about, that you

5   got from who?

6   A.   My sister gave me the bag.  That belongs to my sister and

7   she --

8   Q.   So, this was the sister that's married to who?

9   A.   Babubhai Patel.

10   Q.   Oh.  And your sister gave you the $135,000 cash when?

11   A.   That was in 2010.  I mean, sometimes she gives some

12   installment, like 10,000, 15,000, and I just put it in the box.

13   Q.   So, she was using her brother to hide her husband's cash,

14   correct?

15   A.   Not his cash.  That totally belonged to sister.  She

16   claimed that this money belongs to herself, and she wanted me

17   to keep it on the safe side for her money.

18   Q.   Your sister didn't work, did she?

19   A.   No.

20   Q.   Oh.  So, the 135,000 that you had in the safety deposit

21   box, that's money that you claim your sister just happened to

22   get on her own?

23   A.   Yes.

24   Q.   Okay.  Now, the agents seized money, I think you told the

25   ladies and gentlemen, from your accounts too.  Correct?

1    A.   Yes.

2    Q.   You didn't give them permission to do that, did you?

3    A.   No.

4    Q.   Okay.  They seized another hundred and how much?

5    A.   I think 175,000 or some.  I don't know how much exactly.

6    Q.   175,000 from your checking account or savings account?

7    A.   Checking account.

8    Q.   Okay.  And they seized a car, correct?

9    A.   Yes.

10   Q.   That was a Mercedes Benz, correct?

11   A.   No.  A Honda Civic.

12   Q.   Okay.  And they seized a bunch of your wife's jewelry,

13   correct?

14   A.   That's correct.

15   Q.   So, if I'm correct, of all that money that was seized, your

16   lawyer negotiated with the Government to get back for you what?

17   A.   That's correct.  My attorney, Mr. Jim Feinberg, talked to

18   Julie Beck.

19   Q.   So, you got a hundred thousand back from the money that was

20   seized, correct?

21   A.   Yes.

22   Q.   And you got what back from the safety deposit box?

23   A.   Everything I got back.  All the jewelry I got back.

24   Q.   All the jewelry.

25            And how about the money?

1    A.   And the car -- huh?

2    Q.   The money?

3    A.   No cash money.

4    Q.   $100,000 came back to Ramesh Patel and his wife, correct?

5    A.   Yes.

6    Q.   And that was all done recently, correct, where you got the

7    money back and the jewelry?

8    A.   No.  That was one year more.  It was after ...

9    Q.   That was after you signed your Cooperation Agreement,

10   correct?

11   A.   That's correct.

12   Q.   It was after you signed your Plea Agreement, correct?

13   A.   Yes.

14   Q.   Okay.  If we can just jump ahead a little bit, Mr. Patel.

15            With respect to after the agents told you on August

16   3rd of 2011, they didn't believe anything you were saying to

17   you -- do you remember that?

18   A.   Yes.

19   Q.   And the conversation ended.  Correct?

20   A.   Yes.

21   Q.   And you were taken out of the interview room.  Correct?

22   A.   Yes.

23   Q.   And you were taken to this courthouse.  Correct?

24   A.   Yes.

25   Q.   And you were brought in front of a judge and you were

1    placed on bond.  Correct?

2    A.  Yes.

3    Q.  And then you learned at that hearing that you had been

4    indicted with these 25 or 26 other people.  Correct?

5    A.  Yes.

6    Q.  And over the next several months you appeared with your

7    attorney on that case.  Correct?

8    A.  Yes.

9    Q.  And there was a decision in June of 2012 that you

10   understood certain Defendants were going to go to trial before

11   other Defendants.  Correct?

12   A.  Right, yes.

13   Q.  And you learned, did you not, you knew that you were not

14   going to trial in the first trial.  Correct?

15   A.  No.

16   Q.  The first trial actually began in June of 2012.  Correct?

17   A.  Yes.

18   Q.  And one of the people that did go to trial in June of 2012

19   was your brother-in-law, your partner, Bob Patel.  Correct?

20   A.  Yes.

21   Q.  And that trial ultimately lasted until that August.

22   Correct?

23   A.  Yes.

24   Q.  And your brother-in-law was convicted.  Correct?

25   A.  Yes.

1    Q.  Now, between August 3rd of 2011 and the time that your

2    brother-in-law went to trial, you never called the gentlemen at

3    this table and said, hey, I'd like to come in and take another

4    shot at this cooperation stuff, did you?

5    A.  I did talk two times to the prosecutor.

6    Q.  When?

7    A.  That was a couple of weeks before.

8    Q.  The weeks before when?

9    A.  The week before the last week.

10   Q.  I mean week before Bob went to trial?

11   A.  No.

12   Q.  That's my question.

13   A.  Oh, no.

14   Q.  And I apologize if you were confused.  Let me try to clear

15   it up.

16            Before Bob's trial --

17   A.  No, I never made --

18   Q.  -- you never sat down with the prosecutors here?

19   A.  No, I never met them.

20   Q.  You never said I'd like to come, Mr. Neal or Mr. Pratt, and

21   I'd like to tell you everything I know about my brother-in-law,

22   did you?

23   A.  No.

24   Q.  You let your brother-in-law go to trial.  Correct?

25   A.  Yes.

1    Q.  And then he was convicted.  Correct?

2    A.  Yes.

3    Q.  And then in October, after your brother-in-law was

4    convicted, that's when you told your lawyer, hey, why don't you

5    give a call to the prosecutors, I'd like to help myself.  Fair

6    to say?

7    A.  Yes, that's correct.

8    Q.  And your lawyer started to speak with the prosecutors.

9    Correct?

10   A.  Yes.

11   Q.  And then an agreement was made where you agreed to sit down

12   with them.  Correct?

13   A.  Yes, that's correct.

14   Q.  And that was October 25th of 2012.  Correct?

15   A.  That's correct.

16   Q.  Mr. Patel, I'm going to show you Defendant's No. 5 and ask

17   you to take a look at this letter, dated October 25th, 2012.

18   A.  Okay.

19   Q.  And can you look at it.

20           And does it bear your signature on page 3 of 11?

21   A.  Yes.

22   Q.  And that was a letter that was -- you and your lawyer went

23   through.  Correct?

24   A.  Yes.

25   Q.  And in that letter, it's a letter from the prosecutors to

1   you and your lawyer.  Correct?

2   A.  Yes, that's correct.

3   Q.  And it outlines the agreement to meet with you and talk to

4   you.  Correct?

5   A.  Right, that's correct.

6   Q.  And you were asked to sign it after you read it, correct?

7   A.  Yes.

8   Q.  And after it was explained to you, correct?

9   A.  Yes, mm-hmm.

10  Q.  And you did read it, correct?

11  A.  Yes.

12  Q.  And that's a true and accurate copy of the letter that you

13  read on October 25th of 2012.  Correct?

14  A.  That's correct.

15          MR. BEUKE:  Judge, I'm going to ask to move

16  Defendant's No. 5 into evidence.

17          MR. PRATT:  No objection, Your Honor.

18          THE COURT:  Received.

19          *(Defendant Exhibit 5 was admitted into evidence.)*

20  BY MR. BEUKE:

21  Q.  And in addition to that letter, you were also given a

22  Cooperation Agreement, were you not, Mr. Patel?  Or, strike

23  that.

24          There was no Cooperation Agreement given to you at

25  that October 25th, 2012 meeting, was there?

1    A.  I think it was there.  I don't recall.  But there was a

2    Cooperation Agreement.

3    Q.  Well, there was no Plea Agreement given to you then.

4    Correct?

5    A.  It was before the Plea Agreement was ...

6    Q.  Okay.  Well, on October 25th of 2012, just so it's clear

7    for the ladies and gentlemen of the jury, Vinod Patel hadn't

8    been indicted for anything.  Correct?

9    A.  That's correct.

10   Q.  And you agreed to sit down with the prosecutors on October

11   25th of 2012.  Correct?

12   A.  Yes.

13   Q.  You knew that what you were indicted for, that conspiracy

14   to commit health care fraud, you could go to the penitentiary

15   for upwards of ten years.  Correct?

16   A.  Yes.

17   Q.  And you knew that your brother-in-law's trial had already

18   ended and he had been found guilty.  Correct?

