UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                                    Case No. 11-cr-20468

             Plaintiff,          Hon. Arthur Tarnow

    vs.

D-36 VINOD PATEL,

            Defendant.
_____/

## DAY 5

## TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE ARTHUR J. TARNOW
UNITED STATES DISTRICT COURT SENIOR JUDGE
Detroit, Michigan
Wednesday, July 16, 2014


APPEARANCES:

For Government:        JOHN K. NEAL, ESQ.
                       WAYNE F. PRATT, ESQ.
                       U.S. Attorney's Office
                       211 W. Fort Street, Ste 2001
                       Detroit, Michigan 48226

For Defendant:         RICHARD M. BEUKE, ESQ.
                       53 W. Jackson, Suite 1410
                       Chicago, Illinois 60604

                       TIMOTHY M. BLACK, ESQ.
                       713 West Devon Avenue
                       Park Ridge, Illinois 60068



                        *     *     *
OFFICIAL COURT REPORTER:
Denise A. Mosby, CSR, RMR, CRR
313) 961-6230     www.transcriptorders.com

# I  N  D  E  X

**WITNESS:**                                              **PAGE**

**PRADEEP PANDYA**
    Continued Direct-Examination by Mr. Neal      6
    Cross-Examination by Mr. Beuke                26
    Redirect-Examination by Mr. Neal              84
    Recross-Examination by Mr. Beuke              87
    Jury Questions                                91

**JEFFREY WADE**
    Direct-Examination by Mr. Pratt               92
    Cross-Examination by Mr. Beuke               103
    Redirect-Examination by Mr. Pratt            117
    Recross-Examination by Mr. Beuke             118

**HIREN PATEL**
    Direct-Examination by Mr. Pratt              122
    Cross-Examination by Mr. Beuke               160

# E X H I B I T S

| EXHIBIT NO. | IDENTIFICATION | PAGE |
|---|---|---|
| **Government** | | |
| 3A | 2/13/11 phone call | 20 |
| 6D | First Mich. referral chart, pg 9-12 | 97 |
| 14A | Burdette controlled prescriptions | 136 |
| 14B | Burdette noncontrolled prescriptions | 136 |
| 15 | Pandya Plea Agreement | 86 |
| | | |
| **Defendant** | | |
| 8 | Pandya Plea Agreement | N/A |
| 9 | Pandya Cooperation Agreement | 91 |

```
 1                        Detroit, Michigan

 2                   Wednesday, July 16, 2014

 3                        8:39 a.m.

 4                     -     -     -

 5           (Jury not present.)

 6           THE COURT:  Good morning.

 7           MR. NEAL:  Good morning, Judge.

 8           MR. BEUKE:  Good morning.

 9           MR. BLACK:  Good morning.

10           THE COURT:  Quick question, and then we'll bring in

11      the jury.

12           Are we still on schedule to finish tomorrow?

13           MR. NEAL:  Judge, I think we've got a very realistic

14      shot of the Government finishing Thursday.  It might drag out

15      into Friday morning.

16           THE COURT:  Well, if you need more time Thursday

17      afternoon, an hour or so, we can give it to you.

18           MR. NEAL:  I think that may be --

19           THE COURT:  I really shouldn't have said that to you,

20      because now you'll take that time.

21           But bring in the jury.

22           MR. NEAL:  Judge, there is actually one thing I want

23      to bring to your attention before we bring in the jury.

24           Assuming we finish on Thursday, I assume the Defense

25      case will be on Friday?
```

1              MR. BEUKE:  Correct.

2              MR. NEAL:  We do not have a witness list from the

3     Defense at this point.  And I think we need a little bit of

4     time to at least look over the witnesses they plan to call and

5     conduct an investigation.

6              THE COURT:  Oh, you will have all day tomorrow to

7     look over it.

8              You will get him a list by the end of the day today.

9              MR. BEUKE:  Oh, I think we will, Judge.

10             MR. NEAL:  Very well.

11             THE COURT:  All right?

12             MR. PRATT:  I might need the Court's assistance.  I

13    have court Thursday afternoon, but ...

14             THE COURT:  I know you have court Thursday afternoon.

15    It's right here.

16             Who is the judge?

17             MR. PRATT:  Judge Cleland, Your Honor.

18             THE COURT:  Well, he's pretty flexible.

19             MR. PRATT:  I'm sure we'll work it out.

20             THE COURT:  No.  It will give you one more incentive

21    to finish by lunch Thursday.  Then we won't have to worry about

22    it.

23             All rise for the jury, please.

24             *(Jury enters the courtroom at 8:42 a.m.)*

25             CASE MANAGER LANG:  Court is in session.  You may be

```
1    seated.
2              THE COURT:  Good morning.  Everyone is here.
3              Thank you.
4              You may resume your seat.  And remember you are under
5    oath.
6    A.  Yes.
7              THE COURT:  You may continue.
8              MR. NEAL:  Thank you, Judge.
9              PRADEEP PANDYA, WITNESS, PREVIOUSLY SWORN.
10                  CONTINUED DIRECT-EXAMINATION
11   BY MR. NEAL:
12   Q.  Mr. Pandya, when we broke for the day yesterday --
13   A.  Yes.
14   Q.  -- we had talked about a billing and not dispensing
15   scheme --
16   A.  Yes.
17   Q.  -- that you participated in at Tri-City Apothecary.  Is
18   that correct?
19   A.  Yes.
20   Q.  All right.  And remind us, who directed you to engage in
21   that scheme?
22   A.  Vinod.
23   Q.  After you had this conversation with Vinod, you did engage
24   in such a scheme.  Isn't that correct?
25   A.  Yes.
```

1  Q.  All right.  With respect to prescriptions that came in from

2  Dr. Burdette --

3  A.  Yes.

4  Q.  -- was there a particular pattern to which medications

5  would be dispensed and which medications would be billed but

6  not dispensed?

7  A.  Yes.  All prescriptions, whatever we were getting, were a

8  mixed basket kind of thing, but all of the prescriptions had

9  controlled, definitely controlled in that with brand names with

10  that one, and generic which is also like less expensive.

11  Q.  All right.  You were receiving all these prescriptions from

12  Dr. Burdette?

13  A.  Yes.

14  Q.  Which ones would be billed and not dispensed and which ones

15  would be billed and dispensed?

16  A.  Billed and dispensed was only controlled medication, like

17  Xanax, Vicodin ES, Promethazine with codeine; and billed and

18  not dispensed was brand names which was like Voltaren XR,

19  Voltaren gel, Lidoderm patch and inhalers.  Those were ProAir

20  and Ventolin and those kind of inhalers, Semicort.

21  Q.  Was there a reason why those medications were billed and

22  not dispensed, whereas others were dispensed?

23  A.  Because those are expensive medications and I mean the

24  patients actually do not need those things.

25  Q.  All right.  Let me show you a couple of portions of what

1    you identified yesterday as Government Exhibits 13A and 13B, if

2    you could take a quick look at these sets of prescriptions.

3    A.  Yes.

4    Q.  If you could flip through them just so you can see all of

5    the medications, I'm going to ask you a few questions about

6    these documents.

7            *(Brief pause.)*

8    A.  Yes.

9    Q.  Mr. Pandya, are the three sets of prescriptions that I just

10   showed you typical of the prescriptions that came to Tri-City

11   Apothecary from Dr. Burdette's office in Flint?

12   A.  Yes.

13   Q.  All right.  I'd like to show the jury a couple of these.

14           All right.  Mr. Pandya, you see the patient's name

15   here?

16   A.  Yes.

17   Q.  That's Lillie Small?

18   A.  Yes.

19   Q.  What type of medication are we looking at here?

20   A.  That's Vicodin ES, a generic brand.

21   Q.  And that is a controlled drug?

22   A.  That's a controlled medication, yes.

23   Q.  All right.  This medication would be dispensed; is that

24   correct?

25   A.  Yes.

1    Q.  And I notice that there's actually a prescription pad for

2    James Burdette?

3    A.  Yes.

4          After I talked to him, I think he -- he then changed.

5    So after I talked to him to like send me the proper format, so

6    that is what he was sending.

7    Q.  Did he, in fact, begin sending in the proper format?

8    A.  Yes, after he was sending on the same prescription pad,

9    when he was faxing.

10   Q.  I'm going to show you another prescription.  And just so

11   we're clear -- let me see here.

12          These prescriptions were filled and billed on the

13   same date; is that correct?

14   A.  Yes.

15   Q.  That's the 22nd of April, 2010?

16   A.  Correct.

17   Q.  All right.  On this second page we have a couple of

18   medications; Lidoderm patch and another medication?

19   A.  Yes.  Generic, yes.

20   Q.  All right.  What would be the practice of the pharmacy with

21   respect to the billing and dispensing of these medications for

22   Burdette patients?

23   A.  We always dispensed the Norvasc, which is a generic

24   medication which is a cheap medication, but we did not dispense

25   the Lidoderm patch, which is a costly medication.

1    Q.  I see the quantity on the Lidoderm patch is 30?

2    A.  30, yes.

3    Q.  What is a typical reimbursement for 30 on the Lidoderm

4    patch?

5    A.  It was more than $200 per packet.

6    Q.  And then this next page we are looking at, this is the same

7    patient on the same date.  Is that correct?

8    A.  Yes.

9    Q.  Let's walk through these medications.

10   A.  Mm-hmm.

11   Q.  We've got the top medication is what?

12   A.  Spiriva.  That's an inhaler and that's a brand name.

13   Q.  Approximately how much would -- I see the quantity is

14   listed as 30?

15   A.  30, yeah.  That comes in like a pack.  A pack size is 30

16   and it's more than $250 per pack.

17   Q.  And what would the practice have been with respect to this

18   medication coming from Burdette?

19   A.  It was billed and not dispensed.  Those are all brands

20   names over there.

21   Q.  Are there any other medications on this page that would

22   have been billed but not dispensed as a typical practice?

23   A.  No.  Because that is a generic one and generic we used to

24   send.

25   Q.  Then we have one more page for four total pages of

1    prescriptions, a prescription on April 2nd of 2010.

2            Talk to me about the medications on this page?

3    A.  The first one is soma.  That was noncontrolled at that

4    time, but now it is a controlled medication.  But it was really

5    like a controlled medication.  People were using it as kind of

6    a controlled medication like Vicodin ES.

7    Q.  Would soma be dispensed to patients at that time?

8    A.  Yes, definitely.

9    Q.  Are you familiar at this time in 2010, did soma have a

10   street value?

11   A.  Soma definitely had a street value like Vicodin ES.  I

12   don't know how much and I don't know about that.  But

13   definitely, because of the controlled -- I mean the pain

14   medication therapy.

15   Q.  Okay.  How about this Voltaren, one percent gel.  I think

16   you mentioned that a little bit.

17   A.  One percent gel was coming out at 300 gram.  If you see

18   this, it is like three 100 gram packs in one box, and that's

19   like $180 to $200 per box.

20   Q.  And that Voltaren, one percent gel, the typical practice

21   would have been to?

22   A.  Bill but not dispense.

23   Q.  After you began participating in the process of billing but

24   not dispensing these medications --

25   A.  Yes.

1  Q.  -- what -- can you walk the jury through the process of

2  actually taking these medications off the shelf and handling

3  them if they weren't going to be dispensed?

4  A.  Actually, whenever the doctor sends the prescription by fax

5  or by calling us, we usually bill to the insurance.  Like if

6  one of the patients has like seven, eight, nine prescriptions,

7  out of that we filled five prescriptions with noncontrolled

8  medications, and those we were not dispensing, because -- the

9  controlled medication we were dispensing.  Everything was

10  billed.

11  Q.  All right.  What would actually happen to the physical

12  medication that you were billing and not dispensing?

13  A.  The physical medication, initially they took it to the

14  Century, whatever the name, Century Adult Care, and then they

15  bring it back.  And it was the initial stage.

16        Then after I got involved, we just did not dispense

17  from that, and later we put the brand name to the other room,

18  like the backside of the room.

19  Q.  All right.  Let's walk through this a little bit.

20        Was there a reason why you didn't simply store the

21  medications you were billing and not dispensing in the

22  pharmacy?

23  A.  Yeah.  I mean if you have like -- if you bill the

24  medication and did not dispense and if you are piling up in the

25  same pharmacy area, I mean whenever that officers from the

1    Board of Pharmacy like the State of Michigan come there, they

2    might check the invoices versus what we bill and the total

3    amount, and there might be discrepancies.

4    Q.  All right.  And so a decision was made to put these

5    medications somewhere else?

6    A.  Yes.  In that same location there were three different

7    rooms.  We had a middle big room we were storing the

8    medications over there.

9    Q.  All right.  Was this middle room where you were storing the

10   billed but not dispensed medications locked?

11   A.  Yes.

12   Q.  Who had access to that room?

13   A.  My technician Ronak Patel and Atul Patel and Vinod Patel,

14   yes.

15   Q.  During the 2010 time frame were there any other pharmacies

16   owned by Bob Patel in the Saginaw-Bay City area?

17   A.  Yes.

18   Q.  How did you become aware of those pharmacies?

19   A.  We were the pharmacists.  We were just talking on the

20   phone, sometimes discussing the pharmacy medications or like

21   some prescriptions, the medication they do not have in the

22   usual business and if we have it we can send the prescription

23   or the patient over there.  That's how I came to know.

24   Q.  How many total pharmacies did Bob Patel in the Saginaw-Bay

25   City area?

1    A.  When I was working there, there were two to three,

2    including me.

3    Q.  Do you know whether Vinod Patel had any involvement in the

4    other two pharmacies other than Tri-City?

5    A.  Yes.  He was looking after all the pharmacies, sir.

6    Q.  The room at Tri-City where the billed but not dispensed

7    medications were stored --

8    A.  Yes.

9    Q.  -- did you ever see Vinod Patel in that room?

10   A.  Yes.

11   Q.  Did you ever see Vinod Patel bring anything to that room?

12   A.  Yes.  There was a night I was leaving and then I saw him.

13   Q.  What did you see him do with respect --

14           MR. BEUKE:  Objection, Judge.  Foundation.  I'm

15   sorry, Your Honor.  Year-wise, month-wise.

16   BY MR. NEAL:

17   Q.  Approximately what year are we talking about then?

18   A.  2010.

19   Q.  Do you have a sense of what month this would have been?

20   A.  Probably like May or June.

21   Q.  All right.  And what did you see Vinod Patel do with

22   respect to this room?

23   A.  He was bringing the medication, and I was leaving the

24   pharmacy around that time.  And then he and another guy -- he

25   was a pharmacist also, named Lalit Patel, and they bring in two

1    totes.  They have like a medication tote.

2    Q.  Okay.  All right.  At some point did Tri-City's location

3    change?

4    A.  Yes.

5    Q.  Approximately when was that?

6    A.  That was September 22nd or 23rd of 2010.

7    Q.  And where did the location change from and to?

8    A.  The location changed from Saginaw, Michigan to Bay City,

9    Michigan, which is farther north.

10   Q.  When the pharmacy changed locations, did you continue to

11   receive prescriptions from Dr. Burdette?

12   A.  Yes.

13   Q.  And did you continue to handle those prescriptions in the

14   same way that you had before?

15   A.  Yes.

16   Q.  Where were the -- where were the medications that were

17   billed and not dispensed stored after you moved from Saginaw to

18   Bay City?

19   A.  In the same Saginaw area.  Because when we left the

20   pharmacy from the Saginaw area, the new pharmacy was a real

21   small pharmacy in the cellar of doctor's offices and we did not

22   have enough space to store more medications or anything there.

23   Q.  Did you ever have a conversation with Bob Patel about

24   returning the billed but not dispensed medication?

25   A.  Yes, sir.

1   Q.   Approximately when was that first conversation?

2   A.   That was around like before we -- around September,

3   September or -- before September -- I mean the end of

4   September -- I'm not sure exactly, but definitely before we

5   changed the location.

6   Q.   And that was September 2010?

7   A.   2010.

8   Q.   And can you describe for the jury that conversation with

9   Bob Patel?

10  A.   There were like so many totes of the stored medication that

11  were billed but not dispensed and Bob Patel was looking to get

12  away from those medications by sending to the supplier back and

13  getting the money.  And he told me that if you send this

14  through you -- I mean through my pharmacy that I was working,

15  Tri-City Pharmacy -- he will give me like 25 percent of

16  whatever he will get.

17  Q.   Did you have a sense of what the total value of the billed

18  but not dispensed medications was at that time?

19  A.   Almost like 300 to 400,000.

20  Q.   What did you decide to do about returning those medications

21  yourself?

22  A.   I was inclined, but I did not do it.

23  Q.   Why ultimately did you decide not to do it?

24  A.   Because there was like so much medications, if you get the

25  medications from the same supplier, if you are sending them

1    back within so many months and you have one side of your

2    billing and you get a lot of money from the insurances, and if

3    something -- if someone will check, that will be a big red

4    flag.  And I was afraid about that.

5    Q.  At some point in 2010 was there an inspection conducted by

6    state inspectors at Tri-City?

7    A.  Yes.  But that was in December to my new location though.

8    Q.  That was in December at your new location?

9    A.  Yes.

10   Q.  Okay.  Without -- well, describe what happened when the

11   inspectors came into your pharmacy.

12   A.  The inspector came in the morning when we started the

13   business at nine o'clock, and she walked in.  And she was

14   asking me about where is Bob and who owned this pharmacy.  And

15   she looked around at the prescriptions and she was checking the

16   prescriptions and what we were doing, things like that.

17   Q.  All right.  Without getting into the conversations you had

18   with the inspector, after that inspector left, what did you do?

19   A.  After the inspector left, I was so much afraid, and I

20   called immediately Bob and I said I'm not going to fill the

21   prescriptions from this doctor because the inspector, I had a

22   talk to her and I was so much afraid.

23   Q.  All right.  Which doctor are you referring to?

24   A.  Referring to Dr. James Burdette.

25   Q.  And why was it you said I'm not going to fill any of these

1    prescriptions anymore?

2    A.  Because the prescriptions are coming from the Flint area,

3    even though we went farther north to the Bay City area, and

4    there was no reason actually to come all the way, the

5    prescriptions from Flint.  Basically there are so many other

6    pharmacies in midway.  That at this time looks like it is a

7    setup.

8    Q.  And what did Bob Patel say to you after you said this?

9    A.  Bob Patel said, okay, I'm going to talk to Vinod and he's

10   going to change the pharmacy, that the prescriptions will not

11   come to your pharmacy now.

12   Q.  Did Burdette prescriptions continue coming to your pharmacy

13   after that point?

14   A.  No, sir.

15   Q.  Do you know where the Burdette prescriptions went after

16   they stopped coming to Tri-City?

17   A.  It was to the different pharmacies.  Actually the -- there

18   were two locations in the same area basically, and one location

19   was Saginaw.  And then they opened a new pharmacy.  Vinod Patel

20   and everybody -- Vinod Patel and Lalit Patel and Atul Patel,

21   they opened a new pharmacy.

22   Q.  Do you know what that pharmacy was called?

23   A.  It was called -- I forgot the name, because I've never been

24   there.  It was near the Flint area.  I forgot the name.

25   Q.  Okay.  And do you know what happened to the prescriptions

1    with respect to that pharmacy?

2    A.   Yeah.  I came to know because the very same day that I

3    stopped filling prescriptions, my technician was gone from my

4    pharmacy to their pharmacy the very same day, because he knew

5    the things.  Ronak Patel I was talking about.

6    Q.   After you stopped filling prescriptions for Dr. Burdette,

7    what was the source of prescriptions at Tri-City Pharmacy?

8    A.   It was the local doctors where we were in the suburb of

9    four or five doctors, and we were getting prescriptions around

10   them only.

11   Q.   Was there substantial business at Tri-City Apothecary at

12   that time?

13   A.   No, sir.

14   Q.   The billed but not dispensed medications that you had

15   refused to return through your pharmacy back in 2010 --

16   A.   Yes.

17   Q.   -- whatever happened to that stock of medications; do you

18   know?

19   A.   Then one day Chetan Patel, he called me and he said he's

20   going to take the old medications.  If Bob called me, me, like

21   as a pharmacist, just tell him that I took the medications out.

22   Q.   You mentioned someone by the name of Chetan?

23   A.   Chetan Patel, yeah -- I mean Chetan Gujarathi, the last

24   name.  I'm sorry.

25   Q.   Who is Chetan Gujarathi?

1    A.   Chetan Gujarathi was a manager of kind of like all the

2    pharmacies.   The number of pharmacies Babubhai has, he was the

3    manager for all the pharmacies.

4    Q.   Okay.  And, in any event, Chetan -- can you describe for

5    the jury what happened?  Chetan told you at one point he was

6    doing what?

7    A.   Yeah.  He just called me and he said that I'm taking all

8    medications today.  If Bob call you and ask about the

9    medications, tell him that I took the medications.

10   Q.   Mr. Pandya, I'd like to show you what has been admitted as

11   Government Exhibit 3A.  It should be there on your screen.

12            And, Mr. Pandya, the date on this call is 2/13/2011?

13   A.   Yes.

14   Q.   The speakers are you and Babubhai Patel?

15   A.   Yes.

16   Q.   All right.  If we could turn to page two of this document

17   and go to the top five or six lines.

18   A.   Mm-hmm.

19   Q.   Babubhai Patel begins:  "Everything is peaceful."

20            And you state.  "Do you know that Chetan has taken

21   some merchandise from here?"

22   A.   Right.

23   Q.   And Bob said:  "Yes, I know.  I'm trying to work out

24   something with all the merchandise.  Once I have work it out

25   with all the merchandise, then it is clear, do you understand?"

1        What merchandise were you referring to?

2    A.  The billed but not dispensed medication which was stored in

3    my old pharmacy location in Saginaw.  That is to what he was

4    referring.

5           MR. NEAL:  All right.  If we can go down past the

6    middle of this page and start with "I don't want the

7    merchandise to be sitting around."

8    BY MR. NEAL:

9    Q.  Bob states.  "I don't want the merchandise to be sitting

10   around.  What if the inspector shows up.  Then it is a

11   problem."

12           And you state:  "You are right."

13   A.  Yes.

14   Q.  What were you relating to Bob Patel there?

15   A.  Actually Bob, he's a pharmacist too.  So, he knew that if

16   merchandise is around there, if any officials or any inspectors

17   from the Board of Pharmacy or anybody comes who is looking for

18   any transaction or anything, they will definitely come to know

19   that what is going on here.

20   Q.  All right.  Later in this call Bob states:  "But you know,

21   Pradeeplal, the thing is that I have to do for all the

22   locations, and not just for one."

23   A.  Yes.

24   Q.  You state:  "I can understand."

25   A.  Right.

1   Q.  And Bob states:  "Once, you have all the merchandise and

2   doing it is not so easy, then where would I give from."

3           You state:  "Where would you give from.  You are

4   right."

5   A.  Right.

6   Q.  What are you and Bob Patel talking about here?

7   A.  Actually he was referring to like there's so much

8   medication from all of the pharmacies, not only mine, but like

9   -- I don't know the exactly the total number, 25, 26

10  pharmacies.  And he had like -- everywhere he has so many totes

11  at the pharmacies of billed but not dispensed medications.  So,

12  basically he was referring to that if I can clear anyone like

13  that, if we can sell it out or we can send it back to any other

14  source, then it would be easy for them.

15          MR. NEAL:  All right.  You can take that down.

16  BY MR. NEAL:

17  Q.  Mr. Pandya, when did you leave Tri-City Apothecary?

18  A.  The 1st or 2nd of April 2011.

19  Q.  And where did you go after being at Tri-City Apothecary?

20  A.  I was at home for like a month, a month and a half.

21  Q.  And after this month, month and a half at home, where did

22  you go?

23  A.  Then I started with Park Shelton Pharmacy.

24  Q.  Park Shelton Pharmacy?

25  A.  Yes.

1    Q.   Where was that located?

2    A.   That was Detroit.

3    Q.   Was that a pharmacy owned by Bob Patel?

4    A.   No.

5    Q.   Who owned that pharmacy?

6    A.   Mehul Patel.

7    Q.   And you worked there as a pharmacist; isn't that correct?

8    A.   Yes.

9    Q.   Were you a part owner of that pharmacy as well?

10   A.   Yes.  He told me that -- he was granting me the ownership

11   too.

12   Q.   All right.  At Park Shelton Pharmacy did you engage in the

13   same billed but not dispensed scheme that you engaged in at

14   Tri-City Apothecary?

15   A.   Yes, sir.

16   Q.   How long were you at Park Shelton Pharmacy in total?

17   A.   Actually I was there until the pharmacy had to close

18   because of the illegal paperwork.  I was there the 26th of

19   January 2012.

20   Q.   Okay.  After that where did you go?

21   A.   After that I worked at some other pharmacies for like

22   different areas.

23   Q.   And you are still working as a pharmacist?

24   A.   Yes, I am.

25   Q.   Is your supervisor at the pharmacy you are currently

1    working at aware of your legal situation?

2    A.   Yes.

3    Q.   And are you -- is the Board of Pharmacy aware of your legal

4    situation through your attorney?

5    A.   Yes.   My attorney is taking care of that.

6    Q.   All right.   I want to talk about your time at Park Shelton

7    Pharmacy.

8    A.   Sure.

9    Q.   Approximately how much money did you make during your time

10   frame at Park Shelton Pharmacy from, I think you said April of

11   2011 until January --

12   A.   January, yes, January 26th.   Including my salary and

13   everything, I made almost 250 to $300,000.

14   Q.   In March of 2013, Mr. Pandya, what happened to you?

15   A.   March 2013, that date I was handcuffed from my home and I

16   was arrested.

17   Q.   And you ultimately learned you were facing several charges;

18   is that correct?

19   A.   Charges, yes.

20   Q.   And that included conspiracy to commit health care fraud;

21   is that right?

22   A.   Yes.

23   Q.   And conspiracy to distribute controlled substances.   Isn't

24   that correct?

25   A.   Yes.

1  Q.  What did you decide to do about those charges ultimately?

2  A.  Then I talked to my attorney, and I wanted to plead guilty

3  to whatever I did wrong or mistake.  I wanted to plead guilty

4  for that one.

5  Q.  Did you, in fact, plead guilty to those charges?

6  A.  Yes, sir.

7  Q.  And did you sign a Plea Agreement in connection with your

8  guilty plea?

9  A.  Yes, sir.

10  Q.  And does that Plea Agreement contain certain advisory

11  Sentencing Guidelines for you?

12  A.  Yes, sir.

13  Q.  Are you familiar with what those guidelines are?

14  A.  That's for sentencing for at least 72 to 87 -- 88 months.

15  Q.  Does your Plea Agreement include a Cooperation Agreement?

16  A.  Yes, sir.

17  Q.  And does that Cooperation Agreement require you to testify

18  truthfully here today?

19  A.  Yes, sir.

20  Q.  Have you been sentenced ultimately?

21  A.  No.

22  Q.  Do you hope that the Government will ask for a reduction in

23  your sentence as a result of your testimony here today?

