UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                                      Case No. 11-cr-20468
               Plaintiff,             Hon. Arthur Tarnow

     vs.


D-36 VINOD PATEL,

               Defendant.
_____/


## DAY 6

### TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE ARTHUR J. TARNOW
UNITED STATES DISTRICT COURT SENIOR JUDGE
Detroit, Michigan
Thursday, July 17, 2014


APPEARANCES:

For Government:        JOHN K. NEAL, ESQ.
                      WAYNE F. PRATT, ESQ.
                      U.S. Attorney's Office
                      211 W. Fort Street, Ste 2001
                      Detroit, Michigan 48226

For Defendant:        RICHARD M. BEUKE, ESQ.
                      53 W. Jackson, Suite 1410
                      Chicago, Illinois 60604

                      TIMOTHY M. BLACK, ESQ.
                      713 West Devon Avenue
                      Park Ridge, Illinois 60068


                  *     *     *
OFFICIAL COURT REPORTER:
Denise A. Mosby, CSR, RMR, CRR
313) 961-6230     www.transcriptorders.com

# I   N   D   E   X

**WITNESS:**                                                    **PAGE**

**HIREN PATEL**
    Continued Cross-Examination by Mr. Beuke          9
    Redirect-Examination by Mr. Pratt               41
    Recross-Examination by Mr. Beuke                44

**SHELLY BERNARDINI**
    Direct-Examination by Mr. Neal                  46
    Cross-Examination by Mr. Beuke                  55

**TODD STANKEWICZ**
    Direct-Examination by Mr. Neal                  61
    Cross-Examination by Mr. Beuke                  65

**MICHELE WARSTLER**
    Direct-Examination by Mr. Neal                  72
    Cross-Examination by Mr. Beuke                  75

**DOUGLAS CEDRAS**
    Direct-Examination by Mr. Neal                  77

**DOUGLAS CARMACK**
    Direct-Examination by Mr. Pratt                 81
    Cross-Examination by Mr. Black                 117

# E X H I B I T S

| EXHIBIT NO. | IDENTIFICATION | PAGE |
|---|---|---|
| **Government** | | |
| 1D | 2/26/11 transcript of call | 82 |
| 1E | 1/11/11 transcript of call | 85 |
| 2F | 7/14/11 transcript of call | 93 |
| 3B | 7/14/11 audio call | 96 |
| 3C | 5/20/11 audio call | 101 |
| 3D | 6/12/11 audio call | 104 |
| 3E | 6/21/11 audio call | 106 |
| 16 | 1/17/11 Bashir Check | 43 |
| | | |
| **Defendant** | | |
| 13 | DEA report | N/A |
| 14 | 4/16/11 transcript of call | 128 |

```
 1                        Detroit, Michigan
 2                        Thursday, July 17, 2014
 3                        8:40 a.m.
 4                    -    -    -
 5          (Jury not present.)
 6          THE COURT:  Anything to put on the record before we
 7   bring in the jury?
 8          MR. BEUKE:  Yes, Your Honor.
 9          Judge, this morning ...
10          THE COURT:  You guys can sit down if you want.  I was
11   just waiting for the guy in the back to stand up so I could say
12   that.
13          MR. BEUKE:  Judge, this morning the prosecution has
14   given us some new charts.  One of charts deals with a number of
15   checks that I believe are written to four or five different
16   individuals.
17          In speaking with Mr. Neal this morning, he indicates
18   that these individuals are people that they believe were
19   marketers working for First Michigan Home Health Care.
20          I don't know, Judge, how they're planning to tie
21   these checks, written to these individuals, to certain people
22   that were working for -- allegedly working for First Michigan.
23   I don't know if there's been any interviews of these
24   individuals.  We certainly haven't --
25          THE COURT:  Well, did you ask the Government?
```

1           MR. BEUKE:  We did, Judge.  I don't know that we have
2    any interviews of any of these people.
3           THE COURT:  All right.  Let's hear from the
4    Government.
5           MR. NEAL:  Your Honor, we have not interviewed any of
6    the individuals whose checks from First Michigan are summarized
7    in the exhibits Defense counsel refers to.
8           The relevance of these summaries is that witness
9    Ramesh Patel testified as to the names of certain marketers at
10   First Michigan who initially received checks, but then began
11   receiving cash for their activities after it became a concern
12   that there would be a paper trail.
13          This is simply a summary of a bank account that -- I
14   don't believe it has been moved into evidence, but it was
15   provided with the initial exhibits in this case and it's simply
16   a listing of checks from that account.
17          THE COURT:  What number proposed exhibit is it?
18          MR. NEAL:  The bank account is broken into the 12
19   series.  So, it's 12A, B, C -- I believe --
20          Is this D?
21          MR. BEUKE:  D and E.
22          MR. NEAL:  D and E.
23          THE COURT:  First of all, is this something that's in
24   dispute?
25          MR. BEUKE:  Oh, absolutely, Judge.  We're not

1    conceding that any of these people were marketers working for

2    First Michigan in terms of going out and soliciting patients --

3              THE COURT:  No, that's not what I'm asking, whether

4    it's in dispute.

5              Is it in dispute that these people were paid by check

6    at some point?

7              MR. BEUKE:  Judge, I don't know who these people are.

8              THE COURT:  You just heard him tell you who they are

9    from the testimony of one of the witnesses.

10             MR. BEUKE:  Well, but, Your Honor, in order to get

11   these checks --

12             THE COURT:  I'm not asking that you stipulate that

13   they are marketers.  I'm just focusing on the proposed chart

14   that you are referring to.

15             You've got a witness who has said checks were written

16   to these people and then they were paid in cash.

17             MR. BEUKE:  Well, checks --

18             THE COURT:  Do you dispute that checks were written?

19   Is it your position that checks were not written to these

20   people?

21             MR. BEUKE:  Judge, it's my position that -- there's a

22   voluminous number of bank records from First Michigan where

23   checks were written to thousands of people.  I don't know who

24   these people are.

25             If these people were marketers that got checks from

1    First Michigan, I think the proper way to put that into

2    evidence is bring those people, put them on the stand, have

3    them identify the checks that were written, that they got, that

4    were cashed, and have them explain what --

5         THE COURT:  That's certainly a way of doing it, but

6    is it the only way?  And I don't think so.

7         MR. BEUKE:  I think it is, Judge, when they want to

8    be able to argue and stand up in front of the jury and say this

9    proves that marketers worked for First Michigan because we have

10   some checks written to people, that nobody has ever seen or

11   nobody has ever interviewed.

12        THE COURT:  I think what they're saying is this

13   corroborates the witness's testimony or is consistent with the

14   witness's testimony.

15        MR. NEAL:  That's correct, Judge.

16        MR. BEUKE:  Well, Judge, I -- with all due respect, I

17   think we would disagree because --

18        THE COURT:  Well, that's okay.  I know as soon as I

19   hear "with all due respect," I'm wrong, but ...

20        He may use those with that.

21        MR. BEUKE:  I'm learning, Judge.

22        THE COURT:  All right.  You have the right of

23   cross-examination, and so on.

24        MR. BEUKE:  Judge, are these checks going to be

25   introduced through the agents?

1          MR. NEAL:  Yes.  Our intention is to do it through

2   Special Agent Gould when he provides summary testimony.  He'll

3   summarize all other things with the bank accounts.

4          MR. BEUKE:  Our objection for the record, Judge.

5          THE COURT:  It's certainly on the record.

6          Anything else?

7          Do we have the instructions so I can rehearse my

8   reading?

9          MR. PRATT:  They have been -- they are under review

10  by the Defense.  I got them to them late yesterday afternoon,

11  Your Honor.  We don't think there's going to be any major

12  issues.  If you would like them --

13         THE COURT:  Okay.  I would just like to look at them

14  because --

15         MR. PRATT:  If you'd like the draft, you can have the

16  draft as long as you understand that it's just our draft.

17         THE COURT:  No.  I'll wait for the final product.

18         MR. PRATT:  All right.

19         THE COURT:  I should note that the court got a filing

20  at 1:20 a.m. this morning, but it wasn't this case.  It

21  confirms that the electronics work all night long and all

22  morning long.

23         Let's get the jury in, please.

24         *(Jury enters the courtroom at 8:47 a.m.)*

25         CASE MANAGER LANG:  Court is in session.  You may be

1    seated.

2              THE COURT:  Good morning.  Everybody is in place.

3              You may continue your cross-examination.

4              MR. BEUKE:  Thank you.

5                  HIREN PATEL, WITNESS, PREVIOUSLY SWORN.

6                      CONTINUED CROSS-EXAMINATION

7    BY MR. BEUKE:

8    Q.  Mr. Patel, when we left off yesterday --

9    A.  Hello.

10   Q.  -- we left off talking about Dr. Bashir.

11   A.  Yes.

12   Q.  You know who Dr. Bashir is, correct?

13   A.  Yes.

14   Q.  Dr. Bashir is who; can you explain who he is?

15   A.  Dr. Bashir is a doctor who referred patients to Rapid

16   Drugs, and Bob Patel paid $4,000 every month --

17   Q.  That's the person that referred patients to your pharmacy,

18   correct?

19   A.  Yes.

20   Q.  Okay.  Again, just to make sure we're back on track, you

21   went in to the prosecutors and began to cooperate with them in

22   October of 2011, correct?

23   A.  Yes.

24   Q.  Your first interview was on October 17th, correct?

25   A.  Yes.

1    Q.  And your second interview was on October 28th, is that

2    correct, or 26th?

3    A.  Yes, something like that, the dates.  But it was in

4    October, yes.

5    Q.  And then in January you went in and you interviewed again,

6    January 16th of -- I'm sorry -- January 16th of 2013.  Correct?

7    A.  Yes.  Somewhere, yes.

8    Q.  Those were all interviews that you sat with your lawyer and

9    the prosecutors and one or several of the agents.  Correct?

10   A.  Yeah.

11   Q.  In the first interview that you went in there on October

12   16th, you spoke with the prosecutors and the agents about

13   Dr. Bashir, correct?

14   A.  Yes, I believe so.

15   Q.  And you described for the prosecutors that he was a doctor

16   that you became familiar with in August of 2010?

17   A.  Right.  Somewhere, yes.

18   Q.  Okay.  In August of 2010 you had been at Rapid Drugs for

19   almost a year and a half?

20   A.  Yes.

21   Q.  Do you remember in that first interview with the

22   prosecutors they asked you some questions about whether or not

23   you had ever paid doctors?

24   A.  I can't remember.  It's a long time now.

25   Q.  Well, did you ever tell the prosecutors or the agents that

1    you never -- Bob wanted you to go and solicit doctors, correct?

2    A.  Bob wanted what?  Bob wanted what?

3    Q.  Bob wanted you to go out and talk to doctors in the

4    community, correct?

5    A.  Yes.

6    Q.  And that was something that he encouraged you to do to

7    generate business for Rapid Drugs, correct?

8    A.  Yes.

9    Q.  And you did that occasionally as part of your part in this

10   organization, correct?  You talked to doctors?

11   A.  Yes.  I talked to a couple of doctors, yes.

12   Q.  And tried to get doctors to start to solicit or send their

13   patients and their prescriptions to your drugstore, correct?

14   A.  Yes.

15   Q.  Okay.  And you never -- well, when the agents asked you if

16   you ever paid doctors, you told them that you didn't, correct?

17   A.  I said I paid Dr. Bashir.

18   Q.  Well, they asked you did you pay any of the doctors that

19   you solicited, correct?  Do you remember that conversation?

20   A.  Yes.

21   Q.  And you didn't pay any of the doctors --

22   A.  No.

23   Q.  -- you solicited, correct?

24   A.  None of the doctors I paid directly.

25   Q.  Well, you said when the doctor showed some interest in

1   sending patients to our pharmacy, then I turned it over to Bob.

2   Correct?

3   A.  Yes.

4   Q.  And Bob was the one who kind of closed the deal and went to

5   the doctors, and arrangements were made between Bob and the

6   doctors?

7   A.  Yes.

8   Q.  Is that fair to say, that's what you told the prosecutors?

9   A.  Yes.

10  Q.  Now, Dr. Bashir -- did you ever -- well, Dr. Bashir was a

11  doctor that you personally paid, correct?

12  A.  I didn't personally paid.  I had been paid by Bob with a

13  personal check to me.  I cashed it out and I gave it to Rana

14  Naeem, and Rana Naeem paid to Dr. Bashir.

15  Q.  My question, Mr. Patel, were there any other doctors that

16  were sending prescriptions to your pharmacy and Bob Patel's

17  pharmacy Rapid Drugs that you were given money on a monthly

18  basis to pay?

19  A.  Not that I remember, no.

20  Q.  No.

21          But Dr. Bashir was different, right?

22  A.  Yes.

23  Q.  Dr. Bashir was a huge prescription writer; fair to say?

24  A.  Yes.

25  Q.  Dr. Bashir, with one patient he would prescribe 15 or 16

1    different medications, correct?

2    A.  That's correct.  He was a huge prescriber, yes.

3    Q.  He was a tremendous money earner for your pharmacy,

4    correct?

5    A.  Yes.

6    Q.  And in August of 2010, after Dr. Bashir became one of Rapid

7    Drugs' best providers of business, Bob Patel came to you and

8    told you he needed you to take on a new responsibility,

9    correct?

10   A.  Yes.  We went for the meeting.

11   Q.  Well, you had a meeting with Dr. Bashir, correct?

12   A.  I and Bob Patel, yes.

13   Q.  And you and Dr. Bashir and Bob Patel decided that he was

14   going to receive money every month for every --

15   A.  Yes.

16   Q.  Correct?

17   A.  Yes.

18   Q.  For his work in sending patients to your pharmacy?

19   A.  Yes.

20   Q.  And the new job that Hiren Patel took on was that I was

21   going to get a personal check from Bob Patel every month,

22   correct?

23   A.  At that time of the meeting nothing was decided, but later

24   on Bob Patel told me that that's how I'm going to pay and

25   you --

1    Q.  Shortly thereafter, it was decided?

2    A.  Yes.

3    Q.  And shortly thereafter, it was decided that it would be

4    $4,000 a month, correct?

5    A.  Yes.

6    Q.  And every month from August of two thousand and -- what

7    year?

8    A.  '10.

9    Q.  -- '10, and when you quit working for Bob Patel in May of

10   2011, that procedure was followed, correct?

11   A.  Yes.

12   Q.  Just so the ladies and gentlemen are clear, Bob Patel

13   writes Hiren Patel a check for $4,000, correct?

14   A.  Yes.

15   Q.  Hiren Patel takes that check and he deposits it in his

16   account?

17   A.  Mm-hmm.

18   Q.  Correct?

19   A.  Yes.

20   Q.  And then Hiren Patel withdraws $4,000 in cash from his

21   account and gives it to Rana Naeem, correct?

22   A.  Yes.

23   Q.  Rana Naeem was a person that Bob Patel -- was kind of like

24   a right hand-man for Bob, correct?

25   A.  Yes.

1    Q.  And when you gave Rana Naeem the $4,000, you knew that that

2    $4,000 was going in cash to Dr. Bashir.  Correct?

3    A.  Yes.

4    Q.  Anybody show any concern about this paper trail idea that

5    everybody seemed to be worried about?

6    A.  I don't know.

7    Q.  Did that ever come up?

8    A.  I don't know.

9    Q.  Did anybody ever bring up in that conversation, you know,

10   we have -- we're concerned about this paper trail.  And if I

11   write a check to Hiren every month for $4,000 and then in a

12   week or so he withdraws $4,000 out of his account in cash, that

13   could create some kind of a paper trail.  Anybody bring that up

14   as a problem?

15   A.  At what time?

16   Q.  Any time.

17   A.  During the practice when I was working, you mean?

18   Q.  From August of 2010 until May of 2011 when you stopped

19   giving Bashir $4,000 in cash every month.

20   A.  No.

21   Q.  You never were concerned about a paper trail, were you?

22   A.  No.  I was not that educated with that.

23   Q.  Well, you didn't -- you didn't tell Bob, you know, why are

24   you giving the $4,000 check to me, that's going to create a

25   paper trail.  Did you ever tell that to him?

1    A.   No.

2    Q.   Oh.

3         Mr. Patel, when -- you quit Rapid Drugs in May of

4    2011, correct?

5    A.   Yes.

6    Q.   Tell the ladies and gentlemen of the jury why you quit?

7    A.   Because Bob Patel and me were not going along anymore, and

8    I got my work authorization to work independently.

9    Q.   Well, when you say you weren't getting along anymore, in

10   2009 beginning in August, you got a $35,000 check or

11   thereabouts every couple of months.  Correct?

12   A.   Yes.

13   Q.   You told the agents that in 2010 you probably got over

14   $200,000 in bonuses on top of your regular salary.  Correct?

15   A.   Probably.

16   Q.   And in 2011 you continued to get those bonuses checks,

17   correct?

18   A.   Yes.

19   Q.   What was the problem that you and Bob Patel had?

20   A.   Bob Patel was, you know, not happy with me.

21   Q.   Why?

22   A.   Because he said, you know, business, the way you're doing

23   is not good, and he was creating a lot of problems.

24   Q.   Well, Dr. Bashir was still writing patients to Rapid Drugs

25   along with all these other doctors in 2011.  Correct?

1    A.  Yes.

2    Q.  Well, Bob Patel found out about your plans to open up your

3    own pharmacy, didn't he?

4    A.  I don't know.

5    Q.  Well, did you ever talk with him in any phone calls about

6    the fact that he knew that you were planning to open up your

7    own pharmacy with Mehul and Pandya?

8    A.  Not that I remember.

9    Q.  Did you ever meet with him and discuss that you were

10   leaving in order to start a competing pharmacy?

11   A.  I met him, but there was nothing was discussed like that.

12   He just said, you know, what you want to do.  And I said here's

13   the key.  And he says, no, I don't want you to quit.  And then

14   the next day he says, okay, let me take the keys.

15   Q.  Well, when you sat down with the prosecutors again in the

16   second proffer, I believe it was, on October 26th of 2011, do

17   you remember them talking or asking you questions about when

18   you quit Rapid Drugs?

19   A.  Yes.

20   Q.  And that was in May of 2011, correct?

21   A.  Yes.

22   Q.  And do you remember them asking you some questions about

23   Pandya, your new partner?  Do you remember them asking you

24   about him?

25   A.  It has been a long time now, so ...

1   Q.  Well, do you remember them asking or you telling the

2   investigators in the U.S. Attorneys that you knew Pandya was

3   amassing a stockpile of medications that were billed but not

4   dispensed to patients?

5   A.  Yes.

6   Q.  Do you remember telling them that?

7   A.  Yes, I remember that.

8   Q.  So, when you decided to join up with your friend Pandya,

9   you knew he was stealing drugs from Bob Patel, correct?

10  A.  At that time, I didn't know.  As I told you yesterday, that

11  they told me in July that they stole the medication.

12  Q.  Well, you didn't tell that to the agents, that you didn't

13  learn that Pandya was stealing drugs from Bob Patel until July,

14  did you?

15  A.  (No response.)

16  Q.  You told them that you knew that he was amassing a

17  stockpile of drugs while he was working with Bob Patel.

18  Correct?

19  A.  Yeah, I --

20  Q.  Yesterday was the first time you told anybody that you

21  didn't learn about your new found partners' theft of all these

22  medications until July.  Isn't that right?

23  A.  No.  I told in the proffer.

24  Q.  You told them that you only learned about what your

25  partners were doing with Bob Patel in July?

1    A.  Yeah.  I told them during the proffer that they stole the

2    medication.

3    Q.  Oh, I know you told them that you knew Pandya stole the

4    medications.

5    A.  Mm-hmm.

6    Q.  You didn't tell the agents that you knew -- or, that you

7    didn't learn that until July of 2011.  You never told them

8    that, did you?

9    A.  I have to read that and see, you know.

10   Q.  Here.

11   A.  When did I -- what did I say?

12           MR. BEUKE:  Defendant's No. 11, Judge.

13   BY MR. BEUKE:

14   Q.  I'm going to direct you to paragraph eight.  Take your

15   time, Mr. Patel.

16           *(Brief pause.)*

17   A.  It says Mehul Patel told me that they stole the medication.

18   Q.  It doesn't say Mehul Patel told you that in July of 2011,

19   does it?

20   A.  No, it doesn't say the month.

21   Q.  Well, in any event, Mehul Patel, that was the person that

22   you partnered up with, correct?

23   A.  Yes.

24   Q.  And Mehul Patel admitted to you that he had stolen 200 to

25   $300,000 worth of medications from Bob, correct?

1    A.  Yes.

2    Q.  And Mehul Patel told you something else about your other

3    partner, didn't he?

4    A.  Yeah.  They both told me.

5    Q.  Well, Pandya told you the same thing, right?

6    A.  Yes.

7    Q.  Pandya told you that I stole over $400,000 worth of

8    medications from Patel, correct?

9    A.  Some amount there, close, yeah.

10   Q.  And these were the two guys that Hiren Patel thought it was

11   going to be a good idea to get into business with, correct?

12   A.  At that time, I didn't know they stole it.

13   Q.  Well, that's what you say today, but that's not what you

14   said back in October of 2011, is it?

15   A.  No.  I said I --

16   Q.  You didn't say you learned it in July of 2011, did you?

17   A.  How do I know that they stole it?

18   Q.  Well, you had the conversation with your new partners.

19   A.  Yeah.  I had a conversation in July with them.

20   Q.  Yeah.

21        Well, when you learned this about your partners

22   stealing $400,000 worth of medications from Bob Patel, did that

23   give you some concern about the kind of guys that you were in

24   business with?

25   A.  Yes.

1   Q.  And did you leave?

2   A.  At that time, no.

3   Q.  Did you stop the bill but not dispense part of your scheme?

4   A.  No.

5   Q.  You worked with them and continued to work with them,

6   didn't you?

7   A.  Yes.

8   Q.  Because you were getting rich with hanging around with

9   these types of people, correct?

10  A.  Yes.

11  Q.  So, Mr. Pandya, if he said he never took any medications

12  from Bob Patel or never stole anything from Bob Patel, that's

13  not what he told you.  Correct?

14  A.  No.

15  Q.  He told you he did steal over $400,000?

16  A.  Yes.

17  Q.  Do you remember that January 13th interview with the FBI

18  agent?  Do you remember coming down with your lawyer and

19  speaking with the U.S. Attorney and the agent from the FBI

20  about your involvement in this scheme?

21  A.  Yes.  I remember somewhat that time, yes.

22  Q.  I'm going to show you --

23          MR. BEUKE:  Defendant's No. 11, Your Honor.

24  BY MR. BEUKE:

25  Q.  I would ask you to take a look at paragraph one and

1    paragraph two.

2                (Brief pause.)

