UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                     Case No. 11-cr-20468

        Plaintiff,        Hon. Arthur Tarnow

   vs.

D-36 VINOD PATEL,

        Defendant.
_____/


## DAY 7

## EXCERPT TRANSCRIPT OF JURY TRIAL


BEFORE THE HONORABLE ARTHUR J. TARNOW
UNITED STATES DISTRICT COURT SENIOR JUDGE
Detroit, Michigan
Friday, July 18, 2014



APPEARANCES:

For Government:          JOHN K. NEAL, ESQ.
                       WAYNE F. PRATT, ESQ.
                       U.S. Attorney's Office
                       211 W. Fort Street, Ste 2001
                       Detroit, Michigan 48226

For Defendant:          RICHARD M. BEUKE, ESQ.
                       53 W. Jackson, Suite 1410
                       Chicago, Illinois 60604

                       TIMOTHY M. BLACK, ESQ.
                       713 West Devon Avenue
                       Park Ridge, Illinois 60068


                *    *    *

OFFICIAL COURT REPORTER:
Denise A. Mosby, CSR, RMR, CRR
313) 961-6230    www.transcriptorders.com

# I   N   D   E   X

**WITNESS:**                                                          **PAGE**

CHRISTOPHER GOULD
     Direct-Examination by Mr. Neal                              7
     Cross-Examination by Mr. Black                             38

GOVERNMENT RESTS                                                77

DEFENDANT RESTS                                                 77

# E X H I B I T S

**EXHIBIT NO.**  **IDENTIFICATION**                                     **PAGE**

**Government**

| EXHIBIT NO. | IDENTIFICATION | PAGE |
|---|---|---|
| 4 | Provider Enrollment Application | 4 |
| 5 | First Mich Articles of Incorporation | 4 |
| 6A | Medicare Part A summary | 27 |
| 6B | Medicare Part A referrals | 27 |
| 6D | Wade Medicare Summary | 27 |
| 7 | Bob Patel billings summary | 27 |
| 8 | Tri-City Apothecary summary | 27 |
| 9 | Rapid Drugs summary | 27 |
| 11 | Beecher Pharmacy summary | 27 |
| 12A | bank records 3634 | 4 |
| 12B | bank records 5090 | 4 |
| 12C | checks to Vinod Patel | 4 |
| 12D | summary | 18 |
| 12E | checks disbursement summary | 13 |

**Defendant**

| | | |
|---|---|---|
| 1 thru 6 | documents | 78 |
| 7A, 7B | documents | 78 |
| 9, 14 | documents | 78 |

US v Vinod Patel #11-CR-20468-36

```
1                                      Detroit, Michigan
2                                      Friday, July 18, 2014
3                                      8:44 a.m.
4                          -     -     -
5              (Jury not present.)
6              THE COURT:  All right.  Start over.
7              We have a note from the jury:   "Does the Government
8     have any financial evidence against Mr. Patel?"
9              And that will be addressed with your witnesses that
10    are remaining, that's my understanding?
11             MR. NEAL:  Yes, Judge.
12             THE COURT:  Okay.  You indicated you have your
13    exhibits stipulated --
14             People can sit down.  It just takes me a while to
15    bend down.
16             MR. NEAL:  Yes, Your Honor.
17             At this time, I believe without objection, we would
18    move Government Exhibits 12A, 12B, 12C, Exhibit 5, in all
19    subparts, and Exhibit 4 into evidence.
20             THE COURT:  All right.  Any objection?
21             MR. BEUKE:  No, Your Honor.
22             THE COURT:  That's stipulated to.  Okay.
23             (Government Exhibits 4, 5, 12A, 12B and 12C were
24             admitted into evidence.)
25             THE COURT:  I also understand you have the jury
```

US v Vinod Patel #11-CR-20468-36

1   instructions?

2           MR. NEAL:  We do, Your Honor.

3           THE COURT:  Where are they?

4           MR. NEAL:  Right here.

5           THE COURT:  Right here ...

6           MR. NEAL:  It's on this table in front of you.

7           MR. PRATT:  Your Honor, can I make one point on the

8   jury instructions?

9           THE COURT:  Yes.

10          MR. PRATT:  I know ordinarily they are stipulated to

11  and the Court doesn't need to hear anymore, but I may have an

12  exception.

13          THE COURT:  Go on.

14          MR. PRATT:  Okay.  There was one instruction that I

15  had in the original packet regarding -- it's I believe a

16  standard Sixth Circuit instruction about witnesses who testify

17  both as factual witnesses and expert witnesses.  The Sixth

18  Circuit thinks that there's some major risk of confusion of the

19  two different roles.

20          The only one who arguably did both of that was Task

21  Force Officer Carmack, who talked a little bit about his

22  training and experience and things like report writing and also

23  talked about other testimony.

24          The Defense requested that we take that instruction

25  out, pointing out that he testified maybe both as an expert and

1    as a lay witness.

2            I just wanted it to be clear in this record that

3    everyone agreed to make the instructions easier rather than

4    more difficult.  And so that's why that instruction is not

5    there.

6            THE COURT:  Okay.

7            MR. BLACK:  Defense agrees, Your Honor.

8            THE COURT:  Fine.  All right.  Another housekeeping

9    matter.

10           The jury panel as selected -- we changed a couple of

11   seats as you may have -- well, you know that.  But in terms of

12   the record, Seat 14 is now Edward Ross, who originally was in

13   Seat 1.  And Seat 13 is Kristin Barr, who was originally in

14   Seat 14.  And Seat No. 1 is Christina Bozich, B-O-Z-I-C-H,

15   originally in Seat No. 13.

16           So, when we call the numbers, it's the current seats

17   when we are disqualifying two jurors.

18           Is that agreeable?

19           MR. BLACK:  Yes, Your Honor.

20           MR. NEAL:  Yes, Your Honor.

21           THE COURT:  Okay.  Anything else?

22           MR. NEAL:  Nothing from the Government.

23           THE COURT:  I think we are ready for the jury.

24           *(Jury enters the courtroom at 8:48 a.m.)*

25           THE COURT:  Good morning.  Everybody is in their

1    place.

2              I didn't get the memo that it's dress like the judge,

3    but I think 12 out of the four jurors have something either

4    black or very dark-colored on.

5              You may be seated.

6              We have a note from the jurors -- from a juror, and

7    it emphasizes the importance of waiting until the case is over.

8              So, you may call your next witness.

9              MR. NEAL:  Thank you, Your Honor.

10             The United States calls Christopher Gould.

11        **CHRISTOPHER GOULD, GOVERNMENT'S WITNESS, SWORN.**

12             THE COURT:  You may be seated.

13             You may begin.

14             MR. NEAL:  Thank you.

15                         DIRECT-EXAMINATION

16   BY MR. NEAL:

17   Q.  Mr. Gould, could you state and spell your name for the

18   court reporter.

19   A.  Sure.  Christopher, C-H-R-I-S-T-O-P-H-E-R, Gould,

20   G-O-U-L-D.

21   Q.  Mr. Gould, where are you employed?

22   A.  I'm employed by the United States Department of Health and

23   Human Services in their Office of Inspector General.

24   Q.  And what is your job title?

25   A.  Special Agent.

1    Q.   How long have you been in that position?

2    A.   Just over ten years.

3    Q.   And what are your principal responsibilities as a Special

4    Agent for the Department of Health and Human Services?

5    A.   It's investigating instances of fraud, wastes and abuse

6    within the United States Department of Health and Human

7    Services programs; specifically, the programs of Medicare and

8    Medicaid.

9    Q.   In the course of your work with that agency, have you been

10   assigned to a case called United States versus Patel?

11   A.   Yes.

12   Q.   As part of your work in that case, have you prepared

13   certain summaries of documents and data pertaining to this

14   Defendant, Vinod Patel?

15   A.   Yes.

16   Q.   Does that include summaries of bank records?

17   A.   It does.

18   Q.   I'd like to show you what has been admitted as Government

19   Exhibits 12A, 12B and 12C.  If you can just take a quick look

20   at those documents and let me know when you've familiarized

21   yourself with them.

22          *(Brief pause.)*

23   A.   Okay.

24   Q.   Can you tell the ladies and gentlemen of the jury what

25   Exhibit 12A, B and C are?

1    A.   What Exhibits 12A, B and C are financial information from

2    two of the accounts, bank accounts linked to First Michigan

3    Home Health.

4    Q.   Okay.  And which bank are these accounts from?

5    A.   I believe they are from Charter One.

6    Q.   Okay.  And these are two separate accounts; is that

7    correct?

8    A.   That's correct.

9    Q.   Take a look, if you would, at Exhibit 12B.  And I know you

10   are familiar with it, but if you could take a look at Exhibit

11   12B.

12        Is there a principal source of distributions from

13   that account that's present in the paperwork of Government

14   Exhibit 12B?

15   A.   Yes.  The source of funds coming into the account in 12B is

16   actually coming from the account that ends in 3634 that you see

17   in Exhibit A.

18   Q.   And that's Exhibit 12A?

19   A.   Yes.

20   Q.   Okay.  How about the disbursements from the account in 12B,

21   is there a principal place the money from 12B goes?

22   A.   Yes.  The money from 12B goes primarily to the payroll of

23   First Michigan Home Health Care.

24   Q.   Okay.  And is that done directly by First Michigan or is

25   there a payroll company involved?

1    A.   There's a payroll company.

2    Q.   All right.  With respect to the account that's reflected in

3    Government Exhibit 12A, is there a principal source of money

4    that comes into that account that you would be able to see from

5    a review of the account?

6    A.   Yes.  The principal source of money going into the account

7    here in 12A is coming from NGS, National Government Services,

8    which is the Medicare contractor.

9    Q.   All right.  And in terms of the distribution of money from

10   account 12A, what are the locations the money is distributed to

11   from account 12A?

12   A.   So, from account 12A, we are seeing it go into the account

13   that ends in 5090 in 12B.  Also, we are seeing funds being

14   distributed to various individuals and groups.

15            MR. NEAL:  I'd like to show you a portion of

16   Government Exhibit 12A, if we could.  And the page I would like

17   to show is 12A-393.

18            If we could take a look actually at the bottom

19   portion of that document.

20   BY MR. NEAL:

21   Q.   Special Agent Gould, if you look, there we see deposits

22   into this account.  Is that correct?

23   A.   That's correct.

24   Q.   And all the deposits, save one, are from what source?

25   A.   It would be National Government Services, NGS, Medicare

1    Part A.

2            MR. NEAL:  All right.  If we could go to the top

3    portion of this statement.

4            That's fine.

5    BY MR. NEAL:

6    Q.  Special Agent Gould, what's the dates on this particular

7    bank statement?

8    A.  The date is beginning March 1st, 2010 through March 31st,

9    2010.

10   Q.  All right.  And if we look, what are these debits that we

11   are looking at right here?