19   A.  Yes.

20   Q.  And when you came in and sat down with the prosecutors on

21   October 25th of 2012, that was the first time you ever told

22   anybody that you had information about Mr. Vinod Patel doing

23   something wrong.  Isn't that correct?

24   A.  That's correct, yes.

25   Q.  And you sat down with the agents and the prosecutors again.

1    Correct?

2    A.  Yes.

3    Q.  Mr. Patel ...

4            *(Off the record.)*

5    Q.  Mr. Patel, I'm going to show you Defendant's No. 6 and ask

6    you to take a look at this document.

7            Tell the ladies and gentlemen of the jury if you

8    recognize it, and if you do, what you recognize it to be.

9    A.  Okay.  I do recognize this.  This is regarding the visits

10   provided by the home care, which is among the top hundred in

11   2009.

12   Q.  Yeah.  I mean, that's when --

13   A.  In 2009.

14   Q.   -- Bob Patel was the owner of the company, correct?

15   A.  Yes.

16   Q.  And it was October 14, 2009, correct?

17   A.  Yes.

18   Q.  And it's a certificate saying that First Michigan Home

19   Health Care, Inc., they were given the Award of Excellence.

20   Correct?

21   A.  Yes.

22   Q.  That your agency has been selected as one of the top home

23   health care agencies in the United States.  Correct?

24   A.  Yes.

25   Q.  And it's signed by the OCS home care person, correct?

1   A.  That's correct.

2   Q.  And the Precision Home Health line person.  Correct?

3   A.  That's correct.

4   Q.  That's when Bob -- or Vinod Patel was the owner of the

5   company, correct?

6   A.  Yes.

7   Q.  And then sometime after that, that's when you and Bob

8   Patel -- you took 30 percent and Bob Patel took 40 percent.

9   Correct?

10  A.  Yes.

11  Q.  I'm going to show you what I'll mark Defendant's 7A and B.

12          Tell the ladies and gentlemen, if you would,

13  Mr. Patel, if you recognize what these files are.

14  A.  Actually these are the complete charts of the services

15  provided to the patients.

16  Q.  Those are two files on two of the patients that were

17  patients of First Michigan Home Health Care.  Correct?

18  A.  Yes, that's correct.

19  Q.  And those files are typical of the files that are

20  maintained in the regular course of business by First Michigan

21  Home Health Care --

22  A.  That's correct.

23  Q.  -- when you provide services for your patients.  Correct?

24  A.  Yes, that's correct.

25  Q.  And you don't, as you sit here today -- Claude Gaty, you

1   don't have any recollection of who specifically he is, do you?

2   A.   I think that's one of the patients from Dr. Sawalha's

3   office.

4              THE COURT:   Excuse me, counsel.

5              MR. BEUKE:   I'm sorry, Judge.

6              THE COURT:   You can show him that, but please don't

7   put the names in the record.

8              MR. BEUKE:   Oh, okay, Judge.

9   BY MR. BEUKE:

10  Q.   The other, 7B, do you know who that person is?

11  A.   No, I don't.

12  Q.   Okay.   But the contents of these files, Mr. Patel --

13  A.   Yes.

14  Q.   -- they are typical of the way that First Michigan Home

15  Health Care maintained all of the documents that were required

16  by Medicare to be maintained by your agency.   Correct?

17  A.   Yes.

18  Q.   And they record and document all of the services that were

19  performed by your staff members, the nurses, the physical

20  therapists, the occupational therapists, and the dates that

21  they were performed.   Correct?

22  A.   Yes.

23  Q.   And they also contain signatures by not only the nurses,

24  but the patients that were serviced by your company on the

25  dates that they were serviced.   Correct?

1    A.  Yes, that's correct.

2              MR. BEUKE:  A couple of other questions, Judge.

3              Can I see 3G, please.  Can you display it?

4    BY MR. BEUKE:

5    Q.  Do you see that, Mr. Patel?

6              That's one of the calls that Mr. Pratt went over with

7    you.  Correct?

8    A.  Yes.

9    Q.  And you've listened to that call, I think you've told

10   Mr. Pratt.  Correct?

11   A.  Yes.

12   Q.  Okay.  And when you listened to that call, it was a call

13   between you and Bob.  Is that correct?

14   A.  Yes.

15   Q.  Okay.  And there's some mention in that call about Vinod

16   asking you how to return.  Correct?

17   A.  Yes.

18   Q.  And that was Vinod Patel asking you, Ramesh Patel, how do

19   we do this returning drugs to McKesson.  Correct?

20   A.  Yes, that's correct.

21   Q.  And in that conversation that you had with Vinod, you were

22   relating that back to Bob Patel.  Correct?

23   A.  Yes, that's correct.

24   Q.  Vinod Patel didn't know how to do that.  Correct?

25   A.  No.

1   Q.  And when that conversation occurred, I think you've told

2   the ladies and gentlemen, that Vinod Patel had opened up a

3   pharmacy called Beecher Pharmacy.  Correct?

4   A.  That's correct.

5   Q.  Do you remember he had two guys working for him.  One was

6   this guy Atul Patel.  Correct?

7   A.  Yes.

8   Q.  And another guy, Lalit Patel, correct?

9   A.  Yes.

10  Q.  And did you learn that those two guys were running some

11  sort of billing but not dispensed scheme at Beecher Pharmacy

12  and they never told Vinod Patel about it?

13  A.  I don't have any knowledge of that one.

14  Q.  Okay.  But when you had that conversation with Vinod Patel

15  on February 9th -- or, I'm sorry -- with Bob Patel on February

16  9th, 2011, Vinod Patel had come to you to ask your

17  understanding of how that works.  Correct?

18  A.  He asked me about how to return the medication.  That's the

19  only conversation I had.

20  Q.  And that's when I think you mentioned at one point in the

21  call Bob was laughing.  Correct?

22  A.  Yes.

23  Q.  And Bob was laughing because he knew how it worked.

24  Correct?

25  A.  Yes, that's correct.

1    Q.  And you knew how it worked, didn't you?

2    A.  Yes.

3    Q.  You had let your basement be used to store the drugs that

4    had been taken in that scam, correct?

5    A.  That was from the closed pharmacy.  Not from the scam.

6    Q.  Oh, okay.

7              MR. BEUKE:  3J, please.

8    BY MR. BEUKE:

9    Q.  3J, Mr. Patel, you talked with counsel about that.

10   A.  Yes.

11   Q.  You said that -- or, in that conversation, that inspectors

12   came to Mr. English's day care center.  Correct?

13   A.  Yes.

14   Q.  Now, at that point you knew -- or, he was telling you --

15   Vinod Patel was telling you that someone had informed him that

16   inspectors either from the FBI or from some law enforcement

17   agency had gone to that new day adult care facility.  Correct?

18   A.  Yes.

19   Q.  Okay.  And he didn't -- Vinod Patel didn't tell you that he

20   had an interest in that facility, did he?

21   A.  He didn't mention it to me at that point.

22   Q.  Okay.  He was telling you about this information that he

23   learned.  Correct?

24   A.  Yes.

25   Q.  And you were passing along that information to your

1    brother-in-law.   Correct?

2    A.   Yes, that's correct.

3    Q.   And your brother-in-law already knew about that

4    information, didn't he?

5    A.   I don't know whether he knew or not.

6    Q.   Okay.

7                MR. BEUKE:   3H.

8    BY MR. BEUKE:

9    Q.   This is, again, you and Bob.   Is that correct?

10   A.   Yes, mm-hmm.

11   Q.   Okay.   And I think you've told the ladies and gentlemen

12   that this is where you're talking about Dr. Ibrahim.   Correct?

13   A.   Yes.

14   Q.   And Dr. Ibrahim, according to you, wants a thousand dollars

15   a patient, correct?

16   A.   Not Ibrahim.   The person who works for Dr. Ibrahim.

17   Q.   Okay.   Whoever, somebody wants a thousand dollars a

18   patient.   Correct?

19   A.   That's correct.

20   Q.   And you were actually -- you understood about paying the

21   doctors, correct?

22   A.   Yes.

23   Q.   Because Bob trained you in paying the doctors, correct?

24   A.   Yes.

25   Q.   Vinod Patel went to India in September of 2010, correct?

1    A.   Yes, that's correct.

2    Q.   And he stayed in India for a number of months, correct?

3    A.   Yes.

4    Q.   And when he was in India, he had had a falling out -- he

5    and his brother weren't getting along.  Correct?