24  A.  Yes.

25  Q.  Do you have any guarantees about a particular amount or any

1    promises from the Government, I should say, that the Government
2    will be asking for a specific amount of reduction as a result
3    of your testimony and cooperation?
4    A.  I'm sorry.  Can you repeat that?  I didn't understand the
5    question.
6    Q.  It was badly phrased.
7            Are there any promises that you have that the
8    Government will ask for a specific amount of time to be reduced
9    from your sentence as a result of your testimony here today?
10   A.  Yes.
11   Q.  Okay.
12   A.  I mean the amount or the --
13   Q.  I'm talking about the amount.
14   A.  The amount?  I don't know about that.
15   Q.  All right.
16   A.  My attorney is taking care of that one.  So ...
17   Q.  Who ultimately is going to determine your sentence?
18   A.  Judge Tarnow.
19           MR. NEAL:  I have nothing further of this witness.
20           THE COURT:  Cross-examination?
21           MR. BEUKE:  Thank you, Judge.
22                        CROSS-EXAMINATION
23   BY MR. BEUKE:
24   Q.  Is it Mr. Pandya?
25   A.  Pandya, yes.

1   Q.  Pandya?

2   A.  Yes.

3   Q.  Mr. Pandya, I'd like to just take a little step back with

4   respect to your -- you received your pharmacy education and

5   degree when?

6   A.  I was in Bachelor of Pharmacy in 1987.

7   Q.  Okay.  And today you're how old?

8   A.  49 years, sir.

9   Q.  You have a family, correct?

10  A.  Yes, sir.

11  Q.  You own a house?

12  A.  Yes.

13  Q.  And with respect to your career as a pharmacist, I think

14  you told the ladies and gentlemen that -- sometime around the

15  year 2000, 2001, did you come and begin to work as a pharmacist

16  in the United States?

17  A.  Yes.  In Maryland, yes, sir.

18  Q.  Originally in Baltimore, correct?

19  A.  Yes.

20  Q.  And then at some point you and your family moved to the

21  Michigan area, correct?

22  A.  Yes, sir.

23  Q.  And the entire -- for the next ten years, you and your wife

24  worked as pharmacists, correct?

25  A.  No.  My wife is not a pharmacist.

1   Q.  Okay.  What does your wife do for a living?

2   A.  She's a homemaker.

3   Q.  Has she been a homemaker the whole time?

4   A.  Yes.

5   Q.  Okay.  So, she has never been employed outside of the home,

6   correct?

7   A.  She has been employed before, before we married and --

8   Q.  When was that?  I'm sorry.

9   A.  That was 1998, 1999.

10  Q.  Okay.  So, your wife has been a homemaker since 1999,

11  correct?

12  A.  Yeah.  After we got our son, yes.

13  Q.  And at some point when you worked for Rite-Aid, I think you

14  told the ladies and gentlemen that your hours were from nine in

15  the morning until nine at night, correct?

16  A.  Yes.

17  Q.  And you had begun a family, correct?

18  A.  Yes.

19  Q.  And how many children do you have?

20  A.  Two.

21  Q.  Okay.  And for those ten years did you work approximately

22  50 or 60 hours a week?

23  A.  Yes.

24  Q.  Okay.  And that, again, was for the Rite-Aid Pharmacy

25  chain, correct?

1    A.  Yes, sir.

2    Q.  The Rite-Aid Pharmacy chain, that's a national chain,

3    correct?

4    A.  Yes.

5    Q.  And the Rite-Aid Pharmacy chain, that was -- in your

6    10-year career there, you learned how to bill and not dispense

7    with them also, didn't you?

8    A.  No, sir.

9    Q.  Okay.  The Rite-Aid Pharmacy chain didn't operate like

10   that, did it?

11   A.  No.

12   Q.  If there were prescriptions that weren't picked up by a

13   patient after 14 days, the prescriptions were put back into the

14   stockpile, correct?

15   A.  Yes.

16   Q.  And if there had been billing of the Medicare or Medicaid

17   or any private insurance companies, those bills would be

18   reversed, correct?

19   A.  Yes.

20   Q.  So, no one would get charged for those medications that

21   were not dispensed, correct?

22   A.  Yes.

23   Q.  You were trained by Rite-Aid that that was the legal way to

24   do things, correct?

25   A.  Yes.

1  Q.  You knew that was the legal way to do things, correct?

2  A.  Yes.

3  Q.  Now, sometime in 2010, you told the ladies and gentlemen

4  that you wanted to get a different job or to get a job that

5  might allow you to have some more time with your family,

6  correct?

7  A.  Yes.

8  Q.  And you were living up where in 2010?

9  A.  I was living in my house as of now Grand Blanc, Michigan.

10 Q.  Grand Blanc.

11      You were a member of the social Indian community up

12 there, correct?

13 A.  Yes.

14 Q.  One of the people you were friends with was a person you

15 talked about, his name was Mehul Patel, correct?

16 A.  Yes.

17 Q.  Mehul Patel was also a pharmacist, correct?

18 A.  Yes.

19 Q.  And Mehul Patel and you had a number of discussions about

20 your desire to try to get a better work schedule, correct?

21 A.  No.  Actually we talked about I'm trying to change my like

22 job.  That's what we talked.

23 Q.  Well, why did you want to change and leave Rite-Aid?

24 A.  I'm sorry, I didn't ...

25 Q.  Why did you want to leave Rite-Aid?

1    A.  Yeah.  As I explained, I had my daughter born in 2007, and

2    we needed family more time.  Nights and weekends, every time I

3    was working.  So, I needed that time.

4    Q.  You wanted to spend more time with your family?

5    A.  Family, yes.

6    Q.  Okay.  And how much were you making in 2010 as a pharmacist

7    at Rite-Aid?  How much were you making on an hourly basis?

8    A.  It was 54 to 58.  I don't remember exactly right now.

9    Q.  So, you were making over a hundred thousand dollars a year;

10   fair to say?

11   A.  Yes.

12   Q.  And more than enough to support your family, correct, and

13   your bills?

14   A.  Yes.

15   Q.  Okay.  And at some point you reached out or spoke with

16   Mehul about wanting to switch to a different job, correct?

17   A.  Yes.

18   Q.  You knew that Mehul Patel was a pharmacist working for Bob

19   Patel, correct?

20   A.  Yes.

21   Q.  You say that you had never met Bob Patel before, correct?

22   A.  Not before.

23   Q.  And in your group of pharmacy friends, had you heard of Bob

24   Patel's name?

25   A.  I never heard of him because he was Bob -- Mehul was

1    working, only that I heard that.

2    Q.  Well, what pharmacy was Mehul running for Bob Patel?

3    A.  I don't have that idea at that time.

4    Q.  Where was Mehul working in 2010?

5    A.  Somewhere in Detroit.

6    Q.  In the Detroit area?

7    A.  Yes.

8    Q.  Did you and Mehul -- you were friends with Mehul, correct?

9    A.  Yes.

10   Q.  And did Mehul Patel -- you said I think yesterday to the

11   ladies and gentlemen that you had a conversation with him about

12   possibly keeping his eyes open for you about a job opportunity.

13   Correct?

14   A.  Yeah.  He told me if something will come up, he will let me

15   know.

16   Q.  Well, did you speak with him about his experience with the

17   pharmacy chain that he was working for, the Bob Patel pharmacy

18   chain?

19   A.  No.

20   Q.  Did Mehul Patel before you switched jobs ever tell you,

21   hey, Pradeep, we run a bill but not dispense --

22   A.  No, sir.

23   Q.  -- operation over here?

24   A.  No, sir.

25   Q.  So, your buddy never informed you that what we do over at

1    Bob Patel's pharmacies is illegal?

2    A.  No.

3    Q.  Okay.  Well, at some point Mehul came to you and he told

4    you that I heard that there's going to be an opening in the Bob

5    Patel pharmacy chain.  Correct?

6    A.  Yes.

7    Q.  And he told you that do you want me to speak to Bob about

8    you possibly coming on board?

9    A.  Yes.

10   Q.  And you talked to him, and he later told you that I think

11   there's going to be an opening.  Correct?

12   A.  Yes.

13   Q.  And you actually set up a meeting, an interview with Bob

14   Patel.  Correct?

15   A.  Yes.

16   Q.  You told the ladies and gentlemen that it was kind of an

17   interview session.  Correct?

18   A.  No.  Actually we were driving together.  We were going to

19   the pharmacy.

20   Q.  You and Bob were driving together?

21   A.  Me, Bob and Mehul, three were there.

22   Q.  Did you know what pharmacy Mehul worked for then?

23   A.  Somewhere in Detroit.  I don't know even the name.

24   Q.  Okay.  But you knew during your first interview that Bob

25   owned a number of pharmacies, correct?

1    A.  Yes.  He told me, yes.

2    Q.  Okay.  And did he tell you he wanted you to run the

3    pharmacy in Saginaw?

4    A.  Yeah.  He said he opened a pharmacy in Saginaw, yes.

5    Q.  So, in that very first conversation you had with Bob Patel,

6    you knew he was the owner of the pharmacy, correct?

7    A.  Yes.

8    Q.  You knew that he wanted you to run the pharmacy, correct?

9    A.  Yeah.  He was a pharmacist, but he could not come all the

10   way.  So ...

11   Q.  So, you were going to be the head pharmacist, correct?

12   A.  Pharmacist or head pharmacist, yeah, whatever you call it.

13   Q.  You were going to be in charge of that pharmacy, correct?

14   A.  Yeah.  That's the only pharmacist we have.

15   Q.  All right.  Now, Bob Patel offered you that job, correct?

16   A.  Yes.

17   Q.  And you agreed to take the job for less money than you were

18   making at Rite-Aid, correct?

19   A.  Because I was getting the --

20   Q.  My question is did you agree to take a job at a lower pay

21   rate --

22   A.  Yes.

23   Q.  Okay.  And did you say to Bob Patel, listen, I'm not only

24   going to be cutting my hours, I'm going to be cutting my rate

25   of pay from $55 an hour to $45 an hour?  Did you discuss that

1    with him?

2    A.  Yes.

3    Q.  And you agreed to do that, right?

4    A.  Yes.

5    Q.  That was Pradeep Pandya's decision to do that, right?

6    A.  Yes.

7    Q.  Did you ever speak with Bob Patel in that first

8    conversation about the fact that, you know, is there another

9    way that I can make up this difference in what I'm going to be

10   taking home to my family?

11   A.  No.  I did not even talk about that back then.

12   Q.  Well, did you and your buddy Mehul and Bob Patel ever

13   discuss the fact that, don't worry, you're going to be able to

14   make up the difference because we run an illegal bill but not

15   dispense scheme --

16   A.  No, sir.

17   Q.   -- out of Tri-City Pharmacy?

18   A.  No, sir.

19   Q.  Okay.  So, day one -- you talked to Mr. Neal about day one

20   at the pharmacy.

21          And that was what day?

22   A.  It was the end of February we were in the first time.

23   Q.  Well, you agreed -- did you sign a contract with Bob Patel?

24   A.  No, there was no contract.

25   Q.  Just an oral agreement?

1    A.   Just an oral agreement, yes.

2    Q.   And Bob Patel was the owner of Tri-City Pharmacy, correct?

3    A.   Yes.

4    Q.   And Bob Patel -- your first day you actually saw him at

5    Tri-City, correct?

6    A.   Yeah.  He came a couple hours after.

7    Q.   When you reported to work on day one, you opened up or

8    somebody gave you the keys to the pharmacy.  Correct?

9    A.   Yeah.  He was Ronak Patel.

10   Q.   That was the gentleman you had never met before that very

11   first day, correct?

12   A.   Yes.

13   Q.   Ronak Patel was the pharmacy technician, correct?

14   A.   Yes.

15   Q.   Now Tri-City, Pharmacy had been opened prior to your first

16   day on March 2nd of 2010, correct?

17   A.   Yes.

18   Q.   Who was running the pharmacy before you got there?

19   A.   I don't know.  I don't know the name.

20   Q.   But when you -- on your first day, this Ronak Patel was not

21   a pharmacist, was he?

22   A.   No, sir.

23   Q.   He was a pharmacy technician?

24   A.   Yes, sir.

25   Q.   And just so the ladies and gentlemen are clear, a pharmacy

1  technician, can they fill prescriptions?

2  A.  Yeah, they can fill the prescriptions through the computer,

3  and we have to check as a pharmacist.

4  Q.  Okay.  So, the way the operation runs, the legal way it

5  runs, is if the pharmacy technicians get a script brought to

6  them, they can enter the script into the computer, but the

7  pharmacist is actually the person who has to fill every

8  prescription.  Correct?

9  A.  Check the prescription, yes.

10 Q.  So, the pharmacy technicians never on their own filled

11 prescriptions and took drugs from the stockpile and put it in

12 pill bottles and dispensed the medication to the patients, did

13 they?

14 A.  They cannot dispense.  They can do their job -- it should

15 be dispensed to the patient.  They cannot do it.

16 Q.  That has got to be through you, correct?

17 A.  Yes.

18 Q.  And you were the only pharmacist at Tri-City, correct?

19 A.  Yes.

20 Q.  You were in charge of ordering medications for stock,

21 correct?

22 A.  Yes.

23 Q.  That was part of your job, correct, as the head pharmacist?

24 A.  Yes.

25 Q.  And you made sure that the stock that was ordered to have

1    at Tri-City Pharmacy was enough to service your patients.

2    Correct?

3    A.  Yes.  Not every person.

4    Q.  Well, you had to place orders for medications, correct?

5    A.  Yes.

6    Q.  And those orders were from a drug distributor by the name

7    of McKesson Corporation, correct?

8    A.  Yes.

9    Q.  That was the corporation that -- to your knowledge, all of

10   Bob Patel's pharmacies ordered their prescription and

11   nonprescription medications from the McKesson Corporation.

12   Correct?

13   A.  I did not know on the very first time.

14   Q.  Well, it didn't take you long to find out who the supplier

15   was, did it?

16   A.  Yes.  The supplier was McKesson.

17   Q.  Okay.  So, if there were medications that you needed, you

18   called up a salesperson from McKesson and you placed the order.

19   That's how it worked, correct?

20   A.  No.  Nowadays it is computerized.  So ...

21   Q.  We'll talk a little bit about the computer.

22   A.  Mm-hmm.

23   Q.  The computerized system that was in place at Tri-City

24   Pharmacy --

25   A.  Mm-hmm.

1    Q.   -- in March of 2010, you were familiar with the system,

2    correct?

3    A.  No, sir.

4    Q.  Okay.  You didn't know anything about that system or how it

5    worked?

6    A.  No, sir.

7    Q.  Correct?

8           And in the ten years you spent at the Rite-Aid

9    Pharmacy, they had a computer system also?

10   A.  Yeah.  They have like a different system all together.

11   Q.  Did you get training on how the Bob Patel computer system

12   worked?

13   A.  Yes.

14   Q.  Okay.  And you were trained by Ronak, correct?

15   A.  The first day he was there.  Then they send like Ketan

16   Patel.

17   Q.  They sent who?

18   A.  Ketan Patel.

19   Q.  That was another person that worked for Bob Patel, correct?

20   A.  Yes.

21   Q.  And when he came, he trained you on how to operate the

22   computer system, correct?

23   A.  Yes.

24   Q.  Okay.  Now, with respect to -- it took you actually less

25   than a day to realize that the pharmacy that you were in charge

1    of was operating illegally, correct?

2    A.  No.

3    Q.  Well, how long did it take for you to realize that the

4    practices that were being used and employed by Tri-City

5    Pharmacy weren't legal?

6    A.  I explained to the jury that the first day I got the

7    prescriptions, I called Bob and I said that this is not the way

8    the prescriptions should be.  And then I, uhm ...

9    Q.  What you realized was that you saw this room of all these

10   extra medications, correct?

11   A.  The very first day?

12   Q.  Yeah.

13   A.  No.  The very first day there were only two totes in my

14   pharmacy.  So, that's what I see.  I did not --

15   Q.  Well, how long, Mr. Pandya, did it take you to realize that

16   Rite-Aid was being run illegally?

17   A.  Rite-Aid?

18   Q.  A couple weeks?

19        I'm sorry.  Tri-City.  I apologize.

20   A.  Yeah.  Full knowledge, like, three to six weeks or so.

21   Q.  So, within a month you knew what you had involved yourself

22   in, the new job that you took after you had ten years at

23   Rite-Aid, you were part of something that was cheating the

24   Government, correct?

25   A.  Yes.

1  Q.  And at some point you made a decision that I'm going to

2  stay in this job, correct?

3  A.  Yes.

4  Q.  Part of the things that you were doing, you realized that

5  these prescriptions that were coming in weren't prescriptions

6  for any legitimate medical purpose, correct?

7  A.  Yes.

8  Q.  You kept seeing the prescriptions coming in with the same

9  types of Schedule IV, Schedule V, Schedule III controlled

10  substances being prescribed in multiple amounts on each

11  prescription, correct?

12  A.  Yes.

13  Q.  Mr. Pandya knew that this isn't legal, correct?

14  A.  Yeah.  After I came there, yes.

15  Q.  Well, you continued to work there, didn't you?

16  A.  Yes.

17  Q.  You didn't go to Bob Patel and say, hey, I'm leaving, I'm

18  going to go back to Rite-Aid, I'm going to take my $55 an hour

19  and support my family, did you?

20  A.  I did not.

21  Q.  Did you go to Bob Patel and say, listen, we've got to

22  change this Bob, we can't run our business like this?  You

23  never told him that, did you?

24  A.  I talked initially, and then I involved myself, as I told

25  you.  Initially I told him about the prescriptions, what we

1    were getting was not proper, and then I was involved myself.

2    Q.  Well, almost from within a month of you taking the job,

3    correct?

4    A.  One month, two months, in between, yes.

5    Q.  Yeah.  And then you began to meet -- or, you met almost

6    immediately another gentleman by the name of Atul Patel.

7    Correct?

8    A.  Yes.

9    Q.  Atul Patel and Ronak Patel were friends, correct?

10   A.  Yes.

11   Q.  And when you would fill the prescriptions -- I think you

12   described to Mr. Neal the prescriptions that were coming from

13   this Dr. Burdette.

14          You would fill those prescriptions and they would be

15   picked up and delivered by who?

16   A.  Ronak Patel and Atul Patel too.

17   Q.  Well, the two of them would pick up the prescriptions.  And

18   your understanding was they were going to the New Century Day

19   Care Center, correct?

20   A.  Yes.

21   Q.  And after they would take them -- after you would fill all

22   of these prescriptions -- Monday through Friday, correct?

23   A.  Only once or twice in a week, sir.

24   Q.  Okay.  Once or twice a week, they would come and pick them

25   up at your pharmacy, correct?

1    A.   No.   Only when the doctor comes, one or two times a week.

2    Ronak Patel was working with me as a technician.

3    Q.   Right.

4    A.   And when we fill, he used to go at the end of the day.

5    Q.   Well, how many technicians worked for you?

6    A.   Just one.

7    Q.   And how many pharmacists worked for you?

8    A.   Just one.

9    Q.   So, it was you and Vinod Patel everyday together.   Correct?

10   A.   Yes.

11   Q.   And the deliveries to New Century happened once or twice a

12   week.   Correct?

13   A.   Yes.

14   Q.   And Ronak Patel and Atul Patel are the ones who delivered

15   them.   Correct?

16   A.   Yes.

17   Q.   And your understanding of the delivery process is they were

18   taking these controlled substances and they were going to a

19   place and giving them to patients, correct?

20   A.   Yes.

21   Q.   You never saw anybody, whether Atul Patel or Ronak Patel,

22   distribute drugs or prescriptions to any patient, did you?

23   A.   No.   Those two went to New Century.

24   Q.   You never saw them do that?

25   A.   No.

1    Q.   Okay.  And when they were returning medications to the

2    store, the very first time you saw medications come back, you

3    actually tried to reverse the billings.  Correct?

4    A.   Yes.  I told them to reverse --

5    Q.   That was the way you did it at Rite-Aid; fair to say?

6    A.   Yes.

7    Q.   And Ronak Patel and Atul Patel told you that's not the way

8    we do things here, correct?

9    A.   Yes.

10   Q.   Ronak Patel and Atul Patel told you that what we do is we

11   take the medications that we bring back from our delivery runs

12   and we put them in the stockroom, correct?

13   A.   Yes.

14   Q.   We keep them for ourselves, correct?

15   A.   Yes.

16   Q.   And at some point, you knew that those medications were

17   going to be sold back to McKesson.  Correct?

18   A.   I did not see that that was the initial --

19   Q.   Well, how long did it take you to realize that?

20   A.   It has never been sold back to it actually in my presence,

21   but it was the intention.

22   Q.   Well, over your -- you were at McKesson -- I'm sorry.

23           You were at Tri-City for almost 13 months, correct?

24   Is that how long your career lasted there?

25   A.   12 to 13 months, yes.

1    Q.   And those medications they built up on a daily or weekly

2    basis, correct?

3    A.   Yes.

4    Q.   In that storeroom you told the ladies and gentlemen about,

5    correct?

6    A.   Yes.

7    Q.   And you knew that these medications were going to be sold

8    back or taken back and your pharmacy was going to get money --

9    A.   Yes.

10   Q.    -- for returning the medications?

11            That's how it worked, right?

12   A.   Yes.

13   Q.   And that was a -- you knew that you, Mr. Pandya, had billed

14   Medicare for those medications, correct?

15   A.   Yes.

16   Q.   You're the person who sent the bills through the Medicare,

17   correct?

18   A.   Yes.

19   Q.   You're the person who sent the bills to Medicaid, to Blue

20   Cross Blue Shield, to private insurance companies.  That was

21   all done by you.  Correct?

22   A.   Yes.

23   Q.   And when you saw the bill -- the medications come back, you

24   never told those people at Medicare or Medicaid or Blue Cross

25   Blue Shield that, hey, we didn't really distribute these.  They

1   are sitting in my stockroom.  You never did that, did you?

2   A.  No, sir.

3   Q.  That was Mr. Pandya's decision to join Bob Patel's illegal

4   operation.  Correct?  That's one you made?

5   A.  Yes.

6   Q.  And you got bonus checks from Bob Patel, didn't you?

7   A.  No, sir.

8   Q.  Did you ever get a $10,000 check from Mr. Patel?

9   A.  Yes.

10  Q.  And your explanation of the $10,000 check was gas money,

11  correct?

12  A.  Not gas money, but mileage, yes.

13  Q.  Mileage?

14  A.  Yes.

15  Q.  Well, in any event, sir, you never saw -- well, when you

16  were working at Tri-City Pharmacy in, I think you said it was

17  sometime after you began, you started to get prescriptions from

18  a James Burdette.  Correct?

19  A.  Yes.

20  Q.  And when you originally started, you didn't get any

21  prescriptions from Mr. Burdette, did you?

22  A.  Well, originally that's the same -- the same date we got

23  the prescriptions, because he comes on certain days only.

24  So ...

25  Q.  Well, the faxes that you described for Mr. Neal, you were

US v Vinod Patel #11-CR-20468-36

1    actually getting faxes at Tri-City, and the faxes were --

2              (Off the record.)

3    BY MR. BEUKE:

4    Q.  The faxes were, at least you interpreted them to be his

5    notes of his meeting with the patient.  Correct?

6    A.  Yes.

7    Q.  They were conversations that he had with the patient,

8    correct?

9    A.  Yeah.  Like health related, yes.

10   Q.  They were like patient notes.  Correct?

11   A.  Yes.

12   Q.  And you knew, from ten years in the business, this isn't a

13   prescription.  Right?

14   A.  Yes.

15   Q.  You know what a prescription pad looks like?

16   A.  Yes.

17   Q.  And did you check like is there a list of doctors in the

18   state of Michigan, a book that you can look up a particular

19   doctor?

20   A.  No, there's nothing like that.

21   Q.  Well, you knew that Burdette wasn't even a doctor, correct?

22   A.  I came to know after I met him.

23   Q.  Within a matter of weeks, correct?

24   A.  Yes.

25   Q.  And you went to Bob Patel and you told Bob Patel, listen,

1   this guy Burdette is sending us over faxes of his notes and

2   interviews with his patients.

3           Did you tell Bob Patel that?

4   A.   Yeah.   That was my first conversation with him.

5   Q.   And you told him, listen, Bob, I'm all right with this

6   billed but not dispensed scheme, but, you know, we've got to

7   have proper prescriptions.

8           You had that conversation with Bob Patel, correct?

9   A.   Yes.

10  Q.   The pharmacy business, Mr. Pandya, it's a highly regulated

11  business.   Is that fair to say?

12  A.   Yes.

13  Q.   And there are inspectors that come to your pharmacy on a

14  fairly regular basis, correct?

15  A.   Yes.

16  Q.   They check your books, correct?

17  A.   Yes.

18  Q.   They check your stock as opposed to what's -- and your

19  sales, correct?

20  A.   Yes.

21  Q.   They want to match up that the stock that you have in

22  inventory matches the number of prescriptions that you send

23  out, correct?

24  A.   Yes.

25  Q.   And you've been involved -- there were a number of times

1    where people came from the Michigan Attorney General or the

2    Inspector's Office while you were at Tri-City to your pharmacy,

3    correct?

4    A.  Yes.

5    Q.  It didn't just happen in December of 2010, did it?

6    A.  No.  The pharmacy inspection came like only on December

7    16th or so.

8    Q.  Okay.  So, prior to December 16th, from the date you

9    started on March 2nd, 2010, you never had any inspectors at

10   Tri-City before then.  Correct?

11   A.  One time somebody came, but it was just for checking the

12   different area -- I don't know exactly what he came for.

13   Q.  Okay.  The first few months that you were there --

14   A.  Mm-hmm.

15   Q.   -- the stockpile of billed but not dispensed medication

16   that was in this center room --

17   A.  Yes.

18   Q.   -- was it ever -- was it ever removed?

19   A.  No.

20   Q.  Was it ever returned?

21   A.  No.

22   Q.  So, at some point, the billed but not dispensed medication

23   was in fact removed from Tri-City, correct?

24   A.  I'm sorry?

25   Q.  Was that by Mr. Gujarathi?

1   A.   Yes.   Yes.

2   Q.   So, when Mr. Gujarathi came, that was in December of 2010,

3   correct?

4   A.   That was in I think February.   I was working in a different

5   location.

6   Q.   February of 2011?

7   A.   '11, yes.

8   Q.   So, when the inspectors came in December of 2010, the

9   narcotics that you guys had stolen was actually still back at

10  the Saginaw location, correct?

11  A.   No, no, no.   The narcotics was already -- everything

12  dispensed.

13  Q.   Pardon?

14  A.   All narcotics everything was dispensed that --

15  Q.   No.   I'm talking about the billed but not dispensed

16  medication that you guys stole.

17          I mean, you guys stole the drugs, right?

18  A.   That is noncontrolled medication; not the controlled

19  medication.

20  Q.   No.   I didn't say you stole the controlled medication.   I'm

21  saying you stole the noncontrolled medication.   Correct?

22  A.   Yes.

23  Q.   Where were those kept?   Were they also kept in Saginaw?

24  A.   Saginaw.

25  Q.   And when the inspector came in December of 2010, did she

1    say that your books don't match?

2    A.   When the inspector came, she came to a different location

3    basically, yes.

4    Q.   I know that.

5            Did she tell you, listen, you've got these books that

6    don't match up.  The medications that you purchased don't match

7    up to the medications that you distributed?

8    A.   No, no.  There was not that kind of talking.

9    Q.   Okay.  When that inspector came in December of 2010, she

10   asked for who?