3    Q.  Let me know when you're done.

4    A.  Okay.

5    Q.  When you were in the agent's -- Mr. Neal's office, you had

6    another conversation about your partner Pradeep Pandya, didn't

7    you?

8    A.  Yes.

9    Q.  And they asked you about Mr. Pandya, correct?

10   A.  Yes.

11   Q.  And you told the agents and Mr. Neal that Pandya was a guy

12   who was even worse than Bob Patel, didn't you?

13   A.  Was worse than me, I said.

14   Q.  Oh, was worse than you?

15   A.  Yeah.

16   Q.  Okay.  So, Pandya was somebody who was doing more bad

17   things than you, you told them.  Correct?

18   A.  Yes.

19   Q.  And you told them about an incident where the Michigan

20   pharmacy inspector showed up at Mr. Pandya's Tri-City Pharmacy.

21   Correct?

22   A.  Yes.

23   Q.  And you told the agents and Mr. Neal about the fact that

24   Pandya explained to you when the inspectors were there he was

25   shredding all the documents.  Correct?

1    A.  He was shredding the labels, yes.

2    Q.  And he was shredding the labels so the inspectors weren't

3    going to be able to put together those -- they wouldn't have

4    that evidence to use against him.  Correct?

5    A.  Yes.

6    Q.  Mr. Pandya told you what else about what happened that day?

7    A.  I never talked to him.  I just found out.

8    Q.  Well, did you find out from your partner Pandya or did you

9    find out from somebody else?

10   A.  No.  I found out from somebody else.

11   Q.  Who did you find that out from?

12   A.  I found out from Atul Patel.

13   Q.  Well, when -- when did Atul Patel tell you this, Mr. Patel?

14   A.  He said there was a problem in Pandya's pharmacy in

15   Saginaw.

16   Q.  And did he tell you that Pandya was shredding all the

17   documents?

18   A.  Yes, sir.  He said there was a problem, that he was going

19   to shred it, it was sitting on the shredder, and they found

20   out.

21   Q.  Well, you also had a conversation that you shared with

22   Mr. Neal and the agents on that day about what Mehul Patel,

23   your other partner, told you about Mr. Pandya.  Correct?

24   A.  Yes.

25   Q.  And what did Mehul Patel tell you about Pandya, your third

1    partner in your new pharmacy?

2    A.   Mehul Patel told me that I know Pandya from a long time.

3    They were both working together for Rite-Aid Pharmacy, and they

4    both have houses maybe next to each other.  And he says he's a

5    very hard, terrible guy.  You know, he deceived everybody in

6    the community.

7    Q.   He deceived everybody in the Indian community, correct?

8    A.   Or wherever he was working, Rite-Aid, yeah.

9    Q.   Whatever company he was working for, he deceived everybody,

10   correct?

11   A.   Yes, that's what he told me.

12   Q.   And Mehul Patel told you this guy is one of the worst

13   people in the world.  Correct?

14   A.   Yes.

15   Q.   And this is a guy that you and your partner Mehul Patel

16   decided I'm going to go into business with, correct, knowing

17   all of those things?

18   A.   I never knew Pandya personally, but there were -- you know,

19   I just took his word.

20   Q.   Well, your other partner knew him for a long time?

21   A.   Yes.

22   Q.   Right?

23   A.   Yes.

24   Q.   Mr. Patel, who is Cindy Sterling?

25   A.   She was a rep for McKesson Corporation.

1    Q.   What does that mean?  What's a rep?

2    A.   A representative who represents the McKesson Corporation.

3    Q.   And McKesson Corporation was who?

4    A.   That's a wholesaler supplier for the medications to the

5    pharmacists.

6    Q.   And as the medication supplier, they were the individuals

7    that when Rapid Drugs would need to restock their inventory,

8    they would contact Cindy Sterling.  Correct?

9    A.   (No response.)

10   Q.   Or one of the reps from McKesson?

11   A.   I don't understand.  Restock?  What do you mean restock?

12   Q.   Well, I'm sorry.

13              Cindy Sterling, were you familiar with her?

14   A.   Yeah.

15   Q.   Did she call on your store out at Rapid Drugs?

16   A.   She doesn't call generally, but she -- I saw her a couple

17   of times, yes.

18   Q.   When you placed orders with Rapid Drugs, would it go

19   sometimes through Cindy Sterling?

20   A.   No.  It goes on the internet.

21   Q.   Okay.  Bob Patel -- you had conversations with Bob Patel

22   about Cindy Sterling, didn't you?

23   A.   I think I had one time, yes.

24   Q.   Okay.  And what did Bob Patel tell you about his

25   relationship with the McKesson representative?

1   A.  He said that Cindy -- he knows Cindy very well.  For a long

2   time he's doing business with her, and she's always going to

3   take care of him, his pharmacies or his business, whatever.

4   Q.  Well, he actually had an arrangement with Cindy Sterling,

5   didn't he?

6   A.  Who?

7   Q.  Bob Patel.

8   A.  I don't know where he goes everyday.

9   Q.  Well, I didn't ask you if you knew where he went everyday.

10          When you sat down with the agents, you talked with

11  the agents about Cindy Sterling, correct?

12  A.  Yes.

13  Q.  And you told the agents about a conversation that you had

14  with Bob Patel about Cindy Sterling, correct?

15  A.  I believe so, yes.

16  Q.  And you told the agents that Cindy Sterling was going to

17  take care of Bob Patel in terms of the medications that were

18  going to be returned to McKesson.  Correct?

19  A.  Yes.

20  Q.  This they had an arrangement between the two of them,

21  correct?

22  A.  Yes.

23  Q.  That she was going to approve all of these billed but not

24  dispensed narcotics and give a refund to Bob Patel.  Correct?

25  A.  Can I correct --

1    Q.   Sure.

2    A.   It's noncontrolled.

3    Q.   Well, okay.   The noncontrolled.

4             Million dollars worth of narcotics or --

5    A.   Noncontrolled.

6    Q.   -- noncontrolled drugs that were worth over a million

7    dollars.   Correct?

8    A.   Yes, he told me that.

9    Q.   And he had to have somebody to resell those to, correct,

10   Bob Patel?

11   A.   Resell to who?

12   Q.   How did Bob Patel get rid of those drugs?

13   A.   He said he was going to return to McKesson and through

14   Cindy in order --

15   Q.   Not only did he say he was going to do that, he told you he

16   did that through Cindy Sterling, correct?

17   A.   He said he was working on it.

18   Q.   Well, and he got like 70 percent back on each one of the

19   cost of those drugs, correct?

20   A.   That, I don't know, because that was not my --

21   Q.   He never shared the numbers with you?

22   A.   No, but he said he's doing his best to get money back.

23   Q.   Well, your understanding was he got the money back.

24   Correct?

25   A.   I believe so.

1    Q.  And the $400,000 that your one partner Pandya stole in

2    drugs from Bob Patel, he didn't get that back, did he?

3    A.  He stole it, so how can he get it back.

4    Q.  When you guys teamed up, did you guys try to do the same

5    deal with Cindy Sterling?

6    A.  No.  We don't have Cindy Sterling.  We didn't have

7    McKesson.

8    Q.  Who did you have?

9    A.  We had another company, Amerisource.

10   Q.  Did you have the same kind of deal with that company?

11   A.  We never returned anything until (sic) I was there.

12   Q.  Well, eventually you did, right?

13   A.  I said we never did until (sic) I was there.  So, I don't

14   know what they did after I --

15   Q.  That's what I'm asking you.  When you got there, when you

16   became a partner in the Park Shelton Pharmacy, how did you

17   return the drugs that -- the noncontrolled medications that

18   were billed for but not dispensed?  How did you get rid of

19   those drugs?

20   A.  We never returned.  As I said, after I was there, we never

21   returned anything.

22   Q.  Well, when you told the agents that in the six months that

23   you were there, you pocketed $300,000 and Mehul pocketed

24   $300,000 --

25   A.  No.  I said yesterday I got $81,000.

1    Q.  81, 000.  Okay.

2         Well, you knew your other two partners each got

3    300,000.  Right?

4    A.  I don't know how much they got because I didn't have access

5    to the account.  They had it.

6    Q.  So, that's almost $700,000 in seven months paid out to you

7    three.  Correct?

8    A.  Not seven months, I don't know.

9    Q.  How did that pharmacy make $700,000 in profits in seven

10   months, at $100,000 a month?  How did you know that?

11   A.  I was just there for three months.  So, I don't know what

12   they did after that.

13   Q.  Well, mr. Patel, let me ask you about, at Park Shelton

14   there were three doctors who were writing prescriptions for you

15   and Mehul and Pandya.  Correct?

16   A.  Yes.

17   Q.  Dr. Jan, Dr. Benito, and who else?

18   A.  Dr.  U, Dr. Utarnachitt.

19   Q.  All right.  With respect to those three doctors, you were

20   paying those three doctors?  Correct?

21   A.  I never paid anybody.

22   Q.  But one of your team members paid them, is it fair to say,

23   Mehul or Pandya?

24   A.  They didn't pay the doctor directly.  They paid the rent to

25   Dr. Jan.

1    Q.  So, that's how your deal worked.  You paid extra money in

2    rent, and that was really the bribe, correct?

3    A.  Yes.

4    Q.  That was the incentive to make sure that these guys wrote

5    all kinds of phony prescriptions to your pharmacy, correct?

6    A.  Yes.

7    Q.  And that's the way the money was generated to get Mehul

8    $300,000 and Pandya 300,000 and you 81,000.  Correct?

9    A.  Yes.

10   Q.  Those three doctors were on essentially your payroll.

11   Correct?

12   A.  Not on payroll.  As I said, they were paying for the rent

13   to Dr. Jan, and I don't know how they paid it.

14   Q.  Let me ask you this, Mr. Patel.  Tell the ladies and

15   gentlemen who Naseem Khan is.

16   A.  Naseem Khan?

17   Q.  Yes.

18   A.  He is a guy that owned a physical therapy office before in

19   Dr. Jan's building where Rapid Drugs was located.

20   Q.  Now, when you sat down with the prosecutors on those

21   various occasions, they asked you about Vinod Patel.  Correct?

22   A.  He was part of the conversation, yes.

23   Q.  Did you tell the agents that over the months you claimed to

24   have become a friend of Vinod Patel, correct?

25   A.  Yes.

1   Q.  And you went out to functions with him and his family,

2   correct?

3   A.  Yes.

4   Q.  Okay.  You socialized occasionally; fair to say?

5   A.  Yes.

6   Q.  And you considered him somebody that was a friend of yours,

7   correct?

8   A.  Yes.

9   Q.  And you knew all about Vinod Patel's ownership interest in

10  First Michigan Home Health Care, correct?

11  A.  Yeah.  He told me he was the owner.  So, there was nothing

12  about --

13  Q.  You knew that he was one of the owners, correct?

14  A.  Yes.

15  Q.  And you knew what First Michigan Home Health Care did,

16  correct?

17  A.  Yes.

18  Q.  You understood the concept of having to send nurses or

19  therapists out for home visits and providing services to

20  various people who were homebound.  Correct?

21  A.  Yes.  Homebound.

22  Q.  You knew he had been in that business for several years,

23  correct?

24  A.  Yes.

25  Q.  You had never referred anybody to First Michigan home

1   health care, had you?

2   A.  Not that I remember, no.

3   Q.  Okay.  Now, Naseem Khan, how did you know him?

4   A.  As I told before, that he used to have an office in

5   Dr. Jan's office --

6   Q.  Whose office, I'm sorry?

7   A.  Dr. Jan's office.  He used to have it before Rapid Drugs --

8   before I went there to work at Rapid Drugs.  And then he has

9   his own office outside of the building.

10  Q.  Naseem Khan owned a company called Supreme Rehab, correct?

11  A.  Yes.

12  Q.  Was he a friend of yours?

13  A.  He used to come to get his own medication at Rapid Drugs

14  and to meet Dr. Jan.  So ...

15  Q.  You would provide or you would fill his medications,

16  correct?

17  A.  Yes.

18  Q.  Okay.  Was he somebody that you socialized with or you

19  considered a friend?

20  A.  I never socialized with him, no.

21  Q.  Dr. Bashir, was he someone that you considered a friend?

22  A.  I met him a couple of times, yes.

23  Q.  Well, you were the person -- you were the conduit to put

24  $4,000 cash in his pocket every month, correct?

25  A.  As I said, it was working as a channel.  So, I never paid

1    directly.

2    Q.  So, there was no paper trail, correct?

3    A.  There was a paper trail.

4    Q.  All right.

5    A.  As you said before, that there was a paper trail.

6    Q.  Well, do you remember in September of 2010 having a

7    conversation with your guy Dr. Bashir?

8    A.  Who, I'm sorry?

9    Q.  Do you remember in September, October of 2010 having a

10   conversation with Dr. Bashir?

11   A.  Me, myself?

12   Q.  Mm-hmm.

13   A.  Yes.  I told you that me and Bob Patel went to talk to him,

14   yes.

15   Q.  Well, after did you have another conversation, just you and

16   Dr. Bashir, without Bob Patel?

17   A.  We always had conversation over the phone.  When he --

18   Q.  Very often?

19   A.  Yes.  He calls prescriptions over the phone.  So, I talk to

20   him.

21   Q.  Did you call and say and say, hey, Rana Naeem is going to

22   be over with the 4,000 later today?  Did you ever talk to him

23   about that?

24   A.  (No response.)

25   Q.  Probably not, huh?

1    A.  May be one time I remember that he asked for it.

2    Q.  Well, let me talk to you about Mr. Naseem Khan and his

3    Supreme Rehab.

4         Do you remember in September or October of 2010

5    talking with Dr. Bashir regarding the home health care

6    business?

7    A.  At what time you say?

8    Q.  September or October of 2010.

9    A.  Yes.

10   Q.  Do you remember Dr. Bashir telling you that he was getting

11   numerous offers of financial compensation from home health care

12   businesses to refer his Medicare, Medicaid patients to their

13   home health care businesses?

14   A.  To other home health care businesses, yes.

15   Q.  And do you remember telling the agents that you told

16   Dr. Bashir that you were an acquaintance of Naseem Khan?

17   A.  Yes.

18   Q.  And that Naseem owned a company called Supreme Rehab?

19   A.  Yes.

20   Q.  And that that was a company that did home health care

21   business?

22   A.  Yes.

23   Q.  Okay.  Do you remember setting up a meeting between Khan

24   and Bashir and Bashir's nephew and yourself?

25   A.  Yes.

1    Q.  Do you remember going to a restaurant somewhere in Ann

2    Arbor, Michigan?

3    A.  Yes, I remember.

4    Q.  And the purpose of that meeting, Mr. Patel, was to try to

5    steer Naseem Khan's -- or steer Mr. Bashir's patients to Naseem

6    Khan, correct?

7    A.  No.

8            The point of that meeting was Asher Bashir owned a

9    company, a visiting physician company, and Asher Bashir wanted

10   a home care company to build a company -- Asher didn't have a

11   home care license yet.  He said his license is still in

12   progress.  So, until he could get his own license, he needed a

13   home care company.

14   Q.  Let me ask you this.  You had a meeting with the agents on

15   December 9th of 2013, correct?

16   A.  December?  You said December?

17   Q.  Yes.

18   A.  2013?

19   Q.  Yes.

20   A.  I don't remember the exact date, but it could be.

21   Q.  I'm going to show you Defendant's No. 12 and ask you to

22   read to yourself paragraph No. 2, if you would please.

23   A.  Yes.

24   Q.  That report you've had an opportunity to look at, correct?

25   A.  Yes.

1    Q.   The report documents your conversations with the agents and

2    Mr. Neal about this particular topic, doesn't it?

3    A.   Yes.

4    Q.   And the purpose of the lunch was to introduce all the

5    parties to each other, correct?

6    A.   Yes.

7    Q.   Do you remember telling them that a few days later Khan

8    spoke to you and said that Khan and Asher Bashir worked out a

9    deal where Dr. Bashir would refer all of his patients to

10   Supreme Rehab?  Do you remember telling him that?

11   A.   Asher Bashir's patients, yes.

12   Q.   Do you remember telling him that a few days after the

13   conversation, Khan stated to you that the deal was no longer

14   feasible because Asher Bashir was requesting all of the

15   wrap-around prepayment money and some of the post-payment

16   money.  Correct?

17   A.   Yes.

18   Q.   So, you tried to broker a deal between your main script

19   writer, Dr. Bashir, and Mr. Khan and his nephew, correct?

20   A.   That --

21   Q.   That's what you were trying to do?

22   A.   No.  I mean it was nothing to do with Dr. Bashir and Rapid

23   Drugs' business.  It was Asher Bashir's business.

24   Q.   My question is, Dr. Bashir was the biggest script writer to

25   your pharmacy back at that time.  Correct?

1   A.  Yes.

2   Q.  And the biggest script writer to your pharmacy came to you

3   and said, listen, I'm getting a lot of offers about who to

4   refer my home health care patients to.  Didn't he tell you

5   that?

6   A.  Yes.

7   Q.  Okay.  And when he told you that, did you say to him, hey,

8   I've got a friend of mine by the name of Vinod Patel who has a

9   home health care business, let me hook you up with Vinod Patel?

10          You didn't tell him that, did you?

11  A.  No.

12  Q.  You told him let me hook you up with somebody else, a guy

13  named Naseem Khan, and you brokered a lunch to get to try to

14  get that business to go to Naseem Khan.  Correct?

15  A.  Yes.

16          MR. BEUKE:  May I have a moment, Judge?

17          THE COURT:  Certainly.

18          MR. BEUKE:  Nothing else, Your Honor.

19          THE COURT:  Redirect?

20          MR. PRATT:  Yes, Your Honor.

21          MR. BEUKE:  Oh, wait.  I'm sorry, Your Honor.  I

22  forgot one thing.

23  BY MR. BEUKE:

24  Q.  Mr. Patel, that very first session that you sat down with

25  Mr. Neal and the agents on October 17th of 2011, that was a

1    meeting that lasted several hours, correct?

2    A.  I believe so, yes.

3    Q.  Do you remember at some point towards the end of that

4    meeting Mr. Neal and you going through a particular phone call

5    that occurred between you and Bob Patel on April 16th of 2011?

6    A.  April 16th?  Maybe.

7    Q.  April 16th was after -- well, or shortly before you quit

8    Rapid Drugs, correct?

9    A.  Yes.

10   Q.  Do you remember going over that phone call with Mr. Neal

11   and discussing the contents of that conversation?

12   A.  I don't remember exactly right now, but if you can show me.

13   Q.  What was the phone call about?

14   A.  I don't remember, as I said because it was a long time.

15   But if you can show me, I can tell you.

16   Q.  Well, you went through -- did he play a tape for you?

17   A.  No.  He showed me the transcript of the phone call.

18   Q.  All right.  And you read the transcript, correct?

19   A.  I think so, yes.

20   Q.  You read what Bob said to you, correct?

21   A.  Yes.

22   Q.  And you read what you said to Bob, correct?

23   A.  Of course, yes.

24   Q.  And you've testified over the last couple of days about all

25   these conversations that you remember having with Vinod Patel.

1    You've told these ladies and gentlemen about all these Vinod

2    Patel conversations with you.  Correct?

3    A.  When?  In the last two days, you mean?

4    Q.  Yes.

5    A.  Yeah, I told whatever I knew.

6    Q.  The conversations that occurred back in 2009, 2010, 2011,

7    you had no problem telling the ladies and gentlemen about all

8    those conversations, did you?

9    A.  No.

10   Q.  The first time you were in the prosecutor's office and he

11   let you read a transcript of a conversation that you had with

12   Bob Patel that occurred on April 16th of 2011, as you sit here

13   today, you don't remember what that conversation was about, do

14   you?

15   A.  Because --

16   Q.  Yes or no.

17   A.  No, because it's 30,000 phone calls.  How do I remember

18   which one was there?

19   Q.  Well, you had no problem remembering all of the

20   conversations you had with Vinod Patel, did you?  You had no

21   problem remembering those?

22   A.  Because that was my personal memory, you know.

23   Q.  So, when he gave you a transcript two years ago and said

24   read this --

25   A.  It was three years ago now.

```
1    Q.  Three years ago.

2             When he gave you that transcript and said this is a

3    transcript of what you said and what Bob Patel said -- and you

4    read the transcript, didn't you?

5    A.  Yes, I did.

6    Q.  And you talked about the contents of what was in the

7    transcript, didn't you?

8    A.  Yes.

9    Q.  And as you sit here today, you have no idea of what was in

10   that transcript, do you?

11   A.  The reason is there was a lot of --

12   Q.  My question is do you have any idea of what that April

13   16th, 2011 --

14             MR. PRATT:  Your Honor --

15   Q.  -- phone call between you and Bob Patel was about?

16   A.  No.

17   Q.  Yes or no.

18             THE COURT:  Is there an objection?

19             MR. PRATT:  Your Honor, the objection is it has been

20   asked and answered, although at different volumes, if that

21   makes a difference.

22             MR. BEUKE:  Oh, I'm sorry, Judge.  I'll tone it down.

23             Nothing else.

24             THE COURT:  The objection is sustained.

25             MR. BEUKE:  Nothing else, Judge.
```

1                        REDIRECT-EXAMINATION

2     BY MR. PRATT:

3     Q.  All right.  Mr. Patel, you were asked a number of questions

4     about Dr. Bashir and Asher Bashir?

5     A.  Yes.

6     Q.  Are Dr.  Bashir and Asher Bashir the same person or are

7     they two people?

8     A.  Two people.

9     Q.  Okay.  What's the relationship between them?

10    A.  Asher Bashir is a nephew of Dr. Bashir.

11    Q.  All right.  And which one was in the physical therapy

12    business?

13    A.  Nobody has a physical therapy business.  Asher Bashir owned

14    a visiting physician office.  So, he had the patients.  He

15    applied for his home care services license -- home care service

16    license, but he didn't get it yet.  So, he said I need somebody

17    to get those services.

18    Q.  Okay.  You talked about the $4,000 payments to Dr. Bashir.

19    And just so we're clear, what was the purpose of those regular

20    $4,000 monthly payments to Dr. Bashir?

21    A.  It was supposed to give it to Dr. Bashir every month as a

22    part of the business he was giving to Rapid Drugs.

23    Q.  And what business was Rapid Drugs getting in exchange for

24    the cash?

25    A.  We were getting whatever patients he sees everyday.  Of

1    course, he was a visiting doctor.  He goes house to house.

2    Whatever patient he sees, he calls.

3    Q.  And how was the business that you were getting paid for,

4    what insurance or insurances were paying for that?

5    A.  The majority were Medicare.

6    Q.  All right.  What about the minority, what about the others?

7    A.  Maybe cash or maybe -- I don't think anybody has any other

8    insurance.