12   A.  These are ATM purchases, debits.

13   Q.  Okay.  From the ATM card linked to this particular account?

14   A.  Correct.

15   Q.  Do we see a few transactions in the city of Saginaw,

16   Michigan?

17   A.  Yes, we do.

18   Q.  And in March of 2010 what pharmacy, if any, was active in

19   the Saginaw area?

20   A.  Tri-City Apothecary at that time.

21   Q.  This is before Beecher Pharmacy is opened?

22   A.  Correct.

23   Q.  Before we leave these exhibits, I do want to ask what is

24   Exhibit 12C?

25   A.  12C are checks isolated from these bank accounts where you

1    would see -- on these pages you would see checks to Vinod

2    Patel.

3    Q.  Okay.  Have you had a chance to observe the signature cards

4    for each of these accounts?

5    A.  Yes, I have.

6    Q.  During the period between May of 2007 and 2012, is there an

7    authorized signer on both of these accounts?

8    A.  Yes, there is.

9    Q.  And is there only one authorized signer of both these

10   accounts?

11   A.  Yes.

12   Q.  And who is that?

13   A.  Vinod Patel.

14   Q.  Special Agent Gould, you mentioned earlier that you

15   prepared summaries of account 12A and 12C?

16   A.  Yes.

17   Q.  Take a look at what has been marked for identification as

18   Government Exhibit 12E.

19          Do you recognize that document?

20   A.  Yes, I do.

21   Q.  And can you describe for the jury briefly what 12E is?

22   A.  Sure.

23          12E, the first page is a breakdown of the

24   disbursements from the accounts to certain individuals.  Four

25   individuals actually it focuses on.  It focuses on

1    disbursements to Vinod Patel, Babubhai Patel, Ramesh Patel and

2    Paresh Patel.

3    Q.   Okay.  And the pages behind it?

4    A.   And the pages behind it are what we call the scheduling.

5    So, for each individual it shows the check information by each

6    line.  So, you'll see the date of the check, the number of the

7    check, the amount of the check and the payee.

8    Q.   And have you double-checked and verified the information

9    that's contained in Government Exhibit 12E?

10   A.   Yes, I have.

11   Q.   And to be clear for the jury, this is a summary of the bank

12   account reflected in 12A and 12C?

13   A.   That is correct.

14   Q.   Not 12B, just the payroll?

15   A.   Correct.

16            MR. NEAL:  Your Honor, at this time, I would move

17   Government Exhibits 12 into evidence.

18            THE COURT:  Any objection?

19            MR. BLACK:  No, Your Honor.

20            THE COURT:  They are admitted.

21       *(Government Exhibit 12E was admitted into evidence.)*

22            THE COURT:  And while the exhibits are being

23   admitted, there were a couple that you agreed to outside the

24   presence of the jury.

25            Do you want to tell the jurors what those exhibits

1    are?

2              MR. NEAL:  Certainly.

3              Ladies and gentlemen, outside of your presence we

4    agreed to the admission of Government Exhibits 12A, 12B and

5    12C.  That's the raw bank information for these accounts.

6              And we also agreed to the admission of Exhibit 5 and

7    all of its subparts, which we will be talking about in a

8    moment.  That's corporate records concerning First Michigan.

9              And Exhibit 4, which is Medicare Provider Enrollment

10   concerning First Michigan.  And we'll be talking about that in

11   a moment.

12             Ms. Drinkard, if you could display Government Exhibit

13   12E.

14   BY MR. NEAL:

15   Q.  Special Agent Gould, this is a summary of the accounts

16   marked in Government Exhibits 12A and C?

17   A.  Correct.

18   Q.  And the amount of -- or, the value of checks written to

19   Vinod Patel from this account is what?

20   A.  It's $583,325.

21   Q.  The amount of checks written to Babubhai Patel is what?

22   A.  $452,506.

23   Q.  The amount of checks written to Ramesh Patel, the third

24   partner, is what?

25   A.  $240,175.

1   Q.  And the amount written to Paresh Patel -- and I see in

2   parentheses that's Atul Patel -- is what?

3   A.  Is $112,950.

4   Q.  Do you recall testimony in this case concerning how Atul

5   Patel received money from First Michigan Home Health Care?

6   A.  Yes.

7   Q.  Can you summarize how those checks were written?

8   A.  The checks were written to Atul Patel's cousin Paresh

9   Patel.  Paresh Patel would then cash those checks and give the

10  money directly to Atul.

11  Q.  With respect to the money that went to Vinod Patel during

12  this time frame, was there a particular pattern to the amounts

13  that Vinod Patel received?

14  A.  Not particularly.

15  Q.  If we can take a look at page two of this exhibit.

16          And, Special Agent Gould, would you just alert the

17  jury as to what this is?

18  A.  Yes.

19          This is what we call the scheduling of the checks

20  going to Vinod Patel from the accounts in 12A and 12C.  And it

21  focuses on for each check, the date of the check, the check

22  number, the amount of the check and the payee.

23  Q.  And if we highlight the top portion, say the top seven or

24  eight lines of this -- there you go -- is it fair to say we see

25  strange -- not strange, but we see different amounts of checks

1    going to Vinod Patel on a periodic basis?

2    A.  That's correct.

3    Q.  We see checks for as low as $700; is that right?

4    A.  Yes.

5    Q.  And as high as $50,000?

6    A.  Correct.

7    Q.  Within a several-month time frame?

8    A.  Yes.

9    Q.  And if we move a little bit further in this account down to

10   the 2009, early 2010 time frame, we see the same random number

11   of -- you know, of -- random amount of checks distributed to

12   Vinod Patel during this time frame?

13   A.  Yes.

14   Q.  As high as $25,000; as low as $1200?

15   A.  Yes.

16   Q.  And to be clear, all of the checks that are listed on the

17   schedule are reflected -- the actual checks are reflected in

18   Government Exhibits 12A and 12C?

19   A.  That's correct.

20   Q.  If we could take a look at the schedule for Babubhai Patel.

21        Babubhai Patel received many fewer checks during this

22   time frame; is that correct?

23   A.  That's correct.

24   Q.  He did, however, receive one very large check on the 16th

25   of December of 2008?

1    A.  Yes.

2    Q.  And that check is in the amount of $100,000?

3    A.  That's correct.

4    Q.  Was that the largest single check you saw disbursed out of

5    the First Michigan bank account?

6    A.  Yes, that is the largest.

7    Q.  And the total amount Babubhai Patel received from First

8    Michigan during this time frame in checks is $452,506?

9    A.  Correct.

10   Q.  And if we could take a look at Ramesh Patel's

11   disbursements.

12          We see many fewer checks than we saw for Vinod Patel;

13   is that correct?

14   A.  Correct.

15   Q.  We also see the same somewhat random pattern in terms of

16   the amounts of the checks that are disbursed?

17   A.  That is correct.

18   Q.  And, finally, with respect to the schedule for Paresh

19   Patel, we see fewer checks.  Is that correct?

20   A.  Fewer than Vinod's, yes, that's correct.

21   Q.  We also see somewhat random amounts in terms of the amounts

22   of money given to Paresh Patel on a sporadic basis?

23   A.  Somewhat, yes.

24   Q.  Who signed all the checks for all of these accounts from

25   your review of the records?

1    A.   Atul -- excuse me.   It was Vinod Patel who signed it.

2    Q.   Special Agent Gould, I would like to show you an exhibit

3    that we will mark for identification purposes as 12D.

4              This is also a summary of checks that you prepared?

5    A.   Yes.

6    Q.   From the same Charter One Bank account?

7    A.   Yes.

8    Q.   And these are checks to certain individuals?

9    A.   Yes, they are.

10   Q.   And you have double-checked your work?

11   A.   Yes.

12             MR. NEAL:   Your Honor, at this time, I would move the

13   admission of Government Exhibit 12D.

14             THE COURT:   Any objection?

15             MR. BLACK:   No objection.

16             THE COURT:   Received.

17             (Government Exhibit 12D was admitted into evidence.)

18   BY MR. NEAL:

19   Q.   Special Agent Gould, I see that you've summarized checks

20   received by four individuals.   Is that correct?

21   A.   That's correct.

22   Q.   How did you identify those individuals?

23   A.   They were names provided to us by a witness.

24   Q.   And who was that witness?

25   A.   Ramesh Patel.

1    Q.  He testified that certain of these individuals were

2    marketers for First Michigan.  Is that correct?

3    A.  That is correct.

4    Q.  If we could take a look at Government Exhibit 12D, the

5    first page.

6            These are checks that were written to Nicole Pannell

7    or Parnell?

8    A.  Yes.

9    Q.  And this is an individual identified by Ramesh Patel as a

10   marketer for First Michigan?

11   A.  Yes.

12   Q.  What is the last date of the check to Nicole Pannell?

13           MR. NEAL:  I'm sorry.  If we can go back to the

14   previous page.

15           I apologize.  If we can go to page two.

16   BY MR. NEAL:

17   Q.  What is the latest date of a check to Nicole Pannell that

18   we see?

19   A.  The latest date that we have for a check here is August

20   23rd, 2009.

21   Q.  All right.  And the total amount that was written in checks

22   to this person is how much?

23   A.  $41,730.

24   Q.  And every single one of these checks was signed by whom?

25   A.  Vinod Patel.

1    Q.   If you could take a look at the next page of this exhibit.

2              These are First Michigan checks written to Gerald

3    Dixon or Dixon-Bey.  Is that correct?

4    A.   Correct.

5    Q.   Also identified by Ramesh Patel as a marketer for First

6    Michigan?

7    A.   Correct.

8    Q.   The latest date on one of these checks is what?

9    A.   December 16th, 2009.

10   Q.   And the total amount in checks written to this individual

11   is what?

12   A.   $21,205.

13   Q.   If we can take a look at the next page of this exhibit.

14             This is another individual identified by Ramesh Patel

15   as a marketer for First Michigan?

16   A.   Correct.

17   Q.   And the last date of a check written to Kim Simpson is

18   what?

19   A.   December 1st, 2008.

20   Q.   And the total amount this individual received from First

21   Michigan was what?

22   A.   $6,586.

23   Q.   And all of these checks were signed by whom?

24   A.   Vinod Patel.

25   Q.   If we can go to the next page.

1              We have another individual here, Melinda Huddleston.

2  Is that correct?

3  A.   Correct.

4  Q.   Also identified by Ramesh Patel as a marketer?

5  A.   Correct.

6  Q.   And the total amount this individual received is?

7  A.   $15,300.

8  Q.   And we have no checks of this individual past July 18,

9  2008.  Is that correct?

10 A.   Correct.

11 Q.   And I mentioned earlier there were four individuals whose

12 disbursements you summarized.

13            There's actually five, correct?

14 A.   That's correct, yeah.

15 Q.   If we turn to the next page of this exhibit, we see checks

16 to Lori Singleton.

17            And this is someone who is also identified by Ramesh

18 Patel as a marketer for First Michigan?

19 A.   Yes.

20 Q.   The total amount this individual received is?

21 A.   $10,600.

22 Q.   And the last date this person received a check from First

23 Michigan was?

24 A.   June 15, 2008.

25 Q.   Special Agent Gould, in the course of this investigation,

1    you obtained certain corporate records.  Isn't that correct?