6    A.   Yes.

7    Q.   And when he and his brother weren't getting along, that's

8    when his brother came over to you.  Correct?

9    A.   Yes.

10   Q.   And that's when he started using your accounts to be used

11   to move 50,000 here, 75,000 there.  Correct?

12   A.   That was before that one.

13   Q.   Okay.  That was when?

14   A.   That was August or September -- I'm sorry -- August or July

15   of 2010.  It was before -- the fallout was the end of 2010.  It

16   was in December or January, early January 2011.

17   Q.   So, you had gotten in bed with your brother-in-law in

18   August of 2010 where he was moving money through your accounts.

19   Correct?

20   A.   Yes.

21   Q.   And then he and his brother's falling out happened sometime

22   after that, according to you?

23   A.   Yeah, almost the end of the year.

24   Q.   Well, he went to India, correct?

25   A.   Yes.

1    Q.  And went to India in August or September, correct?

2    A.  It happened when he came back from India.

3    Q.  Well, he was in India for several months, wasn't he?

4    A.  Yes, he was.

5    Q.  He didn't come back from India until after Christmas, did

6    he?

7    A.  Yeah, it was a couple of months.

8            THE COURT:  That's four times for that question.

9    BY MR. BEUKE:

10   Q.  Now, when he came back from India, that's when he opened up

11   Beecher Pharmacy.  Correct?

12   A.  Yes.

13   Q.  And you were now in charge of First Michigan Home Health

14   Care, correct?

15   A.  No.  He was still in charge.  He had active roles, but his

16   position was reduced in the home care.

17   Q.  Well, according to your testimony, Bob trained you on how

18   to pay doctors and the marketers, how to handle?

19   A.  That's correct.

20   Q.  All that training and all of that information came to you

21   from Bob, correct?

22   A.  Yeah.  That started in early August -- early 2011.

23   Q.  Vinod Patel never trained you in any of those things, did

24   he?

25   A.  No, not in the market, he didn't train me.

1    Q.  In that phone call you mentioned that -- you used the term

2    "one kilo"?

3    A.  Right.

4    Q.  And the one kilo, you guys used that as kind of a code.

5    Right?

6    A.  Yes.

7    Q.  And the code -- you thought that if the federal government

8    was listening in on the phones, if you guys used the word "one

9    kilo," that would somehow throw somebody off.  Correct?

10   A.  Yes, mm-hmm.

11               MR. BEUKE:  1I or 3I.  I'm sorry.

12   BY MR. BEUKE:

13   Q.  Do you see that call, Mr. Patel?

14   A.  (No response.)

15   Q.  That's, again, between you and Bob?

16   A.  Yes, mm-hmm.

17   Q.  And that's talking about Dr. Tran?

18   A.  Yes, mm-hmm.

19   Q.  And Dr. Tran -- Bob tells you we'll try to pamper her

20   first.  Correct?

21   A.  Yes.

22   Q.  And Dr. Tran was a person that you were paying.  Correct?

23   A.  Yes.

24   Q.  And you would take -- Bob would give you money.  Correct?

25   A.  Not Bob.  Bob said we can offer more money to Dr. Tran in

1    case she sends some more referrals.

2    Q.  Well, the money that you were giving and you were paying

3    Dr. Tran came from where?

4    A.  From the First Michigan bank account we used to cash the

5    checks.

6    Q.  So, you took money out of First Michigan.  You did,

7    correct?

8    A.  No.  I mean, Vinod told me to write the check in either his

9    name or my name, cash, and then cash the check.

10   Q.  So, you did write checks?

11   A.  Yes.  I did write the checks, yeah.

12   Q.  Finally, Mr. Patel, some of the nurses that worked for your

13   company over the years.

14            Maddy Peterson, do you remember her?

15   A.  Maddy Peterson?

16   Q.  Maddy Peterson.

17   A.  Maddy?

18   Q.  Maddy, yes.

19   A.  Maddy, I remember, but --

20   Q.  Lillian Robinson?

21   A.  Yes, I do remember.

22   Q.  Susan Lynch?

23   A.  Yes.

24   Q.  Gloria Robinson?

25   A.  Yes.

```
1    Q.  Dawn Rutherford?

2    A.  Yes.

3    Q.  Lillian Robinson?

4    A.  Yes.

5    Q.  Ella Bonden?

6    A.  Yes.

7    Q.  Patricia Garner?

8    A.  Yes.

9    Q.  Marcia Hill?

10   A.  Yes.

11   Q.  Elizabeth Phillips?

12   A.  Yes.

13   Q.  Some therapists, Akash Ahuja?

14   A.  Yes.

15   Q.  Hippowith Disanyachi?

16   A.  Who?

17   Q.  Disanyachi?

18   A.  I don't recall this one.

19   Q.  Mahesh Patel?

20   A.  Yes.

21   Q.  Occupational therapists there were, do you remember any of

22   those people?

23   A.  That's Dennis something.  There was only one occupational.

24   Dennis something.

25   Q.  Finally, Mr. Patel, what is a CHAP survey?
```

1    A.   CHAP means like -- it's like a Medicare accredited agency

2    who comes to the home care, and every three years they come and

3    watch you and certify for the next period.

4    Q.   So, it's Medicare or the federal government coming into

5    your business every three years.   Correct?

6    A.   Yes.

7    Q.   And they come in and they observe how the business works.

8    Correct?

9    A.   Yes, that's correct.

10   Q.   And they observe the performance of your office staff.

11   Correct?

12   A.   Yes.

13   Q.   And the performance of your technicians, your nurses, your

14   therapists.   Correct?

15   A.   Yes.

16   Q.   They go over your whole business from beginning to end?

17   A.   Yes.

18   Q.   Fair to say?

19   A.   Yes.

20   Q.   And after they go through your business, they decide this,

21   this branch of the Medicare agency, they decide whether or not

22   you are going to be an accredited agency.   Correct?

23   A.   Yes, that's correct.

24   Q.   And that was done in 2009 with First Michigan Home Health

25   Care, wasn't it?

1    A.  Yes, it was done.

2    Q.  And shortly after it was done, that's when you or

3    Mr. Patel's agency, First Michigan Home Health Care, was given

4    that Certificate of Excellence, wasn't it?

5    A.  Yes, mm-hmm.

6              MR. BEUKE:  Nothing else, sir.

7              THE COURT:  Do you want to see if we want to go

8    through four or do you want to break now?

9              We'll take our break.  It's 11:30.  15, another 17

10   minutes.

11             All rise for the jury.

12             Don't talk about it.  Don't speculate.  And enjoy

13   your time off.

14             *(Jury leaves the courtroom at 11:28 a.m.).*

15             THE COURT:  Do you have anything you want to put on

16   the record?

17             MR. NEAL:  No, Your Honor.

18             MR. BEUKE:  No, Your Honor.

19             THE COURT:  Do you want to put that other matter on

20   the record that you talked about or do it at the end of the

21   day?

22             MR. BEUKE:  Judge, I'm trying to remember what it

23   was.

24             THE COURT:  Then it wasn't important.

25             You may step down.

1          And we are only going to go to about 12:30 today.

2          MR. NEAL:  Okay.

3          *(Recess taken.)*

4          CASE MANAGER LANG:  Please rise.

5          THE COURT:  Are we going to be using the projector

6    now or should I turn the lights back on?

7          MR. PRATT:  I think we can turn the lights back on.

8          *(Jury enters the courtroom at 11:53 a.m.)*

9          CASE MANAGER LANG:  Court is again in session.  You

10   may be seated.

11         THE COURT:  Redirect?

12         MR. PRATT:  Yes, Your Honor.

13                    REDIRECT-EXAMINATION

14   BY MR. PRATT:

15   Q.  Sir, when you first began working for First Michigan and

16   first learned that the recruiters, the marketers were being

17   paid for patients, which brother was paying for patients; was

18   it Bob Patel or was it Vinod Patel?

19   A.  Vinod Patel.

20   Q.  Did the payments that Vinod Patel was making, did they get

21   reflected in those patient files?

22         You were shown a couple of patient files.  Is there

23   anyplace where it's marked paid cash for this patient?