11   A.   Bob Patel.

12   Q.   You knew Bob Patel was the owner of your pharmacy, correct?

13   A.   Yes.

14   Q.   And did you try to get Bob Patel on the phone?

15   A.   Yes.

16   Q.   Did you give her Bob Patel's number?

17   A.   Yeah.

18   Q.   She talked to Bob Patel, correct?

19   A.   Not in my presence.

20   Q.   Well, did you speak with Bob Patel -- that was a very --

21   A.   The same day after she left, yes.

22   Q.   I mean, it was an unnerving thing for you.  I think you

23   told Mr. Neal that you were very afraid.  Correct?

24   A.   Yes.

25   Q.   Because your license was on the line, correct?

1    A.   Yes.

2    Q.   Everything that you had agreed to become a part of from

3    March until you left Tri-City, you knew was illegal, correct?

4    A.   Yes.

5    Q.   And if the inspector found out about that, your license is

6    gone.   Correct?

7    A.   Yes.

8    Q.   And even after you pled guilty, your license isn't gone, is

9    it?

10   A.   No.

11   Q.   After you made your Cooperation Agreement and pled guilty

12   to this charge, the State of Michigan is still letting you

13   operate as a pharmacist.   Correct?

14   A.   Yeah.   My attorneys they are taking care of that, yes, sir.

15   Q.   Well, nobody has revoked your license, correct?

16   A.   No.   My attorneys are taking care of those ...

17   Q.   My question is nobody has revoked your license, correct?

18   A.   No, sir.

19   Q.   You are working everyday, correct?

20   A.   Yes.

21   Q.   And you're making your -- how much money an hour now?

22   A.   Right now I'm making $53, but not full-time right now.

23   Q.   That's after you pled guilty almost a year ago, correct?

24   A.   Yes.

25   Q.   And so it's clear for the ladies and gentlemen, when you

1    began to question Mr. Burdette's prescriptions, I think you

2    told them that you initially went to Bob.  Correct?

3    A.  Yes.

4    Q.  And you told Bob Patel this isn't right, Bob.  Correct?

5    A.  Yes.

6    Q.  And Bob Patel told you I will have a talk with Burdette.

7    Correct?

8    A.  He said he will talk to Vinod Patel.

9    Q.  Okay.  And Vinod Patel at that point, you had never met

10   him.  Correct?

11   A.  No.

12   Q.  Your testimony is, is that Vinod Patel came to Tri-City and

13   spoke with you.  Correct?

14   A.  Yeah.  He introduced himself.

15   Q.  And Bob Patel ultimately was told that you wanted to go to

16   meet Burdette.  Correct?

17   A.  No.  He said he's going to talk to Vinod Patel.  And Vinod

18   Patel told me that wait several days when he's available and

19   what time he told me to go.

20   Q.  Well, your testimony was that you told Bob -- Vinod Patel

21   about the problem with these prescriptions, correct?

22   A.  Yes.

23   Q.  And you told Bob Patel -- or, I'm sorry -- Vinod Patel,

24   that we can't have prescriptions like this coming through.  I

25   can't fill these?

1   A.  Yes.

2   Q.  Okay.  And you never met Burdette in your life, correct?

3   A.  Not before, no.

4   Q.  Incidentally, you've never heard that James Burdette -- you

5   did meet him, correct?

6   A.  Once, yes.

7   Q.  And you went to see him, correct?

8   A.  Yes.

9   Q.  And you've never heard that James Burdette has ever been

10   indicted in this case, have you?

11   A.  Yes.

12             MR. NEAL:  I'm going to object to that question.  I

13   think questions about charges against others are irrelevant.

14             THE COURT:  Sustained.  And it will be part of the

15   standard jury instructions that it doesn't matter what happened

16   to anybody else.  Your job is to evaluate this case.

17   BY MR. BEUKE:

18   Q.  Mr. Pandya?

19   A.  Yes, sir.

20   Q.  After this conversation with Vinod Patel, you told Vinod

21   Patel that you wanted to go see Mr. Burdette.  Correct?

22   A.  Yeah.  I wanted to see who is writing and where he is

23   located.

24   Q.  How many different doctors were prescribing medications or

25   prescriptions to Tri-City Pharmacy that you were billing in

1    those first month or two that you were there?

2    A.   The location where I was in Saginaw were like four or five

3    doctors surrounding me.  And those doctors and only Burdette.

4    Q.   And those other doctors were all in the same building,

5    correct?

6    A.   Not building.  Like a cul-de-sac kind of thing, yes.

7    Q.   They were all close to the location, correct?

8    A.   Yes.

9    Q.   And Burdette was the only one who was sending prescriptions

10   in on interview notes, correct?

11   A.   Yes.

12   Q.   And after you spoke with Vinod Patel, you told him that

13   these can't -- I can't fill these.  Correct?

14   A.   Yes.

15   Q.   And you told Vinod Patel I'd like to go and meet with

16   Burdette.  Correct?

17   A.   Right.

18   Q.   And at that point when -- he told you where Burdette's

19   office was located.  Correct?

20   A.   Yes.

21   Q.   He told you Burdette's phone number, correct?

22   A.   Phone number was already -- I knew, yes.

23   Q.   Okay.  So, you knew that?

24   A.   Because I had a talk to the doctor whenever we have a

25   question.  The very first day he had notes he was sending, like

1    the doctor approved the prescriptions and stuff like that.

2    Q.  So, that stuck out in your mind that that might be

3    something that gets Pradeep Pandya in trouble, if I start

4    filling prescriptions that are written on interview notes.

5    Correct?

6    A.  Yes.

7    Q.  If the inspectors came by, my license is on the line.

8    Correct?

9    A.  Yes.

10   Q.  And you already I think told Mr. Neal that the medications

11   that Burdette was prescribing for these people, they were

12   crazy, correct?

13           There were a lot of prescriptions for controlled

14   drugs and noncontrolled drugs, correct?

15   A.  Yes.

16   Q.  Multiple medications on each order.  Correct?

17   A.  Yes.

18   Q.  And that was extremely unusual, in your experience.

19   Correct?

20   A.  Yes.

21   Q.  Sometimes doctors, when you worked at Rite-Aid, would write

22   prescriptions with one or two prescriptions on the same script.

23   Fair to say?

24   A.  Yeah.  For a specialty like, for example, like a doctor's

25   specialty towards like the ear, nose, eye, or back pain or

1    anything, then we got those prescriptions only.

2    Q.  Burdette, the guy who wasn't even a doctor, was prescribing

3    all kinds of controlled medications and noncontrolled

4    medications?

5    A.  Noncontrolled, yes.

6    Q.  For different ailments; fair to say?

7    A.  Yes.

8    Q.  And you knew that was probably illegal, just reading these

9    medications that he was sending to you to be filled.  Correct?

10   A.  It's not -- I mean to fill on the same, it's not illegal if

11   you talk to the doctor, and once you confirm and then you have

12   a note, you can ...

13   Q.  If the pharmacist knows that the medications that he's

14   filling are not for a legitimate medical purpose, your license

15   is on the line.  Correct?

16   A.  Yes.

17   Q.  It's your responsibility to check with the doctor to make

18   sure not only is he authorized to prescribe these medications,

19   but they are for a legitimate medical reason.  Correct?

20   A.  Medical reason, yes.

21   Q.  Okay.  That was your job, correct?

22   A.  Yes.

23   Q.  And when you saw these scripts coming through on these

24   pieces of paper, it was something that you knew he had to

25   correct.  Right?

1    A.   Yes.   I needed to see the doctor or check up, yes.

2    Q.   So, Vinod Patel gives you the address --

3    A.   Yes.

4    Q.    -- where you can go visit Burdette, correct?

5    A.   Yes.

6    Q.   And you did that.   You told the ladies and gentlemen I went

7    to Burdette's building.   Correct?

8    A.   Yes.

9    Q.   And you told Burdette how he had to write the

10   prescriptions.   Correct?

11   A.   Well, I mean, I did not say how he should write, but I just

12   said the format was wrong.

13   Q.   Well, when you talked with Burdette, you told him that,

14   listen, if you keep sending prescriptions on your

15   doctor-patient notes, we're going to get in trouble?   Did you

16   tell him that?

17   A.   The format, yes.

18   Q.   And when you told him that, he said to you, okay,

19   Mr. Pandya, I'll make sure I send them on the proper scripts

20   from now on?

21   A.   Yes.

22   Q.   You're the one, you, Pradeep Pandya, was the one who

23   corrected the problem for Bob Patel and for Dr. Burdette,

24   correct?   You made sure it was done right?

25   A.   Yeah.   For my purpose, yes.

1   Q.  Well, for your purpose, you also at that point knew that

2   the noncontrolled medications were going in your pharmacy's

3   middle room, correct?

4   A.  Yes.

5   Q.  You knew that your partner Bob Patel was stealing the

6   drugs, correct?

7   A.  Yes.

8   Q.  Okay.  In fact, I think you told the ladies and gentlemen

9   at some point in May or June of 2010 -- correct me if I'm

10  wrong -- but Bob Patel came to you, correct, with an offer?

11  A.  It was the end of September.

12  Q.  Okay.  So, in September you had been at the pharmacy for

13  six months, correct?

14  A.  Yeah.

15  Q.  You knew Bob Patel for all of six months, correct?

16  A.  Yes, sir.

17  Q.  There was no doubt in Pradeep Pandya's mind that what you

18  were involved in was a completely illegal operation.  Correct?

19  A.  Yes.

20  Q.  And Bob Patel comes to Pradeep Pandya and he says, listen,

21  Pradeep, all those medications that we've stolen that are in

22  the middle room, the way we make money is to sell them back to

23  McKesson.  Correct?

24  A.  Yes.

25  Q.  And you thought about doing it, according to your

1    testimony.  Correct?

2    A.  Yes.

3    Q.  And when you thought about doing it, you decided not to

4    because there were too many medications to send back?

5    A.  Yes.

6    Q.  You thought it would create a red flag, correct?

7    A.  Yes, sir.

8    Q.  And did you ever say to Bob how about if we send back maybe

9    a box at a time?

10   A.  No, I did not say anything to Bob.

11   Q.  So, it's your testimony that you never agreed to get

12   involved in the sale of those stolen medications back to

13   McKesson.  Correct?

14   A.  Yes.

15   Q.  But they were sold back to McKesson.  Correct?

16   A.  I did not know about that.

17   Q.  Well, they were taken at some time by this Mr. Gujarathi

18   out of the Saginaw location?

19   A.  Yeah.  He told me that I'm getting all medications, yes.

20   Q.  Mr. Gujarathi told you that, correct?

21   A.  Yes.

22   Q.  And that's the phone call you had with Bob Patel, correct?

23   A.  Yes.

24   Q.  And you weren't even in that building anymore when that

25   occurred, correct?

1    A.   No.

2    Q.   So, you never saw Gujarathi take the medications, did you?

3    A.   No, sir.

4    Q.   You were just told that by Bob Patel, correct?

5    A.   No.  Gujarathi called me and then Bob Patel called me, yes.

6    Q.   Well, Gujarathi, you knew him before he went and got those

7    medications, didn't you?

8    A.   Yeah.  He was sending my paychecks.  He was the manager for

9    all the pharmacies.

10   Q.   He was the guy who was Bob Patel's accountant.  Correct?

11   A.   Yes.

12   Q.   He was Bob Patel's right-hand man, correct?

13   A.   Right-hand man, yes.  You can say that, yes.

14   Q.   All right.  So, you knew when you got a call from Chetan

15   Gujarathi, you knew who he was and his relationship with Bob

16   Patel.  Correct?

17   A.   Yes.

18   Q.   Okay.  Now, Mr. Pandya, with respect to your conversation

19   that you had with Burdette, after that conversation ended,

20   after you corrected or told him how he had to write the

21   scripts, from that point on, he wrote the scripts the proper

22   way, according to you.  Correct?

23   A.   Yes.

24   Q.   So, every medication that you filled with a James Burdette

25   signature on it was written the right way after you

1    straightened out the problem?

2    A.  Yes.

3    Q.  Now, Mr. Neal asked you some questions yesterday about a

4    conversation that you had with Vinod Patel about your concern

5    over James Burdette's medication prescriptions.

6    A.  Yes.

7    Q.  And I think you told Mr. Neal yesterday that Vinod Patel

8    came to see you after you brought this to Bob Patel's

9    attention.  Correct?

10   A.  No.  The first time he came to the pharmacy was like as a

11   regular visit.

12   Q.  Well, he just came into the pharmacy, correct?

13   A.  Yes.

14   Q.  And he didn't tell you, hey, I'm the owner, I'm Bob Patel's

15   brother.  He told you --

16   A.  He introduced himself to me.

17   Q.  And you told Mr. Neal about a threat or a conversation, a

18   heated conversation that you had with Vinod Patel.

19   A.  On the phone, yes.

20   Q.  Yeah.  When was that conversation approximately?

21   A.  Before I talked to him, I talked to Bob regarding the

22   prescriptions format.

23   Q.  Was it in April, May, June?

24   A.  Around April and May, yes.

25   Q.  Okay.  And Vinod Patel, according to you, contacted you by

1  phone?

2  A.  Yes.

3  Q.  Did he come to the pharmacy?

4  A.  No.

5  Q.  So, the conversation that you had with Vinod Patel was over

6  the phone.  Correct?

7  A.  Yes.

8  Q.  Did you ever or you and Mr. Neal ever go through your phone

9  records to try to verify that there were phone calls between

10  you and Vinod Patel's phone?

11  A.  It was the pharmacy phone.

12  Q.  Did you and Mr. Neal ever go through your phone records or

13  the pharmacy phone records to verify that there was a phone

14  call made around the time where you claim to have gotten

15  threatened --

16  A.  I don't know that.

17  Q.   -- between you and Vinod Patel?

18  A.  I don't know that.

19  Q.  You never did that, right?

20  A.  I don't know.

21  Q.  So, the ladies and gentlemen are left here to rely on your

22  version of what happened in that phone call.  Fair to say?

23  A.  That's what -- I was the person that was getting that phone

24  call, yes.

25  Q.  Well, you told the ladies and gentlemen that Vinod Patel

1    was irate on the phone.  Correct?

2    A.  Yes.

3    Q.  He told you he was going to come and beat you up?

4    A.  Not the very first time -- the conversation with the first

5    time.  It was the second time.

6    Q.  Was it before or after he gave you James Burdette's

7    address?

8    A.  It was after.

9    Q.  Okay.  So, he gives you Burdette's address, correct?

10   A.  Yes.

11   Q.  And you go out and straighten out the problem with

12   Burdette, correct?

13   A.  Yes.

14   Q.  And then after that you get a phone call from Vinod Patel.

15   That's your story.  Correct?

16   A.  I mean, I talked to Bob, and Bob called him and he called

17   me --

18   Q.  Well, you don't know who Bob called.  You weren't --

19   A.  Bob told me that he was going to talk to his brother

20   because he was looking after the business.

21   Q.  My point is the problem with James Burdette had already

22   been solved, correct?

23   A.  Yes.

24   Q.  Burdette was writing medications on prescription pads that

25   were properly written, correct?

1    A.   Yes.

2              THE COURT:   That's the fourth time.

3    BY MR. BEUKE:

4    Q.   Well, how long after you straightened out the problem with

5    Dr. Burdette did you have this heated conversation with Vinod

6    Patel?

7    A.   Like I said, as soon as the medication was bring back and

8    reverse the claims, then we had a conversation after that.

9    Q.   You had been not reversing the claims almost for two months

10   at that point, correct?

11   A.   No, sir, I'm not talking about that ...

12   Q.   I understand that.  You started not reversing the claims

13   within a month of you getting on the job, correct?

14   A.   That was after that phone call, yes.

15   Q.   Okay.  And you stopped reversing the claims and you joined

16   this illegal practice.  Correct?

17   A.   Yes.

18   Q.   My question, sir, is when Vinod Patel -- when you're

19   telling these ladies and gentlemen that he threatened you, you

20   had been at the pharmacy for almost three months at that point.

21   Correct?

22   A.   That was before that.  One and a half to two months in

23   between.

24   Q.   Okay.  You say that Vinod Patel said what to you?

25   A.   I was on the phone call.  He said why do you need to put

1    the medication back, what we bill to the insurance.  You don't

2    run the business here.  And the same thing Vinod Patel told me

3    also --

4    Q.  But you had already decided that you were doing that, you

5    weren't reversing the billing at that point.  Right?

6    A.  Not at that time.  After that, yes.  I was involved, yes.

7    Q.  Well, what else did he say to you?

8    A.  He said -- he was so much mad and he was upset on me,

9    because I told about putting the medication in the reverse

10   back, and he said he's going to beat me.  He said not only --

11   Q.  He said he's going to beat you up?

12   A.  Yes.

13   Q.  What else?

14   A.  He said he had a lot of connections over in India, and my

15   family is there and so he's going to harass them too.

16   Q.  So, he threatened to not only hurt and beat you up, but he

17   threatened to hurt and beat up your family in India?

18   A.  Yeah, that he has the connections and --

19   Q.  Well, in your mind you took it to mean that my family in

20   India is going to have a problem, correct?

21   A.  Yes.

22   Q.  When he told you that, according to you, you immediately

23   called Bob.  Right?

24   A.  Yes.

25   Q.  And the next day Vinod Patel called you back and

1    apologized?

2    A.  Yes.

3    Q.  Okay.  Mr. Neal talked to you about your arrest on March

4    13th -- March 19th of 2013, correct?

5    A.  Yes.

6    Q.  And when you were arrested on March 13th -- 19th of 2013,

7    you were taken to a jail cell, correct?

8            You were eventually brought to court, correct?

9    A.  Yes.

10   Q.  And at some point you learned all of these charges that

11   were pending against not only you, but a number of other

12   people.  Correct?

13   A.  Yes.

14   Q.  Okay.  And you knew one of the people that had been charged

15   along with you was Vinod Patel, correct?

16   A.  Yes.

17   Q.  And Atul Patel, correct?

18   A.  Yes.

19   Q.  And Lalit Patel, correct?

20   A.  Lalit Patel, I don't know.

21   Q.  Yeah.  He never got charged in your indictment, did he?

22   A.  I don't know anything about that, no.

23   Q.  What about Mehul Patel?

24   A.  Mehul Patel, that's right.

25   Q.  And Mehul Patel was your friend, correct?

1    A.  Yes.

2    Q.  Where is Mehul Patel?

3    A.  I don't know about that.

4    Q.  He's back in India?

5    A.  I don't know.

6    Q.  Okay.  After you were charged, you hired a lawyer, correct?

7    A.  Yes.

8    Q.  You spoke to a lawyer over the next several months,

9    correct?

10   A.  Yes.

11   Q.  You told the lawyer I want to come in and talk with the

12   prosecutors.  Correct?

13   A.  Yes.

14   Q.  Make me a deal.  Correct?

15   A.  Yes.

16   Q.  And you were looking to try to make sure that Mr. Pandya

17   was going to spend, if possible, the least time in custody for

18   everything that you did?

19   A.  Yes.

20   Q.  That was your hope, correct?

21   A.  Yes.

22   Q.  And you went in and you spoke with the prosecutors on --

23   was it -- when did you have your first interview with them?

24   A.  (No response.)

25   Q.  Do you remember?

1    A.  No, I don't remember.  It should be a couple of months

2    after.

3    Q.  Well, do you remember who was present?

4    A.  President?

5    Q.  Present for the interview?

6    A.  Yeah.  Mr. Neal.

7    Q.  Pardon?

8    A.  Mr. Neal was there.

9    Q.  Mr. Neal.  And who else?

10   A.  And there was another agent like an agent working for ...

11   Q.  And you had signed an agreement to participate in this.

12   Correct?

13   A.  Yes.

14           MR. BEUKE:  Judge, I'm gonna ...

15           *(Off the record.)*

16           MR. BEUKE:  Defendant's No. 8.

17   BY MR. BEUKE:

18   Q.  Can you take a look at that document, Mr. Pandya?

19   A.  Yes.

20   Q.  You've seen that document, that eight-page document before,

21   haven't you.

22           *(Off the record.)*

23           THE COURT:  I'm sorry.  Repeat your question, please.

24   BY MR. BEUKE:

25   Q.  You've seen that document before today, haven't you, sir?

1  A.  Yes.

2  Q.  You and Mr. Neal went over your testimony in preparation of

3  you coming here yesterday a couple times, correct?

4  A.  Me and my lawyer, he's been through too.

5  Q.  And Mr. Neal, correct?

6  A.  Yes, mm-hmm.

7  Q.  You went over the questions that he was going to ask you,

8  correct?

9  A.  He was going to ask me?

10  Q.  Yeah.

11  A.  I don't know about that.

12  Q.  Well, he allowed you to read and review that document?

13  A.  Yeah.  I've seen this document, yes.

14  Q.  Okay.  And you've read it a number of times, correct?

15  A.  Uhm ...

16  Q.  Yes or no.

17  A.  A number of times, yeah.  That was my thing.  So, I ...

18  Q.  Well, that's a report concerning your conversations with

19  Mr. Neal and the agents on September 24th of 2013.  Correct?

20  A.  Yes.

21  Q.  And that report that you've reviewed documents your

22  conversations with Mr. Neal and with the agents.  Correct?

23  A.  Yes.

24  Q.  And in the report that you and your attorney and Mr. Neal

25  went over, that was a report about everything that you told

2:11-cr-20468-AJT-MKM  Doc # 1261  Filed 09/16/14  Pg 71 of 198  Pg ID 18105

1    them in that conversation.  Correct?

2    A.  Yeah.  It was not everything, because it was part --

3    because so many things was in my talk and there was limited

4    time.  So ...

5    Q.  Mr. Pandya, you talked with Mr. Neal and Mr. -- the

6    agents --

7    A.  Agents.

8    Q.   -- about this prescription pad problem.  Correct?

9    A.  Yes.

10   Q.  You discussed that in that interview.  Correct?

11   A.  Yes.

12   Q.  And you discussed with them in that interview that Bob

13   Patel told you to go and see Dr. Burdette.  Correct?

14   A.  Bob Patel told me to go and do this.

15   Q.  Well, you didn't say to the agents that Bob told Vinod and

16   Vinod told you, did you?

17   A.  Because he was looking for the whole ...

18   Q.  Well, that topic was discussed by you and Mr. Neal,

19   correct?

20   A.  (No response.)

21   Q.  Never once in that interview did you ever tell Mr. Neal or

22   the agents that Vinod Patel threatened you, did you?

23   A.  Because there was so many --

24   Q.  My question is did you tell the agents and Mr. Neal in that

25   interview, the first time you were going in there to try to get

1    your deal, that Vinod Patel threatened you?  Yes or no.

2    A.  No, not in this one.

3    Q.  Okay.  About nine months go by, and you go and meet with

4    Mr. Neal again on June 24th, a couple weeks back, didn't you?

5    A.  Yes.

6    Q.  And you met at Mr. Neal's office, correct?

7    A.  Yes.

8    Q.  And you knew you were preparing for your testimony against

9    Vinod Patel.  Correct?

10   A.  Yes.

11   Q.  For the very first time, Mr. Pandya, you told somebody

12   about Vinod Patel threatening you.  Isn't that correct?

13   A.  Yes.

14   Q.  And when you described that he had connections in India and

15   he wanted to beat you up, that was the first time you ever told

16   anybody about that.  Isn't that correct?

17   A.  No.

18   Q.  Who did you tell before June 24th of 19 -- of 2013?

19   A.  Bob.  Bob Patel.  I told him before when that actually

20   happened.

21   Q.  So, when Pradeep Pandya was in the agents' presence and

22   Mr. Neal's presence, the person that was going to give you your

23   deal potentially, you never mentioned one word about being

24   threatened by Vinod Patel, did you?

25   A.  No.

1    Q.  I want to talk to you a little bit about after you left

2    Tri-City Pharmacy.

3    A.  Mm-hmm.

4    Q.  That state inspection and the inspector that showed up at

5    your doorstep at Tri-City in December of 2013, that shook you

6    up.  Correct?

7    A.  Yes.  2010, yes.

8    Q.  And it shook you up so much, that you quit Tri-City?

9    A.  Yes.

10   Q.  The next day, right?

11   A.  Not the next day.  Afterwards, yes.

12   Q.  Well, you stayed there for four months, didn't you?

13   A.  Yeah.

14   Q.  The billed but not dispensed scheme, that continued to go

15   on, didn't it?

16   A.  From that moment, I stopped.  I did not do anything after

17   that.

18   Q.  Okay.  So, you decided I can't involve myself in this

19   anymore, correct?

20   A.  Yeah.

21   Q.  And after you quit in March of two thousand and -- what

22   year?

23   A.  2011.

24   Q.  Okay.  And you stayed home for a month.  Correct?

25   A.  A month, a month and a half, yes.

1    Q.   And about a month later you got a phone call from your

2    buddy Mehul, right?

3    A.   Yes.

4    Q.   That was your pal, right?

5    A.   He was my friend, yes.

6    Q.   That was the guy that was also a Bob Patel pharmacist,

7    correct?

8    A.   Yes.

9    Q.   And Mehul Patel told you about an idea that he had.

10   Correct?

11   A.   He said he's opening a pharmacy, yes, that's what he said.

12   Q.   Well, he told you about him and his buddy who, who was

13   going to be his partner?

14   A.   Hiren Patel, yes.

15   Q.   Hiren Patel.  That's another guy that you knew, correct?

16   A.   Yeah.  I knew him after one time, yes.

17   Q.   Well, when did you meet Hiren Patel?

18   A.   I never meet him before I come to the new pharmacy, yes.

19   Q.   Well, in the conversations that you had with Mehul, he told

20   you about the plans that he and Hiren had made to open up their

21   own pharmacy, correct?

22   A.   Yes.

23   Q.   Mehul told you that Hiren and him had planned on opening up

24   this pharmacy, and Bob Patel found out about it.  Correct?

25   A.   Yes.

1    Q.  And Mehul told you that after Bob Patel found out about it,

2    that Bob Patel threatened to take away Mehul and Hiren's visas.

3    Correct?

4    A.  Hiren's visa, yes.  Mehul was I think a citizen, yes.

5    Q.  You didn't have that problem because at that point you were

6    a citizen, correct?

7    A.  Yeah, I was a citizen.

8    Q.  And so Mehul Patel comes to you and says, listen, we would

9    like to be partners with you, Pradeep?  Correct?

10   A.  Yes.

11   Q.  And we're going to use you to actually be the one who is

12   going to apply for the pharmacy license.  Correct?

13   A.  Yes.

14   Q.  And you knew Mehul Patel and Hiren Patel couldn't apply for

15   the license because they were afraid of Bob.  Correct?

16   A.  Yes.

17   Q.  All right.  Or at least Hiren was?

18   A.  Yes.

19   Q.  And at that point, Pradeep Pandya did what?

20   A.  Then we applied for the pharmacy and we opened the

21   pharmacy.

22   Q.  Well, you decided to go into business with Mehul and with

23   Hiren.  Correct?

24   A.  Yes.

25   Q.  And you made the applications for the pharmacy license.

1    Correct?

2    A.  Yes.  Yes.

3    Q.  You signed all the paperwork, the legal paperwork.

4    Correct?

5    A.  Yes.  Yes.

6    Q.  And it took about how long for you and your partners to get

7    the pharmacy license to open up Park Shelton?

8    A.  A month or a month and a half.  I'm not sure exactly.

9    Q.  You guys had to find a place to put the pharmacy, correct?

10   A.  Yes.

11   Q.  You went out and looked at different sites, correct?

12   A.  Not me.  Because I applied for the license, everything

13   should be ready there.