9    Q.  Was there any Medicaid?

10   A.  I don't think so.

11   Q.  All right.  In any event, you explained I think in some

12   detail that you did not personally hand the cash to Dr. Bashir?

13   A.  Yeah, I never.

14   Q.  Okay.  How were you involved in that payment?

15   A.  Bob Patel told me that he's going to give me a check every

16   month or, you know, he can arrange the $4,000 for me somehow,

17   and I'll give it to Rana Naeem, and Rana Naeem is going to give

18   it to Dr. Bashir.

19   Q.  Okay.  And I'm going to show you what we've marked as

20   Government Exhibit No. 16.

21          Can you identify what this is?

22   A.  Yes.  This is a check written from the personal account of

23   Babubhai Patel and his wife to me, on my personal name, Hiren

24   Patel, on January 17, 2011 in the amount of $4,000.

25          MR. PRATT:  Your Honor, I would move the admission of

1    Exhibit 16.

2              MR. BEUKE:  No objection, Judge.

3              THE COURT:  Received.

4              *(Government Exhibit 16 was admitted into evidence.)*

5    BY MR. PRATT:

6    Q.  All right.  And so you got that check on or about what

7    date?

8    A.  The date he wrote, I guess.

9    Q.  January --

10   A.  17th, 2011.

11   Q.  What did you do with the money that went into your account?

12   A.  I withdraw the cash from my account and I give it to Rana

13   Naeem.

14   Q.  And do you have way of knowing what Rana Naeem did with the

15   cash?

16   A.  Yes.  He's supposed to take the money to Dr. Bashir.

17   Q.  All right.  Did he tell you that, in fact, he carried out

18   his job?

19   A.  I never got a complaint from anybody.  So, I believe so he

20   did.

21   Q.  And if he did not carry out his assignment, who would you

22   have received a complaint from?

23   A.  I would have received a complaint from Dr. Bashir and Bob

24   Patel.

25   Q.  The Defendant, Vinod Patel, does he have a nickname that

1    you and others refer to him by?

2    A.  Victor.

3    Q.  Okay.

4         MR. PRATT:  Okay.  Thank you, Your Honor.  Nothing

5    further.

6         MR. BEUKE:  A couple, Judge.

7                    RECROSS-EXAMINATION

8    BY MR. BEUKE:

9    Q.  Mr. Patel, there's a number of Victor Patels out in the

10   Detroit area, aren't there?

11   A.  Maybe.

12   Q.  Okay.  This $4,000 check that Mr. Pratt showed you is dated

13   January 17, 2011, correct?

14   A.  Yes.

15   Q.  And what you did is you took and deposited that check into

16   your account, correct?

17   A.  Yes.

18   Q.  And you withdrew $4,000 in cash from your account, correct?

19   A.  Yes.

20   Q.  Where is the check from August of 2009?

21   A.  It may be the same thing.

22   Q.  Where's the check, have you seen it, that you got from Bob

23   Patel?

24   A.  I don't remember right now.

25   Q.  How about September of 2009, October, November, December,

1  have you seen any of shows checks?

2  A.  I ...

3  Q.  Yes or no.

4  A.  I saw the statement of my account.

5  Q.  Well, when the prosecutors brought you down to go over your

6  testimony, did they show you all of those checks?

7  A.  I didn't see the copies of the checks, but I seen my -- the

8  statements of my account.

9  Q.  Did you see the withdrawals -- the withdrawal slips when

10  you took $4,000 out of your account every month?

11  A.  A couple of statements, yes.

12  Q.  Where are they?

13  A.  I don't have it right now, because the account is closed.

14  Q.  This guy Asher Bashir, he was a person that -- well, strike

15  that.

16          MR. BEUKE:  Nothing else.

17          THE COURT:  Any redirect?

18          MR. PRATT:  No, Your Honor.  Thank you.

19          THE COURT:  Anything from the jurors?

20          You may step down.

21  A.  Thank you.

22          MR. NEAL:  You.

23          THE COURT:  You may call your next witness.

24          MR. NEAL:  Thank you, Your Honor.  The United States

25  calls Shelly Bernardini to the witness stand.

1          THE COURT:  Raise your right hand, please.

2          SHELLY BERNARDINI, GOVERNMENT'S WITNESS, SWORN.

3          THE COURT:  Please be seated.  Adjust the microphone

4     so it picks up your voice.  If you get too close, it will cut

5     out.

6                        DIRECT-EXAMINATION

7     BY MR. NEAL:

8     Q.  Ms. Bernardini, could you state and spell your name for the

9     benefit of the court reporter?

10    A.  Sure.  Shelly, S-H-E-L-L-Y, Bernardini,

11    B-E-R-N-A-R-D-I-N-I.

12    Q.  Ms. Bernardini, where do you work?

13    A.  I work for National Government Services.  It's an entity of

14    WellPoint.

15    Q.  Is National Government Services sometimes abbreviated as

16    NGS?

17    A.  Yes, sir.

18    Q.  What is your job title at NGS?

19    A.  I am the Clinical Home Health Educator for Jurisdiction 6

20    and Jurisdiction K for Medicare.

21    Q.  Okay.  We'll talk in a moment about what that job entails.

22    But, first of all, NGS is a Medicare contractor; is that

23    correct?

24    A.  Yes, sir.

25    Q.  All right.  Would you describe for the ladies and gentlemen

1   of the jury in very general terms what is Medicare?

2   A.   Medicare is the health insurance for our elderly population

3   in the United States or our disabled population in the United

4   States.  Both can qualify for Medicare.

5   Q.   And how is Medicare funded?

6   A.   Medicare is funded by the federal government.

7   Q.   All right.  NGS is a Medicare contractor.

8           What does a Medicare contractor do?

9   A.   Previously we were referred to as the fiscal intermediary,

10  meaning that we pay the bills for Medicare.  And as the

11  contractor we pretty much do the same thing, and we review

12  charts, et cetera, and pay claims for Medicare.

13  Q.   What does your job at NGS entail?  What are your principal

14  responsibilities?

15  A.   My job at National Government Services is the role of

16  Clinical Consultant for Jurisdiction K and Jurisdiction 6 for

17  home health.  So, I provide education to approximately 26

18  states with regard to home health for Medicare.

19  Q.   All right.  You mentioned Jurisdiction 6 and Jurisdiction

20  K.

21           Do those jurisdictions include the state of Michigan?

22  A.   Yes, sir, they do.

23  Q.   All right.  Are you familiar -- does your job require you

24  to be familiar with rules and regulations concerning Medicare's

25  Home Health Program?

1    A.   Absolutely.

2    Q.   All right.  Let me ask you this.  Who is eligible for home

3    health services under Medicare's Home Health Program?

4    A.   Eligible would be anybody over 60, 65 years old or

5    disabled.

6    Q.   That's someone who would be eligible for Medicare

7    generally.

8    A.   Medicare.

9    Q.   But in terms of home health, is there a particular clinical

10   profile that a patient has to meet to be able to receive home

11   health services under Medicare?

12   A.   Absolutely.  The patient would have to be homebound.

13   Q.   All right.  Does homebound have a particular definition in

14   the Medicare program?

15   A.   Homebound does have a definition.  It is in the pub manual

16   that's written by the Centers for Medicare and Medicaid

17   Services, and it specifically speaks to the fact that the

18   patient would have to be homebound to be eligible for Medicare

19   services.

20   Q.   Can you summarize for the ladies and gentlemen of the jury

21   what homebound means in that context?

22   A.   Sure.

23        The definition in the manual, the Pub Manual 100-02,

24   states that a patient would be eligible for home care services

25   if they are homebound.

1          And "homebound" is defined as a patient that is at

2    home and requires the assistance of a supportive device to

3    leave home or the assistance of another person to leave their

4    home, and it would be a considerable and taxing effort for the

5    patient to leave home even with the assistance of such, and it

6    would be an abnormal thing for the patient to have to leave

7    home or something that would be contraindicated by medical

8    advice like -- I mean do you want me to give an example?

9    Q.  I think that's fine for our purposes right now.

10   A.  Thank you.

11   Q.  Let me ask you this.  Who makes the determination under

12   Medicare's rules and regulations concerning whether or not a

13   patient is homebound and, thus, eligible for home health care?

14   A.  A physician has to write the order for a patient -- I mean,

15   has to certify that the patient is indeed homebound by Medicare

16   regulation.

17   Q.  All right.  Let's walk through the process of the home

18   health care benefit under Medicare after that determination is

19   made.

20          A physician makes a determination that the patient is

21   homebound and signs an order.

22   A.  Yes.

23   Q.  What is the next step in the process?

24   A.  Okay.  The patient would then be discharged home, and there

25   would be a plan of care written by that physician.  He would

1    write the orders stating that the patient needs to receive home

2    health care, and he would decide with the patient which agency

3    they would want to use, and the patient would then go home.

4            The plan of care is written by the doctor, certified

5    by the doctor.  That is sent to the home health agency and to

6    the physician that would follow the patient in the community.

7    And then services would then be started -- the start of care

8    would start immediately.

9    Q.  All right.  A couple of things I want to unpack there.

10           You said initially the patient would be discharged

11   home?

12   A.  Discharged home from --

13   Q.  What do you mean by "discharged home"?

14   A.  They would be discharged from the hospital or from the

15   rehab center or skilled nursing facility.

16   Q.  I think this brings up an interesting point.

17           Typically is the home health benefit intended for

18   those just leaving an acute care facility like a hospital

19   or ...

20   A.  Typically.

21   Q.  All right.

22   A.  They can also receive an order from a doctor's office.  It

23   doesn't happen as often because more patients are discharged

24   from the hospital or from a subacute facility like a nursing

25   home or a rehab center.

1   Q.  All right.  After the plan of care is signed and -- you

2   said there would then be a referral to an entity to provide the

3   services?

4   A.  Yes, sir.

5   Q.  What kind of services are covered under Medicare's home

6   health benefit?

7   A.  The Medicare home health benefit would cover nursing

8   services, but they have to be skilled services and the services

9   have to be intermittent.  But it would be nursing services,

10  physical therapy services, occupational therapy services,

11  speech language pathology and social work.  I apologize.

12  Q.  Okay.  Are those services intended to be of unlimited

13  duration?

14  A.  It would depend on the case, and the patient would have to

15  be -- would have to visit with their physician intermittently

16  to decide -- to have that determining factor.

17  Q.  How long is a typical home health care plan of care in

18  terms of number of days?

19  A.  Typically 30 days or less.  The expectation would be that

20  the patient would have to have a visit with their physician and

21  have that discussion if they want to extend the care, the home

22  care.

23  Q.  All right.  And would another physician order be required

24  if a plan of care expires --

25  A.  Yes, sir.

1    Q.  -- for home health services to continue?

2    A.  Yes, sir.

3    Q.  All right.  Do you know anything about -- well, strike

4    that.

5            With respect to claims for payment from a home health

6    agency, a home health agency submits claims for payment to NGS.

7    Isn't that correct?

8    A.  Yes, sir.

9    Q.  All right.  And those claims for payment are submitted on

10   behalf of the services that are provided --

11   A.  Yes, sir.

12   Q.  -- as part of the home health episode?

13   A.  (Witness nodding head.)

14   Q.  All right.  Is data about those claims collected by NGS?

15   A.  Sometimes.

16   Q.  Okay.  Well, let me ask you this.  The claims that are

17   submitted from the home health agency to NGS, are these

18   submitted in paper form or electronically?

19   A.  Electronically.

20   Q.  Okay.  And that electronic claim, is information about that

21   electronic claim maintained by NGS?

22   A.  The claim, yes.

23   Q.  Okay.  Just a couple of additional questions.

24           Does NGS engage in any sort of an auditing process

25   with respect to claims that have been submitted by home health

1   agencies?

2   A.  Internally?

3   Q.  Internally.

4   A.  Yes, sir.

5   Q.  Can you describe a little bit about what that process

6   involves?

7   A.  We at National Government Services have a contractor that

8   works for us, and they measure our ability to pay claims

9   correctly, and it is referred to as the Comprehensive Error

10  Rate Testing.  And they come in and look at claims that we have

11  paid or denied to see if we've done so correctly.

12  Q.  You mentioned claims that are paid or denied.

13           Do you have an internal mechanism for denying claims?

14  Can claims be denied by NGS?

15  A.  Oh, yes absolutely.

16  Q.  And what -- if you know, what kind of bases would lead to a

17  claim being denied by NGS?

18  A.  It would -- it would depend on how the claim came about.

19  Sometimes claims come in, and there's a submission of a claim,

20  and we'll request documentation of a chart to review that.  And

21  we have, I don't even know how many reviewers, that review

22  charts and look at charts.  But there are also claims that come

23  in, you know, millions of claims come in, and they just come in

24  the system and they don't generate anyone to look at the

25  documentation.

1    Q.  All right.

2    A.  These are just paid or denied --

3    Q.  All right.  I was going to talk about that.

4            Millions of claims come in.

5    A.  Yes.

6    Q.  Do you have any sense of approximately what percentage are

7    reviewed in the sense that NGS requests additional document for

8    the claim?

9    A.  I don't.

10   Q.  All right.  But would you agree it's a very small

11   percentage?

12   A.  It's a very small percentage.

13   Q.  Okay.  A couple of questions in conclusion.

14           Under the Medicare home health benefit, will Medicare

15   knowingly pay for home health services for beneficiaries who

16   are not homebound?

17   A.  Absolutely not.

18   Q.  Will Medicare knowingly pay for home health care services

19   for beneficiaries who do not actually receive those services?

20   A.  Absolutely not.

21   Q.  Even if a patient actually receives the services and

22   actually is homebound, will Medicare pay for home health

23   services that are induced through payment of a kickback or a

24   bribe?

25   A.  Absolutely not.

1          MR. NEAL:  I have nothing further.

2          THE COURT:  Defense, cross-examination?

3          MR. BEUKE:  Thanks.  Thanks, Judge.

4                         CROSS-EXAMINATION

5    BY MR. BEUKE:

6    Q.  Ms. Bernardini, how long have you worked for the agency?

7    A.  This my fourth year, and I worked previously for Medicare

8    for approximately three years.

9    Q.  Okay.  So, you've been familiar with the process for a

10   number of years?

11   A.  Yes, sir.

12   Q.  Okay.  In terms of claims that come in to the agency, you

13   indicated that the claims are being made by various home health

14   care businesses throughout the country.  Correct?

15   A.  Depending on the jurisdiction.

16   Q.  Okay.  And how does it work in Michigan?  I guess we should

17   concentrate on that.

18   A.  Michigan claims are sent to Jurisdiction 6 for review, if

19   the claims are paid through Jurisdiction 6.

20   Q.  That would be located where?

21   A.  Chicago, I believe.

22   Q.  Okay.  And when the claims are submitted by, let's say, a

23   company called First Michigan Home Health Care, the claims are

24   for each individual patient or do the claims come in like the

25   monthly claims that were generated, or how are claims or how

1    would claims be submitted for a company like First Michigan

2    Home Health Care?

3    A.  Well, they would be individual and specific to the

4    beneficiary.

5    Q.  All right.  So, each time a particular service is performed

6    by, let's say, First Michigan for a particular patient, the

7    claim that is submitted to your agency for payment has to

8    reflect the services that were provided to that particular

9    patient on a particular day.  Fair to say?

10   A.  Yeah.  Typically it's over a month or so.

11   Q.  And the claims that are submitted, do they have to be

12   documented electronically by any sort of information?  Is there

13   a coding process or something like that?

14   A.  I'm not following.

15   Q.  Let's say a nurse goes out to visit me on Monday, and the

16   nurse when he or she visits me is trying to help me get over a

17   knee replacement surgery.

18          The treatment that's provided to me during the

19   nurse's visit is, how is that reflected in the billing process?

20   A.  It's going to depend on the services that she provided.

21   Q.  Okay.  So, each particular service warrants a certain

22   amount of compensation from your agency, correct?

23   A.  Yes.

24   Q.  So, it's not one visit covers -- you get a hundred dollars

25   a visit for a nurse going on any particular day.  It's

1    dependent on the amount of services that are performed while

2    the nurse is in the presence of the patient.  Correct?

3    A.  I believe so.  I don't work for claims, so ...

4    Q.  Well, are you familiar with the claims process?

5    A.  Yes.

6    Q.  Okay.  So, I guess what I'm asking is, there has to be

7    documentation that your agency requires that the services are

8    actually provided.  Correct?

9    A.  On the claim.  For the claim.

10   Q.  And each particular patient, what your agency requires or

11   what Medicare requires is that a chart and that documentation

12   has to be maintained by that company in case you want to

13   question whether or not services were performed.  Correct?

14   A.  Yes.  They would keep that in the chart.

15   Q.  So, you mentioned the ability of your agency to reject

16   claims or to question claims.  Correct?

17   A.  Yes, sir.

18   Q.  And that process happens how?

19   A.  Sometimes a claim will come in and it will be denied for

20   wrong codes.  And that can be noticed on a bill or a claim.

21   Q.  If that happens, is that denial sent back to the home

22   health care business?

23   A.  Yes.  We might ask for records at that point.

24   Q.  Okay.

25   A.  Sometimes just a random additional request is sent to a

1   provider or an agency requesting records, and that's just
2   random, and then we review those charts.
3   Q.  So, the paperwork then in that situation has to be provided
4   so you can either confirm or deny or investigate whether or not
5   the services were actually performed?
6   A.  Investigate is the word, yes.
7   Q.  Okay.  And those investigations, they are not done by you,
8   I take it, correct?
9   A.  I have done them, yes.
10  Q.  Okay.  And would you actually go to the home health care
11  service or business --
12  A.  No.
13  Q.   -- and ask --
14          Would you go to the patient?
15  A.  No.
16  Q.  Would you go to the doctor?
17  A.  (No response.)
18  Q.  How would you investigate, if you had a question as to
19  whether or not the services were actually performed?
20  A.  Everything that was performed should be documented in the
21  medical record.
22  Q.  So, how would you investigate it in the times that you've
23  investigated in the past?
24  A.  In the medical record.
25  Q.  So, you would ask for the medical file of a particular

1    patient, correct?

2    A.   Yes.

3    Q.   And the First Michigan, if you requested that, they would

4    have to produce the patient's file for you, correct?

5    A.   Yes, sir.

6    Q.   And would you ever take it a step further if you still

7    questioned whether or not the services were performed?  Would

8    you go out and attempt to interview either the nurse that was

9    supposed to have provided the service or the patient who was

10   supposed to have received the service or the doctor who was the

11   referring physician?

12   A.   That's out of my scope of practice.

13   Q.   I'm sorry?

14   A.   That's out of my scope of practice.

15   Q.   It's out of your scope of practice.

16             What does that mean?

17   A.   I am a nurse.  We have agencies that handle fraud.

18   Q.   You are a nurse that what?

19   A.   I'm a nurse.  We have agencies that handle fraud.  That is

20   not my job title.

21   Q.   All right.  But if you were investigating a claim -- you've

22   done that in the past, correct?

23   A.   To review, yes.

24   Q.   And if you went and you got the patient file from the

25   company, and after you looked at the patient file you still had

1    some questions about those particular areas I've just talked to

2    you about --

3    A.   I would send it to our Fraud and Abuse Department.

4    Q.   All right.  So, then there's another process in the chain

5    that would be followed, and that goes to another agency or

6    interagency.  Correct?

7    A.   Yes.

8    Q.   And after that person continues or finishes the

9    investigation, do they have to report back then to you?

10   A.   No.

11   Q.   Okay.  Who do they report to?

12   A.   I am not sure.

13   Q.   Okay.  Now, when did you become involved in this particular

14   case?  When did you receive a call from the Government in this

15   case?

16   A.   A few weeks ago.

17   Q.   And do you have the ability in your database to review

18   whether or not there had been any claims or complaints of fraud

19   against a company called First Michigan Home Health Care?

20   A.   No, sir.  I was unaware of the name of the company or

21   anything really about this.

22   Q.   If you wanted to investigate whether or not there had been

23   any claims of fraud against a particular company -- in this

24   case, for instance, First Michigan Home Health Care -- who

25   would you direct your questions to in your agency or in a

US v Vinod Patel #11-CR-20468-36

1   different agency?

2   A.  I would have to ask around.  I wouldn't -- I wouldn't

3   really know.

4   Q.  Somebody keeps that information in the government, correct?

5   A.  I'm sure.

6   Q.  To your knowledge, was that ever done for a company called

7   First Michigan Home Health Care?

8   A.  No, sir.

9           MR. BEUKE:  Nothing else.

10          MR. NEAL:  I have nothing further, Your Honor.

11          THE COURT:  Jurors?

12          Thank you very much.  You may step down.

13          You may call your next witness.

14          MR. NEAL:  Thank you, Your Honor.

15          The United States calls Todd Stankewicz.

16          THE COURT:  Raise your right hand, please.

17      TODD STANKEWICZ, GOVERNMENT'S WITNESS, SWORN.

18          THE COURT:  Please be seated.  Adjust the microphone

19  so we can hear you.

20          You may begin.

21                      DIRECT-EXAMINATION

22  BY MR. NEAL:

23  Q.  Mr. Stankewicz, would you state and spell your name for the

24  record.

25  A.  Sure.  It's Todd Stankewicz; Todd, T-O-D-D, Stankewicz,

1   S-T-A-N-K-E-W-I-C-Z.

2   Q.  Mr. Stankewicz, where are you employed?

3   A.  I'm employed with the Centers for Medicare and Medicaid

4   Services or CMS.

5   Q.  What is CMS?

6   A.  CMS is a federal agency that administers the Medicare

7   benefit.

8   Q.  What is your job title?

9   A.  I'm the Regional Pharmacist in the Chicago office.  And so

10  I oversee Medicare Part D or an adviser for Medicare Part D.

11  Q.  Okay.  We'll talk about that in a moment.  But I take it

12  you are a pharmacist by training?

13  A.  Yes.  I have licenses in both Illinois and Minnesota.

14  Q.  You mentioned Medicare Part D.

15          Can you explain to the ladies and gentlemen of the

16  jury what Medicare Part D is?

17  A.  Yes.

18          Medicare Part D is the Medicare Drug Program, and it

19  started back in 2006.  Basically what it does is it's all part

20  of the Medicare program, but it's primarily providing

21  prescription drugs to beneficiaries.

22  Q.  Is Medicare Part D administered directly by CMS?

23  A.  Medicare Part D is a little bit different than some of the

24  other parts of Medicare.  We contract with health plans, say,

25  Blue Cross Blue Shield of Michigan, Humana, United, to

1    administer the benefit for us.