2    A.  (No response.)

3    Q.  Special Agent Gould, in the course of this investigation

4    you created -- or, you obtained certain corporate records.  Is

5    that correct?

6    A.  Yes.  I obtained certain corporations records correct, yes.

7    Q.  And that includes record for First Michigan Home Health

8    Care?

9    A.  Correct.

10   Q.  I'd like to show you what has been admitted as Government

11   Exhibit 5F, and if we could turn to page two of this exhibit.

12           We have a corporation name on here; is that correct?

13   A.  Yes.

14   Q.  And the name of the company is?

15   A.  First Michigan Home Health Care, Inc.

16   Q.  Okay.  And we have an address for the company; is that

17   correct?

18   A.  Yes.

19   Q.  And the title of this document is Certificate of Change of

20   Registered Office and/or Change of Resident Agent?

21   A.  Right.

22   Q.  Is that what you see up in the middle of page?

23   A.  Change of Registered Office and/or Change of Resident

24   Agent.

25   Q.  If we go down to the bottom of this document we see a

1    signature, is that correct, and a date?

2    A.  Yes.

3    Q.  And Vinod Patel is listed as the President.  Isn't that

4    right?

5    A.  Correct.

6    Q.  And the date signed is May 30th, 2007?

7    A.  Yes.

8    Q.  This signature that you see over on the left-hand side, is

9    that consistent with the signature that you saw on the

10   signature cards for the bank records for this individual?

11   A.  That is not.  It's inconsistent with all of the other

12   signatures that I've reviewed.

13   Q.  All right.  If we could take a look at the next corporate

14   filing that we have, Government Exhibit 5A.

15            The date on this document is -- down at the bottom

16   with the signature -- is February the 4th, 2008.  Is that

17   correct?

18   A.  Yes, correct.

19   Q.  All right.  And this is a Corporate Information Update.

20   Isn't that right?

21   A.  Yeah.  It's the yearly -- it's the yearly filing that they

22   are required to file.

23   Q.  And we see a signature down there to the left.  Do you see

24   that?

25   A.  I do.

1  Q.  And do you see the name that the President,

2  Secretary-Treasurer is listed as Vinod Patel?

3  A.  Yes.

4  Q.  Is that signature on this document consistent with the

5  signatures that you've seen on the bank records for Vinod

6  Patel?

7  A.  Yes, it is.

8  Q.  And if we could take a look at Government Exhibit 5B.

9         Government Exhibit 5B is the same annual filing; is

10  that right?

11  A.  Yes.

12  Q.  And we see the date on this document is?

13  A.  February 11th, 2009.

14  Q.  And the signature on this document, is it consistent with

15  the other signatures for Vinod Patel that you've seen?

16  A.  Yes, it is.

17  Q.  If we go to Government Exhibit 5G we have a Certificate of

18  Renewal of Assumed Name; is that right?

19  A.  Yes.

20  Q.  And we also have a signature on this document; is that

21  correct?

22  A.  Correct.

23  Q.  Also substantially consistent with the signatures you've

24  seen on other documents for Vinod Patel?

25  A.  Yes.

1    Q.  And, finally, if we go to Government Exhibit 5C we have

2    another annual filing.  Is that correct?

3    A.  Correct.

4    Q.  And we have a signature on this document?

5    A.  We do.

6    Q.  And it is consistent with the other signatures that you had

7    for Vinod Patel?

8    A.  Yes.

9    Q.  All right.  Special Agent Gould, I would like to show you

10   what has been admitted as Government Exhibit 4.  If you could

11   take a quick look at it and tell us what it is?

12   A.  This is the Medicare -- well, the CMS855A document, which

13   is the Medicare Provider Enrollment Application.

14   Q.  For what entity?

15   A.  This would be for First Michigan Home Health Care, Inc.

16   Q.  And in the Medicare Part A program, such as the home health

17   context, are Provider Enrollment Applications required?

18   A.  Yes.

19   Q.  And what kind of information is contained in Provider

20   Enrollment Applications, just very generally?

21   A.  Generally you'll get corporate information about the

22   provider entity; in this case, First Michigan Home Health Care.

23   You'll get information about the owners and operators of the

24   provider, as well as, you know, address, contact information.

25   There's also a Certification Statement located in this document

1    as well.

2              MR. NEAL:  All right.  If we could take a look at

3    page 12 of this exhibit.  And I'd like to highlight the top

4    portion.

5    BY MR. NEAL:

6    Q.  We have a signature on this document, correct?

7    A.  That's correct.

8    Q.  And is that signature consistent with the signature that we

9    saw on the bank records and on most of the corporate records

10   for Vinod Patel?

11   A.  Yes.

12   Q.  I'd like you to read the first two sentences of the

13   authorized official signature portion of this document?

14   A.  Okay.  It reads:

15              "I have read the contents of this

16              application.  My signature legally and

17              financially binds this provider to the laws,

18              regulations, and program instructions of the

19              Medicare program."

20   Q.  What is Vinod Patel representing to Medicare by signing

21   this document?

22   A.  He's representing that he's going to follow all the rules

23   and regulations of the Medicare program.

24   Q.  Special Agent Gould, another kind of material that you

25   summarized in connection with this case involved claims data

1    from Medicare, Medicaid, and Blue Cross.  Is that correct?

2    A.  Correct.

3    Q.  I'd like to show you what has been marked for

4    identification purposes only as Government Exhibits 6A, 6B, 6D,

5    7, 8, 9, 11 and 6E.  And if you could take a very brief moment

6    to look through those and confirm what they are.

7            *(Brief pause.)*

8    A.  So, these are summary charts that I have prepared from the

9    Medicare, the Medicaid and the Blue Cross Blue Shield data.

10   Q.  All right.  And you've checked their accuracy?

11   A.  Yes.

12   Q.  And they are accurate to the best of your knowledge?

13   A.  Yes.

14            MR. NEAL:  I would move Government Exhibits 6A, 6B,

15   6D, 7, 8, 9, 11 and 6E into evidence at this time.

16            MR. BLACK:  No objection, Judge.

17            THE COURT:  Received.

18            *(Government Exhibits 6A, 6B, 6D, 7, 8, 9, 11 and 6E*

19            *were admitted into evidence.)*

20            MR. NEAL:  If we could display Government Exhibit 6A.

21   BY MR. NEAL:

22   Q.  Special Agent Gould, what are we looking at here?

23   A.  We are looking at a summary of Medicare Part A data for

24   First Michigan Home Health Care.  Specifically, it's looking at

25   the -- it's an overview of the amounts paid to First Michigan

1    Home Health Care by Medicare Part A by year.

2    Q.  And from your review of the bank records, is it fair to say

3    that the vast majority of money coming into First Michigan came

4    from this source, Medicare Part A?

5    A.  Yes.

6    Q.  What is the total amount that First Michigan received from

7    2007 through August 2nd, 2011 from the Medicare program?

8    A.  Yeah.  From June 1st, 2007 to August 2nd, 2011, First

9    Michigan Home Health Care was paid $7,254,212.55 by Medicare

10   Part A.

11              MR. NEAL:  If we could take a look at Government

12   Exhibit 6B and highlight it for the jury.

13   BY MR. NEAL:

14   Q.  Special Agent, what is Government Exhibit 6B?

15   A.  Again, this is a summary of Medicare Part A data for First

16   Michigan Home Health Care, specifically, looking at a breakdown

17   of referring providers to First Michigan Home Health Care, the

18   top ten referring providers for the time frame June 1, 2007 to

19   August 2, 2011.

20              And what I've done here is you see the number of

21   referrals for each referring provider, as well as the amount

22   that was paid by Medicare Part A to First Michigan Home Health

23   Care.  For this chart I have sorted it by the number of

24   referrals, by the top ten physicians.

25   Q.  And that is why we see, for example, Malik Dababneh has

1   only 119 referrals, but his total amount paid to First Michigan

2   as a result of those referrals is somewhat higher than the

3   individual right above him on the chart, Kenneth Mitchell?

4   A.  Correct.

5   Q.  And that's because you sorted it by number of referrals?

6   A.  Correct.

7   Q.  I notice that the top referring provider is someone by the

8   name of Paul Petre?

9   A.  Yes.

10  Q.  Did Paul Petre, according to the testimony in this case,

11  have an employee working for him?

12  A.  Yes, he did.

13  Q.  Who was that employee?

14  A.  It was a physician assistant by the name of James Burdette.

15  Q.  According to Medicare rules and regulations, can James

16  Burdette refer patients directly himself to a home health

17  agency?

18  A.  A physician assistant cannot.

19  Q.  So, any referrals that James Burdette made to First

20  Michigan would be reflected in Paul Petre's name as the

21  identifier?

22  A.  That's correct.

23  Q.  The total amount paid to First Michigan as a result of such

24  referrals is what?

25  A.  For?

1    Q.  For Petre/Burdette.

2    A.  For Petre/Burdette, the amount paid to First Michigan for

3    those 381 referrals was $1,239,804.44.

4    Q.  I'd like to go ahead and show you what has been admitted as

5    Government Exhibit 6D as well.

6              And if you can explain for the ladies and gentlemen

7    what we are looking at here?

8    A.  This is a summary of Medicare Part A data for First

9    Michigan Home Health Care, specifically, focusing on the

10   Medicare beneficiary Jeffrey Wade.

11   Q.  And Jeffrey Wade was billed by First Michigan as having

12   received home care from them between November 17th of 2009 and

13   December 27th of 2009?

14   A.  Correct.

15   Q.  All right.  The referring provider?

16   A.  Petre.

17   Q.  And we have a diagnosis code and a diagnosis description?

18   A.  Yes.

19   Q.  And the paid amount that First Michigan was paid is what?

20   A.  $5,003.87.

21   Q.  If we could go to page two of this exhibit.

22             This is a summary of a different type of data; is

23   that correct?

24   A.  Correct.

25             This is a summary of the pharmacy data linked to the

US v Vinod Patel #11-CR-20468-36

1    Medicare beneficiary Jeffrey Wade.  Not only does this summary

2    have Medicare Part D data, it also has Medicaid pharmacy data

3    as well.

4    Q.  All right.  And is there a particular set of pharmacies

5    that you limited this summary to?

6    A.  When I pulled this data for Jeffrey Wade, I didn't pull it

7    by a certain pharmacy other than the Bob Patel pharmacies.

8    Q.  Okay.  So, these are Bob Patel pharmacies -- Bob Patel's

9    pharmacies billings for medications purportedly provided to

10   Jeffrey Wade?

11   A.  Correct.

12   Q.  And if we go through -- we have a very large number of

13   medications; fair to say?

14   A.  That's fair to say.

15   Q.  The largest single prescriber at least on the first couple

16   of pages appears to be Burdette, James Benjamin?

17   A.  Correct.

18   Q.  We see a couple of other names that we've heard -- or, at

19   least one other name that we've heard in the course of this

20   trial on the following page, the name Mark Greenbain?