24   A.  No.  There is no cash in the patient's file.

25   Q.  Why not?

1    A.   Again, it's illegal, to mark down the notation of that one.

2    Q.   How about when Vinod Patel and First Michigan got that

3    first wonderful, if you know, did Vinod Patel tell the folks,

4    hey, and I'm paying for the business?  Did he tell them that?

5    A.   No.  Actually that's like home care software based on the

6    services provided.  And it is billed in the name of the company

7    Elite.

8    Q.   Yes.

9    A.   They have all the data of the home care, and based on that

10   data, that certificate is generated.

11   Q.   So, it was based on the data?

12   A.   Yes.  It was based on the Medicare data they do have on

13   file, on record, that certificate is generated.

14   Q.   All right.  Did Vinod Patel tell the nurses and the

15   physical therapists that these people we are sending you out to

16   see, that some of them have been recruited by kickbacks?

17              MR. BEUKE:  Objection.  Judge.  How would he know?

18   A.   Actually none --

19              THE COURT:  Hang on a second, please.

20              Every question, implicit in it is if you know.  If

21   you know, you may answer the question.

22   A.   No, I'm not aware of whether the nurse or the therapist

23   have been told, to pay the kickback.

24   BY MR. PRATT:

25   Q.   To your knowledge, did Vinod Patel -- is there any single

1    nurse or therapist that you know that Vinod Patel said yes,

2    we're paying by kickbacks?  Are you aware of any --

3    A.  No, I'm not aware of that one.

4    Q.  Let me ask you this.  Was it tough to make a profit in the

5    home health care business?

6    A.  Yes.  The first thing, it's very hard to get the referral,

7    the very first thing.  That's the hard part.

8    Q.  All right.  During the time you were there, would First

9    Michigan have been able to make a profit without the referrals

10   from the kickbacks, just in terms of regular --

11   A.  No.  There is no way we can make profit.

12              MR. BEUKE:  Your Honor ...

13              THE COURT:  If you have an objection, stand and tell

14   me.  Don't ...

15              MR. BEUKE:  Judge, I have an objection.  I don't know

16   if he has any accounting background or any business background

17   or whether he's in a position to give an opinion as to that.  I

18   don't think he does.

19              MR. PRATT:  Your Honor, I think his testimony -- and

20   if and I have to lay a foundation, but given how he worked in

21   the office and saw a billing, I think there's an adequate

22   foundation for that testimony.

23              THE COURT:  I think both from his experience and his

24   Master's agree in information systems combined, the objection

25   is overruled.

1    BY MR. PRATT:

2    Q.  Now, as far as the split of the profits, the 40 percent for

3    Babubhai Patel, 30 percent for you and 30 percent for this man,

4    Vinod Patel -- do you recall testifying about that?

5    A.  Yes, sir.

6    Q.  All right.  Now, Babubhai Patel got the 40 percent of the

7    profits.

8            Did he know that the business was being generated

9    illegally through the bribes and kickbacks?

10   A.  Yes, he know.

11   Q.  And you, you're getting the 30 percent?

12   A.  Yes.

13   Q.  You knew it as well?

14   A.  Yes.

15   Q.  And how about Vinod Patel, did he know that as well?

16   A.  Yes, he knew that.

17           MR. PRATT:  Thank you, Your Honor.  I have nothing

18   further.

19           THE COURT:  Recross?

20                       RECROSS-EXAMINATION

21   BY MR. BEUKE:

22   Q.  Every year your business goes through what's called a cost

23   report.  Correct?

24   A.  That's correct, yes.

25   Q.  The cost report is a report that's prepared by the

1    government.  Correct?

2    A.  No.  That's prepared by the accountant.

3    Q.  Okay.  The cost report is prepared on your business.

4    Correct?

5    A.  Yes.

6    Q.  And it has to be provided to the government.  Correct?

7    A.  Yes.  Every year we have to submit it.

8    Q.  It details all your expenses and things like that.  And all

9    of that information is given to the government.  Correct?

10   A.  Yes.

11   Q.  Okay.  The certification that you got, you indicated that

12   it's based on some sort of a software program?

13   A.  It's based on the patient data, which is in the software.

14   It's in the Medicare system.  They do have all of the patient

15   data.

16   Q.  Well, I thought you told the ladies and gentlemen a little

17   while ago that there were people from that agency that actually

18   came down and spent time at your business.  They saw how the

19   business was being run.  Correct?

20   A.  Who?  CHAP?

21   Q.  The people who gave the award to you guys.

22   A.  No, they didn't come to the office.

23   Q.  You didn't tell the ladies and gentlemen a little while ago

24   that nobody was down there from that agency?

25   A.  No.  I mean it was mailed from that ...

1    Q.  Now, when you met with the agents on August 3rd of 2011,

2    you never told those agents anything about Vinod Patel paying

3    anybody what you now refer to as bribes, did you?

4    A.  No, I didn't.

5    Q.  After your brother-in-law had been convicted and before you

6    were getting ready to go to trial, that's when you and your

7    lawyer ran into the prosecutor's office and said let me talk

8    about Vinod.  Correct?

9    A.  Not talk about Vinod.  My attorney just talked to the

10   Government attorney about the Plea Agreement.

11   Q.  The nurses and the physical therapists, they are the people

12   who actually went out to the houses and provided the services.

13   Correct?

14   A.  Yes.

15   Q.  If you talked to those people, those were the people that

16   interacted with those patients on a daily basis or a couple

17   times a week.  Fair to say?

18   A.  Yes.

19   Q.  They charted everything that they did with this patients?

20   A.  Yes.

21   Q.  They charted -- they had conversations 45, sometimes an

22   hour and a half meetings with the patients.  Correct?

23   A.  Yeah, they did.

24   Q.  Did any one of those patients ever come into your office

25   and tell you, Mr. Patel, I gave my Medicare number because I'm

1   getting drugs from Bob Patel's pharmacies?

2           Nobody ever told you that, did they?

3   A.  I'm not aware of that one.

4   Q.  Did any nurses or physical therapists ever come up to you,

5   the office manager, and say, you know, we're getting reports

6   from our patients that the -- that they're being used to get

7   drug prescriptions for Bob Patel's pharmacies?

8           Did anybody ever tell you that?

9   A.  No.

10          MR. BEUKE:  Nothing else, Judge.

11          THE COURT:  Any redirect?

12          MR. PRATT:  No, Your Honor.  Thank you.

13          THE COURT:  Question from the jurors?

14          You may step down.  Thank you.

15          You may call your next witness.

16          MR. NEAL:  Thank you, Judge.  The United States calls

17  Pradeep Pandya.

18          THE COURT:  Please raise your right hand.

19          PRADEEP PANDYA,  GOVERNMENT'S WITNESS, SWORN.

20          THE COURT:  Please be seated.  Adjust the microphone

21  so we can hear you.

22                          DIRECT-EXAMINATION

23  BY MR. NEAL:

24  Q.  Mr. Pandya, could you state and spell your name for the

25  benefit of the court reporter?

1   A.   Sure.  My first name is Pradeep, P-R-A-D-E-E-P; last name

2   Pandya, P-A-N-D-Y-A.

3   Q.   How old a man are you, Mr. Pandya?

4   A.   I'm 49 years old.

5   Q.   Where were you born?

6   A.   I was born in India.

7   Q.   Is English your first language?

8   A.   No.  My first language is Gujarati.

9   Q.   Are you having trouble understanding me now?

10   A.   No.

11   Q.   Do you speak and write English fluently?

12   A.   Yes, fluently, but at certain times I have to ask like if I

13   don't understand, yes.

14   Q.   Very well.  If you don't understand anything that I say,

15   please ask me --

16   A.   Sure.

17   Q.   -- and I will clarify.

18          How far did you go in school?

19   A.   I did my Bachelor's of Pharmacy and I did my Master's of

20   Pharmacy also.

21   Q.   Did you obtain those degrees in the United States?

22   A.   No, sir.

23   Q.   Where did you obtain those degrees?

24   A.   In India.

25   Q.   When did you first come to the United States permanently?

1    A.  I came in 1997.

2    Q.  All right.  And what did you do in 1997 when you arrived in

3    the United States for the first time?

4    A.  Actually I was looking for a job to get an H1 to settle

5    down here, and I got that one.

6    Q.  Can you explain to the jury what an H1 is?

7    A.  An H1 is like a work visa; that if you have experience in a

8    certain area or whatever, you apply, and if the company can

9    hire you, then you can work with your experience based on a

10   work visa.