14   Q.  So, you had this all ready during the month you say you

15   were sitting at home, correct?

16   A.  Mehul and Hiren had the location, the location was ready

17   for them.  And they asked me to apply for them, yes.

18   Q.  And you did it?

19   A.  And I did it, yes.

20   Q.  And you became their partner, correct?

21   A.  Yes.

22   Q.  And as soon as you became their partner and the first day

23   that you guys opened at Park Shelton, you, Pradeep Pandya, was

24   -- you guys were using marketers, correct?

25   A.  Marketers, yes.

1    Q.  Hiren Patel had his own marketers, according to you,

2    correct?

3    A.  Yes.

4    Q.  Hiren Patel had people who were trying to steer

5    prescriptions to your pharmacy, correct?

6    A.  Pharmacy, yes.

7    Q.  And you knew your license was on the line.  You were the

8    owner.  Correct?

9    A.  Yes.

10   Q.  And you knew all about the bill but not dispense scheme.

11   Right?

12   A.  Yes.

13   Q.  Tell the ladies and gentlemen how long it took Mr. Pandya

14   and his partners to start running the same scheme?

15   A.  It was a lower scale.  It was not exactly the same.  The

16   doctors was a different size than that one.  But we did that

17   one, yes.

18   Q.  Well, the lower scale was you had doctors writing false

19   prescriptions to your pharmacy, correct?

20   A.  False prescriptions?  I don't know about that one, sir.

21   Q.  Well, you knew that the prescriptions that you were filling

22   had controlled medications on them, correct?

23   A.  Yes.

24   Q.  And noncontrolled, correct?

25   A.  Yes.

1    Q.  And the noncontrolled weren't being given to these

2    patients.  Correct?

3    A.  Yes.

4    Q.  The controlled were being given to the patients, correct?

5    A.  Yes.  Yes.

6    Q.  And that was the same scheme that you were running at

7    Tri-City.  Correct?

8    A.  Yes, sir.  Yes, sir.

9    Q.  And you and Mehul and Hiren started the same scheme,

10   correct?

11   A.  Yes.

12   Q.  This is four months after you were shaking in your boots

13   after this state inspector came in and walked into Tri-City

14   Pharmacy in December.  Correct?

15   A.  Yes.

16   Q.  It took you four months to get over that fear, and then you

17   jumped right back in, didn't you?

18   A.  Yes.  Yes.

19   Q.  And you told the ladies and gentlemen that that pharmacy

20   stayed open with you and Mehul and Hiren for about seven

21   months.  Correct?

22   A.  It was -- yes.  Seven, eight months, yes.

23   Q.  I think it closed when?

24   A.  January 26th, two thousand and ...

25   Q.  And in the seven or eight months that you guys were running

1    your low scale billed and not dispensed scheme, you made

2    $300,000?

3    A.  Yes.

4    Q.  Correct?

5    A.  Yes.

6    Q.  And not only did you make $300,000, but Mehul made 300,000.

7    Correct?

8    A.  Yes.

9    Q.  And the 300,000 that you made was all based on the scheme

10   that you and Mehul were running.  Correct?

11   A.  Yes.

12   Q.  A million two you guys took and put in your pockets in

13   seven months.  Correct?

14   A.  Yes.

15   Q.  And the 600,000 that you took, okay, and put in your

16   pocket --

17   A.  Mm-hmm.

18   Q.  -- as a result of your plea in this case, you've given the

19   Government back that $600,000, haven't you?

20   A.  I did not give anything back.

21   Q.  Well, did you give the Government back one dollar yet?

22   A.  No, sir.

23   Q.  You've never given them a cent, have you?

24   A.  No.

25   Q.  And the 600,000 is where?

1    A.  600,000?

2    Q.  Yeah.

3        Where did you put the 600,000 that you made for the

4    bill but not dispense scheme?

5    A.  Well, I took only 300,000, sir.

6    Q.  No, no.

7        You told the ladies and gentlemen a minute ago that

8    you made 600,000.  Right?

9    A.  No.  I made 300,000 for myself, yes, sir.

10   Q.  Well, in your interview back with the agents and Mr. Neal

11   in October or September of 2013, they asked you about how much

12   money you made at Park Shelton Pharmacy, didn't they?

13   A.  Yes.

14   Q.  And when they asked you that question, you told them what?

15       Or, I'm sorry.  Maybe I have it wrong here.

16           *(Off the record.)*

17   Q.  Did you tell them that you made 600 or 300?

18   A.  Three.

19   Q.  300,000.  I'm sorry.

20       Where is the 300,000 that you made in six months?

21   Where is that today?

22   A.  It is me.  I use it for my family already.

23   Q.  Pardon?

24   A.  I used it for my family to use for expenses.

25   Q.  It's gone?

1    A.  It's gone.

2    Q.  And since 2013 did you tell them that the 300,000 that I

3    made illegally and all the money that I made when I worked for

4    Bob Patel, it's all gone, guys?

5    A.  (No response.)

6    Q.  Part of your Plea Agreement indicated that you would

7    forfeit to the Government all of the proceeds that you made

8    while you were involved in this conspiracy, correct?

9    A.  Can you repeat?  I'm sorry, I don't understand.

10   Q.  The Plea Agreement that you signed with Mr. Neal --

11   A.  Yes.

12   Q.  -- and your lawyer --

13   A.  Yes.

14   Q.  -- do you remember that?

15   A.  Yes.

16   Q.  And when you went through the Plea Agreement, part of the

17   agreement indicated that you would forfeit anything that you

18   made during the course of your involvement in this conspiracy.

19   Correct?

20   A.  My attorney knows exactly.  The terminology, I don't -- but

21   yes.

22   Q.  And you've said that everything that you made from Tri-City

23   was a product of you knowing and being involved in this

24   conspiracy.  Correct?

25   A.  I took only my salary from Tri-City.

1    Q.  You never made a dime from Tri-City other than the $10,000

2    and your salary.  Correct?

3    A.  Yes.

4    Q.  But as soon as Pradeep Pandya got on his own, in six months

5    he made $300,000.  Correct?

6    A.  Yes.  That was including my salary, yes.

7    Q.  So, that part of the agreement, you're not going to pay

8    back the Government $300,000, are you, because you've spent it

9    all?

10   A.  I spent it as of now.  I don't know, yes.

11   Q.  While you were in that interview with the agents and

12   Mr. Neal back in September of 2013, while you were trying to

13   get your deal, they played a phone call for you also, didn't

14   they?

15   A.  A phone call?

16   Q.  Yeah.

17   A.  They showed me the paper, yes.

18   Q.  The transcript?

19   A.  Yes.

20   Q.  And it was a transcript where you were talking with whom?

21   A.  With Bob Patel.

22   Q.  And the transcript of your conversation with Bob Patel was

23   about your wife, correct?

24   A.  Yes.

25   Q.  And you wanted Bob Patel to put your wife on the payroll,

1    correct?

2    A.  Yes.

3    Q.  And you wanted your wife on the payroll so your wife could

4    falsely claim to the government that she was working and she

5    was making a salary, correct?

6    A.  Yes.

7    Q.  That was another part of the fraud that Pradeep Pandya

8    decided he wanted to involve himself in, correct?

9    A.  It was at that time, yes.

10   Q.  And you and Bob talked about that and he was going to do

11   that for you, didn't he?

12   A.  It never happened.

13   Q.  It never happened because you quit Tri-City, correct?

14   A.  No, I quit Tri-City after that, sir.

15   Q.  Well, Bob Patel in that conversation, he told you that he

16   would do that for you, didn't he?

17   A.  It was -- I don't know that.

18            MR. BEUKE:  Judge, can I have a moment?

19            THE COURT:  Sure.

20   BY MR. BEUKE:

21   Q.  You indicated I think, Mr. Pandya, that you pled guilty to

22   this offense back on October 10th of 2013.  Correct?

23   A.  Yes.

24   Q.  And you were in this courtroom when you pled guilty.

25   Correct?

1    A.  Yes.

2    Q.  There was another person who pled guilty right before you

3    in this case on that date.  Correct?

4    A.  Yes.

5    Q.  Atul Patel.  Correct?

6    A.  I saw him, yes.  I was outside waiting actually.

7    Q.  He wasn't your friend though, was he?

8    A.  No, he was not my friend.

9           MR. BEUKE:  Nothing else, Your Honor.

10           THE COURT:  Redirect?

11           MR. NEAL:  Yes, Your Honor.

12                        REDIRECT-EXAMINATION

13   BY MR. NEAL:

14   Q.  Mr. Pandya, do you recall some questions from Mr. Beuke

15   about the threat that Vinod Patel made to you?

16   A.  Yes.

17   Q.  And do you recall being asked when you first talked about

18   that threat with the Government?

19   A.  Yes.

20   Q.  I'd like to show you this document and see if you recognize

21   it.

22           Have you seen that document before, Mr. Pandya?

23   A.  Yes.

24   Q.  All right.  And is that a report of an interview that you

25   had with the Government in December of 2013?

1   A.  Yes, it is.

2   Q.  And in this -- if you could just take a moment and look

3   through it.

4           In that interview is it fair to say that you

5   discussed Vinod Patel in a little bit more detail?

6   A.  Yes.

7   Q.  And on page two of that interview report is there a

8   discussion of the conversation that you had with Vinod Patel

9   where he threatened you?

10  A.  Yes.

11  Q.  Do you recall some questions from Mr. Beuke about the

12  forfeiture amount in the Plea Agreement?

13  A.  Yes.  That's what he was asking me.

14  Q.  Sure.

15          Do you owe the United States any money as a result of

16  your Plea Agreement?

17  A.  As of now, I -- there's a -- I don't have all those papers.

18  So ...

19  Q.  Let me show you this document and take a look at it.

20  A.  Yeah.

21  Q.  Do you recognize that?

22  A.  Yes.

23  Q.  And what is it?

24  A.  It's a Guilty Plea Agreement.

25  Q.  It's a Guilty Plea Agreement.

1              Is that your signature on the last page?

2    A.  Yes.

3    Q.  All right.  And if we can take a look --

4              MR. NEAL:  I don't know whether we need to publish

5    this to the jury --

6              MR. BEUKE:  I have no objection to that.

7              THE COURT:  Pardon?

8              MR. NEAL:  You have no objection?

9              MR. BEUKE:  No.

10             MR. NEAL:  We'll just move it into evidence, then.  I

11   would like to move this Plea Agreement of Pradeep Pandya into

12   evidence, Government Exhibit 15.

13             THE COURT:  With no objection, it's received.

14             *(Government Exhibit 15 was admitted into evidence.)*

15   BY MR. NEAL:

16   Q.  Mr. Pandya, do you see paragraph E here?

17   A.  Yes.

18   Q.  And does that involve restitution?

19   A.  Yes.

20   Q.  How much money do you owe the United States Department of

21   Health and Human Services?

22   A.  $2.8 million.

23   Q.  And how much money do you owe Blue Cross and Blue Shield of

24   Michigan?

25   A.  250,000.

1    Q.  Thank you.

2         Mr. Pandya, do you recall discussing with Mr. Beuke

3    the billing and not dispensing scheme at Tri-City Apothecary?

4    A.  Yes.

5    Q.  Who was the first person to direct you to engage in a

6    billing and not dispensing scheme at Tri-City Apothecary?

7    A.  Vinod Patel.

8         MR. NEAL:  I have nothing further.

9         THE COURT:  Recross?

10        MR. BEUKE:  Thank you, Judge.

11                   RECROSS-EXAMINATION

12   BY MR. BEUKE:

13   Q.  Mr. Pandya?

14   A.  Yes.

15   Q.  On September 24th of 2013 when you and your attorney came

16   in to meet with Mr. Neal and the agents, you went through in

17   very detail about your involvement in this case.  Correct?

18   A.  Yes.

19   Q.  And you've gone over your report -- it's approximately how

20   many pages?  Nine?

21   A.  I don't know how many.  It should be eight, nine, pages,

22   yes.

23        Yes.

24   Q.  In that report -- and you've told us that you never told

25   them anything about being threatened by Vinod Patel, correct?

1    A.   Because in September, first -- it was the first time --

2    Q.   My question is you never told them about being threatened

3    by Vinod Patel, correct?

4    A.   On this one?

5    Q.   Yes.

6    A.   No.

7    Q.   And in December when you came in, you came in in

8    preparation for testimony that you were going to be asked to

9    give against Vinod Patel, correct?

10   A.   Yes.

11   Q.   In that second conversation when you sat down with these

12   gentlemen, that's the very first time you told anybody about

13   being threatened by Vinod Patel, correct?

14   A.   Yes.

15   Q.   Okay.  The -- Mr. Neal asked you some questions about what,

16   pursuant to your Plea Agreement, your debt to the United States

17   of America is.

18           And that's contained in your Plea Agreement.

19   Correct?

20   A.   Yes.

21   Q.   I'm going to show you Defendant Exhibit No. 9.  Mr. Neal

22   talked about a Cooperation Agreement.

23           That's also a document you signed that day, correct?

24   A.   (No response.)

25   Q.   You and your attorney and Mr. Neal and Mr. Pratt, correct?

1    A.   Yes.

2    Q.   And the Cooperation Agreement -- can you read page two,

3    paragraph C.

4             That document was signed by you and your attorney and

5    Mr. Neal and Mr. Pratt in addition to the Plea Agreement.

6    Correct?

7    A.   Yes.

8    Q.   And in that paragraph you've agreed to identify and forfeit

9    all of the property or monies that you made during your

10   involvement in this conspiracy.   Correct?

11   A.   Yes.

12   Q.   Have you identified any properties for the gentlemen from

13   the prosecution that you've made as a result of your

14   involvement in this conspiracy?

15   A.   I did not identify anything.   I don't have anything from

16   that money though.

17   Q.   So, you don't have anything to identify for them that you

18   could lose, correct?

19   A.   The money what I was like owing -- like I got, I did not

20   buy property or anything.

21   Q.   You just bought cereal and food and clothes and things like

22   that, correct?

23   A.   Yeah.   For regular purpose.

24   Q.   $300,000 worth?

25   A.   This was in 2010, yes.

1    Q.   There's nothing that you've identified for these gentlemen

2    that you bought as a result of making $300,000 in six months.

3    Correct?

4    A.   No, sir.

5    Q.   And there's nothing that you're going to identify to them.

6    Correct?

7    A.   No.

8    Q.   And there's no monies that you're going to give back to the

9    Government, is there, because it's all gone.  Right?

10   A.   If I have to.  It's gone, yes.

11   Q.   It's gone.  You don't have anything.

12   A.   Yes.

13   Q.   So, Pradeep Pandya isn't going to lose anything, not one

14   dime, as a result of what he signed and pled guilty to.  Isn't

15   that correct?

16   A.   I don't know about that, sir.

17   Q.   Mr. Neal told -- or, asked you the question, you owe the

18   Government 2.8 million.  Right?

19   A.   Yes, sir.

20   Q.   Where are you going to get that?

21   A.   I don't know.

22   Q.   You're never going to pay it back, are you, sir?

23   A.   I mean, I would like to.  I don't have any right now.

24              MR. BEUKE:  Nothing else.

25              Judge, I'm sorry.  I'm going to ask to move

1   Defendant's No. 9 into evidence, the Cooperation Agreement.

2           MR. NEAL:  I have no objection to that, and I have no

3   further questions of this witness.

4           THE COURT:  What about No. 8?  Have we admitted that

5   or have you admitted that?

6           If it hasn't, you have no objection to No. 8?

7           MR. NEAL:  I'm sorry.  What is Defendant's No. 8?

8           *(Off the record.)*

9           MR. NEAL:  Defendant 8 is not going to be admitted,

10  Your Honor.

11          MR. BEUKE:  No, Your Honor.

12          THE COURT:  Okay.  So, we'll just have a gap?

13          MR. NEAL:  I think that will keep the jury on its

14  toes.

15          THE COURT:  All right.  8 is not admitted.  9 is

16  admitted.

17          *(Defendant Exhibit 9 was admitted into evidence.)*

18          THE COURT:  Questions from the jury?

19          Write it down.

20          Anyone else on the jury?  Write them down.

21          All right.  Here's the question:  "Who is James

22  Burdette and what is his occupation?"

23  A.   James Burdette was a PA, that's physician assistant.  He

24  was to see the patients in the clinic.

25          THE COURT:  And who was he a physician assistant

1   working with?

2   A.  I think it was under Dr. Paul.

3          THE COURT:  Okay.  Any follow-up questions?

4          Any questions from either side?

5          MR. NEAL:  No, Your Honor.

6          MR. BEUKE:  No, Your Honor.

7          THE COURT:  You may step down.  Thank you.

8   A.  Thank you.

9          Thank you.

10         THE COURT:  You may call your next witness.

11         MR. PRATT:  Yes, Your Honor.  The United States calls

12  Jeffrey Wade.

13         THE COURT:  Please raise your right hand.

14         JEFFREY WADE,  GOVERNMENT'S WITNESS, SWORN.

15         THE COURT:  Please be seated.  Adjust the microphone

16  so we can hear you.

17                      DIRECT-EXAMINATION

18  BY MR. PRATT:

19  Q.  All right, sir.  If you could speak into the microphone and

20  tell us your full name, spelling the last.

21  A.  Jeffrey Aaron, W-A-D-E, Wade.

22  Q.  All right.  Mr. Wade, can you tell us how old you are?

23  A.  I'm 46.

24  Q.  In what city do you currently live?

25  A.  In Flint, Michigan.

1    Q.   How long have you lived in Flint?

2    A.   Mostly all my life.

3    Q.   Do you -- are you employed at the present time?

4    A.   No.  I have my own landscaping business.

5    Q.   Okay.  So, you are in the landscaping business and you are

6    an entrepreneur I guess.

7    A.   I'm trying to be.

8    Q.   All right.  How long have you been in the landscaping

9    business?

10   A.   It has been about 20 years.

11   Q.   Okay.  Do you own some equipment in this landscaping

12   business?

13   A.   Yes, I do.

14   Q.   Can you tell us what kind of equipment you own?

15   A.   Two push mowers and a rider.

16   Q.   Okay.  Do you have any way to get the equipment around?

17   A.   Yes.  I have a trailer.

18   Q.   Okay.  Do you have people that work for you?

19   A.   My sons.

20   Q.   Okay.  Going back a couple of years -- do you -- what type

21   of landscaping work do you do?  Is it only residential, is it

22   commercial, is it both?

23   A.   Just residential.

24   Q.   Okay.  Did there come a time a couple years ago you got a

25   job for New Century Adult Care?

1    A.  Yes, I did.

2    Q.  Okay.  Where was their premises located?

3    A.  On Dort Highway.

4    Q.  In what city?

5    A.  Flint, Michigan.

6    Q.  All right.  And who was it that hired you to do their

7    landscaping there?  Was that the owner, Mr. English?

8    A.  Yes.  Yes, sir.

9    Q.  Okay.  Do you -- you say your sons work with you.

10            Do you get out there and cut the grass too?

11   A.  No.  I just -- I get on the rider.

12   Q.  But on the rider, that's riding what, riding the lawn

13   mower?

14   A.  Lawn -- yes.

15   Q.  Okay.  Have you -- tell us a little bit about your medical

16   issues.  Have you ever had any medical issues that caused you

17   to be confined to your home?

18   A.  No, sir, never.

19   Q.  Okay.  How were you able to get to court today?

20   A.  I drove myself.

21   Q.  Okay.  You didn't need anyone to help you?

22   A.  No, sir.

23   Q.  All right.  I'm going to ask you if there was a time period

24   going back a number of years, three or four or five years, that

25   you saw a physician assistant by the name of James Burdette?

1    A.   Yes, I seen James Burdette.

2    Q.   Okay.  And why did you see Mr. Burdette?

3    A.   Because I needed my medications.  I have sarcoidosis and I

4    need two hip replacements.

5    Q.   Okay.  You had hip problems?

6    A.   And I have sarcoidosis.

7    Q.   And without getting too intrusive, what is that?  That's

8    beyond ...

9    A.   It's like a lung -- something that messes with your lungs

10   or kidneys or whatever.

11   Q.   Okay.  And what kind of medication did you get from

12   Physician Assistant Burdette for those medical issues, your

13   hips and your lungs?

14   A.   I got my pain medicine, I got soma, I got Levothyroxine,

15   Prednisone, and sometimes I got Xanax when I couldn't sleep.

16   Q.   Okay.  During the time you were seeing James Burdette, did

17   you see someone called Dr. Mark Greenbain?

18   A.   I think I spoke with Greenbain once.  He was there.  They

19   was having so many doctors there, I couldn't keep up with them.

20   Q.   Okay.  And how about a Dr. Paul Petre, was he your doctor?

21   A.   He could have been.  Like I said, it was so many in there,

22   I can't keep up with them.

23   Q.   Okay.  Which was the doctor you would see regularly to get

24   your medication?

25   A.   It started out with Dr. Burdette.

1    Q.  Okay.  Let me ask you this.  How did it work that you would

2    actually get the medications that would be prescribed to you by

3    Dr. -- by Physician Assistant Burdette?  Would he hand you the

4    prescriptions so you could go to the pharmacy?

5    A.  No, sir.  They would just call it in and they would bring

6    it the next day from somewhere in Saginaw.  Sometimes I didn't

7    get it.

8    Q.  Okay.  Explain that to me.  Had you ever had a situation

9    where you didn't get a prescription?

10   A.  Yeah.  It was stolen or something happened to it.

11   Q.  Okay.  You sometimes had problems getting medications?

12   A.  Yes.

13   Q.  Where would the medication be delivered to you at?

14   A.  Sometimes it came to Marie's house on Martin Luther King.

15   Q.  All right.  Who is Marie?

16   A.  I really don't know.  I just met her when I started seeing

17   Dr. Burdette.

18   Q.  Okay.  Before last month, June of 2014, had you ever heard

19   of a company called First Michigan Home Health Care?

20   A.  Never.

21   Q.  Did you ever get treatment from First Michigan Home Health

22   Care?

23   A.  No.  No, sir.

24   Q.  Did you ever tell Dr. Petre or anyone else that you're

25   homebound and you have real trouble getting out of your house?

1    A.  No, sir.

2    Q.  I'm going to show you --

3           MR. PRATT:  Ms. Drinkard, if you would -- I'm going

4    to show you what I would move for admission, subject to the

5    foundation -- which may have actually been stipulated to --

6    Government Exhibit 6D.

7           I would move the admission of 6D at this time.

8           THE COURT:  Any objection?

9           MR. BEUKE:  Judge, 6D is a very voluminous exhibit.

10   I'm not sure if we are ...

11          MR. PRATT:  I'm talking pages nine to 12 would be the

12   only pages I would be displaying to the jury at this time.

13          MR. BEUKE:  I have no objection, Judge.

14          THE COURT:  Received.

15          *(Government Exhibit 6D, pages 9 to 12, was admitted*

16          *into evidence.)*

17          MR. PRATT:  Ms. Drinkard, could you please display

18   page ten of Government Exhibit 6D.  And if you could focus in

19   on it so we could actually read it, just maybe the first few

20   lines, so Mr. Wade will be able to read it.

21   BY MR. PRATT:

22   Q.  All right.  Mr. Wade, that's your name over on the far

23   left.  Is that correct?

24   A.  Yes.

25   Q.  All right.  And there's an indication of some medications

1    billed on your behalf, and I'd like to go over some of those

2    with you.  All right?

3    A.  Mm-hmm.

4    Q.  We're going back to 2010 for a prescriber -- on the far

5    right there you see a James Benjamin Burdette?  Do you see

6    that?  On the far right, Dr. James Benjamin Burdette?

7    A.  Mm-hmm.

8    Q.  Carisoprodol -- I can never pronounce that -- or soma, he

9    prescribed that for you?

10   A.  Yes.

11   Q.  And you got that?

12   A.  Yes.

13   Q.  And you used that?

14   A.  Yes.

15   Q.  All right.  How about the Alprazolam, we are looking at the

16   fourth line down, 6/25/2010?  Or Xanax?

17   A.  Is that Xanax?

18   Q.  Yes.

19   A.  Yes, I had them when I couldn't sleep.

20   Q.  Okay.  There are some other drugs that are a little more

21   expensive than Alprazolam and soma.

22          The drug called Seroquel, 6/25/2010, did you ever

23   receive or use Seroquel?

24   A.  No, sir, never.

25   Q.  Have you ever been diagnosed as someone in need of

1    antipsychotic drugs?

2    A.  No.

3    Q.  What about Lidoderm, did you receive Lidoderm prescribed to

4    you?

5    A.  No.  I don't know what that is, sir.

6    Q.  Okay.  And let's see.  How about the next one, Nexium --

7              MR. PRATT:  I'm sorry.  I'm still on the same page.

8    The next drug on the next line.

9    BY MR. PRATT:

10   Q.  Nexium, have you ever received that from the pharmacy?

11   A.  No, sir.

12   Q.  All right.  At the time going back in 2009, 2010 and 2011,

13   did you get explanations of benefits that showed what was being

14   billed to your card?

15   A.  Yes, but I never read them.

16   Q.  Okay.  So, it's fair to say you didn't tell anybody, hey,

17   I'm only getting part of these medications?

18   A.  Yes.  They was giving me medications I didn't need.

19   Q.  All right.  There were some you didn't need as well?

20   A.  Yes.

21   Q.  Like what?

22   A.  Inhalers and all kind of medications I couldn't pronounce.

23   You know, I didn't know what they were.

24   Q.  Okay.  And just so we're clear, at one time it was your

25   understanding they were coming from a pharmacy in Saginaw.  Is

1    that correct?

2    A.  Yes.  That's when we would pick them up at Marie's house.

3    Q.  Okay.  Did there come a time after you saw James Burdette

4    where how you would get the prescriptions changed?  Did they

5    change the pharmacy?

6    A.  Yes.  They would call into a pharmacy on South Saginaw

7    Street, and they would do the same thing, just give out

8    medications that we didn't need.

9           MR. PRATT:  And if you could turn to page 11 now and

10    go to the bottom of the page, the bottom part.

11    BY MR. PRATT:

12    Q.  So, we are here for a date of services in 2011; the first

13    date, February 7th, 2011.  Your card was billed for Seroquel

14    from Beecher Pharmacy.

15           Did you get Seroquel from Beecher Pharmacy?

16    A.  No, not that I know of.

17    Q.  Okay.  Like I say, you've never been told by any doctor or

18    anything you have psychiatric problems?

19    A.  No, sir.

20    Q.  Okay.  And you say you think you might have seen

21    Dr. Greenbain one time, but there's an indication you were

22    going to him regularly.

23           Do you think that that's what happened?

24    A.  No.  I wasn't going to Greenbain regular.

25    Q.  Okay.  Turn to the next page.

1              There are some other drugs that were billed to you

2    from Beecher Pharmacy.

3              How about the Hydrocodone, acetaminophen, which is

4    Vicodin, did you actually get that?

5    A.  Yes, I got the Vicodin sometimes.

6    Q.  Okay.  How about the Venlafaxine, do you know what that is?

7    A.  No, I don't.

8    Q.  Did you ever get it?

9    A.  Probably did, but I don't know -- I don't know what it is.

10   I think I probably got it.

11             MR. PRATT:  Okay.  If we could go down to the middle

12   of the page then.