2    Q.  Do beneficiaries select amongst these different plans?

3    A.  Yes.  Beneficiaries would select the plans.  There are

4    plans offered in the area.  There are usually quite a few

5    choices.  Michigan has probably over 30 plans that they can

6    select from.  So, they would select from there.

7    Q.  Does CMS have any sort of a regulatory role with respect to

8    these plans and what they provide?

9    A.  CMS oversees the program.  So, what they would do is they

10   contract directly with these plans.  So, we have oversight over

11   these plans.

12   Q.  In terms of individual providers, say a pharmacy, if a

13   pharmacy wanted to provide medications to beneficiaries of one

14   of these plans, do they contract with the individual plan or do

15   they contract with CMS to be able to provide?

16   A.  The individuals would contract with the health plans.  CMS

17   doesn't contract directly with pharmacies.  They would be

18   downstream entities of that health plan.

19   Q.  Okay.  Does CMS collect data about something called

20   prescription drug events that occur with respect to all these

21   Medicare Part D plans?

22   A.  Yes.

23         So, what we require from the health plans is when a

24   claim is run at a pharmacy, there's certain information on that

25   such as the beneficiary's name, their information, the

1    provider, what drug they've been given.  And there are a

2    certain amount of those data elements or parts of those claims

3    that get sent to CMS.

4    Q.  All right.  And is that data stored?

5    A.  Yes.

6    Q.  And is that available for law enforcement or other entities

7    to access for use in investigations?

8    A.  As far as I know, yes.

9    Q.  Does CMS have any kind of an auditing role over Part D

10   health plans when it comes to individual claims?

11   A.  Yes.

12           CMS would audit the health plans themselves.  And in,

13   turn, we do look at claims data during our general audit

14   process.  So, we would have the health plan then show us the

15   claims data and show us information that was provided to CMS.

16   Q.  And what kinds of things would CMS be looking for in these

17   sorts of audits?

18   A.  We look to make sure that they are administering their

19   formulary correctly.  So, health plans, they all have

20   formularies --

21   Q.  And can you describe for the jury what a formulary is?

22   A.  Sure.

23           It's a list of jobs covered by the health plan under

24   the benefit.  CMS has certain requirements for formulary.  So,

25   when we are auditing a health plan, we are making sure that

1    they are following both CMS's rules and what they said they
2    would cover, they are covering appropriately.
3    Q.  Let me ask you this.  In the Medicare Part D context, will
4    Medicare Part D or any of its plans knowingly pay for
5    prescription drugs that are not medically necessary?
6    A.  No.
7    Q.  Will Medicare Part D or any of its plans knowingly pay for
8    prescription drugs that are not actually provided to patients?
9    A.  No, they would not.
10   Q.  Will Medicare Part D or any of its plans knowingly pay for
11   drugs, even if they are medically necessary and actually
12   provided, that the claim is induced through means of payment of
13   a kickback or bribe?
14   A.  No, they would not.
15           MR. NEAL:  I have nothing further, Your Honor.
16           THE COURT:  Cross-examination?
17                      CROSS-EXAMINATION
18   BY MR. BEUKE:
19   Q.  Well, sir, in order for your agency to make those types of
20   determinations -- let's talk about medically necessary first.
21   How would you determine or how would you investigate whether a
22   particular prescription and the medications prescribed on the
23   prescription are medically necessary?
24   A.  We determine medical necessity by what's either listed in
25   compendia or with the FDA labeling.

1   Q.   What is compendia?

2   A.   There are two different compendia.  There's American

3   Hospital Formulary Service and USP.  And what we do is we look

4   to see what it says in there as far as what's approved usage

5   for the drugs.  And we would rely on the physician, the

6   pharmacist, you know, the other entities to make sure that's

7   appropriate, and the health plans, because ultimately we

8   contract with health plans.

9   Q.   Being a pharmacist, I'm assuming in your experience -- did

10  you ever work at a pharmacy?

11  A.   Yes.

12  Q.   Okay.  In your experience working at a pharmacy, if a

13  prescription comes in for a particular patient or an individual

14  and they give you the prescription, what's one of the first

15  things that you would check?

16  A.   That it was the correct drug and the correct name.

17  Q.   Okay.  And you would look at the prescription, correct?

18  A.   Correct.

19  Q.   And at that particular time would you feel any need to

20  investigate whether or not this doctor is, in fact, a doctor or

21  would you attempt to corroborate that in any way?

22  A.   As a pharmacist, when I'm filling a prescription for a

23  Medicare Part D plan, there's a database that would be on the

24  file that the health plans would have.  So, I would know if

25  it's a doctor in good standing or not through that.

1    Q.   Okay.  So, that is a piece of information that is readily

2    available at the pharmacy for the pharmacist to log into and

3    find out.  Correct?

4    A.   There is a file through the OIG that lists physician --

5    Q.   With the Office of the Inspector General; is that correct?

6    A.   That's correct.

7    Q.   And that file is maintained specifically for that purpose,

8    so pharmacists can inquire as to whether or not this particular

9    doctor is someone that is a participant in that particular

10   plan.  Correct?

11   A.   That -- that's correct.

12   Q.   Okay.  And in terms of -- would you as a pharmacist be --

13   would part of your role as a pharmacist be required to

14   investigate whether or not this particular drug should be

15   prescribed to this particular patient?

16        That's not the role of the pharmacist, is it?

17   A.   I -- I think it would depend.

18   Q.   Well, I suppose anything is possible.  But if you saw an

19   audiologist prescribing Xanax to somebody, that's something

20   that you would question, correct?

21   A.   Possibly.

22   Q.   And if you -- if you were to have questions about that, the

23   very first thing that you would do is to contact the physician,

24   correct?

25   A.   Correct.

1    Q.  And you would ask for some explanations from the physician

2    as to, Doctor, why are you prescribing Xanax to somebody who

3    has ear problems.  Fair to say?

4    A.  Yes.

5    Q.  And if you had questions about that type of issue, you can

6    reject the prescription, correct?  You can refuse to fill the

7    prescription, correct?

8    A.  Pharmacists have that ability to refuse, yes.

9    Q.  And the pharmacists can also report to governmental

10   agencies if they have certain concerns about whether or not

11   certain doctors are appropriately prescribing medications

12   without any medical necessity.  Correct?

13   A.  Yes.

14   Q.  That's one of the duties and the responsibilities of the

15   pharmacist.  Correct?

16   A.  Yes.

17   Q.  Okay.  And in terms of the drugs that are billed for but

18   not provided, you indicated to Mr. Neal that that's certainly

19   not something that would be paid out on.  Correct?

20   A.  CMS would not pay them out.

21   Q.  Okay.  CMS would not -- if they were aware of the fact that

22   a physician was prescribing controlled or noncontrolled

23   medications to patients and the pharmacist was only supplying

24   the controlled medications and he was keeping or stealing the

25   noncontrolled medications, that's certainly something that your

1    agency would want to know about and investigate.  Correct?

2    A.  Yes.

3    Q.  How would that investigative process begin or how would

4    that take place; would you explain that for the ladies and

5    gentlemen?

6    A.  So, can you just please clarify the question?  As far as

7    how would it take place by CMS?

8    Q.  CMS or whatever governmental agency would be responsible to

9    investigate that.

10   A.  I would have to say I don't know the exact answer to that,

11   because CMS would work with other agencies and --

12   Q.  What other agencies would CMS work with?

13          If you were given information or a complaint was made

14   to your agency that a pharmacy was billing Medicare for payment

15   of medications that they weren't providing and that came in to

16   your desk, what would you do?

17   A.  I would send it to our Center for Program Integrity.

18   Q.  Okay.  And the Center for Program Integrity, what do they

19   do?

20   A.  They would investigate fraud, waste and abuse cases, and

21   they are with CMS.

22   Q.  In our particular example, would they send somebody out to

23   the pharmacy?

24   A.  I don't know what they do.

25   Q.  You've never been involved in the investigative process?

1    A.   I have not been involved with CPI other than forwarding

2    cases on to them, yes.

3    Q.   Just finally, Mr. Stankewicz, I think Mr. Neal asked you

4    about if medications were, in fact, and if they were for a

5    medically necessary condition, it's your testimony that if the

6    prescriptions -- or, there was some sort of an agreement

7    between the doctor and the pharmacist to receive some form of a

8    kickback or monetary payment, that's also something that CMS

9    would reject and refuse to pay.  Is that correct?

10   A.   Correct.

11   Q.   Okay.  And how typically are those types of situations

12   brought to your attention?

13   A.   They usually go through the program -- Center for Program

14   Integrity.  So, not often.

15   Q.   Well, with respect to -- every individual who is a

16   beneficiary of Medicare or Medicaid -- Medicare, we'll stick

17   with -- they have a Medicare number.  Correct?

18   A.   That's correct.

19   Q.   And when medications are billed to their Medicare number,

20   those patients are given a statement, a monthly statement.

21   Correct?

22   A.   Yeah, they are being -- the health plan would provide them

23   an explanation of benefits.

24   Q.   So, every month these particular patients receive a

25   statement that indicates to them not only the drugs that

1    they've been prescribed, but also the drugs that they've been

2    given and that Medicare is going to pay based on their coverage

3    under the Medicare number.  Correct?

4    A.  What happens is the health plan would send them out an

5    explanation of benefits if they got drugs that prior month.

6    Q.  Mm-hmm.

7    A.  And it would show what drugs they got during that month.

8    And it would also show where they were in their Medicare

9    spending, yes.

10   Q.  Just -- just -- can you explain to me, if a patient

11   received that statement and he said to himself, listen, I've

12   been billed for drug A, B, C and D and I only got C and D, what

13   is the mechanism where he could file some sort of a complaint?

14   Who would that be filed with?

15   A.  The individual or the beneficiary could either contact

16   1-800-Medicare and file a complaint or they could also talk to

17   their health plan, and then they would go through their

18   channels.

19   Q.  Okay.  So, there is this process.  That information is on

20   the statement that they get every month.  Correct?

21   A.  That information should be on the statement, anything

22   billed through the health plan.

23            MR. BEUKE:  Thank you, sir.

24            THE COURT:  Redirect?

25            MR. NEAL:  I have nothing further, Your Honor.

1          THE COURT:  Jurors?

2          You may step down.  Thank you very much.

3          You may call your next witness.

4          MR. NEAL:  The United States calls Michele Warstler.

5          THE COURT:  Would you raise your right hand, please.

6     MICHELE WARSTLER,  GOVERNMENT'S WITNESS, SWORN.

7          THE COURT:  Please be seated.  Adjust the microphone

8     so we can hear you.

9          You may begin.

10          MR. NEAL:  Thank you, Judge.

11                    DIRECT-EXAMINATION

12    BY MR. NEAL:

13    Q.  Ms. Warstler, can you state and spell your name for the

14    benefit of the court reporter.

15    A.  Sure.  It's Michele Warstler, M-I-C-H-E-L-E,

16    W-A-R-S-T-L-E-R.

17    Q.  Ms. Warstler, where are you employed?

18    A.  I work for the Michigan Department of Community Health.

19    Q.  Does the Michigan Department of Community Health have any

20    responsibility for the state's Medicaid program?

21    A.  Yes.  It administers the state's Medicaid program.

22    Q.  Can you describe for the jury in general terms what the

23    Medicaid program is?

24    A.  The Medicaid program is a medical assistance program.  It's

25    a type of medical insurance that's provided to the indigent or

1    poor people of the state of Michigan.

2    Q.  And who administers the Medicaid program?

3    A.  The Michigan Department of Community Health.

4    Q.  In the state of Michigan?

5    A.  Yes.

6    Q.  I take it this is a state program?

7    A.  It is.

8    Q.  All right.  How is it funded?

9    A.  It's funded by both state and federal funds.

10   Q.  Part of the health care service that are provided to the

11   indigent citizens of Michigan under the Medicaid program

12   includes prescription drug coverage.  Is that correct?

13   A.  Yes.

14   Q.  All right.  And with respect to the prescription drug

15   coverage that's provided by Michigan's Medicaid program, does

16   it fall into several broad categories of coverage?

17   A.  The Medicaid program has a fee for service component and a

18   managed care component.

19          If the Medicaid beneficiary has fee for service

20   Medicaid, then all their services, including prescriptions, are

21   paid for by the state Medicaid program.

22          If they are in one of our Medicaid health plans that

23   are contracted with the state, then the health plan covers the

24   medical services for that person, including pharmacy.  Other

25   than there are -- there are something called carve-out drugs.

1    There are some specific class classifications that even if a

2    Medicaid beneficiary is in a health plan, the fee for service

3    Medicaid program pays for those medications.

4    Q.  Okay.  Could you describe, again in very general terms,

5    what makes a Medicaid beneficiary eligible for either fee for

6    service or one of these managed care health plans?

7    A.  Most of Medicaid beneficiaries are eligible to be in one of

8    the Medicaid health plans, and they were a choice of health

9    plans in their county.  There are certain populations of

10   Medicaid beneficiaries that are not eligible to be in a health

11   plan, including those patients in nursing homes.

12   Q.  Does the Michigan Department of Community Health collect

13   data about claims from the managed care plans?

14   A.  Yes.  They are called encounter data, and managed care

15   entities must submit those claims to the state.

16   Q.  All right.  And on the fee for service side, does the

17   Michigan Department of Community Health collect data directly

18   from providers?

19   A.  Yes.

20        The providers bill the Medicaid program directly, and

21   the Department of Community Health processes those claims.

22   Q.  Is that data, the encounter data and the fee for service

23   data sometimes made available to law enforcement for use in

24   investigations?

25   A.  Yes.

1    Q.  Ms. Warstler, let me ask you this.  Will Michigan's

2    Medicaid program, in either the fee for service component or

3    the managed care component, knowing pay for medications that

4    are not actually provided to patients?

5    A.  No.

6    Q.  Will either component of Medicaid knowingly pay for

7    medications that are not medically necessary?

8    A.  No.

9    Q.  And in the event that medications are, in fact, medically

10   necessary and are, in fact, actually provided to patients, will

11   Michigan's Medicaid program knowingly pay for those

12   prescriptions if the prescriptions were referred to the

13   pharmacy by means of a kickback or a bribe?

14   A.  No.

15           MR. NEAL:  I have nothing further of this witness.

16           THE COURT:  Cross-examination?

17                     CROSS-EXAMINATION

18   BY MR. BEUKE:

19   Q.  Ma'am, with respect to this particular case, to your

20   knowledge, did law enforcement, any law enforcement agencies

21   contact the Michigan Department of Community Health and request

22   any of the information contained within your encounter data

23   database regarding First Michigan Home Health Care?

24   A.  Not that I'm aware of.

25   Q.  Back in 2008 or 2009 or '10, '11, '12, '13, were you aware

1    of any request by law enforcement for any sort of information

2    concerning the documentation that you have available in your

3    databases?

4    A.  For the home health agency?

5    Q.  Yes.

6    A.  No, not that I'm aware of.

7    Q.  How about for any complaints or questions regarding

8    services that were paid for by the agency that were medically

9    unnecessary; do you have any information that your agency

10   received complaints about First Michigan Home Health Care

11   providing services that were medically unnecessary?

12   A.  I don't know off the top of my head, but I also didn't look

13   in our case tracking system.

14   Q.  All right.  Did anybody from law enforcement ever request

15   you to look?

16   A.  I don't believe so.

17   Q.  Did anybody from law enforcement ever request that you

18   check your encounter data to determine whether services were

19   provided by First Michigan Home Health Care and paid for by the

20   agency for -- for services that were not, in fact, provided?

21   A.  I'm not aware of that.

22   Q.  Ma'am, were you ever requested to begin or conduct an

23   investigation about whether or not physicians who were

24   referring patients for care and service to First Michigan Home

25   Health Care were receiving kickbacks or bribes from anybody at

1    First Michigan health care for those referrals?

2    A.  Not that I'm aware of.

3            MR. BEUKE:  Nothing else, Judge.

4            THE COURT:  Redirect?

5            MR. NEAL:  I have nothing further, Your Honor.

6            THE COURT:  Jurors?

7            You may step down.  Thank you.

8            MR. NEAL:  The United States calls Douglas Cedras.

9            THE COURT:  Raise your right hand.

10           DOUGLAS CEDRAS,  GOVERNMENT'S WITNESS, SWORN.

11           THE COURT:  You may be seated.

12   A.  Thank you.

13           THE COURT:  Adjust the microphone so we can hear you.

14           You may begin.

15           MR. NEAL:  Thank you, Judge.

16                        DIRECT-EXAMINATION

17   BY MR. NEAL:

18   Q.  Mr. Cedras, can you state and spell your name for the court

19   reporter?

20   A.  Yes.  Douglas Cedras; D-O-U-G-L-A-S, C-E-D-R-A-S.

21   Q.  Mr. Cedras, where are you employed?

22   A.  Blue Cross and Blue Shield of Michigan.

23   Q.  And what's your job title?

24   A.  I am the Director of Corporate and Financial

25   Investigations.

1    Q.  How long have you been with Blue Cross Blue Shield of

2    Michigan?

3    A.  23 years.

4    Q.  Very briefly can you describe to the jury what Blue Cross

5    Blue Shield of Michigan is?

6    A.  Yes.

7            Blue Cross you Blue Shield of Michigan is a health

8    care payer.  We pay health care claims for groups that are what

9    we call administrative service contracts, where they pay the

10   cost of care.  They pay us an administrative fee for processing

11   the claims.  We also pay claims for what we call rated groups,

12   which is more like a regular insurance policy, and we also pay

13   claims for people who have individual contracts.

14   Q.  All right.  Can you briefly describe for the jury the

15   differences between group contracts and individual policies?

16   A.  Yes.

17           If it's a group contract, the employer will incur the

18   cost of care for the employees typically with a cost share to

19   the employee.  If it's an individual contract, it's that

20   person's individual responsibility to pay for their premiums.

21   Q.  All right.  With respect to all of the different sorts of

22   plans that Blue Cross Blue Shield of Michigan offers is

23   prescription drug coverage generally available?

24   A.  Yes, it is.

25   Q.  If prescription drug coverage is available and is selected

1    by either the group or the beneficiary, is there a standard

2    package of benefits that comes with that sort of insurance?

3    A.   It varies, but typically there's a standard packaging of

4    benefits where the cost of the pharmaceutical drugs, the

5    medically necessary pharmaceutical drugs are paid for as a part

6    of the policy.

7    Q.   Is there a division of Blue Cross Blue Shield of Michigan

8    that is responsible for contracting with individual pharmacies?

9    A.   Yes, sir, there is.

10   Q.   What is that called?

11   A.   It's called Pharmacy Services.

12   Q.   All right.  And does that group have broad responsibility

13   for all -- for contracting with individual pharmacies for all

14   the different sorts of plans that Blue Cross Blue Shield of

15   Michigan offers with respect to the prescription drug

16   component?

17   A.   Yes, sir.

18   Q.   All right.  Does Blue Cross Blue Shield of Michigan collect

19   data from all the different plans that Blue Cross and Blue

20   Shield of Michigan either administers or provides in the state

21   of Michigan?

22   A.   Yes, sir.

23   Q.   And that includes claims data; is that correct?

24   A.   Yes.

25   Q.   And is that information ever provided to law enforcement in

1    connection with criminal or civil investigations?

2    A.  Yes, it is.

3    Q.  A couple more questions.  Do any of Blue Cross Blue Shield

4    of Michigan's plans knowingly pay for medications that are not

5    actually provided to patients?

6    A.  We do not.

7    Q.  All right.  Does Blue Cross Blue Shield of Michigan in any

8    of its plans knowingly pay for medications that are not

9    medically necessary?

10   A.  We do not.

11   Q.  All right.  Does Blue Cross Blue Shield of Michigan in its

12   in any of its plans knowingly pay for medications that may be

13   medically necessary and may be actually provided, but the claim

14   was induced by means of a kickback or bribe?

15   A.  We do not.

16            MR. NEAL:  I have nothing further.

17            THE COURT:  Cross-examination?

18            MR. BEUKE:  No questions, Judge.  Thank you, sir.

19            THE COURT:  Jurors, any questions?

20            Thank you very much.

21   A.  Thank you, sir.

22            THE COURT:  You may call your next witness.

23            MR. NEAL:  Your Honor, we think we have a fairly

24   lengthy witness next.  Now is perhaps a good time to take our

25   morning break.

```
 1              THE COURT:  All right.  It's 10:20.  Let's start at
 2    20 to 11, a 20-minute break.
 3              All rise for the jury, please.
 4              Please don't talk about this or do any research.  And
 5    I'll see you in 20 minutes.
 6              (Jury leaves the courtroom at 10:21 a.m.)
 7              THE COURT:  Anything anyone wants to put on the
 8    record?
 9              MR. NEAL:  Not from the Government, Your Honor.
10              MR. BEUKE:  No, Your Honor.
11              THE COURT:  Thank you.  We'll see you in 20 minutes.
12              (Recess taken.)
13              CASE MANAGER LANG:  Please rise.
14              THE COURT:  Anything -- you want to try it without
15    the jury?
16              Anything anyone wants to put on the record?
17              MR. PRATT:  No, Your Honor.
18              THE COURT:  Okay.
19              (Jury enters the courtroom at 10:54 a.m.)
20              CASE MANAGER LANG:  Court is again in session.
21    Please be seated.
22              THE COURT:  Everybody is in place.
23              Raise your right hand.
24         DOUGLAS CARMACK,  GOVERNMENT'S WITNESS, SWORN.
25              MR. PRATT:  The United States recalls Douglas
```

1  Carmack.

2                         DIRECT-EXAMINATION

3  BY MR. PRATT:

4  Q.  Task Force Officer Carmack, I would like to go through the

5  final group of wiretap calls.  If you could turn --

6          MR. PRATT:  Ms. Drinkard, if you could turn to call

7  1D, D as in dog.

8  BY MR. PRATT:

9  Q.  Officer Carmack, could you identify this call?

10  A.  This call took place February 26, 2011.  The speakers are

11  Babubhai Patel and Pinakeen Patel.

12  Q.  And who is Pinakeen Patel?

13  A.  He's a pharmacist that worked for Bob's organization.

14          MR. PRATT:  Okay.  Ms. Drinkard, if you could focus

15  on right below the first "voices overlap," starting with

16  Pinakeen.

17          And, Mr. Fitzpatrick, if you could read just the

18  first two sections there.

19          MR. FITZPATRICK:  "Pinakeen:  That is true, 20, 25

20  percent, I also understand, and I am trying for that, and I am

21  trying to push, you know.

22          "Bob:  If you cannot make 25 percent, then it's not

23  worth to be in."

24  BY MR. PRATT:

25  Q.  All right.  Task Force Officer Carmack, what are Pinakeen

1    and Bob discussing here?

2    A.  Profit margin for the pharmacy.

3    Q.  All right.  And the expression of "If you can't make 25

4    percent, it's not worth it to be in it"?