21   A.  Correct.  Mark Greenbain, yeah.

22   Q.  Now, Special Agent Gould, we've summarized all the billings

23   for First Michigan Home Health Care.

24           Have you also had an opportunity to summarize all the

25   billings for all of Bob Patel's pharmacies?

1    A.  Yes.

2    Q.  And is that reflected in Government Exhibit 7?

3            MR. NEAL:  Will you put that up, please.

4    A.  Yes.

5    BY MR. NEAL:

6    Q.  What is the total amount paid to all Patel pharmacies by

7    Medicare Part D during the time frame of January 3, 2006

8    through the end of June 2011?

9    A.  It's 37,770,557.81.

10   Q.  And if we could turn to the next page of this exhibit.

11           And explain to the ladies and gentlemen of the jury

12   what we are looking at here?

13   A.  This is the Medicaid breakdown for all of the Patel

14   pharmacies for the time frame January 3rd, 2006 through August

15   2nd, 2011.  It's broken down by the top ten prescription drugs

16   by paid amount.

17   Q.  Gotcha.  As well as was the last chart, correct?

18   A.  Correct.

19   Q.  Top ten prescription drugs by paid amount.

20           What is the total amount that Bob Patel pharmacies

21   made from Medicaid during this time frame?

22   A.  $23,134,691.92.

23   Q.  And, finally, if we could turn to page three of this

24   exhibit.

25           This is data from whom?

1    A.   This is data from Blue Cross Blue Shield of Michigan.

2    Q.   And what is the total amount that Patel pharmacies were

3    paid for medications provided to private insurance

4    beneficiaries of Blue Cross Blue Shield of Michigan?

5    A.   $6,359,872.14.

6    Q.   In addition to these overall breakdowns, were you able to

7    do breakdowns of specific pharmacies and their billings?

8    A.   Yes.

9    Q.   And that includes pharmacies whose names we've heard during

10   the course of this case.  Correct?

11   A.   Correct.

12   Q.   I'd like to turn to Government Exhibit 9, if we could.

13           Government Exhibit 9 is a breakdown of what?

14   A.   It's a breakdown of Medicare Part D data for Rapid Drugs

15   for the time frame December 18th, 2007 through January 20th,

16   2011.

17   Q.   And was there a particular reason why you stopped on

18   January 20th, 2011?

19   A.   Rapid Drugs changed names on that date from Rapid Drugs to

20   Noble Care Pharmacy.

21   Q.   All right.  And if we could take a look at page two of this

22   exhibit, what are we looking at here, Special Agent Gould?

23   A.   Again, this is a breakdown of the Medicare Part D data for

24   Rapid Drugs for the time frame December 18th, 2007 through

25   January 20th, 2011.  What we are focusing on here are the top

1   ten prescribers by the amount paid to Rapid Drugs by Medicare

2   Part D.

3   Q.  All right.  And we see James Burdette's name on there.

4   Isn't that correct?

5   A.  Yes.

6   Q.  All right.  Burdette and Petre are number three and number

7   four in terms of prescribers.  Is that correct?

8   A.  That's correct.

9   Q.  We've also heard the name Javaid Bashir during the course

10  of this trial.  Is that correct?

11  A.  That's correct.

12  Q.  He is the largest single prescriber by Rapid Drugs?

13  A.  By paid amount, yes.

14  Q.  Were you able to do a similar breakdown for Tri-City

15  Apothecary?

16  A.  Yes.

17  Q.  If we could turn to Government Exhibit 8.

18          And if you could explain to the ladies and gentlemen

19  what we are looking at here?

20  A.  Again, here is a breakdown of the Medicare Part D data for

21  Tri-City Apothecary for the time frame January 27th, 2010

22  through April 28th, 2011.  And this is actually looking at the

23  top ten prescription drugs by amount paid to Tri-City

24  Apothecary by Medicare Part D.

25  Q.  And during that time frame the total amount paid by

1   Medicare to Tri-City Apothecary was?

2   A.   $857,686.81.

3   Q.   And that was the time the pharmacy was open; is that

4   correct?

5   A.   Correct.

6   Q.   If we can take a look at page two of this exhibit.

7          And Tri-City Apothecary, is it fair to say that the

8   great majority of prescriptions came from one source?

9   A.   Yes.

10   Q.   And what source was that?

11   A.   James Burdette.

12   Q.   And James Burdette referred how much business to Tri-City

13   Apothecary during that time frame?

14   A.   For James Burdette prescriptions, Medicare Part D paid

15   $657,238.09 to Tri-City Apothecary.

16   Q.   Out of a total amount of what?

17   A.   Out of a total of $857,686.81.

18   Q.   Were you able to prepare a similar chart for Beecher

19   Apothecary, Vinod Patel's pharmacy?

20   A.   Beecher Pharmacy, yes.

21   Q.   Beecher Pharmacy.  I apologize.

22          If we could take a look at Government Exhibit 11.

23          And if you could explain to the ladies and gentlemen

24   what we are looking at here?

25   A.   Here is another breakdown of Medicare Part D data.  This is

1   for Beecher Pharmacy for the time frame December 28th, 2010

2   through August 2nd, 2011.  And this is focusing on the top ten

3   prescription drugs by amount paid to Beecher Pharmacy by

4   Medicare Part D.

5   Q.  And the December 28th, 2010 date, is that the first date a

6   claim was submitted --

7   A.  Yes.

8   Q.   -- to Medicare?

9        And what is the total amount that Medicare paid

10  Beecher Pharmacy during that roughly 8-month time frame?

11  A.  $591,552.68.

12  Q.  And if we were to take a look at page two of this exhibit,

13  what are we looking at here, Special Agent Gould?

14  A.  Here is another breakdown of Medicare Part D data for

15  Beecher Pharmacy for the time frame December 28th, 2010 through

16  August 2nd, 2011.  Here, we are looking at the top ten

17  prescribers by amount paid by Medicare Part D to Beecher

18  Pharmacy.

19  Q.  And if we look at this, we have Dr. Burdette.  Isn't that

20  correct?

21  A.  Physician Assistant Burdette.

22  Q.  Yes, Physician Assistant Burdette.

23        And he's responsible for a little over 50 percent of

24  the total reimbursements to Beecher Pharmacy.  Is that correct?

25  A.  Correct.  About 57 percent, I think.

1   Q.   The second prescriber is Mark Greenbain?

2   A.   Yes.

3   Q.   Is that correct?

4   A.   Correct.

5   Q.   And he's responsible for $161,000.  Isn't that correct?

6   A.   $161,591.93, yeah.

7   Q.   And the third highest prescriber for Beecher Pharmacy is

8   another doctor named Anmy Tran.  Isn't that correct?

9   A.   That's correct.

10  Q.   And she was responsible for referring approximately

11  $80,000?

12  A.   Approximately, yes.

13  Q.   Those top three prescribers, approximately what percentage

14  of the total reimbursements from Medicare to Beecher Pharmacy

15  are attributable to those top three prescribers?

16  A.   It's over 90 percent.

17  Q.   Special Agent Gould, if we could, I'd like to go back to

18  something, if we could go back to Government Exhibit 12D.

19          Special Agent Gould, this is the chart, if you will

20  recall, of the marketers identified by Ramesh Patel?

21  A.   Yes.

22  Q.   Did you prepare this chart, Government Exhibit 12D, before

23  Ramesh Patel testified or after Ramesh Patel testified?

24  A.   These were prepared after his testimony.

25  Q.   And what was the purpose in preparing these charts?

1   A.   The purpose of preparing these charts was to corroborate

2   the testimony of Ramesh Patel.

3   Q.   And, finally, I'd like to show you Government Exhibit 6E.

4            And this is a different kind of chart.  Isn't that

5   correct?

6   A.   That's correct.

7   Q.   This is a bar chart?

8   A.   Yes.

9   Q.   And what does it depict?

10  A.   Basically it's following Physician Assistant James

11  Burdette's prescriptions at Rapid Drugs, Tri-City Apothecary

12  and Beecher Pharmacy.

13  Q.   And what was the purpose of preparing this chart?

14  A.   This was to corroborate testimony and information provided

15  to us by witnesses.

16            MR. NEAL:  I have nothing further at this time,

17  Judge.

18            THE COURT:  Cross-examination?

19                    CROSS-EXAMINATION

20  BY MR. BLACK:

21  Q.   Agent Gould, you said this was Vinod Patel's signature in

22  2007.  Isn't that right?

23  A.   It's a signature next to the name of Vinod Patel.

24  Q.   And that's for 2007?

25  A.   May 30th, 2007, correct.

1    Q.  And that's the --

2              THE COURT:  Excuse me.  Counsel, would you tell us

3    what that is, please, that you are referring to?

4              MR. BLACK:  Oh, I'm sorry.  This is Government

5    Exhibit 5F, page two.

6              THE COURT:  Okay.  Thank you.

7              Repeat your question.

8    BY MR. BLACK:

9    Q.  Government Exhibit 5F, page two, you see the signature at

10   the at the bottom, right?

11   A.  I do.

12   Q.  You said that's Vinod Patel in 2007?

13   A.  That's the signature next to the printed name of Vinod

14   Patel on May 30th, 2007.

15   Q.  Were you there when that document was signed?

16   A.  No, I wasn't.

17   Q.  Okay.

18             MR. BLACK:  Can you pull Government Exhibit 5G,

19   please.

20   BY MR. BEUKE:

21   Q.  I'm showing you Government Exhibit 5G.

22             At the bottom that's Vinod Patel's signature in 2009,

23   right?

24   A.  On the 10th of November 2009, yes, that signature is above

25   the typed -- or, the printed name of Vinod Patel.

1   Q.  And you weren't there when that document was signed either,
2   were you?
3   A.  I was not physically present for that, no.
4   Q.  Here, this is Government Exhibit 4, page 12.
5           Do you see the signature on that one?
6   A.  I do.
7   Q.  You testified that's Vinod Patel's signature in 2009,
8   right?
9   A.  It's similar to the Vinod Patel signatures that I've seen,
10  yes.
11  Q.  The other Vinod Patel signatures from 2009?
12  A.  Yes.
13  Q.  Were you there when that one was not signed?
14  A.  I was not physically present for that, no.
15  Q.  Looking at Government Exhibit 4, page 40, you said that's
16  Vinod Patel's signature in 2009 as well, right?
17  A.  It's the signature under the typed name of Vinod Patel,
18  yes.
19  Q.  Okay.  Were you there when that one was signed?
20  A.  I was not physically present for that.
21  Q.  Okay.  There was a little bit of testimony about checks
22  that were written from First Michigan to various people.  Do
23  you remember that?
24  A.  I do.
25  Q.  Okay.  You testified that there were a number of checks

1   written to Nicole Pannell?