11   Q.  When you came over in 1977 you said you were looking for an

12   H1 visa?

13   A.  Yes.  I was looking for a job, yes.

14   Q.  And did you find a job in the United States?

15   A.  Yes.

16   Q.  Where was this job?

17   A.  That job was in Maryland.

18   Q.  Okay.  And what kind of a job was it?

19   A.  It was for research, and they let me in the research and

20   development and manufacturing side.

21   Q.  The research and development and manufacturing side of what

22   kind of business?

23   A.  It was a pharmacy business.  I'm sorry.  So, pharmacy

24   business, yes.

25   Q.  Okay.  And what was the name of the business?

1    A.  Unigen Pharmaceuticals.  U-N-I-G-E-N, Unigen

2    Pharmaceuticals.

3    Q.  How long did you work in that capacity at Unigen

4    Pharmaceuticals?

5    A.  For three years almost, yes.

6    Q.  All right.  So that took you from 1997 until 2000?

7    A.  2000, yes.

8    Q.  What did you do in 2000?

9    A.  In 2000 side-by-side I was working and I was equivalizing

10   my degree as a pharmacist for a pharmacy licensing.  And I

11   passed all exams and everything in 2000, 2001.

12   Q.  Okay.  You said you were equivalizing your degree?

13   A.  Yes.  If you come from outside of the country, here you can

14   equivalize your degree in terms to get a license as a

15   pharmacist.  After then after that, there are stipulated exams,

16   you have to pass them.

17   Q.  Okay.  In 2000 you said you began to equivalize your degree

18   and take these exams?

19   A.  Yes.

20   Q.  All right.  What happened after you finished these exams?

21   A.  After I finished the exams, I became a pharmacist in 2001.

22   Q.  All right.  And were you hired to work at a particular

23   location?

24   A.  Yeah.  I was hired by Rite-Aid Pharmacy where I was doing

25   my internship.

1    Q.  All right.  And this Rite-Aid Pharmacy, where was it

2    located?

3    A.  That's in Baltimore, Maryland.

4    Q.  How long were you a pharmacist with Rite-Aid in Baltimore,

5    Maryland?

6    A.  I worked for Rite-Aid from 2001 to 2003 -- two years in

7    Baltimore, Maryland.

8    Q.  Okay.  And what happened in 2003?

9    A.  In 2003 I came down here, transferred myself from Rite-Aid

10   to Rite-Aid in 2003.

11   Q.  I'm sorry.  You said you transferred yourself from Rite-Aid

12   to Rite-Aid in 2003?

13   A.  Yes.  Because I was working for Rite-Aid, and I transferred

14   from one Rite-Aid to another Rite-Aid, one state to another

15   state.

16   Q.  All right.  And what state did you come to?

17   A.  From Maryland to Michigan, this state.

18   Q.  Okay.  Why did you come to Michigan in 2003?

19   A.  Actually there was more pharmacists living in Michigan, and

20   I didn't have anybody from my family's side, but my wife has --

21   my wife's sister, she was living in Ohio, and my wife's

22   brother, they were living in Indiana.  So it was a little bit

23   near this state.  So, that was the reason.

24   Q.  Okay.  So, you came to Michigan in 2003 to work as a

25   pharmacist for Rite-Aid.

1        Where in Michigan did you go?

2   A.  In Flint, Michigan.

3   Q.  And how long were you a pharmacist for Rite-Aid in Flint,

4   Michigan?

5   A.  I worked since 2003 to 2010.

6   Q.  In the period from 2003 to 2010, did anything change with

7   respect to your visa status?

8   A.  Yes.

9        I was on an H1 visa with the Rite-Aid Pharmacy, and

10  then my wife was -- she got the citizenship over here.  And

11  then I applied on her basis, and then I got the green card and

12  then I got the citizenship in 2009.

13  Q.  In 2009 you became a citizen of this country?

14  A.  Yes.

15  Q.  Okay.  You indicated you stopped working with Rite-Aid in

16  2010; is that right?

17  A.  Yes.

18  Q.  What led to that change?

19  A.  Because I have -- my daughter, she is so young and I needed

20  more hours towards family.  And my long weekend and hours with

21  the Rite-Aid, I needed more time with family.

22  Q.  And what hours were you working with Rite-Aid in, say, 2009

23  before you decided to make the switch?

24  A.  From 2009 and 2010 until I left, I was working nine a.m. to

25  nine p.m., nine to nine.  It was like 12 hours.

1    Q.   Okay.   What did you do in terms of looking for a job with

2    more regular hours?

3    A.   Actually I was looking for a job, and I inquired with a

4    couple of pharmacies and like with local or community friends

5    who were in this line.   So, I was asking if somebody has that.

6    Q.   All right.   Was one of the people you inquired of a

7    gentleman by the name of Mehul Patel?

8    A.   Yes.   He was living in the same community.

9    Q.   Did you know who Mehul Patel worked for?

10   A.   Mehul Patel at that time worked for Babubhai Patel.

11   Q.   All right.   You inquired of Mehul Patel -- you explained to

12   Mehul Patel your issue with the hours at Rite-Aid.   Is that

13   correct?

14   A.   Yes.

15        Actually we were working -- excuse me.   We were

16   together in like community programs.   And so I asked him that

17   I'm looking for a change, a job with better hours so I can be

18   with my family.   And he said, yeah, yeah, I'm working for

19   Babubhai Patel, and I will ask him if something comes.   He has

20   so many pharmacies, and if something comes up, I will let you

21   know.

22   Q.   Did you, in fact, hear from Mehul Patel about his inquiry

23   with Bob Patel?

24   A.   Yes.

25   Q.   All right.   What did Mehul Patel tell you?

1    A.  Mehul Patel told me that I already talked to Bob Patel, and

2    if needs you, he will ask you to come down and you will take an

3    interview.

4    Q.  Did you, in fact, eventually hear from Mehul Patel about a

5    possibility of a job opening with Bob Patel?

6    A.  Yes.

7    Q.  All right.  And approximately when was that?

8    A.  That was in the last week of February in 2010.

9    Q.  All right.  And what specifically did you hear?

10   A.  Initially he told me that he already opened a pharmacy in

11   Saginaw and he did need a pharmacist over there.

12   Q.  All right.  When you say "he," who are you referring to?

13   A.  Babubhai Patel.

14   Q.  Did you speak with him on the phone?

15   A.  Yes.  I talked to him on the phone, and he said we're going

16   to meet, yes.

17   Q.  All right.  You did, in fact meet, Bob Patel, I take it?

18   A.  Yes.

19   Q.  All right.  And what did you do the first time you met him?

20   A.  That was the very first time in my life I just met Bob

21   Patel.  On the same day he drove me with Mehul to the pharmacy.

22   Q.  Okay.  And, again, where was the pharmacy located?

23   A.  The pharmacy was located in Saginaw, Michigan.

24   Q.  Was the pharmacy open when you arrived up in Saginaw on

25   that first day?

1    A.   No.   It was in the evening.   So, the pharmacy was closed.

2    Q.   All right.   Can you describe for the jury what the

3    conversation was in the car on the way up, and when you got

4    there?

5    A.   Yes.   Going, there was a normal -- like he was inquiring

6    where did I work, how much experience I have, those kinds of

7    things.   It was like a regular interview -- not an interview,

8    but a regular inquiry kind of thing; where did I work, how much

9    experience did I have.

10   Q.   All right.   On the way back after seeing the pharmacy, can

11   you describe what the conversation was then, on the way back to

12   Flint, after seeing the pharmacy in Saginaw?

13   A.   Yeah.   After seeing the pharmacy, he said that you're going

14   to start by this Monday, coming Monday.   I'm going to arrange

15   for the key, and then you can start as a pharmacist.

16   Q.   Did you discuss, you know, salary?

17   A.   Yes, sir.

18   Q.   And what was that discussion?

19   A.   He told me that initially I'm going to give you like $45

20   for an hour for up to six months and then he can increase the

21   rate for more.

22   Q.   All right.   Was there any talk about benefits he was going

23   to provide you?

24   A.   He said initially he wouldn't give any benefits, but only

25   since I was driving from Flint, he said he's going to give me

1    drive hours -- I mean drive miles.