13   BY MR. PRATT:

14   Q.  Okay.  One of the drugs -- I think you said you need the

15   Prednisone; is that correct?

16   A.  And the Levothyroxine, yes.

17   Q.  And if you could read for the Court, how much did the

18   Prednisone -- how much was that bill for?  What is the dollar

19   amount next to that?

20   A.  3.36.

21   Q.  Okay.  What about the Levothyroxine?

22   A.  9.14.

23   Q.  Those are the drugs you needed and used?

24   A.  Those are the main drugs I need, because I have

25   sarcoidosis.

1          MR. PRATT:  Okay.  Let's go to page nine of the

2     exhibit.

3          *(Off the record.)*

4          MR. PRATT:  How about page eight?

5          Okay.  If you could highlight that.

6     BY MR. PRATT:

7     Q.  Mr. Wade, did you know that First Michigan Corporation

8     billed on your card for $5,003.87 back in 2009 for home health

9     care?

10    A.  No, I did not, sir.

11    Q.  Did you receive home health care from First Michigan?

12    A.  No, I did not, sir.

13    Q.  Has anyone from the Government -- that would include

14    myself, the agents, anyone else -- told you you're in trouble

15    or you're being threatened with any kind of thing for your

16    testimony today?

17    A.  No, sir.

18          I just want to get my name cleared of all this, of

19    all this.  You know, this is my second time being here because

20    they are using my name, and I'm just getting tired of it.

21    Q.  All right.  So, there was another group of people that also

22    used your name; is that correct?

23    A.  Yes, sir.  Yes, sir.

24    Q.  And you would rather be doing what instead of testifying in

25    court?

```
1              MR. BEUKE:  Objection.
2    BY MR. PRATT:
3    Q.  Is there anything you would rather do rather than testify
4    in court?
5              MR. BEUKE:  Objection.
6    A.  Yes.  I would rather be at home --
7              THE COURT:  Wait.  Stop.  Stop.  Sustained.
8    BY MR. PRATT:
9    Q.  Sir, what are you going to do when you --
10             THE COURT:  I can take judicial notice if you want.
11   BY MR. PRATT:
12   Q.  Sir, what are you going to do after you leave here today?
13             MR. BEUKE:  Objection.
14   A.  I'm going to try to get home in time to be with my sons so
15   we can finish up our work.
16             THE COURT:  The answer can stand.  But go to a
17   different topic.
18             MR. PRATT:  Your Honor, thank you.  I have no further
19   questions.
20             THE COURT:  That's a different topic.
21             Next.
22             MR. BEUKE:  A couple, Judge.
23                          CROSS-EXAMINATION
24   BY MR. BEUKE:
25   Q.  Good morning, Mr. Wade.
```

1    A.  How you doin', sir.

2    Q.  Mr. Wade, you have lived in Flint, Michigan with your

3    family for pretty much your whole life, I think you've told us.

4    Correct?

5    A.  Yes.

6    Q.  And there are a number of things, physical ailments, that

7    you have.

8            Can you describe those again for myself?

9    A.  I have sarcoidosis.  I need two hip replacements, and my

10   right knee is messed up.

11   Q.  The need for the hip replacements, I've had one of those.

12   Is it --

13           THE COURT:  Do you want to be sworn in?

14           MR. BEUKE:  No, Judge.

15           THE COURT:  Why don't you get to a question that

16   is ...

17   BY MR. BEUKE:

18   Q.  The hip replacements that you need, that's been a condition

19   that has troubled you for a long period of time.  Correct?

20   A.  It has been since about '97.

21   Q.  So, almost 15, 16 years?

22   A.  Yeah.  My doctor told me I didn't need it because I was too

23   young right now.

24   Q.  With respect to the hip replacement, you need both

25   replacements, right?

1    A.   Yeah.   Because the one is injured, the other get bad.

2    Q.   So, the other physical ailments in addition to the joint

3    problems that you have are what, sir?

4    A.   I've got arthritis real bad.

5    Q.   Arthritis in other parts of your body other than the hips?

6    A.   My joints, all of my joints.

7    Q.   Okay.   So, all of the joints give you problems, arthritic

8    problems, in addition to your hips needing to be replaced.

9    Correct?

10   A.   All of my joints?   What you mean, all of my joints?

11   Q.   Well, you've been taking pain medications for a number of

12   years to try to help your condition.   Correct?

13   A.   And now I'm weaning myself off of a lot those medications

14   now.

15   Q.   No.   I'm just asking you --

16   A.   Yes, I have.

17   Q.    -- there are medications you have been taking to try to

18   alleviate the pain that you have?

19   A.   Yes.

20   Q.   And you went to doctors about those conditions, correct?

21   A.   Yes, I've seen doctors.

22   Q.   You've been seeing doctors for the better part of your last

23   15 or 18 years?

24   A.   Yes, I have.

25   Q.   And those doctors that you would go see would routinely

1    prescribe medications for you to help you deal with your pain,

2    correct?

3    A.   Sometimes.

4    Q.   In 2012 do you remember what doctors you saw?

5    A.   Only the ones that came to New Century.

6    Q.   Well, did you go to see doctors in 2013?

7    A.   Only -- well, I don't know.  I had one doctor that came to

8    my house.

9    Q.   In what year?

10   A.   I don't remember the year.  My mind is, you know.

11   Q.   Okay.  In 2013 do you remember, Mr. Wade, any of the

12   doctors you saw in 2013?

13   A.   It could have been Greenbain or Dr. Burdette, one of those

14   guys, or it could have been my doctor, Dr. Beard.

15   Q.   You don't remember as you sit here today, do you?

16   A.   No, I don't.

17   Q.   In 2012 you don't really --

18   A.   I don't remember it, because, you know, I wouldn't remember

19   it.

20   Q.   I mean, 2012, you don't really remember the doctors you saw

21   in 2012, do you?

22   A.   Sir, I was in the hospital in Florida for a long time.

23   Q.   When were you in the hospital in Florida?

24   A.   It was back in '96.  I was in there for a month.  I passed

25   out at the gate.  Me and my family was going to Disneyland, and

1    I passed out at the gate.  And ever since then, I've been

2    having memory loss.  I can't remember anything.

3    Q.  Okay.  A lot of the people that have tried to help you

4    manage your pain and help you with your other ailments, they

5    came to your house.  Correct?

6    A.  Some did.

7    Q.  Okay.

8    A.  But Dr. Burdette and them was using me.

9    Q.  Well, my question is some of those people came to your

10   house.  Correct?

11   A.  Yes.

12   Q.  And you would have people come to your house and conduct

13   examinations of you or try to help you deal with the pain?

14   A.  Not dealing with the doctors that I seen with -- Burdette

15   and them never came to my house.

16   Q.  Okay.  Well, my question is that with respect to the people

17   that came to your house.

18           When were you seeing people at your house?

19   A.  It was probably back in 2013.

20   Q.  Okay.  And do you ever remember prior to 2013 doctors or

21   nurses coming to your house and trying to help you with your

22   pain?

23   A.  Yes.

24   Q.  Okay.  That's -- people have come to your house to try to

25   help you over the years for the last several years.  Is that

1    fair to say, sir?

2    A.  Yes.  I'm in pain everyday.  And I just got up here in the

3    cold out there.  I could barely get over there.

4    Q.  No, I understand that, sir.

5         My question, Mr. Wade, is in 2010 or 2011, did any

6    law enforcement people come to your house and ask you these

7    questions that Mr. Pratt asked you a couple minutes ago?

8         In 2010, 2011, did any law enforcement people show up

9    at your house?

10   A.  No.

11   Q.  How about 2012, did any law enforcement people show up at

12   your house?

13   A.  No.

14   Q.  2013, did anybody from the FBI or the --

15   A.  Not the FBI, but --

16   Q.  -- the DEA --

17   A.  -- but the agents did.  That's what we did for James -- not

18   James Burdette, but New Century, they came and asked me

19   questions about them.

20   Q.  I don't mean to interrupt, Mr. Wade.  But isn't it correct

21   that the first time any agents showed up at your house to ask

22   you questions about your medical condition was June 20th last

23   month?  They came to your house to interview you, correct?

24   A.  (No response.)

25   Q.  There were two agents.

1    A.  Yeah, they came to my house.

2    Q.  Okay.  And one of them was the gentleman in the back; is

3    that correct?

4    A.  But I wasn't there.  I met up with them somewhere.

5    Q.  Okay.  Well, I don't want to know where you met up with

6    them.  But you got a call from Mr. Carmack, Agent Carmack,

7    asking if you would come and speak with him.  Correct?

8    A.  Yes.

9    Q.  And you told him that you would.  Correct?

10   A.  Yes.

11   Q.  And you met with Agent Carmack and another agent, and they

12   talked with you for the first time about your medical

13   condition.  Correct?

14   A.  Yes.

15   Q.  And you cooperated with them.  Correct?

16   A.  Mm-hmm.

17   Q.  And they asked you about a company called New Century.

18   Correct?

19   A.  Yes.

20   Q.  And you told them about the fact that you had worked there

21   cutting grass.  Right?

22   A.  All I did was cut the grass, sir.  And you know what --

23   Q.  I understand.

24   A.   -- all I'm trying to do is get my name of it.  And that's

25   why I'm testifying.  And I'm tired of this going on me, you

1    know, sir.  That's all I want to do.

2    Q.  I understand.  And I'll try to keep my questions really

3    short.

4           The agents asked you if you had ever heard of a

5    company called First Michigan Home Health Care, correct?

6    A.  Yes.

7    Q.  And you told them you've never heard of that company,

8    correct?

9    A.  I don't remember that company.

10   Q.  Do you remember the names of the companies over the years

11   that have come to your house and given you some service in your

12   house?  Do you remember any of the names of those companies?

13   A.  I just know the doctors.

14   Q.  I'm talking about the companies that --

15   A.  No, I don't know the companies.

16   Q.  You've told the ladies and gentlemen that there have been a

17   number of companies over the years that have come to your

18   house.  Correct?

19   A.  There has been like two.  It's been two.

20   Q.  Okay.  And you don't remember the names of the companies,

21   do you?

22   A.  Uhm, not right off the -- right off the bat, but I know ...

23   Q.  Okay.  You indicated that you did --

24          When the agents met with you on June 20th, sir, you

25   told them that you did receive home care at your residence for

```
 1   a back condition.  Correct?
 2   A.  For a back condition?
 3   Q.  Correct.
 4   A.  No.  I had a heart condition at the time --
 5   Q.  You were --
 6            THE COURT:  Wait.  Let him answer the questions.
 7            MR. BEUKE:  Sorry, Your Honor.
 8            THE COURT:  Listen to his answers.
 9   A.  Thank you.
10            THE COURT:  Because your next question is sometimes
11   in direct contradiction or sometimes in direct agreement.  But
12   you don't have to ask every question twice.
13            MR. BEUKE:  All right.
14   BY MR. BEUKE:
15   Q.  Mr. Wade, my question is in that conversation you had about
16   three weeks ago with those agents, wherever it took place, did
17   you tell the agents that you did receive home care at your
18   residence for a back condition, but you were not sure what
19   company provided the therapy?  Did you tell them that?
20   A.  If you know Dr. Beard --
21   Q.  Did you --
22            THE COURT:  Let him answer the question.
23   A.  I just told you I don't remember the company, but if you
24   could tell me, I'll remember the name.  You know, if you could
25   look up Dr. Beard, that's who came.
```

US v Vinod Patel #11-CR-20468-36

BY MR. BEUKE:

Q.  Okay.  My question, Mr. Wade -- and I'll try to keep it simple -- did you tell those agents three weeks ago when you met with them that you did have home care at your residence for your back condition that you --

A.  I don't have a back condition.  It's for my hips.

Q.  My question is did you tell the agents that you had --

A.  No.

Q.  -- home care for a back condition, but you could not remember the company?  Yes or no.

A.  It's not for back.  It's for my hips, the company.

Q.  Did you tell the agents in that conversation on June 20th --

A.  No.  No.

Q.  -- that you had home care for your hip condition?

A.  No.

        THE COURT:  That's the second time he's said no in answer to your question.  You're just not -- you're doing what --

        MR. BEUKE:  I'm just trying to lay a foundation for impeachment, Judge.

        THE COURT:  No.  What you're doing is what, when I was a teacher, we used to call it alligating.  When you's are speaking, your mouth is open, but your ears are closed.

        You have to listen to the answer now.  He has

1   answered that question twice.

2   BY MR. BEUKE:

3   Q.  Mr. Wade, I want to direct your attention to a few days on

4   July 9th of 2014.

5          Did you get a phone call from Mr. Gould, one of the

6   agents that you met with earlier on June 20th?

7   A.  Yeah, so I can be here to solve this issue.

8   Q.  Well, did you get a phone call, is my question, sir?

9          THE COURT:  He just answered yes.

10          MR. BEUKE:  Okay.

11          THE COURT:  Now go to your next question.

12   BY MR. BEUKE:

13   Q.  In that phone call do you remember Agent Gould asking you

14   about the home care that you received?

15   A.  You just asked me that question.

16   Q.  I'm talking about on July 9th, a couple days ago.

17          In that phone call that you had with Agent Gould --

18   A.  He didn't ask me about no home visit.

19   Q.  And my question, Mr. Wade, in that phone call on July 9th,

20   did you tell Agent Gould that the home care that you received

21   was not for back therapy.  Rather, it was a normal doctor visit

22   that took place at your house?

23   A.  Yes.

24   Q.  Did you tell him that?

25   A.  Yes.  But it wasn't over the phone.

1            THE COURT:  Wait for a question, please.

2    BY MR. BEUKE:

3    Q.  Sir, with respect to the first meeting that you met with

4    Agent Carmack and Agent Gould, they showed you a photograph,

5    didn't they?

6    A.  Of course.

7    Q.  Okay.  And the photograph that they showed you was of who?

8    A.  Some people.

9    Q.  How many photographs did they show you?

10   A.  A few.

11   Q.  More than five or less than five?

12   A.  More than five.

13   Q.  Okay.  Did you identify any of the people in those

14   photographs?

15   A.  Yes.

16   Q.  How many people did you identify?

17   A.  I couldn't say.  About three.

18   Q.  Okay.  Were the people that you identified male, female, or

19   both?

20   A.  One of them was male and one was female and I don't

21   remember the other one.  But that was Marie and her son, I know

22   those persons.

23   Q.  One of the photos you identified was female --

24   A.  Marie and her son.

25   Q.  Marie?

1    A.   Marie and her son.

2    Q.   And that was the young lady that you told the ladies and

3    gentlemen that you picked up prescriptions at her house?

4    A.   Yes.

5    Q.   Is that correct?

6    A.   Yes.

7    Q.   And you identified a photograph of her son, Marie's son?

8    A.   Mm-hmm.

9    Q.   The other photograph, the third one that you identified, do

10   you remember if that person was a male or a female?

11   A.   It was a male.

12   Q.   Did you ever identify or did they ever show you a

13   photograph of James Burdette?

14   A.   I knew who Burdette was.

15   Q.   Okay.  So, you never saw -- they didn't show you a

16   photograph of Mr. Burdette?

17   A.   His picture might have been in there, but I know I know who

18   Dr. Burdette is.

19   Q.   Okay.  With respect to the -- did they ever show you any

20   photographs of people of Indian descent?

21   A.   Yes.

22   Q.   And did you ever identify --

23   A.   Those were -- excuse me.  Those was the guys who was in

24   Saginaw bringing the medications.

25   Q.   Okay.  You never identified any photograph of Vinod Patel

1    that afternoon, did you?

2    A.   Uhm, I don't recall.

3    Q.   You've never seen this young man that's sitting at the

4    table over here, Mr. Patel, before, have you?

5    A.   I don't recall.

6    Q.   Do you recall if any of the photographs that the agents

7    showed you were a photograph of Mr. Patel --

8    A.   Let me take another look, please.

9              He could have been one of the doctors that came to

10   New Century and they was in a meeting.  He looked like one of

11   the doctors there that came to a meeting.

12   Q.   He looks like one of the doctors that came there?

13   A.   Yeah.

14   Q.   Okay.  Other than this first meeting on June the 20th of

15   2014 and a couple weeks ago or the phone conversation that you

16   had with the agents on July 9th, you haven't had any other

17   conversations with any law enforcement people over the last

18   five years, have you?

19   A.   No.

20   Q.   And those gentlemen gave you a subpoena to appear here

21   today, Mr. Wade?

22   A.   No.  They didn't have to give me a subpoena.  I just want

23   to clear my name.  No, they didn't subpoena me.

24             MR. BEUKE:  Okay.  Thank you.  Nothing further, Your

25   Honor.

US v Vinod Patel #11-CR-20468-36

1          THE COURT:  Redirect?

2                    REDIRECT-EXAMINATION

3    BY MR. PRATT:

4    Q.  When you say in response to the question that you didn't

5    have other contact with law enforcement, that's in this case.

6    You've talked with law enforcement in connection with the other

7    case?

8    A.  With the other case, yes.

9    Q.  All right.

10   A.  Yes, I did.

11            MR. BEUKE:  Objection.  Well, Judge, can we have a

12   brief sidebar?

13            THE COURT:  No.  We are going to break in a few

14   minutes.  We can talk about it.

15            MR. PRATT:  Okay.

16   BY MR. PRATT:

17   Q.  I know you said you have some memory issues, in

18   cross-examination.  Is that correct?

19   A.  Yes.

20   Q.  How sure are you that you've never had a back condition

21   that needed treated?

22   A.  I am sure of that.

23            MR. BEUKE:  Objection.

24   A.  I'm positive, sir.

25            THE COURT:  What's the objection?

1          MR. BEUKE:  Well, I'll withdraw it, Judge.  I'll

2     recross.

3          THE COURT:  Okay.

4     BY MR. PRATT:

5     Q.  All right.  And how sure are you, sir, that about five

6     years ago there was a series of people, a series of visits by

7     someone who was not a doctor coming to your house and giving

8     you treatment?

9     A.  There was no one that was not a doctor coming to give me

10    treatment.

11         MR. PRATT:  Thank you, Your Honor.  I have nothing

12    further.

13         THE COURT:  Recross?

14         MR. BEUKE:  Very briefly, Judge.

15                   RECROSS-EXAMINATION

16    BY MR. BEUKE:

17    Q.  Mr. Wade, you did tell the agents that there was someone

18    who came to your house and provided home care for you --

19    A.  It was a doctor.

20    Q.  Okay.  And when was that, Mr. Wade?  When was that

21    treatment that was provided to you by that doctor?

22    A.  What kind of treatment?

23    Q.  For your back condition or your hip condition.  When was

24    that if you can recall?

25    A.  He came -- he came there because I had -- he gave me a

1    test, an EKG for my heart, and I had to wear the heart monitor.

2    Q.  An EKG test that was done at your house?

3    A.  Yes, overnight.

4             MR. BEUKE:  Nothing else, Judge.

5             THE COURT:  Anything further?

6             MR. PRATT:  No, Your Honor.

7             THE COURT:  Any questions from the jurors?

8             Thank you very much for making the trip down.

9    A.  Thank you, sir.

10            THE COURT:  And you may be excused.

11   A.  You have a blessed day, sir.

12            THE COURT:  It's five to 11, a good time for our

13   break.  And we'll be back at a quarter after 11.

14            All rise for the jury.

15            Don't talk about this case amongst yourselves.

16            *(Jury leaves the courtroom at 10:55 a.m.)*

17            THE COURT:  Anything anyone wants to put on the

18   record?

19            MR. BEUKE:  Judge, my issue that I raised a little

20   bit ago dealt with reports or information concerning

21   conversations by law enforcement with the Government witness,

22   Mr. Wade.

23            We've been tendered last week I believe a report

24   concerning his interview with the agents in June, and then over

25   the last couple of nights I think we got this last report

1    dealing with his interview telephonically on July 9th.

2            We were not provided with any other witness

3    statements from Mr. Wade at any other time.  And I think if

4    there were interviews with Mr. Wade prior to these two

5    interviews that we were given, it should have been tendered to

6    us.

7            THE COURT:  Response?

8            MR. PRATT:  Yes, Your Honor.

9            I thought I made clear from the witness's testimony

10   this was the second time he testified.  He testified in the

11   Glenn English prosecution regarding billings in that case.  And

12   I don't have that report.  I don't even know if they wrote one.

13   But our obligation is to turn over prior statements that relate

14   to his testimony here.  And what he did or did not do there, I

15   didn't think was relevant to his direct testimony here.

16           I will search for that report, if there is one, and

17   turn it over to him.  It's not in his case file.

18           THE COURT:  All right.  What is your response to

19   that?

20           MR. BEUKE:  Judge, I certainly would like that

21   report.  And we may want to call Mr. Wade back to the stand.  I

22   don't know that we ever were informed that Mr. Wade had given

23   prior testimony in any other case either.

24           THE COURT:  Well, I assume Mr. Wade was available to

25   be interviewed by either side.

1          And my recollection of the way that came up was a --

2    it was not responsive to the examination of the Government.

3    That he was just expressing his frustration with having to

4    clear his name and mentioned that he had testified before.

5          MR. BEUKE:  Well ...

6          THE COURT:  If there's something that's

7    extraordinarily exculpatory or exculpatory at all, if there is

8    a report that exists, you will be given it, and you'll have the

9    opportunity to recall him.

10          We are in recess.

11          Oh.  We do need the jury instructions first thing

12    tomorrow morning.

13          MR. PRATT:  Yes.

14          THE COURT:  And verdict form.

15          *(Recess taken.)*

16          CASE MANAGER LANG:  Please rise.  This court is again

17    in session, the Honorable Arthur J. Tarnow, presiding.

18          THE COURT:  Are you going to be using the screen?

19          MR. PRATT:  Yes, Your Honor.

20          *(Jury enters the courtroom at 11:19 a.m.)*

21          CASE MANAGER LANG:  Court is again in session.  You

22    may be seated.

23          THE COURT:  You may call your next witness.

24          MR. PRATT:  Yes, Your Honor.  The United States calls

25    Hiren Patel.

```
 1              THE COURT:  Mr. Patel, would you stand, please.
 2              HIREN PATEL, GOVERNMENT'S WITNESS, SWORN.
 3              THE COURT:  Now you may be seated.
 4  A.   Thank you.
 5                       DIRECT-EXAMINATION
 6  BY MR. PRATT:
 7  Q.   Sir, could you speak into the microphone.  Please state
 8  your full name for the court reporter.
 9  A.   Hiren Patel, H-I-R-E-N, P-A-T-E-L.
10  Q.   Mr. Patel, how old are you?
11  A.   34.
12  Q.   Where were you born?
13  A.   India.
14  Q.   Are you related to the Defendant Vinod Patel or Babubhai
15  Patel?
16  A.   I worked for Babubhai Patel.
17  Q.   Are you related by blood or by marriage?
18  A.   No.
19  Q.   Okay.  Just happened to have the same name?
20  A.   It's a common name.
21  Q.   Okay.
22  A.   Yeah.
23  Q.   Where were you born?
24  A.   May 20th.
25  Q.   Where?
```

1    A.   A-H-M-E-D-A-B-A-D, Ahmedabad, Gujarat.

2    Q.   And Gujarat is the state you were born in?

3    A.   Yes.

4    Q.   What is the country you were born in?

5    A.   India.

6    Q.   Tell us your educational background.

7    A.   I have a degree, a Bachelor in pharmacy.

8    Q.   When did you receive your Bachelor's Degree in pharmacy?

9    A.   2002.

10   Q.   Did you get that degree in the United States or in India?

11   A.   In India.

12   Q.   When did you first come to the United States?

13   A.   2005.

14   Q.   What was your intention when you came to the United States?

15   What was your plan?

16   A.   I was giving exams to get registered as a pharmacist here.

17   Q.   All right.  Do you just come over and take an exam, or were

18   you there some things you had to do to become eligible to take

19   the exam?

20   A.   I have to give exams and get a work visa.

21   Q.   Okay.  Did you do that?

22   A.   Yes.

23   Q.   Did you obtain employment -- did you pass the exams?

24   A.   Yes, I did.

25   Q.   Did you obtain employment here in the United States?

US v Vinod Patel #11-CR-20468-36

1    A.  It's a work visa, right?

2    Q.  Yes.

3    A.  Yes, I did.

4    Q.  All right.  Who employed you first?

5    A.  Rite-Aid Corporation.

6    Q.  When did you first work for Rite-Aid?

7    A.  I started in October 2005.

8    Q.  What was your job with Rite-Aid?

9    A.  I was a pharmacist.

10   Q.  Okay.  What was your initial job with Rite-Aid?

11   A.  As an Intern, Pharmacy Intern.

12   Q.  Okay.  Did you eventually obtain a job as a full-time

13   pharmacist with Rite-Aid?

14   A.  Yes.

15   Q.  And when was that?

16   A.  March 2006.

17   Q.  Okay.  What store were you employed at by Rite-Aid in 2006?

18   A.  In Adrian, Michigan.

19   Q.  How long did you work there approximately?

20   A.  2007 March -- March -- May 2007.

21   Q.  All right.  What job did you move to in May of 2007?

22   A.  I moved to CVS Corporation.

23   Q.  Okay.  And where did you -- where did you work for CVS?

24   A.  I worked at a couple of stores, first of all, and then they

25   moved me permanently to Eight Mile and Lahser.

1    Q.   Okay.   Where were you living at the time you were working

2    for CVS?

3    A.   In Farmington Hills.

4    Q.   All right.   Did there come a time you decided to leave CVS

5    and work in another pharmacy occupation?

6    A.   Yes.

7    Q.   When was that?

8    A.   That was about February 2009.

9    Q.   Who did you decide to work with in the pharmacy business in

10   February 2009?

11   A.   I started to work for Babubhai Patel.

12   Q.   All right.   Did Babubhai Patel assign you to a particular

13   pharmacy?

14   A.   Yes.

15   Q.   What was the name of that pharmacy?

16   A.   Rapid Drugs.

17   Q.   Would you tell us where that's located or was located?

18   A.   Yes.   It was Nine Mile and Lahser in Southfield, Michigan.

19   Q.   Did you have a training period at Rapid Drugs in February

20   2009?

21   A.   Yes, I did.

22   Q.   Were there any training practices that you observed that

23   were different than what you had seen at Rite-Aid or CVS?

24   A.   Yes.

25   Q.   What did you see that was different?

1   A.   I saw some prescriptions which we were supposed to reverse

2   the claim after the patient did not pick up, and -- at CVS we

3   were reversing the claims, but at Rapid Drugs we were not.

4   Q.   Okay.  So, there were drugs that were billed and the

5   patient didn't pick them up and the billing was not reversed?

6   A.   Yes.

7   Q.   Okay.  How were you trained in that practice?  Who showed

8   you that practice?

9   A.   I observed Mitesh Patel doing it.

10  Q.   All right.  After your training period, did you continue

11  that practice when you were on your own?

12  A.   Yes, I did.

13  Q.   All right.  What was your -- what was your employment

14  agreement with Babubhai Patel?  What was your pay rate and was

15  there any possibility of you getting profit sharing?

16  A.   Yes.  It was $50 an hour, and he said, you know, let's

17  start working and I'll give you bonus checks.

18  Q.   Okay.  Did you have a written contract or was this just the

19  word of Bob Patel?

20  A.   It was word.

21  Q.   Okay.  As you're going along in 2009, April, May, June of

22  2009, how was the business going at Rapid Drugs?