5    A.  That's not enough of a profit margin for them.

6    Q.  All right.

7            MR. PRATT:  Please turn to the top of page two, and

8    if you could read the first three sections once they are up.

9            MR. FITZPATRICK:  "Bob:  It's no meaning, because

10   today if we count, so yours is about 17 percent.

11           "Pinakeen:  Yeah, it is about 17, 18 percent,

12   understand.

13           "Bob:  No, 17, minimum it should be 25 percent."

14   BY MR. PRATT:

15   Q.  All right.  Is this discussing the same issue, the profit

16   margins?

17   A.  Correct.

18   Q.  All right.

19           MR. PRATT:  Let's turn to page five, the very bottom

20   of page five, the very last line.

21           Last line of page five.

22           *(Off the record.)*

23           MR. PRATT:  All right.  I guess we'll have to do it

24   the old-fashioned way then.

25           *(Off the record.)*

1              MR. PRATT:  All right.  Mr. Fitzpatrick, if you could

2     start at the very first line on page five.

3              MR. FITZPATRICK:  "Bob:  Pinakeen, if you do this

4     systematic, nothing will happen.  If you short two, three

5     pills, then nothing."

6              MR. PRATT:  Thank you.  If you could continue that on

7     the top of page six.

8              MR. FITZPATRICK:  "Pinakeen:  All that Babubhai is

9     on, but Babubhai, all that will be seen in the long-term, all

10    that you cannot see it immediately.

11             "Bob:  Not that, against the billing you will come to

12    know in one month only, today suppose you fill 100

13    prescriptions, let me give you a simple example.  At Lathia's

14    it's the same as at your place, they are all white, right?  At

15    Lathia's it's the same there, saves three bottles per week, so

16    it becomes three thousand dollars per week."

17             MR. PRATT:  And if you could stop and go to the last

18    line of the call.

19             MR. FITZPATRICK:  "Pinakeen:  I'm doing everything.

20    I'm doing all I can, you will not believe.  You ask Shyamal

21    [U/I], but I do it in a limit, hundred percent, but with do not

22    do blanket, alright.  All that can be done, we are doing, [U/I]

23    shorting, [U/I], and all."

24    BY MR. PRATT:

25    Q.  And what is this shorting that they are discussing?

1  A.  As Bob describes in the call, shorting a certain amount of

2  pills per bottle, over time it will accumulate and have enough

3  pills to fill another bottle that can be sold and billed to the

4  insurance companies.  Over time, it can create a large amount

5  of profit.

6  Q.  Okay.  Let's turn to Government Exhibit 1E.  And can you

7  identify this call?

8  A.  This is January 11, 2011.  The speakers are Babubhai Patel

9  and Jay last name unknown.

10  Q.  Okay.  And if you could reminded us, January 11th of 2011,

11  where does that stand in the time period of the wiretap

12  intercept?

13  A.  The wire started on the 10th of January 2011.  So, it's the

14  next day.

15  Q.  Okay.

16       MR. PRATT:  Let's turn to page two, the very top of

17  the page.

18       And, Mr. Fitzpatrick, if you could read starting at

19  the top section for us.

20       MR. FITZPATRICK:  "Jay:  Tell me, what is it?

21       "Bob:  In this, the pharmacy at Saginaw, I just want

22  to say this on the outside, that I am making Jay a partner in

23  it and Jay is coming in.

24       "Jay:  Hmm, hmm.

25       "Bob:  At Saginaw.

1              "Jay:  Hmm, hmm.

2              "Bob:  And I know that Vinod, et cetera, if Jay has

3    come, they will go away."

4    BY MR. PRATT:

5    Q.  All right.  What are they talking about in terms of who is

6    operating the pharmacies in Saginaw?

7    A.  Could you say that again?

8    Q.  Yes.

9              What's the proposal here as far as operation of the

10   Saginaw pharmacies?

11   A.  It's Bob's pharmacy, and he's going to bring Jay in as a

12   partner.

13   Q.  And who is going to be pushed out?

14   A.  Vinod.

15              MR. PRATT:  Let's turn to page six.

16              I'm sorry.  Let's -- yeah, turn to page six, the

17   fourth line down, "Jay:  Hmm."

18              MR. FITZPATRICK:  "Jay:  Hmm.  So is there a share of

19   Vinod in Saginaw?

20              "Bob:  No.  What I told him?

21              "Jay:  Hmm.

22              "Bob:  That you run all these, that's it.

23              "Jay:  Hmm, hmm.  Manage it.

24              "Bob:  He said, I do not want to do it.

25              "Jay:  Hmm, hmm.  I want to do my own.  Is that so?"

1              MR. PRATT:  Wait until Ms. Drinkard ...

2         Okay.  Please continue.

3              MR. FITZPATRICK:  "Bob:  Hmm.

4         "Jay:  Hmm, hmm.

5         "Bob:  First you try and run this, and you run it

6    like this, so that we do not get exposed.

7              "Jay:  Hmm, hmm.  Airtight.  But in it, has anyone

8    offered patients to him?

9         "Bob:  Huh?

10        "Jay:  Had you offered him to run?

11        "Bob:  I will give you a share, that's it.

12        "Jay:  That would have worked well.  He is an idiot."

13             MR. PRATT:  Please continue on page seven.

14             MR. FITZPATRICK:  "Bob:  Not to run, but to give a

15   share itself.

16        "Jay:  Right.  So what else would he want?

17        "Bob:  But he is trying to be over smart.

18        "Jay:  Yeah, yeah.  Shall I tell you one thing,

19   Babubhai?  Being over smart and all that, and feeling superior

20   because people say he is superior, but then a person who feels

21   he is superior, you know, he suffers one time because of that

22   and he regrets it, and that's when he comes to know, that this

23   is what happens.  Who is his ... who is his pharmacist?

24        "Bob:  Lalit."

25

1    BY MR. PRATT:

2    Q.   Okay.  And who is Lalit?

3    A.   One of Bob's pharmacists.

4    Q.   Okay.  And just so we can put this in the context of the

5    time frame, how does this call relate to the time frame of

6    Beecher Pharmacy opening?

7    A.   Well, I can't recall the exact date, but I believe it was a

8    couple months prior to opening.

9            MR. PRATT:  All right.  Let's go forward to page 17,

10   the very top of the page.

11           MR. FITZPATRICK:  "Jay:  Hmm.

12           "Jay:  So, to Rameshbhai, in a year how much does he

13   make from home health care?

14           "Bob:  He gets about 60,000 as salary and another

15   about 60,000.

16           "Jay:  So he does get hundred and twenty, right?

17           "Bob:  Yes.  So if he gets hundred thousand, then

18   it's not bad.

19           "Jay:  So his house can be managed.  He needs 10,000

20   to run his home."

21   BY MR. PRATT:

22   Q.   Okay.  Who are they talking about here?

23   A.   Ramesh Patel.

24   Q.   And what's the distinction between salary and the other

25   60,000, if you know?

```
 1    A.  I believe that would be from the fraud or the kickbacks,

 2    his take on the backside of it.

 3            THE COURT:  Move the microphone a little bit closer,

 4    please.

 5    A.  Oh.  Sorry.  Sorry.

 6            MR. PRATT:  All right.  Let's move forward to page

 7    19, if you could start at the top of the page.

 8            MR. FITZPATRICK:  "Bob:  Rameshbhai, I tell you,

 9    Rameshbhai is sitting.  Rameshbhai is peaceful.  He say I am

10    happy.

11            "Jay:  Open one for me like that.

12            "Bob:  Home care?

13            "Jay:  Yes, if I get a lakh, it's more than enough.

14            "Bob:  Really?

15            "Jay:  Yes.

16            "Bob:  Don't want to do [U/I]?

17            "Jay:  If want to, then we'll do something else, but

18    for now at least the vehicle will move, you know.

19            "Bob:  There is a person in [U/I] marketing will have

20    to be done.

21            "Jay:  Hmm, marketing, not the type to fall behind

22    the marketing.  Yes, but then, if you can get a lakh, two lakh,

23    then you can look around peacefully, then there isn't any [U/I]

24    right, [U/I] has to be done any ways, you know.

25            "Bob:  (Laughs).
```

```
 1              "Jay:  (Laughs).
 2              "Bob:  I ... that is in it ... if you don't do
 3      marketing, Jay, then it's difficult.
 4              "Jay:  I know that."
 5      BY MR. PRATT:
 6      Q.  Okay.  The discussion of marketing, did you -- what's the
 7      difference between the two types of operation of home health,
 8      the marketing and the nonmarketing?
 9      A.  Home health marketing is collecting the patients and
10      bringing them to doctors and getting them in the system.
11      Q.  Okay.  All right.
12              MR. PRATT:  Let's move forward to page 20, the middle
13      of the page with "Jay:  So then marketing ..."
14              MR. FITZPATRICK:  "Jay:  So then marketing, don't
15      they do the marketing?
16              "Bob:  No, they do it, that is, it's tough, home care
17      is very tough, very tough.
18              "Jay:  Mich ... it's a little more tough in Michigan.
19              "Bob:  No, no, home care is very tough.
20              "Jay:  Hmm.
21              "Bob:  Because whichever doctors have got attached
22      previously now.
23              "Jay:  Hmm, hmm.
24              "Bob:  Those fellows just won't let go."
25      Q.  All right.  What's the discussion here about marketing and
```

US v Vinod Patel #11-CR-20468-36

1  doctors being attached?

2  A.   Doctors being attached are doctors that were recruited into

3  the organization, and marketers are those that are going to

4  bring the patients to the doctors, it's all one.

5           MR. PRATT:  All right.  If you could start at the top

6  of page 21.

7           MR. FITZPATRICK:  "Bob:  They never ... do not let go

8  of the old ones, those people, it's very tough, very tough.

9           "Jay:  Right.

10          "Bob:  You have to take the marketers patients.

11          "Jay:  Hmm."

12 BY MR. PRATT:

13 Q.   Okay.  And, again, the marketers refers to who in the

14 organization?

15 A.   Individuals that go around and collect patient to be

16 brought into the organization.

17          MR. PRATT:  Okay.  Let's turn to page 26.  If you

18 could start at the very bottom of the page with "Bob:  Huh."

19          MR. FITZPATRICK:  "Bob:  Huh.  Which town in Indiana?

20 If there are blacks, then only it is fun.  There has to be few

21 blacks."

22          MR. PRATT:  And please turn to the top of the next

23 page.

24          MR. FITZPATRICK:  "Jay:  (Laugh).

25          "Bob:  Whites, there being just whites alone is no

1  fun."

2          MR. PRATT:  Would you go down to the bottom of the

3  page, four sections from the bottom, Jay:  There was Gary ..."

4          MR. FITZPATRICK:  "Jay:  There was Gary, Indiana, in

5  it there were two big clinics in the blacks area.  Earlier when

6  I had passed by, then I had seen it.  [U/I] remember I had told

7  you that I had taken local road to return from Chicago.

8          "Bob:  Huh.

9          "Jay:  From Chicago I had taken local highway to

10 return.

11         "Bob:  Huh."

12         MR. PRATT:  Please continue on page 28.

13         MR. FITZPATRICK:  "Jay:  I returned passing through

14 many, many villages.

15         "Bob:  Huh.

16         "Jay:  All those were towns of blacks.

17         "Bob:  When we put in a new one and if there are

18 blacks, then business can be built up immediately.

19         "Jay:  That is true.

20         "Bob:  In the whites there are difficulties."

21         MR. PRATT:  Could you turn forward then to page 30

22 starting the fourth section from the top of the page with "Jay:

23 Friend" -- "Jay:  If...," rather.

24         MR. FITZPATRICK:  "Jay:  If with a black, then you

25 would have enjoyed it, then there would not have been any other

1    headaches.  That is true.

2             "Bob:  It is not that.  Business can be easily

3    turned.

4             "Jay:  Hmm.

5             "Bob:  It can be easily turned around.  If you want

6    to pull?

7             "Jay:  Hmm, hmm.

8             "Bob:  If you tell the blacks, take these twenty

9    dollar coupons, coupons of McDonald.

10            "Jay:  Hmm, hmm.

11            "Bob:  They would come easily.

12            "Jay:  But if you are getting all patients, and the

13   doctor sitting here hands over to you?  If he is handing over

14   all the patients, then what difference does it make whether

15   they are blacks or whites?"

16   BY MR. PRATT:

17   Q.  Would you tell us what the reference to the doctors handing

18   over patients refers to?

19   A.  The doctors are turning over their patient load or the

20   patients that they have from their own practice.

21   Q.  Turning them over to who?

22   A.  To Bob and his organization.

23   Q.  All right.  Let's move to Government Exhibit 2F.

24            Would you identify this call?

25   A.  July 14, 2011.

1    Q.  Who are the participants?

2    A.  Vinod Patel and Babubhai Patel.

3            MR. PRATT:  All right.  Would you please read this

4    call in its entirety.

5            MR. FITZPATRICK:  "Vinod:  Yes.

6            "Bob:  For now don't say anything to Atulya.  First

7    let me properly structure out everything, then we will talk.

8    Until then I will find out everything, prepare the platform.

9            "Vinod:  No, I will not tell, those two are fighting,

10   Marie and both ..., because everyone is making phone calls to

11   Marie, those idiots, that they are coming to my home, coming to

12   my home.  So, Marie has come to know about it.  So, Marie,

13   Marie was upset yesterday:  Why are you doing so much drama.

14   So he says, I didn't do it and he didn't do it and that guy

15   didn't do it.  And I ... I am not meddling in this, so those

16   two are fighting."

17           MR. PRATT:  If you could stop for a moment.

18   BY MR. PRATT:

19   Q.  There's reference to Atulya in the first paragraph.

20           Who is that?

21   A.  Atul Patel.

22   Q.  And Marie in the second paragraph?

23   A.  Marie Lewis.

24           MR. PRATT:  Please continue.

25           MR. FITZPATRICK:  "Bob:  Completely out ..., so it

1    will take about two months for me to structure out.

2            "Vinod:  Those ... those two are fighting, so

3    yesterday, I don't know, yesterday he had said, that black guy,

4    that we don't want anyone, don't want that [U/I] and don't want

5    him and [U/I] to phone [U/I].  [U/I] then told James, phone and

6    tell him that as of today don't come here anymore.  When he was

7    told that, he blabbered everything, Edward.

8            "Bob:  Was it Edward?

9            "Vinod:  Yes.

10           "Bob:  So, no, no, Edward.  Edward will come.

11   There's in question about him.  I will bring in Edward.  I will

12   bring Edward."

13   BY MR. PRATT:

14   Q.  And who is Edward?

15   A.  Sanyani Edwards.

16           MR. PRATT:  All right.  Please continue.

17           MR. FITZPATRICK:  "Vinod:  So, he blabbered.  He said

18   that, at home, he set it up at home, and he said, whatever he

19   is to give I will give and this and that.  So went ahead and

20   said that in the heat of the moment, but later on he must have

21   tried to do it, but it did not happen.

22           "Bob:  Okay.  I will bring in Edward, Edward.

23           "Vinod:  So, Edward knows everything.  I will not say

24   anything.

25           "Bob:  I will call Edward, okay."

1          MR. PRATT:  All right.  Let's move forward to

2     Government Exhibit 3B.

3     BY MR. PRATT:

4     Q.  Can you identify this call?

5     A.  July 14, 2011.  The participants are Marie Lewis and Bob

6     Patel.

7     Q.  All right.  So, this is the same day as the call we just

8     heard?

9     A.  Correct.

10          MR. PRATT:  All right.  And this one is an English

11     call.

12          May we have the volume up on this one?

13          *(Off the record.)*

14          MR. PRATT:  All right.  Please play the call.

15          *(Government Exhibit 3B,  audio phone call, played in*

16          *open court, as follows:)*

17          "Marie:  Hello.

18          "Bob:  Yeah Marie.

19          "Marie:  Hello.

20          "Bob:  Marie?

21          "Marie:  Ughh, huh.

22          "Bob:  Go ahead Bob.

23          "Marie:  Bob, Bob?

24          "Bob:  Yeah, yeah.

25          "Marie:  Ughh, huh.

1          "Bob:  Ugg, you said you give me number, what number?

2          "Marie:  Ohhh, you, ohh, ok.  I thought Victor gave

3     it to you.  (Laughs.)  Alright.  Hold on, hold on, ugh.  313-"

4     BY MR. PRATT:

5     Q.  Who is Victor?

6     A.  Vinod.

7          MR. PRATT:  All right.  Please continue.

8          *(Government Exhibit 3B,  audio phone call, played in*

9          *open court, as follows:)*

10         "Bob:  Mm-hmm.

11         "Marie:  733.

12         "Bob:  Yeah I know, he's a crook.

13         "Marie:  You know who he is?

14         "Bob:  He's a crook.

15         "Marie:  So you know him already?

16         "Bob:  Yeah [U/I].

17         "Marie:  Huh.

18         "Bob:  I'll tell you number don't tell [U/I] is that

19     ok?

20         "Marie:  Ok.

21         "Bob:  313-733-7390.

22         "Marie:  Yeah.

23         "Bob:  7390?

24         "Marie:  Yeah.

25         "Bob:  Ok.

1              "Marie:  Don't do it?

2              "Bob:  No, no, no, no.

3              "Marie:  Ohh, ok, alright.

4              "Bob:  No,no, no, no.

5              "Marie:  Ok.

6              "Bob:  He's a, he's a, he's a crook.

7              "Marie:  Is he?

8              "Bob:  Yeah, he's a crook.

9              "Marie:  Ohh, alright.

10             "Bob:  Ugh, he took it my $30,000, crook.  He's a

11    crook.

12             "Marie:  Really" --

13             MR. PRATT:  Stop.

14    BY MR. PRATT:

15    Q.  What's Bob discussing with Marie, what process?

16    A.  He provided the doctor a kickback of 30 grand, and that

17    person took it and did not provide him with the prescriptions

18    needed, and he's calling him a crook.

19             MR. PRATT:  Okay.  Please continue.

20             *(Government Exhibit 3B,  audio phone call, played in*

21             *open court, as follows:)*

22             "Marie:  Really, cus he was sure tellin' me, ohh, Bob

23    is a hard worker, and I said, yes, he is.

24             "Bob:  He's a talk you know.

25             "Marie:  Ohh, alright well.

1                "Bob:  No, no, just say no.

2                "Marie:  I'll call and tell her cus he wanted 3 other

3       doctors to go want me to meet 3 other doctors so I'll just call

4       and tell him that I know you met the, ughh, ughh, my manager in

5       Flint and the thousand dollars.

6                "Bob:  Don't mention my name.  Just tell him you

7       know, yeah, yeah, yeah, yeah."

8                MR. PRATT:  Stop there.

9       BY MR. PRATT:

10      Q.  Why is Marie talking about meeting doctors?

11      A.  Marie recruits doctors for Bob.

12               MR. PRATT:  Please continue.

13               *(Government Exhibit 3B,  audio phone call, played in*

14               *open court, as follows:)*

15               "Marie:  Ok, alright, I'll just tell him that we.

16               "Bob:  He doesn't have patient you know that.

17               "Marie:  Huh.

18               "Bob:  He don't have patient in Flint you know.

19               "Marie:  No, he don't have patient in Flint nope he

20      sure don't [U/I] ... um, what our patient is you know load and

21      stuff and I'm like, well, nah, you can't use our patients now.

22               "Bob:  No, no, we don't want him no way, Ughh, uhh."

23               MR. PRATT:  You can stop.

24      BY MR. PRATT:

25      Q.  The reference to Marie saying you can't use our patients

1   now, who is "our patients"?

2   A.   The patients that she controls and the ones that have been

3   brought into the organization.

4            MR. PRATT:   Okay.   Please continue.

5            *(Government Exhibit 3B,  audio phone call, played in*

6            *open court, as follows:)*

7            "Marie:   Okay.

8            "Bob:   We want be the you know the wellness and

9   Hartman those we won't you know, we won't back to where the

10  practice is.

11           "Marie:   Ughh, doctor, you heard of a Doctor Veronica

12  Williams.

13           "Bob:   Ugg uhhh.

14           "Marie:   Huh.

15           "Bob:   She's from Flint?

16           "Marie:   Yeah, she's from Flint.

17           "Bob:   Ughh, she's got a good practice.

18           "Marie:   Mmm, hmm, mm, hmm, she's, umm, off of Beach

19  and Rose.   So, maybe I'll give her a call.   Someone told me

20  about her, so let me call her first and then go and see what I

21  think, and then we'll go from there.

22           "Bob:   Yeah, yeah.   This month we gonna find right

23  you know.

24           "Marie:   Yep, yep.

25           "Bob:   That will work, okay thank you Marie.

1              "Marie:  Okay.  Alright.  Buh-bye."

2              MR. PRATT:  Could you move to Government Exhibit 3C.

3              *(Off the record.)*

4              MR. PRATT:  All right.  3C, please.

5    BY MR. PRATT:

6    Q.  Can you identify the call?

7    A.  May 20, 2011.  The speakers are Marie Lewis and Babubhai

8    Patel.

9              MR. PRATT:  Will you please play the call.

10             *(Government Exhibit 3C,  audio phone call, played in*

11             *open court, as follows:)*

12             "Marie:  Hey, Bob.

13             "Bob:  Marie.

14             "Marie:  Uh-huh.

15             "Bob:  Victor call me. You need some HIV doctor

16   there?

17             "Marie:  Who, who there.

18             "Bob:  You need some HIV doctor.

19             "Marie:  Another doctor.

20             "Bob:  No, no HIV you know the ...

21             "Marie:  Oh, HIV?  Um, yeah, Victor mentioned that to

22   me, um, to look for.  I know one so I was gonna go to Hurley's

23   and talk with him and see you know.

24             "Bob:  So, doctor is right now at Hurley?

25             "Marie:  Uh-huh.  Yeah, yep. Uh, Doctor McCree.

1          "Bob:  So he want to start his own practice or you

2    wanna work with Hurley?

3          "Marie:  Uh, no, he wanna do his own practice you

4    know.

5          "Bob:  So does he wanna come there? (U/I).

6          "Marie:  Yes.

7          "Bob:  You know, no rent.

8          "Marie:  Right.  That's what I told him no rent.

9          "Bob:  Yep.

10         "Marie:  So I'm a, I'm a talk with him, um, maybe

11   I'll call him tomorrow.  I'll give him a call tomorrow.

12         "Bob:  Yep. No rent."

13         MR. PRATT:  If you can stop that.

14   BY MR. PRATT:

15   Q.  What is the reference to offering no rent to the doctor in

16   this call?

17   A.  What Bob would do is he would offer doctors to join, no

18   rent, for use of the facility, the building in the form of a

19   kickback.