2   A.  Correct.

3   Q.  Out of First Michigan's bank account?

4   A.  That's correct.

5   Q.  And you said she was a marketer?

6   A.  Ramesh Patel testified to that, yes, she was a marketer.

7   Q.  Okay.  Did you -- and you looked through all the checks and

8   you created the chart that you showed the ladies and

9   gentlemen --

10          MR. BLACK:  Government Exhibit 12D, if you can pull

11   that up, please.  Thank you.

12   BY MR. BLACK:

13   Q.  Government Exhibit 12D, you created this chart, right?

14   A.  Yes.

15   Q.  And you looked through all the checks that were received

16   from First Michigan's bank account and you created this chart.

17   Right?

18   A.  That's correct.

19   Q.  And did you look at the signatures on those checks?

20   A.  Yes.

21   Q.  And those matched the signatures of Vinod Patel from 2009,

22   right?

23   A.  They are consistent with the signatures that we were

24   seeing, consistent other than that one signature that we see on

25   May 30th of 2007.

1   Q.   Okay.  And were you there when any of these checks were

2   written?

3   A.   I was not physically present for that, no.

4   Q.   Is it safe to say you weren't there for any checks that

5   were ever written from First Michigan?

6   A.   I was not present for any checks written by First Michigan,

7   no.

8   Q.   Okay.  Were you present when the bank account was opened?

9   A.   I wasn't there for that, no.

10  Q.   Okay.  Now, regarding Ms. Pannell, you said that you based

11  off of the testimony of Ramesh Patel, is how you decided she

12  was a marketer in this case.  Right?

13  A.   He testified that, yes, she is a marketer.

14  Q.   Okay.  That's not the first time you have heard the name

15  Nicole Pannell, is it?

16  A.   That may have been the first time I've heard that name.

17  Q.   Okay.  Is that the first time this name has come up

18  throughout the entire investigation?

19  A.   I can only speak for myself, and I think that was the first

20  time I had heard that name.

21  Q.   Okay.  You're one of the lead case agents in this case,

22  right?

23  A.   One of several, yes.

24  Q.   Okay.  And you've had a chance to review the reports in

25  this case?

1    A.   Most.

2    Q.   The reports especially of some of the people that have come

3    to testify in each of these trials?

4    A.   Yeah, most.  I can't say all, but ...

5    Q.   Okay.  Ramesh Patel, when he sat down with the Government,

6    he told them about Nicole Pannell and he said that that was one

7    of the marketers in this case, didn't he?

8    A.   Did he?

9    Q.   He did, didn't he?

10   A.   I would have to see a report.

11   Q.   Okay.

12           *(Off the record.)*

13   BY MR. BLACK:

14   Q.   Regardless, you never went to interview Nicole Pannell, did

15   you?

16   A.   I did not.

17   Q.   You never sat down with her and asked her if she received

18   any checks from First Michigan?

19   A.   No, I didn't.

20   Q.   You never sat down and asked her why she may have received

21   a check from First Michigan?

22   A.   I did not.

23   Q.   You never subpoenaed her bank records?

24   A.   No, I didn't.

25   Q.   You never looked at her W-2?

1    A.   Nope.

2    Q.   Okay.  Did anybody in this case sit down with Ms. Pannell?

3    A.   I don't believe so.

4    Q.   Okay.  And nobody in this case subpoenaed her bank records?

5    A.   I do not believe so.

6    Q.   Okay.  How about Gerald Dixon or Dixon-Bey --

7              MR. BLACK:  If you could put up page three of

8    Government Exhibit 12D.

9    BY MR. BLACK:

10   Q.   Gerald Dixon, Dixon-Bey, is that two different people or is

11   that one person?

12   A.   We believe that is one person.

13   Q.   Okay.  Based on the fact that their names are similar?

14   A.   Yeah, based on the similarity of the names and just the

15   testimony that we got from Ramesh.

16   Q.   Okay.  Is that the testimony where Ramesh said Gerald, he

17   didn't know the last name?

18   A.   I believe so.

19   Q.   Okay.  And did you ever send out an investigator to talk to

20   Gerald Dixon?

21   A.   No, we didn't.

22   Q.   How old Gerald Dixon-Bey?

23   A.   No.

24   Q.   How old Gerald last name unknown?

25   A.   That would be a lot of Geralds, I think.

1    Q.   And to your knowledge, no W-2s were ever subpoenaed for

2    Gerald Dixon or Dixon-Bey?

3    A.   No, sir.

4    Q.   Or last name unknown?

5    A.   No.

6    Q.   Okay.  Or bank records?

7    A.   No.

8    Q.   Okay.  Looking at Government Exhibit 12D, page four, Kim

9    Simpson, again, you said this was based on Ramesh Patel's

10   testimony that she is a marketer in this case.  Right?

11   A.   Correct.

12   Q.   Okay.  And, again, you never sent an investigator to see

13   Kim Simpson?

14   A.   No.

15   Q.   You never subpoenaed her bank records?

16   A.   No, I didn't.

17   Q.   Her W-2s?

18   A.   No.

19   Q.   You never sat down and asked her if she received this

20   money?

21   A.   No.

22   Q.   Okay.  And, again, is that the same with Melinda Huddleston

23   or Lori Singleton?

24   A.   Yeah, it's the same.

25   Q.   For both of them?

1    A.  Yeah, for both of them.

2    Q.  All right.

3            MR. BLACK:  Put up Government Exhibit 12E, please.

4    BY MR. BLACK:

5    Q.  We are looking at Government Exhibit 12E, apparently page

6    five.

7            You put this chart together too, right?

8    A.  Yes.

9    Q.  And this is the total amount of money that each person

10   listed up there received via check from First Michigan Home

11   Health Care between January 2008 and December 2011.  Is that

12   right?

13   A.  Out of that account.  That's in Exhibits 12A and 12C, yeah.

14   Q.  Are those the only accounts that First Michigan had?

15   A.  I'm not aware of ...

16   Q.  Are those the only accounts you have from First Michigan?

17   A.  Of what I had access to, yes.

18   Q.  Okay.  Is that the only account that was subpoenaed from

19   First Michigan?

20   A.  You know, I'm not aware.  That was done by the financial

21   side.

22   Q.  Okay.  Either way, Vinod Patel, $583,325 from January 2008

23   to December 2011.  Is that right?

24   A.  Yes.

25   Q.  Is that his gross pay or his net income?

1   A.  You know, we're just looking at the checks going from that

2   account to Vinod.  So, I couldn't say if it was his gross pay

3   or if it was his net income, because we didn't really take into

4   account the payroll checks.

5   Q.  Okay.  So, you don't know how much money Vinod Patel put

6   back into the business?

7   A.  I do not.

8   Q.  Okay.  This is just the number of checks written to Vinod

9   Patel?

10  A.  Or the amount of the checks written to Vinod Patel, yes.

11  Q.  Okay.  And that's the same with each one of these people;

12  is that right?

13  A.  Correct.

14  Q.  Okay.

15          MR. BLACK:  May I see 12E, page two, please.

16  BY MR. BLACK:

17  Q.  Looking at the breakdown of Ramesh Patel in Government

18  Exhibit's 12E, page two -- is that right?

19  A.  Yes.

20  Q.  You testified this is a list of each one of the checks

21  written from these accounts that you subpoenaed to Ramesh

22  Patel.  Right?

23  A.  Yes.  That one account ending in 3634.

24  Q.  Okay.  In what order did you put the checks in on this

25  chart?

1    A.   They are not in a particular order.

2    Q.   Okay.  You said they were just random numbers, right?  It

3    doesn't look like there's any pattern?

4    A.   To the amounts that were written to Ramesh, there's not

5    really a, like a consistent amount, no.

6    Q.   Okay.  If you look at some of the checks in 2007 up, you

7    know, near the middle of the top -- the bottom of the top

8    middle section, 2007, you see there's a check for a thousand

9    dollars, one for 500, one for 1600?

10   A.   Yes.

11   Q.   In 2008, he received $400?

12   A.   Mm-hmm.

13   Q.   Then on December 30th, 2008, all of a sudden he receives

14   $24,000.  Right?

15   A.   Yes.

16   Q.   And after that the numbers, they stay pretty high like

17   that, don't they?  They are all in the double digit thousands?

18   A.   It appears so.

19   Q.   Okay.  Throughout 2009 and 2010, he received remarkably

20   more money than he had before?  Doesn't he?

21   A.   Definitely more than what he was receiving in 2007 and

22   2008.

23   Q.   Okay.  And, again, with all these checks that are listed

24   here and all the other charts that you showed from First

25   Michigan's checking account -- you looked at the checks there,

1   right?

2   A.  Yes.

3   Q.  And they all bear a signature similar to the one of the

4   Vinod Patel's in 2009?

5   A.  Correct.

6   Q.  Okay.  And you weren't there when any of those checks were

7   signed either?

8   A.  No.  I was not physically present for that, no.

9           MR. BLACK:  If you could put up Government Exhibit 7.

10  Thank you.

11  BY MR. BLACK:

12  Q.  You are looking at Government Exhibit 7.  This is page one.

13  This is a chart you put together of all the Medicare Part D

14  data of all of the Patel pharmacies, the amount was that was

15  paid for Medicare Part D by the top ten drugs that were

16  prescribed.  Is that right?

17  A.  Yes.

18  Q.  Okay.  And how many pharmacies did -- does all the Patel

19  pharmacies include?

20  A.  Approximately 26 pharmacies, I believe.

21  Q.  Okay.  Approximately 26 or 26?

22  A.  I can't say for sure whether it was 26, 27.  There were a

23  lot.

24  Q.  Okay.  What's the criteria to be a Patel pharmacy?

25  A.  They were the pharmacies that were -- that we had seen that

1   were owned and/or controlled by Bob Patel.

2   Q.  Okay.  Based on testimony of other people?

3   A.  No.  This is based on information we had collected over the

4   course of the investigation.

5   Q.  Okay.  And you came out with a number somewhere around 26?

6   A.  Yes, something like that.

7   Q.  Was Rapid Drugs one of those?

8   A.  Yes.

9   Q.  Was Tri-City one of those?

10  A.  Yes.

11  Q.  Was Beecher Pharmacy one of those?

12  A.  No.  Beecher Pharmacy was not included in the totals.

13  Q.  How about Park Shelton?

14  A.  Park Shelton was not included in that.

15  Q.  Okay.  We are looking now at what was previously identified

16  as Government Exhibit 8.

17          You prepared this chart too, right?

18  A.  I did.

19  Q.  And this is, again, the Medicare Part D payments per drug

20  to Tri-City Apothecary, right?

21  A.  Correct.

22  Q.  And that was the pharmacy were where Pradeep Pandya was the

23  pharmacist, correct?

24  A.  Yeah.  He was a pharmacist up there.

25  Q.  Okay.  The first one up there, just for example, Lidoderm,

1   $102,762.42 worth of Lidoderm was prescribed out of Tri-City

2   Apothecary.  Is that right?

3   A.  Well, it was -- it wasn't prescribed out of Tri-City

4   Apothecary.  It was -- it was billed to Medicare Part D by

5   Tri-City Apothecary.

6   Q.  Okay.  All right.  And how many prescriptions does that

7   equal?  How many prescriptions of Lidoderm gets you

8   $102,762.42?