2    Q.   Okay.  All right.  Let me ask you this.  You said Babubhai

3    Patel offered you $45 an hour.  Isn't that correct?

4    A.   Yes.

5    Q.   What were you making as a pharmacist at Rite-Aid at that

6    time?

7    A.   At that time I was making like $53.

8    Q.   All right.  What hours was Bob Patel offering to you?

9    A.   It was from nine to five.

10   Q.   Let me ask you this.  The pharmacy up in Saginaw that Bob

11   Patel showed you --

12   A.   Yes.

13   Q.   -- what was it called?

14   A.   Tri-City Pharmacy.

15   Q.   All right.  Let's walk through your first day as a

16   pharmacist at Tri-City Pharmacy.

17           You drove up there from Flint, I take it?

18   A.   Yes, sir.

19   Q.   And what happened when you arrived?

20   A.   I arrived about nine o'clock over there, and I see the -- I

21   did not have a key and he said he was going to arrange one.

22           So, Ronak Patel, who is a technician over there, he

23   came with the key and he opened up the pharmacy.  I was just

24   looking around the pharmacy.  And then I saw the -- he said

25   he's going to come back -- I mean, Babubhai Patel was to come.

1    Q.  Well, let me stop you there.  A couple things:  One, you

2    said that the person who met you up there was someone named

3    Ronak Patel?

4    A.  Yes.

5    Q.  Can you spell that for the benefit of the court reporter?

6    A.  R-O-N-A-K, Ronak is the first name; last name Patel,

7    P-A-T-E-L.

8    Q.  And what was Ronak Patel's job?

9    A.  He was working as a technician; that's what he told me,

10   yes.

11   Q.  All right.  And you said something about he was going to

12   meet me up there?  What was the "he"?

13   A.  Bob Patel told me when we were driving back, said I'm going

14   to be there not by nine o'clock, but a couple hours here and

15   there, because he was driving from, leaving from Detroit.

16   Q.  All right.  Did Bob Patel actually come up and meet you at

17   the pharmacy in Saginaw on that first day?

18   A.  Yes, sir.

19   Q.  All right.  And approximately how long was he there with

20   you?

21   A.  Just for a few minutes.

22   Q.  All right.  And do you recall what he discussed with you on

23   that occasion?

24   A.  He discussed that like this is the pharmacy, and the area

25   surrounding doctors, they are going to send the prescriptions.

1    And he said if there are any questions or anything, just let me

2    or my brother know.

3    Q.  All right.  And you say he mentioned "let me and my brother

4    know."

5            Had you met Bob Patel's brother at that point?

6    A.  No, sir.

7    Q.  Did he tell you what his brother's name was?

8    A.  He said, yes.

9    Q.  What was his name?

10   A.  Vinod Patel.

11   Q.  Did Bob Patel describe anything about what role Vinod Patel

12   had in the pharmacy at that time?

13   A.  He said that he's going to take care of all the business

14   from Flint and up, like up north or wherever up from Flint.

15   That's what he was saying.

16   Q.  Babubhai Patel said who was going to take care of that

17   business?

18   A.  Vinod Patel, yeah.

19   Q.  Did Bob Patel give you Vinod Patel's phone number on that

20   occasion?

21   A.  Yes.  That was already with Ronak Patel, in the pharmacy it

22   was written.

23   Q.  All right.  Did you meet Vinod on that day?

24   A.  No, sir.

25   Q.  All right.  Did you meet Vinod subsequent to that day?

1    A.   Yes.

2    Q.   Approximately when did you meet Vinod Patel for the first

3    time?

4    A.   In actually a couple of days.  A couple of days.

5    Q.   All right.  And the first time you met Vinod Patel, can you

6    describe what interaction you had, if any?

7    A.   No, he just -- he just came usually in the pharmacy and

8    introduced himself to me as Vinod Patel, and I introduced

9    myself, and then there was like a normal two minutes talk.

10   Q.   All right.  Within the first several weeks you were at the

11   pharmacy, did you have someone who trained you on the pharmacy

12   systems?

13   A.   Actually Ronak was knowing a little bit for the computer,

14   and then they arranged somebody, whose name was Ketan Patel, to

15   like --

16            *(Interjection by court reporter.)*

17   A.   Ketan, K-E-T-A-N.  Ketan Patel.

18   Q.   And you said "they arranged."  Who is "they"?

19   A.   This is Babubhai Patel and Vinod Patel.

20   Q.   And who is Ketan Patel?

21   A.   Ketan Patel, I don't remember who is he, but he came to

22   just train me.  He was a technician.  He was not a pharmacist.

23   Q.   All right.  In your first period at Tri-City, did you have

24   an opportunity to see the sources of prescriptions that were

25   coming into the pharmacy?

1    A.  Yes.

2            The very first day I was working there, I got like a

3    couple of prescriptions from surrounding, and then subsequently

4    I got the faxes coming out from Flint, but I don't know who the

5    doctor was.

6    Q.  You said you got faxes coming from Flint?

7    A.  Yes, sir.

8    Q.  And was there a particular doctor that was sending you

9    these faxes from Flint?

10   A.  Yes.  His name was James Burdette.

11   Q.  All right.  And were the prescriptions that you received --

12   I take it you received these --

13           Well, how often did you receive these prescriptions

14   from Burdette in the first several weeks you were working

15   there?

16   A.  Once or twice in a week.

17   Q.  Okay.  And were the prescriptions that you were receiving

18   from Dr. Burdette similar to prescriptions that you had seen

19   during your years at Rite-Aid?

20   A.  No, sir.  It was totally different, totally.

21   Q.  What was different about Dr. Burdette's prescriptions?

22   A.  Actually Dr. Burdette, he was faxing me like rough

23   paperwork with him and his patient diagnosis and the blood

24   pressure, whatever, the description, if the patient had a

25   problem.  And on the same paper he was faxing me for the

1    prescription, whatever he told to the patient.

2    Q.  All right.  Was there anything about the prescriptions that

3    struck you as improper about the form of the prescriptions?

4    A.  There was not a prescription actually.  If you see the

5    prescriptions, you see you have a certain format.  That format

6    was not matching with that format, what I was getting.

7    Q.  All right.  You say the format prescriptions should have.

8    What are you referring to?

9    A.  Format prescriptions would have a list written like the

10   date of the prescription, the doctor's signature, who the

11   doctor is -- that is, his degree, NPI.  Sometimes the doctor

12   don't write the DEA.  If there is a controlled prescription,

13   there is a DEA number, they have to write it down.

14   Q.  All right.  Were any of these indicators present on the

15   documents that were being faxed to you from Flint?

16   A.  No, sir.

17   Q.  All right.  Did you notice anything about the kinds of

18   medications that were being prescribed to each and every

19   patient from Dr. Burdette?

20   A.  Dr. Burdette, I seen the prescriptions were sent with

21   noncontrolled and controlled both on the same paper.

22   Q.  All right.  Let me ask you this.  In your observation of

23   these prescriptions, did every patient receive a controlled

24   substance?

25   A.  Yes.  Every -- each and every prescription I saw, there was

1    Vicodin ES, there was Xanax, and then every other prescription,

2    I would say, there was like Phrenilin with codeine liquid.

3    Q.  And did these prescriptions or these documents you were

4    receiving from Flint also contain noncontrolled medications?

5    A.  Yes.

6    Q.  And was there kind of a pattern to these -- let me ask you

7    this.  Was there any pattern to the noncontrolled medications

8    you were receiving?

9    A.  Yes.  I seen the pattern like in almost all prescriptions

10   they had generic and brand names, but the generic one is

11   different like blood pressure medication, but the brand name

12   was almost same name for every patient.

13   Q.  All right.  And what were some of the brand name

14   medications?

15   A.  Voltaren XR tablet, Voltaren gel, and then the pump, which

16   is called the Ventolin inhaler and the ProAir inhaler, like

17   those kind of brand names.

18   Q.  Mr. Pandya, I'm going to show you what has been marked as

19   Government Exhibit 13A and 13B.  There are a number of

20   documents in each of these folders.

21   A.  Okay.

22   Q.  But if you could take a moment and just review them fairly

23   quickly and let me know when you've had an opportunity to

24   review them and are prepared to talk about them briefly.