23  A.   It was doing okay, but not profitable.

24  Q.   Okay.  What, if anything, did you discuss with Bob Patel

25  about this problem with it not being very profitable?

1   A.   In May of 2009 approximately Bob Patel came to the store at

2   Rapid Drugs and he told me that I have to pay you from

3   out-of-pocket; business is not doing good.  So, then he told me

4   that what you're doing here, this is not a corporation, CVS.

5   This is an independent pharmacy.

6            I never worked for an independent pharmacy before.

7   So, he said things work different here.

8   Q.   All right.  What did you tell him?  What did you respond to

9   him about what you were doing to make the profits go higher?

10  A.   I said I'm trying my best and I have been good to all the

11  patients and doing whatever I can.

12  Q.   All right.  Did he propose to you and did you engage in

13  additional fraudulent practices after this conversation?

14  A.   Yes, I did.

15  Q.   All right.  And we don't need to go into detail, but can

16  you describe in general terms what he asked you to do and what

17  you did?

18  A.   Yes.

19            He said, you know, bill more prescriptions on Dr. Jan

20  Iqbal, who was the main doctor in the building, and also please

21  do not reverse the claims of any patients at all who did not

22  pick up, or even if you are billing, do not reverse.

23  Q.   And.  And so did you follow his instructions and engage in

24  fraudulent practices?

25  A.   Yes, I did.

1    Q.  All right.  How was the business doing by August of 2009?

2    A.  It was doing a little bit better than before.

3    Q.  All right.  In August of 2009 did you have an opportunity

4    to increase the business even more?

5    A.  Yes, I did.

6    Q.  How did that opportunity come about?

7    A.  That opportunity came from the business in the Flint,

8    Michigan.

9    Q.  Okay.  Who approached you about the business from Flint,

10   Michigan?

11   A.  Bob Patel told me and Vinod Patel told me that, you know,

12   we have a lot of patients recruited for home care services.

13   And your pharmacy is not doing good, so we have decided to give

14   you the prescription business of those patients in Flint.

15   Q.  All right.  Now, you say Bob Patel and Vinod Patel.  Let me

16   break it down.

17          Did you already know Vinod Patel at this time?

18   A.  Yes, I did.

19   Q.  How did you meet Vinod Patel?

20   A.  He just came to the pharmacy and introduced himself, that

21   I'm a brother of Bob Patel.

22   Q.  How soon was that after you started at Rapid Drugs?

23   A.  I think it was approximately the first two weeks of my

24   employment.

25   Q.  All right.  How close was -- and did -- Vinod Patel, did he

1   tell you where he worked and what he did?

2   A.  I told me that he owned a home care in partnership with his

3   brother and Ramesh Patel.

4   Q.  Okay.  And where was that business located?

5   A.  That was at Nine Mile and Greenfield in Southfield.

6   Q.  How close is that to Nine Mile and Lahser, Rapid Drugs?

7   A.  It's less than two miles.

8   Q.  Okay.  Did you have some fairly frequent contact with Vinod

9   Patel during that time after you started at Rapid Drugs before

10  August of 2009?

11  A.  Yes, I had.

12  Q.  Was that contact always of a business nature or was there

13  social contact?

14  A.  It was both business and social.  We were close friends.

15  He was coming frequently to the pharmacy.

16  Q.  Was there anyone else that was in your group that was, as

17  you would say, sort of close friends coming to the pharmacy?

18  A.  Yes.  There was one guy named Atul Patel that was always

19  with him most of the time.

20  Q.  Okay.  And did either -- did Atul Patel or Vinod Patel tell

21  you what Atul Patel's job was?

22  A.  Yes.  Vinod Patel explained to me.

23  Q.  Okay.  What did Vinod Patel explain to you about Atul

24  Patel's job?

25  A.  They told -- he told me that Atul Patel is an MBA, he has a

1  degree, MBA, and he's good marketing; I hired him for the

2  marketing, for my home care services.

3  Q.  Okay.  All right.  So, I guess we're going now to August of

4  2009.  There's this opportunity.

5          Can you tell us specifically what Vinod Patel

6  explained to you about this opportunity for you to increase the

7  business at Rapid Drugs?

8  A.  Yes.

9          He told me that this is all patients recruited by

10 Atul Patel for home care services, and you're going to fill all

11 the prescriptions for them and deliver them to Flint.

12 Q.  All right.  And when he said recruited, did either Atul

13 Patel or Vinod Patel tell you what it meant to be recruited; in

14 other words, what they had to do to recruit these patients?

15 A.  At that time, I was new to this independent pharmacy and

16 home care.  I didn't know about much about it.  I didn't know

17 at that time, but later Atul Patel told me that Vinod Patel was

18 paying $800 to him per patient to recruit for home care

19 services.

20 Q.  Okay.  So, at the time he just said "recruited," and that

21 had no special meaning to you?

22 A.  No, not really at that time.

23 Q.  Okay.  Later on you heard there was payment involved?

24 A.  Yes.

25 Q.  Okay.  And who did you hear that from?

1    A.   First I heard from Atul Patel.

2    Q.   Did you ever hear from that from anyone else that they were

3    paying to get the patients?

4    A.   Yes.   Vinod Patel told me.

5    Q.   All right.   So, how did this work with getting

6    prescriptions from Flint?   What was explained to you about how

7    this was going to work?

8    A.   I was told that one of Dr. Paul Petre's assistants,

9    Dr. James Burdette, is going to see all these patients in

10   Flint, and he's going to call in the prescriptions at the end

11   of the day, and I have to deliver those prescriptions.

12   Q.   Okay.   And did this practice begin?

13   A.   Yes.

14   Q.   Did this cause a change in your business at Rapid Drugs?

15   A.   Yes.   It changed drastically.

16   Q.   Tell us how it changed drastically.

17   A.   Well, Dr. James Burdette was calling in about, you know,

18   nine to ten prescriptions for each patient, and we were getting

19   about ten patients a day.   So, it was a hundred prescriptions a

20   day we were getting more.

21   Q.   Okay.   Was there a particular pattern to Dr. Burdette's

22   prescriptions?

23   A.   Yes.

24   Q.   What was that pattern?

25   A.   He was prescribing pretty much two to three narcotics per

1    patient, and the rest of them was nonnarcotics.

2    Q.  All right.  What did you do with the narcotics that were

3    being prescribed?

4    A.  I billed it and I dispensed it and I delivered it to the

5    patient.

6    Q.  All right.  And what were the narcotics that were typically

7    prescribed by PA Burdette?

8    A.  It was Schedule III from Vicodin to Lortab to Norco; and

9    sometimes Schedule IV, Xanax; and Schedule V, Promethazine with

10   codeine cough syrup.

11   Q.  All right.  And what about the noncontrolled drugs; was

12   there a pattern of what prescriptions you were getting faxed

13   down for them?

14   A.  It was called in actually.

15   Q.  All right.

16   A.  He was calling in a lot of particular blood pressure

17   medications, and then on top of that he was calling in Nexium,

18   Lidoderm patch, some more expensive noncontrolled medications.

19   Q.  All right.  These patients that were getting prescriptions

20   called in that were being referred to you from the health care,

21   what insurance did most of them have?

22   A.  Everybody has Medicare.

23   Q.  What was your practice regarding the noncontrolled

24   medications that were being prescribed to the home care

25   patients?

1    A.  I was doing the same practice as before.  I was holding one

2    or two prescriptions which were the most expensive and not

3    dispense to the patient.

4    Q.  All right.  You indicated dispensing to the patient.

5              Would the patients typically actually be coming to

6    your pharmacy, walking in the door, and saying where's my

7    drugs?

8    A.  It started to later on and --

9    Q.  I said typically though.  What was the typical practice?

10   A.  You mean for the patients?

11   Q.  Yeah.

12   A.  Yeah, they were called in.

13   Q.  How did the patients get their drugs?

14   A.  We had to deliver to Flint with the driver.

15   Q.  Okay.  Who was the driver?

16   A.  At that time we had a driver Samuel Betts, and there was

17   one more driver.  I don't remember the name now.

18   Q.  Okay.  Did Vinod Patel explain to you what was going to

19   happen when the driver took the drugs up to Flint?

20   A.  He said tell the driver to deliver to a particular

21   location.

22   Q.  Okay.  And what location was that?

23   A.  I think there was one particular -- I have never been to

24   Flint, but there was one location, they have a sign where the

25   patients are being seen by Dr. James Burdette and also picked

1    up the medications, it looks like Marie's house.

2    Q.  Okay.  You were told Marie's house by Vinod Patel?

3    A.  Yes.

4    Q.  Okay.  You've never been up there?

5    A.  No, I've never been there.

6              MR. PRATT:  Your Honor, I'm going to show the witness

7    proposed Government Exhibit 14A.

8    BY MR. PRATT:

9    Q.  And I ask if you can identify this.

10   A.  Sure.

11             Yes.

12   Q.  All right.  What is 14A?

13   A.  These are the controlled prescriptions called in by PA

14   James Burdette and was Flint patients for the home care

15   business in Flint, patients, and we delivered to them.

16   Q.  All right.  And who filled those prescriptions?

17   A.  I filled it.  It's my initials.  And there's one more

18   pharmacist's initials there too.

19   Q.  Okay.  And who is that?

20   A.  It looks like M.P., Mitesh Patel.

21   Q.  Okay.  So, you and Mitesh Patel were the ones that filled

22   that sample of controlled prescriptions?

23   A.  Yes.

24   Q.  All right.  And then I'm also going to show you what we're

25   going to identify as 14B.

1           If you can put those back in so I don't get them

2     mixed up?

3     A.   Okay.

4           MR. PRATT:  I'm going to show him 14B if I can get in

5     it, Your Honor.

6           THE COURT:  I think I sat next to you in the movies

7     with that.  The sound is familiar.

8           MR. PRATT:  I hope it was at least a good movie.

9           *(Off the record.)*

10    BY MR. PRATT:

11    Q.   All right.  Would you take a look through those and see if

12    you can identify those?

13          THE COURT:  Just keep your voice up.

14    A.   Yes.

15          *(Brief pause.)*

16    A.   Yes, I recognize them.

17    BY MR. PRATT:

18    Q.   Okay.  You recognize them.

19          What is 14B?

20    A.   14B is a prescription called in by James Burdette for the

21    Flint patients of noncontrolled medications.

22    Q.   And who filled those noncontrolled medications at Rapid

23    Drugs?

24    A.   It looks like there's two initials, the same as I told

25    before, mine and Mitesh Patel.

1          MR. PRATT:  Your Honor, I would move the admission of

2    14A and 14B.

3          THE COURT:  Any objection?

4          MR. BEUKE:  No, Your Honor.

5          THE COURT:  Admitted.

6          *(Government Exhibits 14A and 14B were admitted into*

7          *evidence.)*

8          MR. PRATT:  Ms. Drinkard, if you could display 14A,

9    one of the controlled substance prescriptions.

10   BY MR. PRATT:

11   Q.  All right.  If you would look on the screen, can you

12   explain what we're seeing here on the prescription?

13   A.  Yes.  The first one is for Stokes Williams is Xanax 1

14   milligram, one tablet at that time, 30.  The second one is

15   Vicodin ES, 750 milligram, 90, three times per day.

16   Q.  All right.  And how do we know that this is a phone-in

17   prescription?

18   A.  Because it was written on the pharmacy prescription pad.

19   Q.  All right.  And if we turn it over to the back, can we tell

20   which pharmacist was responsible?

21   A.  This one looks like M.P., Mitesh Patel.

22   Q.  Okay.  And there were similar controlled substance

23   prescriptions that you filled.  Is that correct?

24   A.  Yes.

25   Q.  And were these drugs always dispensed?

1    A.   Yes.

2    Q.   And were they always billed?

3    A.   Yes.

4    Q.   How much -- if we look on these tabs on the back, how much

5    does the pharmacy get -- if you know.  It may not be on the

6    back.  Does the pharmacy get reimbursed very much for these

7    drugs?

8    A.   Not really.  These are cheap medications.

9    Q.   Okay.  I notice it has copays on the back.

10             Were you able to collect copays from these Flint home

11   health care patients?

12   A.   Never.

13   Q.   All right.  Let's turn now and see if we can display 14B,

14   display the first one of those, the noncontrolled drugs.

15             Tell us what we are seeing here.

16   A.   These are noncontrolled prescriptions for the same patient,

17   Stokes Williams.  Lasix, 20 milligram, one daily; Klor-con,

18   K-L-O-R-C-O-N, 10 milliequivalent, 30, one tablet a day.

19   Q.   All right.  You indicated that some of the noncontrolleds

20   would be dispensed and some weren't.

21             How did you decide which ones to dispense and which

22   ones not to dispense?

23   A.   The most expensive medication, which we don't dispense.

24   Q.   Okay.  And --

25             All right.  Are either of these medications the

US v Vinod Patel #11-CR-20468-36

1    expensive kind or are these the cheap kind?

2    A.  No.  It's cheap.

3            MR. PRATT:  Can you go to the next one then,

4    Ms. Drinkard.

5    BY MR. PRATT:

6    Q.  Okay.  Soma, was that dispensed?

7    A.  Yes.

8    Q.  Okay.  And what's the next drug?

9    A.  The next one it looks like Zestoretic, Z-E-S-T-O-R-E-T-I-C.

10   Q.  Expensive or cheap?

11   A.  Cheap.

12   Q.  Okay.  Let's go to the next prescription.

13           Okay.  What are these two drugs?

14   A.  The first one is Metformin, 1,000 milligram, twice a day,

15   60.  The next one is Voltaren XR, 100 milligram, 30, once a

16   day.

17   Q.  All right.  Are these drugs expensive or cheap?

18   A.  Voltaren XR is a little bit expensive.

19   Q.  So, what would you do with that?

20   A.  It could be -- it's impossible to say for now, you know, it

21   has been so much long time, whether it has been given or not.

22   But it could be given sometimes, and if it's a refill, maybe

23   it's not given.

24   Q.  All right.  Please go to the next prescription.

25   A.  These both are cheap too.

1    Q.   Okay.  Let's go to the next one.

2    A.   This is very cheap.

3    Q.   Very cheap?

4    A.   Yeah.

5    Q.   All right.

6    A.   Yeah, here we go.  This one, the Lidoderm patch, the next

7    one has not been given.

8    Q.   Okay.  Why do you say -- you say the Lidoderm patch has not

9    been given.

10        Why would the Lidoderm patch not be given?

11   A.   It's a very expensive medication.  It's about 200, $300.

12   And it's just a patch.  The patient already has a lot of pain

13   medication.  And Dr. Burdette knew about it, to cause some

14   extra medications, you know, for the profit of the pharmacy.

15   Q.   Well, let me ask you about that.  Did you have any

16   conversations with Dr. Burdette -- any conversations with Dr.

17   Burdette about -- or, PA Burdette about his prescribing

18   practices?

19   A.   Yes, I had.

20   Q.   And what were those conversations about?

21   A.   Initially when he started call-in prescriptions for the

22   Flint patients, he was prescribing, as I told you, Schedule

23   III, the Vicodin or Lortab and Xanax and codeine cough syrup,

24   Schedule V.  And then I asked him that why are you prescribing

25   everybody, you know, the same medications, all three

1   combinations.

2   Q.   And why would that raise a problem, prescribing the same

3   three controlled drug combinations?

4   A.   Because nobody needs that kind of medications every -- pain

5   medication, it could be possible, but not the cough syrup every

6   month.

7   Q.   Okay.  And so what did he do?

8   A.   He said, okay, I'll stop calling in cough syrup.

9   Q.   Okay.  And what conversation, if any, did you have with him

10  about these noncontrolled drugs?

11  A.   Whenever he calls the prescription in, we always have a

12  talk to him.  I always talk to him.  I write down the

13  prescriptions, and I ask him, okay, what else do you want to

14  prescribe on top of this, because these are all cheap

15  medications, there's no profit in this, to deliver all the way

16  to Flint.  And he says, okay, you can put Nexium, Lidoderm

17  patch or cream, whatever he said.

18  Q.   Okay.  And so I guess the question to you, sir, is was

19  there some concern here that there was some patient who was in

20  desperate need of their Nexium or their Lidoderm patch that was

21  not going to be getting it because you were not sending it up

22  to Flint?

23  A.   No, there was no concern at all.

24  Q.   Okay.  Did you ever get any complaints coming back from the

25  folks in Flint; I didn't get my Lidoderm patch, I didn't get my

1   Nexium pills?

2   A.  No.  I got the complaints for the controls, that I'm not

3   getting them on time, but not for the noncontrols.

4   Q.  All right.  Let's explore that a little bit.  I think a

5   little while ago you said that your practice -- that the

6   pharmacy changed drastically.

7           Can you explain what, if anything, changed regarding

8   telephone calls that you received at the pharmacy?

9   A.  Yes.

10          Since we started the Flint business, the phone was

11  constantly ringing.  Like, it wasn't stopping at all.  It's

12  like we are in the phone call center, you know.  People were

13  that much desperate to get their controlleds.

14          And then everybody was fed up in the pharmacy, the

15  staff and me and everybody, because they've been calling

16  constantly to get their controlleds as soon as they are seen by

17  Dr. Burdette.

18  Q.  Okay.  Let me ask you this.  Did you ever have any

19  complaints calling about they're anxious for their

20  noncontrolleds?

21  A.  Never.

22  Q.  Let me ask you this.  The patients that wanted their

23  controlleds, the Defendant Vinod Patel, did he ever get

24  involved in this process of making sure patients got their

25  controlled drugs?

1    A.  He did came -- he did come to the pharmacy a couple of

2    times to pick up the controlleds for the patients.

3    Q.  All right.  And when the Defendant Vinod Patel came to the

4    pharmacy to pick up controlleds for the patients, were these

5    just the ordinary the doctor called it in and for some reason

6    the driver didn't take it up or were these different

7    controlleds?

8    A.  It was the same controlled from Lortab to Vicodin to Xanax,

9    but I didn't give it out because it was too early to fill.

10   Q.  Okay.

11   A.  That's from a pharmacy perspective, you know.

12   Q.  There are certain medications, like controlleds, that

13   there's a time frame they are supposed to be used?

14   A.  Yes.

15   Q.  Explain that like on, say, a drug like Vicodin.  If I get a

16   prescription of Vicodin filled today, can I come back next week

17   and ask you to give me another prescription of Vicodin?

18   A.  It maybe depends on how many days' supply the doctor has

19   put on the directions.  If he puts twice a day and he

20   prescribed 60 tablets, then I cannot dispense to people in 28

21   days.

22   Q.  Okay.  So, you had some patients where, according to the

23   doctor's directions, they weren't due to have it filled.  Is

24   that right?

25   A.  Yes.

1    Q.  All right.  So, as to those patients what did this

2    Defendant, Vinod Patel, do on those occasions?

3    A.  He came to the pharmacy and he told me that give me those

4    prescriptions even -- I said but it's not due yet; I cannot

5    fill it.

6           He said this is not your business.  I own this

7    business, this pharmacy.  You just work here.  Give it to me

8    and bill it later whenever it's due.  And he picked it up.

9    Q.  Okay.  And so he actually took the controlled drugs?

10   A.  Yes, he did.

11   Q.  And when you say he told you to bill it later, what did you

12   do regarding the billing?

13   A.  I don't remember exactly, but I tried to bill it maybe if

14   it goes through the, you know, their insurance, because those

15   patients were like jumping from pharmacy to pharmacy, you know.

16   So, it's hard to tell now whether it went through the insurance

17   or not.

18   Q.  But you at least tried to bill it?

19   A.  Yes, I did.

20   Q.  All right.  You mentioned earlier that you talked on the

21   telephone to Marie.

22           What, if anything, did you discuss with Marie about

23   this process of providing these -- filling these prescriptions

24   for the home care patients?

25   A.  I have talked to Marie almost, you know, three to four

1   times a week about the patients' prescriptions.  She always

2   calls after the doctor has seen the patients; that when are

3   they going to receive the medications for those patients.

4   Q.  I'm sorry.  I didn't hear that last part.

5   A.  When are they going to receive their medications.

6   Q.  All right.  So, she would call you when for some reason

7   they didn't receive them?

8   A.  Yes.

9   Q.  Okay.  Did this process, this procedure of filling

10  prescriptions for the home health patients in Flint, did that

11  allow Rapid Drugs to become more profitability?

12  A.  Yes, it did.

13  Q.  Are we talking about a small amount more profitable or

14  significant?

15  A.  Significant.

16  Q.  Was the -- before August of 2009, was Rapid Drugs making

17  any kind of profit at all, significant profit?

18  A.  Not significant.

19  Q.  Okay.  What about after?

20  A.  Yes, it did, with Flint business, yes.

21  Q.  Okay.  Did there come -- how long did the practice of

22  filling for the home health care patients, how long did that

23  last?

24  A.  At Rapid Drugs, it lasted from August 2009 to approximately

25  middle of January 2010.  So, four and a half to five months.

1    Q.   Okay.  What, if anything, of significance happened in

2    January of 2010?

3    A.   There was a robbery that happened with the driver in Flint

4    who was going to deliver those prescriptions for the patients,

5    and then nobody was willing to go deliver the medications.

6              I told my concern to Bob Patel that I don't have a

7    driver, that nobody is willing to go deliver, and everybody is

8    scared.

9              So, we don't have a driver and these patients are

10   like now harassing us -- not getting the prescriptions, they

11   are now harassing -- because we didn't have a driver, some

12   patients drove from Flint all the way to Southfield, Michigan

13   to pick up their medications.  And.

14             The staff was scared.  Everybody was scared.  You

15   know, they were not friendly.

16   Q.   All right.  Did you have a conversation with the Defendant

17   Vinod Patel about this driver problem?

18   A.   He knew about this.

19   Q.   Okay.  That was -- now you informed him of that?  That's

20   what I wanted to know.

21   A.   I don't remember exactly, but he knew about this.

22   Q.   Okay.  So, what happened with the driver problem?

23   A.   Then Bob Patel found out that maybe I'm not interested to

24   fill these prescriptions anymore.  So, he moved to the other

25   pharmacy.  And he said one of my pharmacy is almost ready in

1    north, in the Flint-Saginaw area.  He said fill for a couple of

2    weeks, and then I'll move everything, all of the business to

3    the Flint-Saginaw area pharmacy.

4    Q.  Okay.  And is that what happened?

5    A.  Yes, it did.

6    Q.  Okay.  And what pharmacy, if you know, did he eventually

7    move this business to?

8    A.  It was moved to Tri-City Apothecary in Saginaw.

9    Q.  How do you know that?

10   A.  Because Bob Patel told me to share all the patients' data,

11   like their name, date of birth, their Medicare number, Medicaid

12   card, what prescriptions they were taking, and transfer it over

13   to that pharmacy.

14   Q.  All right.  Did Vinod Patel know that it was being

15   transferred to Tri-City Apothecary?

16   A.  Yes, he did.

17   Q.  All right.  Let me ask you this.  That practice of billing

18   but not dispensing the extra prescriptions, did Vinod Patel

19   know that that practice was going on?

20   A.  Yes, he did.

21   Q.  How did he know that?

22           MR. BEUKE:  Objection.

23           THE COURT:  Give me a cause.

24           MR. BEUKE:  My objection is how can he get into

25   Mr. Patel's mind.

1          MR. PRATT:  Well, Your Honor, the follow-up question

2     was how did he know that, and then we got an objection.

3          THE COURT:  Why don't you ask that question first.

4          MR. PRATT:  I'm trying to ...

5          THE COURT:  Well, did you know, Witness?

6     BY MR. PRATT:

7     Q.  Did you know whether or not he knew about the billing but

8     not dispensing of the add-on drugs?

9          THE COURT:  And who is the "he"?

10    BY MR. PRATT:

11    Q.  Vinod Patel, this man.

12    A.  Yes, he knew.

13    Q.  And how do you know that?

14    A.  Because he told me there was a pile -- that some

15    prescriptions that were dispensed over there which were not

16    being picked up by the patients and there's a pile of

17    prescriptions sitting there.  Where ever the store, I don't

18    know, but there was a pile of prescriptions sitting there.

19    Q.  And that was one of the aspects of this billing but not

20    dispensing; it caused a pile of drugs to accumulate.  Is that

21    correct?

22    A.  Yes, it did.

23    Q.  All right.  What, if anything, did you do about the pile of

24    drugs that was accumulating?

25    A.  Whatever I had in the pharmacy, I put in the -- the

1    McKesson or whoever was supplying the totes, I put them in the

2    totes.

3    Q.  And then what happened to them?

4    A.  Eventually I would return them to McKesson, our wholesale

5    supplier, and then I stopped, you know, returning to McKesson.

6    Q.  And then what happened to the pile of drugs?

7    A.  Then Bob Patel told me that it's going to be picked up from

8    the pharmacy by somebody, one of his employees, and taken to

9    somewhere else.

10   Q.  And did that happen?

11   A.  Yes.

12   Q.  All right.  Now, you mentioned I think that Atul Patel was

13   a marketer for Defendant's home health care business.

14            Did he have any other marketers that worked with him

15   or for him?

16   A.  Yes.  One person I know, his name is Gerald.  Last name, I

17   don't know right now.

18   Q.  Okay.  How did you meet Gerald, this other marketer Gerald?

19   A.  Vinod Patel introduced me.

20   Q.  Approximately where and when was this introduction made?

21   A.  It was maybe 2009 sometime, but I don't know the month.

22   Q.  Okay.  And what was the context or what happened when you

23   and Vinod and Gerald got together?

24   A.  Vinod Patel told me that he's a marketer for recruiting

25   patients in the Detroit area and he gives me the patients.  So,

1   any patient he will get, he will give it to you to fill the

2   prescriptions for those patients.

3   Q.   Okay.   He was a home health recruiter for First Michigan?

4   A.   Yes, he was.

5   Q.   Okay.   But you were going to get the prescription business?

6   A.   Yes, I was.

7   Q.   All right.   By the way, did Vinod Patel ever explain why it

8   was you were getting all this prescription business from his

9   home health?   Did he explain why he was willing to do this for

10  you?

11  A.   Yeah.   Because he said Bob was his brother.   So, you know,

12  he's going to give his business to one of the pharmacies of Bob

13  Patel, because he wants to keep the money in the family.

14  Q.   Okay.   What happened when you and Gerald and Vinod Patel

15  got together?   Do you recall the three of you having a

16  conversation and going somewhere?

17  A.   Yes.   One time we got a complaint from Chadda (sic) who

18  recruited a patient for First Michigan home care, for Vinod

19  Patel.

20  Q.   Okay.   There was a complaint from who?

21  A.   From the patient.

22  Q.   Ah.   A complaint from a patient who was recruited for home

23  health care?

24  A.   Yes.

25  Q.   Who told you this?

1    A.   Actually I got a call from the insurance company.

2    Q.   Okay.

3    A.   That the patient made a complaint that they did not receive

4    a particular medication, noncontrolled medication called

5    Nexium.

6    Q.   Okay.  So, it wasn't an add-on; they really wanted it?

7    A.   No.  Actually that patient found out from their billing

8    they get every month or every week, I don't know, but they

9    found out that that prescription was billed, but she does not

10   own that.

11   Q.   Ah.  So, it was because of the benefit sheet that the

12   patient gets?

13   A.   Yes.

14   Q.   Okay.  So, the insurance company is complaining to you.

15        What did you do when you got that complaint from the

16   insurance company?