20         MR. PRATT:  All right.  Would you please continue.

21         *(Government Exhibit 3C,  audio phone call, played in*

22         *open court, as follows:)*

23         "Marie:  So I'm a, I'm a talk with him, um, maybe

24   I'll call him tomorrow.  I'll give him a call tomorrow.

25         "Bob:  Yep.  No rent."

1              "Marie:  Yeah, no rent?  Yep.

2              "Bob:  And also did you get a chance for Hartsman?

3    No, right?

4              "Marie:  No, uh-uh.

5              "Bob:  Then Monday I'll have to come there.  I, you

6    and me, we have to go.

7              "Marie:  Ok, alright.

8              "Bob:  Monday I have to.

9              "Marie:  Okay.

10             "Bob:  I know you are so busy I know that.

11             "Marie:  (U/I) I know cause Doctor Tran wanted me to

12   go to the clinic today.

13             "Bob:  Yeah.  So, Monday probably I'll have to catch

14   you.

15             "Marie:  Okay. Alright yeah, mon, mon (U/I).

16             "Bob:  I'll get you some bonus too. I'll come Monday.

17             "Marie:  Okay.

18             "Bob:  Alright?

19             "Marie:  Alright. Alright, bye. "

20   BY MR. PRATT:

21   Q.  And there's some reference to Bob getting Marie some bonus.

22             What does that refer to?

23   A.  Bonus to Marie, a kickback.

24   Q.  3D, can you please turn to that call and identify the call.

25   A.  June 12th, 2011.  And the speakers are Marie Lewis and

1    Babubhai Patel.

2            MR. PRATT:  Would you please play the call.

3            *(Government Exhibit 3D,  audio phone call, played in*

4            *open court, as follows:)*

5            "Marie:  Hello.

6            "Bob:  Marie, do you think Tran going to help to get

7    the Hartman if Tran gonna come on board ... or not."

8            MR. PRATT:  Could you stop.

9    BY MR. PRATT:

10   Q.  What's the reference to Tran helping out what here?

11   A.  A podiatrist, Dr. Anmy Tran, she also helped recruit

12   doctors into the organization.

13           MR. PRATT:  Okay.  Please continue.

14           *(Government Exhibit 3D, audio tape, played in open*

15           *court as follows:)*

16           "Marie:  Heartsman?

17           "Bob:  Doctor Heartman [ph].

18           "Marie:  Yeah I think he would have come on board but

19   it's so hard for me to get with him cause he be so busy.  Yeah,

20   but I'm just gonna have to go and just sit there and you know

21   and after he gets with his patients, cause his patient loads

22   is.  Every time I go over there it's like about twenty-five,

23   thirty patients waiting.

24           "Bob: [Stutters] That's a priority, that's the reason

25   priority ...

1           "Marie:  Uh, huh ...

2           "Bob:  Because, I don't wanna be, you know the other

3      guy is going to shoot it up before I you know.

4           "Marie:  Right, but I'll go over there and just tell

5      Tran to just open up the clinic and then I'll just be over

6      there first thing in the morning maybe I can catch him.

7           "Bob:  But you have the good relation do you?

8           "Marie:  Hah?

9           "Bob:  You have the good relation with the Doctor

10     Hardman?

11          "Marie:  Yeah.

12          "Bob:  Just offer no rent you now, I just pay hundred

13     dollars (100) and also I'll take care of the other part too,

14     you know."

15          MR. PRATT:  If you can stop that.

16     BY MR. PRATT:

17     Q.  What is the offer to this doctor to come into the

18     organization?

19     A.  The offer to the doctor is he doesn't have to pay any rent.

20     Q.  And also what else?

21     A.  To just pay a hundred dollars and also take care of the

22     other part too, the kickbacks and the patients.

23          MR. PRATT:  Okay.  Let's move on to the next call,

24     3E.

25

1   BY MR. PRATT:

2   Q.  Would you identify 3E?

3   A.  June 21, 2011.  The speakers are Marie Lewis and Babubhai

4   Patel.

5           MR. PRATT:  Please play the call.

6           *(Government Exhibit 3E, audio tape, played in open*

7           *court as follows:)*

8           "Marie:  Hello?

9           "Bob:  Marie.

10          "Marie:  Hey Bob.

11          "Bob:  Are you okay?

12          "Marie:  Ya, how you doing?

13          "Bob:  Okay. Ah the reason I call, Doctor Delecruz.

14  Did you discuss with Doctor Delecruz?

15          "Marie:  Doctor Delecruz?

16          "Bob:  Um huh.

17          "Marie:  Yep, I talked with her.  Ya, she's coming,

18  here.  Ya, she's coming here on Thursday and I'm gonna meet

19  with her Thursday.

20          "Bob:  Okay, but this Thursday I am not here, so do

21  you think following week we gonna discuss?

22          "Marie:  Ya, ya.

23          "Bob:  Huh?

24          "Marie:  Uh huh.  Yep, I'm [U/I] you know, never know

25  cause, Victor told me he was going to be gone, so I'm just

1    gonna let her know that, you know, that she can come and start

2    you know.  And then when you come back you can talk with her.

3             "Bob:  So probably we, next week we gonna discuss, ah

4    so, Doctor Hartman we see tomorrow, or no?

5             "Marie:  Yep, I'm going to see him tomorrow, yep.

6             "Bob:  Okay, so when we set my meeting with him, next

7    week?

8             "Marie:  Uh huh. Yep.

9             "Bob:  Cause Thursday and Friday I am not in town,

10   and so.

11            "Marie:  Right, cause Lisa called me too.  And wanted

12   to know.

13            "[VOICES OVERLAP.]

14            Bob: That's right.  We gonna, we gonna wrap it up

15   probably, what I want to do, early morning because 11:00 I have

16   a meeting, so.

17            "Marie:  Oh.

18            "Bob:  I'll be coming, ah Mussa [PH] work all day

19   tomorrow, right?

20            "Marie:  Let's see tomorrow's Wednesday, ah.  Nope I

21   think they work a half a day on Wednesday.

22            "Bob:  Oh, he work half a day only?

23            "Marie:  Uh, huh.

24            "Bob:  Everyday?

25            "Marie:  No just on Wednesday.  But a Martha.

1              "Bob:   Huh?

2              "Marie:   Just on Wednesday, but Martha, she'll be

3     there.

4              "Bob:   Okay.   But lease, did they make a lease or

5     not?"

6              MR. PRATT:   Okay, stop.

7     BY MR. PRATT:

8     Q.   What's the purpose of bringing up a discussion of a lease

9     with the doctor?

10    A.   Okay.   "But lease, did they make a lease or not?"

11              To join in an agreement for the kickback on the lease

12    is like an agreement to join the organization.

13    Q.   Okay.   So, you talked in these calls about a number of

14    payments to the doctors.

15              Are the doctors the only persons in an organization

16    that it's possible to get a kickback?

17    A.   No.

18    Q.   What are the other participants that can get kickbacks?

19    A.   Marie, the marketers.

20    Q.   Like a bonus payment?

21    A.   Yeah, bonus payment.

22    Q.   And what about patients?

23    A.   Patients can also receive kickbacks, yes.

24    Q.   In what forms?

25    A.   Cash or they can -- their pills, the controlled substances.

1    Q.   Okay.  I want to ask you a few questions about the report

2    writing process.

3              Can you explain what the report writing process is in

4    criminal investigations working for DEA?

5    A.   During an interview or an event, whatever you, you take

6    notes of what happened, and at a later time you write the

7    report for your recollection or whoever else is involved in it,

8    for their recollection.

9    Q.   Okay.  So, the report is in what form when it's finished?

10   Is it handwritten or typewritten or what?

11   A.   Word document, it's typed.

12   Q.   Okay.  Is it a verbatim transcription of everything that

13   was said or done?

14   A.   No.

15   Q.   Who ends up getting the report?

16              If say a witness like Hiren Patel sits down and talks

17   with you for a couple hours or if you go out and do an

18   undercover operation like you testified before at the pharmacy,

19   who ends up getting that collection of reports?

20   A.   Once the investigation is completed to that point,

21   everybody -- the prosecution gets them, the defense team gets

22   them, witnesses, Defendants, for discovery purposes.

23   Q.   Okay.  Is it unusual then, based on this process, to have

24   more than one report for one witness?

25   A.   At one time or throughout the time?

1    Q.   Throughout the whole period of time.

2    A.   Yes.

3    Q.   Is it usual or unusual?

4    A.   It's usual to have multiple reports over time.

5    Q.   Why is that?

6    A.   Depending on where you are at in the investigation, you

7    have your initial report.  And then over time, you go back and

8    you ask more questions and you can go into specific things,

9    back out and put other things and learn more information,

10   depending on where you are in the investigation and what you

11   are looking for.

12   Q.   To you, as an investigator, is there any significance to

13   the fact that a witness talks -- that you ask him questions

14   about some Defendants in a first interview and then different

15   Defendants in a fourth interview, does that have any

16   significance to you as an investigator?

17   A.   No.

18   Q.   I want to ask you particularly about a little bit of the

19   time frame.

20            Did the witnesses that have testified in this case,

21   the cooperating witnesses, did they come in at the same time or

22   at different times?

23   A.   For the interviews?

24   Q.   Yes.  And by that I mean --

25   A.   No.

1   Q.   -- the timeline of the investigation.

2   A.   No.   Different times.

3   Q.   Who was one of the first Defendants in to cooperate?

4   A.   Ramesh was one of the first ones.   He did a post-arrest

5   interview.

6   Q.   How about Hiren Patel?

7   A.   Yes.

8   Q.   Are you familiar with something -- in the process of

9   someone deciding to cooperate and become a witness, are you

10   familiar with something called a Kastigar letter?

11   A.   Correct.

12   Q.   What's a Kastigar letter?

13   A.   It's an agreement between the Government and the Defense

14   team or that Defendant's attorney, of being honest and truthful

15   of what they're going to say during an interview.

16   Q.   All right.   And we have -- I'm going to show you what's

17   admitted already as Defense Exhibit No. 5, a letter signed by

18   Assistant U.S. Attorney John Neal.

19           Are you familiar with this type of letter?

20   A.   Yes.

21   Q.   Is this a unique letter or is this what we call a form

22   letter?

23   A.   A form letter.

24   Q.   All right.   Just so we can get the timing of this, when

25   does the potential witness get this letter?   Do they get this

1   letter after they've signed their Rule 11 and pled guilty or do

2   they get it at an earlier stage?

3   A.  Before.

4   Q.  Okay.  What -- when is this letter signed?

5   A.  This particular one I'm holding?

6   Q.  Yes.

7   A.  It's dated October 25th, 2012.  That's when it was dated.

8   Q.  Okay.  And as opposed to the date, what is the relationship

9   between the -- do you interview the person three or four times

10  and then you sign the Kastigar letter or do you sign the

11  Kastigar letter first?

12  A.  Prior, first.

13  Q.  Why is that?

14  A.  So that they understand what the Kastigar is about and they

15  have an understanding.

16  Q.  Okay.  And you said that's an obligation to tell the truth.

17          Does the Defendant get some protection in that

18  letter?

19  A.  Yes.

20  Q.  What protection do they get?

21  A.  If they tell the truth, what they're saying cannot be used

22  against them.

23  Q.  Okay.  Do you ever have the experience that someone sits

24  down, signs a Kastigar letter and gives you a bunch of

25  information, and then it never progresses further, they never

1    in fact sign a Plea Agreement and cooperate with the

2    Government?  Does that ever happen?

3    A.  Are you asking me if someone signed a <u>Kastigar</u> letter and

4    has not cooperated?

5    Q.  No.  Signed a <u>Kastigar</u> letter, but then not signed a Rule

6    11, not pleaded guilty, not signed a Cooperation Agreement.

7    A.  Yes, it has happened.

8    Q.  Okay.  Is that unusual or anything out of the ordinary with

9    that?

10   A.  It happens.  It's not unusual.

11   Q.  Okay.  So, if they elect later that they are not going to

12   plead guilty and they want to go to trial, what protection does

13   this letter give them?

14   A.  The protection is if they were honest and they told the

15   truth during that interview, then it can't be used against

16   them.

17   Q.  You can't use it against them?

18   A.  Right.

19        THE COURT:  Slide the microphone a little bit closer.

20   A.  Sorry.

21   BY MR. PRATT:

22   Q.  I want to ask you some questions about forfeitures.

23        Are you familiar with the Drug Enforcement

24   Administration's process for pursuing forfeitures?

25   A.  I'm familiar with it, but I wouldn't say I'm an expert at

1    it.

2    Q.  All right.  Well, let me ask you this.  As one of the

3    co-case agents, was it one of your goals to maximize asset

4    forfeitures?

5    A.  If we could.

6    Q.  All right.  How much, by the way, if you know -- do you

7    have an estimate of how much from all the Defendants in this

8    case, how much was the overall amount that was initially

9    seized?

10   A.  Four to five million.

11   Q.  Okay.  You think the Government got everything that was

12   stolen?

13   A.  No.

14   Q.  Okay.  Does the Government get to keep every --

15            First of all, does the Government get to seize every

16   asset that the Defendants own?

17   A.  Everything they own?  No.

18   Q.  Why not?

19   A.  It depends on how the asset was -- how the Defendant got

20   the asset.  If it was proceeds from the criminal acts, that's

21   different than if they got it as a gift when they were a young

22   child, how they acquired the asset themselves.

23   Q.  Okay.  So, the Government can only take the assets that

24   were purchased with the proceeds of the crime basically?

25   A.  Correct.

1    Q.   Okay.  So, what happens if you seize an asset and it turns

2    out later that they, for example, were given it as a gift by

3    somebody else?

4    A.   And it's not a proceeds?  We return it.

5    Q.   Okay.  What happens not only in general, but what

6    specifically happened in this case in the asset forfeiture

7    process?  Which part of the U.S. Attorney's office handled

8    that?

9    A.   The Forfeiture Unit.

10   Q.   And who is your contact in the Forfeiture Unit that made

11   those decisions?

12   A.   Julie Beck, prosecutor.

13   Q.   Okay.  Now, once it proceeds forward, does the -- do those

14   cases all go to hearing or were those cases settled?

15   A.   Negotiated or settled.

16   Q.   Okay.  And in the settlements in this case, if you know,

17   did the Government -- was the settlement a hundred percent for

18   the Government?

19   A.   No.

20   Q.   Okay.  I want to ask you if in that settlement process, in

21   determining how much the Government keeps and the Defendant

22   keeps, if you know, was there any linkage of that to those

23   people who entered Cooperation Agreements as opposed to those

24   people who went to trial?

25   A.   Are you asking me is there a difference between who gets to

1    keep what depending on what happens?

2    Q.  Yes.

3    A.  It's equal across the board, everybody gets the same.

4    Q.  For example, Babubhai Patel, did the Government keep a

5    hundred percent of the items that they initially seized from

6    him?

7    A.  No.

8    Q.  Even though went to trial?

9    A.  Correct.

10   Q.  Was there any other Defendant that got significant assets

11   back that comes to mind that went to trial?

12   A.  I guess I wasn't going to trial.  I can't recall.  I wasn't

13   part of that process.  I know assets were returned.

14   Q.  Okay.  To your knowledge, was any witness given more money

15   back because they are willing to testify?

16   A.  No.

17   Q.  Why not?

18   A.  There's no formula for that.  It's everybody is treated

19   equal across the board as far as the assets go, if it's

20   proceeds or not.

21   Q.  Okay.  Now, are you familiar with something called

22   restitution?

23   A.  Yes.

24   Q.  What is restitution?

25   A.  Restitution is part of the -- when you sentenced, if they

1    have to pay restitution back to the government or to the health

2    care providers, if they have to pay things back or return stuff

3    back.

4    Q.   Okay.  And if you know, any difference in restitution

5    amounts, depending on whether people decide to testify or not?

6    A.   I believe it's based on their actions during their criminal

7    acts.  I don't think there's no difference.

8    Q.   All right.  I know you don't have the dates in front of you

9    right there.  But if Hiren Patel came in in October of 2011,

10   would that have meant he was one of the first cooperators?

11   A.   That's an earlier date after the take-down.  So, yes.

12   Q.   And how about if Ramesh Patel didn't come in until 2012,

13   that would mean he would be one of the later ones?

14   A.   Yes.

15   Q.   Or at least middle?

16   A.   Middle, yeah.

17            MR. PRATT:  All right.  Nothing further, Your Honor.

18            THE COURT:  Cross-examination?

19            MR. BLACK:  Thank you, Your Honor.

20                         CROSS-EXAMINATION

21   BY MR. BLACK:

22   Q.   Officer Carmack, how you doing?

23   A.   Okay.  Yourself?

24   Q.   Good.  Thank you.

25            On the topic of the forfeitures that you were just

1    talking about with Mr. Pratt, you said there's a settlement

2    process that happens with Julie Beck, an Assistant U.S.

3    Attorney, in the Forfeiture Unit.  Is that right?

4    A.  All settlements involve negotiations between the Forfeiture

5    Unit and the Defendant's attorneys.  I'm not privy to that,

6    but --

7    Q.  You're not part of that process?

8    A.  Correct.

9    Q.  It's Ms. Beck or one of her colleagues?

10   A.  Correct.

11   Q.  And it's the Defense counsel, right?

12   A.  For the Defendant, yes.

13   Q.  Right.

14          And they go into a room or somewhere at the U.S.

15   Attorney's office and they negotiate what gets forfeited and

16   what doesn't get forfeited.  Is that right?

17   A.  I would assume.  I'm not part of that.  I have no idea what

18   happens in those rooms.  So ...

19   Q.  Okay.  But to your understanding, that goes into the

20   decision whether or not a Defendant takes a deal.  That's part

21   of the process?

22   A.  No.  Those are separate.

23   Q.  Okay.  It happens at the same time, though?

24   A.  I can't answer that process.  I'm not part of that.

25   Q.  Okay.  Well, there's no formula as to what the Government

1    takes and doesn't take, you just said, right?

2    A.  Are you saying what we seize at the time?

3    Q.  What you seize at the time and then what gets returned,

4    it's not a formula.  It's just what you deem to have come as a

5    proceed from ...

6    A.  There are other factors involved in what makes an asset

7    seizable or not seizable.

8    Q.  And what are some of those factors?

9    A.  Can I give examples to kind of explain the point?

10   Q.  Sure.

11   A.  If a Defendant buys a car or is given a car as a kickback,

12   depending on the value of the car at the time, when it's

13   seized, it's got to be put into storage and it's got to be

14   kept, and the marshals are responsible for that, and they have

15   to pay a fee to store the car.  If the car has high mileage --

16   the car is going to depreciate over time.

17            So, if the government is going to seize an asset and

18   it's going to cost the government money, there's no true

19   proceed for the government to seize that asset.  It's a loss.

20   Q.  Well, let me ask you this.  Who decides whether those

21   proceeds are going to be forfeited?

22   A.  That would be between our Asset Removal Group and the

23   prosecutor's office, the Forfeiture Group.

24   Q.  So, the Forfeiture Group and the Asset -- what did you call

25   it, the Asset Seizure Group?

1    A.   ARG or just Asset Group, the guys who try to identify

2    assets and follow up on it.

3    Q.   So, those guys are from your office or from the DEA?

4    A.   Or the FBI office also helps us with that too.

5    Q.   Okay.  They get together with the prosecutors.  And they

6    decide what was a proceed of a criminal act?

7    A.   I can't -- like I say, I have nothing to do with the

8    negotiations.  I wasn't involved in the financial part of this.

9    So, sorry.

10   Q.   No, that's all right.

11            You talked a little bit about the report writing

12   process with Mr. Pratt.

13            You learned how to write reports in the police

14   academy, right?

15   A.   Yes.

16   Q.   All right.  And they taught you -- when you became a DEA

17   agent, did they also teach you how to write reports?

18   A.   There was a different way to do it than -- yes.

19   Q.   So, you were schooled in how to write reports the DEA way?

20   A.   I wouldn't say schooled.  It was a crash course.

21   Q.   Okay.  Well, in your crash course at the DEA, in

22   conjunction with your work as a police officer, you learned how

23   to write reports?

24   A.   Correct.

25   Q.   And you learned that you write the reports at the time that

1  the statements are given, right?

2  A.  Not at that time, but at a later time.  Try to.

3  Q.  Shortly thereafter, right?

4  A.  Try to.

5  Q.  When the thoughts are fresh in your head?

6  A.  Try to.

7  Q.  Yeah.  When the comments that the witness made are fresh in

8  your mind?

9  A.  Yes.

10  Q.  You do that at the time so that it can be as accurate as

11  possible, right?

12  A.  That's paraphrasing, but yes.

13  Q.  And you do that because you know you may have to testify

14  three, four years later, right?

15  A.  Correct.

16  Q.  And you want to remember what happened at that time, right?

17  A.  To try to refresh my memory, yes.

18  Q.  Right.  Okay.

19       I'm going to ask you about a couple of the reports

20  that you wrote in conjunction with this case.

21       Do you remember on June 20th sitting down with a

22  gentleman named Jeffrey Wade?

23  A.  Oh.  Yes.

24  Q.  Mr. Wade testified here in this trial, right?

25  A.  Correct.

1          MR. BLACK:  Hold on one second.

2    BY MR. BLACK:

3    Q.  And that was June 20th of 2014, right?

4    A.  Correct.

5    Q.  Just a couple weeks ago?

6    A.  Correct.

7    Q.  Okay.  And when you sat down with Mr. Wade, you interviewed

8    him?

9    A.  Correct.

10   Q.  You asked him some questions?

11   A.  (Witness nodding head.)

12   Q.  And you wrote down the answers?

13   A.  Correct.

14   Q.  And then you took the answers and you made a report out of

15   that.  Right?

16   A.  Correct.

17   Q.  Do you remember asking him about First Michigan Home Health

18   Care?

19   A.  Yes.

20   Q.  And do you remember him stating -- do you remember writing

21   in your report, "Wade stated that he did receive home care at

22   his residence for a back condition, but was not sure which

23   company provided the therapy?"

24          Do you remember writing that?

25   A.  If you are reading from my report, yes.

1   Q.  And did you write that in direct response to something that

2   he said?

3   A.  Paraphrasing, yes.

4   Q.  Okay.  Do you remember sitting down with Ramesh Patel on

5   August 3rd, 2011?

6   A.  Yes.

7   Q.  That was right after he was arrested, right?

8   A.  Correct.

9   Q.  Okay.  And when you wrote down -- with him, again, you

10  asked him some questions and he gave you some answers?

11  A.  Correct.

12  Q.  And you wrote a report out of that.  Correct?

13  A.  Correct.

14  Q.  In your report you wrote that, "Ramesh Patel stated he

15  started as the IT person and later became an administration

16  person and controlled the operation."