9   A.  You know, I don't have that chart in front of me.  So, I

10  couldn't tell you.

11  Q.  Is it safe to say that's the same for all the drugs on that

12  list?

13  A.  Exactly, yeah.  We didn't include that breakdown I did by

14  number of prescriptions.

15  Q.  Okay.  How many patients were prescribed Lidoderm between

16  January 27th, 2010 and April 28th, 2011?

17  A.  Geez, I couldn't tell you off the top of my head.

18  Q.  Okay.  You also don't know what the diagnosis for each of

19  those patients were?

20  A.  No.  And I don't think the Medicare Part D data actually

21  provides the diagnosis for the patients.

22  Q.  Okay.  Do you know which doctors prescribed this Lidoderm

23  on here?

24  A.  I couldn't tell you off the top of my head.  If I had my

25  data in front of me, I could run you a quick pivot table and

1    tell you.  But off the top of my head, no, I can't tell you who

2    it is.

3    Q.  "Pivot table."  That sounds like it's over my head.

4              How much did each prescriber prescribe; do you know

5    that much?

6    A.  Just the Lidoderm?

7    Q.  Yeah, for example.

8    A.  No, I don't.

9    Q.  Okay.  And is it safe to say it's the same for all the

10   drugs up there?

11   A.  No.  I didn't prepare anything like that for those.

12   Q.  Of the Lidoderm that was billed to Medicare at Tri-City

13   Apothecary, the $102,762.42 worth, how much of it was returned

14   to McKesson?

15   A.  I do not know.

16   Q.  Okay.  And the pharmacist from January 27th, 2010 to April

17   28th, 2011, was that Pradeep Pandya the entire time?

18   A.  You know, I don't know if it was Pradeep the whole time or

19   if it was a combination of other pharmacists.

20   Q.  Okay.  And this is just the second page of Government

21   Exhibit 8.  It's the same kind of list, Medicare data, the

22   amount that was billed per doctor that prescribed each drug.

23   Is that right?

24   A.  True.

25   Q.  Okay.  And how many prescriptions, do you know, did James

1    Burdette prescribe out of Tri-City Apothecary on that list?

2    A.  I couldn't tell you off the top of my head.  I've got a

3    similar chart prepared like that, but I don't think we included

4    it in this.

5    Q.  Which drugs was James Burdette prescribing out of that

6    amount?

7    A.  Again, I don't have something prepared like that.  I could

8    easily do it if I had it in front of me, but ...

9    Q.  And you also don't know off the top of your head how much

10   each one of the drugs he prescribed cost?

11   A.  No.

12   Q.  Okay.

13   A.  Just the total.

14   Q.  What was the time period that James Burdette was

15   prescribing -- was he prescribing that entire time period?

16   A.  As far as I know, I believe so, yes.

17   Q.  How about Mark Greenbain?

18   A.  The same, I believe so.

19   Q.  What about Kriangsak Thepveera?

20   A.  I can't speak to Thepveera.

21   Q.  Anmy Tran?

22   A.  Same, yeah.

23   Q.  Unknown?

24   A.  Yeah.  Unknown is a tough one.

25   Q.  Yeah.

1          Same all the way down.  You can't say what the dates

2     were that any one of those doctors was prescribing, can you?

3     A.  No, other than just to say that my chart encompasses the

4     time frame January 27th, 2010 through April 28th, 2011.

5          MR. BLACK:  Okay.  Government Exhibit 9, please.

6     BY MR. BLACK:

7     Q.  Looking at Government Exhibit 9, that's Rapid Drugs.

8     That's the pharmacy where Hiren Patel was the pharmacist.  Is

9     that correct?

10    A.  That's correct.

11    Q.  Okay.  And the same questions for that.  You don't know how

12    much -- you don't know how many prescriptions of Oxycontin were

13    written from Rapid Drugs in that time frame?

14    A.  Not off the top of my head, no.

15    Q.  And you don't know which doctors prescribed them or how

16    many patients?

17    A.  No.  The chart doesn't get into that.

18    Q.  Okay.  All right.  Government Exhibit 11, this is the same

19    chart you made, but for Beecher Pharmacy.  Right?

20    A.  Correct.

21    Q.  And that's the pharmacy where Lalit Patel was the

22    pharmacist?

23    A.  I believe Lalit was one of the pharmacists there, yeah.

24    Q.  Okay.  And, again, I'm not going to go through all the

25    drugs.

1          You don't know how many prescriptions of each of

2    those drugs were written or which doctors wrote them?

3    A.  No, I couldn't tell you off of this chart here.

4    Q.  And the same for the doctors, the chart for the doctors,

5    you don't know --

6    A.  Correct.  All it is is just the top ten amounts there.

7    Q.  Okay.

8          MR. BLACK:  Can I see Government Exhibit 6A.

9    BY MR. BLACK:

10   Q.  You are looking at Government Exhibit 6A.  This is the

11   amount paid from Medicare Part A to First Michigan by year.  Is

12   that correct?

13   A.  That is correct.

14   Q.  Okay.  It kind of goes up, and it peaks in 2009, and then

15   it goes back down and levels off again in 2011.  Is that right?

16   A.  Yeah.  I see a peak at 2.9 million in 2009.  It goes down

17   to 1.5 million in 2010.  And then for 2011, it's not a complete

18   year of data.  So, you've got an incomplete year there, since

19   it only goes to August 2nd, 2011.

20   Q.  Right.  Okay.

21          And did you -- did you -- in your calculations here,

22   did you include the staff costs per year of each of these?

23   A.  I don't think the Medicare data goes into that, like has

24   that information in it.

25   Q.  And Medicare data doesn't have the rents that First

1   Michigan paid in there either?

2   A.  No.

3   Q.  Well, you got First Michigan's bank records, right?

4   A.  Our financial side did get First Michigan's bank records,

5   yes.

6   Q.  Okay.  Did you ever investigate the profit or the loss each

7   year?

8   A.  We did not perform an analysis of/profit/loss or anything

9   like that.

10  Q.  Okay.  You didn't prepare a chart that shows the income

11  versus the expenses?

12  A.  Nope.

13  Q.  Or how much of that money equals money in somebody's

14  pocket; you never provided a chart like that?

15  A.  Nope.  Just this breakdown.

16  Q.  Okay.  And you don't know how many patients First Michigan

17  saw in 2007, do you?

18  A.  I couldn't tell you off the top of my head, no.

19  Q.  Or 2008 or 2009?

20  A.  No.

21  Q.  2010 and 2011?

22  A.  (Witness shaking head.)

23  Q.  Okay.

24          MR. BLACK:  Government Exhibit 6B, please.

25

1    BY MR. BLACK:

2    Q.  Government Exhibit 6B, you said this was a chart you

3    prepared.  This is, again, First Michigan Home Health Care.

4    Right?

5    A.  Yes.

6    Q.  And it's the number of referrals that each doctor referred

7    and then the amount that Medicare paid for that amount of

8    referrals.  Right?

9    A.  Yeah, for the top ten referrals.

10   Q.  Okay.  And aside from Mr. Dababneh, which Mr. Neal

11   mentioned, it's -- the number of referrals descends --

12        Well, the number of referrals descends, right; that's

13   the way you organized the chart?

14   A.  Right.  I organized it by referrals, yes.

15   Q.  Okay.  And then also, aside from Mr. Dababneh and

16   Mr. Mitchell, if you just switch those around -- they are

17   pretty close, but if you switch those around, that column

18   descends too.  Right?

19   A.  Correct.  Other than those two, yes.

20   Q.  All right.  So, it's pretty proportional, the number of

21   referrals equals the number you received from First Michigan?

22   A.  Correct.

23   Q.  Okay.  And you said the Paul Petre data, that's Paul Petre

24   and Mr. Burdette?

25   A.  Well, it's -- those are the referrals that are attributed

1    to Paul Petre.

2          We confirmed with Medicare Part A that the referrals

3    have to be -- have to come from a physician.  The PA -- in this

4    case Burdette, who is in that group -- he couldn't have

5    referrals attributed to him.  So, any referrals that the PA

6    were to make, they would have to be under Paul Petre's name.

7    Q.   Okay.  So, you don't know how many referrals in this 381

8    were Paul Petre or how many were James Burdette, do you?

9    A.   No.  The data didn't break it down like that.

10   Q.   Okay.  You never found any -- you looked through the bank

11   records, right, for First Michigan?

12   A.   Some of them, yes.

13   Q.   You never found any cash, real large cash withdrawals that

14   were then transferred to Dr. Burdette or Dr. Petre, did you?

15   A.   I wouldn't be able -- I guess you could see if there are

16   any big cash withdrawals.  But I guess from that point, I don't

17   think you could see where they went to or who they would go to

18   unless they were written by check.

19   Q.   Okay.  There were no checks to either of those doctors,

20   were there?

21   A.   I didn't see any checks written to Burdette or to Petre.

22   Q.   There were no checks written to any of these doctors, were

23   there?

24   A.   There was a check written to Roberto William that I saw.

25   Q.   Okay.  How much was that check?

1   A.   I believe it was for a thousand dollars.

2   Q.   A thousand dollars.

3          And when was that?

4   A.   I couldn't -- I don't know the date on that one.

5   Q.   Okay.  And this chart goes from June 1st, 2007 to August

6   2nd, 2011.

7          That's the total amount of time that First Michigan

8   was in Vinod Patel's name.  Is that right?

9   A.   Well, it started in his name the end of May 2007.  And then

10  the way I put this chart together was up until the August 2nd

11  date for us.  However, the name -- it stays in Vinod's name

12  past that into I think 2012.

13  Q.   Okay.  And this top ten list here, that's the top ten for

14  that entire span of time?

15  A.   Correct.

16  Q.   You don't know the top ten in 2007, do you?

17  A.   I didn't break it down by year, no.

18  Q.   Okay.  So 2008, nine, ten, eleven --

19  A.   No.  It just encompasses that entire time frame.

20  Q.   Okay.  You are familiar with Dr. Petre, right?

21  A.   Yes.

22  Q.   You're aware that he was interviewed as part of the

23  investigation for this case?

24  A.   Yes.

25  Q.   And are you also aware that he said that he never received

```
 1    any money --
 2              MR. NEAL:  Well, I'm going to object to this, Your
 3    Honor.  I believe this is calling for hearsay, a witness who
 4    never testified in this court.
 5              THE COURT:  Response?
 6              MR. BLACK:  Your Honor, I'm -- this is being offered
 7    for impeachment purposes.
 8              THE COURT:  Impeachment of whom?
 9              MR. BLACK:  Of the witness, in addition to several
10    witnesses that testified, Ramesh, Atul, witnesses that
11    testified that doctors were paid.
12              MR. NEAL:  Your Honor, I think it is improper to --
13    this is an improper foundation --
14              THE COURT:  Sustained.
15    BY MR. BLACK:
16    Q.  In the indictment in this case, you are aware that
17    Dr. Petre was indicted.  Right?
18    A.  Yes.
19    Q.  And he pled guilty?
20    A.  He did.
21    Q.  And he entered into a Cooperation Agreement with the
22    Government?
23              MR. NEAL:  I'm going to object.  Relevance, Your
24    Honor.
25              THE COURT:  Is it relevant?
```

1          MR. BLACK:  It is, Your Honor.

2          THE COURT:  Give me a hint.

3          MR. BLACK:  As far as the course of investigation

4    that the Government took in this case.