25   A.  Okay.  Sure.

1    Q.  Thank you.

2            *(Brief pause.)*

3    A.  Yeah, these are the prescriptions I was getting by fax.

4    Okay.  He was sending these --

5    Q.  All right.  Why don't you do this, because I would like

6    move the entire exhibit in at once.  If you can take a look at

7    just all the documents fairly quickly, and let me know after

8    you've had a chance to look at them, I'm going to ask you a

9    couple questions about them.

10   A.  Sure.

11           *(Brief pause.)*

12   Q.  Mr. Pandya, do you recognize these documents that I've just

13   shown you?

14   A.  Yes.

15   Q.  What are they?

16   A.  Those are the prescriptions.

17   Q.  Prescriptions from whom?

18   A.  From Dr. Burdette.

19   Q.  All right.  Are there stickers on these prescriptions?

20   A.  Yes.

21   Q.  All right.  Do these stickers have any initials contained

22   on them?

23   A.  Yes.  That's my initials.

24   Q.  Did you handle each and every prescription that I've shown

25   you in Government Exhibits 13A and 13B --

1    A.  Yes.

2    Q.  -- during your time at Tri-City Pharmacy?

3    A.  Yes.

4            MR. NEAL:  Your Honor, at this time, the United

5    States would move into evidence Government Exhibits 13A and

6    13B.

7            MR. BEUKE:  No objections, Judge.

8            THE COURT:  They are received.

9            *(Government Exhibits 13A and 13B were admitted into*

10           *evidence.)*

11   BY MR. NEAL:

12   Q.  Mr. Pandya, I'm going to show you a portion of what has

13   been admitted as Government Exhibit 13A.

14           Do you recognize this kind of document, Mr. Pandya?

15   A.  Yes.  That's the initial document that he used to fax me.

16   Q.  All right.  This was a fax received from Flint?

17   A.  Yes, sir.

18   Q.  All right.  And this is a prescription written by

19   Dr. Burdette?

20   A.  Dr. Burdette.

21   Q.  All right.  And what was it about this kind of document,

22   again, that was different than what you had seen before?

23   A.  Right.

24           Actually the prescription, if you'll see, there's

25   three different -- like first there's major diagnosis and

1   findings.  That's actually the doctor-patient conversation and

2   what the patient had.

3          This whole paper is like between the doctor and the

4   patient.  It's not for the pharmacist and doctor.  The format

5   of the pharmacy prescription is different.

6   Q.  Is there a DEA number anywhere on here?

7   A.  It should be, but it is not there.  Because if you will see

8   the last prescription was soma and -- the last one was Lortab.

9   The Lortab is a controlled medication and has to have a DEA

10  number on the top.

11  Q.  Let me show you, if I could, another portion of that same

12  exhibit, Government Exhibit 13A.

13          What are we looking at here, Mr. Pandya?

14  A.  That was a prescription, it says Vicodin ES, 750 milligram.

15  This is to be given twice daily, and then soma, Xanax, and

16  Voltaren XR and Voltaren gel, like those things.

17  Q.  This is also a prescription faxed to you by Dr. Burdette?

18  A.  Yes.

19  Q.  The format on this one, is it also problematic?

20  A.  Yes.  This is what we were getting and this is not

21  acceptable for a medicine prescription.

22  Q.  After you saw this kind of prescription during your first

23  several weeks at Tri-City Apothecary, did you express any

24  concerns about those prescriptions to anyone?

25  A.  Yes.  I called Babubhai Patel and I asked him why are we

1   getting these prescriptions, and I explained things, my

2   concern.

3   Q.   Okay.   You called Babubhai Patel?

4   A.   Yes.

5   Q.   What did you say to Babubhai Patel?

6   A.   I told him that the prescriptions by fax that we are

7   getting is from somewhere in Flint.   I don't know who is the

8   doctor, and he's sending me them in an improper format.

9   Q.   What, if anything, did Bob Patel say to you about this?

10   A.   He said that's okay.   I'm going to tell Vinod Patel, and he

11   will call and he will take care of that.

12   Q.   Did you receive a phone call from Vinod Patel about this

13   topic?

14   A.   Yes, sir.

15   Q.   And let's walk through that phone call.

16            Vinod Patel called you?

17   A.   Yes, sir.

18   Q.   And what, if anything, did he say?

19   A.   He said what exactly do I need?   And I explained to him

20   whatever my concern was, this is not the right format, and

21   explaining the same thing.   I said I cannot fill the

22   prescription --

23   Q.   You explained your concerns?

24   A.   Yes.

25   Q.   What, if anything, did Vinod Patel say in response?

1    A.  In response, he was so much angry on that one.  He said I

2    did not have any question or any problem with this kind of

3    prescription you're getting from any of my pharmacies.  And you

4    are the only pharmacist -- if you get a prescription from

5    anywhere else, I mean why are you comparing them.  And I was

6    asking him to, like I would need to see the doctor.

7    Q.  All right.  What, if anything, did Vinod Patel say about

8    Dr. Burdette in this conversation?

9    A.  That's why I was asking him, like I need to see who the

10   doctor is that is writing because of the format and because the

11   prescription was coming by fax only.  And he said do not worry

12   about that.  Dr. Burdette is our doctor and he's a good doctor.

13   He has a good relationship with -- they have some adult care in

14   Flint.

15   Q.  They have some what now in Flint?

16   A.  Adult care.

17   Q.  Adult care?

18   A.  Named New Century or First Century or I'm not exactly sure

19   of the Century name.  That is stuck to my mind right now.

20   Q.  Okay.  How did this conversation end, this first

21   conversation with Vinod Patel?

22   A.  He was angry with me and he was like upset with me.  He did

23   not like to go and talk about the pharmacy prescriptions.  And

24   he hung up the phone.

25   Q.  All right.  What did you do after Vinod Patel hung up the

1    phone on you?

2    A.   And then like, again, I called Babubhai and asked him, like

3    this was -- I talked to your brother and this is what happened.

4    And he said okay, I'm going to talk to him.  If you want to see

5    the doctor, I'm going to talk to him to arrange a meeting with

6    the doctor.

7    Q.   Okay.  Did Vinod Patel ever call you back about that topic?

8    A.   No.

9    Q.   Okay.  What was the next thing that happened about the

10   topic of you actually going and seeing Dr. Burdette?

11   A.   Yeah.  Then Vinod Patel talked to Ronak Patel, that we can

12   go -- me and Ronak Patel can go, because I did not know where

13   the location was.  And then he said, okay, you can go and meet

14   the doctor.

15   Q.   All right.

16   A.   And so it's okay.

17   Q.   Did you, in fact, go and meet the doctor, Dr. Burdette?

18   A.   Yes.

19   Q.   What, if anything, did you explain to him about

20   prescriptions?

21   A.   Actually I explained the same thing to the doctor.  I said

22   you are the doctor and this is not the write format for the

23   prescription.  The prescription should say Rx on the top and

24   the date and the name of the patient and date of birth, and it

25   should be like in a regular fashion for the prescriptions.

1   Q.  And what did Dr. Burdette say in response to this?

2   A.  And Dr. Burdette says he will, you know, clarify

3   everything.  He will change and give the format I need and he's

4   going to take care of that one.

5   Q.  All right.  After this meeting with Dr. Burdette, did you

6   come to notice anything unusual at Tri-City Pharmacy about how

7   prescriptions or medications with Dr. Burdette were being

8   dispensed?

9   A.  Yeah.  I mean Dr. Burdette was -- as I say, like he would

10  send me each and every prescription with a controlled, Vicodin,

11  Vicodin ES and Xanax and those things with noncontrolled

12  medications.

13  Q.  All right.  And after these prescriptions would come into

14  your pharmacy --

15  A.  Right.

16  Q.  -- what would you and the technician do with the actual

17  physical medications?

18  A.  Yeah.  The physical medications, the technician will bill

19  to the insurance company, and then I check the prescription,

20  and then we were sending the prescription to the First Century

21  or Century Day Care.

22  Q.  All right.  Delivering the medications --

23  A.  Yeah, delivering the prescriptions.  It was from Flint.

24  Q.  Did you start to notice at some point any medications

25  returning from Flint?

1   A.  Yeah.  I mean there was a day when I went in the morning

2   and I see like a couple of prescription bags that were sitting

3   down there, even though we sent it by delivery.  I asked him

4   why these bags are here.  And he said this came back because

5   the patients were not there.  I said, okay, if the patients are

6   not there, then we have to put them back into the stock.