17   A.   I called immediately to Vinod Patel and Gerald both.

18   Q.   Okay.  And what happened?

19   A.   After that, Vinod Patel and Gerald -- Vinod Patel told me

20   that I'll see you in the evening after you close the pharmacy.

21   Q.   What happened that night after you closed the pharmacy?

22   A.   Vinod Patel came with Gerald, and they said leave your car

23   here, because the patient was not living too far.  The patient

24   was at Seven Mile and Lahser and the pharmacy was at Nine Mile

25   and Lahser.  So, it was only two miles.  So, he says we're

1    going to go in the one car.

2    Q.   Okay.  So, who said we're going to go in one car?

3    A.   Vinod Patel.

4    Q.   All right.  So, whose car did you go in?

5    A.   I don't remember exactly right now.

6    Q.   It wasn't yours?

7    A.   I don't think so, no.

8    Q.   All right.  Where did the three of you go?

9    A.   We went to the patient's house at Seven Mile and Lahser.

10   Q.   What happened when you got there?

11   A.   We got to an apartment building, and the first apartment on

12   the left, we went inside the house, and Vinod said let Gerald

13   talk.

14   Q.   Let Gerald do the talking?

15   A.   Yeah.

16   Q.   Okay.  Did Gerald talk to this patient, this person?

17   A.   Yes, Gerald did talk to the patient and --

18   Q.   What did he tell -- tell us the conversation between Gerald

19   and the patient.

20   A.   Gerald told the patient that did you complain about

21   anything to the insurance company from the pharmacy billing.

22   And the patient said yes.  And they talked.  They were talking

23   so fast.  And Gerald explained that why you did that, you know.

24   We're always going to take care of you.

25              And then after that, Vinod Patel give the 50 dollar

1    bills to Gerald, and Gerald gave it to the patient.  And then
2    Gerald told that now you're happy, please withdraw the
3    complaint.
4            And that patient asked that is it going to be every
5    month.  And then, you know, nobody said anything -- Gerald said
6    I'll talk to you later about that.
7            And then we left from there.  I was upset and I asked
8    Vinod Patel why did you give $50 to her.  We can reverse the
9    billing if she doesn't want it.  He said that's the way Detroit
10   works.
11   Q.  Now, during the time that you were having conversations
12   with Vinod Patel, Atul Patel at Rapid Drugs, did Atul Patel
13   ever discuss what was going on with the services in the home
14   health -- at the First Michigan Home Health Company?
15   A.  Yes, he told me about that, but I'm not sure exactly where
16   it happened, the pharmacy or outside, because we are also
17   friends too.
18   Q.  Okay.
19   A.  But he told me a lot of business is coming, like patients
20   like walking to wherever their office was, to get the services.
21   Q.  And did he tell you that a lot of the patients walking to
22   the -- walking to get the services, he had some concern about
23   that?
24   A.  Yes.  He said everybody wants their controlled medications.
25   Q.  Okay.  Tell us a little bit about the profits at Rapid

```
1    Drugs.  Did you start getting bonus checks from Bob Patel?

2    A.  Yes, I did.

3    Q.  What kind of payments did you receive from Bob Patel?

4    A.  I don't remember the exact amount, but it was sometimes

5    $25,000, sometimes 30,000, sometimes 50,000.

6    Q.  Okay.  And you got that in addition to your regular salary?

7    A.  Yes, I did.

8    Q.  And you got that because of the practices that you were

9    willing to engage in at Rapid Drugs; is that correct?

10   A.  Yes.

11   Q.  All right.  Did Vinod Patel ever have any conversations

12   with you about how he was paying Atul Patel?

13   A.  Atul Patel told me that he was getting $800, but Vinod

14   Patel told me I am only paying $600, there's not that much

15   profit, you know, he's just lying.

16           I said, okay, well, I believe.  I don't know the

17   business, so I don't know, you know.

18   Q.  So, there was some dispute between the two of them as to

19   exactly how much was being paid?

20   A.  Yeah.

21   Q.  Okay.  How about Atul Patel in terms of being paid by

22   check; do you know if Atul Patel was paid by check by Vinod

23   Patel?

24   A.  Yes.  Atul Patel told me about it.

25   Q.  Okay.  What did Atul tell you about that?
```

1    A.  He told me that he -- he was a student visa -- he was on a

2    student visa.  He wasn't on a work visa.  And Vinod Patel maybe

3    did not have that much capacity to pay him in the cash, in the

4    form of cash.

5            So, he said -- Atul said that Vinod Patel told me

6    that he was going to pay me by check, but he cannot pay me

7    because I'm not legally work in the United States.  So, he paid

8    through his cousin.  I think his name was Paresh Patel.

9    Q.  Okay.  And then what did Paresh Patel turn around and do?

10   A.  I think gave it to Atul Patel.

11   Q.  Did he tell you what business his cousin was in?

12   A.  Yeah.  His cousin owned a liquor and tobacco store in

13   Canton.

14   Q.  Okay.  Did Atul Patel explain to you how much money they

15   could make for recruiting just one home health care patient to

16   First Michigan Home Health Care?

17   A.  He said it depends, but it's still from six to $8,000.

18   Q.  All right.

19   A.  It could be more.  They put some quotes.  I don't know.

20   Q.  All right.  Did Atul Patel tell you that the business ever

21   had any problems with folks not actually being available and

22   being home when the physical therapist came?

23   A.  Yes.  I found out through one more common friend we have,

24   his name is Chetan Shah, and we found out.

25   Q.  All right.  Thank you.

1          Do you know if the prescriptions for the recruited

2    home health patients stayed at Tri-City Apothecary or if they

3    moved somewhere else?  Do you know that, yourself?

4    A.  Yes.  It was billed at Tri-City Apothecary.

5    Q.  Do you know where the business went after that?

6    A.  I think Vinod Patel opened his own pharmacy.

7    Q.  Okay.  The bonus checks you were getting, you say you were

8    getting bonus checks that were about $20,000 or more.  Is that

9    right?

10   A.  Yes.

11   Q.  That allowed you to buy things; is that right?

12   A.  Yes.

13   Q.  All right.  What, if any, cars were you able to purchase?

14   A.  (No response.)

15   Q.  Or did you buy cars before you got bonus checks?  I'm not

16   sure.

17   A.  I had cars before that.  I had a Lexus and a BMW before I

18   joined Bob Patel.

19   Q.  All right.  In any event, did you continue working for Bob

20   Patel and Rapid Drugs even after the home care patients left?

21   Did you continue working for him for a while?

22   A.  Yes.

23   Q.  Did you continue to work at Rapid Drugs?

24   A.  Yes.

25   Q.  How long did you work there?

1   A.  Up until May 2nd, 2011.

2   Q.  What happened in May of 2011.

3   A.  I have authorized immigration to work independently.  It's

4   called a work authorization.  I don't need any sponsor anymore

5   to sponsor me to get my work visa.  So, I left Bob Patel.

6   Q.  Okay.  So, you left him.  And what did you do?

7   A.  I went to work with Mehul Patel and Pradeep Pandya, who had

8   previously worked for Bob Patel.

9   Q.  Okay.  And where did you go to work for them?

10  A.  At Park Shelton Pharmacy in Detroit, Michigan.

11  Q.  All right.  Did you engage in some of the same illegal

12  activities there with those gentlemen that you had been doing

13  at Rapid Drugs?

14  A.  Yes, I did.

15  Q.  What happened in August of 2011?

16  A.  There was an indictment issued for Bob Patel's business and

17  a lot of employees.

18  Q.  And did that include you?

19  A.  Yes, it did.

20  Q.  All right.  And how did you come to court?

21  A.  I surrendered the next day in the morning at the DEA

22  office.

23  Q.  All right.  And so you're charged with an indictment.  Is

24  that correct?

25  A.  Yes.

1    Q.   What did you decide to do regarding your charges?

2    A.   I decided to plead.

3    Q.   All right.  And did you decide to simply plead guilty or

4    did you decide to also cooperate and provide testimony?

5    A.   I decided to cooperate and to testify.

6    Q.   All right.  How quickly did you make this decision after

7    you surrendered on August 3rd, 2011?

8    A.   My attorney was in contact with the U.S. Attorney's office,

9    you know, within a week of this case, and they said wait for

10   the discovery to come, and then it was within a month.

11   Q.   All right.  So, you sat down and talked with the agents

12   within a month or two?

13   A.   We decided, but then they made the appointment in October.

14   Q.   Okay.  So, you decided within a month, but the actual

15   appointment wasn't until October?

16   A.   Yes.

17   Q.   Now, you mentioned discovery.  That's the papers that are

18   given out to your lawyer that have evidence.  Is that correct?

19   A.   Yes.

20   Q.   At that time did that -- at that time, if you know, did

21   that discovery include anything about the Defendant here, Vinod

22   Patel?

23   A.   No.

24   Q.   Okay.  So, when you sat down with the agents, were you

25   saying you had seen in papers or were you telling them what you

1    had seen and what you had heard?

2    A.  I told them whatever I heard and whatever I saw.

3    Q.  Now, what charges did you plead guilty to?

4    A.  Charges.  I plead guilty to both counts I've been indicted.

5    Q.  All right.  The health care fraud conspiracy?

6    A.  Yes.

7    Q.  Involving the pharmacies?

8    A.  Yes.

9    Q.  And a controlled substance count?

10   A.  Yes.

11   Q.  All right.  And under your agreement is there an estimated

12   guideline range that the judge is going to look at for

13   sentencing?

14   A.  Yes.

15   Q.  And what is that range?

16   A.  57 to 71 months.

17   Q.  Okay.  And if the Government finds -- if at the conclusion

18   of your testimony if the Government makes a motion, the

19   Government can recommend a lower sentence.  Is that correct?

20   A.  I hope so.

21   Q.  All right.  How many times have you testified now in this

22   case?

23   A.  This is the third time.

24   Q.  All right.  What's your current immigration status?

25   A.  I don't have any status right now, but I think I've been

1    allowed to go to India.  So, the U.S. Attorneys have told me
2    that there's a kind of visa I was assigned, but I'm not sure
3    about my visa.
4    Q.  Okay.  You actually had a family issue in the last couple
5    of months; is that correct?
6    A.  Yes.
7    Q.  What happened?
8    A.  My father died back home in India.
9    Q.  All right.  And your lawyer requested that you be allowed
10   to go and attend to matters?
11   A.  Yes.
12   Q.  Did you do that?
13   A.  No, I have not, because the trial was coming.
14   Q.  Okay.  So, you're going to attend to matters after this
15   trial?
16   A.  Yeah, I hope so.
17   Q.  Okay.  During the time after you pled guilty -- during the
18   time after you pled guilty, did you continue to work in some
19   sort of employment capacity?
20   A.  Yes.  I have worked for a lot of pharmacies now.
21   Q.  Okay.  And during some of that time, were you out of status
22   and not eligible to work?
23   A.  Yes.
24   Q.  All right.  Are you working now?
25   A.  No.

US v Vinod Patel #11-CR-20468-36

160

```
1    Q.  Okay.  Who is going to decide what your sentence is going
2    to be?
3    A.  The Honorable Judge and the Court.
4    Q.  What will happen to your immigration status once -- what
5    will happen to your immigration status once you've completed
6    service of whatever sentence is imposed?
7    A.  I may be deported.
8    Q.  Has anyone for the Government -- and that's myself,
9    Mr. Neal, any of the agents -- have they promised to do
10   anything for you regarding immigration?
11   A.  No.
12            MR. PRATT:  Thank you, Your Honor.  I have no further
13   questions with this witness at this time.
14            THE COURT:  Cross-examination?
15            MR. BEUKE:  Judge, can we approach, Your Honor, just
16   in terms of timing and scheduling?
17            THE COURT:  We can do that after the jury is gone if
18   you are talking about the rest of the trial.
19            MR. BEUKE:  Just as to today, Your Honor.
20            THE COURT:  Well, I presume this will be our last
21   witness today.  If you don't finish, he'll come back in the
22   morning.
23            MR. BEUKE:  Thanks, Your Honor.
24                        CROSS-EXAMINATION
25
```

1    BY MR. BEUKE:

2    Q.  Mr. Patel, with respect to your involvement in this

3    investigation, what you told the ladies and gentlemen was that

4    you were indicted along with Bob Patel on August the 2nd of

5    2013 -- or, I'm sorry -- 2011.  Correct?

6    A.  Yes.

7    Q.  Agents came out to your house to arrest you, but you were

8    not there, were you?

9    A.  Yes.

10   Q.  Okay.  Were you arrested at your house?

11   A.  No.

12   Q.  Okay.  And you were allowed to come down the next day and

13   surrender, correct?

14   A.  Yeah.  I came with my attorney.

15   Q.  You were released on bond almost immediately.  Correct?

16   A.  Yes.  That day, yes.

17   Q.  And after you were given the charges against you, you were

18   given a copy of the indictment.  Correct?

19   A.  Yes.

20   Q.  And you knew and understood what the charges were against

21   you.  Correct?

22   A.  Yes.

23   Q.  And at that time you were employed -- or, you were partners

24   in a pharmacy with Pradeep Pandya, correct?

25   A.  Yes.

1   Q.  And Mehul Patel, correct?

2   A.  Yes.

3   Q.  And Mehul Patel, he was indicted along with you, correct?

4   A.  No, he was not indicted at that time.

5   Q.  Okay.

6   A.  Neither was Pradeep Pandya.

7   Q.  Okay.  So, neither one of your partners was indicted in

8   that first indictment.  Correct?

9   A.  Yes.

10  Q.  And you were working with those partners and owned that

11  Park Shelton Pharmacy, correct?

12  A.  Yeah.  I was working --

13  Q.  You told the ladies and gentlemen that when you and your

14  partners opened that pharmacy, that opened in May of 2011,

15  correct?

16  A.  Approximately, yes.

17  Q.  Okay.  So, that pharmacy had been in business for three

18  months, four months.  Correct?

19  A.  Yes.  Since when the indictment came, you mean?

20  Q.  And you and your partners, during that four-month period of

21  time, you told the ladies and gentlemen that you were operating

22  the same scam that you learned from Bob Patel.  Correct?

23  A.  Yes.

24  Q.  That you learned from Mitesh Patel when he trained you at

25  Rapid Drugs, correct?

1    A.   Mitesh Patel and Bob Patel.

2    Q.   And that scam involved you paying doctors, correct?

3    A.   I never paid any doctors, but Bob Patel did.

4    Q.   For you and your partners' scam at Park Shelton, who was

5    paying the doctor and who was the doctor that was being paid?

6    A.   Mehul Patel was paying.

7    Q.   So, Mehul Patel, your partner, paid which doctor how much?

8    A.   He paid rent to Dr. Jan and he paid rent for Dr. Benito and

9    for Dr. U to Dr. Jan.

10   Q.   So, that was your organization's bribery to doctors to send

11   patients and prescriptions to your pharmacy, correct?

12   A.   It wasn't my pharmacy.  It was Mehul Patel's pharmacy and

13   Pradeep Pandya's pharmacy.

14   Q.   Well, it was put in Pandya's name, correct?

15   A.   I believe so.  I don't remember exactly, but yes.

16   Q.   The idea originally was for you and Mehul to open up the

17   pharmacy, correct?

18   A.   Yes.

19   Q.   And somebody threatened your visa status if you did that,

20   correct?

21   A.   I don't understand.  You're just going too fast.

22   Q.   Well, did there come a time in the latter part of 2010 when

23   you and Mehul Patel decided that you wanted to open up your own

24   pharmacy together?

25   A.   In 2010?

2:11-cr-20468-AJT-MKM   Doc # 1261   Filed 09/16/14   Pg 164 of 198   Pg ID 18198

1    Q.   The latter part, December or November of 2010.

2    A.   Not that I recall.

3    Q.   Well, Bob Patel did he ever come to you and threaten you,

4    if you opened up your own pharmacy, that he would do something

5    about your visa status?

6    A.   He told me if I was going to quit his organization, he's

7    going to do that.

8    Q.   Okay.  And you knew that he was a man that made good on his

9    promises, correct?

10   A.   I don't understand that he --

11   Q.   Well, did Bob Patel tell you that he learned that you and

12   Mehul Patel were going to open up your own pharmacy?

13   A.   At what time?

14   Q.   The end of 2010, the beginning of 2011.

15   A.   Maybe he knew.

16   Q.   Okay.  Well, at some point, Bob Patel came to you and had a

17   conversation with you about that.  Correct?

18   A.   You are going past now in 2010, and you were asking me

19   about 2011.

20   Q.   When did Bob Patel threaten you about your visa status?

21   A.   That was 2010.  February to April 2010.

22   Q.   Okay.  When did you and Mehul Patel decide to try to open a

23   pharmacy together?

24   A.   It was after one year, May 2011.

25   Q.   Okay.  Well, you had made plans with Mehul Patel before

1    that, correct?

2    A.  I never talked to him before about opening a pharmacy,

3    because I had no status.

4    Q.  Pradeep Pandya, that's a gentleman you met when?

5    A.  Pradeep Pandya?

6    Q.  Yeah.

7    A.  I know him, yeah.

8    Q.  When did you meet him?

9    A.  Pradeep Pandya?

10   Q.  Yes.

11   A.  I think I met him for the first time with Mehul Patel's

12   son, I remember.

13   Q.  When?

14   A.  Could be 2011.

15   Q.  2011?

16   A.  Yeah.

17   Q.  So, prior to that, you had never met the guy?

18   A.  I never met him.  I talked to him maybe over the phone.

19   Q.  Where did you meet him?

20   A.  I met him at the Starbucks, maybe, in Northville.

21   Q.  When you met him at Starbucks at Northville, were you with

22   Mehul Patel?

23   A.  Yes.  I didn't who was Pradeep Pandya by the look.

24   Q.  Well, you were introduced to him, correct?

25   A.  Yes.

1   Q.  Mehul Patel told you this is the guy we're going to use to

2   get the pharmacy license.  Correct?

3   A.  He said we are going to open a pharmacy.

4   Q.  Yes.  This was an agreement between the three of you,

5   correct?

6   A.  Yes.

7   Q.  And you still had that H1 visa status at that point,

8   correct?

9   A.  No.  At that time I got my work authorization.

10  Q.  So, if somebody said that you were threatened by Bob Patel

11  to revoke your visa status if you opened up a competing

12  pharmacy, that isn't correct?

13  A.  You're just confusing everybody here, you know.

14  Q.  No.  I'm trying to ask you a question.

15          Did Bob Patel threaten to have your visa status

16  revoked if you opened up a competing pharmacy?

17  A.  He said he will revoke my visa if I'm going to leave his

18  organization.

19  Q.  Okay.  And you told him I won't leave your organization.

20  Correct?

21  A.  Yes.  Because at that time I did not have any other work

22  visa.

23  Q.  And you and Mehul Patel were in discussions about opening

24  up your own pharmacy, correct?

25  A.  Yes, after I got my EAD, work authorization.

1  Q.  You knew how much money Bob Patel's pharmacies were making.

2  Correct?

3  A.  Yes.

4  Q.  You were getting a piece of all of those profits.  Correct?

5  A.  Yes.

6  Q.  From August of 2009, correct?

7  A.  Yes.

8  Q.  You wanted to get your own piece of the pie, didn't you?

9  A.  Yes.

10  Q.  Okay.  So did Mehul, correct?

11  A.  Yes.

12  Q.  So did Pradeep, correct?

13  A.  Yes.

14  Q.  Now, a decision was made between the three of you that

15  Pradeep was going to be the person that applied for the

16  license.  Correct?

17  A.  No.  They both applied already when I met them.

18  Q.  Okay.  So, it's your understanding of the Park Shelton

19  business that it was Pradeep and Mehul who were the owners of

20  the company.  Correct?

21  A.  Yeah.  They already decided.  They already applied for it.

22  They already got the license and everything before ...

23  Q.  But you had your deal with Pradeep and Mehul about the

24  profits that you were going to make from being involved in Park

25  Shelton.  Correct?

1   A.   Yes.

2   Q.   You got as much money as they did.   Correct?

3   A.   What's that?

4   Q.   You got as much money as they did.   You were partners with

5   them?

6   A.   No.

7   Q.   Not on paper, but --

8   A.   That's what they told me, yes.

9   Q.   Okay.  And you got profits from Park Shelton, correct?

10  A.   I just took one check.

11  Q.   One check for how much?

12  A.   I think it was about 81,000.

13  Q.   Okay.  And that was how long after you opened it up in May

14  of 2011?

15  A.   The beginning of May to -- until the -- before the

16  indictment.

17  Q.   Well, within a couple months, you drew $81,000 from the

18  business.   Correct?

19  A.   Yes.

20  Q.   Okay.  And did you know that Pradeep Pandya took 300,000

21  out of Park Shelton?

22  A.   I had no idea, because after the indictment --

23  Q.   Well, my question is did you know Pradeep Pandya took

24  300,000 out of Park Shelton as his profits?

25  A.   He could be.  He might have.

1    Q.  And Mehul Patel, your other partner, took 300,000 out of
2    Park Shelton as his profits?
3    A.  It could be.  Because I was not on the account, so I don't
4    know what they did.  But they could have taken it, yes.
5    Q.  After you got indicted, did you ever go to Pradeep and
6    Mehul and say, hey, guys, you know I'm in a little bit of a jam
7    here, I'm indicted, and I would like to get my money that I've
8    got coming to me as a partner with you guys, when do I get my
9    money?
10            Did you ever have that conversation with them?
11   A.  I had a conversation with them, that what happened to the
12   money in the account.
13   Q.  And did they tell you that we each took 300,000 and we gave
14   you your 81 and that's how it's going to be split up?
15   A.  He told me that don't call me again.  You are done with.
16   Q.  Who told you that?
17   A.  Mehul Patel told me.
18   Q.  So, your partner, after you got indicted and they didn't,
19   he said don't ever call me again.  Correct?
20   A.  Yes.
21   Q.  Okay.  And you never called him again?
22   A.  No.  Because they don't want to talk to me.
23   Q.  Okay.  Did you ever go to Park Shelton and see Mehul or
24   Pradeep about the rest of the money that you had coming?
25   A.  I only went one time, the next day, after --

1   Q.  Two days after the indictment?

2   A.  Yes.

3   Q.  August 4th, right?

4   A.  August 4th.

5   Q.  What happened on August 4th?

6   A.  I went to Park Shelton.

7   Q.  Why?

8   A.  To talk to them --

9   Q.  Tell the ladies and gentlemen.

10  A.  I went to Park Shelton Pharmacy to talk to Mehul Patel and

11  Pradeep Pandya.

12  Q.  And they were both there weren't they?

13  A.  Yes, they were.

14  Q.  And you went to Park Shelton after the indictment was given

15  to you, you went there to talk to them about all these billed

16  but not dispensed medications that were at Park Shelton or

17  being hid somewhere.  Correct?

18  A.  Yes, I talked to them about that.

19  Q.  Tell the ladies and gentlemen what that conversation was

20  about.

21  A.  I told them that, you know, guys, you told me that you guys

22  stole some medications from Bob Patel's pharmacies too and --

23  Q.  Well, let's take a step back.

24          When were you told that they stole medications from

25  Bob Patel; how long prior to August of 2011, when the

1    indictment came down?

2    A.  They told me about it in July of 2011, for a month --

3    Q.  So, a month earlier your two partners admitted to you that

4    they stole how much medication from Bob?

5    A.  I think they said about 200 to $300,000 each.

6    Q.  They also told you where the medication was being stored,

7    correct?

8    A.  Yes, they told me.

9    Q.  And you knew where it was being stored, correct?

10   A.  Yes.

11   Q.  And where was it being stored; tell the ladies and

12   gentlemen?

13   A.  They said they stored it at their houses in Grand Blanc,

14   Michigan.

15   Q.  Okay.  So, Pradeep Pandya had stolen medications at his

16   house, correct?

17   A.  Yes.

18   Q.  And Mehul Patel had stolen medications at his house also,

19   correct?

20   A.  Yes.

21   Q.  They never used your house to hide any of the stolen

22   medications that your pharmacy -- well, you didn't have

23   anything to do with stealing the medications --

24   A.  No --

25   Q.  -- from Bob Patel?

1    A.   -- I never did anything, sir.

2    Q.   And you didn't allow those stolen medications to be used at

3    Hiren Patel's pharmacy, did you?

4    A.   It wasn't my pharmacy, but they never brought anything,

5    because they never told me -- they told me in July.  And after

6    this happened in August, they said they're going to get rid of

7    it.

8    Q.   Well, in July when you learned about your partners stealing

9    all that medication from Bob Patel, did you ask them what they

10   were going to do with it?

11   A.   Not really.

12   Q.   No?

13          Did they tell you what their plans were for all this

14   three or $400,000 worth of stolen medication?

15   A.   I cannot recall that.

16   Q.   Okay.  You guys in that August 4th conversation, what did

17   they tell you you guys were going to do with the medication

18   then?

19   A.   I was not there anymore, but they told me they were going

20   to get rid of it.

21   Q.   Well, they told you how they were going to get rid of it,

22   didn't they?

23   A.   They said they were going to put it in the drain, in the

24   hot water or something, and get rid of it.

25   Q.   So, they were going to boil it and flush it down the

1   toilet, correct?

2   A.   That's what they were going to do.   That's what they told

3   me.

4   Q.   And you were worried about that, weren't you?

5   A.   Why should I worry about it.   They had stolen drugs at

6   their houses.   I had never seen the drugs physically.   Why

7   should I --

8   Q.   You had stolen drugs.   You had been stealing drugs along

9   with them since May of 2011, correct?

10  A.   But those drugs were still at Park Shelton.   They were not

11  went to their house.

12  Q.   Well, did you tell your partners, hey, guys, I'm under

13  indictment now.   So all of the stolen drugs that we've gotten

14  together at Park Shelton for the last three or four months,

15  we've got to get rid of these drugs?

16  A.   I did tell them.

17  Q.   And did they get rid of the drugs after you told them that?

18  A.   I have never been to the pharmacy after that, so I don't

19  know what they did.

20  Q.   I mean what was -- what was of paramount importance for you

21  was making sure that the agents didn't come with a search

22  warrant for Park Shelton and find all of the stolen drugs that

23  you and your partners had hid there.   Correct?   You were

24  worried about that?

25  A.   I told them.

1    Q.  And did they get -- you told them to get rid of the drugs,

2    correct?

3    A.  I told them.

4    Q.  And they did get rid of the drugs, didn't they?

5    A.  They just told me that you don't come to the pharmacy

6    again, and I never been.

7    Q.  Well, they told you not to come to the pharmacy again

8    because they told you they don't want to get into the same

9    trouble as you're in.  Right?

10   A.  Maybe, yes.

11   Q.  And they were hoping that you would never cooperate and

12   tell them that you guys have been stealing drugs for the last

13   three or four months in your own business.  Correct?

14   A.  Maybe, yes.

15   Q.  Okay.  Well, you told Mr. Neal -- or, Mr. Pratt, I believe,

16   that you came to work for Bob Patel when?

17   A.  February 2009.

18   Q.  Okay.  And February 2009 you came over from CVS.  Is that

19   correct?

20   A.  Yes.

21   Q.  And you were making a good wage there.  Correct?

22   A.  Where?

23   Q.  CVS.

24   A.  Yeah.  I was making about $54 an hour.

25   Q.  Okay.  A little more than a hundred thousand dollars a

1    year, correct?