17          Do you remember that?

18  A.  I've read the report.  I don't remember him saying it to me

19  personally at the time, but it's in the report.

20  Q.  If it's in your report, would that suggest that that's

21  something he said to you?

22  A.  Yes.

23  Q.  Similarly, do you remember from that report you wrote,

24  "When asked, Ramesh Patel stated that Babubhai Patel asked him

25  to place Davenport Pharmacy in his name.  Ramesh Patel agreed

1    to do it and signed all the necessary paperwork."

2              Do you remember writing that in your report?

3    A.  I've read the report, and that's in there.

4    Q.  And would that be in response to something that Ramesh

5    Patel told you?

6    A.  Yes.

7    Q.  All right.  Finally, in that same report, do you remember

8    writing, "Ramesh Patel stated that Babubhai Patel gets large

9    sums of money for opening pharmacies for Paul last name

10   unknown."

11             Do you remember writing that?

12   A.  Yes.

13   Q.  And would that have been in response to something that

14   Ramesh Patel told you?

15   A.  Yes.

16   Q.  Do you remember having a meeting with Hiren Patel on

17   October 17th, 2011?

18   A.  No.  I met with him a couple of times.  I don't remember

19   the exact dates.

20   Q.  Okay.  You remember having a couple of meetings with him

21   though?

22   A.  Yes.

23   Q.  You and Mr. Neal was there?

24   A.  I believe so.

25   Q.  Okay.  Do you remember in one of your meeting you sat down

1    with Mr. Hiren Patel and you played him several phone calls?

2    Do you remember that?

3    A.  Vaguely, yes.

4    Q.  Okay.  And you asked him some questions about those phone

5    calls?

6    A.  I don't know if we played them or we brought transcripts.

7    I'm not sure we played them, but yes.

8    Q.  If I showed you a transcript, might that refresh your

9    memory as to whether or not you showed him that phone call?

10   A.  The report would probably be better, but ...

11   Q.  Okay.

12   A.  Sorry.

13              *(Witness reads the report.)*

14              I do agree we showed him phone calls transcripts.

15   So ...

16   Q.  I'm going to show you what has been marked as Defense

17   Exhibit 13.

18   A.  Yeah.

19   Q.  Do you recognize that?

20   A.  I did not write this, but I was there during the meeting.

21   Q.  And what do you recognize that to be?

22   A.  It's a DEA report.

23   Q.  Of your meeting with Hiren Patel?

24   A.  Yeah, a proffer or an interview of Hiren Patel.

25   Q.  Okay.  If you could flip open to the page that I had open

1    and read No. 23 for me, please, to yourself and let me know

2    when you've read it.

3    A.  Okay.

4            *(Brief pause.)*

5    A.  I've read it.

6    Q.  Okay.  Does that refresh your memory as to whether or not

7    you showed him a phone call?

8    A.  Yes.

9    Q.  I'm showing you -- I'll take that back.

10           I'm showing you what I will mark as Defense Exhibit

11   14.  And take a look at this and tell me whether you recognize

12   it.

13   A.  A transcript, a telephone call.

14   Q.  What is the telephone call number?

15   A.  Session number?

16   Q.  Yes.

17   A.  It's Target Telephone 1, that would be 20252.

18   Q.  Is that the phone the transcript that you showed to Hiren

19   Patel on that day?

20   A.  I believe so.

21   Q.  All right.

22           THE COURT:  Is that a transcript that has already

23   been introduced as a prosecutor's exhibit?

24           MR. BLACK:  It is not, Your Honor.

25           THE COURT:  Okay.

1    BY MR. BLACK:

2    Q.  I'm going to read the call to you.  And tell me if this is

3    the way it was read to Mr. Patel when you showed it to him --

4    A.  I don't believe I read it to him.  I just gave him the call

5    and he read it to himself.  So ...

6              MR. PRATT:  Your Honor, until it's in evidence, I

7    think he can refresh his memory with it.  I'm not sure we need

8    this conversation.

9              THE COURT:  What's your response?

10             MR. BLACK:  I can move to have it entered into

11   evidence.

12             THE COURT:  Do you have any objection?

13             MR. PRATT:  I have no idea which call this is, Your

14   Honor.

15             I think -- may I have a moment with counsel, Your

16   Honor?

17             THE COURT:  Sure.

18             *(Off the record.)*

19   BY MR. BLACK:

20   Q.  Agent Carmack, do you know --

21             THE COURT:  Hang on a second.  Have we decided is

22   there an objection to the exhibit from the prosecutor?

23             MR. PRATT:  I think there's a foundational problem,

24   Your Honor, but, you know, I thought maybe he could get --

25   maybe he would be satisfied by showing it to the witness and

1   asking him questions, but --

2          There is a foundation problem, but I guess I'll waive

3   those, Your Honor, as long as Defense understands the

4   limitations of this exhibit, because this is not one of the

5   transcripts that has been gone over for accuracy and corrected

6   like the ones we have in court.  So --

7          THE COURT:  Well, you can stop.  You've waived your

8   objection.

9          And you may continue.  It's received.

10          Go on.

11          *(Defendant Exhibit 14 was admitted into evidence.)*

12   BY MR. BLACK:

13   Q.  Officer Carmack, is this a true and accurate

14   representation -- or, is it in the same or substantially the

15   same condition as when you showed it to Hiren Patel?

16   A.  I wouldn't -- I can't tell.  I don't remember giving this

17   to him.  I'm not saying it didn't happen.  I just don't recall

18   giving it to him.  It's a transcript.

19   Q.  Would you please read the transcript itself into the record

20   for the jury?

21   A.  The entire call?

22   Q.  Yes, please.

23   A.  All right.  I will start with the voices.

24          "Hiren:  So ... Rana was here.  He had dropped

25   off" --

1    Q.  Before you get into that, I'm sorry.  What is the date of

2    the call and who is on the call?

3    A.  4/16/11, and the speakers are Hiren and Babubhai Patel.

4    Q.  Go's head.

5    A.  I'm going to start with Hiren where the translation starts.

6            "Hiren:  So ... Rana was here ... he had dropped off

7    ... for the new home care he had opened ...

8            "Bob:  What?

9            "Hiren:  The new home care he had opened?

10           "Bob:  Yes.

11           "Hiren:  He had brought some brochures.  We have to

12   make setting for the blacks and the whites.  He will give us 25

13   to 30 patients every month.

14           "Bob:  What is his name?

15           "Hiren:  Rich (PH).

16           "Bob:  Rich (PH)?

17           "Hiren:  Huh ... he is mine, mine ... you don't know

18   him, for my pharmacy ... I had done a lot of business with him

19   in 2009, then I had to stop because of the 15 that had stopped.

20           "Bob:  I was saying something else ... the check for

21   one hundred thousand, that was transferred on someone else name

22   ... how much was to pay for the tax ... were they both husband

23   and wife ... both of them?

24           "Hiren:  Huh ... yeah, they were husband and wife.

25   They were husband and wife, yeah, they were.

1          "Bob:  How much was their tax?

2          "Hiren:  I had to pay twenty-three thousand and four

3    hundred.

4          "Bob:  Ah ... it came ... one minute.  Stay on the

5    line, Hiren.

6          "(Bob puts Hiren on hold.)

7          "Bob:  Yeah, Harry.  And ... and how much was for the

8    state?

9          "Hiren:  The whole total was twenty-three thousand

10   and four hundred.

11         "Bob:  For the state and the other.

12         "Hiren:  Yes, for both.

13         "Bob:  Okay.  So ... I wannah, I wanna find out, you

14   know ... because the other guy is 80,000.  So I'm comparing so

15   I can know.

16         "Hiren:  So ... that's why" -- I don't know how to

17   pronounce this -- "Hasmuklal is the one who set it up.

18         "Bob:  What?

19         "Hiren:  Hasmuklal is the one who set it up in it

20   [U/I], you know.

21         "Bob:  But ... according to Somil, you should have 30

22   percent of tax, it is, it is, it is.

23         "Hiren:  I know.  That's why I gave it to Hasmuklal

24   to do it, because Somil doesn't work it out.  Hasmuk is the

25   only one who can do the work.

1        "Bob:  Somil can do it too.  Is not like that ... but

2   Somil can do it too, in this we have to tell him to do it.

3        "Hiren:  Huh.  You are right.  He used to get the

4   return for one thousand and two hundred, alright.

5   Twenty-three, he was getting one thousand and two hundred

6   dollars in returns.

7        "Bob:  Is that amount arrives, we can add it and

8   then, Hiren, that's your 25,000.

9        "Hiren:  Yes.  Twenty-five is that, and I gave it to

10  him, so ... twenty-five would be the total.

11       "Bob:  Yes.  It's twenty-five, it is twenty-five,

12  that's what come to be.

13       "Hiren:  Yeah.  But Rameshial is more.  Rameshial

14  income is higher, seventy-five was given to Kartik.

15       "Voices overlap.)

16       "Bob:  Rameshial is more.

17       "Hiren:  Yes, Rameshial has to pay 40,000.

18       "(Voices overlap.)

19       "Bob:  It's 35 to 40,000 that he pays.

20       "Hiren:  Yes.  So we saved 10,000.

21       "Bob:  Right, right, yeah ...

22       "Hiren:  I was gonna meet you, but you didn't call

23  back ...

24       "(Casual conversation between Bob and Hiren.)

25       "(Time:  11:22:51.)

1         "Bob:  Hiren, why the two last payment ... we have

2    ordering of one twenty-three.  Why aren't we getting payments?

3    Why?

4         "Hiren:  It has come from the Ecex-L, it says we are

5    getting 62,000, from the report.

6         "Bob:  When is it coming?

7         "Hiren:  Ah ... there are not writing the date in it.

8    But there are disclosing how much it is and sending it in the

9    mail, and the mail had come to me yesterday, and the total is

10   62,000 from Exec-L.

11        "Bob:  Okay.  62,000, it looks like they are holding

12   it for me.

13        "Hiren.  Yeah.  [Stutters.]

14        I received a previous letter stating we have

15   prescription services in all, and they have hold the payment.

16   That's what the letter said that I have with me.

17        "Bob:  Okay, okay, okay.  In this case everywhere is

18   the same.

19        "(Voices overlap.)"

20        "Bob:  Checks from the last few weeks, if you check,

21   because your checks amount would be for 50 to 60,000 that would

22   come in.

23        "Hiren:  I know.  I have checked it all.  I have

24   checks for everything else.  I have no idea.

25        "Bob:  The last two checks, in the last two weeks,

1    have you checked it, all the payments ... insurance companies

2    are thieves.  The checks are five to 7,000, that's nothing.

3              "Hiren:  I know.  Before Medco ... I used to get 19

4    to $20,000 checks.  I know.

5              "Bob:  Now we will see in this week, because

6    Wednesday ... we have a draw on Friday ... and I will have to

7    shift it to next Monday.

8              "Hiren:  Billing, billing I have seen and it is ...

9    one sixty.

10             "Bob:  Huh?  For this cycle?

11             "Hiren:  Is not like the billing is less, you know.

12             "Bob:  Huh, huh.

13             "Hiren:  The billing is still the same for 30,000,

14   you know.  But these people seem to oppress the money or they

15   are doing something ... why not do the pay, pay ... provider

16   pay.

17             "Bob:  Yeah ... well, do the provider pay then, no

18   problem.  But the provider pay will not make much of a

19   difference because the provider pay ... whatever the loss we

20   are doing ...

21             "Hiren:  Huh.

22             "Bob:  If you do the loss, provider pay is easy.  In

23   that five to 7,000 will go annually.  Understood?

24             "Hiren:  The money will go straight to it, and not go

25   through the trouble of the checks.  The checks you have to

1    bring it, deposit it, one, one, two, two checks come, and then

2    you got checks from other four to five places, and then you

3    will have to get it picked up every Thursday.  Then the checks

4    that come in on Friday will go for the next week Friday.

5              "Bob:  From now on we don't have to wait until next

6    Thursday ..."

7              "[Minimized.]

8              "[End of conversation.]"

9    Q.  Thank you, Officer Carmack.

10   A.  It was exciting.

11   Q.  Just to remind the jury, that call took place on April

12   16th, 2011, you said, right?

13   A.  Correct.

14   Q.  And that's approximately two or three weeks before Hiren

15   Patel opened Park Shelton Pharmacy.  Isn't that right?

16   A.  I don't remember the date, but I believe it was around that

17   time.

18   Q.  It was right around that time.

19              And Park Shelton Pharmacy, that's a pharmacy that

20   Hiren, as you'll remember, opened up with Mehul and Pradeep.

21   Correct?

22   A.  Correct.

23   Q.  Okay.  And that is call that you just read, that's one of

24   seven calls that Hiren had with Bob during the month of April

25   2011?

1    A.   I have no idea how many calls he had that month.

2    Q.   Okay.  One of several calls likely between --

3    A.   Yes.

4    Q.   All right.  And in this call they are talking about, well,

5    several things.  Correct?

6    A.   Correct.

7    Q.   First of all, Hiren is asking Bob for advice on how to pay

8    taxes to his employees.  Isn't that right?

9    A.   Correct.

10   Q.   Okay.  And they have a discussion about Bob tells him,

11   well, this is how much Ramesh pays in taxes.  Isn't that right?

12   A.   Ramesh, yes.

13   Q.   Yeah.

14        And he says this is how Ramesh structures his taxes

15   between Ramesh and Ramesh's wife so that they can pay less.

16   Right?

17   A.   Correct.

18   Q.   And he's instructing Hiren on how maybe he can structure

19   tax payments to his employees so that they can pay less taxes

20   to the government.  Right?

21   A.   I believe so.

22   Q.   Okay.  And that's so Hiren can tell his employees at Park

23   Shelton, you know, he can structure their tax returns the same

24   way that Bob structures --

25   A.   I -- I can't answer that.

1  Q.  Okay.  The call between Bob and Hiren, Bob was sort of a

2  mentor to Hiren in opening his new pharmacy.  Isn't that right?

3  A.  He's giving his opinion.

4  Q.  Okay.  Maybe some advice too?

5  A.  It's however you perceive it.

6  Q.  Okay.  And you talked a little bit with Mr. Pratt about

7  Kastigar letters, and he showed you Ramesh Patel's Kastigar

8  letter.  Right?

9  A.  Correct.

10  Q.  And I'm going to show you to that again.  It's Defense

11  Exhibit 5.

12  A.  Thank you.

13  Q.  Now, you said that's a form letter sent from the U.S.

14  Attorney's office to a Defendant.  Right?

15  A.  There could be slight changes.  I did not prepare this, and

16  I don't know the details, but yes.

17  Q.  But, to your knowledge, it's generally the same from

18  Defendant to Defendant?

19  A.  I believe so.

20  Q.  Okay.  And the U.S. Attorney sends it to the Defendant or

21  his attorney or her attorney?

22  A.  I'm not sure how the whole process works out, but I believe

23  there's probably interaction between the both of them.

24  Q.  Okay.  It's your understanding the Defendant reviews that

25  with his attorney?

1    A.   Correct.

2    Q.   And signs the letter, right?

3    A.   Correct.

4    Q.   Usually probably in the presence of their attorney?

5    A.   Correct.

6    Q.   And in the presence of the U.S. Attorney as well?

7    A.   I believe so.

8    Q.   All right.  I'll take that back from you.

9            You said that if the Defendant lies, then the things

10   that they say after -- in their session after the Kastigar

11   letter, that can be used against them in court.  Right?

12   A.   If they are found that the statements are not truthful,

13   yes.

14   Q.   Okay.  Otherwise, the statement that they make can't be

15   used against them?

16   A.   Correct.

17   Q.   And there are various ways that you or the U.S. Attorney's

18   office have to determine whether or not the Defendant is lying?

19   A.   Based on the intent of the Defendant, yes.

20   Q.   Okay.  Maybe you might review the testimony or the proffers

21   of other Defendants?

22   A.   I don't think it's that simple, but yes.

23   Q.   Sometimes you might look at the evidence, and if something

24   that they said in their proffer session is different than what

25   the evidence shows, that would suggest they're lying?

1    A.  Or they don't -- their recollection is not all there.

2    There's different factors, I'm trying to say.

3    Q.  Okay.  So, you would go in and you would investigate maybe

4    what the factors were?

5    A.  We try to verify if we could.

6    Q.  According to the letter, one of the things the Government

7    might do is give a polygraph examination to --

8                THE COURT:  Excuse me.  We've already ruled on this.

9                MR. BLACK:  Thank you, Your Honor.  I'll move on.

10   BY MR. BLACK:

11   Q.  In any matter, if you determine that the Defendant is not

12   telling the truth, then everything that they said in the

13   proffer session can be used against them at trial.  Is that

14   right?

15   A.  I've never had that situation take place, so I don't know

16   what I would do in that situation.  I have no experience in

17   that.

18   Q.  I'm going to go through some of the phone calls that

19   Mr. Pratt took you through.  I just want to discuss a few

20   things in there.

21                MR. BLACK:  Can you put up 1D.  Thank you.

22   A.  You said 1D?

23                MR. BLACK:  1D, yeah.

24   BY MR. BLACK:

25   Q.  As you noted, that's a phone call between Bob Patel and

1    Pinakeen Patel.  Is that right?

2    A.  Correct.

3    Q.  And that was on February 26th, 2011?

4    A.  Correct.

5    Q.  And Pinakeen Patel, that's a pharmacist, right?

6    A.  Correct.

7    Q.  He's a pharmacist in one of Bob Patel's pharmacies?

8    A.  Correct.

9    Q.  Do you know which pharmacy?

10   A.  I do, but it escapes me.  I can't recall which one it is.

11   Q.  Okay.  Was it Rapid Drugs?

12   A.  No.

13   Q.  Tri-City Apothecary?

14   A.  He moved around to different pharmacies, but I can't

15   remember which one he ended up at.

16   Q.  Is he a floater?  Is that what you called the floater?

17   A.  He floated in the beginning, but then he got his permanent

18   position.

19   Q.  All right.  If you'll go to page number three, about

20   halfway down, Bob says, "You got money in Highland Park.  Why

21   did you get, because we did it proper, right?"

22           What is he talking about there when he says Highland

23   Park?

24   A.  Highland Park is one of the pharmacies that he had worked

25   at.

1    Q.   That Pinakeen had worked at?

2    A.   Yes.

3    Q.   And he has money in Highland Park, according to Bob in this

4    call.   Right?

5    A.   Correct.

6    Q.   Okay.   Vinod Patel is not the owner of Highland Park, is

7    he?

8    A.   Who?   Vinod?

9    Q.   Vinod Patel.

10   A.   No.

11   Q.   Okay.   And there they also talk about a man named Danny.

12   Who is Danny?

13   A.   Dinesh Patel.

14   Q.   Who is Dinesh Patel?

15   A.   He was the pharmacist that worked at Caring Pharmacy and

16   later on Detroit.

17   Q.   Okay.   Now, between pages five and six, Mr. Pratt had their

18   young man read portions of the transcript, and he read, quote.

19   Bob --

20         Bob said:   "Pinakeen, in this if you do it

21   systematic, nothing will happen.   If you short two, three

22   pills, then nothing."

23         Pinakeen says:   "All that Babubhai is on, but

24   Babubhai all that will be seen in the long term, all that you

25   cannot see it immediately.

1          Bob says:  "Not that, against the billing you will

2    come to know in one month only, today suppose you fill hundred

3    [100] prescriptions, let me give you a simple example, at

4    Lathia's it's the same as at your place, they are all white,

5    right?  At Lathia's it's the same, there, saves three [3]

6    bottles per week so it becomes three thousand dollars [$3,000],

7    per week."

8          You remember that part?

9    A.  Yes.

10   Q.  And you mentioned how that's the scheme where they short,

11   they take a pill or two out of the bottle, and then dispense

12   the bottle.  Right?

13   A.  Yes.

14   Q.  Okay.  We talked about that a little bit when we first met,

15   you and I?

16   A.  I believe so.  I don't recall it.

17   Q.  All right.

18   A.  Yes.

19   Q.  And when he says, "It was the same at Lathia's as it is at

20   your place," who is Lathia's?

21   A.  Lathia I believe is another pharmacist at a different

22   pharmacy.  I don't remember his last name.

23   Q.  Okay.  Do you remember which pharmacy that was?

24   A.  Lathia?

25   Q.  Yes.

1    A.  No, I'm sorry.

2    Q.  And "it's the same as at your place," is he talking about

3    Highland Park in that part?

4    A.  I don't -- the call is dated February 26th.  I don't know

5    what pharmacy he was at at the time of the call.

6    Q.  Okay.

7    A.  I can't ...

8    Q.  Is it safe to say it wasn't Beecher Pharmacy?

9    A.  I don't think it was Beecher Pharmacy.

10   Q.  Okay.  And then finally at the bottom of page six, it says,

11   "Ask Shyamal."

12            Who is Shyamal?

13   A.  I don't know.

14   Q.  It's not Vinod Patel, is it?

15   A.  No.

16   Q.  Okay.  Let me go to Exhibit 1E next.  That's the lengthy

17   phone call that was read between Bob and Jay LNU.

18            LNU, that's last name unknown, right?

19   A.  Correct.

20   Q.  You never figured out who Jay was?

21   A.  I personally don't know who Jay is.

22   Q.  Okay.  Is it safe to say nobody found out if it's not on

23   the transcript?

24   A.  The transcript was done during the calls.  So, since then,

25   through interviews, I don't know if other people have obtained

1   who he is.

2   Q.   Okay.  Either way, you don't know who Jay is?

3   A.   Correct.

4   Q.   And this call takes place on 1/11/2011, which you said is

5   the second day of the wiretap?

6   A.   Correct.

7   Q.   But a couple of months after the opening of Beecher

8   Pharmacy, right?

9   A.   I don't remember what date Beecher opened.  So, if you say

10   that it is, I'll go with your date.

11   Q.   It's safe to say it's after the date no matter how much --

12   I mean, somewhere near, but after the date that --

13   A.   I don't remember when Beecher opened.

14   Q.   Okay.  Now, Mr. Pratt had read for you on page two right at

15   the top, it says "Tell me what is it.  In this, the pharmacy at

16   Saginaw, I just want to say this on the outside, I'm making Jay

17   a partner in it and Jay is coming in."

18           And Jay says:  "Hmm, hmm."

19           And Bob says:  "At Saginaw."

20           And you said Saginaw, that's one of Bob's pharmacies,

21   right?

22   A.   He had a couple around that area.

23   Q.   Okay.  And Jay agrees.

24           And then Bob says:  "I know Vinod, et cetera, if Jay

25   has come, they will go away."

1            If you said, "they will go away," that means Bob

2    they're pushing Bob out.  Isn't that what you said?