5          THE COURT:  It's sustained.

6          *(Off the record.)*

7          MR. BLACK:  Your Honor, could we take a break at this

8    time this morning and have a discussion about some things, some

9    housekeeping matters?

10         THE COURT:  Sure.

11         MR. BLACK:  Thank you.

12         THE COURT:  This will be, try and make it a 15-minute

13   break.  You'll probably get another one later.

14         All rise for the jury.

15         Don't talk about it.  Relax for a few minutes.

16         You may be excused.

17         *(Jury leaves the courtroom at 10:02 a.m.)*

18         THE COURT:  All right.  What would you like to

19   discuss?

20         MR. BEUKE:  Judge, if we could, along this line of

21   questioning, our understanding is that during the course of the

22   two indictments that were returned in this case, a number of

23   doctors were indicted, a number of doctors whose names were

24   brought up through civilian witnesses in the case, as well as

25   the agents who testified.

1          The doctors that I particularly think are relevant

2     are Dr. Petre, Dr. Greenbain, Dr. U or Dr. Utarnachitt,

3     Dr. Ruben Benito and Dr. Javaid Bashir.  All of those doctors

4     have pled guilty in this case.  All of those doctors have been

5     made relevant in this case through the testimony of the

6     Government witnesses.

7          I think that several of the doctors have also entered

8     into Cooperation Agreements with the Government.

9          Now, I think -- I understand Your Honor's ruling.  I

10    think -- I don't believe that we can go into statements that

11    were made by these doctors subject to proffer agreements with

12    the prosecutors.  However, the fact that they've pled guilty

13    and the fact that they've entered into Cooperation Agreements

14    with the Government we believe is something that the jurors

15    should be allowed to know.

16          THE COURT:  Because?

17          MR. BEUKE:  Because they are certainly witnesses.

18    The Cooperation Agreements have been gone into by the

19    Government with each one of their witnesses that entered into

20    such an agreement.  And they are available to be called by the

21    Government.  That's part of their agreement.

22          The fact that they weren't called in this case is

23    certainly something that we believe should be -- able to be put

24    in front of the jury so they can evaluate the testimony of the

25    witnesses who were called.

1          THE COURT:  What's the Government's response?

2          MR. NEAL:  Your Honor, my response would be I think

3     the focus should be on the evidence that was heard, you know,

4     not what evidence may have been heard, and asking the jury to

5     speculate as to what Paul Petre would have said if he were

6     called.  It's really not an appropriate function for the jury.

7          And I think, look, we have mentioned a number of

8     these doctors names.  The fact that they pled guilty, I don't

9     have an objection to.

10         Getting into what information they provided or didn't

11    provide or whether or not they have a Cooperation Agreement, I

12    don't see the relevance, and I think really we just invite

13    improper speculation on the part of the jury.

14         MR. BEUKE:  No, Judge, we don't want to go into the

15    information that they provided.  That's not our intention.

16    Just the fact that if they did enter into a Cooperation

17    Agreement with the Government, and that's as far as we'll go.

18         MR. NEAL:  But, again, I just don't see -- I don't

19    see the relevance.  It invites --

20         THE COURT:  I'm going to be telling the jury --

21    although I haven't gotten to it in my review of the

22    instructions, I trust I will be telling the jury that what

23    happened to the other people charged is not relevant to their

24    function here.

25         I also will be telling the jury that they don't have

1    to call all the witnesses who know something about the

2    transaction.

3              And then if I let you go into the fact that they pled

4    guilty, that's inconsistent with and it's allowing them to

5    focus on something that is not relevant to the charge.

6              MR. BEUKE:  Judge, it's not the plea of guilty that

7    we believe is relevant.  It's the fact that they've pled guilty

8    and they've entered into Cooperation Agreements with the

9    Government.  The Cooperation Agreement is the important thing

10   or the relevant thing.

11             THE COURT:  Well, I understand what you're saying,

12   but I think we could be here for another two or three weeks

13   having all these people come in and testify that they don't

14   know something or that they do know something.

15             But he's not -- the Government is not required to

16   call everybody who knows something about the case.

17             MR. BEUKE:  No, I understand that, Your Honor.

18             But this is a different -- these -- you've allowed

19   evidence in through a number of the witnesses about the fact

20   that Vinod Patel told me he paid doctor so-and-so or he paid

21   this doctor or he paid that doctor.

22             THE COURT:  I recall -- I don't recall an objection

23   to any of that.

24             MR. BEUKE:  Well, Judge, I understood Your Honor's

25   ruling to be that if it's a statement of a co-conspirator made

1    during the course of the conspiracy, it was coming in.

2              THE COURT:  If it was against their interest, yes.

3              MR. BEUKE:  Yes.

4              THE COURT:  Okay.

5              MR. BEUKE:  Well, I understand Your Honor's ruling,

6    and I respect Your Honor's ruling.

7              THE COURT:  Okay.

8              MR. BEUKE:  But my position here -- our theory is

9    that if, in fact, that statement by our client to this third

10   party comes in, and nobody testifies that our client ever put a

11   dime in anybody's hand, and these doctors are the persons who

12   the statements refer to, and they certainly are available and

13   under some sort of an agreement, a contract with the Government

14   to testify, should they be needed to testify, the fact that

15   they didn't call them is something the jury should know.

16             THE COURT:  Your response?

17             MR. NEAL:  Your Honor, again, I think that this is an

18   invitation to improper speculation on the part of the jury.

19   Their consideration should be limited to the evidence that has

20   been heard.

21             You will be instructing them that the guilt or

22   innocence of others is no defense to a criminal charge; that,

23   you know, that the guilty pleas of others, you know, are only

24   to be considered for the purpose of evaluating the credibility

25   of a particular witness and not for any other purpose.

1          I think getting into guilty pleas and Cooperation

2    Agreements with people who are not witnesses can only invite

3    improper speculation by the jury as to what these people would

4    have said.

5          THE COURT:  Well, I think you can argue to the jury

6    that there are all these other people mentioned and they

7    haven't been called based on the record as it is now.

8          MR. BEUKE:  Well, but, Judge, the importance of the

9    information that they've entered into Cooperation Agreements

10   with the Government is the golden goose for the Defense.  I

11   mean, that's the important thing; the fact that they have an

12   agreement to testify whenever these gentlemen say here's a

13   subpoena, come to court.  And they didn't call them.

14         I'm not going to ask anybody to speculate.  I just

15   think that that information needs to be in the hand of the

16   jury.

17         THE COURT:  Let's hear the Government's response.

18         MR. NEAL:  That's exactly what you would be asking

19   the jury to do, to speculate.

20         As the Court pointed out, we're not required to call

21   every witness who could possibly corroborate or have

22   information pertinent to the case.  And by bringing up the fact

23   that there were witnesses who were not called --

24         I certainly think it's fine in argument, to argue you

25   didn't hear enough evidence.  But, you know, to argue, well,

1    the Government had these witnesses they could have called and,

2    you know, you didn't hear from them and that you would have

3    heard from them X, Y or Z or to suggest that -- again, it's

4    just speculation.  It's speculating as to what people who are

5    not witnesses in this court would have said.

6             MR. BEUKE:  But, Your Honor, you and I and counsel

7    all know the fact that somebody pleads guilty, and if he's not

8    under a Cooperation Agreement, that puts him in a completely

9    different category.  He has no requirement or he has not

10   entered into any agreement with the prosecutors to be available

11   to be called as a witness against anybody he has relevant

12   testimony against.

13            The fact that these certain people, these doctors

14   have entered into that agreement puts them in a completely

15   different category.

16            And certainly the prosecutors can try their case any

17   way that they want.  And they've chosen to try the case without

18   calling the doctors.  But the fact that they have these doctors

19   available to them to call, the names that were thrown out in

20   the courtroom over the last five or six days, and they chose

21   not to call them, is something that these people should know.

22            THE COURT:  All right.  What's your last thing?

23            MR. NEAL:  Your Honor, I'm not sure how a Cooperation

24   Agreement is particularly relevant.  You can subpoena anyone

25   and put them on the witness stand, you know, and ask them

```
 1    questions.

 2           But the fact that we have not called a number of

 3    individuals, again, I think the only inference that can be

 4    drawn from that is a speculative inference.  And I don't think

 5    it's an appropriate topic for cross-examination, an appropriate

 6    topic to go into.

 7           THE COURT:  All right.  My ruling stands.

 8           Five more minutes.

 9           MR. BEUKE:  Judge, can I just ask you with respect

10    to -- I'm not sure if we're done with the agent, but if we are

11    done, the Government will rest.

12           And do you want us to formally rest in front of the

13    jury or ...

14           THE COURT:  Yes.

15           MR. BEUKE:  Okay.  And then are we going to go right

16    into closing arguments or ...

17           THE COURT:  I think so.

18           In fact, are you done with your cross-examination?

19           Because if you are, we will make this an extra ten

20    minutes so that you can be fresh for your -- well rested and

21    fresh for your closing arguments.

22           We are in recess.

23           (Recess held until 10:32 a.m.)

24           LAW CLERK:  All rise.

25           (Jury not present.)
```

1          THE COURT:  All right.  We have another note from the

2     jury.

3          "Compared to other pharmacies (smaller, not like a

4     CVS or a Rite-Aid) linked to home health care services, do they

5     have the same prescriptions going through their store as well

6     in that volume?  What's the comparison?"

7          I'll just tell them they're going to have to rely on

8     whatever is produced.  And if somebody understands the

9     question, you can answer it through a witness.

10          MR. BEUKE:  Judge, can we have the note?  We'll ask

11     it.

12          THE COURT:  Huh?

13          MR. BEUKE:  Can we have the note?  We'll ask it.

14          THE COURT:  Yeah, you can ask it.  That's fine.

15          You don't need the note to ask it.  Do you want me to

16     read it again?

17          MR. BLACK:  Yeah, one more time, if you could,

18     please.

19          THE COURT:  "Compared to other pharmacies (smaller,

20     not like a CVS or a Rite-Aid) linked the home health care

21     services, do they have the same prescriptions going through

22     their store as well in that volume?  What's the comparison?"

23          Got it?

24          MR. BLACK:  Not exactly, but I got it.

25          THE COURT:  Okay.

1          MR. BLACK:  Do you want me to ask it exactly or ...

2          THE COURT:  I don't want you to ask it at all.  I

3     don't want --

4          MR. BLACK:  Can I --

5          THE COURT:  No, no.  I don't want to tell you how to

6     try your case.  I don't want to tell the prosecutor to ask it

7     or not ask it.  That's your decisions.