7   Q.  Okay.  And what, if anything, did you suggest doing about

8   the billing for medications for patients who were not there?

9   A.  Yeah.  Billing -- the billing part, like if you -- I said

10  if you don't get the patient to pick up the prescription, you

11  have to put it back, by reversing the claims, whatever the

12  insurance paid.

13  Q.  And what does reversing the claim mean?

14  A.  Reversing the claim means like whatever the insurance pays

15  money for that particular medicine for particular patients, we

16  have to put it back through the computer online, and then we

17  can put the medication back in the stock.

18  Q.  This conversation that you are describing is with Ronak

19  Patel?

20  A.  With Ronak Patel, yes.

21  Q.  All right.  What did Ronak Patel say when you told him --

22  A.  Ronak Patel said this is not what we're doing here.  We

23  don't take the medications billing out.

24  Q.  And what, if anything, did you say in response to that?

25  A.  And I said, okay, then I have to talk to Bob Patel.

```
 1              I did not explain anything to him.  I said this is
 2    not the way we should ...
 3    Q.  All right.  Did you, in fact, have a conversation with Bob
 4    Patel about this?
 5    A.  Yes, sir.
 6    Q.  And what, if anything, did Bob Patel say?
 7    A.  I explained to Bob and said this is what is happening here
 8    and would you be able to like talk with these people and what
 9    I'm saying, they will be able to reverse the claim.  And this
10    is not working -- this is not the way we are working here in
11    the pharmacy.  So, I'm concerned.
12              And Bob said, okay, I'm going to talk to Vinod Patel.
13    Q.  Okay.  Did you receive a phone call from Vinod Patel after
14    talking to Bob?
15    A.  Yes.  I left the pharmacy that day.  And then he called me
16    on my cell phone when I was at the gas station, yes.
17    Q.  All right.  Let's describe that conversation for the jury.
18    You answered the phone.
19              And what did Vinod Patel say, if anything?
20    A.  Vinod Patel, he asked me like what is it now that you have
21    a problem.  I said because we are not getting -- we are not
22    putting back the prescriptions --
23              (Microphone shuts off.)
24              THE COURT:  If you are too close to it, you get that.
25    A.  Sorry.
```

1          THE COURT:  Go on.

2    A.  I said we don't -- we are not putting back the

3    prescriptions by reversing the claim.  And he said what do you

4    mean by reversing the claim.  We are not doing anything in our

5    pharmacies like that.  I have so many pharmacists working with

6    me like that and if you'll just do your job.  Uhm, I'm going to

7    hit you or beat you, and he was totally abusing me and that's

8    what he was saying ...

9    Q.  Let's break that down a little bit.

10          You said Vinod Patel called you and you said you

11    expressed your concern to him?

12    A.  Yes.

13    Q.  All right.  And explain again slowly what it was Vinod

14    Patel said in response?

15    A.  Vinod Patel says we are not putting those medications back

16    with reversing the claim.  This is how we are working.  And we

17    are all pharmacists.  You are not the only pharmacist working

18    for me.  There are so many other pharmacies I am handling, and

19    they are doing the same thing what I am telling them to do.

20    Q.  All right.  And then after you said this -- after he said

21    this, what happened?  Did you speak or did he continue

22    speaking?

23    A.  Yeah, he continued speaking.

24          And I talked to him.  He said this is not the way we

25    are working.  And then he was abusing me and said just do your

1    job, do what I'm telling you to do.  And he's telling me to

2    beat me or hit me.

3              Even on the top there, he said like I have

4    connections.  I'm from India and so I have connections back in

5    India.  And my family is still living there, and he threatened

6    those people also.

7    Q.  Do you have family still living in India?

8    A.  Yes, sir.

9    Q.  Did you have family living in India at that time?

10   A.  Yes, sir.

11   Q.  Were you genuinely concerned when Vinod Patel threatened

12   your family?

13   A.  Definitely, yes.

14   Q.  How did this call end?

15   A.  Then he -- he was abusing me and then he hung up the phone.

16   Q.  All right.  What did you do after receiving this call from

17   Vinod Patel?

18   A.  Then immediately I called Bob Patel and said this is what

19   happened.  Like you told me to talk to him, and he called me.

20   He abused me -- I mean abusing me.  And then he -- we said the

21   same thing, like what I explained to you.  I mean you want me

22   to explain again, I can do it.  But Bob Patel said, okay, I'm

23   going to talk to Vinod Patel, and then he hung up the phone and

24   he said okay.

25   Q.  Did you receive a call back from Vinod Patel?

1    A.  Not the same day, sir.

2    Q.  All right.  But did you eventually receive a call back from

3    Vinod Patel?

4    A.  Yes.  The next day he called me, yes.

5    Q.  What, if anything, did he say in the second call?

6    A.  He came back to the normal, and he said I'm sorry, I

7    apologize for what I said to you.

8    Q.  All right.  Did you discuss the substance of what you

9    discussed before, though, about billing and not dispensing

10   medications?

11   A.  Not at that time.

12   Q.  Did you ultimately have another conversation with Vinod

13   Patel about that?

14   A.  No, sir.

15   Q.  All right.  What did you decide to do about the medication

16   in terms of reversing claims after this discussion with Vinod

17   Patel?

18   A.  From that moment, I came to know the scheme, what they were

19   exactly doing.  And then I myself also unfortunately, I was

20   doing the same they were doing.

21   Q.  You began to participate in the scheme?

22   A.  Yes, sir.

23   Q.  And you began to bill and not dispense for medications --

24   A.  Yes, sir.

25   Q.  -- coming from Dr. Burdette?

1   A.  Yes, sir.

2           MR. NEAL:  Your Honor, I notice you said something

3   about stopping at 12:30?

4           THE COURT:  All right.  All rise for the jury.  Go

5   home.  Tomorrow the same time.

6           Thank you.  And thank you for not talking about it

7   with anybody or doing your own research.

8               *(Jury leaves the courtroom at 12:35 p.m.)*

9           THE COURT:  Anything anyone wants to put on the

10  record?

11          You may step down.

12          MR. NEAL:  Your Honor, we do have a matter.  We can

13  excuse the witness.

14          THE COURT:  Yes.  Go on.  You can go home now.

15  A.  Oh.  Thank you.

16          THE COURT:  How long is this going to be?

17          MR. NEAL:  Five minutes.

18          CASE MANAGER LANG:  Can't let the jurors leave until

19  the Defendant leaves.

20          THE COURT:  Okay.

21          MR. NEAL:  Okay.

22          MR. BEUKE:  Judge, just --

23          THE COURT:  Go on.

24          MR. BEUKE:  I've been speaking with John, and -- over

25  the last several days, and I've had a conversation with

1    Mr. Patel.  I've explained to him about the procedures involved

2    and what we would be agreeing to in terms of a stipulation as

3    to the foundational purposes for the documents that the

4    Government is seeking to introduce.

5              I think we are prepared to stipulate.  So, they don't

6    have to call in six people from Baltimore.

7              THE COURT:  Great.

8              MR. BEUKE:  But we would, Judge, maintain our

9    objections to whether or not they have any relevance as to the

10   charges against Mr. Patel.

11             THE COURT:  You've just done that.

12             MR. NEAL:  And that's acceptable to the Government.

13             THE COURT:  Okay.  That's it?

14             MR. NEAL:  That's it.

15             THE COURT:  All right.  I would love it if you could

16   stipulate on some of the other things and move a little faster.

17             I certainly don't want to limit cross-examination,

18   but I think the rule is limited to asking the question once,

19   maybe twice.  So, if we can just go by the rules.

20             And we're done.  Thank you.

21             MR. NEAL:  Thank you, Judge.

22             *(Proceedings adjourned at 12:38 p.m.)*

23                       —    —    —

24

25

STATE OF MICHIGAN )
                  ) ss.
COUNTY OF WAYNE   )


I, Denise A. Mosby, Federal Official Court Reporter, do
certify that the foregoing is a correct transcript from the
record of proceedings in the above matter.


                        s/ Denise A. Mosby
                        _____
                        DENISE A. MOSBY, CSR, RMR, CRR
                        United States Court Reporter
                        124 Theodore Levin U.S. Courthouse
                        231 W. Lafayette Boulevard
                        Detroit, MI 48226
                        313.961.6230
                        Denise_Mosby@mied.uscourts.gov

Dated:   September 9, 2014