2    A.  Yes.

3    Q.  Okay.  And the offer to come to work for Bob Patel came

4    from Bob Patel.  Correct?

5    A.  Yes.

6    Q.  You knew who he was, correct?

7    A.  Yeah.  I had met him two times before that.

8    Q.  You knew not only who he was, but you knew that he was a

9    person in the Detroit community that owned a number of

10   pharmacies.  Correct?

11   A.  Yes.

12   Q.  You had been in the pharmacy business for a long time prior

13   to 2009.  Correct?

14   A.  Yeah.  I worked for Rite-Aid and CVS, as I told.

15   Q.  Okay.  But when you went to work for Bob Patel, you knew

16   that he was an independent pharmacy.  Correct?

17   A.  Yes.

18   Q.  And how long after February 2nd of 2009 that you came to

19   work for him did it take you to figure out that Bob Patel's

20   pharmacy didn't run the same way that the other pharmacies that

21   you worked at ran?

22   A.  Yeah, it was ...

23   Q.  How long did it take you to figure that out?

24   A.  Uhm, it -- it -- everything comes slowly, you know, with

25   all experience.  So, it's --

1    Q.  Did it take a couple of days?

2    A.  A couple of weeks and then months came, to understand the

3    billings and stuff like that.  Because when I was working at

4    CVS, I never worried about what the insurance is and whether

5    they paid or not.  And all this matter comes into the mind

6    later on.

7    Q.  Is it your testimony, Mr. Patel, that at CVS or at

8    Rite-Aid, they don't care what the insurance company is --

9    A.  Yeah.  It --

10   Q.  -- or they don't care how to get paid?

11   A.  Yeah.  Because we're just an employee.  They don't tell us

12   how much they get paid and ...

13   Q.  Well, the procedures to get paid at CVS, if a Medicare

14   patient comes to CVS with a prescription, and the prescription

15   is filled, CVS gets paid the same way that Rapid Drugs gets

16   paid, correct?  You have to bill Medicare?

17   A.  I hope so.  But there's a different contract.  So -- I hope

18   they are getting paid.

19   Q.  Did you ever see the contract that CVS had with Medicare?

20   A.  No.

21   Q.  Did you ever see the contract that Rapid Drugs had with

22   Medicare?

23   A.  Maybe, but ...

24   Q.  You saw the contract that Rapid Drugs had with Medicare?

25   A.  Sometimes the insurance companies do fax it, some papers to

1    sign it.

2    Q.  Did you ever see the contract that Rapid Drugs had with

3    Medicare?  Yes or no.

4    A.  Medicare is not one insurance company.  You are confusing

5    everybody.

6         Medicare has several insurance companies.  They are

7    contracted like CVS, Caremark, Humana, ARP.  So, everybody has

8    their own contract.

9    Q.  Let's get back to your start at Rapid Drugs.

10        Your trainer was Mitesh Patel, correct?

11   A.  Yes.

12   Q.  He's the person who taught you about the bill but not

13   dispense way of doing business, correct?

14   A.  Yes, he did.

15   Q.  He's the one who explained to you that this is the way we

16   make more money at our pharmacy, correct?

17   A.  He explained to me, yes.

18   Q.  And he told you that the way the scam works is that doctors

19   write prescriptions to our pharmacy.  We fill all the drugs

20   that are on the prescriptions.  The patients get the controlled

21   drugs and they don't get the noncontrolled drugs.  That was

22   explained to you.  Correct?

23   A.  It wasn't exactly like that.

24   Q.  Well, how was it?  Tell the ladies and gentlemen how it was

25   explained to you by Mitesh Patel.

1    A.  Well, at that time when I started at Rapid Drugs, Rapid

2    Drugs wasn't doing much business.  He told me about doctors in

3    the building, and he told me the main business we are getting

4    is from the doctors here inside the building.  And Dr. Jan is

5    the main doctor, who was also the owner of the building.  And

6    he's the primary prescriber and primary business for us.

7            So, if you have any prescriptions to make on his

8    name, you can make it.  And then later we will put it on the

9    prescription --

10   Q.  If I may stop you for a minute.

11           If you have any prescriptions to make on his name,

12   you can make it?

13   A.  Yes.

14   Q.  What does that mean?

15   A.  That meant if -- you know, if you want to make any

16   prescriptions for profit, you can make on his name.

17   Q.  So, he's telling you, in your training time, that if you

18   get one of these doctors' prescriptions and you want to put

19   some extra prescriptions on the script, you can do that?

20   A.  Yes.

21   Q.  Our doctors will back you up.  Correct?

22   A.  He says -- yeah, the doctor will write the prescription.

23   Q.  And you did that, correct?

24   A.  Yes, I did.

25   Q.  You did it thousands of times, correct?

1    A.  I cannot say how many times, but yes, I did.

2    Q.  And you just wrote the names of narcotics that were to be

3    applied to that prescription on your own.  Correct?

4    A.  I never prescribed any narcotics.

5    Q.  Well --

6    A.  Non- --

7    Q.  How about noncontrolled?

8    A.  Noncontrolled, yes.

9    Q.  So, you only forged the noncontrolled drugs, not the

10   controlled drugs.  Correct?

11   A.  Controlled drugs, I can never write on my own.

12   Q.  And when you did that, you knew that those drugs that you

13   were handwriting on the prescriptions weren't going to be given

14   to the patients, correct?  You knew that?

15   A.  Yeah.

16   Q.  And you knew that they were going to be returned back to

17   the store, correct?

18   A.  Store means --

19   Q.  Rapid Drugs.

20   A.  It was in the store.  Yeah, it was never given out.  So, it

21   was in the store.

22   Q.  So, these noncontrolled drugs that you handwrote on the

23   prescriptions, they didn't even get put in the package that was

24   picked up by the drivers.  Correct?

25   A.  Yes.  Sometimes, yes.

1    Q.  They just went back into the storage room.  Correct?

2    A.  Yes.

3    Q.  So, you didn't bother the drivers even taking those out of

4    the store, correct, out of Rapid Drugs?

5    A.  Sir, I didn't hear you.  You were turning around.

6    Q.  You never sent -- the noncontrolled drugs that you

7    prescribed kind of on your own and put on the prescription

8    pads, you didn't even send those with the drivers?

9    A.  No.

10   Q.  Did Mr. Neal or Mr. Pratt or any of the agents, did they

11   ever show you any of those prescription pads or prescriptions

12   that you handwrote out?

13   A.  With my handwriting?

14   Q.  Yes.

15        Did you go through them, any of those?

16   A.  Sometimes in the beginning in the discovery and when I went

17   to the proffer, I saw some evidence --

18   Q.  How about when you were preparing to testify in this case;

19   did they say to you, hey, Hiren, we're going to ask that the

20   jury take a look at some of these prescriptions that you forged

21   during your time at Rapid Drugs?  Did they go through that

22   stuff with you?

23   A.  Uhm ...

24   Q.  They didn't, did they?

25   A.  No.  They just went through the one prescription right now

1    for the Lidoderm patch.

2    Q.  The Lidoderm patch, that's the one they said they were

3    going to use to show to the jury.  Correct?

4    A.  That was one of them.

5    Q.  How many times did you forge prescriptions on prescription

6    pads that you received at Rapid Drugs over the how many months

7    you worked there?

8    A.  It's hard to tell.  It's -- you know, how many times I'm

9    going to tell.  It was a practice.

10   Q.  Well --

11   A.  Practice is like everyday.

12   Q.  In 2009, is it fair to say, Mr. Patel, that you were all in

13   on the bill but not dispense scam?

14   A.  (No response.)

15   Q.  You knew how it worked, correct?

16   A.  Yeah.

17   Q.  It had been explained to you by Mitesh, correct?

18   A.  Mitesh and Babubhai Patel.

19   Q.  And Bob Patel told you this is how we're going to make

20   money, correct?

21   A.  Yes.

22   Q.  And at some point within the next couple of months, you

23   started getting cut in on the profits.  Correct?

24          You told Mr. Pratt about you beginning to get bonus

25   checks.  Correct?

1    A.  Yes.

2    Q.  And the bonus checks started coming to Hiren Patel when?

3    August of 2009, correct?

4    A.  Probably.

5    Q.  In August of 2009, you got a bonus check from Bob Patel for

6    about $25,000, correct?

7    A.  Could be possible.  I don't remember the amount.

8    Q.  Well, they were a personal check from Bob Patel to you,

9    correct?

10   A.  It was a business check, a business check from ...

11   Q.  From Bob Patel's management company, correct?

12   A.  Yeah.

13   Q.  Was that Elite Pharmacy Management?

14   A.  I don't think Elite Pharmacy Management existed at that

15   time.

16   Q.  Well, you got your bonus checks from Bob Patel once every

17   three months, is that correct, in the beginning of 2009?

18   A.  Yeah, it would be three, three months.

19   Q.  And your first bonus check came without even the Rapid

20   Drugs store that you were running with Mitesh even making a

21   real profit, you've told us.  Correct?

22   A.  I didn't understand --

23   Q.  You said a little while ago that the profits at Rapid Drugs

24   in August of 2009, they weren't making much money.  Correct?

25   A.  It wasn't significant, I said, yeah.

1    Q.   Okay.  But in any event, Bob Patel approached you and said,

2    listen, Hiren, I'm going to give you a bonus check beginning in

3    August of 2009.  And you got a bonus check in August of 2009,

4    didn't you?

5    A.   Probably, yeah.

6    Q.   Well ...

7    A.   It's been a lot of years now for me to remember.

8    Q.   Over the next year and a half that you remained there, you

9    got a bonus check every three months.  Fair to say?

10   A.   Yeah, probably.

11   Q.   And the bonus checks that you got, you took from Bob Patel.

12   Correct?

13   A.   Yes.  He gave them to me.

14   Q.   And the bonus checks that you got from Bob Patel, when you

15   took them, you deposited them in your account.  Correct?

16   A.   Yes.

17   Q.   Did you ever give copies of those bonus checks that you got

18   from Bob Patel to the prosecutors?

19   A.   I never -- I -- because I thought it was closed after the

20   indictment, and I never ...

21   Q.   So, you've never seen those bonus checks that you got from

22   Bob Patel.  They haven't been shown to you when you've come

23   down to this building to prepare for your testimony.  Correct?

24   A.   Bonus checks?

25   Q.   Yeah.

1   A.   No.   The only thing I knew is I have seen the statement of

2   my account.

3   Q.   Well, my question is did you ever see the bonus checks that

4   Bob Patel wrote to you as --

5   A.   I didn't see the image, no.

6   Q.   In any event, over that -- how long -- 18 months that you

7   were there after August 2009, you got over a couple hundred

8   thousand dollars worth of bonus checks.   Correct?

9   A.   In what year are you saying?

10   Q.   Well, did you -- the bonus checks, did you put the bonus

11   checks on your tax returns in '09?

12   A.   Yeah.   Whatever he provided, yes, I put everything on

13   the --

14   Q.   You made sure that those checks -- you knew that the checks

15   were easily traced, correct?

16   A.   Yeah.

17   Q.   And that's why you reported that as income, correct?

18   A.   Yes.

19   Q.   Did you -- and you knew that that income was as a result of

20   your involvement in this scheme to defraud the government.

21   Correct?

22   A.   That money?

23   Q.   Yeah.

24   A.   Bonus checks.

25   Q.   Yeah.

1          Now, with respect to those checks, you also got
2  checks from Bob Patel for helping him return the stolen
3  medication.  You were compensated for that on occasion also.
4  Correct?
5  A.  I don't understand exactly.
6  Q.  Well, the stolen drugs were --
7  A.  Stolen from where?
8  Q.  The stolen drugs at Rapid Drugs.  Okay.
9  A.  From --
10  Q.  They were returned to the McKesson Corporation --
11  A.  Mm-hmm.
12  Q.  -- or they were -- correct?
13  A.  Yeah.  It was returned to McKesson Corporation.
14  Q.  Okay.  And when the stolen -- or, billed but not dispensed
15  drugs were returned to McKesson, you also got a check.
16  Correct?
17  A.  Yeah.  Everything comes into account he said, you know.
18  Q.  Well, I know.  But in addition to the bonus checks, the
19  profit bonus checks that you got, you got checks from Bob Patel
20  when those medications were returned.  Correct?
21  A.  Well, everything was included to the bonus check.  So ...
22  Q.  Did you ever get $50,000 from Ramesh Patel?
23  A.  Yes, I did.
24  Q.  You got it on more than one occasion.  Correct?
25  A.  Yeah.  I got it twice.

1    Q.   Yeah.  So, the Ramesh Patel two $50,000 checks -- you knew
2    who Ramesh Patel was, right?
3    A.   Yes, I knew.
4    Q.   You knew that he was Bob's brother-in-law, correct?
5    A.   I knew he was a partner with Vinod Patel.
6    Q.   He was a partner of Bob Patel?
7    A.   Vinod Patel and Bob Patel.
8    Q.   Well, you knew Ramesh Patel was going to be the person who
9    was going to be used to give you your piece of the pie.
10   Correct?
11   A.   Yes, he told me, Bob Patel.
12   Q.   Bob Patel told you that, correct?
13   A.   Yes.
14   Q.   And Bob Patel told you I'm going to give $50,000 to Ramesh,
15   have him put it into his account, and then I'm going to have
16   Ramesh write a check to you for 50,000.  Correct?
17   A.   Yes.
18   Q.   And that's how it worked, correct?
19   A.   That's what he told me.
20   Q.   Well, that's not only what he told you.  That's what
21   happened.  Correct?
22   A.   He did that, yes.
23   Q.   So, you didn't get that $50,000 check -- the first one
24   didn't come from Bob Patel, it was written to you by Ramesh
25   Patel.  Correct?

1    A.   Yes.

2    Q.   And then that happened a second time, another $50,000

3    check.   Correct?

4    A.   Yes.

5    Q.   And that, again, was written to you by Ramesh Patel?

6    A.   Yes.

7    Q.   Okay.   And your understanding of that was that these stolen

8    medications and this billed but not dispensed scheme, that

9    money was coming from the fact that they had returned these

10   drugs and gotten paid on that.   Correct?

11   A.   Well, they were bonus checks.   And so it was hard to tell

12   which money was what.   It was a lot of money, you know --

13   Q.   It was a little confusing as to all of the money that was

14   coming to Hiren Patel for his involvement with Bob Patel.

15   Correct?

16   A.   Yeah.   And I don't know his -- how many accounts he has and

17   stuff like that.   So, I don't know where he's bringing the

18   money, but there were bonus checks, that's all I know.

19   Q.   Now, you talked to Mr. Pratt a little bit about after you

20   were indicted, you got the discovery in the case.   Correct?

21   A.   Yes.

22   Q.   And you went into the discovery in the case.   Correct?

23   A.   Yes.

24   Q.   You went through it with your lawyer.   Correct?

25   A.   Yes, I did.

1    Q.  Nothing in the discovery of the case that you went through

2    with your lawyer indicated that Vinod Patel -- they had nothing

3    about Vinod Patel in that discovery, you told us.  Correct?

4    A.  Nothing I remember.  I -- because I only read what is

5    relevant to me.

6    Q.  Well, the reports that were given to you were the reports

7    about that investigation and that indictment of you 26

8    individuals.  Correct?

9    A.  Yes.

10   Q.  You don't ever remember seeing anything that you and your

11   lawyer went through about Vinod Patel, do you?

12   A.  My attorney gave it to me, the whole CD to --

13   Q.  You went through it, correct?

14   A.  I went through it.

15   Q.  Yeah.  And you went through it because you wanted to make

16   some decisions about your future.  Correct?

17   A.  Yes.

18   Q.  And when you went through it, you knew that one of the

19   decisions you were considering was testifying against Vinod

20   Patel?

21   A.  Well, I wasn't --

22   Q.  Correct?

23   A.  I wasn't told to testify.  I --

24   Q.  I didn't ask you that.

25           I said one of the decisions that you were pondering

1    was whether or not, if you cooperated, you could give them

2    information about Vinod Patel -- or, I'm sorry -- Bob Patel and

3    others.  Correct?

4    A.  Yeah, if they asked me.

5    Q.  And you knew that, when you went through the discovery,

6    that you didn't see anything about Vinod Patel in the

7    discovery.  Correct?

8    A.  I don't remember anything in there.

9    Q.  And did you think to yourself that if I can give them other

10   people, maybe that will help me even more?  That went through

11   your mind, didn't it?

12   A.  No.  I had been told by my attorney to tell the truth.

13   Q.  Okay.

14   A.  And that's what I did.

15   Q.  Well, let me ask you this.  You said Vinod Patel told you

16   about his home health care business.  Correct?

17   A.  Yes.

18   Q.  Vinod Patel -- your understanding of Vinod Patel was that

19   he was one of the owners of First Michigan Home Health Care.

20   Correct?

21   A.  Yes.  That's what he told me.

22   Q.  When he told you about his business, he told you about how

23   his business operated.  Correct?

24   A.  Yeah.  He explained sometimes, yes.

25   Q.  He told you that patients were referred to his company,

1   correct?

2   A.   That they were referred, yes.

3   Q.   And after they were referred, he had to go through a number

4   of steps in order to see if they could sign the patient up for

5   care.  Correct?

6   A.   Yes.

7   Q.   You knew that the patients had to be homebound or had to

8   have trouble getting out of their home, correct?

9   A.   He told me.

10  Q.   He explained to you that I have all these nurses that work

11  for me, physical therapists, people like that.  Correct?

12  A.   Yes.

13  Q.   You knew Ramesh Patel ran the office.  Correct?

14  A.   Yes.

15  Q.   And you knew that the way the home health care business

16  worked, was that the nurses and the therapists had to go in the

17  homes and provide services to the patients.  Correct?

18  A.   Yes.

19  Q.   And knowing all of that, they didn't get paid until the

20  services were provided.  Correct?

21  A.   That, I don't know, because that's none of my business, you

22  know.

23  Q.   Well, did you ask him -- you had all these conversations,

24  you say, with Vinod Patel.  Do you remember --

25  A.   Vinod Patel --

1    Q.  -- as you sit here today, did he tell you that we have to

2    send nurses and therapists out to the houses of these patients

3    to provide services for them; that's how my business works?

4               MR. PRATT:  Asked and answered, Your Honor.

5    A.  He told me that they have to visit.  And more visits, more

6    money.  That's what he told me.

7    BY MR. BEUKE:

8    Q.  Well, more visits are more services, correct?

9    A.  Probably.

10   Q.  In his business he gets paid when the service is provided,

11   correct?

12   A.  Even when it's not provided.

13   Q.  Well, that's unlike your business where you get a script,

14   either by fax or over the phone, and you just start writing

15   names of narcotics on the script, right, and you bill for that?

16   A.  I give the narcotics to the patient.

17   Q.  Well, you give them narcotics, but you steal the

18   noncontrolled substances, correct?

19   A.  Yes.

20   Q.  And then you sell it back to the distributor and get twice

21   the profit on that.  Correct?

22   A.  Yes.

23   Q.  So, that's the way your scam worked --

24               THE COURT:  Stop.

25               Was that a continuing objection about asked and

1    answered?

2            MR. PRATT:  Well, I wasn't getting -- yes, it is,

3    Your Honor.

4            THE COURT:  Okay.  Well, as it gets closer to

5    lunchtime, I get a little bit slower.  And I have to make

6    arrangements.

7            Do you want to go to a different topic that hasn't

8    been asked and answered?

9            MR. BEUKE:  I'll try, Judge.

10   BY MR. BEUKE:

11   Q.  Mr. Patel, the conversations that you had with Vinod Patel

12   about how First Michigan operated, they were between you and

13   him.  Correct?

14   A.  Or with Atul Patel maybe.  I don't remember.

15   Q.  This person Atul Patel, you were introduced to him when?

16   A.  Maybe the first, second week of my employment at Rapid

17   Drugs.

18   Q.  Okay.  And he was a person that you understood was --

19   worked with Vinod Patel, correct?

20   A.  Yeah.  Vinod Patel told me that he has a degree, and MBA,

21   and he's going to market the patients for me, for home health

22   care services.

23   Q.  When you were told that he was going to market patients,

24   you didn't have any experience in the business.  Correct?

25   A.  No, not at that time.

193

1    Q.  All right.  And you've never had any experience in the

2    business, have you?

3    A.  Not at that time, but --

4    Q.  Well, not ever.  Correct?

5    A.  Well, later they told me.

6    Q.  Well, you have not ever had any involvement in a home

7    health care business?

8    A.  Not directly.

9    Q.  Okay.  And everything that you've told the ladies and

10   gentlemen is stuff that you say you were told by people.

11   Correct?

12   A.  Yes.

13   Q.  You never saw a nurse go out to give any service.  Right?

14   A.  No.

15   Q.  You never saw a doctor write a prescription for home health

16   care service.  Correct?

17   A.  No.

18   Q.  The --

19             THE COURT:  Are you going to go through the whole

20   codes of service?  He said he didn't see anyone give any

21   service.

22             MR. BEUKE:  I'll try to move on, Judge.

23   BY MR. BEUKE:

24   Q.  You never saw any doctor paid by anybody from a health care

25   agency that Vinod Patel was involved in, did you?

1   A.  I went with Bob Patel to Dr. Paul Petre's office a couple

2   of times.

3   Q.  Well, my question is when you went with Bob Patel to

4   Dr. Petre's office, that was Bob Patel paying Dr. Petre in your

5   presence.  Correct?

6   A.  He wasn't paying.  He's just -- he told me that I have to

7   talk to him in private.

8   Q.  You weren't a part of that conversation?

9   A.  No.

10  Q.  Were you?

11  A.  No.

12  Q.  You don't know what was said by Bob Patel to Petre or Petre

13  to Bob Patel, do you?

14  A.  No.

15  Q.  Okay.  And in your business at Park Shelton, you guys paid

16  doctors, correct?

17  A.  That's what Bob Patel did, yes.

18  Q.  And in your business at Rapid Drugs, you guys paid doctors,

19  correct?

20  A.  Yes.

21  Q.  Tell the ladies and gentlemen who Dr. Bashir is?

22  A.  Dr. Bashir is a doctor who was a visiting physician, and he

23  prescribed all of the prescriptions of his patients to Rapid

24  Drugs.  He referred them to Rapid Drugs.

25  Q.  When did you first become aware of Dr. Bashir in providing

195

1    prescriptions for Rapid Drugs?

2    A.  Sometime in mid 2010.

3    Q.  Okay.  While you were still there, correct?

4    A.  Yes.

5    Q.  While you were still working with Bob Patel, correct?

6    A.  Yes.

7    Q.  And Dr. Bashir was a doctor that was paid to provide

8    prescriptions to Rapid Drugs, correct?

9    A.  Yes.

10   Q.  Actually, you were the person that was used to get

11   Dr. Bashir money, correct?

12   A.  Yes.

13   Q.  Tell the ladies and gentlemen how you graduated to that

14   involvement in Bob Patel's scheme?

15   A.  Rana Naeem, who is the person who -- hello.

16          Rana Naeem is the person who introduced Dr. Bashir to

17   Bob Patel's operation.

18   Q.  Rana Naeem, that was a person that you met when?

19   A.  I met him pretty much every week.

20   Q.  I mean when was the first time you met him?

21   A.  It's hard to say, but somewhere in 2009, early 2009.

22   Q.  Did you learn that Rana Naeem had at one point worked for

23   First Michigan?

24   A.  Yeah.  He told me later on -- he told me later, that maybe

25   sometimes --

1    Q.  You learned that he was fired by Vinod Patel, correct?

2    A.  He said that after he taught the business to Vinod Patel

3    and Ramesh Patel, he was been ...

4    Q.  He was fired, wasn't he?

5    A.  Fired or he was told by Bob that he will not recruit the

6    patients from outside --

7    Q.  Well, who did Rana Naeem end up with after Vinod Patel

8    fired him?

9    A.  He was still working for Bob Patel.

10   Q.  Yeah.  See, that was who he went to, right?

11   A.  He was working for a lot of people.  He wasn't like a

12   person who was just working for Bob Patel.  He was working for

13   a lot of people in --

14   Q.  Let's try to stay focused on Rapid Drugs and Rana Naeem and

15   Hiren Patel and Dr. Bashir.

16           THE COURT:  Okay.  It's a preview of coming

17   attractions.  You can start on that tomorrow.  It's almost one

18   o'clock.  And we're done for the day.

19           And please don't talk about it.  Don't do any

20   research.  And probably by tomorrow or the next day when you

21   fall asleep, you'll hear me saying that.  So, don't even dream

22   about it.

23           Thank you.

24           The same time tomorrow.  We may go for a few minutes

25   after one tomorrow, but hopefully not.

US v Vinod Patel #11-CR-20468-36

```
1                  (Jury leaves the courtroom at 12:55 p.m.)

2            THE COURT:  You may step down.

3            Anything anyone wants to put on the record?

4            MR. BEUKE:  No, Your Honor.

5            MR. NEAL:  No, Judge.

6            THE COURT:  All right.  How many more witnesses do we

7    have for the prosecution?

8            MR. NEAL:  Your Honor, tomorrow we have actually four

9    program witnesses; someone from Medicare Part A, Medicare Part

10   D, Medicaid, and Blue Cross.

11           THE COURT:  Those have not been stipulated to?

12           MR. NEAL:  Not on the program side.  We have

13   stipulated on the data side.

14           THE COURT:  Okay.

15           MR. NEAL:  We also have Special Agent Carmack and

16   Special Agent Gould who will be testifying.

17           THE COURT:  Can they testify together?

18           How about the Defense, how many witnesses do you

19   have?

20           MR. BEUKE:  Judge, I expect that we're going to have

21   that decision made sometime tonight, and I'll certainly -- if

22   the decision is one witness or more, I'll let the prosecutors

23   know.  If the Defense is going to call no witnesses, I'll let

24   them know also.

25                  THE COURT:  All right.  You can let them know by five
```

```
 1    o'clock.

 2            MR. BEUKE:  Judge, can I ask you, if we finish the

 3    evidence tomorrow and if the Defense is not going to put

 4    forward a case, do we plan on arguing on Friday?

 5            THE COURT:  We'll plan on arguing tomorrow, depending

 6    on what time you finish.  If it's too close to one, then we'll

 7    do closing Friday.

 8            MR. BEUKE:  Okay, Judge.

 9            THE COURT:  That's why it's important to have the --

10    are all the instructions agreed to now?

11            MR. NEAL:  We need to work out a couple things,

12    Judge.  But we'll take care of that.

13            THE COURT:  The famous "we'll take care of that."

14            We're done for the day.  See you in the morning.

15            MR. NEAL:  Thank you.

16            (Proceedings adjourned at 12:57 p.m.)

17                          —     —     —

18    STATE OF MICHIGAN )
                        ) ss.
19    COUNTY OF WAYNE   )

20    I, Denise A. Mosby, Federal Official Court Reporter, do
      certify that the foregoing is a correct transcript from the
21    record of proceedings in the above matter.

22                              s/ Denise A. Mosby
                              _____
23                              DENISE A. MOSBY, CSR, RMR, CRR
                              United States Court Reporter
24                              124 Theodore Levin U.S. Courthouse
                              231 W. Lafayette Boulevard
25    Dated:  9/10/2014        Detroit, MI 48226
```

US v Vinod Patel #11-CR-20468-36