3    A.  I don't believe I said that.

4    Q.  Okay.  No where in the call does it say that -- I'm sorry.

5    Pushing Vinod out?

6    A.  That's what they are discussing.

7    Q.  Okay.  Nowhere in the calls does it say they're pushing

8    Vinod out, does it?

9    A.  (No response.)

10   Q.  That's just the way you read it; isn't that right?

11   A.  Can I have a second to read this?

12   Q.  Sure.

13   A.  They're discussing adding Jay as a partner.

14           Later on down, "We do not have to mention it to

15   Vinod," later down on the same line, on page two.

16   Q.  Yeah.  We do not have to mention it to Vinod, right?

17   A.  Correct.

18   Q.  Vinod is going to have no part in this?

19   A.  That's what they are discussing.

20   Q.  Okay.  Moving on to page three, Bob says to Jay, he says:

21   "So, so, I want to make him realize that, just as Bobby and

22   Jay" --

23   A.  I'm sorry, where are we?

24   Q.  I'm sorry.  Page three.  It's the fourth line down.

25   A.  Okay.

1    Q.  Bob says:  So, so, I want to make him realize that, just as

2    Bobby and Jay.  Vinod says that he is my brother?"

3             Bobby -- that's Jay, the gentleman that Bob Patel is

4    talking to on the phone, Bobby is his brother, isn't that

5    right, is Jay's brother?

6    A.  I don't know.

7    Q.  Okay.  And Jay responds:  "Our community brothers will not

8    improve in a lifetime.  Those handicapped in their brains will

9    never improve in their lifetime."

10            He's talking about Vinod and his little brother Bobby

11   there, isn't he?

12   A.  He's talking about -- I believe he's referencing Vinod, but

13   I'm not sure about Bobby.

14   Q.  Okay.  As you move down a little bit at the bottom of page

15   three, Bob says:  "Then too your brother is your only brother.

16   Others are not."

17            Jay says:  "Others will not be."

18            Bob says:  "All others are" -- expletive -- "ones who

19   only talk."

20            Jay says:  "This is true."

21            Bob says:  "That understanding, so I want to make him

22   understand this."

23            That's Bob saying he wants to make Vinod understand

24   the way he does business.  Isn't that right?

25   A.  I wasn't part of that conversation, so I can't read in

1    Bob's mind what he's trying to say.

2    Q.   Okay.   Is it safe to say you can't read in anybody's mind

3    in any of these conversations what anybody is saying?

4    A.   Some of these conversations can be interpreted by the words

5    and comments in our interviews, but reference to this one, the

6    expletive, I'm not really sure to what that's referencing,

7    but ...

8    Q.   Okay.   On page four right above where they both laugh, Jay

9    says:  "Because of his selfishness, I left everything.  I never

10   bothered to ask, when he had come, that how much is the volume,

11   what is it, what are you doing, how is it going?  Never to ask.

12   So, ultimately he came to meet me. How it is, this is and that.

13   So, I came to know that he had realized."

14          That's a story that Jay is telling Bob about letting

15   his little brother fail so that he will eventually learn Jay's

16   way.  Isn't that right?

17   A.   Let me read it again.

18   Q.   Okay.

19   A.   He's saying I left everything.  He's walking away.  So, I

20   came to -- he's saying that he came back and realized.

21   Q.   He's giving advice to Bob.  He's saying let Vinod go try

22   his own thing, let him fail, and then he'll come back and do

23   things your way.  Isn't that right?

24   A.   I can't answer that far into it, but he's giving an example

25   of what he's done in his -- he's giving Bob an example.

1    Q.   Okay.   On page six on the fourth line down -- I believe

2    this was read already for the jury, but I'm going to read it

3    again.

4               Jay says:   "Hmm.   So, is there a share of Vinod in

5    Saginaw?"

6               Bob says:   "No.   What I told him?

7               Jay agrees.

8               Bob says:   "That you run all these, that's it."

9               Jay says:   "Hmm, hmm, manage it.

10              Bob says:   "He said, I do not want to do it."

11              Vinod says he doesn't want to be a part of Bob's

12   operation in Saginaw.   Isn't that right?

13   A.   Jay is saying "manage it."   And Bob is saying Vinod said I

14   do not want to do it.   I think it continues later on.

15   Q.   Page eight up here in the top, Bob says:   "I do not need

16   Vinod either, let me tell you that, Jay."

17              Jay says:   "That's right."

18              Bob says:   "I can do by myself.   I am doing it

19   anyways."

20              Do you see that part?

21   A.   Yep.

22   Q.   He's not doing it with Vinod's help.   He's doing it on his

23   own.

24   A.   Then there's reference that he's managing on the prior

25   page.

US v Vinod Patel #11-CR-20468-36

1    Q.  I'm sorry?

2    A.  If I'm not mistaken, then Jay referenced that Vinod's

3    managing on the prior page or two pages.

4    Q.  No.  He mentioned that he's doing it on his own.  Bob

5    doesn't want to have any help.  Isn't that what the words say?

6              "He said, I do not want to do it."

7              A couple lines later, Bob says I don't need Vinod to

8    do it anyway.  I can do it by myself.  I am doing it anyway.

9    A.  Okay.

10   Q.  Do you see that part?

11   A.  And then on page eight.

12   Q.  Mm-hmm.

13   A.  Okay.  So, what's your question?

14   Q.  That's Bob saying that he doesn't -- he doesn't work with

15   Vinod anyway, right?  Bob works on his own?

16   A.  That's what these two are discussing, yes.

17   Q.  And then on page 17, Mr. Pratt had read the part where Jay

18   says:  "So, to Rameshbhai in a year how much does he make" --

19   A.  One second.  I'm sorry.

20   Q.  I'm sorry.

21   A.  Go ahead.

22   Q.  Page 17, second line down, Jay says:  "So, to Rameshbhai,

23   in a year how much does he make from the home health care?"

24              Bob says:  "He gets about 60,000 as salary and

25   another about 60,000."

1                  Jay says:  "So he get a hundred twenty, right.

2                  Bob says:  "Yes.  So, if he gets a hundred thousand,

3        then it's not bad."

4                  Right there they are talking about profit sharing.

5        Isn't that right?

6        A.  Yes.

7        Q.  Ramesh has a piece in the company and he shares in the

8        profits of the company?

9        A.  Yes.

10       Q.  Page 19 up at the top, they are talking about First

11       Michigan Home Health Care.  Isn't that right?

12       A.  Let me go back and read just the initial ...

13                  They are talking about opening up a home care.

14       Q.  Okay.  And they reference the home health care that Bob

15       already owns?

16       A.  Where is that at?

17       Q.  Well ...

18                  *(Brief pause.)*

19       Q.  Well, he says -- up at the top at page 19, he says:

20       "Ramesh, I tell you, Ramesh is sitting.  Ramesh is peaceful.

21       He say I am happy."

22                  And Jay says:  "Open for me like that."

23                  And Bob says:  "Home care?"

24                  And he says:  "Yeah, home care."

25       A.  He's referencing a home care that Bob -- Jay wants him to

1    open up a home care like Bob already has.

2    Q.  Similar to the one that Bob has with Ramesh, right?

3    A.  They don't reference which one in that section, but that

4    Bob has a home care.

5    Q.  Okay.  And Bob owned First Michigan Home Health Care with

6    Ramesh, right?

7    A.  And Vinod.

8    Q.  We need Call No. -- Government 2F.

9            That was a call between Vinod and Bob.  Isn't that

10   right?

11   A.  Yes.

12   Q.  And they are talking about a fight that Atulya -- and you

13   said that's Atul Patel?

14   A.  Correct.

15   Q.  The same Atul Patel that testified here?

16   A.  I believe so.

17   Q.  And he's having a fight with Marie, right?  And you said

18   it's Marie Lewis?

19   A.  Correct.

20   Q.  Who Atul Patel identified as a marketer that he worked very

21   closely with in Flint, right?

22   A.  That Marie was a marketer?

23   Q.  That's right.

24   A.  Yes.

25   Q.  Okay.  And Atul was a marketer, right?

1    A.   To some extent, yes.

2    Q.   Okay.  And on page one, the third line down, at the end of

3    that section, Vinod says:  "And I, I'm not meddling in this.

4    Those two are fighting."

5              He's staying out of it, right?

6    A.   He doesn't want to get between -- since he has a

7    relationship with both of them, I believe that to be he doesn't

8    want to get involved in a personal fight.

9    Q.   He doesn't want to have anything to do with their business?

10   A.   No, I don't interpret it that way.

11   Q.   You weren't there?

12   A.   Correct.

13   Q.   All right.  Government Exhibit 3B.  That was a phone call

14   between Bob and Marie Lewis, we were just speaking about.

15   Isn't that right?

16   A.   Yes.

17   Q.   And that's in July of 2011.

18   A.   July 14th of 2011.

19   Q.   Okay.  And on the top of page two, Marie says, "Oh, okay.

20   I thought Victor gave it to you."  And she laughs.  "Alright.

21   Hold on."

22             And you said Victor, that's Vinod Patel, right?

23   A.   Correct.

24   Q.   There's a Defendant in this case named Vikas Sharma; isn't

25   that correct?

1    A.   A Defendant in this case called --

2    Q.   Vikas Sharma.

3    A.   Vikas Sharma, yes.

4    Q.   And he's a pharmacist?

5    A.   Correct.

6    Q.   He's a pharmacist in one of Bob's pharmacies, right?

7    A.   Correct.

8    Q.   They call him Victor, don't they?

9    A.   I can't recall if they do or do not.

10   Q.   You don't know that Victor here is Vinod Patel?

11   A.   I believe that to be Vinod Patel.

12   Q.   You don't know whether it's Vinod Patel or Vikas Sharma or

13   somebody else named Victor?

14   A.   Vikas Sharma was a pharmacist located in Detroit.  Marie

15   worked in Flint.

16   Q.   You don't know one way or another whether this Victor here

17   is Victor Sharma or not?

18   A.   I believe it to be Vinod Patel.

19   Q.   Okay.  But you don't know?

20   A.   I believe it to be Vinod Patel.

21   Q.   But you don't know, it's safe to say, right?

22            All right.  There's telephone number --

23            THE COURT:  You've now passed the record.  I think

24   that was five times.

25            MR. BLACK:  Great, Your Honor.

1          THE COURT:  Now, you can save some of this for

2    closing argument.

3          MR. BLACK:  Okay.

4          THE COURT:  And you don't have to have him repeat

5    what he said on direct, because it's already part of the

6    record.

7          MR. BLACK:  Okay.

8          THE COURT:  If there is a question of interpretation,

9    you are entitled to yours, and you can tell the jury or your

10   partner can tell the jury at closing argument.  But we don't

11   have to go through this exercise with each and every exhibit.

12         MR. BLACK:  Okay.  Thank you, Your Honor.

13   BY MR. BLACK:

14   Q.  About halfway down on that page, there's a number

15   313-733-7390.

16         Do you know whose telephone number that is?

17   A.  I do not.

18   Q.  On page three they are talking about a crook.  They say,

19   "Yeah, he's a crook."

20         And you said that was one of the doctors that Marie

21   and Bob were working with.  Right?

22   A.  I believe that's what they were referencing.

23   Q.  Do you know which doctor they were referencing?

24   A.  I do not.

25   Q.  Okay.  And on page four Bob mentions two different doctors,

1    Dr. Hartman and Dr. Veronica Williams.  Is that right?

2    A.  Correct.

3    Q.  And you said that those were doctors that were paid by the

4    Patel organization?

5    A.  I did not say that.  I'm not sure if Hartman is the correct

6    name, but I don't have much information about those two

7    doctors.

8    Q.  Okay.  Did you ever recover any checks that were written to

9    a Dr. Hartman or a Dr. Veronica Williams from First Michigan

10   Home Health Care?

11   A.  I didn't do the banking.  So, like I said before, I'm not

12   familiar with that, what they recovered and what they didn't.

13   Q.  As far as you know, there's no checks --

14   A.  I can't answer either way, sorry.

15   Q.  Okay.  Call No. 3C, that's another call between Bob and

16   Marie Lewis, right?

17   A.  Correct.

18   Q.  In that call Bob and Marie are talking about meeting up,

19   right?

20   A.  Can I have a moment to read this?

21           *(Brief pause.)*

22   A.  Later on Monday, yes.

23   Q.  You have to pay a doctor, is that right?  Is that your

24   understanding?

25   A.  I don't think it's to pay a doctor.  I think it's to see if

1   they have a deal in place to have a future arrangement with the

2   doctor --

3           *(Interjection by court reporter.)*

4   A.  I believe it's not to pay a doctor, but to see if there's a

5   future arrangement that can be made with that doctor.  And they

6   mention the word "rent," like I said before, as a form of a

7   kickback.

8   Q.  Okay.  And they are trying to schedule that meeting based

9   around Bob's schedule, right?

10  A.  I believe so.

11  Q.  Okay.  In call 3D, on page two, about halfway down Bob

12  says, "Just offer no rent, you know, I just pay a hundred

13  dollars, and also I'll take care of the other part too, you

14  know."

15          Is that a hundred dollars per patient?

16  A.  You said 3D?

17  Q.  Yes.

18  A.  What page?

19  Q.  Two.

20  A.  Oh, I'm sorry.  I didn't hear you say that.

21          Can you ask your question again?  I'm sorry.

22  Q.  Yeah.

23          About halfway down Bob says:  "Just offer no rent,

24  you know, I just pay a hundred dollars, and also I'll take care

25  of the other part too, you know."

1            Is Bob saying he's going to pay a hundred dollars per

2  patient there?

3  A.  I'm not sure.  I believe it to be some form of a kickback,

4  but I'm not sure.

5  Q.  Okay.  And that he will make that payment -- he'll take

6  care of the other part too?

7  A.  Correct.

8  Q.  Is that what that says?

9  A.  Correct.

10  Q.  Finally, on call 3E, that's, again, between Bob and Marie

11  Lewis.  Right?

12  A.  Correct.

13  Q.  Bob says on page one, about halfway down, he says:  "Ah,

14  the reason I call Dr. Delacruz, did you discuss with

15  Dr. Delacruz?"

16            Who is Dr. Delacruz?

17  A.  I believe it's Dr. Fannie Delacruz.

18  Q.  Okay.  And on page two, near the bottom Marie says:

19  "Right, cause Lisa called me too and I wanted to know."

20            Who is Lisa?

21  A.  I have no idea.

22  Q.  Okay.  At the very last line on that page, Bob says:  "I'll

23  be coming, ah, Mussa (PH) work all day tomorrow, right?"

24            Who is Mussa?

25  A.  I'm not familiar with it -- I've heard the name Mussa

1    before, but I can't recall the name.

2    Q.  Okay.  And near the top of page three Marie says:  "No,

3    just on Wednesday, but a Martha."

4         Who is Martha in that?

5    A.  Same thing.  I don't know that name.

6    Q.  You're not sure?

7    A.  Correct.

8         MR. BLACK:  Just one moment, Your Honor.

9         No further questions.

10        MR. PRATT:  No redirect, Your Honor.

11        THE COURT:  Jurors have any questions?

12        You may step down.

13   A.  Thank you.

14        THE COURT:  Thank you.

15        You may call your next witness.

16        MR. NEAL:  Thank you, Your Honor.

17        Could we have a five-minute recess before the next

18   witness is called?

19        THE COURT:  Sure, if there's such a thing.

20        All rise for the jury.

21        We'll do our best to be five minutes.

22        *(Jury leaves the courtroom at 12:28 p.m.)*

23        THE COURT:  And?

24        MR. NEAL:  Your Honor, I don't know what the Court

25   would prefer to do in terms of the schedule for today.

1          This witness is going to take us past one.  He is our

2     last witness.  We will certainly you know finish him up -- we

3     can finish him up today, depending on the length of cross.  It

4     would take us well past one o'clock however.  If we --

5          THE COURT:  Who is your last witness?

6          MR. NEAL:  Excuse me?

7          THE COURT:  Who is your --

8          MR. NEAL:  Special Agent Gould.

9          THE COURT:  Okay.

10          MR. NEAL:  If you prefer, we can adjourn now and come

11     back tomorrow.

12          THE COURT:  No.  I think we'll start at 8:15

13     tomorrow.

14          MR. NEAL:  That will work, Your Honor.

15          THE COURT:  But I have a couple of questions.

16          Is the Defense going to call any witnesses?

17          MR. BEUKE:  No, Your Honor.

18          THE COURT:  Okay.  Is this a good time to put on the

19     record that you have advised your client about his right to

20     testify?

21          MR. BEUKE:  It is, Your Honor.

22          THE COURT:  If you'll do the honors.

23          MR. BEUKE:  Pardon?

24          THE COURT:  If you'll do the honors?

25          MR. BEUKE:  I can.  I don't know ...

1          THE COURT:  Pardon?

2          MR. BEUKE:  I can.  You want him sworn?

3          THE COURT:  No.  Just bring him up to the microphone

4   so we can hear him.

5          MR. BEUKE:  Come on up.

6          Give me a minute, Your Honor.

7          THE COURT:  Okay.

8          *(Off the record.)*

9          MR. BEUKE:  Thank you, Judge.

10         Mr. Patel, Mr. Black and I have spoken with you on a

11  number of occasions regarding the preparation of your defense

12  in this case.  Is that correct?

13         MR. VINOD PATEL:  Yes.

14         MR. BEUKE:  And we've advised you about your absolute

15  right to testify if you wish to or your absolute right not to

16  testify if you wish to also.  Correct?

17         MR. VINOD PATEL:  Yes.

18         MR. BEUKE:  And we've discussed with you both the

19  pros and the cons of testifying, as well as the pros and the

20  cons of not testifying.  Is that correct?

21         MR. VINOD PATEL:  Yes.

22         MR. BEUKE:  Mr. Patel, you've indicated to Mr. Black

23  and myself that it's your desire not to testify.  Is that

24  correct?

25         MR. VINOD PATEL:  Yes.

1          MR. BEUKE:  Has anybody threatened you or forced you

2     in any way in terms of your making that decision?

3          MR. VINOD PATEL:  No.

4          MR. BEUKE:  Is that your decision?

5          MR. VINOD PATEL:  Yes.

6          THE COURT:  All right.  Thank you.

7          MR. BEUKE:  Thank you, Judge.

8          THE COURT:  I am -- well, I guess this is addressed

9     to the prosecution.  Two things, both relating to the same

10    topic.

11          Do you want me to repeat the instruction about the

12    lie detector that I gave the first time it was mentioned?

13          MR. NEAL:  Your Honor, I don't think that's

14    necessary.  I think you've made it clear.

15          THE COURT:  Okay.  The other point is I would suggest

16    your form Kastigar letter takes that out.

17          MR. BEUKE:  Judge, can I just put something on the

18    record regarding that?

19          THE COURT:  Again, yes.

20          MR. BEUKE:  Just for the record, Your Honor, this is

21    an agreement or this is a letter detailing an agreement between

22    the prosecutors and the defense.  Mr. Patel nor Mr. Black or

23    myself dictated any of the wording in that agreement.

24          And it's certainly something that, in my experience,

25    is explained to the Defendant by both the prosecutors and the

1    defense attorney before it's signed by any of the parties.

2            I didn't draft that.  I didn't put that in the

3    agreement.  That was something --

4            THE COURT:  I know that.

5            MR. BEUKE:  Okay.  Well, that letter --

6            THE COURT:  Now, the record notes that.

7            And I agree with you, it shouldn't be in there, if

8    that's what your point is.  But it also shouldn't be brought up

9    in front of a jury.

10           And from my experience, it will probably be two to

11   three years before it's addressed by the U.S. Attorney's

12   office.

13           MR. BEUKE:  All right, judge.

14           MR. NEAL:  Shall we just bring the jury out and

15   dismiss them?

16           THE COURT:  Yeah.

17           We need the jury instructions by sometime early this

18   afternoon, and we need copies.  You guys can figure out the

19   number of copies.  We're going to excuse the two jurors after

20   they have to listen to me read it.

21           And the prosecutors know this, the Defense attorneys

22   will learn, that if you thought the reading of the transcripts

23   was boring, you're going to have a new definition of boring.

24           We need a verdict form for each juror, a copy of the

25   instructions for each juror and ...

1          MR. NEAL:  A copy of the indictment, Your Honor?

2          THE COURT:  You want the indictment to go to the

3     jury?

4          MR. BEUKE:  No, Your Honor.

5          THE COURT:  No.

6          MR. NEAL:  Okay.

7          THE COURT:  We did it last time, didn't we?

8          MR. NEAL:  We have in the last three trials, Your

9     Honor.  It's a helpful guide for them.

10         THE COURT:  We'll give it to them with the admonition

11    that it's not evidence, just for their convenience.

12         MR. BEUKE:  Judge, just in terms of timing?

13         THE COURT:  Yeah.

14         MR. BEUKE:  If we begin at or near the scheduled

15    hour, should we assume that we're going to go into closing

16    arguments tomorrow?

17         THE COURT:  Absolutely.

18         MR. BEUKE:  Okay.

19         THE COURT:  And Mike will tell the jurors before they

20    go home that they should be prepared to stay as long as they

21    want.

22         MR. BEUKE:  Judge, on Saturday and Sunday they're not

23    going to be deliberating, I take it?

24         THE COURT:  Do you want them to?

25         MR. BEUKE:  In Chicago, Judge, they're going to the

1    hotel and they're in the hotel until they come back with a

2    verdict.  So, uhm ...

3            THE COURT:  Well, we don't have to put this on

4    Chicago.

5            MR. BEUKE:  No, I agree with you, Judge.  I don't

6    want to be here on the weekend.

7            THE COURT:  No, we don't do Saturdays and Sundays.

8            *(Off the record.)*

9            THE COURT:  All right.  We're done.

10           MR. BEUKE:  Thank you, Judge.

11           MR. BLACK:  Thank you, Judge.

12           THE COURT:  We'll start at the regular time on

13   Friday.

14           MR. NEAL:  Thank you, Judge.

15           MR. PRATT:  Thank you Judge.

16           THE COURT:  We are in recess.

17           *(Proceedings adjourned at 12:35 p.m.)*

18                        —    —    —

STATE OF MICHIGAN )
                  ) ss.
COUNTY OF WAYNE   )


I, Denise A. Mosby, Federal Official Court Reporter, do
certify that the foregoing is a correct transcript from the
record of proceedings in the above matter.


                         s/ Denise A. Mosby
                         _____
                         DENISE A. MOSBY, CSR, RMR, CRR
                         United States Court Reporter
                         124 Theodore Levin U.S. Courthouse
                         231 W. Lafayette Boulevard
                         Detroit, MI 48226
                         313.961.6230
                         Denise_Mosby@mied.uscourts.gov

Dated:   September 11, 2014