8          MR. BLACK:  Can I look at it and copy word-for-word

9     or ...

10         MR. NEAL:  Why don't we just have the Court, if you

11    want to address that to the witness at the conclusion of the

12    cross-examination, that's fine or ...

13         THE COURT:  Is that agreeable to the Defense?

14         MR. BEUKE:  No.  We'll ask it.

15         MR. BLACK:  Yeah.

16         THE COURT:  Okay.

17         *(Off the record.)*

18         MR. BLACK:  It will just take me a moment.  I write

19    fast.

20         Thank you.

21         MR. NEAL:  Judge, if you could at least address the

22    fact that the question will be asked by the Defense attorney?

23         THE COURT:  Yeah.

24         MR. NEAL:  I think that's fine.

25         THE COURT:  Yeah, I'll tell 'em.

1          MR. NEAL:  Very good.

2          THE COURT:  I'll just use the word "counsel," and you

3     both can ask it.  And maybe you can do it as a duet.

4          *(Off the record.)*

5          THE COURT:  You're not tracing it, are you?

6          MR. BLACK:  I want to get the handwriting exactly

7     right.

8          *(Off the record.)*

9          MR. BLACK:  Thank you, Your Honor.  Thanks.

10         THE COURT:  Ready for the jury?

11         MR. BEUKE:  Yes, Judge.

12         THE COURT:  All right.

13         *(Jury enters the courtroom at 10:36 a.m.)*

14         THE COURT:  Everyone is in their place.  You may be

15    seated.

16         I have a note addressed to any witness, I guess.  And

17    counsel will ask the question.

18         So, you may continue your cross-examination.

19         MR. BLACK:  Thank you, Judge.

20    BY MR. BLACK:

21    Q.  Agent Gould, you're looking at Government Exhibit 12A, page

22    393.

23         Do you remember when Mr. Neal showed that to you a

24    little bit earlier?

25    A.  Yes.

1    Q.  And you said you noticed -- you said at the top that those

2    are ATM or debit withdrawals, is that right, or transactions?

3    A.  I believe those are ATM debit transactions, correct.

4    Q.  Okay.  And you had some took place in Saginaw?

5    A.  Yes.  There are some that took place in Saginaw, Michigan.

6    Q.  Which at that time was Tri-City?

7    A.  Yeah, I believe so.

8    Q.  Okay.  And you don't know who had the debit card for each

9    of those transactions, do you?

10   A.  No.  I don't know who had it in their hand at that time,

11   no.

12   Q.  You don't know how many debit cards First Michigan had?

13   A.  I do not, no.

14   Q.  Or who had access to their debit cards?

15   A.  No, I don't.

16   Q.  Okay.  You were -- you've been here throughout the

17   testimony.  You heard that -- or, you've learned through the

18   investigation that certain witnesses have said that

19   Dr. Burdette, for example, was paid for his services.  Is that

20   right?

21   A.  Yeah, I don't recall hearing that.

22   Q.  Or Dr. Petre?

23   A.  Again, I don't recall hearing that.

24   Q.  Dr. Greenbain?

25   A.  Again, I don't recall hearing that.

1   Q.  Dr. Jan?

2   A.  I believe when they spoke of Dr. Jan, it involved Park

3   Shelton Pharmacy, and he was getting a rent payment, which was

4   in effect an inflated rent payment.

5   Q.  Okay.  And Dr. Bashir, do you remember him?

6   A.  I remember a discussion about Dr. Bashir as well.

7   Q.  Okay.  And you -- in going through First Michigan's bank

8   records, again, you never saw a check to Dr. Burdette or

9   Dr. Petre?

10  A.  Correct.  The checks I saw, I didn't see anything for

11  Burdette or Petre.

12  Q.  Or Greenbain or Jan or Bashir?

13  A.  Correct.  I didn't see any checks for those doctors either.

14  Q.  Okay.  And the bank records, they track cash withdrawals,

15  right?

16  A.  Uhm, I believe so.

17  Q.  Okay.  And, well, bank records typically track cash

18  withdrawals.  Isn't that right?

19  A.  Yeah, they would be.

20  Q.  All right.  And you never found any large cash withdrawals

21  that would corroborate anybody's testimony that any of those

22  doctors were paid from First Michigan, did you?

23  A.  You know, I personally didn't see any large cash

24  withdrawals.

25  Q.  Okay.  You mentioned earlier that you put together the

1    charts regarding the marketers, and you base that off of

2    testimony from Ramesh Patel in this case.  Isn't that right?

3    A.  That's right.

4    Q.  Nicole Pannell?

5    A.  Yes.

6    Q.  And he sat up there and said Nicole Pannell was a marketer

7    that was paid?

8    A.  I believe he did, yes.

9    Q.  Gerald Dixon, Dixon-Bey, last name unknown, that's one that

10   he said was paid?

11   A.  Yes.

12   Q.  Kim Simpson, that's one he said was paid?

13   A.  Yes.

14   Q.  Melinda Huddleston, that's one he said was paid?

15   A.  I believe so, yes.

16   Q.  And Lori Singleton, that's one he said was paid?

17   A.  I believe so.

18   Q.  And he said that from the stand you're sitting at right

19   now.  Right?

20   A.  That's what I recall, yes.

21   Q.  Okay.  And you were involved with the investigation in this

22   case, as we mentioned before.  Right?

23   A.  Yes.

24   Q.  And you reviewed reports that were pertinent to those

25   witnesses?

1   A.   I've reviewed -- I can't say that I've reviewed them all.

2   I've reviewed most.

3   Q.   Okay.   From that stand is actually the first time Ramesh

4   Patel ever mentioned any of the names, Nicole Pannell, Kim

5   Simpson, Gerald Dixon, Dixon-Bey, last name unknown, Melinda

6   Huddleston or Lori Singleton.   Right?

7   A.   At least that's how I recall it.

8   Q.   All right.   And when he mentioned those names, you ran to

9   the office and put together these charts?

10  A.   I made my way over to the office.

11  Q.   Figuratively.

12  A.   Yes.

13  Q.   You went to the office, right?

14  A.   Yeah.   We took those names and we checked the list of

15  checks and ...

16  Q.   You had your agents search through all the checks?

17  A.   Well, we looked through -- I looked through them.

18  Q.   Okay.   You looked through all the checks.

19         And you found checks that were written to each of

20  those people?

21  A.   Yeah, myself and the team, we looked through them.

22  Q.   As soon as you heard those names, you didn't send an

23  investigator out to talk to any of those people?

24  A.   No, we didn't.

25  Q.   Okay.   And the first time you heard that was in trial?

1    A.   The first time I heard the names was in trial, yeah.

2    Q.   The first time those names were ever mentioned?

3    A.   It was the first time I heard them.

4    Q.   Finally, you put together these charts with, you know,

5    medications and amounts paid by Medicare Part D for each of the

6    pharmacies that you thought were relevant in this case, right?

7              Tri-City, Rapid, and Beecher.  Is that right?

8    A.   Yes.

9    Q.   Okay.  Now, the numbers on those charts, how do those

10   numbers compare to other smaller pharmacies like -- not a CVS

11   or a Walgreens -- other small mop-and-pop pharmacies that are

12   connected to home health care agencies across the country?

13   A.   Outside of like the Bob Patel pharmacies?

14   Q.   Just in general.

15   A.   In general?  I didn't do an analysis of that type.

16   Q.   Okay.  Do you have any data regarding prescription patterns

17   for other pharmacies that aren't in what you would classify as

18   a Bob Patel pharmacy?

19   A.   No.  I didn't do any analyses like that.

20   Q.   You can't say whether Lidoderm is prescribed at the same

21   rate at a pharmacy in the south side of Chicago, can you?

22   A.   No.  I didn't do -- I didn't undertake an analysis like

23   that, no.

24   Q.   You don't know if Nexium is prescribed in the same manner

25   in a small town outside of Omaha, Nebraska, do you?

1    A.   No.   I didn't do an analysis like that.

2    Q.   Okay.   You don't know how they compare?

3    A.   I do not.

4              MR. BLACK:   All right.   One moment, Your Honor.

5              Nothing further.

6              THE COURT:   The Government?

7              MR. NEAL:   I have nothing further for this witness,

8    Your Honor.

9              THE COURT:   Jurors, anymore questions?

10             You may step down.

11   A.   Thank you.

12             THE COURT:   You may call your next witness.

13             MR. NEAL:   Your Honor, at this time, the Government

14   rests its case.

15             THE COURT:   All right.   The Defense?

16             MR. BEUKE:   Judge, subject to the admission of our

17   exhibits, the Defense would rest, ladies and gentlemen.

18             THE COURT:   Any objections to the admission of the

19   exhibits that haven't already been admitted?

20             I think they've pretty well all been admitted.

21             MR. NEAL:   Your Honor, if we could take one moment?

22             THE COURT:   Sure.

23             *(Off the record.)*

24             MR. NEAL:   Your Honor, I believe we've reached

25   agreement on the Defense exhibits.

1          THE COURT:  Well, do you want to put it on the

2     record?  Are they all admitted or ...

3          MR. BLACK:  Your Honor, we've agreed that Defendant's

4     Exhibits 1, 2, 4, 5, 6, 7A, 7B, 9 and 14 will be admitted.

5          MR. NEAL:  No objection, Your Honor.

6          THE COURT:  All right.  They are all admitted.

7          *(Defendant Exhibits 1, 2, 4, 5, 6, 7A, 7B, 9 and 14*

8          *were admitted into evidence.)*

9          THE COURT:  You'll be given one copy of the exhibits

10    for your deliberations.

11         All right.  So, the Defense rests.

12         That means you've heard all the evidence and it's

13    time for closing argument.  And they are arguments.  They are

14    not evidence.  The goal is to try to convince you of the

15    respective positions.

16         Ultimately, you collectively are the finders of fact.

17         You may begin.

18         And two housekeeping matters.  One is we're going to

19    give you menus so you can eat your lunch in here.  We will do

20    that after the closing arguments.  And then I will give the

21    instructions.  And after the instructions, we are going to

22    eliminate two jurors, just from the jury, not from the -- okay.

23         *(Off the record.)*

24         *(Closing Arguments were not transcribed,)*

25                    *          *          *

STATE OF MICHIGAN )
                 ) ss.
COUNTY OF WAYNE  )

I, Denise A. Mosby, Federal Official Court Reporter, do
certify that the foregoing is a correct transcript from the
record of proceedings in the above matter.


                         s/ Denise A. Mosby
                         _____
                         DENISE A. MOSBY, CSR, RMR, CRR
                         United States Court Reporter
                         124 Theodore Levin U.S. Courthouse
                         231 W. Lafayette Boulevard
                         Detroit, MI 48226
                         Denise_Mosby@mied.uscourts.gov

Dated:   September 12, 2014

US v Vinod Patel #11-CR-20468-36